1       **IN THE UNITED STATES DISTRICT COURT**
                         **FOR**
2              **THE MIDDLE DISTRICT OF ALABAMA**

3

4

5

6    THE UNITED STATES
        OF AMERICA
7                                    CRIMINAL ACTION NO.
            vs.                      2:07-CR-165-MHT
8
     ANDREAS JEJUAN SMITH
9

10

11

12

13                      VOLUME II OF VII
                         1ST DAY OF:
14                  JURY TRIAL PROCEEDINGS

15

16

17               *  *  *  *  *  *  *  *  *  *

18

19

20   HEARD BEFORE:        The Hon. Myron H. Thompson

21   HEARD AT:            Montgomery, Alabama

22   HEARD ON:            March 19, 2008

23   APPEARANCES:         Jerusha Adams, Esq.
                          Tommie Brown-Hardwick Esq.
24                        Kevin Butler, Esq.
                          Aylia McKee, Esq.
25                        Danielle Mason, Esq.

# T A B L E   O F   C O N T E N T S

**ITEM DESCRIPTION**                                    **PAGE NO.**


Table of Contents ...........................    1

Title Page ..................................    2

Preliminary Jury Charge
        by the Court ........................    5

Opening Statements
        by Ms. Adams ........................    9

Opening Statements
        by Ms. McKee ........................   15

Annette Gurley - Direct Examination
        by Ms. Hardwick .....................   25

Annette Gurley - Cross Examination
        by Mr. Butler .......................   58

Annette Gurley - Redirect Examination
        by Ms. Hardwick .....................  114

Annette Gurley - Recross Examination
        by Mr. Butler .......................  122

Annette Gurley - Further Redirect Examination
        by Ms. Hardwick .....................  123




Court Reporter's Certificate ................  128


                        -o0o-

| | |
|---|---|
| 1 | WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE HON. |
| 2 | MYRON H. THOMPSON ON MARCH 19, 2008 AT THE UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA: |
| 3 | |
| 4 | THE COURT:  Now at this time, as I said, this is the |
| 5 | jury that will try the case of *United States of America vs.* |
| 6 | *Andreas Jejuan Smith.* |
| 7 | The clerk will swear from the jury. |
| 8 | (Whereupon, the petit jury was sworn by the courtroom |
| 9 | deputy clerk.) |
| 10 | THE COURT:  You may all be seated. |
| 11 | Now, Counsel, I know we have some preliminary matters |
| 12 | we need to take up.  I'd like to take up those later.  I'll say |
| 13 | at this time you are not to mention any of those matters in |
| 14 | your opening statements.  But we will take them up later.  So I |
| 15 | am conditionally granting the motions to the extent that the |
| 16 | matter should not be mentioned in the opening statements. |
| 17 | How long do you need for your opening statements? |
| 18 | MS. McKEE:  Your Honor, fifteen minutes for the |
| 19 | Defense. |
| 20 | THE COURT:  Fifteen minutes? |
| 21 | MS. ADAMS:  Fifteen minutes, Your Honor. |
| 22 | THE COURT:  Fifteen minutes it is for each side. |
| 23 | Please bring your witnesses in and let's swear in |
| 24 | anyone who may testify, whether they testify or not. |
| 25 | MR. BUTLER:  Your Honor, given the nature of the |

1    progress so far, many of -- all of our witnesses are not here

2    right now, so tomorrow, if Your Honor would like to swear them

3    in en masse -- --

4             THE COURT:  We can do it first thing tomorrow

5    morning.  But let's swear in everyone who will --

6             MS. ADAMS:  The majority of the witnesses are here.

7             THE COURT:  Which witnesses will you be calling this

8    afternoon, though?

9             MS. HARDWICK:  The officer is getting the witnesses,

10   Your Honor.

11            THE COURT:  Does either side desire the rule?

12            MS. ADAMS:  Yes, Your Honor.

13            THE COURT:  Okay.  All witnesses, except those who

14   are parties or representatives of parties, are excused from the

15   courtroom.

16            Bring these witnesses forward and we'll swear them in

17   because they are here.

18            (Whereupon, all prospective witnesses currently

19   present were duly sworn by the courtroom deputy clerk.)

20            THE COURT:  You are excused at this time.  Please go

21   to the witness room.

22            (Whereupon, said prospective witness were escorted

23   out of the courtroom.)

24            MS. ADAMS:  Your Honor?

25            THE COURT:  Yes, ma'am?

1          MS. ADAMS:  Your Honor, may we discuss how long we

2     may proceed today so that possibly I could let --

3          THE COURT:  We plan on going until five o'clock.

4          MS. ADAMS:  Okay.  Thank you.

5                    PRELIMINARY JURY CHARGE:

6          Members of the jury, you have been sworn as the

7     jury to try this case.  By your verdict you will decide

8     disputed issues of fact.  I will decide all questions of law

9     that arise during the trial, and before you retire to

10    deliberate at the close of the case I will instruct you on the

11    rules of law that you must follow and apply in reaching your

12    decision in this case.

13         Now because you will be called upon to decide the

14    facts of the case, you should give careful attention to the

15    testimony and evidence presented for your consideration during

16    the trial, but you should keep an open mind and should not

17    state or form any opinion about the case one way or the other

18    until you have heard all of the evidence in the case, and until

19    you've had the benefit of the closing arguments of the

20    attorneys as well as my instructions on the law.

21         Now during the trial you must not discuss the case

22    in any manner among yourselves or with anyone else.  Nor should

23    you permit anyone to discuss the case in your presence.

24         And insofar as the attorneys are concerned, as well

25    as others whom you may come to recognize as having some

1    connection with this case, in order to avoid even the

2    appearance of impropriety you should have no connection or

3    contact with these persons while you are serving on this jury.

4    So, for example, you may see some of the lawyers down in the

5    cafeteria.  You will notice that the lawyers will do something

6    that we in the south don't normally do, that is not say hello.

7    They will, in other words, not show you southern hospitality.

8    And the reason for that is they are instructed not to say

9    anything to you so that there is not even a hint that something

10   improper may be said.

11        So the reasons for these cautions lie in the fact

12   that it will be your duty to decide this case only on the basis

13   of the testimony and evidence presented during the trial

14   without consideration of any other matters whatsoever.

15        Now a question sometimes arises as to whether

16   individual members of the jury will be permitted to take notes

17   during the trial.  If you would like to take notes you may do

18   so; on the other hand, you are not required to take notes if

19   you do not want to.  That is left up to you individually.  And

20   at this time I'm going to ask the clerk of the court to hand

21   out pads and pencils.

22        Now I believe you all -- Does anyone not have a pad

23   or a pencil?

24        I'm going to ask that you put your names on your

25   pads.  Even if you take no notes at all, we want to make sure

1    that you get your pad back and you don't get someone else's

2    pad.  Also, during any breaks during the trial, please make

3    sure you turn your pads over in your chair so that we can't see

4    even if you've written nothing.  It's none of our business

5    whether you take notes or whether you don't take notes.  But if

6    you do decide to take notes, be careful not to get so involved

7    in note-taking that you become distracted from the ongoing

8    proceedings.

9           Also, your notes should be used only as aids to your

10   memory.  And if your memory should later differ from your

11   notes, you should rely upon your memory and not necessarily

12   your notes.  If you do not take notes, you should rely upon

13   your own independent recollection or memory as to what the

14   testimony was, and you should not be unduly influenced by the

15   notes of other jurors.  Notes are not entitled to any greater

16   weight than the recollection or impression of each juror as to

17   what the testimony was.

18          Now from time to time during the trial I may be

19   called upon to make rulings of law on objections or motions

20   made by the attorneys.  You should not infer or conclude from

21   any ruling I may make, or any other statement that I may make,

22   that I have any opinion on the merits of this case favoring one

23   side or the other.  And if I should sustain an objection to a

24   question that goes unanswered by a witness, you should not

25   speculate as to what the answer might have been if given, nor

1  should you draw any inferences or conclusions from the

2  unanswered question itself.

3  Now during the trial it may be necessary for me to

4  confer with the attorneys from time to time out of your hearing

5  concerning questions of law or procedure that require

6  consideration by the Court alone.  On some occasions you may

7  even be excused from the courtroom for this purpose.  Now I

8  will try to limit these interruptions as much as possible, but

9  I ask that you remember at all times the importance of the

10  matter that you are here to decide, and I further ask that you

11  be patient, even though the case may seem to go slowly at

12  times.

13  Now we will begin by affording the attorneys for each

14  side an opportunity to make opening statements to you in which

15  they may explain the issues in the case, and summarize the

16  facts that they expect the evidence will show.  Now after all

17  of the testimony and evidence has been presented, the attorneys

18  will then be given another opportunity to address you at the

19  end of the trial and make their summations or final arguments

20  in the case.

21  Now the statements that the attorneys make now, as

22  well as the arguments that they present at the end of the

23  trial, are not to be considered by you as evidence, which will

24  come only from witnesses and exhibits, or as your instructions

25  on the law, which will come only from me.  Nevertheless, these

1    statements and arguments are intended to help you understand

2    the issues and the evidence as it comes in, as well as the

3    positions taken by both sides.

4              Now at this time I'm going to ask that you give your

5    close attention to the attorneys as they make their opening

6    statements.

7              Now who will open for the Government?

8              MS. ADAMS:  I will, Your Honor.

9              THE COURT:  Ms. Adams.  Proceed.

10                            OPENING STATEMENTS:

11             MS. ADAMS:  May it please the Court?  Counsel?

12             Members of the jury, I am Jerusha Adams, Assistant

13   United States' Attorney prosecuting this case as I introduced

14   myself before.  And with me today is Ms. Tommy Brown-Hardwick,

15   another Assistant United States Attorney who is prosecuting

16   this case.  Our job today, and during this trial, would be to

17   present the evidence against the defendant in this case, Mr.

18   Andreas Jejuan Smith.  Which leads you to conclude that he is

19   guilty of all four counts of the indictment.

20             You are here today because the defendant robbed

21   Compass Bank located at Thirty-four eighty Eastern Boulevard on

22   June twenty-second, two thousand and seven.  Then, when the

23   deputy United States marshals attempted to arrest him for bank

24   robbery one, he shot at the officers.  This case is about

25   finding a violent criminal guilty of violence.  Nothing more.

1          Now I'm just going to briefly discuss the four counts

2    of the indictment again.

3          Count one, is bank robbery of Compass Bank on June

4    twenty-second, two thousand and seven.

5          Count two is forcible assault of a federal officer

6    occurring on July twentieth, two thousand and seven.  Federal

7    officers in this case would be the deputy United States

8    marshals who are trying to affect an arrest warrant for Mr.

9    Smith.

10          Count three is for use and carrying a firearm during

11   and in relation to a crime of violence.  That relates back to

12   shooting at the deputy United States marshal on July twentieth,

13   two thousand and seven.

14          And then the last count, the fourth count, is for

15   after having been convicted of a felony, possessing a firearm.

16   That count, again, relates back to shooting at the deputy

17   United States marshals on July twentieth, two thousand and

18   seven.

19          Those are the four counts against the defendant in

20   this case.

21          Now the United States has a burden of proving to you

22   those four counts beyond a reasonable doubt.  That's our burden

23   of proof.  We accept that burden, we embrace that burden, and

24   we will satisfy that burden.  How will we satisfy that burden?

25   By presenting evidence to you.

1    Now you will hear from the judge at the end of the

2  trial, he'll instruct you on the law, and he will tell you that

3  there are two forms of evidence.  There is direct evidence and

4  there is circumstantial evidence.  Direct evidence is when you

5  have a person that testifies to an actual knowledge of the

6  fact, like an eyewitness.  And then there is circumstantial

7  evidence which are facts by a chain tending to prove a fact.

8    We will present to you direct and circumstantial

9  evidence.  We anticipate that the evidence in this case will

10  show that the defendant is guilty of all four counts of the

11  indictment.

12    Now that I've discussed the counts with you, I'll

13  discussed the different forms of evidence.  I want you to

14  really understand this case.  We went through a list of

15  witnesses that we possibility will call, and there was quite a

16  list.

17    We're going to bring quite a few witnesses to you in

18  order to satisfy our burden.  But most importantly, you need to

19  understand three -- I had to make sure I had the right fingers

20  up -- three very important people in this case.  These three

21  people were just in the midst of doing their every day job.

22  These three people are the victims in this case.  They were

23  simply working, doing what they're supposed to do every day

24  when they were placed into a violent situation.  A violent

25  situation created by the defendant.

1              The first person, the first victim in this case is

2    Annette Gurley or Annette Nichols.  We expect the evidence to

3    show that Ms. Gurley was a victim teller at Compass Bank.  She

4    was working at Compass Bank on June twenty-second, two thousand

5    and seven, and around ten o'clock, ten-fifteen we expect the

6    evidence to show that a young black male wearing dark jeans,

7    long sleeve white shirt with a black T-shirt over it and a

8    black apron, the white hat and a bandage on the left side of

9    his neck exited from the passenger's side of a black Chrysler

10   Sebring.

11             We expect the evidence to show that that person that

12   entered the bank handed Ms. Gurley a note that said, "This is a

13   robbery," and then demanded money.  That person also said, "I

14   have a gun," and had his hand in his pocket.

15             Ms. Gurley then opened up her cash drawer.  That

16   person then leaned on the counter, reached and took the money

17   from the cash drawer and then said, "Where's the rest of the

18   money?"  We expect the evidence to show that Ms. Gurley then

19   opened the vault.  That person then leaned on the counter to

20   the extent that their feet are literally up off the floor and

21   continued to take money from the vault.

22             Once that person took the money from the vault, then

23   they said, "Where's the rest of the money?"

24             Ms. Gurley said, "All I have left is change."  That

25   person then went, exited the bank and ran out of the bank.  We

1    expect the evidence to show that that person, that bank robber,

2    was the defendant, Andreas Smith.  Police conducted an

3    investigation, identified the vehicle, matched the vehicle to

4    Mr. Smith and an arrest warrant was obtained.

5            That leads us to our next two victims.  We have

6    Deputy United States Marshal John C. Hamilton, and Task Force

7    Officer Duane Richardson, who also works in the Department of

8    Corrections.  Those individuals received their arrest warrants

9    and they tried to effectuate an arrest on the defendant.  Now

10   they are members of what is called of the Gulf Coast Regional

11   Task Force.  It's their job to go out, receive warrants, locate

12   and identify fugitives.  People who are wanted.  So they're in

13   the midst of doing their job.  They have investigated the

14   defendant, and it leads them to twenty-eight sixty-one Jan

15   Drive.

16           On July twentieth, two thousand and seven around

17   eleven o'clock they decide they're going to try and knock on

18   that door of that residence, try to find out some further

19   information and try to locate the defendant.  We expect the

20   evidence will show that Deputy United States Marshal Hamilton,

21   and Task Force Officer *Richardson*, were at the front door of

22   Twenty-eight sixty-one Jan Drive.  They knocked on the door,

23   and what happened is that the defendant answered the door.

24   Deputy United States Marshal Hamilton then said, since he

25   quickly identified the defendant because they had pictures, so

1    he said, "Andreas Jejuan Smith, we have an arrest warrant for

2    you.  We're the police.  Please step outside."

3            We expect evidence to show that Mr. Smith then

4    slammed the door on the marshals.  They attempted to kick the

5    door down.  After a few attempts they were successful and then

6    shots were fired in their direction from inside of the

7    residence.

8            Now in this case, the deputy United States marshals

9    did not return fire.  What they did was they entered the

10   residence from the rear.  And we expect that the evidence will

11   show that Deputy United States Marshal Hamilton will testify

12   that he saw the defendant holding a handgun in his hands and

13   running from the front of the residence to the rear.  That is

14   what we expect the evidence to show.

15           Now in relation to a prior conviction, we plan to

16   present that information to you.  He has a prior conviction of

17   a felony and, therefore, it's unlawful for him to possess

18   firearms.

19           Ladies and gentlemen of the jury, all we ask is that

20   you simply listen closely to the evidence, consider it and then

21   decide on the four counts charged against the defendant.

22           We expect that the evidence that we present to you

23   will show and establish that the defendant is guilty of robbing

24   Compass Bank on June twenty-second, two thousand and seven,

25   that he's guilty of shooting at the deputy United States

1    marshal on July twentieth, two thousand and seven when they

2    tried to arrest him, that he used a firearm during and in

3    relation to a crime of violence and that he is a convicted

4    felon and possessed that.

5            At the end of this case we'll be able to get up and

6    talk to you again.  At that time we will ask you to deliberate

7    and return a verdict.  At that time we will ask you to return a

8    verdict, the only verdict that the evidence in this case

9    supports, a verdict that the defendant is guilty of all counts.

10           Thank you.

11                         OPENING STATEMENTS:

12           THE COURT:  This is Ms. McKee?

13           MS. McKEE:  Yes, Your Honor.

14           May it please the Court?

15           THE COURT:  Yes.

16           MS. McKEE:  Ladies and gentlemen of the jury, Andreas

17   Smith did not commit this robbery.  Andreas Smith did not shoot

18   at anyone.  Andreas Smith did not possess a gun.  In fact,

19   Andreas Smith didn't do any of the things alleged in the

20   Government's indictment against him.  In fact, this indictment

21   is just what it looks like, pieces of paper.  It's not

22   evidence.  It doesn't prove a thing.

23           Now what this does do for us during this trial is

24   it's a roadmap for the Government.  It sets out each and every

25   single element that they are going to have to prove to you

1   during this trial.  To attempt to prove this to you they're

2   going to present you with evidence -- or present evidence to

3   you.  Excuse me.  And that evidence is only going to come from

4   one place, and it's going to be here, the witness stand.

5   Ladies and gentlemen, you will not hear evidence of every

6   element of the Government's case come from this witness stand.

7   And when the Government cannot prove their case beyond a

8   reasonable doubt, you must find Andreas Smith not guilty.

9           Now right now Mr. Andreas Smith, as he sits before

10  you, he sits here completely innocent.  This will remain true

11  throughout this entire trial, that Andreas Smith is completely

12  innocent of everything that the Government has alleged against

13  him today.

14          Now as Ms. Adams explained to you, this is a bit of a

15  complicated case.  It involves two separate events, a robbery

16  that took place on June twenty-second, two thousand seven; the

17  second event, a shooting that took place on July twentieth, two

18  thousand seven.  Now it's going to be very important that you

19  keep those two things separate, because the Government is going

20  to have to prove each element for both the robbery as well as

21  the shooting.

22          Ladies and gentlemen, Ms. Adams in her opening said

23  that she wanted you to understand three important people in

24  this case.  That was Annette Gurley, the teller at Compass

25  Bank, Marshal Hamilton and Task Force Officer Williams.  Those

1    individuals, Ms. Gurley was the victim of a robbery.  The

2    officers were victims of a shooting.  But today you will learn

3    that there is another victim in this case, and that victim is

4    Andreas Smith.

5            About a month before Mr. Smith was born, his father,

6    Glenn Teague, you're going to find out throughout this trial

7    that in nineteen eighty Mr. Teague was convicted and imprisoned

8    to a four year sentence for robbery.  Because of some

9    complications, he wasn't actually paroled from that sentenced

10   until two thousand six.  While still on parole -- Excuse me.

11   Actually, when he got out on parole and the robbery took place

12   on June twenty-second, two thousand seven, Mr. Glenn Teague was

13   still on parole for that robbery offense.

14           Now Mr. Teague was in prison for almost twenty-four

15   years.  And if you remember I said Mr. Teague went to prison

16   about a month before his son, Mr. Smith, was born.  So for the

17   first twenty-four years of Mr. Smith's life he never received a

18   letter from his father, a card, not even a birthday present.

19   Mr. Smith doesn't know anything, doesn't know much at all about

20   his father.

21           In fact, any communication that Mr. Smith did have

22   with his father when Mr. Teague was in prison was because Mr.

23   Smith himself as a child, desiring a relationship with his

24   father, attempted to reach out, but he got no response because

25   Mr. Teague wasn't interested in his son.  He didn't care that

1    he had a child on the outside that was interested in a

2    relationship with him.

3         But things changed when Mr. Teague got out of prison.

4    All of a sudden Mr. Teague himself, about one month before the

5    robbery of Compass Bank on June twenty-second, two thousand

6    seven, Mr. Teague, a man that had not spoken, essentially, to

7    his son in over twenty-four years, decides to start calling

8    him.  All of a sudden now he wants a relationship with his son,

9    Mr. Smith.

10        One of the things that Mr. Teague wanted specifically

11   with Mr. Smith was for Mr. Smith to go with him on a trip, a

12   trip to Florida.  And you'll hear about that trip in just a

13   moment later.  Let me just tell you about it now.  It's a trip

14   that took place on June twenty-second, two thousand seven, the

15   same day as the robbery of Compass Bank.  Mr. Teague kept

16   calling Mr. Smith urging him, "You gotta be ready," wanted to

17   make sure that Mr. Smith was going to be ready on June

18   twenty-second, two thousand seven, that morning to leave

19   Alabama and travel into the state of Florida.

20        Mr. Smith, never having a relationship with his

21   father, was interested.  He wanted to see what his father had

22   to offer to him as far as a relationship with him, because, you

23   see, when Mr. Teague was in prison and he got out, he began to

24   explain to Mr. Smith how he had changed.  How he had learned

25   and began to practice the Muslim religion.  And by that, he

```
 1   wasn't engaging in the same type of behaviors any more and
 2   essentially could be a good friend and father to Mr. Smith.
 3          But what you'll learn is on June twenty-second, two
 4   thousand seven, the day of the robbery at Compass Bank, when
 5   Mr. Smith gets in the car with his father, on their way to
 6   Florida Mr. Smith begins to notice something really strange.
 7   He begins to notice a lot of money that his father had in his
 8   possession.  Now Mr. Smith is no fool.  So he became a bit
 9   curious because he had never known his father in the
10   twenty-four years that he had been living at this point to have
11   any money like that.  Never any information from his own mother
12   that Mr. Teague, his father, ever was able to get his hands on
13   money like that.
14          When Mr. Smith began to ask his father about that
15   money, Mr. Teague told him, "Mind your business."  That's what
16   he told his son.  "Mind your business."  However, when they
17   made it to Florida, Mr. Smith quickly learned a lot of the
18   things that his father had been speaking to him up to this
19   point were still lies, because he saw his father in Florida
20   engaging in activities that an individual he felt like based on
21   what his father had told him of his practice of the Muslim
22   religion he would not engage in.
23          Things like drugs.  Women.  Alcohol.  And
24   specifically pork, being one of those things.  All of these
25   things were contrary to what Mr. Teague, Mr. Smith's father,
```

had been telling him.  During an argument over this, when Mr.
Smith asked his father basically, "What is going on?  I thought
you said you changed, Dad."  In the midst of one of these
arguments, in that moment Mr. Teague made several harsh
comments to Mr. Smith in relation to his relationship as a
father to him.  And one of those things was the question that
Mr. Smith had been asking about on the way to Florida, was
where the money had come from.  And Mr. Teague told him in the
heated bits of those arguments between him and his son, "I
robbed that bank and I'm not going back to prison."

The next thing Mr. Smith knew after being told by his
father that he was the one who robbed the bank and he was not
going back to prison, Mr. Smith woke up in Florida alone on the
side of the road naked with multiple scratches and dirt all
over every crevice of his body.  He was laying in the bushes
disoriented and moaning with absolutely no memory of what had
taken place with him over the past few days.

In fact, a sanitation worker out there picking up
trash is actually the individual who found Mr. Smith.  Due to
Mr. Smith's condition, Mr. Smith had to rely on his family back
here in Montgomery, Alabama, to get him back home.  Where was
the man who drove him to Florida?  Where was his father that
took him from Alabama, his home, to Florida?  You see, after
that argument, Mr. Teague left, and he left Mr. Smith in
Florida by himself.

1    The next thing Mr. Smith knew when he got back to

2  Montgomery, he heard the United States marshals were looking

3  for him and didn't understand why.  He didn't know why.  He

4  heard some law enforcement agency was looking for him.  What

5  Mr. Smith did not know is that in some way the police had

6  connected Mr. Teague to this robbery of Compass Bank on June

7  twenty-second, two thousand seven.  But instead of being an

8  honorable father, something he had not been for the entire life

9  of Mr. Smith, when Mr. Teague was questioned about that bank

10  robbery he immediately pointed the finger at Mr. Smith.  And

11  the evidence will strongly support that Mr. Smith did not

12  commit this robbery.

13    What the evidence will show you is that Mr. Teague,

14  or someone, committed this robbery.  But Mr. Andreas Smith did

15  not commit robbery against Compass Bank on June twenty-second,

16  two thousand seven.  In fact, you're going to hear from a

17  witness during this trial that's going to tell you that she's

18  Mr. Andreas's sister -- excuse me, Mr. Smith's sister.  And on

19  June twenty-second, two thousand seven, the date that they

20  heard that Compass Bank was robbed, Mr. Smith was actually at

21  her house because, you see, they had a little deal worked out,

22  that because she had to go to work at the time, being her

23  brother Mr. Smith would go to her house and watch her four year

24  old son, his nephew.  And that's exactly what Mr. Smith was

25  doing the morning of June twenty-second, two thousand seven.

1    But you know who wasn't at work?  And who wasn't at

2    home?  Mr. Teague.  Because, you see, Mr. Teague had a job.

3    You're going to hear from Mr. Teague's boss.  He's going to

4    come and take the stand and tell you that Mr. Teague called,

5    said he wasn't coming to work on Friday.  And just so you know,

6    June twenty-second, two thousand seven was a Friday in the two

7    thousand seven calendar year.  He wasn't coming to work Friday

8    because he was going on a trip to Florida.  And he never showed

9    up to work that particular Friday.  On June twenty-second, two

10   thousand seven Mr. Teague stuck to his plan.

11    Now Ms. Adams explained that Annette Gurley was the

12   teller at Compass Bank.  But I want you to listen very closely

13   to what Miss Gurley has to say when she takes the stand.

14   Because what you're going to hear her say is that right after

15   the robbery on June twenty-second, two thousand seven when the

16   police responded to Compass Bank, when they asked her about

17   what had happened and asked her what this person looked like,

18   they asked her a very specific question:  "Would you be able to

19   identify this person again if you saw him?"  And she told them,

20   "I don't know.  I think, I think I could."  Now that's within

21   thirty minutes of allegedly seeing this person.

22    Four days later after the robbery, Miss Gurley

23   identified an individual.  She's eating at a Hooters

24   Restaurant.  You're going to hear that while she's eating at

25   the restaurant she sees a cook in the back because Hooters has

1    these type restaurants, it's a very large window where you can

2    actually see into the kitchen.  So if a cook is back there

3    cooking, as a customer you can clearly see who is back there

4    working.

5              While she was inside in Hooters she sees an

6    individual that's a cook, and it piques her interest so she

7    watches him.  And she calls her boss at Compass Bank and says,

8    "That's the man who robbed Compass Bank.  He's at Hooters."  So

9    what did her boss do?  He called the police.

10             You're going to hear from the stand that Miss Gurley

11   is going to have to admit she chose and she said, "He is the

12   robber" because of three things, his height, his appearance.

13   But the main thing that got her as she watched him and watched

14   him in Hooters was his body language.  And she said, "That was

15   the body language of the suspect that came and robbed Compass

16   Bank."

17             Ladies and gentlemen, Andreas Smith does not work at

18   Hooters.  The individual that she identified was not Andreas

19   Smith.  It was not until after the police had talked to Glenn

20   Teague, Mr. Smith's father, not until after Glenn Teague

21   pointed that first finger at Andreas Smith that then Annette

22   Gurley, Miss Gurley said she joined in and then she also

23   pointed the finger at Mr. Smith.

24             COURTROOM DEPUTY CLERK:  Miss McKee, it's time.

25             THE COURT:  How much time?  How much time do you

1    need?

2              MS. McKEE:  Your Honor, I can speed it up and get it

3    done in another five minutes, Your Honor.

4              THE COURT:  I'll give you two minutes.

5              MS. McKEE:  Yes, sir.

6              THE COURT:  You can relate what the evidence will

7    show.  Argument comes later.

8              MS. McKEE:  Yes, Your Honor.

9              Ladies and gentlemen, one of the individuals,

10   Detective Hill regarding the robbery, you're going to learn

11   that when he saw Mr. Teague, he saw him and he said he fit the

12   description of the robber.  And the car, Mr. Teague's vehicle,

13   fit the description of the get-away car.

14             Now with regard to the shooting on June twentieth,

15   two thousand seven, what you're going to learn is that there

16   were only three people in that house.  Mr. Smith and two other

17   individuals.  And that it was those individuals who actually

18   shot at the law enforcement officers, not Andreas Smith.

19   Andreas Smith never shot at anybody.  Never possessed a gun.

20             The reason those individuals shot the law enforcement

21   officers that day on June twentieth, two thousand seven, is

22   because inside that residence, when they heard the knock at the

23   door, they knew right then they had guns and drugs all over

24   that house.  And it was for that reason they felt, whether it

25   was a robber or someone they knew that hadn't called over to

```
1    the house, was trying to get in that residence.  And these

2    individuals protected their property.  Their guns and their

3    drugs.

4           Ladies and gentlemen the Government will not be able

5    to prove every element of their case to you today.  And after

6    you hear the evidence in this case we will ask you to find Mr.

7    Smith not guilty, because Mr. Smith is not guilty.

8           Thank you.

9           THE COURT:  First witness.

10          MS. HARDWICK:  The Government calls Annette Gurley.

11                    A N N E T T E    G U R L E Y,

12      the witness herein, having first been duly sworn or

13   affirmed to tell the truth, was examined and testified as

14   follows:

15                    DIRECT EXAMINATION

16            BY MS. HARDWICK OF ANNETTE GURLEY:

17          MS. HARDWICK:  May I proceed, Your Honor?

18          THE COURT:  Yes.

19   Q.  Would you state your full name and your employment, please.

20   A.  Annette Gurley.  Compass Bank.

21   Q.  And where is the Compass Bank located that you are

22   employed?  What is the address?

23   A.  One-fifty Dexter Avenue right now.

24   Q.  On June twenty-second, two thousand and seven were you

25   working for Compass Bank?
```

1    A.   Yes, ma'am.

2    Q.   Which location were you working?

3    A.   The one at Eastern Boulevard in Executive Park.

4    Q.   Was that Thirty-four eighty Eastern Boulevard?

5    A.   Yes, ma'am.

6    Q.   Miss Gurley, on June twenty-second, two thousand and seven

7    what was your last name?

8    A.   Nichols.

9    Q.   And for the record would you spell your last name on June

10   twenty-second, two thousand and seven.

11   A.   N-i-c-h-o-l-s.

12   Q.   And your last name today is what?

13   A.   Gurley.

14   Q.   And would you spell your last name for the record, please.

15   A.   G-u-r-l-e-y.

16   Q.   Miss Gurley, I'd like to direct your attention back to June

17   twenty-second, two thousand and seven and ask you what position

18   were you working at the bank at Compass Bank?

19   A.   I was the teller.

20   Q.   Did you have any other duties and responsibilities?

21   A.   Yes, ma'am.

22   Q.   What other duties did you have?

23   A.   I had to -- Well, all the duties of the teller.  I had the

24   vault.  I did reports and stuff.

25   Q.   On June twenty-second was Compass Bank equipped with any

1    video cameras?

2    A.   Yes, ma'am.

3    Q.   And can you tell us how many cameras that Compass Bank

4    has?

5    A.   There were three in the lobby.

6    Q.   Whose responsibility is it each day to assure that those

7    cameras are operating properly?

8    A.   It was my responsibility.

9    Q.   On June twenty-second particularly in two thousand and

10   seven, did you check those cameras?

11   A.   Yes, ma'am.

12        MS. HARDWICK:   Your Honor, may I approach the witness

13   with several exhibits?

14        THE COURT:   Yes.

15        MS. HARDWICK:   And to expedite it, may I remain

16   beside the witness?

17        THE COURT:   Go ahead.

18        MS. HARDWICK:   Thank you.

19   Q.   Miss Gurley, I'm going to hand you what has been previously

20   marked as Government's exhibit number four.  Do you recognize

21   Government's exhibit number four?

22   A.   Yes, ma'am.

23   Q.   Can you tell the ladies and gentlemen of the jury what it

24   is?

25   A.   This is the video that was taken from the cameras at

1    Compass Bank on June twenty-second.

2    Q.  And have you had an opportunity to review Government's

3    exhibit four?

4    A.  Yes, ma'am.

5    Q.  And is that the same -- Did it accurately record the events

6    on June twenty-second, two thousand and seven?

7    A.  Yes, ma'am.

8         MS. HARDWICK:  We'd offer Government's exhibit four

9    that's previously been tendered to defense counsel.

10        MR. BUTLER:  Your Honor --

11        THE COURT:  Yes?

12        MR. BUTLER:  Could I ask -- lay a few foundational

13   questions for the witness?

14        THE COURT:  You would like to ask a question?

15        MR. BUTLER:  Yes.

16        THE COURT:  Go ahead.  I'll allow that.

17        MR. BUTLER:  After the events on June twenty-second,

18   two thousand and seven were you the individual who retrieved

19   the videotaped images of what occurred that day?

20        THE WITNESS:  No, sir.

21        MR. BUTLER:  Do you know who that person was?

22        THE WITNESS:  Corporate security in Birmingham.

23        MR. BUTLER:  Okay.  So though you had the

24   responsibility of maintaining the videotape, you're not the

25   person who actually retrieved the videotape after the events

1    took place that day.

2            THE WITNESS:  No, sir.

3            MR. BUTLER:  Your Honor, may I speak with Government

4    counsel?

5            THE COURT:  Yes.

6            (Whereupon, Mr. Butler conferred with Ms. Hardwick

7    off the record and out of the hearing of the other courtroom

8    participants.)

9            MR. BUTLER:  Your Honor, I'm not going to object.

10            THE COURT:  Okay.  Admitted.

11   Q.  Miss Gurley, I'm handing you Government's exhibit one.  Do

12   you recognize Government's exhibit one?

13   A.  Yes, ma'am.

14   Q.  Can you tell us what it is, please?

15   A.  This is the front of the building where I work, Thirty-four

16   eighty.

17   Q.  When you say "the building," what, specifically, are you

18   referring to?

19   A.  Compass Bank.

20   Q.  And what address is Government's exhibit one?

21   A.  Thirty-four eighty Eastern Boulevard.

22   Q.  Does Government's exhibit one accurately depict Compass

23   Bank as it appeared on June twenty-second, two thousand and

24   seven?

25   A.  Yes, ma'am.

1            MS. HARDWICK:  We'd offer Government's exhibit one.

2            MR. BUTLER:  No objection.

3            THE COURT:  It's admitted.

4   Q.  I'm handing up Government's exhibit number two.  Can you

5   tell us what that is?

6   A.  This is the teller station where I worked.  Teller station

7   one and teller station two.

8   Q.  When you say "teller station," were you referring to

9   Compass Bank?

10  A.  Compass Bank, Thirty-four eighty Eastern Boulevard.

11  Q.  And does Government's exhibit two accurately depict the

12  lobby area of Compass Bank as it appeared on June

13  twenty-second, two thousand and seven?

14  A.  Yes, ma'am.

15            MS. HARDWICK:  We'd offer Government's exhibit two.

16            MR. BUTLER:  No objection.

17            THE COURT:  Admitted.

18  Q.  Ms. Gurley, you previously testified regarding setting up

19  and operating a camera or cameras for the bank, is that

20  correct?

21  A.  Yes, ma'am.

22  Q.  I'm going to hand you Government's exhibit number three and

23  ask if you can identify it for us, please.

24  A.  This is the daily verification of video cameras for Compass

25  Bank in Montgomery main where I worked at Thirty-four eighty

1    Eastern Boulevard.  And this is where I checked all three

2    cameras and signed that I have verified that they're working

3    okay.

4    Q.  On June twenty-second -- On Government's exhibit three,

5    does June twenty-second, two thousand and seven appear as a

6    date that you checked the three cameras and signed the

7    verification form?

8    A.  Yes, ma'am.

9    Q.  And does Government's exhibit three accurately reflect a

10   copy of the form that is originally on file at the bank?

11   A.  Yes, ma'am.

12           MS. HARDWICK:  We'd offer Government's exhibit three.

13           MR. BUTLER:  No objection.

14           THE COURT:  Admitted.

15   Q.  I'm going to hand you Government's exhibit five.  Do you

16   recognize Government's exhibit five?

17   A.  Yes, ma'am.

18   Q.  And what is it, please?

19   A.  This is my teller window where I worked at Thirty-four

20   eighty, Eastern Boulevard.

21   Q.  And does Government's exhibit five reflect the counter that

22   you were working at Compass Bank on June twenty-second, two

23   thousand seven?

24   A.  Yes, ma'am.

25           MS. HARDWICK:  We'd offer Government's exhibit five.

```
 1              MR. BUTLER:  No objection.

 2              THE COURT:  Admitted.

 3   Q.  Miss Gurley, I'm handing you Government's exhibit six.  Do

 4   you recognize that photograph?

 5   A.  Yes, ma'am.  That's behind the counter where I worked.

 6   That was my work station.

 7   Q.  And on June twenty-second, two thousand and seven does

 8   Government's exhibit six accurately reflect the workspace that

 9   you had on that date?

10   A.  Yes, ma'am.

11              MR. BUTLER:  No objection.

12              THE COURT:  Admitted.

13              MS. HARDWICK:  And that is Government's exhibit six,

14   Your Honor, that he's just agreed to.

15              THE COURT:  Yes.

16   Q.  I'm handing you Government's exhibit seven.  Can you tell

17   us what that is?

18   A.  That's right at my station looking out where I transact

19   business every day.

20   Q.  And is that a door directly in front of your workspace?

21   A.  Yes, ma'am.

22   Q.  Does it accurately depict the workspace and the door

23   leaving from Compass Bank on June twenty-second, two thousand

24   and seven?

25   A.  Yes, ma'am.
```

1          MS. HARDWICK:  We'd offer Government's exhibit seven.

2          MR. BUTLER:  No objection.

3          THE COURT:  Admitted.

4   Q.  I'm going to hand you Government's exhibit eight.  Can you

5   tell us what that is?

6   A.  That's the note that the gentleman handed me on June

7   twenty-second.

8   Q.  And does Government's exhibit eight accurately reflect a

9   copy of the note that you were handed on June twenty-second,

10  two thousand and seven?

11  A.  Yes, ma'am.

12          MS. HARDWICK:  We'd offer Government's exhibit eight.

13          THE COURT:  Admitted.

14          MS. HARDWICK:  Your Honor, with permission from the

15  Court and Mr. Butler, I'd like to offer Miss Gurley a group of

16  pictures, still pictures from the video rather than do them

17  individually to expedite.

18          THE COURT:  Yes.  You mean you'd like to offer them

19  to the jury?

20          MS. HARDWICK:  To Miss Gurley.

21          THE COURT:  Yes, you may do that.

22  Q.  Miss Gurley, I'm going to hand you Government's exhibit

23  nine, ten, eleven, twelve, thirteen, fourteen, fifteen,

24  sixteen, seventeen, eighteen and nineteen at this time and ask

25  you whether or not you have had an opportunity to see

1  Government's exhibit nine through nineteen before.

2  A.  Yes, ma'am.

3  Q.  Would Government's exhibits nine through nineteen

4  accurately reflect still photographs taken from the video that

5  was recorded at Compass Bank on June twenty-second, two

6  thousand and seven?

7  A.  Yes, ma'am.

8         MS. HARDWICK:  We'd offer Government's exhibits nine

9  through nineteen.

10         MR. BUTLER:  No objection.

11         THE COURT:  Admitted.

12  Q.  Ms. Gurley, I'm going to hand you Government's exhibit

13  twenty and ask if you can identify Government's exhibit twenty.

14  A.  That's the teller counter where I worked, right near where

15  the door that I walk into.  It's the corner of the teller

16  counter.

17  Q.  And does Government's exhibit twenty accurately reflect the

18  counter and the lobby area of Compass Bank on June

19  twenty-second, two thousand and seven?

20  A.  Yes, ma'am.

21         MS. HARDWICK:  We'd offer Government's exhibit

22  twenty.

23         MR. BUTLER:  No objection.

24         THE COURT:  Admitted.

25  Q.  I'm going to hand you Government's exhibit twenty-one and

1    ask you, do you know what that is?

2    A.  Yes, ma'am.

3    Q.  And can you tell the jury what it is, please.

4    A.  This is my teller drawer after I was robbed.

5    Q.  And does Government's exhibit twenty-one accurately reflect

6    your teller drawer after you were robbed on June twenty-second,

7    two thousand and seven?

8    A.  Yes, ma'am.

9         MS. HARDWICK:  We'd offer Government's exhibit

10    twenty-one.

11         MR. BUTLER:  No objection.

12         THE COURT:  Admitted.

13    Q.  I'm handing you Government's exhibit twenty-two.  Do you

14    recognize that exhibit?

15    A.  Yes, ma'am.

16    Q.  And what is it, please?

17    A.  This is my coin vault after it was robbed.

18    Q.  And does Government's exhibit twenty-second accurately

19    reflect your coin vault after the robbery on June

20    twenty-second, two thousand and seven?

21    A.  Yes, ma'am.

22         MS. HARDWICK:  We'd offer Government's exhibit

23    twenty-two.

24         THE COURT:  Admitted.

25    Q.  Miss Gurley, I'm going to publish some things to the jury

1    and ask you some questions of exhibits that have been admitted.

2    Okay?

3    A.   Yes, ma'am.

4    Q.   Government's exhibit one, Compass Bank, is that what we're

5    talking about here today?

6    A.   Yes, ma'am.

7    Q.   Government's exhibit two.  Miss Gurley, using the screen,

8    and you may touch it and make a circle and it will appear,

9    would you show the jury which position you were operating out

10    of on June twenty-second, two thousand and seven?  That is the

11    teller window you were operating from?

12    A.   Yes, ma'am.

13    Q.   If you recall, can you use a drawing motion to show from

14    which direction the person who robbed you came as he approached

15    your window?  Did he come directly to your window?

16    A.   No, ma'am.

17    Q.   Where did he go before he came to your window?

18    A.   He came like right over in here, in this area, right in

19    there.

20    Q.   Government's exhibit three, you indicated that you signed

21    this.  Is this the log that you check each video to indicate

22    that it's working properly each day?

23    A.   Yes, ma'am.

24    Q.   And did you do that on June twenty-second?

25    A.   Yes, ma'am.

1    Q.  Were there cameras operating properly?

2    A.  Yes, ma'am.

3           MS. HARDWICK:  Your Honor, at this time, with

4    permission of the Court, the Government would like to play the

5    Government's exhibit that has been previously admitted.

6           THE COURT:  You may do so.  Are you ready to play it?

7           MS. HARDWICK:  Yes, sir, Your Honor.

8           (Whereupon, said videotape was played before the

9    Court and jury.)

10          THE COURT:  Is it as small on the jurors' screen as

11   it is on mine?  There is no way you can make it bigger?  It's

12   hard to see.  It's so tiny.

13          MS. ADAMS:  No, Your Honor, unfortunately we can't.

14   The program that the bank actually has with their surveillance

15   camera only allows this image.

16          THE COURT:  Okay.  So it's going to be that tiny?

17          MS. ADAMS:  Yes, Your Honor.

18          THE COURT:  Okay.  Go ahead, then.

19          (Whereupon, said video recording continued to be

20   played before the Court and jury.)

21          THE COURT:  Now there's a person in the photograph.

22   Is that supposed to be the person who is alleged to have done

23   anything?

24          MS. HARDWICK:  No, Your Honor.  This is an overview

25   of the total three cameras operating.  We will narrow it to the

```
 1    main camera which will record and show just what happened in
 2    the front of her window.
 3              THE COURT:  Okay.  So this person on the window is
 4    not necessarily the person who has robbed the bank?
 5              MS. HARDWICK:  That is correct, Your Honor.
 6              THE COURT:  Okay.
 7              (Whereupon, said video recording continued to be
 8    played before the Court and jury.)
 9              THE COURT:  How long does this last?
10              MS. HARDWICK:  Your Honor, it's just a couple of
11    minutes.  And the actual robbery is even shorter.
12              THE COURT:  Pardon me?
13              MS. HARDWICK:  The actual robbery is even shorter,
14    with the main camera focusing on the robbery.
15    Q.  Ms. Gurley, do you see the photograph that is depicted
16    before you now?
17    A.  Yes, ma'am.
18    Q.  And can you tell the ladies and gentlemen of the jury who
19    is depicted in the person that is depicted in the still
20    image?
21    A.  That's the guy that robbed me.
22    Q.  And at that point, can you tell the Court where he's
23    going?
24    A.  He's coming to my window.
25              THE COURT:  You don't have a still of that, do you?
```

1       MS. HARDWICK:  Yes, we do.

2       THE COURT:  May I see it?

3       MS. HARDWICK:  Because this is still up on the

4   screen, it won't show up as well.

5       THE COURT:  Will the jury have the still to take back

6   with them later?

7       MS. HARDWICK:  Yes, Your Honor.

8       MR. BUTLER:  At this time I'm going to add that I

9   have no objection to those stills being entered, and because

10  the Government is entering the video, I didn't have objections.

11  The stills that the Government has are not all of the stills

12  that were taken by the cameras.

13      THE COURT:  Do you have any additional stills that

14  you would like to be used?

15      MR. BUTLER:  I do have some.

16      THE COURT:  Bring those to my attention, and if

17  they're admissible the jury will have those, as well.

18      Go ahead.

19      (Whereupon, said video recording continued to be

20  played before the Court and jury.)

21  Q.  Who is the individual that's depicted in that still

22  picture?

23  A.  Daniel Robinson is at my window, and the robber is behind

24  him.

25  Q.  Who is Daniel Robinson?

```
 1              THE COURT:  You said what, now?
 2   Q.  Would you point on the screen to show us?
 3   A.  Daniel Robinson is right here.  And the robber is right
 4   behind him, right there.
 5              THE COURT:  Okay.
 6   Q.  If could you proceed, please.
 7              (Whereupon, the video recording continued to be
 8   played before the Court and jury.)
 9   Q.  Who is the person approaching your window?
10   A.  The guy that robbed my bank.
11              MS. HARDWICK:  At this time we'd ask that you stop
12   this proceeding and play camera two, which is just the robbery
13   for us, please.
14              (Whereupon, said video recording was played before
15   the Court and jury.)
16   Q.  Can you tell the ladies and gentlemen of the jury what is
17   happening at that point, Miss Gurley?
18   A.  The robber had just handed me the note, and he was coming
19   across my counter and getting the money.
20              MS. HARDWICK:  Would you start again and be prepared
21   to stop it.
22              Would you pause it.
23   Q.  At this point, did you see him look back at the door?
24   A.  Yes, ma'am.
25   Q.  Did you see anyone else come in the door?
```

1    A.   Donna Cooper.

2    Q.   Who is Donna Cooper?

3    A.   She works at Compass Bank.

4    Q.   And when Donna Cooper came into the bank, where did she

5    go?

6    A.   She went up the stairs.

7    Q.   Okay.

8    A.   To the left, right after you come in the door.

9    Q.   Okay.

10   A.   To his back is to the left.

11   Q.   Okay.  If you'd start it again, please.

12            Would you pause it, please.

13            If you would, back it up one.

14   Q.   What is he doing at that point?

15   A.   Putting the money in a tube sock.

16   Q.   In what kind of a sock?

17   A.   A tube sock.

18   Q.   If you'd lean in just a little bit into that mic so we can

19   hear you.

20   A.   He's putting the money in a black tube sock.

21   Q.   And did you see that tube sock when he first came up to

22   your counter?

23   A.   I don't recall.

24   Q.   What's happening at that point?

25   A.   He's on my counter and leaning down into the coin vault

```
1    getting the strapped money out.
2              MS. HARDWICK:  Would you start it again, please.
3              (Whereupon, said video recording continued to be
4    played before the Court and jury.)
5    Q.  At that point, did you see the robber's head raise up?
6    A.  Yes, ma'am.
7    Q.  Where were you in this picture when he was on top of the
8    counter leaning over getting the cash out of your drawer
9    area?
10   A.  He was right in my face.  It's a very small area back
11   there, and I was back there.
12   Q.  What were you doing?
13   A.  I was just letting him have whatever he wanted to get him
14   out of there.
15   Q.  Were you paying any attention to him?
16   A.  Oh, yes, ma'am.
17             MS. HARDWICK:  Would you start it again, please.
18             (Whereupon, said video recording continued to be
19   played before the Court and jury.)
20   Q.  And what's happening at that point, Ms. Gurley?
21   A.  He's gotten the money and he's walking away from my
22   counter.
23             MS. HARDWICK:  And would you proceed again.
24             (Whereupon, said video recording continued to be
25   played before the Court and jury.)
```

1    Q.   Miss Gurley, would you describe for the ladies and

2    gentlemen of the jury where your cash drawer is in this

3    picture, Government's exhibit six?  Would you show us where --

4    Well, let me just clear up something.  The person that's

5    depicted in this photograph, do you know who that is?

6    A.   No, I don't.

7    Q.   He didn't have anything to do with this robbery, is that

8    correct?

9    A.   Oh, no.

10   Q.   Now would you show them on this picture of Government's

11   exhibit six where your cash drawer is, the first cash drawer

12   that the robber got money from?

13   A.   Um, let's see -- It's like right in here.

14   Q.   Okay.  And you indicated that there was a second area that

15   you opened.

16          Let me just back up and ask you this.  When the

17   person first came up to you, what, if anything, did they say to

18   you?

19   A.   When he first walked up, he handed me a note and didn't say

20   anything.

21   Q.   Okay.  I'm going to show and publish for you -- Is that the

22   note that you were handed?

23   A.   Yes, ma'am.

24   Q.   Did you read it?

25   A.   Yes, ma'am.  "This is a robbery."

```
1    Q.   On that date did you read it?

2    A.   No, ma'am, not at first.

3    Q.   How did you know that it was a robbery?

4    A.   When I pulled the computer around, he stuck his hand in his

5    pocket and he said he had a weapon, to open the drawer now.

6    Q.   You said that fast, so I need you to slow down for just a

7    second.

8              You said you pulled the computer around.  When this

9    note appeared, why did you pull the computer around?

10   A.   A lot of the customers hand me notes with their account

11   numbers on them, and I thought that was an account number so I

12   was fixing to look up the account.

13   Q.   So you attempted to pull the computer around.  What

14   happened after that?

15   A.   That's when he stuck his hand in his pocket and told me

16   that he had a weapon, to "Open the drawer now."

17   Q.   Is that when you realized you were being robbed?

18   A.   Yes, ma'am.  That's when I looked down at the note.

19   Q.   When he told you he had a weapon, did you believe him?

20   A.   Oh, yes, ma'am.

21   Q.   What did you do after that?

22   A.   I turned and opened the drawer.

23   Q.   Is this the drawer that you opened?

24   A.   Yes, ma'am.

25   Q.   Does this drawer contain any bait money?
```

1    A.   Yes, ma'am.

2    Q.   Now explain to the jury what is "bait money".

3    A.   "Bait money" is money that Compass Bank will pull and write

4    down the serial numbers and kept recorded.  And they put it

5    underneath this sensor right here.  And when you pull it, it

6    sets off an alarm.

7    Q.   Is the bait money recorded?

8    A.   Yes, ma'am.

9    Q.   Is a record kept of it?

10    A.   Yes, ma'am.

11         MS. HARDWICK:  May I approach, Your Honor?

12         THE COURT:  Yes.

13    Q.   I'm going to hand you Government's exhibit twenty-four.  Do

14    you recognize Government's exhibit twenty-four?

15    A.   Yes, ma'am.

16    Q.   What is it?

17    A.   This is the bait money record.

18    Q.   Is that the bait money record that you had in your drawer

19    on June twenty-second, two thousand and seven?

20    A.   Yes, ma'am.

21         MS. HARDWICK:  We'd offer Government's exhibit

22    twenty-four.

23         THE COURT:  Admitted.

24    Q.   While we're here, Ms. Gurley, is the Compass Bank federally

25    insured?

1    A.   Yes, ma'am.

2    Q.   I'm going to hand you Government's exhibit twenty-three and

3    ask you if you recognize that exhibit.

4    A.   Yes, ma'am.

5    Q.   What is it?

6    A.   Federal deposit insured -- It's the receipt that we keep at

7    the bank showing that we're federally insured.

8    Q.   And does Government's exhibit twenty-three accurately

9    depict a copy of your Federal Deposit Insurance Corporation

10   certificate?

11   A.   Yes, ma'am.

12        MS. HARDWICK:  We'd offer Government's exhibit

13   twenty-three.

14        MR. BUTLER:  No objection.

15        THE COURT:  Admitted.

16   Q.   And just to clarify, after the robbery, Ms. Gurley, did you

17   have to do a count to determine how much money had been taken

18   from the bank?

19   A.   Yes, ma'am.

20   Q.   I'm going to hand you Government's exhibit twenty-five and

21   ask you if you can tell us what it is.

22   A.   This is the *Teller Daily Balance Sheet* that we use to list

23   all of our coins and all of our money on the sheet.

24   Q.   And after a robbery, is it a procedure that you check the

25   balance in your drawer?

1    A.   Yes, ma'am.

2    Q.   Did you do that on June twenty-second?

3    A.   Yes, ma'am.

4    Q.   Can you tell the jury how much money was taken from you on

5    June twenty-second, two thousand and seven?

6    A.   Five thousand nine hundred and twenty dollars.

7              MS. HARDWICK:  We'd offer Government's exhibit

8    twenty-five.

9              THE COURT:  Admitted.

10   Q.   Now, Miss Gurley, let's go back to what was taking place

11   when you were robbed.  You indicated that you pulled the bait

12   money, and at the point it's pulled --

13             THE COURT:  Why don't we take a five minute recess.

14   I'll excuse the jury for five minutes.

15             Don't forget to turn your notes over in your chairs

16   so we can't even see whether you've written nothing.

17             (Whereupon, the jury was escorted out of the

18   courtroom, and the following colloquy ensued):

19             THE COURT:  Counsel, the reason I asked for a five

20   minute recess is we have a juror who is sleeping.  Did you

21   notice?

22             MS. HARDWICK:  Yes, sir, Your Honor.

23             THE COURT:  I think it's the gentleman at the far end

24   over here.  We can gently suggest that he drink some coffee,

25   but we'll keep a watch on him.  If it ends up that he continues

```
1    to sleep, I'll make him the alternate.
2            He's not the alternate now, is he?  He's not one of
3    the alternates?
4            MS. HARDWICK:  No, sir.
5            MS. ADAMS:  Your Honor, may I put something on the
6    record, please?
7            THE COURT:  Yes.
8            MS. ADAMS:  The United States has noticed that he had
9    been sleeping since opening statements, and he's the same juror
10   that said he had served on a jury before and he indicated he
11   was bored.
12           THE COURT:  Right.  Yeah, I do remember that.  Let's
13   put his name in the record so we know who we're talking about.
14           MS. ADAMS:  Parker, Your Honor.
15           THE COURT:  Is that Mr. Parker?
16           MS. ADAMS:  Yes, Your Honor.
17           THE COURT:  I'm going to make him the alternate, and
18   light of the fact of how we've been proceeding so far.  We'll
19   decide what to do later.
20           We'll take a five minute recess.
21           (Whereupon, a recess was taken.)
22           THE COURT:  Proceed.
23           MS. HARDWICK:  Thank you, Your Honor.
24   Q.  Ms. Gurley, you testified that the defendant had taken all
25   of your money which alerted an alarm, is that correct?
```

```
 1    A.  Yes, ma'am.
 2    Q.  You also mentioned "Donna Cooper".  And who is Donna Cooper
 3    again?
 4    A.  Donna Cooper is a lady that works upstairs at Compass
 5    Bank.
 6    Q.  Now during the time that you're being robbed, what, if
 7    anything, does the person say to you after he tells you to give
 8    him the money?
 9    A.  Well, after he told me to give him the money and he came
10    across the counter, he said to "Open the other drawer."  And I
11    asked him, "Which drawer?"  And at that time he just said, "You
12    heard me.  I said open the drawer now."
13    Q.  Speak up a little.
14         He said, "You heard me.  Open the drawer now"?
15    A.  Yes, ma'am.
16    Q.  Now you indicated that you said something.  What was the
17    tone of your voice?  Was it quiet?  Loud?  Medium?
18    A.  I was at normal tone at first, and then when I saw Donna
19    Cooper come in I changed the tone of voice.  I was scared, but
20    I wanted her to notice that something was going on, so I just
21    picked it up just a little.
22    Q.  I'm going to show you Government's exhibit number sixteen.
23    Is that one of the still shots?
24    A.  That's Donna Cooper.
25    Q.  Would you circle her, please.
```

1          Now is that an accurate depiction of when you first

2    noticed that Ms. Cooper was back inside the bank during the

3    robbery.

4    A.  Yes, ma'am.

5    Q.  At the point that you noticed that Ms. Cooper was

6    approaching the stairs, what did you do?

7    A.  That's when my tone of voice changed and I said, "That's

8    all the money I have."

9    Q.  Why did you do that?

10   A.  So she would not come near me, so she would know something

11   was going on.

12   Q.  Okay.  Do you know whether she noticed whether anything was

13   going on?

14   A.  Yes, ma'am.  She looked directly over.

15   Q.  At that point did you know that someone else in the bank

16   besides you knew that you were being robbed?

17   A.  Yes, ma'am.

18   Q.  What did you do after that, Ms. Gurley?

19   A.  After he robbed me I just sealed off the area where it was

20   robbed.

21   Q.  Okay.  I'm going to show you the area again here.  When the

22   person -- and so that we can stop saying "the person" -- have

23   you seen or do you recognize anyone in this courtroom today in

24   reference to the June twenty-second robbery?

25   A.  Yes, ma'am.

```
 1   Q.  If so, would you identify the person for us.
 2   A.  The gentleman with the black jacket and white shirt.
 3           MS. HARDWICK:  Let the record reflect she's
 4   identified the defendant.
 5   Q.  Now at the point in time that the defendant is robbing you,
 6   we have before us Government's exhibit six.  Now, Ms. Gurley,
 7   that appears to be a narrow or small space.  Could you tell or
 8   demonstrate for the jury -- not demonstrate, but with your
 9   finger demonstrate, how far over the body of the defendant came
10   when he was robbing you and which area he was reaching for in
11   your workspace?
12   A.  He was right here, and he was coming over into this drawer
13   and down into this.  This is where the coin vault was, and I
14   was right in here.
15   Q.  So would it be a fair statement, Ms. Gurley, to say that
16   you were within a foot or two of the defendant the whole time
17   you were being robbed?
18   A.  Probably less than a foot.  I mean, I was very close.
19   Q.  This is Government's exhibit number thirteen.  Is that the
20   defendant looking back?
21   A.  Yes, ma'am.
22   Q.  And during that time you're seeing what appears to be the
23   right side of his face, is that correct?
24   A.  Yes, ma'am.
25   Q.  Did you have an opportunity to see the left side of his
```

1    face?

2    A.   Yes, ma'am.

3    Q.   And can you tell us whether you noticed anything unique

4    about the left side of his face?

5    A.   He had a bandage on his neck.

6    Q.   While I have this one up front, I'm going to show this to

7    you.   That's the defendant.   Now, can you describe or point to

8    how much of his body was over in your workspace during the time

9    that he was reaching for the money?

10   A.   Over half of his body because his waist -- I mean, this is

11   like his waist right here, and the rest of it was over in my

12   space.

13   Q.   So from what appears to be his buttocks, it's on the

14   counter farther toward you, so from his buttocks to the upper

15   part, including his face is in your workspace?

16   A.   Yes, ma'am.

17            MS. HARDWICK:   Your Honor, just one second, please.

18            (Whereupon, Ms. Hardwick examined various documents

19   at the lectern.)

20   Q.   I'm going to show you Government's exhibit number nine.

21   You indicated that you also saw the left side of the

22   defendant's face as well.   Can you see the left side there?

23   A.   Yes, ma'am.

24   Q.   Was there anything out of the ordinary about the left side

25   that was drawn to your attention?

```
 1    A.  Right in the area right in there.  It's hard to do.
 2    There's a white bandage on his neck.
 3    Q.  Was it a large or small bandage?
 4    A.  It was a large.
 5    Q.  And what did it appear to be to you?
 6    A.  I thought it was a burn.
 7    Q.  Is that what you told the police?
 8    A.  Yes.
 9    Q.  So you saw some markings coming from up under the large
10    bandage on the left side?
11         MR. BUTLER:  Objection as to leading.
12    Q.  Did you see any markings coming from under the bandage?
13    A.  I just saw a big, like two inch by two inch bandage that
14    was covering his neck, and I told them I thought it was a burn
15    because I thought maybe I saw --
16    Q.  I didn't understand your last comment.
17    A.  I thought that it was a burn, because I thought, you know,
18    I saw the big bandage and I don't remember if I saw -- to me I
19    thought it was a burn.  I might have saw some Vaseline type or
20    ointment coming from it maybe.  I don't remember exactly, but I
21    do remember that there was a bandage and I did say it was a
22    burn.
23    Q.  Approximately how old did you think the individual was as
24    far as age range?  Did you tell them an approximate age
25    range?
```

```
1    A.  I said, "In his twenties."

2    Q.  Ms. Gurley, and I'm going to ask you this question, could

3    you have mistaken a twenty year old for someone that's almost

4    fifty?

5    A.  No, ma'am, I don't think.

6    Q.  Now did you give any further description of the person?

7    A.  I don't remember exactly what I told them.  I know he was

8    tall and skinny.

9    Q.  Okay.  Now, Miss Gurley, I'm going to ask you about a few

10   days later.

11        Well let me just ask you this first.  How did it make

12   you feel when he told you he had a weapon.

13   A.  Very nervous.

14   Q.  A few days later you went to a place called Hooters for

15   dinner.  Do you recall that?

16   A.  Yes, ma'am.

17   Q.  Was that approximately June twenty-sixth, two thousand and

18   six?  If you recall the date.

19   A.  It was June twenty-sixth.

20   Q.  When you were at Hooters did something happen to cause you

21   to become alarmed?

22   A.  One of the cooks kept staring at me and hiding behind some

23   bowls and stuff that were on the cook area.

24   Q.  When that happened, how did that make you feel?

25   A.  Very, very nervous.
```

1    Q.   And why was that?

2    A.   Because I had just been robbed and he looked close to some

3    of his similarities.  His actions reminded me of the guy that

4    had robbed me.

5    Q.   And as a result of that, did you contact someone?

6    A.   I called the police.

7    Q.   Did you contact your boss?

8    A.   Oh yes, ma'am, I contacted Mona George, and she told me to

9    call the police.

10   Q.   The name you're saying is not clear.  You contacted who?

11   A.   Mona George.  That's my immediate -- Mona George is over

12   all the Compass Bank tellers.

13   Q.   To be sure, because I'm not able to see your lips, so spell

14   the last name please.

15   A.   G-e-o-r-g-e.

16   Q.   Mona George.

17   A.   Yes, ma'am.

18   Q.   And she is a personnel person with Compass Bank?

19   A.   She is the manager over all of the tellers and over all of

20   the branches.

21   Q.   With Compass Bank?

22   A.   Yes, ma'am, with Compass Bank.

23   Q.   Now after that happened, were you later shown a photograph

24   lineup that included the person that you saw at Hooters?

25   A.   Yes, ma'am.

1    Q.   Were you able to identify anyone in that photograph lineup

2    as the person who robbed you?

3    A.   No, ma'am.

4    Q.   So you made no identification from that photo array or

5    photo lineup that was shown to you?

6    A.   No, ma'am, I did not.

7    Q.   Okay.  Now back on July second, were you shown a photograph

8    lineup that contained a person that you did identify as the

9    person who robbed you?

10   A.   Yes, ma'am.

11   Q.   I'm going to hand you Government's exhibit eighty-one.  Do

12   you recognize Government's exhibit eighty-one?

13   A.   Yes, ma'am.

14   Q.   And would you tell us what it is, please.

15   A.   It's where I identified the guy that robbed me, circled the

16   number of the picture who identified and initialed it and

17   signed it.

18   Q.   And what date did you do that on?

19   A.   On July the second.

20   Q.   When did you that, did they ask --

21          MS. HARDWICK:  We'd offer, Your Honor, Government's

22   exhibit eighty-one.

23          THE COURT:  Admitted.

24   Q.   Is number six the person you identified on July second, two

25   thousand and seven?

1    A.  Yes, ma'am.

2    Q.  When you made that identification of number six as being

3    the person and signed your name, at the time it was Annette

4    Nichols, right?

5    A.  Yes, ma'am.

6    Q.  And you are one and the same person today?

7    A.  Yes, ma'am.

8    Q.  And the same person who has identified the defendant today

9    in court.

10   A.  Yes, ma'am.

11   Q.  Now the photo array that you were shown previously, is

12   there any other photo array that you've ever signed identifying

13   anybody else as the person who robbed you?

14   A.  No, ma'am.

15   Q.  Does this person appear to be forty-five or fifty years old

16   to you?

17   A.  No, ma'am.

18   Q.  Now when you saw this person who appeared to be looking at

19   you or staring at you, were you uncomfortable?

20   A.  Very.

21   Q.  But to this day have you ever identified anyone else other

22   than Andreas Smith as being the person who robbed you?

23   A.  The only one I've identified is the one with six that I

24   circled.

25   Q.  When you say the one that's number six?

```
1    A.  Yes, ma'am.  I didn't know his name, but --

2    Q.  Okay.  So the person there is who you identified?

3    A.  Yes, ma'am.

4    Q.  And at that time you didn't even know his name?

5    A.  No, ma'am.

6    Q.  Miss Gurley, do you remember this description of this

7    person with that apron on?

8    A.  Yes, ma'am.

9    Q.  When you were at Hooters, did the persons in Hooters, were

10   they wearing dark aprons like that?

11   A.  Yes, ma'am.

12          MS. HARDWICK:  Your Honor, I believe those are all my

13   questions for this witness, and we would tender the witness for

14   cross examination.

15          THE COURT:  Cross?

16          MR. BUTLER:  Yes, Your Honor.  Thank you.

17                  CROSS EXAMINATION

18          BY MR. BUTLER OF ANNETTE GURLEY:

19   Q.  Miss Nichols, my name is Kevin Butler.  I'm an attorney.

20          You saw me -- Did you see me, by chance, when I was

21   looking at the monitor during Ms. Hardwick's examination

22   regarding the video tape?

23   A.  Yes, sir.

24   Q.  And you recognize also the fact that the two persons

25   sitting at counsel table with me are two females, correct?  I
```

1  mean on the far left side are two women?

2  A.  Yes, sir.

3  Q.  The only other person at counsel table is the person that

4  you've identified today as Mr. Smith?

5  A.  Yes, sir.

6  Q.  Okay.  Now a couple of questions I need to ask.  Where did

7  you grow up?  You don't have to tell addresses or anything like

8  that, but where did you grow up?

9  A.  Pike Road.

10         MS. HARDWICK:  We'd object to the relevancy of where

11  she grew up.

12         MR. BUTLER:  Your Honor, you have not made a ruling

13  on a certain pretrial motion.  This testimony -- I can forego

14  this and recall her later, but I'm just trying to do it because

15  it may be necessary to rule on her testimony down the line.

16         THE COURT:  Why don't we hold off right now and I'll

17  have to address that.

18         MR. BUTLER:  I understand.

19  Q.  On June twenty-second you were robbed, and I can only

20  imagine that that was a very traumatic experience for you.

21  A.  Yes, sir.

22  Q.  Had you ever been robbed before?

23  A.  No, sir.

24  Q.  So this was the first time, and this is something that's

25  very traumatic and dramatic because you're essentially exposed.

1    You have that counter in front of you, but there is nothing

2    else around you, correct?

3    A.  That's correct.

4    Q.  And when you were interviewed by police, you informed them

5    that you were very nervous during the event.

6    A.  Yes, sir.

7    Q.  You also indicated that the person who was -- who robbed

8    you was also very nervous.

9    A.  Yes, sir.

10   Q.  I'm going to show you what the Government has already shown

11   you, that is pictures of the Compass Bank.  This is the front

12   door of the bank, I'm assuming?

13   A.  Yes, sir.

14   Q.  And pretty obvious things but I need to ask you, the front

15   door has a handle that appears to be made out of metal?

16   A.  Yes, sir.

17   Q.  And it's surrounded by glass.

18   A.  Yes, sir.

19   Q.  To open the door somebody has to put their hand on that

20   handle to open the door, correct?

21   A.  Yes, sir.

22   Q.  Okay.  Additionally, your teller station, this is the front

23   of it, correct?

24   A.  Yes, sir.

25   Q.  And there's a counter right there, I mean a counter that is

```
 1    not made of wood, is that correct?
 2    A.   That's correct.
 3    Q.   And it appears to be made out of like granite or marble or
 4    plastic.  What's it made out of?
 5    A.   Marble or granite.
 6    Q.   Marble or granite.  So it's a hard surface.
 7    A.   Yes, sir.
 8    Q.   Persons often put their hands on that counter when engaging
 9    in transactions with you, and/or to lean on or rest.  But it's
10    there right in front of you, and people often touch it,
11    correct?
12    A.   Yes, sir.
13    Q.   Thank you.
14            This is your teller station, correct?
15    A.   Yes, sir.
16    Q.   And your teller station -- This ledge that has a computer
17    on it, what's that made from, do you know?
18    A.   The same, I would assume.
19    Q.   The same type of material that the front is?  So it's a
20    hard surface that you touch during the day when doing your
21    business at the bank, correct?
22    A.   Yes, sir.
23    Q.   All right.  A couple of other things.  It seems like silly
24    questions, but there is an import.  This was the note that was
25    handed to you, correct?
```

1    A.  Yes, sir.

2    Q.  And there's some glare on it, but it says, "This is a

3    robbery."  Correct?

4    A.  Yes, sir.

5    Q.  It appears to be in what do you call it, not cursive but

6    just normal writing, correct?

7    A.  Yes, sir.

8    Q.  Have you ever been involved in cases where individuals have

9    submitted fraudulent documents to Compass Bank, whether at the

10   top end or -- by that I mean, the top end doing the

11   investigation, or at the other end simply having received maybe

12   a fraudulent document sheet or anything like that?

13   A.  Would you explain?

14   Q.  Have you ever been involved in any type of case that way,

15   whether at the bank having received a fraudulent document,

16   something that was false?  Have you ever been involved in

17   anything like that?

18          Let me rephrase that.  Not you personally, not that

19   you were in any way, shape or form submitting something

20   fraudulent, but having receiving something from a customer or

21   someone like that.  Have you ever been involved?

22          MS. HARDWICK:  Your Honor, again, we would object to

23   the relevancy.  How is this relevant to this bank robbery?

24          MR. BUTLER:  I'll tie it up with the next question.

25          THE COURT:  Go ahead.

1    A.   I had someone bring in some travelers checks that were

2    fraud.

3    Q.   That's a good example.  Do you know whether or not any

4    handwriting analysis was done in that case?

5    A.   There was no handwriting, period, on those.

6    Q.   So you don't know whether or not -- There was no

7    handwriting on the travelers checks, you just got bad travelers

8    checks?

9    A.   Yes.

10    Q.   I see.  I think I see.

11    A.   Well on travelers checks we have to have the signature on

12    them before you submit them.  When they're sold, they have to

13    sign in front of you.  So when they brought the travelers

14    checks they were not signed, period.  There was nothing written

15    on them.

16    Q.   I see.  Did the person then sign?

17    A.   No.

18    Q.   Do you know whether or not there was any handwriting

19    analysis done on this note to compare it to say the writing of

20    the person at Hooters or, say, Mr. Smith?

21    A.   I have no idea.

22    Q.   I understand.

23          The Government showed a video to you.  I was

24    wondering if the Government could pull that up for me.

25          While they're doing that, I'm going to just show you

1    a series of photographs that have already been entered.  Here's

2    number nine.  I can do it this way.  Government's exhibit nine,

3    ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen,

4    seventeen, eighteen and nineteen.  Those are images taken from

5    the video that was played here in court, correct?

6    A.  Yes, sir.

7    Q.  But there are three cameras working at the bank, correct?

8    A.  Yes, sir.

9    Q.  Far more images of this event were taken.  These are ones

10   that for whatever reason the Government deems pertinent in this

11   case, correct?  These are the ones that were shown you, but

12   more images were taken by the cameras within the bank,

13   correct?

14   A.  The cameras are going twenty-four hours a day.

15        MR. BUTLER:  Could you go to the very beginning?

16   Could you fast forward it to approximately ten fourteen

17   twenty-three.  Could you hit play of all the cameras.  And

18   could you get ready to stop it.

19        MS. ADAMS:  Mm-hmm.  There's about twenty more

20   seconds.  Stop it now?

21   Q.  All right.  You see that at the top of the screen?  I don't

22   know if you can see it on your monitor, but at the top of the

23   screen there is a time code.  It says ten fourteen fifty-three.

24   A.  Yes, sir.

25   Q.  Okay.  That is the time that your camera is recording in

1  conjunction with the photographic image it's recording,

2  correct?

3  A.  Yes, sir.

4  Q.  And that time, ten fourteen fifty-three, is when the person

5  appears to make his first entrance into the -- Well, let me

6  rephrase that.  That's when he's approaching you prior to the

7  robbery?

8  A.  Yes, sir.

9  Q.  I think I need to stop right here, because I missed an

10  important point.  Approximately an hour earlier, maybe an hour

11  and fifteen minutes earlier, had -- this person had approached

12  the bank and attempted to either come inside or came inside

13  briefly.  Is that correct?

14  A.  He had approached the bank and came to the door.  He didn't

15  come in.  He was looking to see -- It appeared as if he was

16  looking to see what time we opened.

17  Q.  So this person had actually been to the bank approximately

18  an hour to an hour and fifteen minutes earlier.  Was the bank

19  open when he came?

20  A.  Not yet.

21  Q.  So it hadn't opened.  When does the bank open?

22  A.  I think it opened at nine then.

23  Q.  So he had to have come at least before nine.  Would it be

24  safe to say that he came fifteen minutes before it had

25  opened?

1    A.   Ten or fifteen.   Somewhere around there.

2    Q.   So around eight forty-five, this individual had come up to

3    the bank, correct?

4    A.   Somewhere around close to nine.   I'm not exactly sure what

5    time.

6    Q.   Showing you -- Using this photograph as a reference point,

7    your actual desk or teller station is what would you say,

8    approximately --

9    A.   It's right there.

10   Q.   It's right there but a little bit further to my left --

11   well, to your left.   Or is it right there?

12   A.   It's about right there.   The chairs -- I mean it's very

13   close.   The lobby is not very big.

14   Q.   Gotcha.   The front door is off to the right.

15   A.   Off in this area.

16   Q.   Off in that area.   From your teller desk to the front door,

17   it's approximately a hundred feet.

18   A.   I'm not sure exactly how far it is.

19   Q.   And as you indicated earlier -- Well, the bank was closed

20   so the person couldn't come inside the bank, correct?

21   A.   The doors were unlocked at that time.

22   Q.   Did the person come inside the bank?

23   A.   No.

24   Q.   Okay.   And these are the front doors, correct?

25   A.   The front doors are not shown in this picture.

1   Q.   These are not the front doors of the bank where the person

2   came in?

3   A.   That's the lobby.

4   Q.   Oh, I'm sorry.  I have a picture up here.  Let me approach

5   the witness and show you Government's exhibit one.  Do you

6   recognize that?

7   A.   Yes, sir.

8   Q.   And --

9        MS. HARDWICK:  Your Honor, may I approach Mr. Butler

10  for just a second, please?

11       THE COURT:  Yes.

12       (Whereupon, Ms. Hardwick conferred with Mr. Butler

13  off the record and out of the hearing of the other courtroom

14  participants.)

15  Q.   So this is Government's exhibit one.  These are the front

16  doors of the bank, correct?

17  A.   Yes, sir.

18  Q.   And they're, at least according to this photograph, what

19  would you call it, polarized to help prevent sunlight from

20  coming in too strongly?

21  A.   I don't know.

22  Q.   They're not completely transparent, at least according to

23  this photograph.

24  A.   I don't think they're shadowed, but I'm not positive.  I

25  think they're clear.

1    Q.   Okay.   In this photograph, can you see directly inside the

2    bank?

3    A.   No, sir.

4    Q.   So at least according to this photograph, for whatever

5    reason you can't see inside.

6    A.   But the doors, if I'm not mistaken, are clear.

7    Q.   But can you see directly inside the bank on this

8    photograph?

9    A.   Not on that photograph.

10   Q.   So you saw this person from fifty to a hundred feet away

11   come up to the bank but not go inside at approximately eight

12   forty-five, correct?

13   A.   I don't know exactly what time it was.

14   Q.   Approximately eight forty-five.

15        All right.   Now the person comes into the bank at ten

16   fourteen fifty-three.

17        MR. BUTLER:   Could you fast toward the counter --

18   well, could you just play it.

19        Now could you hit pause and go back a little bit.

20   Hit pause.

21   Q.   Now at ten fourteen fifty-six he hasn't approached your

22   counter yet.   You're still interacting with the gentleman who

23   is at your teller station, correct?

24   A.   Yes, sir.

25        MR. BUTLER:   Could you hit play.   Could you now hit

1    pause.  All right, that's fine.

2    Q.  At ten fourteen fifty-eight he's still standing behind that

3    gentleman, correct?

4    A.  Yes, sir.

5    Q.  Okay.  At ten-fifteen even, he hasn't approached your

6    teller station, correct?

7    A.  I'm not sure.

8    Q.  Well, are we looking at your teller station from this

9    angle?

10   A.  No, sir.

11   Q.  Oh, okay.  So at ten-fifteen he could possibly be at your

12   station?

13   A.  Yes, sir.

14   Q.  Because the gentleman is now walking away?

15   A.  Yes, sir, he's in front of another station.

16   Q.  Okay.

17        MR. BUTLER:  Could you hit play?  Now hit pause.

18   Q.  It appears at ten fifteen zero zero, he now appears to be

19   walking up to your teller station, correct?

20   A.  Yes, sir.

21   Q.  All right.

22        MR. BUTLER:  Hit play.

23   Q.  Now at ten-fifteen oh two, for whatever reason he appears

24   to be looking slightly down, is that correct, or is he looking

25   directly at you?

```
1    A.  I'm not sure if he's looking at directly at me.  I am short
2    so I cannot positively say what he's doing.
3    Q.  But it does appear his head is tilted slightly down.  It
4    could be at you, but it's tilted slightly down?
5    A.  Yes, sir.
6    Q.  Now at ten-fifteen zero four it does appear that he is
7    interacting with you, is that correct?
8    A.  Yes, sir.
9    Q.  You're the person that he is directing his attention to,
10   correct?
11   A.  Yes, sir.
12   Q.  He has one hand on the granite counter, correct?
13   A.  Yes, sir.
14   Q.  I mean with what appears to be a note in it?
15   A.  He has one hand on the counter and the other hand in front
16   of me.
17   Q.  Okay.  And it appears to be resting slightly on the counter
18   as well?
19   A.  Yes, sir.
20   Q.  Okay.  And the time right now is ten-fifteen zero four.
21   Okay.
22           MR. BUTLER:  Could you hit play?
23           (Whereupon, said video recording continued to be
24   played before the Court and jury.)
25   Q.  At zero six he's still talking with you, interacting with
```

1   you?

2   A.   Yes, sir.

3   Q.   And his hand is resting on the counter.  That would be his

4   right hand -- or am I doing that wrong?  One of his hands is

5   resting on the counter.

6   A.   That's his left hand.

7   Q.   Left hand.  I'm bad.  Correct?

8   A.   It appears to be.

9   Q.   Thank you.

10           MR. BUTLER:  Could you hit play?  Keep going.  Pause.

11       (Whereupon, said video recording continued to be

12   played before the Court and jury.)

13   Q.   Now at ten-fifteen ten, he again appears to be looking down

14   for some reason, correct?

15   A.   Yes, sir.

16   Q.   So so far you've had approximately six seconds to look at

17   him, correct?  Well I'll say between six and ten seconds to

18   look at him.  Is that about accurate?

19   A.   Yes, sir.  I assume.

20   Q.   According to the clock that we're watching.

21   A.   Okay.

22   Q.   Okay, thank you.

23           And, again, you've testified this was the first time

24   that you've ever been robbed.  You're extremely nervous, as you

25   should have been, and you were extremely nervous, correct?

1    A.   Yes, sir, I was very nervous.

2         MR. BUTLER:   Okay, go ahead.   Now pause.

3      (Whereupon, said video recording continued to be played

4    before the court and jury.)

5    Q.   Right there he appears to be leaning -- starting to lean

6    over the counter and down over your section, correct?

7    A.   Correct.

8    Q.   So he's looking at something.   Something has caught his

9    attention down and away.

10   A.   He's looking at the money.

11   Q.   Looking at the money.   That's what caught his attention.

12         And it's ten-fifteen twelve.   So again, he's not

13   looking at you, he's looking at the money, correct?

14   A.   That's correct.

15   Q.   And he's got a brim on his hat, correct?

16   A.   Yes, sir.

17   Q.   All right.   But you can't see the top of his forehead?

18   A.   I was up close and personal.

19   Q.   I know.   I'm not talking about that.   I'm saying you can't

20   see the top of his forehead because it's covered with the brim

21   of a hat.

22   A.   That's correct.

23   Q.   And don't get me wrong, I'm not trying to say you weren't

24   there.   We know that you were there.

25         MR. BUTLER:   Could you hit play.

1          (Whereupon, said video recording continued to be played

2     before the Court and jury.)

3     Q.  Now ten-fifteen fourteen, again he appears to be reaching

4     into the money and taking the money, correct?

5     A.  Yes, sir.

6     Q.  His focus is not on you, it's at the money because that's

7     what this person came here to do.  Correct?

8     A.  At that time I think he was focused on me.  The money --

9     The money is over in this area, and I was right down in this

10    area.

11    Q.  Okay.  So it's your position that at approximately

12    ten-fifteen fourteen he glanced back at you while looking over

13    to get the money he was looking back across his shoulder to

14    watch you?

15    A.  He was watching me too, quite a bit.

16    Q.  Okay.  But it's clear he's focused the on the money as

17    well, because that's what he was reaching to the get.

18    A.  I'm not sure exactly.

19          MR. BUTLER:  Would you hit play.

20        (Whereupon, said video recording continued to be played

21    before the Court and jury.)

22    Q.  Now at ten-fifteen he has -- this is ten-fifteen sixteen,

23    he has stood back up, correct?

24    A.  Yes, sir.

25    Q.  And it appears that he's talking to you.

1    A.   Yes, sir.

2    Q.   Now at ten-fifteen eighteen he looks away, correct?

3    A.   Yes, sir.

4    Q.   I believe it was your testimony that what he looks away at

5    is a bank employee?

6    A.   Yes, sir.

7    Q.   Donna?

8    A.   Yes, sir.

9    Q.   Okay.

10            MR. BUTLER:  One moment, Your Honor.

11            Okay.  Could you freeze that?  I mean don't erase it.

12            Anthony, could you switch it over to here?

13            (Whereupon, said video recording continued to be

14    played before the Court and jury.)

15    Q.   Now, I'm showing you a picture of ten-fifteen eighteen.

16    This is marked defendant's exhibit forty-four.  This is a still

17    copy, I guess a copy of the image that was on that video,

18    correct?

19    A.   Yes, sir.

20    Q.   I'm going to -- This is also the same image as Government's

21    exhibit thirteen.  It's just mine, correct?

22    A.   Yes, sir.

23    Q.   I'm pointing my pen at the top part of his face right

24    underneath the brim of his hat.  There appears to be the edge

25    of some type of glasses right underneath his brim.  Do you see

1    that?

2    A.   No, I can't see any glasses.

3    Q.   Okay.  So that's fine.  If you don't see it, you don't see

4    it.  But what you do not see right underneath the brim of his

5    hat what appears to be the outline of what might be -- what is

6    glasses, whether sunglasses or not --

7            MS. HARDWICK:  Your Honor, we would object to Mr.

8    Butler's characterization.  He was not at the robbery.  The

9    witness has testified she doesn't see any glasses.  Mr. Butler

10   now says that there are glasses.

11           MR. BUTLER:  I'm just saying -- If she denies seeing

12   them, she did not see them.

13   Q.   You do not see glasses in the photograph?

14   A.   No.

15           MS. HARDWICK:  She's simply testifying --

16           THE COURT:  She just said she didn't see them.  Okay,

17   let's move on.

18   Q.   Maybe if I make it closer.  Now does that clarify anything

19   to you?  Do you see anything that might look like glasses right

20   there in the photograph underneath the brim of his hat?

21   A.   Not to me.

22   Q.   Okay.  And, again, the time right now is ten-fifteen

23   eighteen, correct?  Well let me just -- The time is ten-fifteen

24   -- I got it all messed up.  One second.  Ten-fifteen eighteen.

25   A.   Yes, sir.

1    Q.   And, again, he's looking away from you right now.

2    A.   Yes, sir.

3    Q.   At ten-fifteen sixteen he had turned back to you for

4    whatever reason he turned away to look at the person that came

5    in, correct?

6    A.   Yes, sir.

7    Q.   So there were two seconds there that you got to see him

8    between ten sixteen and ten eighteen.

9            MR. BUTLER:  Anthony, could you then switch it back?

10   Thanks.  And could you hit the slow play.

11       (Whereupon, said video recording continued to be played

12   before the Court and jury.

13           MR. BUTLER:  All right.  Pause.

14   Q.   Again, he appears to be looking down at the counter or

15   possibly at you.

16   A.   Right.

17   Q.   You were there; what was he doing at this time, was he

18   looking at the counter or at you?

19   A.   I would assume that he's looking at me.

20   Q.   Okay.  So at ten-fifteen twenty, he's looking at you?

21   A.   Yes, sir.

22   Q.   Okay.

23           MR. BUTLER:  Okay, could you hit play?

24           (Whereupon, said video recording was played before

25   the Court and jury.)

1    Q.   Still looking at you at ten-fifteen twenty-two?

2         MR. BUTLER:  Could you hit play?  Now pause.  Could

3    you go back one and pause?

4         (Whereupon, said video recording was played before

5    the Court and jury.)

6    Q.   At ten-fifteen twenty-three, though, you direct your

7    attention away from him to Donna, who is coming in.  It's been

8    your testimony that you were being robbed.  You wanted to alert

9    her so you began to speak a little bit louder.  You did that

10   once you noticed her coming into the bank, correct?

11   A.   Once I noticed her on the stairs, yes, sir.

12   Q.   The stairs -- Assuming, for instance, the judge is in the

13   direction that you were looking at with the individual who was

14   at the bank, the stairs would be over to your left, correct?

15   A.   The stairs go all the way around.

16   Q.   Right.  But the bottom of the stairs where you noticed her

17   would be off to your left.

18   A.   Yes, sir.

19   Q.   So you directed your attention away for maybe a brief

20   second to Donna at ten fifteen twenty-three, correct?

21   A.   Yes, sir.

22   Q.   So you had another three seconds to view the individual who

23   committed this offense.

24        Now at this point the individual is going over the

25   counter, correct?

1    A.  Yes, sir.

2    Q.  And he's got himself all up on there.

3    A.  Yes, sir.

4           MR. BUTLER:  Could you hit play?

5           (Whereupon, said video recording continued to be

6    played before the Court and jury.)

7           MR. BUTLER:  Okay.  Pause.

8    Q.  Now it's ten-fifteen twenty-eight.  The individual started

9    going over the counter at ten-fifteen twenty-three.  Excuse me,

10   I think it's ten-fifteen twenty-six.  And he is working those

11   drawers, trying to get inside the drawers, correct?

12   A.  No, sir.

13   Q.  What's he trying to get into?

14   A.  I had opened the vault, coin vault, and he got the money

15   out of the vault.

16   Q.  He got the stuff.  Okay.

17          MR. BUTLER:  Could you hit it?

18          (Whereupon, said video recording continued to be

19   played before the Court and jury.)

20   Q.  He's still over the counter there.

21          MR. BUTLER:  Keep going.

22   Q.  Still over the counter.

23          He's still over the counter.

24          Now pause there.

25          Now it's ten-fifteen thirty-four.  So he has now

1  spent at least the last eleven seconds trying to deal with what

2  the vault -- whatever he wants out of that vault, correct?

3  A.  That is correct.

4  Q.  And, again, he had a hat on top of his head at this point.

5  A.  That's correct.

6  Q.  The hat didn't fall off.

7  A.  That is correct.

8       MR. BUTLER:  Keep going.

9       Keep going.  Still over the counter.

10  Q.  So for the last twenty seconds almost, actually twenty-one

11  seconds, he has been over the counter getting the money out of

12  the vault, correct?

13  A.  Correct.

14  Q.  He is not looking at you.

15  A.  He was in my face at that time because I'm right there

16  where he was getting money.

17  Q.  Okay.  Well I just ask you have to be -- Let me use me as a

18  little bit of a demonstration.  He's leaning over the counter

19  reaching down to the vault.  His hat doesn't fall off.  Granted

20  he's real close to you, but his focus is down in the vault

21  taking the money out, correct?

22  A.  That space is probably four feet, about as big as this that

23  I was in that he was over in my face.  He was over the counter,

24  and he and I had -- and there's a chair right there, so we had

25  about two or three feet to share.

1    Q.   So at most, though, I mean maybe a foot to a couple inches

2    from you while he's over the counter, correct?

3    A.   That is correct.

4    Q.   And unless his head is able to swivel at a hundred and

5    eighty degrees, he couldn't flip his head back up looking at

6    you directly in the face, he's focusing on the vault.

7    A.   I had squatted downed to unlock the vault and open the

8    vault.  I'm down there with him.

9    Q.   But you were --

10    A.   I'm not standing up.  I'm down in the vault, opening the

11    vault.

12    Q.   Now you didn't say that during your direct testimony, but

13    now it's your testimony that you were actually -- so he's over

14    there and you're like down there looking at him?

15    A.   I'm down in the vault because when he asked for more money,

16    I started pulling out the coverings and didn't know he was even

17    gone because that's all I had left.

18    Q.   So did you assist him in taking the money out of the

19    vault?

20    A.   No, I did not.

21    Q.   He reached in and got the money out of the vault himself?

22    A.   Correct.

23    Q.   While he was bent over the counter, correct?

24    A.   Correct.

25    Q.   You assisted in opening the vault, correct?

```
 1    A.   I opened the vault.

 2    Q.   Right.  But there's not enough room for you two to be

 3    squatted down there together, you then stood back up while he

 4    did whatever he did --

 5    A.   I was down there while he was getting the money because I

 6    had squatted down to open the vault.  When he asked me for more

 7    money --

 8    Q.   Let me put it this way.  If that's where you decided to go,

 9    which it's your testimony that you decided to squat down there

10    with him while he was down there, did you --

11              MS. HARDWICK:  Your Honor, again, I would state a

12    mischaracterization of what the witness is saying.  Mr. Butler

13    is saying she decided to get down there with him.  Her

14    testimony is clearly that when he asked her for additional

15    money, she had to squat in order to open the vault.  Not she

16    decided to get down there with this defendant.

17              THE COURT:  He can clarify his questions.

18              MR. BUTLER:  Maybe I'll rephrase it.

19    Q.   When he said he wanted more money, as Government counsel

20    stated, you bent down there and opened the vault, correct?

21    A.   I had to bend down to unlock the vault.  The vault was

22    locked.

23    Q.   Okay.  You opened up the vault, correct?

24    A.   Correct.

25    Q.   Then for the next twenty seconds he extracts whatever is in
```

1   the vault into his sock.

2   A.  He took the strapped money only, because we have coins in

3   the vault, too.

4   Q.  Okay.  Is it your testimony that during that twenty

5   seconds, the jury just needs to know this, while he is laying

6   prone over the counter getting the money out of the vault, that

7   you were like this?

8   A.  I was down near the vault, yes.

9   Q.  You were crouching.  You didn't stand up?

10  A.  No.

11  Q.  You decided to stay crouched down like this?

12  A.  I had to unlock the vault so I was down.  To the best of my

13  knowledge.

14  Q.  To the best of your ability.  But what you're looking at

15  right now would be this portion of whomever that person was.

16  By that I mean if I'm over the counter -- You're not looking

17  directly into his face, you're looking at a portion of his

18  face, correct?

19  A.  Correct.

20  Q.  Thank you.  I guess I could have done all of that a lot

21  quicker.

22          And that happens for approximately twenty seconds?

23          MR. BUTLER:  Could you hit play?

24          (Whereupon, said video recording continued to be

25  played before the Court and jury.)

1          MR. BUTLER:  Now pause.

2    Q.  He's still over the counter at ten forty-six.

3          Now pause.

4    Q.  At ten-fifteen forty-eight, somewhere between forty-six and

5    forty-eight, he pops back up and he's heading out of the bank,

6    correct?

7    A.  That's correct.

8    Q.  Okay.  So you had direct -- again, using the numbers that

9    you gave corresponding to the time code, you had direct what

10   you would call direct view of him for approximately ten seconds

11   during this entire one minute period of time, correct?

12   A.  Rephrase that question.

13   Q.  Let me rephrase that.  You don't even have to answer that.

14          This whole event took place over approximately a one

15   minute period of time between ten forty-three -- actually, less

16   than a minute.  He approached your counter at ten-fifteen zero

17   zero, and he's out of the bank by ten-fifteen forty-eight,

18   correct?

19   A.  Yes, sir.

20    Q.  During approximately twenty-six seconds of that, he is

21    inside of the vault, correct?  He's trying to get stuff out

22          from inside the vault that you had opened up?

23   A.  He's reaching in the vault.

24   Q.  Yeah.  Okay.  During the remaining twenty, approximately

25   twenty seconds, for whatever reason he's either looking away,

1    looking down, but he's not making direct eye contact at you.

2    A.  He made direct eye contact.

3    Q.  I know he did, but for a portion of that remaining twenty

4    seconds he was either looking away, for instance when Donna

5    came in, or looking down for whatever reason, at least

6    according to the video.

7    A.  He was most likely looking at me at that time.

8    Q.  But what we do know is that for approximately a ten second

9    period of time during this brief forty-six seconds he did

10   appear to look at you, at least ten seconds.  That's been your

11   testimony.

12   A.  At least that or longer.

13   Q.  And that ten second -- Those ten seconds were not a

14   consistent stair.  He looked at you for six seconds and then

15   did something else.  Looked at you for two seconds, did

16   something else.  Then looked at you for three seconds and did

17   something else.  That's what at least these images were

18   showing.  Do you recall going through that?

19   A.  I recall looking at him a lot longer than a minute.

20   Q.  I don't doubt that was the longest forty-six seconds in

21   your entire life, and I'm not trying to minimize, but it was a

22   very brief period of time.  It was forty-six seconds from

23   beginning to end when this event took place.  That's what this

24   still video has been able to show.

25   A.  Okay.

1    Q.   Okay.  Now after the event you were interviewed by law

2    enforcement.  Do you remember being interviewed by law

3    enforcement?

4    A.   Yes, sir.

5    Q.   A couple of individuals interviewed you at, I believe the

6    police had first arrived at the scene trying to get a sense of

7    what was happening, they interviewed you while you were kind of

8    at your station, correct, or near it?

9    A.   I think we all got away from the station because we blocked

10   it off.  I think I was in one of the offices when they

11   entered.

12   Q.   Okay.  Do you recall how many individuals you gave

13   statements to?

14   A.   No, sir, I don't.

15   Q.   Okay.  Do you remember speaking to an individual named

16   Detective Hill?

17   A.   I'm not sure what his name was.  I do remember --

18   Q.   Do you remember informing that individual that you thought

19   he had a baseball cap on, the individual who committed the

20   offense?

21   A.   Yes, sir.

22   Q.   And that it was white.  Do you recall telling him that?

23   A.   I think so.

24   Q.   Do you remember when he asked you does the individual have

25   facial hair, and you said, "I don't think he had any facial

1   hair that I can remember."  Do you remember telling him that?

2   A.  That's been -- I don't remember.

3              MR. BUTLER:  May I approach the witness, Your Honor?

4              THE COURT:  Yes.

5   Q.  I'm showing you a document, and don't read from the

6   document, but read it to yourself.  Don't read it aloud, just

7   read to it yourself.

8              (Whereupon, the witness complied.)

9   Q.  Now if you could, turn to page two of the document, and

10  there is -- going down there's a question.  It says, "Question:

11  Okay."  And then "A:  He had a --" dot dot dot, and then after

12  that, do you see that?

13  A.  Yes, sir.

14  Q.  Could you read that portion of that to yourself.

15  A.  Yes, sir.

16             (Whereupon, the witness complied.)

17  Q.  Okay.  Now you can close that.

18             After reviewing that, do you recall telling the

19  officers that you don't think the person had facial hair?

20  A.  That was back in July.  I cannot honestly say I don't

21  remember exactly what my testimony had been.

22  Q.  Okay.  So what you provided in this statement, this

23  document does not refresh your recollection as to what you told

24  law enforcement at that time?

25  A.  There was so many questions.

1    Q.   Can I ask you this:  Does this document reflect a

2    conversation that you had with law enforcement?

3    A.   Yes, sir.

4    Q.   Okay.  Do you have any reason to believe that what is

5    contained within this document is false or incorrect?

6    A.   No, sir.

7    Q.   If this document indicated that you said you didn't think

8    the person had facial hair, would that have accurately

9    reflected your conversation at that time?

10   A.   Yes, sir.

11   Q.   Okay.  Could you turn to the very last page of that

12   statement.  And there's the last question to you and then

13   there's an answer.

14          Before looking at that, though, ma'am, before looking

15   at that, do you recall telling the police that when asked if

16   you could identify the guy who committed the offense, "I think,

17   I mean no, I couldn't, but I think so."  Do you remember

18   telling the police words to that effect?

19   A.   No, I don't.

20   Q.   Taking a look at that document, the document that I believe

21   you testified you have no reason to believe is false or

22   inaccurate, does that document refresh your recollection as to

23   what you told police at that time?

24   A.   Yes.

25   Q.   And at least at that time you told the police, "I think, I

```
 1   mean, you know, I couldn't but I think so" when asked if you
 2   could identify the person.
 3   A.  I was very nervous.
 4   Q.  And I don't doubt that.  That's not the point here.
 5   A.  I'm sure this is what I said if it says it.  I can't recall
 6   exactly what I said.
 7   Q.  I understand.  And, again, I'm stating the obvious.  This
 8   is probably the most traumatic event that ever occurred to you
 9   in your life.
10   A.  Yes, sir.
11   Q.  That forty-six seconds seems like it stretched on forever
12   to you, didn't it?
13   A.  I never would have thought it was forty-six seconds.  I
14   would have thought it was a lot longer than that.
15   Q.  I know.  But it was a traumatic period of time.
16   A.  Traumatic, yes, sir.
17   Q.  I'm showing you a photograph --
18          MR. BUTLER:  Your Honor, I'm going to move to enter
19   defendant's exhibit forty-four.  It's a mirror of Government's
20   exhibit thirteen.  It's our position, however, that it's a
21   little easier to view.
22          THE COURT:  Okay, very good.
23          MR. BUTLER:  Thank you.
24   Q.  I'm going to show you what is marked as defendant's exhibit
25   one.  The individual on the far left of -- not left, the
```

1    individual on my right with the guy with the peace sign fingers

2    behind him, has a white hat on, does he not?

3    A.  Yes, sir.

4    Q.  He also has what appears to be a pair of sunglasses draped

5    over the hat at this time, correct?

6    A.  Yes, sir.

7    Q.  And the individual --

8           MS. HARDWICK:  Your Honor, may I have a moment with

9    Mr. Butler, please?

10          (Whereupon, Ms. Hardwick conferred with Mr. Butler

11   off the record and out of the hearing of the other courtroom

12   participants.)

13          MS. HARDWICK:  Your Honor, at this time the

14   Government would like to object to the display of defendant's

15   exhibit one that has already been published to the jury and has

16   not been admitted into evidence with no foundation as to when

17   it was taken or who took it or whether or not this witness can

18   even identify it.

19          MR. BUTLER:  This is something that is something that

20   I -- I'm not moving to admit this --

21          THE COURT:  How can you show it to the jury if it

22   hasn't been admitted?

23          MR. BUTLER:  Your Honor, just as this witness could

24   testify that I have a red tie on, and I wouldn't have to move

25   to admit this tie.  This witness is simply testifying that the

1    person in that photograph, whoever it is, has a white hat on

2    and sunglasses over the hat.  The witness can testify to her

3    visual --

4              THE COURT:  When you're ready to introduce this

5    exhibit, the jury can determine whether or not the person has a

6    white hat on and so forth.  What difference does it make

7    whether she sees it?  Unless it's something she has personal

8    knowledge about or if it helps the jury in the resolution of

9    its issues?

10              MR. BUTLER:  Yes, Your Honor.

11              THE COURT:  Okay.  Let's move on.

12              I'm going to excuse the jury for one minute.  I have

13    something else I want to take up with the lawyers.  Just please

14    step out and don't forget to turn your notes over in your

15    chairs.

16              (Whereupon, the jury was escorted out of the

17    courtroom, and the following colloquy ensued):

18              THE COURT:  I want to go back over something you

19    raised earlier because we have this witness on the stand.  You

20    wanted to ask her about her background?

21              MR. BUTLER:  Yes, Your Honor.

22              THE COURT:  How does that depend on whether your

23    expert testimony comes in?

24              MR. BUTLER:  Your Honor --

25              THE COURT:  Are you saying you only want to ask those

1    questions if your expert testimony comes in?

2            MR. BUTLER:  If my expert testimony does not come in,

3    that testimony would not be relevant to these proceedings.

4            THE COURT:  Why not?

5            MR. BUTLER:  I believe I see your point, Your Honor.

6    I could argue that, but --

7            THE COURT:  It depends what you want to ask her. Why

8    don't you ask your questions so I'll know where going here.  Go

9    head and ask your questions.

10   Q.  Where did you grow up?

11   A.  Pike Road.

12   Q.  Where did you grow up?

13   A.  Pike Road.

14   Q.  And where is High Crow?

15   A.  Pike Road, Alabama.

16   Q.  Oh, Pike Road.

17   A.  Pike Road, Alabama.

18   Q.  Okay.  How far is that from Montgomery, Alabama?

19   A.  About ten or fifteen miles outside of the city limits.

20   Q.  Ten or fifteen miles outside the city limits?

21   A.  About that.  It's right outside the city limits down the

22   Troy Highway.

23   Q.  What grade school did you attend?

24   A.  Pike Road Junior High.

25   Q.  And what high school did you attend?

1  A.  Lanier and J. D.

2  Q.  Elementary school, do you remember what elementary school

3  you --

4  A.  Pike road.  The first through the ninth.

5  Q.  Now Pike Road -- I've got to ask.  How old are you?

6  A.  I'm fifty-five.

7  Q.  Okay.  When you attended Pike Road Elementary, what was the

8  proportion of African-American students at your elementary

9  school?

10  A.  None.

11  Q.  When you attended -- And that was through ninth grade,

12  correct?

13  A.  Yes, sir.

14  Q.  When you attended Pike Road High School --

15  A.  No, there was no Pike Road high school.  It was first

16  through the ninth grade at Pike Road.  Tenth, eleventh and

17  twelve was at Lanier and J. D.

18  Q.  And how many African-Americans were in your class at Lanier

19  and J. D.?

20  A.  I have no idea.

21  Q.  Okay.

22          THE COURT:  Would you say it was over fifty percent?

23          THE WITNESS:  Oh, yes.  I assume, because that's been

24  quite a few years ago.  But quite a few.

25          THE COURT:  Would you say it was more than fifty

```
 1    percent?
 2              THE WITNESS:  I'd say probably half and half.
 3              THE COURT:  Okay.  Go head.
 4    Q.  So it was an integrated high school.  Was that the first
 5    time that you had gone to school with African-Americans?
 6    A.  Tenth grade.
 7    Q.  Did you attend college?
 8    A.  Mansy (ph.) Grove Junior College, yes.
 9    Q.  What proportion of your friends and associates are
10    African-American?  This is a guesstimate.
11    A.  Now?
12    Q.  Yes, that you socialize with outside of work on a regular
13    basis.
14    A.  Probably fifteen, twenty percent.
15    Q.  Fifteen to twenty percent.  So the majority, and this is
16    not uncommon, the majority of your friends and associates are
17    what I will call white Americans?
18    A.  Well, I mean the ones I work with.  I don't have that much
19    that I do outside of work, so basically I don't -- There're
20    very few times I will go anywhere with anybody, white or
21    black.
22    Q.  I see what you're saying.
23    A.  I'm basically a home person.
24    Q.  But to the extent you do socialize with individuals outside
25    of work, you'd say fifteen to twenty percent of those
```

1    individuals are African-American?

2    A.   No, probably more than that, because some of my friends,

3    when I do socialize, it's a mixture.

4    Q.   Okay.  So what, twenty to thirty percent may be

5    African-American?

6    A.   Thirty or more, yeah.

7    Q.   Thirty or more.

8    A.   Yeah.  It's according to what function we're talking

9    about.

10   Q.   These are real broad.  I know.  Okay.

11            A brief yes or no.  Have you ever, I've got to ask,

12   been engaged in -- I have to ask this.  Have you ever been in a

13   personal relationship with an African-American?  Have you ever

14   been married to, or did you ever date an African-American?

15   A.   No.

16   Q.   Okay.

17            MR. BUTLER:  Your Honor, those would be the questions

18   I would ask of this witness.

19            THE COURT:  Let me ask a question or two.  In your

20   interactions with African-Americans, have you ever had any

21   difficulty distinguishing them by their facial features and so

22   forth?

23            THE WITNESS:  No.

24            THE COURT:  Do you find it easier or more difficult

25   to recognize differences in African-Americans as opposed to

1    other groups?

2            THE WITNESS:  No.

3            THE COURT:  Okay.

4            THE WITNESS:  I was raised with a black lady that

5    stayed at our house, took care of us, helped us when our mother

6    was at work.  The closest person that you would ever want to

7    see.  A lot of my friends that are black, I mean going to

8    school, we associated.  We went together, did different things,

9    you know, as groups and stuff.  And I would recognize -- I mean

10   I don't have a problem recognizing a black American from -- an

11   African-American from a white person as far as features are

12   concerned.

13   Q.  Again, the woman that raised you, I'm assuming was a female

14   not a male?

15   A.  She didn't raise meShe took care of us.

16   Q.  The woman that baby-sat you was female?

17   A.  Yes, sir.  But I had several black males that helped me

18   too.  I was raised on a farm, and we raised steers and Diddlee

19   (ph.) was one who was with me at all times, and the he was a

20   black American.

21   Q.  And I'm sure you guys had -- He was a very positive person

22   in your life and I applaud you for that.

23   A.  Very positive.

24   Q.  But he was one person, correct?

25   A.  No, I had several that were on the farm.  There was Shorty,

1   Diddlee.  I mean, I had several of them that were around me at

2   the time.

3   Q.  Okay.  But they were farm help.  They were hired to assist

4   you at the farm?

5   A.  Correct.

6   Q.  And your relationship with them was centered around the

7   fact that they were there to help you on the farm and you were

8   there so you saw them and interacted?

9   A.  Correct.

10              THE COURT:  Do you have many African-American

11  customers at the bank?

12              THE WITNESS:  Oh, yes.

13              THE COURT:  About what percentage would that be?

14              THE WITNESS:  Probably eighty percent.  They come

15  into the downtown branch, yes, sir.

16  Q.  That's presently, correct?

17  A.  That's present right now.

18              THE COURT:  At the time of the robbery what was it?

19              THE WITNESS:  Oh, no.  It was probably twenty-five

20  percent that came in there.

21              THE COURT:  Twenty-five percent?

22              THE WITNESS:  Yeah.  It was very slow as far as

23  teller work coming in, people coming in there at that time.

24              THE COURT:  Did you ever have problems distinguishing

25  among African-Americans while you were working at the bank?

1              THE WITNESS:  Oh, no, sir.

2              THE COURT:  Anything else?  Any cross while we're

3       outside the presence of the jury?

4              MS. HARDWICK:  Your Honor, just briefly.

5              Ms. Gurley, you indicated that the bank that was

6       robbed was slow.  Would it be a fair statement to say that that

7       bank is more of a commercial bank than most other banks?

8              THE WITNESS:  Yes, ma'am.

9              MS. HARDWICK:  So when you're saying twenty-five

10      percent African-Americans came into that bank, did you know

11      your customers, that twenty-five percent?

12             THE WITNESS:  Yes, ma'am.

13             MS. HARDWICK:  Did you know them by name?

14             THE WITNESS:  Yes, ma'am.

15             MS. HARDWICK:  Have you ever been confused by any of

16      the customers?

17             THE WITNESS:  No, ma'am.

18             MS. HARDWICK:  Now that you're over at a larger bank,

19      which is over a year's time of the robbery that took place on

20      June twenty-second, have you met a lot more African-American

21      customers?

22             THE WITNESS:  Yes, ma'am.

23             MS. HARDWICK:  Have you had a problem with

24      identifying with them?

25             THE WITNESS:  No, ma'am.

1          MS. HARDWICK:  Those are all the questions, Your

2    Honor.

3          MR. BUTLER:  Brief recross.

4                    RECROSS EXAMINATION

5              BY MR. BUTLER OF ANNETTE GURLEY

6                 (JURY IS NOT PRESENT):

7    Q.  The African-Americans -- Government counsel asked, and you

8    informed them, that the bank that you were at before the

9    Compass Bank where this robbery took place was a slower bank.

10   It was more of a business or commercial bank, I think?

11         THE WITNESS:  Yes, sir.

12         MR. BUTLER:  So the customers that you did deal with

13   were individuals that came in there regularly.  There wasn't

14   much what I would call random traffic.  These were routine

15   customers that you developed a relationship with and came to

16   know, correct?

17         THE WITNESS:  Yes.

18         MR. BUTLER:  Okay.

19         THE COURT:  Anything else?

20         MR. BUTLER:  Nothing else as to this issue.

21         THE COURT:  Would you mind just stepping out with the

22   security officer for just a minute while I take something up

23   with the attorneys.

24         (Whereupon, the witness was escorted out of the

25   courtroom, and the following colloquy ensued):

```
 1              THE COURT:  Counsel, I have reviewed your briefs on
 2    the issue of the expert testimony on cross racial
 3    identification.  I can't make that determination until I hear
 4    from your expert.  And this testimony has also been useful.  I
 5    had no idea in what context you were going to be using this
 6    expert in.
 7              MR. BUTLER:  I understand.
 8              THE COURT:  Is she the only witness whose
 9    identification you're challenging?  Is there anybody else's?
10              MR. BUTLER:  The identification I'm challenging is
11    her identification of my client as the robber.
12              THE COURT:  Right.  Is there anybody else's
13    identification at issue?
14              MR. BUTLER:  No.
15              THE COURT:  So only Ms. Nichols?
16              MR. BUTLER:  Yes.
17              MS. HARDWICK:  She's presently Gurley, Your Honor.
18              THE COURT:  Gurley.  Ms. Gurley.
19              I would like to hear from the expert, because it's
20    possible that some of this testimony could come in and some
21    could not.  My question for you right now, though, is do you
22    still want to put this in anyway regardless of whether the
23    expert testimony comes in?
24              MR. BUTLER:  No, Your Honor.  If the expert testimony
25    does not come in, I don't want to have to ask these series of
```

1    questions.  It would leave a weird taste in the jury's mind.  I

2    mean asking about her background, how many black kids.

3              THE COURT:  We'll just have to delay, then, asking

4    those questions until I hear from your expert.  I really do

5    need to hear from the expert first, and then I'd like to hear

6    argument for both sides.

7              MR. BUTLER:  Yes, Your Honor.

8              MS. ADAMS:  Your Honor, if I may?  Although you asked

9    Mr. Butler as to which witnesses he was challenging the

10   identification, we have more than one.  Ms. Gurley was not the

11   only person or bank employee that identified the defendant in

12   this case.  Daniel Robinson, the black male that was an

13   employee that was at her teller, immediately -- you saw him

14   immediately before the bank robber arrived did identify the

15   defendant prior to the arrest warrant.

16             THE COURT:  Okay.  He identified the defendant as

17   well and he's black?

18             MS. ADAMS:  Yes, Your Honor.

19             MR. BUTLER:  My expert is not being used  as -- I do

20   not anticipate --

21             (Two speaking at once.)

22             THE COURT:  It's very important for me to know this.

23   When will you be calling Mr. Robinson?

24             MS. ADAMS:  As the next witness.

25             THE COURT:  Why don't we reserve this and then I'll

```
1    have to decide.  I'd like to hear from Mr. Robinson too.  Then

2    your expert and then I have the information I need.

3            MR. BUTLER:  Yes.  And our expert, according to the

4    information I provided the Government, as well as the Court,

5    one of the aspects of his expertise is cross racial

6    identification.  Another aspect of his expertise that the Court

7    will weigh in determining whether or not to allow him is time,

8    act to view -- identification in general.

9            THE COURT:  You're positing him for both reasons.

10           MR. BUTLER:  Exactly.

11           THE COURT:  Cross racial as well as identification.

12           MR. BUTLER:  And the Government was given notice in

13   the document of that.

14           THE COURT:  So you're objecting on either case, or

15   both points?

16           MS. ADAMS:  Yes.

17           THE COURT:  Then I'll definitely need to hear Mr.

18   Robinson first.  Why don't we take five minutes, and when we

19   come back we'll finish with this witness.

20           Mr. Parker is now the alternate.  I wanted to state

21   that on the record because he did sleep through the first part

22   of the trial.

23           (Whereupon, a recess was taken.)

24           THE COURT:  Proceed.

25           MR. BUTLER:  Thank you.
```

1    Q.   I believe I asked my last question about what happened that

2    day.

3              Three days after the robbery, on June twenty-fifth,

4    two thousand seven, do you remember meeting with someone to put

5    together what they commonly call a composite photograph.

6    A.   Do what now?

7    Q.   Do you remember meeting with a law enforcement officer to

8    put together a composite photograph, an image of the person who

9    committed this offense to the best you could?

10   A.   Yes.

11   Q.   Do you remember doing that?

12   A.   Yes.

13   Q.   All right.  I'm showing you what's been marked as

14   defendant's exhibit fifty-one.  Do you recognize that?

15   A.   I think that's the one that I halfway composed.  I'm not

16   sure.

17   Q.   Okay.  Well, I have to ask you again.  To the best of your

18   knowledge does that appear to be the composite photograph that

19   you put together?

20   A.   Yes.

21   Q.   Okay.

22              MR. BUTLER:  Your Honor, at this time I'd move to

23   enter defendant's exhibit fifty-one.

24              MS. HARDWICK:  Your Honor, no objections.

25              THE COURT:  Admitted.

1    Q.  I'm assuming they had some type of -- You didn't draw this

2    out by hand; they had kind of a computer thing that they used,

3    and you gave them information and it generated an image based

4    on what you were telling it, correct?

5    A.  Right.  We swapped and played around with the different

6    facial features.

7    Q.  Okay.  Now you can't see because this thing is in black and

8    white.  Do you recall saying that the individual had on a white

9    hat when doing the composite photograph?

10   A.  Yes.

11   Q.  And that white hat would start where this line across the

12   face is, correct?

13   A.  Yes.

14   Q.  It's bleached out because the copy is white and the hat was

15   white so it all disappears.

16          Okay.  Is it fair to say that you wanted whoever did

17   this to be caught?

18   A.  Yes.

19   Q.  It seems obvious.

20          And you wanted to help law enforcement catch the guy.

21   You wanted to do at least your part to assist law enforcement

22   in catching the guy.

23   A.  Yes.

24   Q.  Okay.  On the following day -- I'll just do it this way.

25   On June twenty-sixth, two thousand seven the Government has

1    already asked you about it but I'm going to inquire a little

2    further, you indicated or you I D'd a person at Hooters

3    Restaurant as a person who committed this offense, correct?

4    A.  I didn't identify him as the person who did it.

5    Q.  Well let me rephrase that.  While you were at Hooters

6    Restaurant you saw an individual, correct?

7    A.  Correct.

8    Q.  The individual, as the Government stated, had on a black

9    apron, correct?

10   A.  Correct.

11   Q.  You didn't say -- I mean you thought the person's body

12   language was such that it was similar to the person who had

13   committed the offense at the Compass Bank, correct?

14   A.  Correct.

15   Q.  Additionally, you thought the person was looking at you

16   incorrectly?

17   A.  That's correct.

18   Q.  You didn't go about eating your meal and just chalk it up

19   to hmm, you in fact called your Mona someone at your bank?

20   A.  Mona George.

21   Q.  You also ended up calling, either you or Mona, called the

22   Montgomery Police Department regarding this individual,

23   correct?

24   A.  Correct.

25   Q.  So there was somebody that you identified, that you picked

1   out as someone who based on his appearance and body language

2   met the description of the person who committed this offense.

3           MS. HARDWICK:  Again, Your Honor, we would object to

4   the mischaracterization of the witness's statement.  She stated

5   clearly that she did not identify anybody.

6           MR. BUTLER:  I'll use another word.

7   Q.  You picked out at Hooters Restaurant someone whose body

8   language and appearance matched that of the person at the

9   Compass Bank.

10          MS. HARDWICK:  Again we would object --

11          THE COURT:  Is that what you did or is that not what

12  you did?

13          THE WITNESS:  I picked out an individual.

14  Q.  And that individual was arrested.

15  A.  I'm not sure.

16          MS. HARDWICK:  Your Honor, we would object to that

17  unless he knows for sure that happened.

18          THE COURT:  Do you know whether that individual was

19  arrested?

20          THE WITNESS:  I don't.

21  Q.  Okay.  Were you present -- Let me back up.

22          After you picked out this person, did you finish your

23  meal?  Did you leave?  What happened?

24  A.  I finished my meal and left.

25  Q.  Okay.  So you weren't present when anything happened.  That

1   was the last time you saw that individual personally?

2   A.   Correct.

3   Q.   And no law enforcement arrived at Hooters while you were

4   there?

5   A.   Not while I was there.

6   Q.   You were shown a lineup of individuals -- You were shown a

7   lineup shortly thereafter.  Was it that day?

8   A.   That night.

9   Q.   It was that night?

10  A.   Six people.

11  Q.   Did you go to the police station or did they come to you?

12  A.   I went to the police station.

13  Q.   Okay.  I'm showing you what's been marked as defendant's

14  exhibit fifty-two.  Do you recognize not anybody in the photo

15  but this lineup?

16  A.   I don't know if that's a lineup or not.

17  Q.   Okay.  I'm going to ask you -- You've grown up in the

18  South, correct?

19  A.   Correct.

20  Q.   You're aware that -- Well this sounds silly, but no two

21  people are the same, correct?

22  A.   That's correct.

23  Q.   In the African-American community their features, just like

24  any other community, which differentiate different individuals,

25  appearance wise.

1    MS. HARDWICK:  Your Honor, we would object to the

2    relevancy based on the out-of-court conference with the Court.

3    MR. BUTLER:  This does not have to do with that

4    issue.

5    THE COURT:  Overruled.  Go ahead.

6    Q.  For instance, I'm an African-American whose skin tone is

7    darker than Miss McGhee's, who is sitting at counsel table.

8    Her skin tone is lighter than mine, correct?

9    A.  That's correct.

10    Q.  Okay.  On July -- What's happened so far, and correct me if

11    I'm wrong, is you provided a statement to law enforcement

12    shortly thereafter the robbery regarding what you could or

13    could not recall regarding the robber.  You then, three days

14    later, did a composite photograph of what you could remember to

15    the best of your memory, remember regarding the robber.  In

16    this composite photograph it appears this individual has facial

17    hair and a beard, is that correct?

18    MS. HARDWICK:  Your Honor, we object to the form.

19    Mr. Butler is beginning to testify rather than ask the witness

20    questions.

21    THE COURT:  I'll allow him to lead her.

22    Go ahead.

23    A.  Yes.

24    Q.  After that, you picked out a person at Hooters.  You were

25    shown a lineup, but you did not identify any of the individuals

```
1    in that lineup.

2    A.  That's correct, I did not.

3    Q.  So the person that you picked out was innocent of this bank

4    robbery.

5              MS. HARDWICK:  Your Honor, we object to the form of

6    asking this witness whether somebody was innocent or guilty of

7    a person she never even picked out.

8              MR. BUTLER:  I'll rephrase.

9    Q.  Is the person that you picked out at Hooters sitting at

10   this table?

11   A.  No.

12             MS. HARDWICK:  Your Honor, again, we'd object because

13   she never picked anyone out at Hooters.

14             THE COURT:  What did you do at Hooters?

15             THE WITNESS:  He was standing behind the cook's

16   things.

17             THE COURT:  And you said something about him.

18             THE WITNESS:  He kept looking over and kept coming,

19   and then he would hide and he'd come back.

20             THE COURT:  You mentioned it to somebody else?

21             THE WITNESS:  It made me very nervous, and I

22   mentioned that it possibly could have been him.

23             THE COURT:  Possibly been what?

24             THE WITNESS:  The robber.

25   Q.  Nothing further as to that.
```

1          What then happened is on July second, law enforcement

2    came to your residence with a lineup, correct?

3    A.  That's correct.  Six pictures.

4    Q.  Do you recognize this?  Well it's been entered.  This is

5    the lineup.

6    A.  Yes.

7    Q.  Okay.  Now, what we know is that you have given this

8    composite with an individual with facial hair and a beard.  Do

9    you recall informing law enforcement that you thought the

10   individual was medium complexion?

11   A.  I don't recall.

12   Q.  In this lineup the person under number one, whether it be

13   because of the way the photos were taken or simply because of

14   who he is, he appears to be more darkly complected, that is

15   darker skinned than numbers two, three, five and six.  Am I

16   accurate in stating that?

17   A.  You're asking me what, now?

18   Q.  The person in slot number one, his skin tone is darker than

19   the remaining individuals.

20   A.  Yes, a little.

21   Q.  Okay.  The person in number -- There is some overlap here.

22   In number one, which we had talked about before, number three,

23   and --

24         MS. HARDWICK:  Your Honor, at this time may we have a

25   side bar, please?

```
 1              THE COURT:  Why don't you discuss it with Mr. Butler
 2      and see if you can work it out.
 3              (Whereupon, Ms. Hardwick conferred with Mr. Butler
 4      off the record and out of the hearing of the other courtroom
 5      participants.)
 6              MR. BUTLER:  Yes, Your Honor.  We need to approach.
 7              THE COURT:  I'll see you back here with the court
 8      reporter, then.
 9                          IN-CHAMBERS CONFERENCE:
10              THE COURT:  Yes?
11              MS. HARDWICK:  Your Honor, the Government's position
12      is that Mr. Butler is rehashing an issue that has already been
13      resolved in a suppression motion that he filed.  The
14      suppression motion was that the photographs were unduly
15      suggestive.  That was ruled upon by the recommendation by the
16      magistrate judge.  I think it was submitted to the Court.  The
17      Court has adopted that motion, and we're just going back
18      through the same thing.
19              THE COURT:  I think the law is clear that when I say
20      something comes in, like a confession or an identification,
21      they can still leave it up to the jury as to whether it was
22      unduly suggestive or whether the confession was still
23      voluntary.  I just merely say I can keep it out as a matter of
24      law.  That doesn't mean the jury can't hear that evidence.  He
25      can make all the argument and present all the evidence he wants
```

1    that she was unduly influenced.  But it's just as a matter of

2    law it can still come in.

3              So the objection is overruled.  Let's go back out.

4              (Whereupon, the in-chambers conference concluded.)

5                            OPEN COURT:

6    Q.  Going back to your composite, the person in your composite

7    has a beard and what I'll call a goatee.  Is that an accurate

8    way of describing it?  Facial hair?

9    A.  The guy had to put in the facial hair.  It was very

10   scraggly, a little bit.  And he had to draw it himself.

11   Q.  But there was hair over the lip and there was hair under

12   the chin, and it's your description that it was scraggly.

13   A.  That is correct.

14   Q.  Okay.  The person in photograph number one doesn't have a

15   beard or a mustache.

16   A.  No, he doesn't.

17   Q.  The person in number two, my position doesn't matter, but

18   it appears that there may be either a shadow or possibly a

19   beard under the person number two, but he doesn't have a

20   mustache.  It's either a shadow or a beard on person number

21   two.

22   A.  It looks like it could be a slight beard or shadow, I'm not

23   sure.

24   Q.  Person number three doesn't have a beard or mustache.

25   A.  That's correct.

1    Q.   And person number five does not appear to have a beard or

2    mustache.

3    A.   Number five could possibly have as much of a beard as six

4    but I'm not for sure.

5    Q.   So five could possibly have a bit of a beard but it's not

6    really clear.  But what we do know is that one, two, three and

7    five don't have mustaches, correct?

8    A.   That's correct.

9    Q.   Numbers four and number six match the composite.  That is,

10   at least as far as facial hair, that is they have facial hair

11   that is what I'll say is a beard and a mustache.

12   A.   Number six you really can't tell that he's got that much of

13   a mustache.

14   Q.   So it's your position that what's above the lip there is

15   not --

16   A.   It appears close to -- I mean, it's not a real big -- like

17   number four.

18   Q.   Okay.  That's fair enough.  Though their mustaches are

19   different, number four and number six are the two that have

20   beards and it appears have mustaches as well.  I mean excuse

21   me, mustaches and beards as well.  Though they're shaped

22   differently, they're cut differently.

23   A.   That's correct.

24   Q.   Okay.  So essentially you were only shown two photographs

25   that match, at least as far as facial hair, the composite

1    photograph that you were given.  Is that not correct?

2    A.  Yes, I guess.

3    Q.  Additionally, number four and number six had different skin

4    tones, correct?  One -- Number four appears to have a slightly

5    darker skin tone?

6    A.  Slightly darker, yeah.

7                MR. BUTLER:  Your Honor, I may be close to finished.

8    Q.  This identification for this photo lineup, was it shown to

9    you at the Montgomery Police Department?

10    A.  No.

11    Q.  Where was it shown to you?

12    A.  At my house.

13    Q.  Who came to your house?

14    A.  I think his name was David Hill.

15    Q.  So a law enforcement officer came to your house with this

16    lineup, correct?

17    A.  That's correct.

18    Q.  Did he show you any other lineups other than this one?

19    A.  I don't recall.  I don't know.

20    Q.  And you identified one of the two people -- well, withdraw

21    that.

22                How long was Mr. Hill at your residence prior to you

23    making that identification?

24    A.  I'm not sure.

25    Q.  It was a while ago and you can't recall.

1    A.   Yeah, I'm not sure.

2    Q.   Were there any other law enforcement officers there with

3    Mr. Hill, or was it just him?

4    A.   I think it was just him.

5    Q.   And was anyone else at home, other than you?

6    A.   Yes.

7    Q.   Who else was present?

8    A.   My mother and Moses, a guy that was helping.

9    Q.   Okay.  Were they present when you were presented this

10   lineup for purposes of making a choice as to who is in there?

11   Were they present in the room?

12   A.   I do not recall.

13   Q.   Okay.  And after the incident at Hooters, and the limited

14   identification that you provided at the bank immediately after

15   the offense, it's your position that you were able to identify

16   one of the two people in this lineup who matched your composite

17   identification?

18   A.   Out of the six, I identified number six and signed it.

19   Q.   And you signed it?

20   A.   Circled it.

21          MR. BUTLER:  Nothing further, Your Honor.

22                     REDIRECT EXAMINATION

23               BY MS. HARDWICK OF ANNETTE GURLEY:

24   Q.   Miss Gurley, I'm going to hand you what's been marked as

25   Government's exhibit eighty-two, which is the original of what

1    Mr. Butler showed you.  Do you recognize that Government's

2    exhibit eighty-two to be a copy of what Mr. Butler just

3    displayed to you?

4    A.  Yes, I do.

5         MS. HARDWICK:  We offer Government's exhibit

6    eighty-two.

7         THE COURT:  Admitted.

8    Q.  Miss Gurley, when you did that composite, did you draw any

9    of the features on that composite?

10   A.  No.

11   Q.  Were you supplying descriptions to the other individual?

12   A.  Yes, ma'am.

13   Q.  And did that individual make the selection of the eyes, the

14   nose, the mouth and the chin?

15   A.  Yes, ma'am.

16   Q.  And did that individual put together this composite based

17   on what they believed you were explaining to them?

18   A.  Yes, ma'am.

19   Q.  Now when that composite was completed, were you asked

20   whether or not that was the individual?

21   A.  I cannot recall.

22   Q.  I'm going to show you a report.  You think that would help

23   refresh your memory?

24   A.  Yeah.

25   Q.  I'd ask you not to read this aloud, but just to refresh

```
1    your memory, if you would look to the last paragraph and read

2    the reference to see if it helps refresh your memory.

3              (Whereupon, the witness complied.)

4    A.  Yes, ma'am.

5    Q.  After Government's exhibit eighty-two, that composite was

6    drawn, do you recall telling the officer that you could not

7    elaborate and advise them that your degree of confidence in the

8    accuracy of this facial composite was low?

9    A.  Yes, ma'am.

10   Q.  So you made no identification on Government's exhibit

11   eighty-two, did you?

12   A.  I could not say that that looked like him.  It's very hard

13   to do a composite, trying to pick out chins.  And I had never

14   done it before, so I had a real difficult time with that.

15   Q.  And you told them that your opinion of this was low?

16   A.  Was what?

17   Q.  Was low.

18   A.  Yes.

19   Q.  Now also on Government's exhibit eighty-two, I note that

20   when they were putting this composite together you didn't tell

21   them to put any eyeglasses on that person.

22   A.  No.

23   Q.  Did you ever see eyeglasses on that person?

24   A.  No.

25              MS. HARDWICK:  If we could have the monitor, Mr.
```

1    Green.

2    Q.   Now I'm going to show you what you see depicted before you

3    is the defendant leaving at that time.

4    A.   That is correct.

5    Q.   On cross examination you had an exchange with Mr. Butler

6    regarding the position that you were in and your height.   First

7    of all, Mr. Butler demonstrated using Government counsel's

8    table.   Is the height of Government counsel table and your

9    teller counter even close in height?

10   A.   No, ma'am.

11   Q.   How tall are you?

12   A.   Five two.

13   Q.   Five feet?

14   A.   Five two.   Five foot two.

15   Q.   And when you are standing behind your counter, I'm going to

16   ask -- I'm going to show you -- If you look at that photograph,

17   can you find anything that resembles your body?

18   A.   This is me right in here.

19   Q.   What is that?

20   A.   That's my head and my hand right there.

21   Q.   Okay.   Now on the frame before, can you find or circle the

22   bank robber, the defendant in that?

23            (Whereupon, the witness complied.)

24   Q.   He's leaving.   Is that correct?

25   A.   That's correct.

1    Q.   Can you see in that frame any part of your body?

2    A.   No, ma'am.

3    Q.   Do you know where -- You stated earlier you didn't know

4    where he left until you stood up.

5    A.   That's correct.

6    Q.   Next frame, is that the point in time when your head

7    appears in your window?

8    A.   Yes, ma'am.

9    Q.   Now I'm looking at your head in reference to the computer

10   and the top of the computer.  And your head appears to be low.

11   A.   I'm pretty short.

12   Q.   You indicated that you had to stoop down in order to open

13   the vault?

14   A.   That's correct.

15          MS. HARDWICK:  Can we switch to the Elmo, please.

16   Q.   In Government's exhibit six, can you show us where the

17   floor is?

18   A.   Where the what?

19   Q.   Floor.

20   A.   There's the floor right there.

21   Q.   And in reference to the floor, where's the top part of the

22   vault that you had to open?

23   A.   Here's the vault door right here.

24   Q.   Is that where you had to open it?

25   A.   Yes, ma'am.

1    Q.   Now which the defendant's buttock is on top of your counter

2    and the rest of his body is down where he's taking the money,

3    where are you?

4    A.   I'm right in here.

5    Q.   So with his body leaning down, are you standing over him or

6    down in the area where his head and the upper torso is?

7    A.   I'm down in the area where his head and the upper body

8    is.

9    Q.   I'm going to show you Government's exhibit number ten.   Is

10   there a pattern on the floor in that bank?

11   A.   Yes, ma'am.

12   Q.   What does that pattern consist of?

13   A.   Squares with the tile, and then there's a carpet.   This is

14   a piece of carpet right in here.   That circle is a carpet.

15   Q.   Government's exhibit number thirteen, you see quite a bit

16   of glare in there, don't you?

17   A.   Yes, ma'am.

18   Q.   Can you see parts of that pattern better in some spots than

19   you can in others?

20   A.   Yes, ma'am.

21   Q.   Do you see a glare in Government's exhibit thirteen?

22   A.   Yes, ma'am.

23   Q.   Do you know what parts of that glare may be reflected in

24   that picture and near the defendant?   Can you tell?

25   A.   The glare is from the doors and the open front.   The

1   sunshine comes in, and my flowers are right here.  I always put

2   them up so the sun can get to them.  I had two African violets

3   I took to the sun.

4   Q.  Now in Government's exhibit number ten, can you see the

5   patterns clearly?

6   A.  Yes, ma'am.

7   Q.  In the position of Government's exhibit thirteen, can you

8   see those patterns as clearly?

9   A.  No, ma'am.

10  Q.  Now Mr. Butler asked you some questions about facial hair

11  on the defendant.  Do you remember every single word that you

12  told the officers?

13  A.  No.

14  Q.  When you picked out the defendant, number six, in the photo

15  array, did you have any doubt in your mind that that was the

16  person who robbed you?

17  A.  No, ma'am.

18  Q.  As you see the defendant here today, do you have any doubt

19  in your mind that that is the person who robbed you?

20  A.  No, ma'am.

21  Q.  Do you recall for trial preparation being asked what about

22  the defendant caused you to be able to identify him?  Do you

23  remember?

24  A.  I can't say that I remember exactly.

25  Q.  Was there anything significant about him when you saw him

1    that caused you to be able to look at that photograph and to be

2    able to select him?

3    A.   Well, just his eyes, and the way he looked at me and kind

4    of was the main thing.  His facial features, you know, I was

5    pretty close to his face.

6    Q.   Now you indicated his eyes and the way that he looked at

7    you.

8    A.   His eyes.  I mean, when you've got somebody right in your

9    face and you're kind of staring at him and you're scared to

10   death, it kind of puts an image that's hard to get rid of.

11   Q.   Now if he had had on sunglasses, would you have been able

12   to see his eyes?

13   A.   No.

14   Q.   Mr. Butler asked you in several formats whether or not you

15   picked out a person or inferred that you picked out a person as

16   being the robber, or looked like he was the robber at Hooters.

17   Did you ever pick out anyone and say that they were the robber

18   from Hooters?

19   A.   No, ma'am.

20   Q.   Other than the exhibit photo array that has been admitted

21   into evidence, is there any other photo array that you're aware

22   of that you signed your name to saying that is the robber?

23   A.   No, ma'am.

24   Q.   There was a reference that it may have been just a mistake

25   that you said when you gave your testimony, have you testified

1  anywhere under oath other than today?

2        MR. BUTLER:  I'll correct myself there.  If I implied

3  that she testified under oath someplace other than today, I was

4  mistaken, she has not.

5  Q.  So your sworn testimony today is that the gentleman seated

6  over in this suit and white coat, white shirt, is the person

7  who robbed you?

8  A.  Yes, ma'am.

9        MS. HARDWICK:  Your Honor, those are all my

10  questions.

11        MR. BUTLER:  Briefly?

12                  REDIRECT EXAMINATION

13            BY MR. BUTLER OF ANNETTE GURLEY:

14  Q.  At the closest proximity to the events of that day, you

15  informed law enforcement that you -- when asked if you could

16  identify the robber you said, "I think, I mean you know, I

17  couldn't but I think so."  Granted you were nervous, you had

18  just been shook up, but that's what you told law enforcement,

19  correct?

20  A.  Correct.

21  Q.  When you went to give your composite, you didn't go in

22  there and just willy-nilly come up with something, you tried

23  your best, correct?

24  A.  I tried.  It's very hard.

25  Q.  It's hard and you tried.  And what you came up with in the

1    composite, I can't find it right now but they have seen it a

2    million times, is a person with facial hair.

3    A.   That's correct.

4    Q.   Okay.  The photo lineup that you were given, only two

5    persons had facial hair that matched the facial hair that was

6    in the composite, is that not correct?

7    A.   Correct.

8    Q.   Thank you.

9         Additionally, using whatever -- word I'll just use

10   the word selected, you selected somebody at Hooters as the

11   person who robbed you, is that not correct?

12   A.   No.

13   Q.   You called law enforcement.  You called your boss.  And

14   your prior testimony was, you said, "This is like the person

15   who robbed me."

16   A.   I called and said that, "I saw someone that could have

17   possibly looked like the guy," yes.

18   Q.   Nothing further.

19                    FURTHER REDIRECT EXAMINATION

20                    BY MS. HARDWICK OF ANNETTE GURLEY:

21   Q.   You just indicated that you were far away from him.  About

22   how far away were you from the person in Hooters?

23   A.   About from here to the door back there.

24        MS. HARDWICK:  Nothing further.

25        THE COURT:  Thank you.  You may step down.

```
1              (Whereupon the witness, Annette Gurley, stepped down
2     from the stand.)
3              THE COURT:  We'll start back tomorrow promptly at
4     nine o'clock.  Then you will have Mr. Robinson as your next
5     witness?
6              MS. ADAMS:  Yes, Your Honor.
7              THE COURT:  How many witnesses do you have after
8     that?  I think we're moving a little bit slower than I
9     expected.
10             MS. ADAMS:  Yes, Your Honor, we have at least eleven
11    after that.
12             MR. BUTLER:  Your Honor, in our case, so the Court
13    can be aware, I think our case will be almost the same.
14             THE COURT:  Very good.  We will start promptly at
15    nine o'clock tomorrow.  I'll ask the jury to be here by eight
16    forty-five so that you can be brought over here at nine and
17    we'll try to speed things up for you tomorrow.
18             MR. BUTLER:  Your Honor, if you could advise Ms.
19    Gurley that she's under subpoena for both of us.  We don't want
20    to excuse her yet.
21             THE COURT:  You're to remain under subpoena, which
22    means you may be called.  You'll have to remain throughout the
23    trial until you are excused.
24             Members of the jury, turn your notes over in your
25    chairs and I'll see you back here tomorrow at eight forty-five.
```

```
 1              (Whereupon, the jury was escorted out of the

 2      courtroom, and the following colloquy ensued):

 3              THE COURT:  Counsel, why don't you get here no later

 4      than eighty forty-five.

 5              There is one matter we can take up now.  I do have

 6      the motion in limine to exclude the marijuana evidence

 7      regarding Willie Jackson.  I don't have the document number on

 8      that.  But anyway, my first concern is this motion was filed

 9      just a couple of days ago, if I remember correctly.

10              MS. ADAMS:  Your Honor, I can resolve this issue.

11      It's document number ninety-nine, and I filed the motion when

12      Mr. Terry Luck advised me that his client would be invoking his

13      Fifth Amendment --

14              THE COURT:  Who is Mr. Terry Luck?

15              MS. ADAMS:  He's counsel for Mr. Jackson on the state

16      charges, the pending marijuana charges.  I spoke to him minutes

17      before I filed this motion, and that's when he told me and I

18      wanted to apprise the Court and Defense counsel of that

19      information.

20              THE COURT:  Why is that a reason for not having filed

21      the motion by the deadline?

22              MS. ADAMS:  I was not aware of the fact that Mr.

23      Jackson would be invoking his Fifth --

24              THE COURT:  Did you talk to Mr. Luck before then?

25              MS. ADAMS:  Yes, I did.
```

1          THE COURT:  And did you tell him that you were going

2   to call Mr. Jackson before?

3          MS. ADAMS:  Yes, I did, Your Honor.

4          THE COURT:  So not until then did you know that Mr.

5   Jackson would be declaring the Fifth?

6          MS. ADAMS:  Yes, Your Honor.  But I just wanted to

7   apprise the Court, but then yesterday Mr. Luck called me and

8   said Mr. Jackson is not going to invoke his Fifth Amendment

9   privilege.  So I told Defense counsel this morning that I was

10   moving to withdraw that motion.

11          THE COURT:  Okay.  Well, very good, then.  Since he's

12   not going to invoke his Fifth, we'll hear from him.

13          Now there is one problem.  Just as an experienced

14   judge I know that people will say they're not invoking the

15   Fifth and they get up here and they invoke the Fifth.  The

16   problem is the jury is not supposed to hear them invoke the

17   Fifth, I don't think.  You may want to educate on me.  So I

18   would strongly recommend that when you call Mr. Jackson, we

19   proceed with him initially outside the presence of the jury

20   just to make sure he does not invoke the Fifth.

21          If he does invoke the Fifth, then you all need to be

22   prepared as to what I should do.  You'll need to research the

23   matter in what happens when a witness invokes the Fifth.

24          MS. ADAMS:  Your Honor, I spoke to Mr. Luck.  Advised

25   him that Mr. Jackson would have to do so off the record.  I

```
 1    also advised him that the Court would require a knowing and
 2    intelligent waiver regarding the privilege.  I have Mr. Luck on
 3    call.
 4            THE COURT:  You'll need to remind me as to what I
 5    need to do outside the presence of the jury in order to protect
 6    Mr. Jackson's rights.  I think we should call Mr. Jackson
 7    outside the presence of the jury, and then, depending on what
 8    he does, you need to know what the law is so you can tell me
 9    how I should proceed.  Obviously if he waives his right,
10    there's no problem.  If he doesn't waive his right, then
11    there's law on that.
12            I have the other motions in limine, but they both
13    deal with the expert testimony.
14            MR. BUTLER:  My expert will be here on the twentieth,
15    and we will get him first thing.  We'll call him out of order.
16            MS. HARDWICK:  Your Honor, one other matter.  Can the
17    Court give us an indication on scheduling so that we can --
18            THE COURT:  Let's talk about that in the morning.
19    That's a good thing to take up.  If your expert is not going to
20    be here -- Your expert will be here tomorrow?
21            MR. BUTLER:  No, the twenty-first, Friday.
22            THE COURT:  Oh.  Is that the earliest he can get
23    here?
24            MR. BUTLER:  This guy -- Yes, Your Honor.
25            THE COURT:  I'd really like to hear from him first
```

1    before I resolve these issues.  The earlier I can hear those

2    the earlier I can resolve the issues.  As soon as he gets here

3    we'll interrupt the trial so we can take him.

4              MR. BUTLER:  Yes, Your Honor.

5              THE COURT:  Thank you.

6              (Whereupon the proceedings were concluded.)

7                          * * * * * * * *

8

9                     COURT REPORTER'S CERTIFICATE

10

11

12        I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled

14    matter as prepared by me to the best of my ability.

15

16        I further certify that I am not related to any of

17    the parties hereto, nor their counsel, and I have no

18    interest in the outcome of said cause.

19

20        Dated this 23rd day of April 2008.

21

22

23              \s\ Mitchell P. Reisner, CM, CRR
                **MITCHELL  P.  REISNER,  CM,  CRR**
                Official US Dist. Court Reporter
24              Registered Professional Reporter
                Certified  Real-Time  Reporter

25