1       **IN THE UNITED STATES DISTRICT COURT**
                        **FOR**
2       **THE MIDDLE DISTRICT OF ALABAMA**

3

4

5

6    THE UNITED STATES
        OF AMERICA
7                                    CRIMINAL ACTION NO.
            vs.                      2:07-CR-165-MHT
8
     ANDREAS JEJUAN SMITH
9

10

11

12

13                          VOLUME IV OF VII
                              3RD DAY OF:
14                      JURY TRIAL PROCEEDINGS

15

16

17

18                      * * * * * * * * * *

19

20   HEARD BEFORE:      The Hon. Myron H. Thompson

21   HEARD AT:          Montgomery, Alabama

22   HEARD ON:          March 21, 2008

23   APPEARANCES:       Jerusha Adams, Esq.
                        Tommie Brown-Hardwick, Esq.
24                      Kevin Butler, Esq.
                        Aylia McKee, Esq.
25                      Danielle Mason, Esq.

𝒙      **MITCHELL P. REISNER, CM, CRR**
                **Official U. S. Court Reporter**
                **Middle District of Alabama**
                       **(334) 265-2500**

1    **T A B L E   O F   C O N T E N T S**

2

3    <u>**ITEM DESCRIPTION**</u>                                    <u>**PAGE NO.**</u>

4
     Table of Contents .........................    1
5
     Title Page ................................    2
6
     Garland Clark - Cross Examination
7         by Ms. McKee (cont'g. from 3/20/08) .....    4

8    Garland Clark - Redirect Examination
          by Ms. Adams ...........................   21
9
     Garland Clark - Recross Examination
10        by Ms. McKee ...........................   23

11   Willie Jackson, Jr. - Direct Examination
          by Ms. Adams ...........................   24
12
     Willie Jackson, Jr. - Cross Examination
13        by Mr. Butler ..........................   45

14   Willie Jackson, Jr. - Redirect Examination
          by Ms. Adams ...........................   66
15
     Willie Jackson, Jr. - Recross Examination
16        by Mr. Butler ..........................   67

17   Derrick Davis - Direct Examination
          by Ms. Adams ...........................   69
18
     Derrick Davis - Cross Examination
19        by Mr. Butler ..........................  103

20   Derrick Davis - Redirect Examination
          by Ms. Adams ...........................  126
21
     Derrick Davis - Recross Examination
22        by Mr. Butler ..........................  130

23   Kathy Richert - Direct examination
          by Ms. Adams ...........................  134
24
     Kathy Richert - Cross Examination
25        by Mr. Butler ..........................  146

# T A B L E   O F   C O N T E N T S

**ITEM DESCRIPTION**                                          **PAGE NO.**


Ronald McCoy - Direct Examination
     by Ms. Hardwick ........................  147

Ronald McCoy - Cross Examination
     by Mr. Butler ..........................  159

James Austin - Direct Examination
     by Ms. Hardwick ........................  164

James Austin - Cross Examination
     by Ms. McKee ...........................  167

Solomon Fulero - Direct Voir Dire Examination
     Sua Sponte by the Court
     (The jury is not present) ..............  183

Solomon Fulero - Direct Voir Dire Examination
     by Mr. Butler
     (The Jury Is Not Present)...............  184

Solomon Fulero - Cross Voir Dire Examination
     by Ms. Adams
     (The jury is not present)...............  208

Court Reporter's Certificate ................  261

-o0o-

```
 1   WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE HON.
     MYRON H. THOMPSON ON MARCH 21, 2008 AT THE UNITED STATES
 2   COURTHOUSE IN MONTGOMERY, ALABAMA:

 3

 4              THE COURT:  Ms. McKee?

 5                     CROSS EXAMINATION CONTINUING

 6                     BY MS. McKEE OF GARLAND CLARK:

 7   Q.  Mr. Clark, we're going to continue with the cross

 8   examination we started yesterday.  Yesterday you testified you

 9   had a marijuana conviction, is that correct?

10   A.  Yes.

11   Q.  And you're currently on probation?

12   A.  No.

13   Q.  You are not?

14   A.  No, ma'am.

15   Q.  I believe you testified yesterday that you thought your

16   case was on appeal, correct?

17   A.  Yes.

18   Q.  And you're aware that that appeal was since affirmed in May

19   of two thousand seven?

20   A.  I didn't hear what you said.  Say again?

21   Q.  That that appeal was affirmed in May of two thousand seven,

22   which would mean that the conviction for the marijuana stands

23   as a conviction.

24   A.  Oh, I had to talk to my lawyer about that.

25   Q.  But according to what you're telling us today, you're not
```

1    on probation right now?

2    A.  No, ma'am, I'm not.

3    Q.  And -- But you were on probation on July twentieth of two

4    thousand and seven?

5    A.  Yes, ma'am, I was supervised.

6    Q.  Yes.  And just generally speaking, just for people who may

7    not under understand, when you're on probation there are

8    certain rules that you have to follow that people that are not

9    on probation don't necessarily have to follow.

10   A.  Correct, ma'am.

11   Q.  So you just have some extra rules that you have to abide

12   by?

13   A.  Yes, ma'am.

14   Q.  One of those rules is that you can't possess a gun,

15   correct?

16   A.  Yes, ma'am.

17   Q.  Another one of those rules is you're not supposed to engage

18   in any illegal activity.  But that's kind of an obvious thing,

19   none of us can, correct?

20   A.  Yes, ma'am.

21   Q.  Sir, at any point in your life -- Now I'm not asking

22   specifically about you, but at any point in your life have you

23   ever been aware of anyone, whether it was a classmate, a

24   neighborhood person just in the neighborhood, or even a friend

25   that was ever involved in drug activity?  Not yourself, but

1    anyone else?

2    A.  Yes, ma'am.

3    Q.  And at any point in your life, and again I'm not asking you

4    about you, but at any point in your life have you ever known

5    any of these people to have or possess a gun?

6              MS. ADAMS:  Objection.  Relevance, Your Honor?

7              THE COURT:  Why is this relevant?

8              MS. McKEE:  Your Honor, it's relevant because I'm

9    asking the defendant if he had a marijuana conviction, which

10   he's already stated before the Court, in his experience and his

11   background in his life to determine who he has been around is a

12   defense theory in this case.  An argument that there were guns

13   and drugs found in his home, and that's what I'm merely asking

14   is, has he ever known any of these people that he's and he's

15   already said yes, I know they were involved in drug activity,

16   has he ever known any of them to have a gun.

17             THE COURT:  You mean the people that were in the

18   house at the time in question?

19             MS. McKEE:  No.  To the previous question I asked

20   him.  I asked him at any point in his life --

21             THE COURT:  Is it that you trying to make the point

22   that people who have drugs tend to have guns, too?

23             MS. McKEE:  That's the area I want to go into.

24             THE COURT:  You can ask whether from his experience

25   do people who have drugs also tend to have guns.  I'll allow

```
 1    that question.
 2    Q.  Mr. Clark, based on your experience, do people who
 3    generally have drugs also have guns?
 4    A.  No.
 5    Q.  No?
 6    A.  Not all the people.
 7    Q.  Well, no, that's not what I've asked.  I'm not asking if
 8    all of them do, because that would be something we can't say
 9    everybody does everything.  But what I'm asking you is
10    generally, which just means a majority or most of the people,
11    not every single one of them.
12    A.  No.
13    Q.  You still say no?
14    A.  No.
15    Q.  So do some ever possess a gun that you are aware of in your
16    experience?
17    A.  Yeah.  I just said, "Yeah."
18    Q.  And now we are coming back to you.  Because you stated you
19    were on probation on July twentieth, two thousand seven, on
20    that particular day if you had possessed a gun, if it had been
21    known that you had possessed a gun, you would essentially have
22    been violating your probation, correct?
23    A.  Yeah.
24    Q.  And so you, yourself, in fact have possessed a gun within
25    the past nine years.
```

```
 1    A.   Say again.
 2    Q.   You, yourself, you have possessed a gun within the last
 3    nine years?
 4    A.   Nine years?
 5    Q.   Yes, sir.
 6    A.   Yes, ma'am.
 7    Q.   And so you're also a member of the Disciples gang, aren't
 8    you?
 9    A.   No, ma'am.
10              MS. ADAMS:  Objection, relevance, Your Honor?
11              THE COURT:  How is whether he's a member of the
12    Disciples gang relevant?  If he even knows what the Disciples
13    gang is.
14              MS. McKEE:  Your Honor, it is relevant because this
15    is one of the only three individuals that was inside this
16    residence, again, with the gun and the drugs where it is
17    alleged with -- this witness is alleging that the shooter was
18    my client, Mr. Smith.  What I'm asking him is his knowledge of
19    guns and drugs.  His only conviction of marijuana, and I'm
20    asking him merely --
21              THE COURT:  I don't know what the Disciples gang is.
22    I have no idea.
23              MS. McKEE:  May I ask him and go into if he has any
24    knowledge of the gang?
25              THE COURT:  Why don't you tell me how it's relevant,
```

1    though, to this case.

2         MS. McKEE:  Your Honor, the Disciples gang is a

3    street gang, Your Honor, that is involved with drug activity

4    and involved with guns.  What I'm asking is, is this individual

5    a member of that organization, the gang, Disciples.

6         THE COURT:  Are you saying that people at that house

7    were members of the Disciples gang?

8         MS. McKEE:  This individual, this witness, Jamaal

9    Clark, is what I'm asking.  Is he a member.

10         THE COURT:  I think we're going beyond the reach of

11    relevance.  I'm going to sustain that.  We're not going to go

12    into his total background and all of that.

13         MS. McKEE:  Yes, Your Honor.

14         THE COURT:  I have been lenient, but this is going

15    way too far.

16    Q.  Now, Mr. Clark, inside the house on July twentieth, two

17    thousand and seven, when the officers came there, marijuana was

18    found inside the house, correct?

19         THE WITNESS:  My lawyer told me not to answer --

20         THE COURT:  I'll have to excuse the jury for just a

21    minute.

22         (Whereupon, the jury was escorted out of the

23    courtroom and the following colloquy ensued):

24         THE COURT:  Yes.

25         MR. BUTLER:  Your Honor --

1          THE COURT:  Just a minute.  I believe Ms. McKee had

2     the floor.  One lawyer per witness.

3          What were you saying to me?

4          THE WITNESS:  I said my lawyer had told me that

5     anything doing with drugs, you know what I'm saying, if it

6     weren't relevant with the case, she advised she --

7          THE COURT:  Everybody has to hear what you're saying.

8          THE WITNESS:  I'm saying my lawyer advised me not to

9     answer anything that was not relevant to the case, like the

10     drugs.  You know what I'm saying?

11          THE COURT:  Okay.  What was your question again, Ms.

12     McKee?

13          MS. McKEE:  I just asked Mr. Clark was there

14     marijuana found in the house on July twentieth, two thousand

15     seven.

16          THE COURT:  You mean did the police find marijuana?

17          MS. McKEE:  Yes.

18          THE COURT:  Were you aware police found marijuana?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.  He can say what he saw when police

21     came.

22          Is that the only thing you're asking?

23          MS. McKEE:  Yes.  That's the only thing I was going

24     to go into.

25          THE COURT:  I'll allow you to answer that one

1    question.

2            Is that all you're going to ask?

3            MS. McKEE:  With regards to the marijuana, yes.

4            THE COURT:  Okay.  Bring the jury back in.

5            You can just say what he saw.

6            Only what you saw concerning the marijuana.  What you

7    personally saw.  You can say that.

8            Counsel, while the jury is returning, the juror who

9    is the attorney, what is her name?

10            MS. McKEE:  I think it's Amy Naylor.

11            THE COURT:  Ms. Naylor says that she has a Social

12    Security hearing, or two Social Security hearings on Tuesday I

13    believe at ten o'clock.  She wanted to know first whether we

14    would be going on Tuesday, and it looks like we may be.

15            MR. BUTLER:  Your Honor, I do anticipate us going.  I

16    feel closings will happen Monday, but I'm a big talker so that

17    could be --

18            THE COURT:  The first question is whether we would be

19    going on Tuesday.  And the second question is, if we are, she

20    would still like to go to those hearings but she thinks she can

21    reschedule them for eleven o'clock.

22            But anyway, I'm bringing that to your attention and

23    we'll take it up later.

24            (Whereupon, the jury was escorted into the courtroom

25    for real this time.)

1      THE COURT:  Now he may answer the question as we've

2  rephrased it.  Go ahead.

3      MS. McKEE:  Shall I restate the question?

4      THE COURT:  Yes.

5  Q.  Mr. Clark, was there marijuana found in the home on July --

6      THE COURT:  The question was did you observe the

7  police find anything in the house, in particular drugs?

8      THE WITNESS:  Yes, sir.

9      THE COURT:  What did you see the police find?

10      THE WITNESS:  Marijuana.

11      THE COURT:  Go ahead.

12  Q.  Mr. Clark, also on July twentieth, two thousand seven the

13  police officers also found guns in the home that you testified

14  to yesterday, correct?

15  A.  Yes, ma'am.

16  Q.  A wood grain gun by the couch or the door as you testified

17  yesterday?

18  A.  Yes, ma'am.

19  Q.  And another gun at the end of the table where yourself and

20  Mr. Willie Jackson were playing dominoes, is that correct?

21  That's what you testified to yesterday.

22  A.  Say again.

23  Q.  And there was another gun at the end of the table where

24  Willie Jackson and yourself were sitting playing dominoes.

25      MS. ADAMS:  Your Honor, we object to the

| | |
|---|---|
| 1 | mischaracterization of the evidence.  Mr. Clark did not testify |
| 2 | that the police found that gun on the table. |
| 3 | THE COURT:  Well let's just see what he's saying. |
| 4 | Why don't you just clarify what you saw. |
| 5 | THE WITNESS:  Okay.  Ask the question again? |
| 6 | Q.  Yeah.  My question is not what the police found, where they |
| 7 | found them.  I'm asking you what you testified to.  Yesterday |
| 8 | you testified that there was another gun at the end of the |
| 9 | table, correct? |
| 10 | A.  That was before the police came, though. |
| 11 | THE COURT:  As long as that's what you said.  Did you |
| 12 | say there was another gun at the end of the table? |
| 13 | THE WITNESS:  Yeah, the handgun. |
| 14 | THE COURT:  Where is the diagram so that he can |
| 15 | clarify where they found what? |
| 16 | MS. McKEE:  Your Honor, may I have just a brief |
| 17 | moment? |
| 18 | THE COURT:  Yes. |
| 19 | (Whereupon, Ms. McKee conferred with Mr. Butler off |
| 20 | the record and out of the hearing of the other courtroom |
| 21 | participants.) |
| 22 | Q.  Sir, I'm showing you what's been admitted as Government's |
| 23 | exhibit forty-six.  As you testified to yesterday, this is the |
| 24 | table where the gun was found, the handgun you just stated. |
| 25 | A.  Yeah.  After they came in, that was the police that came |

```
 1    in.
 2    Q.  Now, sir, again, with you being on probation on July
 3    twentieth, two thousand search, I am not asking at all if you
 4    did, I am simply asking because you were on probation, if you
 5    had knowledge or possessed it, not asking if you did but simply
 6    asking the rules that they told you to follow, if you had
 7    knowledge or possessed the marijuana that was in the house
 8    according to the rules, would that have been a violation of
 9    your probation?
10              MS. ADAMS:  Your Honor, we object.
11              THE COURT:  She can ask him if you possessed
12    marijuana or drugs -- Well first of all, were you on probation
13    during the time that the police came to the house?
14              THE WITNESS:  Yes, sir, on supervised probation.
15              THE COURT:  On supervised probation.  Could you
16    possess either drugs or marijuana while on probation?
17              THE WITNESS:  No, sir.
18              THE COURT:  Go ahead.
19    Q.  So, sir, either possessing guns or drugs would have been a
20    violation of your probation.
21              MS. ADAMS:  Objection.  Asked and answered, Your
22    Honor.
23              THE COURT:  Well I think she's leading to something
24    else.  Go ahead.
25    Q.  Mr. Clark, so either possessing a gun or drugs would be a
```

```
 1   violation of your probation, correct?
 2   A.  Yes.
 3   Q.  And if violated, there's a possibility of going back to
 4   jail, correct?
 5   A.  If I violated, yes.
 6   Q.  And you do not want to go back to jail.
 7   A.  No, ma'am.
 8   Q.  Sir, you testified yesterday that you heard a knock at the
 9   door while you were in the bathroom.
10   A.  Yes, ma'am.
11   Q.  You said you exited the bathroom?
12   A.  Yes, ma'am.
13   Q.  And you said you saw Mr. Smith at the door.
14   A.  Yes, ma'am.
15   Q.  Looking through the peephole?
16   A.  Yes, ma'am.
17   Q.  And yesterday you said that you saw Mr. Smith with the gun
18   standing at the peephole.
19   A.  Looking through the peephole.
20   Q.  Sir, do you remember giving a statement to a Detective
21   Naquin --
22   A.  Yes, ma'am.
23   Q.  -- as a part of this investigation?
24   A.  Yes, ma'am.
25   Q.  And that statement that you gave to Detective Naquin was
```

1   given on July twenty-first, two thousand seven.

2   A.  Yes, ma'am.

3   Q.  That was the day after the shooting, correct?

4   A.  Yes, ma'am.

5   Q.  Sir, at that time -- So is it your testimony here today

6   that you say that you saw Mr. Smith with a gun at the door?

7   A.  Yes, ma'am.

8   Q.  But you didn't tell Detective Naquin that on July

9   twenty-first when you spoke to him.

10          MS. ADAMS:  Objection, Your Honor.  Asked and

11  answered.  This was addressed yesterday.  He testified he did

12  not tell Detective Naquin about Mr. Smith holding the gun at

13  the front door, and he stated why he didn't tell him that.

14          THE COURT:  She's allowed to go into that on cross in

15  more detail.  Go ahead.  Overruled.

16  Q.  Mr. Clark, did you -- you did not tell Detective Naquin

17  that when spoke to him on July twenty-first, the day after the

18  shooting?

19  A.  No, ma'am.

20  Q.  In fact, he asked you and -- Excuse me.  You stated the

21  reason you didn't tell him was because he didn't ask you,

22  correct?

23  A.  I ain't want to feel like I was telling on nobody.

24  Q.  Well, sir, you said you didn't want to tell on anybody?

25  A.  Yes, ma'am.

1  Q.  So you and Mr. Jackson were lifelong friends, correct?

2  A.  Yes, ma'am.

3  Q.  And you don't want to see Mr. Jackson in trouble.

4  A.  No, ma'am.

5  Q.  You, yourself, you don't want to be in trouble, correct,

6  for any of this?

7  A.  No, ma'am.

8  Q.  But you said you and Mr. Smith didn't hang out that often.

9  A.  No, we didn't.

10  Q.  According to you, you and Mr. Smith weren't that close.

11  A.  We ain't.

12  Q.  And you say you didn't want to tell on anyone, but when you

13  got the opportunity to, you pointed the finger at Mr. Smith.

14  A.  Say again.

15  Q.  When you got the opportunity to tell on somebody, you said

16  that Mr. Smith was the individual that had the gun, correct?

17  A.  You mean when I was talking to Naquin?

18  Q.  Well, no, because remember you didn't tell Detective

19  Naquin.

20  A.  Okay.

21  Q.  Didn't you -- You testified that you said that Mr. Smith

22  had the gun.

23  A.  Yes, ma'am.

24  Q.  And at a previous hearing you testified that Mr. Smith had

25  the gun.

```
1    A.   Yes, ma'am.

2    Q.   So an opportunity that you had the day after the shooting,

3    you don't say anything to law enforcement about Mr. Smith

4    possessing a gun, correct?

5    A.   No, ma'am.

6    Q.   You don't say anything to law enforcement.  In fact, you

7    tell law enforcement you never saw Mr. Smith pick up the gun.

8    Correct?

9    A.   That's correct.

10   Q.   You also told law enforcement the day after the shooting

11   you never saw Mr. Smith shoot a gun at anybody, correct?

12   A.   That's correct.

13   Q.   And yet in August of two thousand seven, you turned around

14   and then began to say wait a minute, Mr. Smith did have a gun,

15   didn't you?

16   A.   I ain't turn around to say that.

17   Q.   Did you say it in August of two thousand seven?

18   A.   That I seen him at the door with it?

19   Q.   Yes.

20   A.   Yeah.

21   Q.   So this is the gun that you testified that you say you saw

22   Mr. Smith with, correct?

23   A.   Yes, ma'am.

24   Q.   But in fact, the gun that you claim in the second version

25   of your story that Mr. Smith had, this is actually your gun.
```

```
1    A.  No, ma'am.
2    Q.  Now, sir, again, you know that if it had been known that
3    this was your gun on July twentieth, two thousand seven, that
4    that could or would have been a violation of your probation.
5    A.  You said did I know about -- Say again.
6    Q.  What I'm asking you, if it had been found out that this was
7    your gun on July twentieth, two thousand seven, that would have
8    been a violation of your probation.
9    A.  Yes, ma'am.
10   Q.  And, Mr. Smith, you and Mr. Jackson being as close as you
11   are, you all are still good friends now, correct?
12   A.  I ain't Mr. Smith.
13   Q.  I'm sorry.  Mr. Clark.  You and Mr. Jackson are still good
14   friends, correct?
15   A.  Yes, ma'am.
16   Q.  And the two of you were good friends on July twentieth, two
17   thousand seven, the day of the shooting.
18   A.  Yes, ma'am.
19   Q.  And Mr. Jackson wouldn't have any reason to lie on you that
20   you know of, right?
21   A.  Why would he have a reason to lion me?  I don't have a
22   reason to lie on him.
23   Q.  Yes.  You don't know of any reason that Mr. Jackson would
24   have to lie on you.
25   A.  No, ma'am.
```

```
 1   Q.  Now, sir, you stated that after you came out of the
 2   bathroom you went back to the table.
 3   A.  Yes, ma'am.
 4   Q.  Again, I'm showing you Government's exhibit forty-six.  Is
 5   this the table here that you say you came back to?
 6   A.  Yes, ma'am.
 7   Q.  And you said you heard kicking at the door.
 8   A.  Yes, ma'am.
 9   Q.  You got up after you heard the kicking?
10   A.  Yes, ma'am.
11   Q.  And you got up and headed towards the backdoor.
12   A.  Yes, ma'am.
13   Q.  So after you were alerted by the kicking, you went and took
14   your position here, I believe you said it was yesterday.
15   A.  That's where I ended up on the floor at.
16   Q.  And when the police came, you said someone hit Mr. Smith in
17   the head.
18   A.  Yes, ma'am.
19   Q.  Who was that someone?
20   A.  One of the police.
21   Q.  Sir, when you talked to Detective Naquin, you told him the
22   truth about what happened.
23   A.  Yes, ma'am.
24   Q.  The truth about what happened in the house on July
25   twentieth, two thousand seven?
```

1   A.  Yes, ma'am.

2   Q.  The truth about the shooting that took place in the house

3   on July twentieth, two thousand seven?

4   A.  Yes, ma'am.

5   Q.  Now, Mr. Clark, you're not charged at all with the gun in

6   this case, or any guns in this case, correct?

7   A.  No, ma'am, I'm not charged.

8   Q.  Your real close friend, Willie Jackson, he's not charged

9   with anything involving the guns in this case.

10  A.  No, ma'am.  Not that I know of.

11  Q.  The only person charged today of the three of you that were

12  in the house, is the individual that you say you didn't know

13  very well, correct?

14  A.  Yes, ma'am.

15  Q.  The individual that you said you didn't really hang with.

16  A.  Yes, ma'am.

17  Q.  The individual who really doesn't have any effect on your

18  life at all, correct?

19  A.  No, ma'am.  Beside this right here?

20  Q.  Besides this right here.

21  A.  Yes, ma'am.

22           MS. McKEE:  Your Honor, we have no further questions.

23           THE COURT:  Okay.  Redirect?

24                     REDIRECT EXAMINATION

25               BY MS. ADAMS OF GARLAND JAMAAL CLARK:

1    Q.   Mr. Clark, didn't Detective Naquin ask you if you saw Mr.

2    Smith pick the handgun up from the table?

3    A.   Yes, ma'am.

4    Q.   And what did you respond?  What was your response to that

5    question?

6    A.   That I didn't see him pick it up.

7    Q.   From which direction of the residence were the gunshots

8    coming from based upon what you heard?

9    A.   The front.

10   Q.   Did you hear anything which indicated that the gunshots

11   were coming from the back of the residence?

12   A.   No, ma'am.  That's which way I was going.

13   Q.   Let me ask you this question.  Are you seeking any benefit

14   from the United States for testifying today?

15   A.   No, ma'am.

16   Q.   Has the United States made you any promises regarding your

17   testimony today?

18   A.   No, ma'am.

19   Q.   Have we offered you any sort of deal for testifying

20   today?

21   A.   No, ma'am.

22   Q.   Did you possess a gun on July twentieth, two thousand and

23   seven?

24   A.   No, ma'am.

25          MS. ADAMS:  No further questions, Your Honor.

```
1              THE COURT:  Okay.
2                      RECROSS EXAMINATION
3              BY MS. McKEE OF GARLAND CLARK:
4    Q.  Mr. Clark, you haven't been charged by the Government for
5    this gun, have you?
6    A.  No, ma'am.
7    Q.  That's a benefit, isn't it?
8    A.  It's a benefit?
9    Q.  Yes.
10   A.  And I don't understand what you're saying, "that's a
11   benefit".
12   Q.  Not facing criminal charges for the gun found in this home
13   regarding the shooting, that's a benefit.
14   A.  I don't know that.  I might walk out of here tomorrow and
15   get a charge.
16   Q.  But as of right now with you sitting on the stand today?
17   A.  I don't know that that's no benefit.
18   Q.  That's it's not a benefit to not face that?
19   A.  Not that I know of.
20              MS. McKEE:  No further questions, Your Honor.
21              THE COURT:  Anything else?
22              MS. ADAMS:  No, Your Honor.
23              THE COURT:  You may step down.
24              (Whereupon the witness, Garland Jamaal Clark, stepped
25   down from the stand.)
```

```
 1            MS. ADAMS:  May I call my next witness?
 2            THE COURT:  Yes.
 3            MS. ADAMS:  Your Honor, may he be excused?
 4            THE COURT:  Yes.
 5            MS. ADAMS:  The United States calls Willie Jackson,
 6    Junior.
 7            W I L L I E    J A C K S O N,    J U N I O R,
 8        the witness herein, having first been duly sworn or
 9    affirmed to tell the truth, was examined and testified as
10    follows:
11    Q.  Good morning, sir.
12    A.  How you doing?
13    Q.  Could you please state your full name and spell your first
14    and last name for the record.
15    A.  Willie James Jackson, Junior.  W-i-l-l-i-e, J-a-c-k-s-o-n,
16    J-u-n-i-o-r.
17    Q.  Sir, how old are you?
18    A.  Twenty-seven.
19    Q.  And how are you employed?
20    A.  I'm a delivery driver.
21    Q.  Would you please make sure that you speak into the
22    microphone?
23    A.  I'm a delivery driver.
24    Q.  You're a delivery driver with what company?
25    A.  Alabama Crown.
```

```
 1    Q.  Alabama Crown?

 2    A.  Crown.

 3    Q.  What type of products do you deliver?

 4    A.  Wine and imported beers.

 5    Q.  How long have you been working for Alabama Crown?

 6    A.  Probably like a year and-a-half.

 7    Q.  Sir, where do you live?

 8    A.  I live in Whitley Park.

 9    Q.  What is your specific address?

10    A.  Twenty-eight sixty-one Jan Drive.

11    Q.  Is that located in Montgomery?

12    A.  Yes, ma'am.

13    Q.  Is that in Montgomery County, Alabama?

14    A.  Yes, ma'am.

15    Q.  Are you familiar with Andreas Jejuan Smith?

16    A.  Yes, ma'am.

17    Q.  How familiar are you with Mr. Smith?

18    A.  We friends.

19    Q.  I beg your pardon?

20    A.  We're friends.

21    Q.  How long have you two been friends?

22    A.  Since I was probably eleven.

23    Q.  Are you close with members of his family?

24    A.  Yes, ma'am.

25    Q.  Would you consider yourself to be close friends?
```

```
 1    A.   Yes, ma'am.
 2    Q.   How much interaction have you had with him since you were
 3    eleven?
 4    A.   Um, I mean like day-to-day contact until they moved out of
 5    the neighborhood.
 6    Q.   After -- Well, when did they move out of the
 7    neighborhood?
 8    A.   They moved when we was probably around fourteen.
 9    Q.   So then after they moved, how much interaction did you have
10    with Mr. Smith?
11    A.   Always kept in contact.
12    Q.   And the summer of two thousand and seven, did you keep in
13    close contact with Mr. Smith then?
14    A.   Yes, ma'am.
15    Q.   How often did you see him during the summer of two thousand
16    and seven?
17    A.   I probably seen him a couple of days out of the week.
18    Q.   Each week?
19    A.   Yeah.
20    Q.   Do you see Mr. Smith in the courtroom today?
21    A.   Yes, ma'am.
22    Q.   Could you please identify him to the members of the jury.
23    A.   Right here.
24    Q.   Could you please describe what he is wearing?
25    A.   Black jacket and white shirt.
```

1           MS. ADAMS:  Your Honor, may the record reflect that

2    the witness has identified the defendant?

3           THE COURT:  Yes.

4    Q.  Mr. Jackson, I'm showing you what has been admitted as

5    Government's exhibit forty-seven.  Does that picture look

6    familiar to you?

7    A.  Yes, ma'am.

8    Q.  What is that picture showing?

9    A.  My house.

10   Q.  Does anyone live there with you?

11   A.  No, ma'am.

12   Q.  Do you frequently have visitors at your residence?

13   A.  Yes, ma'am.

14   Q.  Do you own your residence?

15   A.  No.

16   Q.  Are you renting?

17   A.  Yes, ma'am.

18   Q.  Is there anyone else that lives in that neighborhood that

19   you know?

20   A.  Yeah.

21   Q.  Who?

22   A.  A lot of people.  My Mom.  I got aunts.  I know a lot of

23   people.  I have been there since I was eleven.

24   Q.  You said you have been in this neighborhood since you were

25   eleven?

```
1    A.   Yeah.

2    Q.   You mentioned your mother and your the aunt?

3    A.   Mm-hmm.

4    Q.   Where does your mother live?

5    A.   My Mom stays across the street.

6    Q.   And where does your aunt live?

7    A.   She stays around the corner.

8    Q.   Do you recall a shooting occurring at your residence on

9    July twentieth, two thousand and seven?

10   A.   Yes, ma'am.

11   Q.   Were you present when the shooting occurred?

12   A.   Excuse me?

13   Q.   Were you present when the shooting occurred?

14   A.   Yes, ma'am.

15   Q.   Who else was present in your residence when that shooting

16   occurred?

17   A.   Me and Jamaal and Andre.

18   Q.   Now you referred to "Jamaal".  Who is "Jamaal"?

19   A.   Garland Clark.

20   Q.   That's his full name, Garland Clark?

21   A.   Garland Jamaal Clark.

22   Q.   And you referred to "Andre."  Who is "Andre"?

23   A.   Andreas Smith.

24   Q.   Mr. Smith?

25   A.   Yes, ma'am.
```

```
 1    Q.   Do you usually refer to him as "Andre"?
 2    A.   Yes, just Andre.
 3    Q.   Now, you just mentioned Mr. Clark.  What type of
 4    relationship do you have with Mr. Clark?
 5    A.   We friends as well.
 6    Q.   How long have you two been friends?
 7    A.   Probably since we were about, I was probably like nine.
 8    Q.   Do you two generally spend time together?
 9    A.   Yeah.
10    Q.   How often do you associate with each other?
11    A.   We probably see each other probably once or twice out of
12    the week.
13    Q.   Could you please describe for me the layout of your house.
14    A.   I mean, if you come through the front door, I mean there's
15    a hallway.  You got the kitchen like right to your left.  Got a
16    hallway bring you to like the living area, it opens up.  I mean
17    you got an upstairs, two bedrooms.  Have a table.  A pool
18    table.  There's a couch in the living area.  That's pretty much
19    it.
20    Q.   You mentioned a second floor.
21    A.   Yes, ma'am.
22    Q.   Where are the bedrooms in your house?
23    A.   They're upstairs.
24    Q.   And you have two bedrooms?
25    A.   Yes, ma'am.
```

Q.  How many bathrooms do you have?

A.  One and-a-half.

Q.  Where are the bathrooms located?

A.  There's one upstairs and the half is down.

Q.  In which part of your residence did the shooting occur?

A.  It was downstairs.

Q.  Mr. Jackson, I'm showing you what has previously been
admitted as Government's exhibit number forty-six.

A.  Mm-hmm.

Q.  Does that look familiar to you?

A.  Yes, ma'am.

Q.  And what does this exhibit depict to you?

A.  My house.

Q.  Which part of your house?

A.  Downstairs.

Q.  What does this depict?

A.  My front door.

Q.  And what is this?

A.  I can't see it.

Q.  My question was, what does this depict?

A.  The front door.

Q.  And what does this depict?

A.  Stairs.

Q.  What is this?

A.  Sofa.

```
1    Q.   Sorry.  I keep moving the exhibit.
2              What is located right here?
3    A.   That's a sliding door.
4    Q.   What is on the other side of the sliding door?
5    A.   The other side of the sliding door?
6    Q.   Mm-hmm.  I'm asking you as far as this is inside the
7    residence, what's on this side?
8    A.   It would be like the backyard.
9    Q.   Do you have anything in your backyard?
10   A.   There's like a weight bench.  Maybe a couple of barbecue
11   grills.
12   Q.   Do you have any type of fence or border to your backyard?
13   A.   There's a privacy fence.
14   Q.   What is located right here?
15   A.   Pool table.
16   Q.   And here?
17   A.   That's just a dining table.
18   Q.   Dining table?
19   A.   Yes, ma'am.
20   Q.   And this area right here?
21   A.   That's the kitchen.
22   Q.   So what are these?
23   A.   That's the sink.
24   Q.   Are you able to walk from the area where the dining table
25   is located to the kitchen?
```

1    A.  Yes, ma'am.

2    Q.  Where is your bathroom on your first floor located?  And

3    you can touch your screen and actually mark where it's located

4    on your screen if you touch it.

5    A.  All right.  It will probably be -- it's like under the

6    stairs, somewhere up in here.

7    Q.  Okay.  What time of the day did the shooting occur?

8    A.  It was nighttime.

9    Q.  Was it dark outside?

10   A.  Yes, ma'am.

11   Q.  What happened?

12   A.  I mean me and Jamaal, we was playing dominoes.

13   Q.  When you say "Jamaal," you're referring to Mr. Clark?

14   A.  Yes, ma'am.

15   Q.  Okay.

16   A.  Me and Mr. Clark, we were playing dominoes.

17   Q.  Now where were you all sitting while you were playing

18   dominoes?

19   A.  I was right here and he was right there.

20   Q.  Could you make an X as to where he was sitting, Mr. Clark.

21          (Whereupon, the witness complied.)

22   Q.  Okay.  Now you said that Mr. Smith was present.  Where was

23   Mr. Smith?

24   A.  He was over here.

25   Q.  What was he doing?

1    A.   Shooting pool.

2    Q.   Who was he shooting pool with?

3    A.   By his self.

4    Q.   So what happened while you and Mr. Clark were playing

5    dominoes?

6    A.   I think Mr. Clark, he won the first game so he got up to go

7    use the restroom.  And while he was going to the restroom there

8    was a knock at the door.  Like I said, I was in this chair

9    right here, so the table was closer to this wall than that.

10   So --

11   Q.   Now you just said the table is closer to the wall.

12   A.   Yes, ma'am.  It was like real close to the wall.

13   Q.   Are you referring to the dining table?

14   A.   Yes, ma'am.

15   Q.   Okay.  So you said Mr. Clark got up and went to the

16   restroom?

17   A.   Yes, ma'am, he went to the restroom.  There was a knock at

18   the door.  Andre went and answered the door.  I didn't get up

19   and answer it.  It would have been hard for me, by the table

20   being so close.

21   Q.   You said Mr. Smith wouldn't answer the door?

22   A.   Yes, ma'am.

23   Q.   Is that uncommon?

24   A.   Not really.

25   Q.   Why not?

```
 1   A.  Because there's always a couple of us over there so anybody
 2   might answer the door.
 3   Q.  Are you saying that you generally allow other people to
 4   answer your front door?
 5   A.  Yes, ma'am.
 6   Q.  So after Mr. Smith went to answer the front door, what
 7   happened?
 8   A.  I could hear the door open, but then I could hear kind of
 9   like a scuffle or, you know, kind of noises at the door like
10   somebody was pushing on the door or something.  Then I hear the
11   door closed, I hear it locked back.  Well, before that, when he
12   locked the door back and I heard by that time Jamaal was back
13   at the table and everything.
14   Q.  Okay.  Let me stop you for a second.
15   A.  Yes, ma'am.
16   Q.  At what point did Mr. Clark return to the dining table?
17   A.  He came to the table probably before the door opened.
18   Q.  So you heard the door open?
19   A.  Yeah, I heard it open.
20   Q.  Could you see the door open?
21   A.  No, ma'am.
22   Q.  So when you heard the door open, Mr. Clark was back at the
23   table?
24   A.  Yes, ma'am.
25   Q.  Now you said you heard some scuffling at the front door?
```

1    A.   Like bumping at the door.  I mean, I don't know -- it

2    sounded like a struggle at the door, but I was just figuring it

3    might be, you know, one of my cousins or another friend.  They

4    was just playing or something.

5    Q.   You just said "playing or something".  What do you mean by

6    that?

7    A.   Just messing around.  I didn't take it seriously.  It

8    didn't alarm me at first.

9    Q.   Okay.  What happened after -- You said you heard the

10   scuffling and then you heard the door close and lock.

11   A.   Yes, ma'am.

12   Q.   What happened after that?

13   A.   After the door -- I heard the door close.  I heard a kick

14   at the door and there was a second kick at the door.  And then

15   that one got my attention because it was kind of too hard for

16   somebody to be playing.

17          After I heard that kick I tried to get up from the

18   table, but by the table being so close to the wall I had to

19   scoot from this chair to this chair.  And by the time I tried

20   to slide from under the table from this chair, I was probably

21   about right here about to stand up out of the chair and I heard

22   two shots.

23   Q.   Now you just testified that the second kick caused you to

24   get up from your chair?

25   A.   Yes, ma'am.

1    Q.  Where were you trying to go?

2    A.  I was trying to come this way.  I was trying to come this

3    way.  Go this way to the backdoor.

4    Q.  Were you trying to leave?

5    A.  Yeah.

6    Q.  So was this the mark that you indicated where you said you

7    heard two shots?

8    A.  Yes, ma'am.

9    Q.  And from which direction of the residence did you believe

10   that the shots were coming from?

11   A.  The front of the house.

12   Q.  Did you see who was shooting?

13   A.  Excuse me?

14   Q.  Did you see who was shooting?

15   A.  No, ma'am.

16   Q.  Did you see Mr. Clark at that time?

17   A.  Yes, ma'am.

18   Q.  What, if anything, did he have in his hands?

19   A.  Nothing.

20   Q.  And what was Mr. Clark doing at that time?

21   A.  He was somewhere over here.  I mean I can't really see what

22   he was doing, but he was over that way.

23   Q.  So you're saying you had moved from the table?

24   A.  Yeah.

25   Q.  Did you have anything in your hands at that time?

```
1    A.  No, ma'am.

2    Q.  So what happened after you heard those two shots?

3    A.  I got down like right in here.  Got down, stayed for a

4    minute.  I didn't hear any more shots.

5    Q.  Let me stop you for a second.  You said "got down".

6    A.  I squatted down because I heard the two shots.  I didn't

7    know where they were coming from.

8    Q.  You squatted down?

9    A.  Yes, ma'am.

10   Q.  Were you laying on the floor?

11   A.  No, I was like on my hands and knees.

12   Q.  Okay.  So when you said squat, you mean on your hands and

13   knees?

14   A.  Yes, ma'am.

15   Q.  So you said you stayed in that position for a while?

16   A.  Yeah, a couple of seconds.

17   Q.  And then what happened?

18   A.  I didn't hear any more shots.  The kicking had stopped, so

19   I tried to make my way to the backdoor.

20   Q.  Now where was Mr. Smith at the time that all of this was

21   going on?

22   A.  He's still in the front of the house.

23   Q.  Could you see him?

24   A.  No, ma'am.

25   Q.  You testified that you saw Mr. Smith go to the front door
```

1   to answer the door?

2   A.  Yes, ma'am.

3   Q.  Was there -- What, if anything, was in his and hands?

4   A.  He had a gun in his hands.

5   Q.  You said "a gun"?

6   A.  Yes, ma'am.

7   Q.  Are you familiar with guns?

8   A.  Yes, ma'am.

9   Q.  What type of gun was it?

10  A.  It was a pistol.

11  Q.  I'm showing you Government's exhibit sixty A.  Does that

12  gun look familiar to you?

13  A.  Yes, ma'am.

14  Q.  Is that the pistol you were referring to?

15  A.  Yes, ma'am.

16  Q.  Just for clarification purposes, was that the pistol you

17  were referring to when you said you saw Mr. Smith with a

18  pistol?

19  A.  Yes, ma'am.

20  Q.  Now after you squatted down and you said you were there for

21  a few seconds, then what happened?  What did you do?

22  A.  I got up.  Get to the backdoor.

23  Q.  And what direction did you run to the backdoor?

24  A.  I came in from right here.  The pool table is kind of

25  farther down than that because I had to go around the pool

1  table to get out the backdoor.  So I came around the pool table
2  and got close to the door.
3          I guess one of the officers threw one of my weights
4  through the glass door, and I fell back on the sofa right here.
5  When I fell back on the sofa, when the officers came through
6  with his gun, he said, "Don't move."  They were U. S. marshals.
7  I just put my hands up and told them, "Don't shoot me."
8  Q.  Okay.  Let me stop you for a second.  Now you said that the
9  pool table is farther down.
10 A.  Yes, ma'am.
11 Q.  When you say "further down," are you saying it's closer to
12 the sofa?
13 A.  Yeah.
14 Q.  Did you actually make it to the back sliding glass door
15 before you saw the police?
16 A.  No, ma'am.  As I was on the way to the door, they threw the
17 weights through the glass, so I didn't get a chance to get to
18 the door.
19 Q.  Now how did you know that they were police before they said
20 anything?
21 A.  I didn't at first.
22 Q.  So what made you believe that they were the police?
23 A.  It was because one of them said it.
24 Q.  Okay.  So what caused you to fall back on the sofa?
25 A.  The weights coming through the glass.

1    Q.  And then after you fell on the sofa what did you do?

2    A.  I fell on the sofa and he came through the curtains.  He

3    was like, "U. S. marshals.  Don't move."  So I put my hands

4    up.

5    Q.  When you were running towards the sliding glass door, what,

6    if anything, did you have in your hands?

7    A.  Nothing.

8    Q.  When you fell back on the sofa, what, if anything, did you

9    have in your hands?

10   A.  Nothing.

11   Q.  During the time that you're running to the sliding glass

12   door and then falling back on the sofa, did you see Mr.

13   Clark?

14   A.  Yes, ma'am.

15   Q.  Where did you see him?

16   A.  He was on the other side of the pool table up this way.

17   Q.  What, if anything, did he have in his hands at that time?

18   A.  I ain't see anything.

19   Q.  Did you see Mr. Smith?

20   A.  I still didn't see him yet.

21   Q.  After the individuals came until and announced that they

22   were U. S. marshals, you said that you said something.  What

23   did you say?

24   A.  "Don't shoot me."

25   Q.  I'm going to show you Government's exhibit number

1  forty-seven again.  Now you just testified that this is the
2  front of your residence?
3  A.  Yes, ma'am.
4  Q.  Does your front door have a peephole?
5  A.  Yeah.
6  Q.  On July twentieth, two thousand and seven would an
7  individual be able to see another person on the other side of
8  the door from your peephole?
9  A.  Maybe not at the time because the light in front of my
10  house, they were out.
11  Q.  What light in front of your house?
12  A.  Right here.
13  Q.  So you're saying because of lack of light?
14  A.  Yes, ma'am.
15  Q.  Was there anything wrong with your peephole?
16  A.  No, ma'am.
17  Q.  Okay.  After you said to the marshals "Don't shoot me,"
18  what did you do?
19  A.  Just held my hands up.
20  Q.  Did the marshals restrain you?
21  A.  Yeah.  He put me on the ground.
22  Q.  You said he put you on the ground.  What do you mean?
23  A.  He told me to get on the ground, so as I was getting on the
24  ground.  He just -- You know what I'm saying?
25  Q.  Are you saying you were laying on the floor?

1   A.   Yeah.  He laid me on the floor.

2   Q.   While you were laying on the floor, were you able to see

3  Mr. Clark?

4   A.   Yes, ma'am.

5   Q.   And what was he doing?

6   A.   He was laying on the floor on the other side of the pool

7  table.

8   Q.   Were you able to see Mr. Smith?

9   A.   After I was on the ground I did.

10   Q.   And what was Mr. Smith doing?

11   A.   The marshal was, I guess, getting him to the ground.

12   Q.   What, if anything, did you see in Mr. Smith's hands at that

13  time?

14   A.   I didn't see anything in his hands at that time.

15   Q.   Was there anything around him on the floor at that time?

16   A.   The gun was on the floor.

17   Q.   You said "the gun".  What gun are you referring to?

18   A.   That picture you showed me.

19          JUROR:  I hate to interrupt, but I need a bathroom

20  break.

21          THE COURT:  No problem at all.  We'll take one.

22          JUROR:  Thank you.

23          THE COURT:  We'll take ten minutes.

24          You're not the first juror who has needed a bathroom

25  break.  Don't be embarrassed.

```
 1              (Whereupon, a recess was taken.)

 2              THE COURT:  Proceed.

 3              MS. ADAMS:  Thank you, Your Honor.

 4   Q.  Now, Mr. Jackson, when I just asked you, from where we left

 5   off was, is this the same gun that you saw laying on the floor

 6   next to Mr. Smith?

 7   A.  Yes, ma'am.

 8   Q.  Mr. Jackson, have you been convicted of a felony?

 9   A.  No, ma'am.

10   Q.  Do you own any guns?

11   A.  Yes.

12   Q.  How many?

13   A.  Two.

14   Q.  What type of guns do you own?

15   A.  I own an A. K. forty-seven and a three oh eight rifle.

16   Q.  I'm showing you what is Government's exhibit number

17   sixty-one.  Does that look familiar to you?

18   A.  Yes, ma'am.

19   Q.  And what type of firearm is that?

20   A.  That's the three oh eight.

21   Q.  Is that your three oh eight?

22   A.  Yeah.

23   Q.  Where do you normally keep that gun?

24   A.  Under my mattress.

25   Q.  I'm sorry?
```

1   A.   Under my mattress in my room.

2   Q.   And you previously testified that your bedrooms are

3   upstairs?

4   A.   Yes, ma'am.

5   Q.   I'm now showing you Government's exhibit number fifty-five.

6   Do you see the firearm in that photograph?

7   A.   Yes, ma'am.

8   Q.   And what type of firearm is that?

9   A.   A. K.

10  Q.   Is that your A. K.?

11  A.   Yes, ma'am.

12  Q.   Where do you normally keep that firearm?

13  A.   It's behind the sofa or upstairs in my mattress.

14  Q.   Where were you keeping that firearm on July twentieth, two

15  thousand and seven?

16  A.   It was downstairs.

17  Q.   Where downstairs?

18  A.   It was on the side of the sofa.

19  Q.   So this gun is not one of yours?

20  A.   No, ma'am.

21  Q.   Sir, did you see Mr. Clark shoot at the officers?

22  A.   No, ma'am.

23  Q.   Did you see Mr. Clark with any gun in his hands on July

24  twentieth, two thousand and seven?

25  A.   No, ma'am.

```
1    Q.  Did you use any of your guns on July twentieth, two
2    thousand and seven?
3    A.  No, ma'am.
4    Q.  And did you shoot at the officers on July twentieth, two
5    thousand and seven?
6    A.  No, ma'am.
7              MS. ADAMS:  No further questions, Your Honor.
8                          CROSS EXAMINATION
9                  BY MR. BUTLER OF WILLIE JACKSON:
10   Q.  Mr. Jackson, my name is Kevin Butler.
11             You live at Twenty-eight sixty-one Jan Drive?
12   A.  Yes, sir.
13   Q.  How long have you lived at Twenty-eight sixty-one Jan
14   Drive?
15   A.  It's been probably a year now.
16   Q.  Where did you live before you lived at Twenty-eight
17   sixty-one Jan Drive?
18   A.  Forty-eighty Jan Drive.
19   Q.  So you lived across the street?
20   A.  Mm-hmm.
21   Q.  Does anyone live at that residence now?
22   A.  Yes.
23   Q.  And who lives there now?
24   A.  My Mom.
25   Q.  Anyone else stay with your Mom?
```

```
 1    A.  No, sir.
 2    Q.  I'm sorry, sir?
 3    A.  No, sir.
 4    Q.  Okay.  How many houses are on that street?
 5    A.  I'm not sure.
 6    Q.  If you had to guess.  You don't have to be perfect.
 7    A.  Probably forty.
 8    Q.  Forty houses up and down the street?
 9            Are there families that live in those houses?
10    A.  Yes.
11    Q.  Okay.  Now you rent the house from who?
12    A.  Anita (ph.) Ross.
13    Q.  Anita Ross?
14    A.  Anita Ross.
15    Q.  For lack of a better word, the lease for the house, the
16    rent papers, whatever, they're in your name?
17    A.  Yes, sir.
18    Q.  All right.  I'm showing you what's been marked as
19    Government's exhibit forty-six.  We've already gone through it.
20    I'll be brief.  This table, this pool table, this sofa, it's
21    yours, right?
22    A.  Yes, sir.
23    Q.  What's in that house is yours, correct?  The furniture
24    that's in the house is yours, correct?
25    A.  Yes, sir.
```

```
1    Q.  Bed upstairs and everything else is yours?

2    A.  Mm-hmm.

3    Q.  You control that house, correct?

4    A.  Yes, sir.

5    Q.  All right.  You indicated that people come by the house.

6    Does your mother come by sometimes?

7    A.  Yes.

8    Q.  Do you have any nieces?  Nephews?  Cousins?

9    A.  Yeah.

10   Q.  Do they come by the house?

11   A.  Yes.

12   Q.  You also indicate that friends come by the house.  Jamaal

13   Clark comes by?

14   A.  Mm-hmm.

15   Q.  Andreas Smith comes by?

16   A.  Mm-hmm.

17   Q.  Other friends?

18   A.  Mm-hmm.

19   Q.  How old are you?

20   A.  I'm twenty-seven.

21   Q.  So you are -- Where do you work, again?

22   A.  Alabama Crown.

23   Q.  Alabama I'm sorry?

24   A.  Crown.

25   Q.  Crown?
```

```
 1    A.   Yes, sir.

 2    Q.   I'm not sure if the Government got into it.  But what does

 3    Alabama Crown do?

 4    A.   Distribute wine and beer.

 5    Q.   Oh, that's right.  Distribute wine and beer.

 6              And what do you actually do?

 7    A.   I'm a delivery driver.

 8    Q.   Do you own any vehicles?

 9    A.   Yes, sir.

10    Q.   How many?

11    A.   One.

12    Q.   What do you have?

13    A.   Seventy-three Impala.

14    Q.   Have you put any type of modifications on it?  By that I

15    mean is it in the same exact condition it was in nineteen

16    seventy-three?

17              MS. ADAMS:  Objection, Your Honor.  Relevance?

18              MR. BUTLER:  Your Honor, I'm not going to -- I think

19    we need to -- I'm --

20              THE COURT:  What's your question again, now?

21              MR. BUTLER:  Has he put any modifications on the car,

22    on the vehicle.

23              THE COURT:  Why is that relevant?  I still don't

24    understand how that's relevant.

25              MR. BUTLER:  Your Honor, if I were to get into
```

```
 1    another matter, I would not be in compliance with the Court's
 2    earlier ruling.  I'm not inquiring into a certain matter, but I
 3    am touching upon his income --
 4              MS. ADAMS:  Your Honor, could we address this outside
 5    the presence of the jury?
 6              THE COURT:  I apologize, members of the jury, but we
 7    do need to address this out of your presence.
 8              (Whereupon, the jury was escorted out of the
 9    courtroom, and the following colloquy ensued):
10              THE COURT:  Yes?
11              MR. BUTLER:  Your Honor, I was inquiring into his
12    income.  For instance, I don't know what the answer was going
13    to be, if he has extensive modifications on the car, how much
14    those cost, and then I was going to move on.
15              THE COURT:  What point does this go to in this trial?
16              MR. BUTLER:  That being is, and I'll argue this at
17    closing, that being that this is an individual, Your Honor, who
18    sells drugs for a living.  He has money and proceeds from those
19    drugs, and as a result of that he's been able to buy himself
20    items which are above and beyond his income stream at Alabama
21    Distributors.
22              THE COURT:  But what does this prove about your
23    client?
24              MR. BUTLER:  What it proves is that my client did not
25    discharge the firearm, it's an individual who is protecting his
```

1    income source who fired the firearm.

2            THE COURT:  Ask your question.  Let's see how he

3    answers.

4    Q.  You said you have a seventy-three Impala?

5    A.  Yes, sir.

6    Q.  Does that car have any modifications on it, or is it in the

7    factory condition that it was --

8    A.  I have a C. D. player in it.

9    Q.  Have you put any additional wheels on it?

10   A.  No, sir.

11   Q.  It has still the same wheels from nineteen seventy-three?

12   A.  It might not be the same ones, but it's just regular

13   tires.

14   Q.  You haven't put anything else on them?

15   A.  No, sir.

16           THE COURT:  Is that all you wanted to ask him?

17           MR. BUTLER:  Yes, sir.

18           THE COURT:  Do you still want to ask him?

19           MR. BUTLER:  No, Your Honor.

20           THE COURT:  Bring the jury back in.  Let's move on to

21   something else.

22           (Whereupon, the jury was escorted into the

23   courtroom.)

24           THE COURT:  Proceed.

25   Q.  I think my last question to you -- Excuse me.  My question

```
 1   to you is, do you rent that residence?
 2   A.  Yes, sir.
 3   Q.  And you've had that residence for one year?
 4   A.  Yes, sir.
 5   Q.  Okay.
 6            MR. BUTLER:  One moment, Your Honor.
 7            (Whereupon, Mr. Butler conferred with Ms. Adams off
 8   the record and out of the hearing of the other courtroom
 9   participants.)
10   Q.  All right.  The Government showed you these earlier.  What
11   type of gun is this?
12   A.  Three oh eight.
13   Q.  A three oh eight.  It's just called a three oh eight?  Is
14   it any type of brand?
15   A.  That's all I know.  I can't recall.
16   Q.  And where did you purchase that three oh eight?
17   A.  I bought it from a guy.
18   Q.  What guy?
19   A.  I mean it's just a guy that had it for sale.
20   Q.  You don't remember his name?
21   A.  No, sir.
22            MS. ADAMS:  Objection, Your Honor.  Relevance?
23            MR. BUTLER:  The propriety of the purchase.
24            THE COURT:  Pardon me?
25            MR. BUTLER:  The propriety of the purchase.
```

```
1              THE COURT:  How is that relevant?
2              MR. BUTLER:  Your Honor, if he's engaged in illegal
3    activity in the purchase of firearms, he may be engaged --
4              THE COURT:  I'll sustain that objection.  We're
5    getting too far afield.
6    Q.  I'm going to show you this firearm.  Where did you purchase
7    that firearm?
8    A.  At a pawnshop.
9    Q.  How much did you get it for?
10             MS. ADAMS:  Objection, Your Honor.  Relevance?
11             THE COURT:  How much did you say what, now?
12             MR. BUTLER:  How much did he buy it for.
13             THE COURT:  How is that relevant?
14             MR. BUTLER:  Again, Your Honor, I'm just trying to
15   flesh out the circumstances of the arsenal that's in the house.
16             THE COURT:  And the cost of the gun is part of that?
17             MR. BUTLER:  Yes.
18             THE COURT:  I'll sustain that objection.
19   Q.  And, again, this is not your firearm, correct?
20   A.  No, sir.
21   Q.  All right.  Do you shoot elephants or rhinos with this gun?
22             MS. ADAMS:  Objection.  Your Honor, relevance?
23             THE COURT:  I'll sustain it for being sarcastic, and
24   I've warned you once already.
25   Q.  What do you -- Do you hunt with this gun?
```

```
1    A.   No, sir.
2              MS. ADAMS:  Objection, Your Honor.
3              MR. BUTLER:  I think I can ask what the purpose --
4              THE COURT:  I'll allow that.  Go ahead.
5    Q.   What do you use the gun for?
6    A.   I ain't use it for anything.
7    Q.   You just keep it around?
8    A.   I like guns.
9    Q.   Do you go test firing it at places?
10   A.   No, I ain't never fired that one.
11   Q.   You just keep them around?
12   A.   Yeah.
13   Q.   Because you like them?
14   A.   Yes, sir.
15   Q.   You didn't get a little thirty-eight, you decided to get,
16   what is this called, a thirty-eight rifle?  That's the gun that
17   you like?
18   A.   I like that one.
19   Q.   All right.  Now I think you called this an A. K.
20   forty-seven?
21   A.   Yes, sir.
22   Q.   That's an assault rifle, correct?
23   A.   Yes, sir.
24   Q.   Gone hunting with that one?
25   A.   No, sir.
```

1    Q.   What have you used it for?

2    A.   Nothing.

3    Q.   Just keep an assault rifle and another rifle around because

4    you like them?

5    A.   Yes, sir.

6    Q.   Do you have any other hobbies?

7    A.   Excuse me?

8    Q.   Do you have any other hobbies other than gun collecting?

9    A.   No, sir.

10   Q.   The children that come to the house, do you keep them by

11   the sofas when they're around?

12   A.   No, sir.

13   Q.   You just decided to keep it by the sofa that day?

14   A.   I mean yes, I guess.

15   Q.   Where is your gun safe in the house?

16   A.   I don't have one.

17   Q.   So you've got two assault rifles that are out in the open.

18   If the children are inquisitive they can find them.

19   A.   No, sir.

20   Q.   Where do you hide them?

21   A.   I have them under my mattress.

22   Q.   And you don't think children can look under there?

23            MS. ADAMS:   Objection, Your Honor.

24            MR. BUTLER:   Withdrawn.

25   Q.   You've known Jamaal Clark for -- since he was nine?

1    A.   I probably was nine years old.

2    Q.   And that means you two have gone to school together?

3    A.   Yes, sir.

4    Q.   Interacted together?

5    A.   Yes, sir.

6    Q.   Gone out together to see movies, things friends do?

7    A.   Yes, sir.

8    Q.   As with most friends, and you don't have to tell me what

9    they are, you guys share details of your lives, both the good

10   and the bad to one another?

11   A.   Yes, sir.

12   Q.   And that's what you and Jamaal have done for I guess that

13   would be what, almost twenty years now?

14   A.   Yes, sir.

15   Q.   You're aware that, I don't know, because you guys are

16   friends, I don't know, about the year and-a-half ago that

17   Jamaal the was convicted of a felony?

18   A.   Yes, sir.

19   Q.   Yet you decided to have laying around when Jamaal was at

20   the house a firearm.

21           MS. ADAMS:  Objection, Your Honor.

22           MR. BUTLER:  Let me rephrase the question.

23   Q.   You're aware that Jamaal was convicted of a felony,

24   correct?

25   A.   Yes, sir.

1    Q.   Okay.  Yet it's been your testimony today that while Jamaal

2    was at your house, a firearm was laying by the sofa, correct?

3    A.   Yes, sir.

4    Q.   So let's put it this way:  You also testified that when

5    Jamaal got up and went around and went to the bathroom at some

6    point, correct?

7    A.   Mm-hmm.

8    Q.   And the firearm is laying here by the sofa, correct?

9    A.   It's on the side of the sofa.

10   Q.   I'm sorry, point to the --

11   A.   It will be in this area.

12   Q.   So it's in this area.  And he went and got up and went to

13   the bathroom, correct?

14   A.   Mm-hmm.

15   Q.   You didn't put it up -- You didn't hide it up under your

16   mattress when your friend was over who was convicted of a

17   felony?

18   A.   No, sir.

19   Q.   You're aware -- You've known Andreas since he was a young

20   person, correct?

21   A.   Yes, sir.

22   Q.   Yet, again, that firearm is sitting out there while Andreas

23   is over as well, correct?

24   A.   Yes, sir.

25   Q.   This is the firearm that you saw the marshals retrieve on

1    the floor, correct?

2    A.   Yes, sir.

3    Q.   You'd agree that this -- Let's put it this way:  You said

4    you're familiar with firearms because you collect them and you

5    like them.

6    A.   I mean the ones I have.

7    Q.   Right.  So are those the only guns that you're familiar

8    with?

9    A.   I mean, pretty much.

10   Q.   Okay.  You've never seen what's called a nine millimeter or

11   this type of gun before ever?

12   A.   I've seen a nine millimeter before.

13   Q.   Have you ever seen this type of gun?  This is a Smith &

14   Wesson.

15   A.   Yes, that day.

16   Q.   I'm not trying to say it's yours, but you've seen this type

17   of gun?

18   A.   Yes, sir.

19   Q.   And it's got metal on the top, correct?

20   A.   I guess that would be.

21   Q.   A metal slide for the gun?

22   A.   Mm-hmm.

23   Q.   And, again, just tapping on your expertise, again, it

24   appears your expertise is in the assault rifles --

25              MS. ADAMS:  Objection, Your Honor.  That's a

1   mischaracterization of the evidence.  He did not testify that

2   he had any expertise with firearms.  He stated that he was

3   familiar with the guns that he owns.

4              MR. BUTLER:  I think his testimony was he likes to

5   collect guns.

6              THE COURT:  Overruled.  Go ahead and ask your

7   questions.

8   Q.  Have you come to know that when you touch one of these

9   types of guns, to load the bullets you have to slide the thing

10  back?

11  A.  Mm-hmm.

12  Q.  You have to touch the top and slide it back like that?

13  A.  Mm-hmm.

14  Q.  Now, on July twenty something, July twenty-second?  On July

15  twentieth law enforcement came to your house.  Correct?

16  A.  Yes, sir.

17  Q.  Now you and Jamaal are sitting here playing dominoes.

18  A.  Mm-hmm.

19  Q.  And is that something that you two do often?

20  A.  Somewhat.

21  Q.  Okay.  How long had Jamaal been at the house?

22  A.  I'm not sure of the exact amount of time.

23  Q.  If you had to guess?

24  A.  Probably an hour.

25  Q.  Andreas Smith was at the house as well?

1    A.  Mm-hmm.

2    Q.  Andreas, how long had Andreas been at the house?

3    A.  I'm not sure.

4    Q.  This event you indicated happened at night?

5    A.  At night, yes, sir.

6    Q.  Okay.  Andreas had come over to your house what I'll say

7    earlier in the day, is that not correct?

8    A.  Mm-hmm.

9    Q.  Do you recall what time he had come over to the house?

10   A.  No, sir.

11   Q.  Was it around noon?

12   A.  I'm not sure.

13   Q.  Okay.  When he came to the house -- Do you recall

14   testifying before the grand jury?

15   A.  Excuse me?

16   Q.  Do you recall testifying before the grand jury?

17   A.  Mm-hmm.

18   Q.  Do you recall telling them that when he came to the house

19   you did not see him in possession of the firearm?  This is the

20   earlier time that he came.  When he was at the house initially,

21   you did not see any firearm on him?

22   A.  No, sir.

23   Q.  Okay.  He was at the house for a period of time, period of

24   hours, wasn't he?

25   A.  Yes, sir.

1    Q.  Possibly three or four hours?

2    A.  It could have been.

3    Q.  All right.  During that period of time you never saw a

4    firearm in his possession?

5    A.  No, sir.

6    Q.  At some point his girlfriend, or someone -- well at some

7    point he leaves the residence.

8    A.  Mm-hmm.

9    Q.  Do you know who came and who he left the residence with?

10   Did you see who he left with?

11   A.  No, sir.

12   Q.  What you know is he got up and he left.

13   A.  Mm-hmm.

14   Q.  At that point you also testified you never saw a firearm on

15   his person, correct?

16   A.  Yes, sir.

17   Q.  He then -- That is, you did not see him with the firearm?

18   A.  No.

19   Q.  Okay.  And then came back to the residence at what I'll

20   call evening time.  He came back to the residence after he had

21   left with -- after he had left, correct?

22   A.  Mm-hmm.

23   Q.  He then stayed at the residence for an additional period of

24   time, correct?

25   A.  Yes, sir.

1    Q.   When he returned to the residence, you did not see him in

2    possession of a firearm?

3    A.   No, sir.

4    Q.   You also did not see him in possession of a firearm when he

5    got up and went to answer the door.

6    A.   I saw the gun when he was walking to go answer the door.

7    Q.   It was your testimony, though, that when he was at the

8    door, you said you saw a firearm in his hand, correct?

9    A.   When he was at the door I didn't see him because I was

10   sitting down.

11   Q.   Oh, okay.  So you did not see a firearm in his hand at the

12   door.  It's your testimony that you saw him with one as he

13   walked to the door?

14   A.   Mm-hmm.

15   Q.   And it was this firearm right here?

16   A.   Yes, sir.

17   Q.   I just have to ask you.  Is this your firearm?

18   A.   No, sir.

19   Q.   Did you shoot this firearm at the individuals -- Did you

20   shoot this firearm on July twentieth?

21   A.   No, sir.

22   Q.   Okay.  Now you indicated that this table is closer to this

23   wall.

24   A.   Mm-hmm.

25   Q.   So it's back here.

```
1    A.  Yes, sir.

2    Q.  And the pool table is farther over -- Did you say the pool

3    table was farther toward the sofa?

4    A.  Yes, sir, it's closer to the sofa.

5    Q.  It's closer to the sofa.

6            There is also a wall right here, correct?

7    A.  Yes, sir.

8    Q.  And, so, this wall, for instance if you were given -- How

9    this table really is, because this is not to scale, given how

10   this table is really situated, if you were sitting in this

11   chair as it really is, about here, and you couldn't, for,

12   instance see this sofa back over here.

13   A.  No, sir.

14   Q.  Okay.  As a matter of fact, you couldn't see it from this

15   chair either.

16   A.  The sofa?

17   Q.  The sofa.

18   A.  Yes, sir.

19   Q.  You can see the sofa from this chair?

20   A.  Mm-hmm.

21   Q.  So this wall is longer?

22   A.  No, that wall is closer in.

23   Q.  Sorry, sir?  You're pointing at the diagram.  What do you

24   mean by "closer in"?

25   A.  This wall is probably even with the table.
```

1    Q.  Okay.  And this pool table is back over in this direction,

2    correct?

3    A.  Yes, sir.  It's farther down.

4    Q.  Would you just draw like an arrow in the direction it's

5    going.

6    A.  The pool table is probably like this.

7    Q.  Okay.  Over there.

8    A.  Not that far down because it's not in the hallway.

9    Q.  But farther down?

10   A.  Yeah.

11   Q.  Okay.  But from certain angles, for instance right here,

12   you can pretty much on this side you can see the pool table,

13   correct?

14   A.  Yes, sir.

15   Q.  And from here you could see the sofa, even given where it's

16   located?

17   A.  Mm-hmm.

18   Q.  But there is obstructions to this area, to the sofa area

19   from this chair, correct?

20   A.  Yes, sir.

21   Q.  And you say you can see the sofa from this first chair?

22   A.  Yes, sir.

23   Q.  Okay.  Now going into the kitchen area, there is -- This is

24   the kitchen area right here, right?

25   A.  Yes.

```
 1    Q.  When you come in through the front door there's a wall
 2    here?
 3    A.  Yes, sir.
 4    Q.  Then there's an opening that goes into the kitchen?
 5    A.  Mm-hmm.
 6    Q.  Are you living at Jan Drive right now?
 7    A.  Excuse me?
 8    Q.  Are you living at Jan Drive right now?
 9    A.  Yes, sir.
10    Q.  Okay.  Did you have to repair any bullet holes in this wall
11    right here that I'm pointing at?
12    A.  Yes, sir.
13    Q.  You did have to repair bullet holes in this wall?
14    A.  Yes, sir.
15    Q.  Did anyone from Forensic Sciences, Alabama Forensics, ever
16    come to your office and -- I mean come to your residence and do
17    any type of analysis regarding bullet angles, to your
18    knowledge?
19    A.  No, sir.
20    Q.  Okay.  Did they have to -- Did you have to repair bullet
21    holes in the front door?
22    A.  Yes, sir.
23    Q.  Did you have to repair a bullet hole on the side of the
24    door -- I mean where I'm pointing at the side wall of the
25    house?
```

```
 1    A.  Yes, sir.
 2    Q.  Okay.  Did you have to repair busted glass at the front of
 3    the house?
 4    A.  Yes, sir.
 5    Q.  Listen to my question very, very carefully here.  We're in
 6    federal court.
 7    A.  Yes, sir.
 8    Q.  Okay.  Have you been charged in federal court with the
 9    firearms that were in that residence?
10    A.  No, sir.
11    Q.  Have you been charged in federal court with anything else
12    that was found in that residence?
13    A.  No, sir.
14    Q.  Yet it was your residence that you owned and controlled,
15    correct?
16    A.  Yes, sir.
17    Q.  Are you aware that -- it's pretty self-evident -- that it
18    is illegal to discharge a firearm at federal officers?
19    A.  Yes, sir.
20    Q.  Do you -- Well, let's put it this way:  Because you haven't
21    been charged in federal court with any offense at this house,
22    you're presently not looking at going to prison or any penalty
23    for what happened in that house, is that correct?
24             MS. ADAMS:  Objection, ambiguous.
25    Q.  Are you facing any penalty in federal court regarding what
```

1    happened in that house?

2    A.  No, sir.

3    Q.  Again, you've never been to jail, correct?

4    A.  Correct.

5    Q.  Do you have any desire to go to jail?

6    A.  No, sir.

7            MR. BUTLER:  One moment, Your Honor.

8            (Whereupon, Mr. Butler conferred with Ms. McKee and

9    Ms. Mason off the record and out of the hearing of the other

10    courtroom participants.)

11    Q.  Final question.  Have you ever told anyone that you

12    discharged the firearms -- any of the firearms, whether it be

13    this handgun or the rifles, on the date of this incident, that

14    is July twentieth, when the marshals came to arrest Mr.

15    Smith?

16    A.  No, sir.

17    Q.  You've never spoken to anyone or told anyone that you had

18    involvement in this offense?

19    A.  No, sir.

20            MR. BUTLER:  Nothing further.

21                     REDIRECT EXAMINATION

22            BY MS. ADAMS OF WILLIE JACKSON, JUNIOR:

23    Q.  Mr. Jackson, do you have knowledge of what the police

24    technicians did that night on July twentieth, two thousand and

25    seven at your house?

1   A.  No, ma'am.

2   Q.  Weren't you taken to the police station that night?

3   A.  Yes, ma'am.

4   Q.  Do you know of anyone who wants to go to jail?

5   A.  No, ma'am.

6   Q.  Mr. Butler asked you about the fact that you had no federal

7   charges.  The United States hasn't made you any promises in

8   return for your testimony today, have they?

9   A.  No, ma'am.

10          MS. ADAMS:  No further questions, Your Honor R.

11          MR. BUTLER:  Briefly.

12          THE COURT:  Yes.

13                     RECROSS EXAMINATION

14             BY MR. BUTLER OF WILLIE JACKSON, JR.:

15  Q.  Did you ever tell anyone that Jamaal did any shooting at

16  the residence?

17  A.  No, sir.

18          Ms. ADAMS:  Your Honor, that exceeds the scope of

19  redirect.

20          MR. BUTLER:  I can recall the witness.

21          THE COURT:  Overruled.

22  Q.  That Jamaal did any of the shooting or possessed a

23  firearm?

24  A.  No, sir.

25  Q.  The Government just told you that no promises had been made

1   to you, correct?

2   A.  Yes, sir.

3   Q.  But what you've also testified to is that there are no

4   charges pending against you in federal court.  These people

5   sitting here have not charged you with anything that happened

6   at your house, correct?

7   A.  Yes, sir.

8   Q.  Would you enjoy the prospect of having to fight a charge

9   in -- I mean a criminal charge in federal court?

10  A.  Would I what now?

11  Q.  Enjoy the prospect of fighting a criminal charge in federal

12  court?

13  A.  No, sir.

14  Q.  So you have received a benefit in the sense that you have

15  not been charged, correct?

16  A.  I'm not sure what you're asking me.

17  Q.  Let's put it this way:  You're not having to fight a charge

18  in federal court, correct?

19  A.  Mm-hmm.

20  Q.  Something that you said you would not enjoy.

21  A.  Mm-hmm.

22          MR. BUTLER:  Nothing further.

23          THE COURT:  Anything else?

24          MS. ADAMS:  No, Your Honor.

25          THE COURT:  Thank you.  You may step down.

```
 1              (Whereupon the witness, Willie Jackson, Junior,
 2    stepped down from the stand.)
 3              THE COURT:  Next witness.
 4              MS. ADAMS:  Derrick Dwayne Davis.
 5                        D E R R I C K    D A V I S,
 6        the witness herein, having first been duly sworn or
 7    affirmed to tell the truth, was examined and testified as
 8    follows:
 9                        DIRECT EXAMINATION
10              BY MS. ADAMS OF DERRICK DUANE DAVIS:
11    Q.  Good morning, sir.
12    A.  Good morning.
13    Q.  Could you please state your full name and spell your first
14    and last name for the record.
15    A.  Yes, ma'am.  My name is Detective Derrick Duane Davis.
16    First name spelling D-e-r-r-i-c-k, last name D-a-v-i-s.
17    Q.  You just stated that you are a detective?
18    A.  Yes, ma'am.
19    Q.  How are you employed?
20    A.  I'm employed with the City of Montgomery, a crime scene
21    detective in the Crime Scene Bureau.
22    Q.  You said that you are employed with the City of Montgomery.
23    Are you referring to the Montgomery Police Department?
24    A.  Yes, ma'am.
25    Q.  How long have you been with the Montgomery Police
```

1    Department?

2    A.  I have been with the Montgomery Police Department for eight

3    years.

4    Q.  What prior positions have you had with law enforcement?

5    A.  I was a patrolman.  Been on patrol for seven years.  Been

6    in the Detective Division for a year.

7    Q.  You just stated that you were a patrolman.  Were you a

8    patrolman with the Montgomery Police Department?

9    A.  Yes, ma'am.

10   Q.  As a crime scene detective, what are some of your duties?

11   A.  Duties of a crime scene investigator is to go out and

12   collect evidence from the scene.  Take photographs of evidence

13   of the scene and also the scene itself.

14   Q.  Now you stated "collect evidence".  What exactly does that

15   mean?

16   A.  Collecting evidence such as anything that was used,

17   anything that's been used as far as fingerprints, solid items

18   that had been used on the scene or that have been used to

19   commit a crime.

20   Q.  So you're saying items that could possibly have been

21   involved in a crime?

22   A.  Yes, ma'am.

23   Q.  What type of training have you received that qualifies you

24   for that position?

25   A.  I've trained up under another crime scene investigator.  We

1    also trained in the proper division.  Before you become a crime

2    scene investigator you're trained in another division as far as

3    learning how to investigate a scene, how to do interviews, how

4    to talk to suspects.  And while doing so I also learned how to

5    collect evidence, take photographs, video evidence.  Also video

6    a scene.  And collect fingerprints.

7    Q.  Now you said one thing, you said train in another division.

8    What do you mean by that?

9    A.  I was also a property detective.  I was a property

10   detective for at least six months.

11   Q.  What is a property detective?

12   A.  That's a detective that focuses on burglaries, any kind of

13   theft of property.  As far as somebody breaking and entering

14   into a residence.  And we also interview suspects from the

15   scene.

16   Q.  As a property detective, what did you do?

17   A.  I went out to -- we also took in crimes such as somebody

18   committing theft of property, different theft of properties,

19   different burglaries.  We also interview suspects on that

20   scene.  Also, there's being a property detective you would deal

21   with items such as not as being in the robbery, but a burglary

22   is different than a robbery because a robbery detective is a --

23   is in the person division.  A person detective.  I was more

24   like a property detective dealing with items that were stolen

25   from victims.

1    Q.   Now you also stated that you do prints.

2    A.   Yes, ma'am.

3    Q.   What do you mean by "prints"?

4    A.   Fingerprints that were left on the scene by a suspect, or

5    any suspects on that scene.  As far as -- Collecting prints is

6    a skill to where you've got to the find out if you've got any

7    evidence left behind by a suspect.  You go out and we'll use

8    different kind of powders or magnetic powders to pull up a

9    print, and we'll submit it to our latent fingerprint

10   examiner.

11   Q.   Okay.  Now you said "pull up a print".  Are you saying that

12   you look for prints on evidence?

13   A.   Yes, ma'am.

14   Q.   And how do you pull up a print?

15   A.   Well we use different kind of powders.  The first powder we

16   use is a black silk powder.  It's almost like a charcoal powder

17   to look for certain items that was used by a suspect.  You'll

18   put powder on it and try to pick up any kind of moisture that

19   was left behind by a fingerprint that was left by a suspect.

20   It's depending on how many points in that fingerprint that you

21   get in order to say that you have a good print.

22          MR. BUTLER:  Your Honor, I'd object to the analysis

23   portion of his testimony.  His expertise I believe is

24   collection.  There hasn't been a foundation as to analysis.

25          THE COURT:  It depends on his training.

1        MR. BUTLER:  No foundation has been laid, Your Honor.

2    Q.  You stated that you received fingerprint training.  What

3    type of training was that?

4    A.  I received fingerprint training from another crime scene

5    investigator.  Also we have automated fingerprint

6    identification system classes with our latent fingerprint

7    examiner to focus on how many points that we can possibly find

8    in a print.

9    Q.  So how did you learn how to lift a print?

10   A.  I learned how to lift a print by a lot of practice.  I also

11   did a lot of studying up under another fingerprint examiner.  I

12   did a lot of studying up under another crime scene investigator

13   as far as we go out and we'll probably do a lot of tests to see

14   if we can pull up a print on our own.

15        And we also went to a lot of scenes to where I took a

16   lot of prints in my time since I have been with the police

17   department.

18   Q.  How long is it that the Montgomery Police Department trains

19   their crime scene detectives on lifting prints?

20   A.  We have classes we go through.  Individual classes with

21   ourselves.  We do a lot of training down in the Crime Scene

22   Bureau amongst each other, and we do training as far as

23   learning how to print, how to pull up a print.

24        We do different prints as far as putting them in

25   different stages to pull up a print.  We go through a lot of

1  training amongst ourselves down at the Crime Scene Bureau.

2  Q.  Did you participate in the regular training that Montgomery

3  Police Department requires for printing for crime scene

4  detectives?

5  A.  Yes, ma'am.

6  Q.  What is the difference between a print and a latent

7  print?

8  A.  The difference between a print and a latent print?  You can

9  have a print -- you can have a print that you can say -- well,

10  like if I pull up a print I might pull up a print of unknown

11  value.  Now if I submit it to my latent fingerprint examiner,

12  he can tell you whether it's going to have value or it's going

13  to have no value.

14       A lot of times we'll pull up a print that we think

15  would have value or unknown value which it doesn't have any

16  value because of the markings might be smeared or you might

17  think you have enough points but you're not having enough

18  points from a fingerprint in order to make it a good latent

19  print.

20  Q.  Okay.  You keep referring to "points".  What do you mean by

21  "points"?

22       MR. BUTLER:  Your Honor, this is where I would renew

23  my objection.  He has a firm foundation as to his ability to

24  lift prints, he had multiple techniques.  He's still not laid a

25  foundation for analysis.  As a matter of fact, he stated he

1    submitted it to the examiner.

2          THE COURT:  Is the determination of points a part of

3    what you do?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Why is that a part of what you do?

6          THE WITNESS:  Because we do classes with the latent

7    fingerprint examiner.  He'll teach us how many points that we

8    can count up on ridges.  We'll use a scope to find out --

9          THE COURT:  I think you misunderstood my question.

10   Does determining the number of points, is that a part of what

11   you do as part of your work when you lift prints?

12         THE WITNESS:  No, sir.  It's a part of what the

13   latent fingerprint examiner does.  He looks at it and tells you

14   if it's going to have enough value in order to say it's a good

15   print.

16         THE COURT:  So you don't make any preliminary

17   assessments as to whether there are enough points or not when

18   you're lifting prints?

19         THE WITNESS:  No, sir.  If we see a print, we'll

20   still lift it.  Even if it's not a good print we'll still lift

21   it, and we'll see if the latent fingerprint examiner can tell

22   you whether it's going to be a good print or not.

23         THE COURT:  Now what do you want to -- What's your

24   purpose of eliciting this evidence from him?

25         MS. ADAMS:  My purpose is to get -- I was trying to

1    establish a background of his training in prints since he --

2            THE COURT:  Since he's not the one who determines

3    whether the print is --

4            MS. ADAMS:  I was trying to establish his training in

5    lifting prints.

6            THE COURT:  You can do that.  But he's not the one

7    who determines whether the print is sufficient.

8            Go ahead.

9    Q.  You discussed a black silk powder analysis.

10   A.  Yes, ma'am.

11   Q.  And you stated that that is what one of the analyses that

12   you use in lifting prints.

13   A.  Yes, ma'am.

14   Q.  What other forms of analyses do you use?

15   A.  We also use Super Glue fuming tank.  It's a tank where we

16   put items in that's been touched by suspects.  And what it is

17   is, the Super Glue will get on a heating element and it vapors

18   to make the Super Glue fume stick to porous -- like if some

19   prints were left behind, it will stick to it.  And it adheres

20   to any kind of solid object that you put into the tank.

21   Q.  Are those the only two forms of analyses that you use?

22   A.  No, ma'am.  We also use magnetic powder.  Magnetic powder

23   is a magnetic, it sticks to any prints as far as solid objects

24   or paper.

25   Q.  So there are three basic analyses that you use?

1    A.   Yes, ma'am.

2    Q.   And how do you determine which analysis to use for a

3    print?

4    A.   It's depending on the surface of the item that we are

5    collecting.

6    Q.   How does the surface help you in making that

7    determination?

8    A.   If you have a rough surface, it's going to be hard to pull

9    up a print.  If the it's a rough surface with a lot of ridges

10   in it, it makes the fingerprint distorted and you can't really

11   get a good reading off of that item.  That's why we use a Super

12   Glue tank because it makes it stick and makes the print show up

13   a lot better than just using a black powder or the magnetic

14   powder.

15            Magnetic powder you can't really use on any kind of

16   metal surface because it will distort the print.  Black silk

17   powder is a good powder to use.  You can use it on an item, but

18   a lot of times the black silk powder, if you use too much of

19   it, it will distort the print.

20   Q.   If you use too much powder it will distort the print?

21   A.   Yes, ma'am.

22   Q.   What type of firearms training have you received?

23   A.   I received firearms training through the academy as far as

24   shooting a weapon; in order to unload your weapon safely; in

25   order to break down your weapon safely to a certain point.

1   Q.  Did your firearms training in the academy teach you how to

2   load and unload?

3   A.  Yes, ma'am.

4   Q.  Is that what you meant when you said breaking down?

5   A.  Well breaking down the weapon in order to clean it.  You

6   also go to another extreme in order to unload.  You break your

7   weapon down, clean it, put it back together.  You can reload

8   safely without anybody getting hurt.

9   Q.  Do you receive training on ammunition?

10   A.  On ammunition itself?  No.  It's just depending on what

11   kind of ammunition we're shooting out of the certain weapon

12   we're using.

13   Q.  Did you participate in the investigation of Mr. Andreas

14   Jejuan Smith?

15   A.  Yes, ma'am.

16   Q.  How did you participate?

17   A.  I was the crime scene investigator called out to the scene

18   in order to photograph it and also process the scene to collect

19   evidence.

20   Q.  Did you process the scene at Compass Bank on June

21   twenty-second, two thousand and seven?

22   A.  Yes, ma'am.

23   Q.  Did you process any other scenes on that day?

24   A.  Yes, ma'am.  It was another scene on Lisa Court.  I

25   processed a Tahoe for fingerprints.

1    Q.   Which scene did you go to first?

2    A.   I went to Lisa Court first.

3    Q.   And you stated that you processed a Tahoe?

4    A.   Yes, ma'am.  It was a Chevrolet Tahoe.

5    Q.   Were you able to the see any prints on the Tahoe?

6    A.   Yes, ma'am, I was able to see some prints on the Tahoe.

7    They were of unknown value until I got them back to my latent

8    fingerprint examiner.

9    Q.   You state that you had saw prints.  Did you lift any?

10   A.   Yes, ma'am, I did lift some prints from that Tahoe.

11   Q.   What type of process did you use in lifting those prints?

12   A.   I used a black silk powder in order to lift those prints

13   because the Tahoe is made of a metal.  You don't want to use

14   any magnetic powder on the metal.

15   Q.   And what type of surface is on a Tahoe?

16   A.   The Tahoe has a smooth metalitic surface.  It's made of

17   metal.  Smooth.  It's good to get a print off of.  It's just

18   depending on how much powder you use in order to -- if you were

19   to distort a print.

20   Q.   What about smudges?

21   A.   Smudges are not real good prints to lift.  You can't get

22   enough off that print to say that it has value.

23   Q.   Do you lift a smudge?

24   A.   You can lift a smudge.  Like I say, I just lift prints.

25   What I do is I'll lift that print and I'll submit it to my

1  latent fingerprint examiner for him to determine whether he can

2  say yeah, I've got enough here to use it.

3  Q.  So you do lift smudges?

4  A.  Yes, ma'am.

5       MR. BUTLER:  Your Honor, my client needs a break at

6  this time to go to the restroom.

7       THE COURT:  We'll take another ten minute break.

8       (Whereupon, a recess was taken.)

9       THE COURT:  Proceed, Ms. Adams.

10      MS. ADAMS:  Thank you, Your Honor.

11  Q.  After you processed the Tahoe at Lisa Court, what did you

12  process next?

13  A.  After we left Lisa Court, we went to the bank, Compass

14  Bank.

15  Q.  When you say "Compass Bank," are you referring to the bank

16  that was robbed on June twenty-second, two thousand and

17  seven?

18  A.  Yes, ma'am.

19  Q.  I'm showing you what has been admitted as Government's

20  exhibit number one.  Is that the bank you're referring to?

21  A.  Yes, ma'am.

22  Q.  What is the location of that bank?

23  A.  It's at Thirty-four eighty Eastern Boulevard.

24  Q.  Is that located in Montgomery, Alabama?

25  A.  Yes, ma'am.

1    Q.   Is that within Montgomery County, Alabama?

2    A.   Yes, ma'am.

3    Q.   What part of the bank was processed for the prints?

4    A.   Part of the bank that was processed for prints were the

5    front door, inside of the front door, the bank teller counter,

6    the drawer, and also I think the register where the teller was

7    sitting.

8    Q.   How many lifts -- I'm sorry.  How many prints were lifted

9    from those areas?

10   A.   There should have been about three prints that were lifted

11   from the counter of unknown value.

12   Q.   Did you process the counter?

13   A.   Yes, ma'am.

14   Q.   I'm showing you what is Government's exhibit number five.

15   Is that the counter that you're referring to?

16   A.   Yes, ma'am.

17   Q.   Now did you process the whole counter?

18   A.   Yes, ma'am.  Right where you can see the suspect was

19   touching the front counter right there where the teller was

20   sitting at.

21   Q.   Are you saying in front of the teller that was robbed?

22   A.   Yes, ma'am.

23   Q.   I'm now showing you what has previously been admitted as

24   Government's exhibit number twelve.  Does this exhibit depict

25   what you were discussing when you said the bank robber touched

1   the counter?

2   A.  Yes, ma'am.

3   Q.  Does it appear in this photograph that the bank robber put

4   his whole hand on the counter?

5   A.  No, ma'am.

6   Q.  Were you able to lift a print from every finger of a

7   hand?

8   A.  No, ma'am, not every finger.

9   Q.  Does it appear in this photograph, which is Government's

10  exhibit number thirteen, that the bank robber is touching the

11  counter?

12  A.  Yes, ma'am.

13  Q.  So that is the area that you were referring to when you

14  said that you lifted prints from the counter?

15  A.  Yes, ma'am.

16  Q.  Was it difficult for you to lift the prints that you

17  lifted?

18  A.  Yes, ma'am.

19  Q.  Why was it difficult?

20  A.  Because the counter is not made with a smooth surface.

21  It's got ridges into the surface that will distort a print.

22  You can't use magnetic powder because magnetic powder will

23  stick to that surface, so you have to use black silk powder in

24  order to try to pull a print off there.

25  Q.  So you used black silk powder?

1    A.   Yes, ma'am.

2    Q.   Is there anything else that could affect a print besides

3    the surface?

4    A.   Also, if the subject is not touching it just flush with the

5    surface, they might touch it and pull away and leave smudges on

6    the surface.  So that's why we say we collected everything that

7    was right there was touched.  Even if it was a smudge, we still

8    collected it.

9    Q.   So how could a smudge occur?

10    A.   A smudge occurs when a person touches a surface and pulls

11    away, and his hand it smears the print.  To not touch and pull

12    right back up, it's touch and probably dragging it along would

13    make a smear on the surface.

14    Q.   Is there any other way that you could smear a print besides

15    with the actual hand?

16    A.   If your hand was real sweaty and it will distort a print.

17    Q.   Could anything else affect that print once it's on the

18    surface, like once it's on the counter?

19    A.   If it's cleaned, or if moisture hit it, it can distort a

20    print.  If the print is not playing flush to the surface, if it

21    got cracks inside of the surface, it's not going to lay flat

22    and that will change a print as well.

23    Q.   What about friction?

24    A.   Yes, friction will cause a print to be distorted as well.

25    Q.   How does friction affect the distortion of a print?

1    A.  Because you're not getting the full print.  You're not

2    getting enough of a print to say well, okay, got enough to use

3    it as far as turning it into the latent fingerprint examiner.

4    Q.  But you could still lift it.

5    A.  Yes, ma'am.

6    Q.  I'm now showing you Government's exhibit number seventeen.

7    Could that affect a print that's on the counter?

8    A.  Yes, ma'am.

9    Q.  How could what's depicted in Government's exhibit number

10   seventeen affect a print?

11   A.  Well, right there it would -- from the clothing it would

12   distort a print, it will wipe it away, wipe it clean.

13   Q.  Do you usually find prints in a crime scene?

14   A.  Yes, ma'am.

15   Q.  Is that the norm, to find a print?

16   A.  It's rare.  If you got a crime scene that's -- Sometimes in

17   a crime scene you can find good prints and sometimes you can't.

18   It's just depending on what kind of surface you got or what

19   kind of environment you got to say well, okay, that print is

20   destroyed or you can get it.

21   Q.  Did you process the crime scene on July twenty, two

22   thousand and seven?

23   A.  Yes, ma'am.

24   Q.  Did you take photos of that residence?

25   A.  Yes, ma'am.

1    Q.   Does the Government's exhibit number forty-seven depict the

2    residence of which you took photos?

3    A.   Yes, ma'am.

4    Q.   What part of the residence did you take photos of?

5    A.   I took pictures of the residence of the outside and also

6    the inside.

7    Q.   Detective Davis, you just stated that you took the

8    photograph of Government's exhibit number seven.  Do you see

9    the light that is in that window?

10   A.   Yes, ma'am.

11   Q.   And do you see -- Well, what does the light -- How does the

12   light appear in Government's exhibit number seven?

13   A.   It's real bright.

14   Q.   I'm now going to show you what has previously been admitted

15   as defendant's exhibit number two.  Did you take that

16   photograph?

17   A.   Yes, ma'am.

18   Q.   How does the light appear in that window in the

19   photograph?

20   A.   It's dark.

21   Q.   What would make the light look different in the

22   photographs?

23   A.   Time lapsed photography.

24   Q.   Time lapse photography?

25   A.   Yes, ma'am.

1    Q.   What is that?

2    A.   Time lapse photography is what we use when we're taking

3    night shots.  What it is is, we close the shutter on our

4    camera.  If we open our shutter real wide, it will catch the

5    most light it can catch in order for the picture to show up

6    real bright.  And on the other picture to my left, it's showing

7    that I didn't use time lapse photography, I used the regular

8    flash on the camera.

9    Q.  So could you please point to the picture which actually --

10   Let me rephrase.

11        Could you please point to the picture which more

12   accurately reflects the lighting as seen from outside without

13   any photography differences.

14   A.   It would be the picture to my left.  That's the one showing

15   the actual -- with just the direct regular flash on the

16   camera.

17   Q.   That would be defendant's exhibit number two?

18   A.   Yes, ma'am.

19   Q.   What is depicted in Government's exhibit fifty-two?

20   A.   That's a bullet hole.

21   Q.   Where is that bullet hole located?

22   A.   It's coming from the inside to the outside of the door.

23   Q.   I beg your pardon?

24   A.   It's coming from inside to the outside of the front door.

25   Q.   Inside the door to the outside?

1    A.   Yes, ma'am.

2    Q.   How do you know that?

3    A.   From the way that the door is shown, it's serrated to the

4    outside, meaning that something is pushing its way through and

5    bursting it open and it's coming out the outside.

6    Q.   Coming out the outside?

7    A.   It's coming from the inside out.

8    Q.   Inside of the door to the outside?

9    A.   Yes, ma'am.

10   Q.   How many bullets, or bullet holes I should say, did you

11   observe in that front door?

12   A.   Two.

13   Q.   Does Government's exhibit number fifty-one depict a second

14   bullet hole?

15   A.   Yes, ma'am.

16   Q.   I'm now showing you what has previously been admitted as

17   Government's exhibit number fifty-three.  Did you take this

18   picture?

19   A.   Yes, ma'am.

20   Q.   Are you able to see the two bullet holes in that door?

21   A.   Yes, ma'am.

22   Q.   I'm now showing you what has been admitted as Government's

23   exhibit number fifty-six.  Did you take that picture?

24   A.   Yes, ma'am.

25   Q.   And what does that picture depict?

1   A.   That's a picture of the kitchen window.

2   Q.   Were there blinds on the kitchen window?

3   A.   Yes, ma'am.

4   Q.   Did you touch those blinds at all?

5   A.   No, ma'am.

6   Q.   So are you saying that you simply took a picture of what

7   you saw?

8   A.   Yes, ma'am.

9   Q.   What is this that's located in the picture?

10  A.   That's glass.

11  Q.   That's glass from where?

12  A.   From the window in the kitchen.

13  Q.   What does glass on the inside of the window indicate?

14  A.   That something came from the outside in.

15          MR. BUTLER:  Objection to that response, Your Honor.

16  I don't think he's been qualified as --

17          THE COURT:  Are you qualified to make that kind of

18  crime scene analysis?

19          THE WITNESS:  Well, I wouldn't say whether I was

20  qualified, but you can tell where something came from the

21  outside in.

22          THE COURT:  Just using your common sense?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  All right.  Very good.

25  Q.   I'm going to go back to defendant's exhibit number two.

1    Did you walk around this area at all while you were taking the

2    picture?

3    A.  Yes, ma'am.

4    Q.  Did you observe anything outside that indicated evidence of

5    a crime to you?

6    A.  I see where the window was broken.

7    Q.  Did you observe any glass from that window outside?

8    A.  No, ma'am, I didn't see any outside.

9    Q.  I'm now showing you what has been admitted as Government's

10   exhibit number fifty-nine.  What does that photo depict?

11   A.  It's showing some glass on the floor, and also a shell

12   casing.

13   Q.  Could you please point to the shell casing in the picture.

14          (Whereupon, the witness complied.)

15   Q.  What room is this shell casing located in?

16   A.  That's in the kitchen.

17   Q.  How many shell casings did you collect that evening?

18   A.  I collected two.

19   Q.  Did you observe any other shell casings than the ones that

20   you collected?

21   A.  No, ma'am.

22   Q.  Where did you collect -- From where did you collect those

23   two shell casings?

24   A.  I collected both of them from out of the kitchen.

25   Q.  Would Government's exhibit number fifty-eight depict the

1    second shell casing that you collected?

2    A.   Yes, ma'am.

3    Q.   And based upon your experience with firearms, what does the

4    term "shell casing" mean?

5    A.   It's a projected shell casing that had been fired from a

6    weapon.

7    Q.   A projected shell casing that's been fired from a weapon?

8    A.   Yes, ma'am.  Meaning that the lead part of the round that

9    belongs to that shell casing had been fired somewhere to make

10   that round eject from the weapon.

11   Q.   Does that mean that it's part of a bullet?

12   A.   Yes, ma'am.

13   Q.   What's depicted in Government's exhibit number sixty-two?

14   A.   That is -- That's the outside of the backyard right there

15   where the backdoor is at.

16   Q.   Where, in the kitchen, did you find the shell casings?

17   A.   I found one near the window and one close to the vacuum

18   cleaner that's kind of about three feet from the second shell

19   casing.

20   Q.   Now in collecting evidence at Twenty-eight sixty-one Jan

21   Drive, did you walk around the residence?

22   A.   Yes, I did.

23   Q.   And what was the purpose of you walking around the

24   residence?

25   A.   I have to take pictures of the whole residence on the

```
 1   outside before I went on the inside.  I took the whole picture
 2   of the crime scene that occurred to me on the outside first
 3   before making entry into the residence.
 4   Q.  Are you looking for evidence as you walk around?
 5   A.  Yes, ma'am.
 6           MS. ADAMS:  Your Honor, may I approach?
 7           THE COURT:  Yes.
 8   Q.  Sir, I'm handing you what has previously been identified as
 9   Government's exhibit number sixty-five, sixty-six, sixty-seven,
10   sixty-eight, sixty-nine and seventy for identification
11   purposes.  Please examine those exhibits.
12           (Whereupon, the witness complied.)
13   Q.  Are you familiar with what is depicted in those exhibits?
14   A.  Yes, ma'am.
15   Q.  And what is depicted in those exhibits?
16   A.  This is showing where a weapon was fired through a wall and
17   went through the door.
18   Q.  Did you take those photographs?
19   A.  Yes, ma'am, I did.
20   Q.  And do those photographs, or the exhibits, fairly and
21   accurately depict the residence that you observed at
22   Twenty-eight sixty-one Jan Drive?
23   A.  Yes.
24           MS. ADAMS:  Your Honor, I'd offer these exhibits into
25   evidence.
```

1          THE COURT:  Admitted.

2          MS. ADAMS:  Thank you.

3   Q.  Detective, I am now showing you what has been admitted as

4   Government's exhibit number sixty-five.  What does that

5   photograph depict?

6   A.  It's showing the bullet holes going through the door.

7   Q.  What part of the door is that displaying?

8   A.  The front door.

9   Q.  Would that be from the outside or the inside?

10  A.  From the inside.

11  Q.  I'm now showing you what has been admitted as Government's

12  exhibit sixty-six.  What does that photograph depict?

13  A.  It's showing you where the bullet came through the wall and

14  entered into the door from the inside going towards the out.

15  Q.  Where is the wall in that picture?

16  A.  It's joined in between the foyer and the kitchen.

17  Q.  Is that the inside of the residence looking at the front

18  door?

19  A.  Yes, ma'am.

20          MR. BUTLER:  Your Honor, now that the cat is out of

21  the bag, I'd ask that the witness describe what he sees.  He

22  did not do the forensic analysis on trajectory of the bullets,

23  where they came from, how it was firing.  He took the

24  photographs.  Foundation has not been laid that he's a forensic

25  expert in ballistics.  I think he can testify where the bullets

```
1    are, and the Government is free to argue what -- where the

2    holes are, and the Government is free to argue what that might

3    mean.  But he's not a ballistics expert.

4              MS. ADAMS:  Your Honor, I've just been asking him

5    what he's seen.

6              MR. BUTLER:  But he said a bullet hole came through

7    the wall and made a hole in the wall.  That's a ballistics

8    analysis with the trajectory.

9              THE COURT:  Ms. Adams, what's your response?

10             MS. ADAMS:  I have been asking him what he saw.

11             THE COURT:  Well, limit yourself to what he saw,

12   then.

13             And limit yourself to what you saw.

14             THE WITNESS:  Yes.

15   Q.  Does Government's exhibit fifty-two, when you saw it that

16   night, did it look like the outside of the front door?

17   A.  Yes, ma'am.

18   Q.  Is that hole in the same space as this hole on the

19   inside?

20   A.  Yes, ma'am.

21   Q.  I'm now showing you what has been admitted as Government's

22   exhibit number sixty-seven.  What does this exhibit depict?

23   A.  It's showing two holes in the wall.

24   Q.  I beg your pardon?

25   A.  It's showing two holes in the wall.
```

1    Q.   What room is that picture taken in?

2    A.   That's from inside the kitchen.

3    Q.   So how does that wall face the kitchen?

4    A.   That wall is facing the kitchen from, if you're walking

5    through the foyer, it's a wall that's joining the kitchen and

6    the foyer.  It's like a mid wall, and you can walk through

7    there and come into the kitchen.

8    Q.   Would that be the inside of the kitchen?

9    A.   Yes, ma'am.

10   Q.   What is depicted in Government's exhibit number

11   sixty-eight?

12   A.   A hole inside the kitchen wall.

13   Q.   Is that one of the two holes that you just referred to?

14   A.   Yes, ma'am.

15   Q.   And what is depicted in Government's exhibit number

16   sixty-nine?

17   A.   A hole inside the kitchen wall.

18   Q.   Is that the same hole that you just discussed?

19   A.   No, ma'am, that's a different one.

20   Q.   And what is depicted in Government's exhibit number

21   seventy?

22   A.   That's the foyer where you come through and go into the

23   kitchen.  There's a piece of wood.

24   Q.   What is this right here?

25   A.   That's a piece of wood.

1    Q.  A piece of wood?

2    A.  Yes, ma'am.

3    Q.  Detective Davis, did you collect any weapons that night on

4    July twentieth, two thousand and seven?

5    A.  Yes, ma'am, I did.

6    Q.  How many weapons did you collect?

7    A.  Three.

8    Q.  I'm showing you Government's exhibit number fifty-five.  Is

9    that one of the weapons that you collected?

10   A.  Yes, ma'am.

11   Q.  And where was that weapon located when you collected it?

12   A.  On the kitchen counter.

13   Q.  What type of weapon is that?

14   A.  It's a semiautomatic rifle.

15   Q.  Did you collect anything else besides that weapon in the

16   kitchen?

17   A.  Yes, ma'am, I did.

18   Q.  What else did you collect?

19   A.  I collected some rounds.  They were sitting right next to

20   it in a plastic bag, and there was also a round right there by

21   the weapon.

22   Q.  Now with what do you normally do when you collect a

23   firearm?

24   A.  I make sure the chamber is clear, that it's not able to

25   fire.

1    Q.  Did you clear the chamber of that gun?

2    A.  Yes, ma'am.

3    Q.  Was there anything in the chambers when you cleared it?

4    A.  No, ma'am.

5    Q.  I'm now showing you Government's exhibit number sixty-one.

6    Was that one of the firearms that you collected that night?

7    A.  Yes, ma'am.

8    Q.  What are these two items?

9    A.  Those are magazines for the weapons.

10   Q.  What type of firearm is depicted in Government's exhibit

11   number sixty-one?

12   A.  That's a semiautomatic rifle.

13   Q.  Did you clear the firearm that night?

14   A.  Yes, ma'am.

15   Q.  And did you find anything in the chambers?

16   A.  No, ma'am, it was empty.

17   Q.  Do you do anything with these magazines when you collect

18   them?

19   A.  Yes, ma'am, I take them and I make sure to see if there are

20   any rounds in them.

21   Q.  How do you see if there are any rounds in them?

22   A.  I make sure I clear the magazine of any rounds that's

23   inside, that's left inside the magazine.

24   Q.  When you say "cleared," does that mean emptied?

25   A.  Yes, ma'am.

1    Q.  I'm now showing you Government's exhibit number sixty A.

2    Is that the third weapon that you collected that night?

3    A.  Yes, ma'am, it is.

4    Q.  And did you clear the chamber of that weapon?

5    A.  Yes, ma'am.

6    Q.  What, if anything, did you find in the chambers?

7    A.  It had a round inside the chamber.

8    Q.  What does the term "loaded" mean in relation to a

9    firearm?

10   A.  Meaning that it's loaded with rounds and ready to fire.

11   Q.  Again, I don't know anything about weapons so please

12   correct me if I'm wrong.  If this magazine was in this gun,

13   does that mean loaded?

14   A.  Yes, ma'am.

15   Q.  If a bullet is in a chamber, does that also mean loaded?

16   A.  Yes, ma'am.

17          MS. ADAMS:  Your Honor, may I approach?

18          THE COURT:  Yes.

19   Q.  Detective Davis, I am handing you what has previously been

20   marked for identification purposes as Government's exhibit

21   fifty-seven B, fifty-seven A and sixty.  Will you please

22   examine those exhibits.

23          (Whereupon, the witness complied.)

24   Q.  Do you recognize those exhibits?

25   A.  Yes, ma'am.

1    Q.   When was the first time that you saw those exhibits?

2    A.   Inside the residence on the kitchen table.

3    Q.   How do you know that those exhibits are the exact same that

4    you saw on July twentieth, two thousand and seven?

5    A.   When I collect them I also mark my initial on those items

6    and put them into the sealed envelopes and also the brown paper

7    bag.

8    Q.   What are those items?

9    A.   These are in the manilla envelopes, and are the two shell

10   casings that were found on the kitchen floor.  And this was the

11   weapon that was found on the kitchen table.

12   Q.   Are you saying that the exhibits fifty-seven A and

13   fifty-seven B are the casings that were found on the kitchen

14   floor?

15   A.   Yes, ma'am.

16   Q.   And are you saying that Government's exhibit number sixty

17   is the weapon?

18   A.   Yes, ma'am.

19   Q.   What weapon?

20   A.   It's a forty caliber Smith & Wesson handgun

21   semiautomatic.

22   Q.   Are those items in the same or substantially the same

23   condition now as when you received them on July twentieth, two

24   thousand and seven?

25   A.   Yes, ma'am.

1    Q.  Is there anything different about those exhibits today than

2    when you saw them on July twentieth, two thousand and seven?

3    A.  No, ma'am.

4         MS. ADAMS:  Your Honor, we offer those exhibits into

5    evidence.

6         THE COURT:  They're admitted.

7         We'll take our lunch break and come back at one

8    o'clock.

9         (Whereupon, the luncheon recess was taken.)

10         THE COURT:  Proceed, Ms. Adams.

11         MS. ADAMS:  Thank you, Your Honor.

12    Q.  Detective Davis, before we broke for lunch you were

13    discussing Government's exhibits fifty-seven A, fifty-seven B

14    and sixty.

15    A.  Yes, ma'am.

16    Q.  What is inside of Government's exhibit sixty?

17    A.  Inside of sixty is the weapon that was found on the dining

18    room table.

19    Q.  I'm sorry, I could not hear you.

20    A.  The weapon that was found on the dining room table, a hand

21    gun, semiautomatic handgun.

22    Q.  Could you please retrieve the weapon from the bag.

23    A.  Yes, ma'am.

24    Q.  Detective, did you do anything with that weapon?

25    A.  Yes, ma'am, I did.

1   Q.  What did you do?

2   A.  When I got back to my crime scene lab I processed this gun

3   for fingerprints.

4   Q.  What does processing a gun for fingerprints mean?

5   A.  That's when I used the black silk powder in order to see if

6   I can find any fingerprints on the weapon.

7   Q.  Now where on the weapon do you look for fingerprints?

8   A.  Basically I will start at the top of the weapon, come down

9   the sides dusting for any fingerprints.  Also, around the base

10  of the weapon and on the trigger part of the weapon.

11  Q.  Were you able to lift any prints from that weapon?

12  A.  No, ma'am.

13  Q.  What, if any, was -- Well, I want to make sure this is

14  clear.  Did you have any difficulty in lifting prints from the

15  weapon?

16  A.  Yes, ma'am.

17  Q.  Why?

18  A.  It's very hard to get a print off of a weapon with such a

19  plastic palmer grip.  It's not a smooth surface on this weapon

20  in order to get a good fingerprint off of it.

21  Q.  Is there anything besides the surface that could have

22  caused difficulty?

23  A.  Basically, if a subject is holding the weapon, sometimes

24  they might -- they throw it down and it will smudge a

25  fingerprint, or if they're holding it and not having just

1    pressed up on there and just releasing it, or just pull the

2    hand away from it then it will smear the fingerprint on it as

3    well.

4    Q.  What did you do in processing the prints or trying to lift

5    prints off of the gun?

6    A.  I put this weapon into my Super Glue tank.  I used the

7    fumes on the Super Glue.  And also I used black silk powder and

8    I had no prints of value on it.

9    Q.  Where is the ammunition that corresponds with that

10   weapon?

11   A.  The ammunition is inside the bag.

12   Q.  Could you please pull the ammunition out.

13   A.  Yes, ma'am.  This right here is the magazine that was taken

14   out of the weapon.

15   Q.  Do you retrieve that magazine from that weapon?

16   A.  Yes, ma'am.  Inside the bag is a lot of loose rounds.

17   Q.  Did you process the loose rounds or magazine?

18   A.  Yes, ma'am, I did.  I processed the loose rounds and the

19   magazine.

20   Q.  What was process that you used for those items?

21   A.  I also stuck those items into the Super Glue tanks in order

22   to see if any fingerprints would develop.  Like I say, this is

23   not a smooth surface.  On the magazine -- It's hard to find any

24   prints on the magazine or on the rounds.

25   Q.  Were you able to lift any prints from those items the?

1    A.   No, ma'am.

2    Q.   What did you do with those items after you processed

3    them?

4    A.   After I processed these items I submitted them to the

5    Department of Forensic Science in order to get a ballistics

6    analysis.

7    Q.   How did you receive those items for today?

8    A.   I received these items back from the Alabama Department of

9    Forensic Science, just like I submitted the fired rounds, shell

10   casings as well as the weapon and the magazine and the

11   rounds.

12   Q.   Now could you explain -- You said how you just -- the same

13   as how you submitted it to them?

14   A.   What I do mean is by just the same way.  I submitted them

15   in separate containers and they gave it back to me just the way

16   I submitted it to them after I test fired to match the

17   ballistics.

18   Q.   I'm not asking you to testify regarding what they did.

19   A.   Okay.

20   Q.   I was just asking you what you did as far as providing the

21   items to them.

22   A.   Okay.  I just submitted it to them just the way I received

23   them, or collected them from the scene.  And after I processed

24   them, I submitted it to the Alabama Department of Forensic

25   Science.

```
 1    Q.  Did you request that an analysis be performed from the
 2    Department of Forensic Science?
 3    A.  Yes, ma'am.
 4              MS. ADAMS:  No further questions, Your Honor.
 5                      CROSS EXAMINATION
 6              BY MR. BUTLER OF DERRICK DAVIS:
 7    Q.  Officer Davis, and I want to address you by your proper
 8    rank, corporal?  Captain?
 9    A.  No, sir, Detective Davis.
10    Q.  Detective Davis, we're going to have to go back through a
11    few things.  How long have you been with the Montgomery Police
12    Department?
13    A.  Eight years.
14    Q.  Eight years.
15              And over the last year you have been involved in what
16    I'll call evidence collection.
17    A.  Actually, the Detective Division, six years in property and
18    approximately going on seven months in the Crime Scene
19    Bureau.
20    Q.  Okay.  So as of right now it's going on seven months?
21    A.  Yes, sir.
22    Q.  So back in July of two thousand seven you had been in crime
23    scene evidence collection for approximately one or two
24    months?
25    A.  Yes, sir.
```

1    Q.  Okay.  How many of these evidence collections on average,

2    evidence collection events do you do a day?

3    A.  Every day.

4    Q.  Do you know how many a day?

5    A.  It depends.  It depends on what the officer submits to us

6    to process.

7    Q.  Would it be fair to say some days you might do one, other

8    days might be real busy and you might have five or six?

9    A.  Yes.

10   Q.  Okay.  Back in June, and correct me if I'm wrong, you have

11   probably done what, maybe twenty or thirty of these prior to

12   the Compass Bank incident?

13   A.  Could have been.

14   Q.  Now, in order to be qualified with the Montgomery Police

15   Department as an evidence collector, do you have to have a

16   Bachelor of Science degree?

17   A.  No, sir.

18   Q.  You do understand that what you are dealing with on a

19   regular routine basis is information which has scientific

20   import.  Forensic scientific import; i.e., ballistics, was the

21   gun fire, how was it fired.  You're aware of that?

22   A.  Yes.

23   Q.  But, again, do you have a degree in -- a Bachelor of

24   Science degree?

25   A.  No, sir.

1    Q.   In any of the physical sciences, physics, chemistry,

2    anything like that?

3    A.   No, sir.

4    Q.   Do you have a Bachelor of Arts in literature or anything of

5    that nature?

6    A.   No, sir.

7    Q.   Do you have a college degree?

8    A.   No, sir.

9    Q.   Now the courses that you took to do the job that you do,

10   you mentioned you went through the academy and that you've

11   worked with a latent fingerprint expert at the Montgomery

12   Police Department.  What other courses have you taken,

13   specifically as to evidence collection?  And before you answer,

14   I do a lot of talking real fast and I'm sorry.  Prior to the

15   Compass Bank incident, what other courses had you taken in

16   evidence collection?

17   A.   We have several hours of training in the academy as far as

18   preserving a scene, collecting evidence --

19   Q.   I hate to keep interrupting you.  When you say we have

20   courses at the academy, are these courses in addition to normal

21   academy -- when I want to become a police officer, I'd have to

22   go through the normal police academy?

23   A.   Yes, sir.

24   Q.   Are there other courses offered, other than what I'll call

25   the basic training, that you took at the academy?

1    A.   No, sir.   We have familiarization courses each year.   We

2    have to keep ourselves familiarized.

3    Q.   You have what?

4    A.   We have to keep ourselves familiarized with our classes.

5    Once you get out of the academy, we keep going back each year

6    throughout the year in order to build up our hours throughout

7    the year.

8    Q.   I guess what I'm getting at, what specialized training have

9    you undergone in, prior to the Compass Bank incident, in

10   forensic evidence retrieval, other than the academy courses?

11   A.   We don't do forensics.   We send it off to D. F. S.   The

12   only thing we do is evidence collection, preserving the scene,

13   learning how to contain evidence and not have it tampered

14   with.

15   Q.   I understand.   And that's my question.   What course --

16   specific training courses have you had in just what you said,

17   gathering evidence and not getting it tampered with?   Other

18   than the academy, have you attended?

19   A.   We have familiarization classes throughout the year.

20   Q.   And other than the familiarization classes what else have

21   you attended?

22   A.   That's it.

23   Q.   Thank you.

24            Now, you would agree that what you do is often

25   extremely critical in criminal cases.

1    A.  Yes.

2    Q.  The reason being is witnesses' perceptions sometimes fade,

3    evidence degrades, falls apart, therefore what you gather

4    sometimes is that which the case will revolve around.

5    Sometimes.

6    A.  Yes.

7    Q.  Okay.  For that reason, and correct me if I'm wrong, even

8    in the familiarization course I'm assuming that they teach you

9    to gather and maintain evidence as soon as possible after the

10   event.

11   A.  It all depends.

12   Q.  I mean, I'm sure there are circumstances where you can't;

13   i.e., if the event happened on the other side of town and if

14   for whatever reason it takes time to get there, but to the

15   extent that your resources allow, to the extent that your

16   abilities allow, it is best to preserve evidence as soon as

17   after the event as possible.

18   A.  Well, my job is to get to the scene for whoever the officer

19   is at the scene, to preserve that scene, do not tamper with

20   anything until I get there in order to photograph everything.

21   Then once I've photographed everything I collect it.

22   Q.  I think you may have just answered my question but in a

23   different way.  Bottom line is, people are taught not to mess

24   with anything until you get there, so that things are preserved

25   accurately, correct?

1    A.   It all depends on what the situation is.

2    Q.   Again, every circumstance is different, but to the best

3    extent possible people are taught and instructed not to tamper

4    with evidence until you're able to get there, photograph it and

5    collect it, correct?

6    A.   Yes.

7    Q.   Okay.  By way of example, let's say that -- I'm not going

8    to walk all the way up there.  Let's just make believe this was

9    a gun and I am touching it.  And imagine that this is a smooth

10   metal surface and I'm a criminal suspect and I drop it down.

11   Okay?

12   A.   Yes, sir.

13   Q.   In a fashion such that where I touched it is still -- is

14   unblemished and pristine, it would not be of benefit to the

15   case investigation or of you if another police officer came

16   along and said oh, that's a gun, hmm, I wonder what happened

17   there and then put it back down.  That police officer might

18   damage and/or alter the physical evidence that was there,

19   correct?

20   A.   To the extent, unless he's trained and knows how to pick

21   the weapon up or wearing gloves.

22   Q.   If he's not wearing the right gloves, if he's a bad officer

23   and tampers with it, my point is moving an item, touching an

24   item, one has the potential of damaging physical evidence on

25   it, the fingerprint.  Is that correct?

1    A.   Yes.

2    Q.   Two, let's say I said oh, I'm a bad cop and that's an

3    interesting gun.   I wonder if that's of import and then I put

4    it down over there and I start doing other things.   In fact,

5    that physical evidence has been tampered with and has been

6    moved to another location, correct?

7    A.   Yes.

8    Q.   Again, that could create problems if, for instance, that

9    location, that is where it was originally placed, is of import

10   in the case.

11   A.   Yes.

12   Q.   How many other officers do you work with who I'll call are

13   your -- do the same thing?   How many people at the Montgomery

14   Police Department do what you do?

15   A.   Five.

16   Q.   Can I ask, was it simply by happenstance or was there a

17   reason that you were both the forensics gathering officer at

18   the Compass Bank, as well as the forensic officer at

19   Twenty-eight sixty-one Jan street?

20   A.   Probably just a coincidence.   The other officer was out on

21   another scene and he was unable to go.

22   Q.   So there wasn't an oh, he had done the Compass Bank, let's

23   bring him in to do --

24   A.   No, sir.

25   Q.   Okay.   Fine.

1           Now -- Well before we do that, I'll just do this

2    while it's up there.  Is the gun out of the bag?

3    A.  Yes.

4    Q.  You would agree that this portion of the gun right here

5    with these little ridges, is not what we could term a smooth

6    surface.

7    A.  Yes.

8    Q.  You'd agree that the top part of this where I have my hand,

9    my finger is a smooth surface.

10    A.  It's not real smooth.

11    Q.  That's not real smooth?

12    A.  No, sir.

13    Q.  Do you feel ridges and/or --

14    A.  It's the way the metal is made.  It's not real smooth.

15    It's got microscopic ridges in it that are hard to see with

16    your eye.

17    Q.  Okay.  Well, let's put it this way:  Everything that is

18    made of molecules, atoms, has microscopic ridges.  There's no

19    such thing as a perfectly smooth surface?

20    A.  I'm not for sure.

21    Q.  Okay.  Again, you don't have a Bachelor of Science degree.

22    A.  No, sir.

23    Q.  So at the microscopic level, there are some blemishes, but

24    to at least the lay eye and my finger, this appears to be

25    smooth.

| | |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  And again, that's a metal surface? |
| 3 | A.  Yes. |
| 4 | Q.  You're saying if I did that, you couldn't get a |
| 5 | fingerprint? |
| 6 | A.  If you did like that I could. |
| 7 | Q.  So you can lift fingerprints off that smooth surface. |
| 8 | A.  Yes, if you touch it like that. |
| 9 | Q.  Assuming I touch it like that. |
| 10 | A.  And not smear it. |
| 11 | Q.  Okay.  And I don't smear it.  But this is a surface for |
| 12 | which fingerprints could be lifted? |
| 13 | A.  Yes. |
| 14 | Q.  And there is such a thing as what's called a full print and |
| 15 | partial print, correct? |
| 16 | A.  Yes. |
| 17 | Q.  By that I mean if I touch it like this way, the side might |
| 18 | have fingerprints, that might be a partial print? |
| 19 | A.  Yes. |
| 20 | Q.  If I touch it this way, that's a full print? |
| 21 | A.  Yes. |
| 22 | Q.  Okay.  You can do -- Well, never mind. |
| 23 |       Additionally, right here there appear to be ridges on |
| 24 | the gun, what I'll call the butt of the gun. |
| 25 | A.  Yes. |

```
 1   Q.  But I'll use this side --
 2           MS. ADAMS:  Mr. Butler, I can't see, and so maybe
 3   some of the jurors can't see.
 4           MR. BUTLER:  Can you see?
 5           MS. ADAMS:  Yes.  Thank you.
 6   Q.  Here there's ridge -- Can you see?
 7   A.  Go ahead.
 8   Q.  I just don't want this pointed at anybody.  It's not
 9   loaded, but -- There are ridges up on this area, correct?
10   A.  Yes.
11   Q.  But I'll show it to you first, this side is a smooth
12   surface, correct?
13   A.  Yes.
14   Q.  Okay.  And, again, the same as the top smooth surface, you
15   can get partial prints off of it?
16   A.  Yes.
17   Q.  Or full prints?
18   A.  Yes.
19   Q.  Okay.  This has one, two, three, four sides which have
20   smooth surfaces on it.
21   A.  Yes.
22   Q.  And, again, partial and full prints could be gathered from
23   it, assuming it's touched in such a manner.
24   A.  Yes.
25   Q.  Are these --
```

```
 1    A.  Those are projected rounds.
 2    Q.  Are you familiar at all with the -- I know you don't have a
 3    Bachelor of Science degree but you may have learned this in
 4    high school -- with the principle of force equals mass times
 5    acceleration?
 6    A.  Yes.
 7    Q.  And are you familiar with that?
 8    A.  Yes, a little bit.
 9    Q.  Okay.  Are you also aware of some of Newton's principles,
10    laws of physics?
11          MS. ADAMS:  Objection, Your Honor.  Relevance?
12          MR. BUTLER:  I'll tie it up in two seconds.
13          THE COURT:  I'll allow it.  Go ahead.
14    Q.  Are you familiar with those at all?
15    A.  Yes.
16    Q.  Have you ever seen a diving board?
17    A.  Yes.
18          THE COURT:  Seen a what?
19          MR. BUTLER:  Diving board.
20          THE COURT:  Okay.
21    Q.  Have you ever seen a diving board?
22    A.  Yes.
23    Q.  You're aware that when you apply a force to the top of that
24    diving board, and then remove the force, it goes back up.
25    A.  Yes.
```

1    Q.   Okay.  You're aware then also that when force is applied

2    for instance by a bullet through a piece of glass, even though

3    it seems somewhat counter intuitive, after that force is

4    released, i.e. by the bullet passing through it, the glass

5    actually goes in the opposite direction of the bullet because

6    it's springing back.

7    A.   I have never seen that.

8    Q.   You're not aware of that principle?

9    A.   No, sir.

10   Q.   So you're not aware of the fact that glass actually comes

11   back into the area where the bullet came from?

12   A.   Depends on if the window is tinted.

13   Q.   It depends on whether what?

14   A.   If the window is tinted.

15   Q.   Tinted?

16   A.   Yes, sir.

17   Q.   So it's your position that the tinting of windows affects

18   the laws of physics?

19   A.   I just know what I've seen when I go on crime scenes.  When

20   a window is shot out, it falls outside of the vehicle.  If a

21   window is shot out of a residence, I have seen the outside

22   glass from shooting inside out.

23   Q.   Okay.  But you are aware that the laws of physics are just

24   that, laws of physics, they don't change based on tinting of

25   windows?

```
 1            MS. ADAMS:  Objection, Your Honor.

 2            THE COURT:  Well, unless you both know what this

 3    involves, it could be that the tinting of the windows changes

 4    the nature of glass.  But we don't know that, so let's not

 5    speculate.

 6            MR. BUTLER:  Well let me rephrase it and ask this

 7    question.

 8  Q.  Were the front windows of Twenty-eight sixty-one Jan Street

 9    tinted?

10  A.  No, sir.

11  Q.  Okay.

12            MR. BUTLER:  One moment, Your Honor.

13            (Whereupon, Mr. Butler conferred with Ms. McKee and

14    Ms. Mason off the record and out of the hearing of the other

15    courtroom participants.)

16  Q.  Did you work at all with an Officer Guy Naquin when you did

17    your evidence collection?

18  A.  Yes, sir.

19  Q.  Was he present with you when you did your evidence

20    collection?

21  A.  Yes, sir.

22  Q.  Now, I'm going to approach you and show you what's been

23    marked as Government's exhibit forty-six.  Do you recognize

24    that?

25  A.  No, sir.
```

1    Q.  Did you do any type of internal diagramming of the house?

2    A.  No, sir.

3    Q.  Okay.  You took photographs from within the house,

4    correct?

5    A.  Yes, sir.

6    Q.  As you were taking those photographs, was Officer -- and

7    correct me if I'm saying his name wrong -- Naquin with you?

8    A.  Officer Naquin.

9    Q.  Naquin.  Was Officer Naquin with you?

10   A.  No, sir.

11   Q.  Did you see your observe what he was doing?

12   A.  No, sir.

13   Q.  I guess now I've got to back up.  Where were you when you

14   were first notified to go to Twenty-eight sixty-one Jan

15   Street?

16   A.  I was at home.

17   Q.  That probably happens to you, unfortunately, a lot.  You're

18   at home and something happens and they need you?

19   A.  Yes, sir.

20   Q.  Assuming it was nighttime or early morning?

21   A.  Nighttime, late.

22   Q.  Okay.  As I'm sure you do in a responsible way, you got

23   there as soon as you could, correct?

24   A.  Yes.

25   Q.  Do you know how long it took you to get to Twenty-eight

1    sixty-one Jan Street?

2    A.   About twenty minutes.

3    Q.   Twenty minutes.

4         Now, when you got to Twenty-eight sixty-one Jan

5    Street, tell the ladies and gentlemen know what was the first

6    thing you did?  You pull in your car, and what do you do?

7    A.   I pull up in my vehicle and I obtain information from the

8    officers on the scene to see what had occurred.

9    Q.   What officers did you speak to, do you remember?  If you

10   don't, you don't.

11   A.   I know there were some U. S. marshals out there.

12   Q.   So you spoke to some marshals about the scene?

13   A.   Yes.

14   Q.   After you got that information, what did you do?

15   A.   I proceeded to take pictures of the scene.

16   Q.   And you've told us in some very good detail that those

17   pictures are involved inside outside, things inside -- What did

18   you start with first, outside or inside?

19   A.   Outside.

20   Q.   Okay.  You described taking photographs around the outside

21   of the house, correct?

22   A.   Yes.

23   Q.   When you were done doing that what's the next thing you

24   do?

25   A.   I took my camera and pursued going inside the residence.

```
1    Q.  Do you recall, were you directed, for instance -- Let me

2    rephrase that.

3            Did you just do everything in a vacuum?  That is,

4    just go about your business doing it, or did the officers say,

5    you know, evidence of interest may be in point A or point B,

6    and as a result go to those locations?

7            MS. ADAMS:  Objection, Your Honor.  That calls for

8    hearsay.

9    Q.  What caused you to go to certain locations?

10   A.  I do it on my own.

11   Q.  So nobody speaks to you at all?

12   A.  No, sir.

13   Q.  So let's say, for instance -- Oh, by the way, so you have

14   no assistant with you?

15   A.  No, sir.

16   Q.  Okay.  So let's say that you go to the residence, you have

17   your introductions, hey I'm here and I'm going to take the

18   photos and everything, and everybody just leaves you alone?

19   A.  Yes, sir.

20   Q.  You go about taking your photos, you gather the evidence

21   and you leave?

22   A.  Yes, sir.

23   Q.  Nobody interacts with you?

24   A.  It just depends.

25   Q.  But in this circumstance on this case, nobody -- you just
```

1   did your thing and gathered it up and said, "I'm finished.  I'm

2   gone?"

3   A.  Yes, sir.

4   Q.  You don't recall interacting with anybody other than

5   possibly Officer Naquin?

6   A.  We do a final walk-through and make sure everything is

7   collected out of the scene.  And that's it.  I take my evidence

8   and go back to the Crime Scene Bureau.

9   Q.  That final walk was something that you do?

10  A.  I do it with the lead detective.

11  Q.  So the lead detective was Naquin?

12  A.  Naquin.

13  Q.  Now to your knowledge Naquin was not the, or do you know --

14  Let me rephrase that.

15          Do you know whether or not Detective Naquin was one

16  of the officers who arrived at the scene at the time of the

17  event.

18  A.  No, sir, I don't know that.

19  Q.  You don't know.  Okay, fine.

20          My point being is are human beings perfect?

21  A.  No, sir.

22  Q.  Do you consider yourself perfect?

23          MS. ADAMS:  Objection.  Relevance?

24          MR. BUTLER:  I'll rephrase it.

25  Q.  You do the best you can to gather every bit of evidence,

1    correct?

2    A.   Yes.

3    Q.   That's your job and that's what you did.

4    A.   Yes.

5    Q.   But it is possible to miss items.  It's possible,

6    correct?

7    A.   It's possible.

8    Q.   And in a circumstance where persons aren't directing you to

9    go over here or over there, you have to do the best you can

10   based on what you see and observed in your training, correct?

11   A.   I wasn't directed.

12   Q.   You weren't directed, that's my point.  You did what you

13   saw, you did what you did at the scene to the best of your

14   knowledge based upon what you saw, objected and your training,

15   correct?

16   A.   Yes, sir.

17   Q.   If, for instance, a shell casing had been in a location

18   that you did not observe or Officer Naquin didn't observe, it

19   might not have been collected.  That's possible?

20   A.   Yes, sir.

21   Q.   And, again, you were not interacting with the marshals, you

22   were doing what you did on your own and at the end the final

23   walk-through with Mr. -- Officer Naquin.

24   A.   Yes, sir.

25   Q.   I'm going to show you again what's been marked as

1    defendant's exhibit forty-six.  That diagram means nothing to

2    you, or -- What does that diagram show you?

3    A.  I'm not aware of what it's saying.  It don't have any words

4    on it.

5    Q.  And, again, you did a walk-through of the residence,

6    correct?

7    A.  Yes.

8    Q.  When you went to the residence, do you recall -- I think

9    your testimony was you recall taking this photograph?

10   A.  Yes.

11   Q.  Okay.  Bottom line is, you took this photo because that

12   appeared to be an item of interest based on your training,

13   correct?

14   A.  Actually, I took that photo, yes.

15   Q.  It's a gun.  It's an item of interest.

16   A.  Yes.

17   Q.  And you took it in the location where it was when you got

18   there twenty minutes after being called to the scene.

19   A.  Yes.

20   Q.  You took this photograph in this location because that's

21   where it was when you got to the residence.

22   A.  Yes, sir.

23   Q.  You went through there, taking photographs of items as they

24   appeared when you got there.

25   A.  Yes, sir.

1   Q.  So if, for instance -- Well let's put it this way:  This

2   photograph is not being taken in an upstairs bedroom?

3   A.  No, sir.

4   Q.  It's being taken on top of a pool table?

5   A.  Yes, sir.

6   Q.  This photograph is not being taken next to a sofa in the

7   living room, it appears that it's being taken in a kitchen.

8   A.  Yes, sir.

9   Q.  This photograph appears to be taken on a table.  It appears

10  to be a wood grain table.  I can see lines of wood, not on a

11  floor or carpeted floor or a hardwood floor.  Well it may be a

12  hardwood floor.  But it appears to be a table.

13  A.  Yes, sir.

14  Q.  Again, for purposes I used during my example, it's best

15  that evidence be left where it is in the condition that it was

16  originally found for you to take your photographs and examine

17  them as the normal course.  There are certain circumstances

18  that it's not?

19  A.  Yes.

20  Q.  As a rule that's the best?

21  A.  Yes, sir.

22  Q.  Thank you.

23       The Government showed you a series of photographs

24  that you took.  Do you remember taking those photographs?  I

25  mean literally outside of seeing the pictures, do you remember

1    being at that house and taking those photographs?

2    A.  Yes, sir.

3    Q.  You indicated that you took two photographs -- I mean a

4    photograph of a bullet hole.  I'm just going to use this.  Do

5    you remember that sink that we saw, that I showed you with the

6    gun on it?  That sink was --

7    A.  It's going to be to the left.

8    Q.  It's off to the left.  Thank you.

9            Over here where this door ends, the door kind of ends

10   like there and there's a wall right there.

11   A.  Yes, sir.

12   Q.  Do you remember taking a photograph of a bullet hole in

13   that wall as well?

14   A.  No, sir, I didn't see a bullet hole.

15   Q.  And you didn't take a photograph of that?

16   A.  I didn't see -- I don't remember.

17   Q.  You don't remember, that's fine.  You don't recall seeing a

18   bullet hole in that wall?

19   A.  That's right.

20   Q.  Have you ever worked with Officer Naquin before?

21   A.  Yes, sir.

22   Q.  Okay.  What was his -- He was the lead detective, I

23   believe, was that what his title there was?

24   A.  Yes, sir.

25   Q.  Okay.  Did he also gather -- Did you observe him gathering

1  any evidence or taking any -- or taking in the crime scene as

2  well?  While you were doing your thing, could you see him in

3  the residence?

4  A.  I see him walk by every once in a while.

5  Q.  So you saw him in there as well?

6  A.  Yes.

7  Q.  Did he mention to you -- Strike that.

8        Oh, a few more questions.  After the Compass Bank

9  situation, the robbery at the Compass Bank, you said you went

10  to Lisa Drive first.

11 A.  Lisa Court.

12 Q.  Lisa Court first?

13 A.  Yes.

14 Q.  You didn't go straight to the bank?

15 A.  No, sir.

16 Q.  Okay.  You're aware that banks are commercial institutions

17 and there are usually a lot of people coming in and out of

18 banks.  You're aware of that?

19 A.  Yes.

20 Q.  Okay.  And as we talked about before, multiple people in a

21 certain crime scene has the potential for contaminating

22 evidence.

23 A.  That's why it was roped off before I got there.

24 Q.  And I understand they roped it off, but the fact of the

25 matter is it is still a commercial institution, correct?

```
 1    A.   Yes.

 2    Q.   You, however, went on over to Lisa Court first.

 3    A.   Yes.

 4    Q.   How much time between when you went to Lisa Court, did what

 5    you had to do?  How much time did it take?  What was the

 6    intervening time period between when you arrived at Lisa Court

 7    and when you ultimately ended up at Compass Bank?

 8    A.   Actually, there was another officer at the bank.

 9    Q.   There was another evidence gathering officer?

10    A.   Yes, sir.

11    Q.   Who was that?

12    A.   Lieutenant Kenny.

13    Q.   All right.  Is he your boss?

14    A.   He's my supervisor.

15    Q.   So he -- Okay.  Well that makes sense.  So he went to the

16    bank first?

17    A.   Yes, he went to the bank to take pictures, and I took

18    pictures of Lisa Court.

19    Q.   When you got back to the bank, had Lieutenant Kenny done

20    any evidence gathering?

21    A.   Not until I got there.

22    Q.   So he went off to the bank, but the bottom line is nothing

23    happened at the bank until you got there as far as evidence

24    gathering.

25    A.   Yes, sir.
```

1   Q.  I don't know if you gave me the answer.  How long -- How

2   long -- What was the intervening time period between when you

3   finished at Lisa Court and when you got to the bank?

4   A.  Approximately about forty-five minutes.

5            MR. BUTLER:  Your Honor, I may be done.

6            (Whereupon, Mr. Butler conferred with Ms. McKee off

7   the record and out of the hearing of the other courtroom

8   participants.)

9            MR. BUTLER:  Nothing further.

10                       REDIRECT EXAMINATION

11            BY MS. ADAMS OF DERRICK DUANE Davis:

12            MS. ADAMS:  May I proceed, Your Honor?

13            THE COURT:  Yes.

14   Q.  Detective Davis, Mr. Butler just asked you about the other

15   M. P. D. officer.  By "M. P. D." I mean Montgomery Police

16   Department officer that assisted you at the Compass Bank.  What

17   was his name?

18   A.  Lieutenant H. D. Kenny.

19   Q.  Could you spell his last name please?

20   A.  Spelling K-e-n-n-e-y.

21   Q.  I want to go back to Government's exhibit sixty-seven,

22   which is what Mr. Butler has before you.  He asked you about

23   this wall right here.

24   A.  Yes, ma'am.

25   Q.  Did you observe a bullet hole in the wall on July

```
1    twentieth, two thousand seven?

2    A.  Not on that wall.

3    Q.  Mr. Butler questioned you regarding prints on a firearm.

4    A.  Yes, ma'am.

5    Q.  And you answered some of his questions.

6    A.  Yes, ma'am.

7    Q.  Specifically, the question he asked you where he placed his

8    finger on the top of kind of the smooth part of the gun we'll

9    say.

10   A.  Yes, ma'am.

11   Q.  Is that how people normally touch firearms?

12   A.  No, ma'am.

13   Q.  But is that the best way to get a print?

14   A.  That is.

15   Q.  So you would say that most people don't touch guns in a way

16   that it's easy to print?

17   A.  Yes, ma'am.

18   Q.  Detective Davis, based upon your experience there's a

19   difference between glass shattering and glass breaking,

20   correct?

21   A.  Ma'am?

22   Q.  Based upon your experience there's a difference between

23   glass shattering and glass breaking?

24   A.  Yes, ma'am.

25   Q.  So what happened in Government's exhibit sixty-two?
```

```
1    A.   Glass is shattered.

2    Q.   Is that why there is glass on both sides?

3    A.   Yes, ma'am.

4    Q.   When I say "both sides," I mean both sides of the sliding

5    glass doors.

6    A.   Yes, ma'am.

7    Q.   And what is depicted in Government's exhibit fifty-nine?

8    A.   Glass breaking.

9    Q.   Is that why you did not see glass on the outside of the

10   kitchen window?

11   A.   Yes, ma'am.

12   Q.   Based upon your experience, did you leave any shell casings

13   at Twenty-eight sixty-one Jan Drive when you left that

14   residence?

15   A.   No, ma'am.

16   Q.   What did the number of shell casings and the number of

17   firearms that you recovered tell you based upon your

18   experience?

19            MR. BUTLER:   Object -- Withdrawn.

20   A.   The number of shell -- Can you repeat the question again?

21   Q.   Sure.  Based upon your experience, what did the number of

22   shell casings that you recovered and number of firearms tell

23   you?

24   A.   That it was only one weapon used.

25   Q.   Why is that?
```

A.  Because the rounds that came from a certain weapon, you can

tell whether they came from a small caliber or large caliber

weapon.  Most of the rounds that I've taken in on the larger

weapons were larger round casings, along with the bullet.  And

this is a smaller caliber handgun round.  It also has a forty

caliber round stamped on it.

Q.  Did you say a forty caliber is a small caliber?

A.  Yes, ma'am.

Q.  And Government's exhibits fifty-seven A and fifty-seven B,

were you able to observe what type of casings they were?

A.  Yes, ma'am.

Q.  And what type of casings were they?

A.  Forty caliber rounds.

Q.  After you processed the three firearms and ammunition that

you collected that night?

A.  Yes, ma'am.

Q.  Based upon your experience, was there anything about the

three firearms that indicated to you that there were three

fired shots that night?

A.  No, ma'am.  Only thing in the Smith & Wesson weapon that I

noticed that is a fourteen round magazine inside, and it only

had thirteen rounds inside.  I had twelve and rounds in the

magazine and one in the chamber.

Q.  Now you said thirteen round magazine?

A.  It's a fourteen round magazine that goes into the weapon.

```
 1    Q.  What does that mean, when you say "a fourteen round
 2    magazine"?
 3    A.  Fourteen bullets can be held inside of that magazine, and
 4    if you chamber one you're going to have fifteen rounds total
 5    that can be held in that weapon.
 6    Q.  So based upon the fact that you discovered one round in the
 7    chamber and twelve rounds in the magazine, what did that mean
 8    to you in clearing that gun?
 9    A.  Two rounds were fired.
10           MS. ADAMS:  No further questions, Your Honor.
11           MR. BUTLER:  Briefly, Your Honor.
12                        RECROSS EXAMINATION
13                  BY MR. BUTLER OF DERRICK DAVIS:
14    Q.  This is a photograph of the front window, the bottom part
15    of the front window of the residence, correct?
16    A.  From the kitchen, yes, sir.
17    Q.  Okay.  Do you see a garden brick or item in that
18    photograph?
19    A.  No, sir.
20    Q.  What you do see, what I'm putting my finger at, is that a
21    casing?
22    A.  Yes, sir.
23    Q.  Do you see at least one casing in proximity to that front
24    window, correct?
25    A.  Yes, sir.
```

```
1    Q.  And, again, where my finger is, there was some busted out

2    window panes, they were the ones over here, correct?

3    A.  Yes, sir.

4    Q.  Again, there's no brick there?

5    A.  No, sir.

6    Q.  As a matter of fact, in the photographs that you took,

7    there were -- I mean other than the front of the house, there

8    were no photographs of bricks in the house?

9    A.  I don't remember seeing a brick.

10   Q.  Okay.  You've, in your training, fired firearms before,

11   correct?

12   A.  Yes, sir.

13   Q.  I've never fired a gun in my life but I've seen it on TV.

14   When they fire, they shoot back in the spent shell --

15          MS. ADAMS:  Your Honor, I object.  He just stated

16   he's never fired a gun, but then he's going to offer an opinion

17   on it?

18          THE COURT:  Well I assume he's asking a question.

19          MR. BUTLER:  I am, Your Honor.

20          THE COURT:  I don't think he's making statements.

21          Go ahead.

22   Q.  And then the shell flips out.  Again, I've seen it on TV.

23   Is that accurate?

24   A.  It can flip in any direction, really.

25   Q.  That's kind of my point.  It can flip any direction,
```

1    correct?

2    A.   Yes, sir.

3    Q.   In looking inside there, those shell casings are metal.

4    A.   Yes.

5    Q.   If they flip in any direction and hit metal they can bounce

6    in any direction because they're kind of oddly shaped?  It

7    depends on how they hit the ground.  They can bounce in

8    different directions as well?

9    A.   Yes.

10   Q.   Okay.  But one casing, for whatever reason, landed almost

11   perfectly in the center of the floor in the kitchen, correct?

12   A.   Yes.

13   Q.   Just right there.  It just landed right there.  It could

14   happen.

15   A.   Yes, sir.

16   Q.   It is also possible that given the nature of it, it could

17   bounce anywhere, correct?

18   A.   Yes.

19            MR. BUTLER:  Nothing further.

20            MS. ADAMS:  No further questions for this witness,

21   Your Honor.

22            THE COURT:  Very good.  You may step down.

23            (Whereupon the witness, Derrick Duane Davis, stepped

24   down from the stand.)

25            THE COURT:  Next witness.

1    MS. HARDWICK:  Your Honor, before we proceed, the

2    Government at this time would like to offer --

3    MR. BUTLER:  Before she states all this -- Well, may

4    I approach the prosecutor?

5    (Whereupon, Mr. Butler conferred with Ms. Hardwick

6    off the record and out of the hearing of the other courtroom

7    participants.)

8    MS. HARDWICK:  May I proceed, Your Honor?

9    THE COURT:  Yes.

10    MS. HARDWICK:  At this time the Government would

11    offer a joint stipulation for trial purposes.  It is the

12    parties' agreement and it states that the parties hereby agree

13    to the following.  The Smith & Wesson point forty caliber

14    semiautomatic handgun named in count four of the indictment did

15    travel in and affect interstate commerce.  This joint

16    stipulation for trial is signed by Jerusha T. Adams, Kevin L.

17    Butler and Andreas Jejuan Smith.

18    The Government would also offer Government's exhibit

19    seventy-two, which is case number C C two thousand one

20    twenty-nine.  It is the *State of Alabama versus Andre J. Smith*.

21    It is a certified copy of the conviction.

22    The Government also offers Government's exhibit

23    number seventy-three, which is case number two thousand

24    one-thirty which is the *State of Alabama versus again Andre J.*

25    *Smith*, a certified copy of conviction.

```
 1          The Government offers finally Government's exhibit
 2    number seventy-one, which is the Alabama Department of
 3    Corrections' records in reference to Andreas Smith.  The
 4    Government would offer seventy-one, seventy-two, seventy-three
 5    and the joint stipulation.
 6              MR. BUTLER:  Without objection.
 7              THE COURT:  Members of the jury, you may consider
 8    these stipulations as evidence in the case along with all the
 9    other evidence.
10              MS. ADAMS:  The United States calls Kathy Richert.
11              THE COURT:  Kathy Richert.
12                   K A T H E R I N E    R I C H E R T,
13        the witness herein, having first been duly sworn or
14    affirmed to tell the truth, was examined and testified as
15    follows.
16                        DIRECT EXAMINATION
17                   BY MS. ADAMS OF KATHY RICHERT:
18              THE COURT:  How many more witness do you have?
19              MS. ADAMS:  One, possibly two.
20              THE COURT:  After we hear form Ms. Richert?
21              MS. ADAMS:  Yes.
22    Q.  Good afternoon, Ms. Richert.
23    A.  Good afternoon.
24    Q.  Could you please state your first and last name and spell
25    both for the record?
```

1    A.  Katherine Richert.  K-a-t-h-e-r-i-n-e, Richert,

2    R-i-c-h-e-r-t.

3    Q.  Where do you live?

4    A.  I live in Montgomery County.

5    Q.  What is your educational background?

6    A.  I have a Bachelor's degree from the University of Alabama

7    at Birmingham.

8    Q.  How are you employed?

9    A.  I'm employed with the Alabama Department of Forensic

10   Sciences, Montgomery Regional Laboratory.

11   Q.  What is your position with Alabama Department of Forensic

12   Science?

13   A.  I am a forensic scientist specializing in firearms and tool

14   mark identification.

15   Q.  Do you have any type of supervisory duties?

16   A.  Yes, ma'am, I do.

17   Q.  What supervisory duties do you have?

18   A.  I am the section chief of the Montgomery Regional

19   Laboratory, as well as the statewide technical leader and have

20   just been appointed as the laboratory director of the

21   Montgomery Regional Laboratory.

22   Q.  How long have you been employed with the Alabama Department

23   of Forensic Sciences?

24   A.  Almost twelve years.

25   Q.  So how long have you been section chief of the Firearms

1    Unit?

2    A.   I believe I was appointed to that position in two thousand

3    four.

4    Q.   And what does that position entail?

5    A.   Basically, as the section chief of the Firearms Unit I'm

6    responsible for the budget, for the calibration and maintenance

7    much all equipment, as well as the administrative duties with

8    the personnel within the section.

9    Q.   What was your position with the Alabama Department of

10   Forensic Sciences before two thousand and four when you became

11   section chief of the Firearms Unit?

12   A.   I was basically a bench scientist.  I was a forensic

13   scientist who did the majority of the case work.

14   Q.   As a forensic scientist, what type of analysis did you

15   perform in that position?

16   A.   Basically the analysis is the same that I perform in my

17   current position as a firearms and tool marks examiner.  We

18   examine fired bullets and fired cartridge casings and try to

19   relate those back to each other or to a particular firearm.  As

20   well as analyzing other types of evidence that might be related

21   to the discharge or a firearm in general.

22   Q.   Do you still fulfill those duties as the section chief of

23   the Firearms Unit?

24   A.   I still do analyze evidence, yes, ma'am.

25   Q.   So you still work cases?

1    A.   Yes, ma'am, I do.

2    Q.   What type of training is required to qualify for your

3    position?

4    A.   The State of Alabama -- As a forensic scientist in this

5    state you are required to have a degree in one of the physical

6    sciences with at least eight courses in chemistry.

7    Q.   Have you received any specialized training for your job?

8    A.   Yes, ma'am, I have.

9    Q.   What type of specialized training have you received?

10   A.   I trained for two and-a-half years within the Alabama

11   Department of Forensic Sciences in the examination of firearms

12   and tool marks evidence before I was certified by the State to

13   perform independent case work.  As well I've attended two on

14   week courses put on by the California Criminalist Institute.

15   I've attended eleven one week training seminars put on by the

16   Association of Firearms and Tool Marks Examiners.

17   Q.   Ma'am, you're speaking a little fast.  Could you please

18   slow down.

19   A.   Sorry.  Would you like me to repeat that?

20   Q.   No.  You can go ahead.

21   A.   I've also attended arms courses put on by Glock, Smith &

22   Wesson, Savage, Sig, Colt, Beretta, and I believe that's it.

23   I've also attended the F. B. I. Firearms Instructors School and

24   I'm a certified instructor in rifles, pistols and shotguns by

25   the F. B. I.

1    Q.   Ma'am, what is an armor course?

2    A.   Basically, it's a course that's put on by the manufacturer

3    of the firearm that entails how the firearm is manufactured, as

4    well as how to take it apart, put it back together and the

5    working mechanism within the firearm.

6    Q.   Did you say that that course is hosted or put on by the

7    manufacturer?

8    A.   Usually it is, yes, ma'am.

9    Q.   So do you mean, then, that an armor course by Glock would

10   be put on and hosted by Glock, the company?

11   A.   That is correct.

12   Q.   Are you a member of any professional associations that

13   relate to your job?

14   A.   Yes, ma'am, I am.

15   Q.   What professional association?

16   A.   I am a member of the Alabama State Association of Forensic

17   Sciences, as well as the Association of Firearms and Tool Marks

18   Examiners where I'm the chairman of two boards.

19   Q.   Now you have mentioned a few times the term or phrase

20   "firearms and tool marks examiner".  What is firearms and tool

21   marks?

22   A.   Essentially, a firearm is a sub-component of a tool mark.

23   What a tool mark is, any time a harder object comes in contact

24   with a softer object which could be in a firearms case the

25   bullet or cartridge case coming into contact with the gun, it

1    is marked by those items.

2    Q.  So what does firearm and tool mark analysis entail,

3    generally speaking?

4    A.  As I said before, generally what we do is, we look at fired

5    bullets and fired cartridge casings and try to relate those

6    microscopically back to each other or to a particular firearm.

7    Q.  Is that the same thing as ballistics?

8    A.  Ballistics is a subsection of firearms examination.

9    Q.  Do you usually perform ballistic analysis?

10   A.  We do not.  What ballistics is, it's actually the study of

11   the bullet in motion, and we do not have the capability within

12   our laboratory to do those types of analysis.

13   Q.  What makes firearms and tool marks identification analysis

14   possible?

15   A.  Basically, during the manufacturing process of a firearm,

16   the tools that are used to manufacture that firearm leave a

17   unique surface on the parts that would come in contact with the

18   fired bullet or a fired cartridge case.  When ammunition is

19   discharged in that firearm, these microscopic marks are placed

20   on the cartridge casing or the bullet, which we are able to

21   identify back to a particular firearm.

22   Q.  You have used the term "fired cartridge case".  What does

23   that mean?

24   A.  A cartridge can be called a "bullet".  It has four basic

25   components in it.  It has the cartridge case, which is also

1    called a shell casing or a hull; the primer of the cartridge,

2    which is what the firing pin would detonate; the bullet which

3    is what comes out of the barrel of the firearm or the

4    projectile; as well as the powder that is in the cartridge

5    which burns at a rapid rate producing a gas which is what

6    pushes the bullet out the barrel.

7    Q.  Now, ma'am, I have to ask you this question.  The members

8    of the jury have been hearing "casings" and "shells".  Is that

9    the same thing as a fired cartridge casing?

10   A.  It is the untechnical term for a fired cartridge case, yes,

11   ma'am.

12   Q.  I know you said it's "untechnical".  Have you heard that

13   term used before?

14   A.  Oh yes, ma'am, I have.

15   Q.  And who normally uses that term?

16   A.  Law enforcement personnel.

17   Q.  So when law enforcement referred to a "spent casing" or a

18   "shell", that's the same thing in your line of work as a fired

19   cartridge case?

20   A.  Generally speaking, yes, ma'am.

21   Q.  How many firearms and tool mark analysis identifications do

22   you perform per week?

23   A.  The actual analysis, that would depend on the week at hand.

24   But generally speaking, I would try to get out three or four

25   cases a week which may have between one and fifty items of

1     evidence each.

2     Q.  Now is that different now that you're section chief of the

3     Firearms Unit than before you had any type of supervisory

4     position?

5     A.  Generally now, yes, ma'am.  I now have more administrative

6     duties, and I do not get to examine as much evidence as I used

7     to do.

8     Q.  How much evidence, since that's what you used to do, did

9     you use to examine before?  Before you became section chief,

10    how many cases did you generally work on a week?

11    A.  Generally, I would turn out between twenty-five and thirty

12    cases a month.

13    Q.  Have you published any professional papers?

14    A.  Yes, I have.

15    Q.  How many?

16    A.  I have three publications, one of which is in the

17    Association of Firearms and Tool Marks Examiners.

18            MR. BUTLER:  Your Honor, if it will expedite it, I am

19    willing to stipulate that she's more than qualified as a

20    firearms expert.

21            THE COURT:  Go ahead.

22    Q.  What topics are those papers related to?  I'm sorry if I

23    missed the answer if you've already answered that question.

24    But what topic did those papers relate to?

25    A.  The papers that I wrote were on stabbing wounds and tool

```
 1   mark analysis in cartilage.

 2   Q.  Have you had an occasion to testify in court before?

 3   A.  Yes, ma'am, I have.

 4   Q.  How many years have you been testifying?

 5   A.  I would say approximately ten.

 6   Q.  And have you been permitted to provide expert testimony in

 7   cases?

 8   A.  Yes, ma'am, I have.

 9   Q.  How many cases?

10   A.  How many testimonies?

11   Q.  Yes, ma'am, approximately.

12   A.  Approximately over two hundred and fifty.

13   Q.  And what subject did you testify -- What subject did you

14   testify about as an expert witness?

15   A.  I have been accepted as a witness as a firearms and tool

16   marks examiner.

17          MS. ADAMS:  Your Honor, we tender this witness as an

18   expert in firearms and tool marks identification.

19          THE COURT:  I think the defendant has already said

20   that --

21          MS. ADAMS:  I'm sorry, I didn't know if he said --

22          THE COURT:  Go ahead.  Go ahead.

23   Q.  Ma'am, have you received any evidence pertaining to a case

24   for Andreas Jejuan Smith?

25   A.  Yes, ma'am, I have.
```

1    Q.   And did you process or analyze that evidence?

2    A.   Yes, ma'am, I did.

3            MS. ADAMS:   May I approach, Your Honor?

4            THE COURT:   Yes.

5    Q.   I'm handing you what's previously been admitted as

6    Government's exhibit fifty-seven A, fifty-seven B and sixty.

7    A.   Yes, ma'am?

8    Q.   Have you seen those exhibits before?

9    A.   Yes, ma'am, I have.

10   Q.   Under what circumstances did you receive those exhibits?

11   A.   I received these exhibits from Detective D. Davis of the

12   Montgomery Police Department and were requested to analyze

13   them.

14   Q.   How do you know that those exhibits are the same exhibits

15   that you received from Detective Davis?

16   A.   Each of these exhibits have my departmental case number,

17   item number and my initials engraved on them.

18   Q.   So in reference to the actual fired cartridge case, you

19   engraved your initials on it?

20   A.   That is correct.

21   Q.   Are those exhibits in the same or substantially the same

22   condition now as they were when you -- after you processed

23   them?

24   A.   Other than having my case number, item number, and initials

25   on them yes, ma'am, they are.

1   Q.  Could you briefly explain the analysis that you performed

2   on those exhibits.

3   A.  Yes, ma'am.  Basically, State's exhibit sixty, which is a

4   Smith & Wesson semiautomatic forty caliber pistol, I examined

5   this firearm, made sure it was operational functional and safe

6   to fire.  Then I test fired this firearm with the submitted

7   magazine and laboratory centered ammunition, collecting the

8   test fired cartridge cases and test fired bullets for my

9   examination.

10          Then I compared State's exhibit fifty-seven A, as

11  well as fifty-seven B, which were two forty Smith & Wesson

12  caliber fire cartridge cases, microscopically to the test fired

13  cartridge cases from Government's exhibit sixty and made my

14  examination there.

15  Q.  And what did you conclude from your examination?

16  A.  I was able to determine that Government's exhibit

17  fifty-seven A and fifty-seven B, the fired cartridge cases,

18  were fired in the chamber of Government's exhibit sixty.

19  Q.  I just want to clarify.  You had a microscopic examination.

20  This is going to sound like a stupid question, but does that

21  involve a microscope?

22  A.  Yes, ma'am, it does.  As a firearms and tool marks examiner

23  the main instrumentation that we use is a comparison

24  microscope.  And essentially what this microscope is, is two

25  microscopes that are connected by an optical bridge that allows

1    you to look at two items simultaneously under the same

2    magnification so that we can look at the microscopic marks on

3    our cartridge case or bullet in comparison to the unknown or

4    evidence exhibit.

5    Q.  How many firearms did you examine in this case?

6    A.  I believe I examined three firearms in this case.

7    Q.  Do you recall what type of firearms, the other two firearms

8    were?

9    A.  Yes, ma'am, I do.

10   Q.  What type were the other two firearms?

11   A.  One firearm was a three oh eight Winchester rifle, and the

12   other was a seven point six two by thirty-nine millimeter

13   rifle.

14   Q.  Ma'am, I'm showing what has previous been admitted as

15   Government's exhibit fifty-five.  Does that -- the weapon in

16   that exhibit, does it resemble a firearm that you analyzed in

17   this case?

18   A.  I'm not sure.

19   Q.  Does it resemble the type of firearm that you analyzed in

20   this case?

21   A.  It does.

22   Q.  I'm now showing you Government's exhibit number sixty-one.

23   Does the weapon in that exhibit resemble the type of firearm

24   that you examined in this case?

25   A.  Yes, ma'am, it does.

```
 1   Q.  After you finished your examination of the evidence that
 2   you received, what did you do with that evidence?
 3   A.  After I marked the evidence, I sealed it up and placed it
 4   back into our evidence vault for disposition to the submitting
 5   agency.
 6            MS. ADAMS:  I tender this witness for cross, Your
 7   Honor.
 8            THE COURT:  Cross?
 9            MR. BUTLER:  It'll be very brief.
10                         CROSS EXAMINATION
11                BY MR. BUTLER OF KATHY RICHERT:
12   Q.  You don't have the ability to study bullets in motion at
13   your lab, correct?
14   A.  We do do muzzle-to-target distance analysis in that sense,
15   but we are not actually able to determine the velocity of a
16   bullet when it comes out of the barrel or anything of that
17   nature, which is actually what ballistics is.  We do the
18   trajectory analysis, but not the actual bullet velocity.
19   Q.  Did you, or anyone from your office, go to Twenty-eight
20   sixty-one Jan Drive on July twentieth, two thousand seven?
21   A.  Not to my knowledge, no, sir.
22   Q.  Did you, or anyone from your office, do what I'll call,
23   using my lay terms, a trajectory velocity analysis of bullet
24   holes or bullet marks in that residence on July twentieth, two
25   thousand seven?
```

1    A.   Like I said, we don't do ballistics analysis, but we

2    did --

3    Q.   Is that a no?

4    A.   Not to my knowledge.

5    Q.   Thank you.   Nothing further.

6              THE COURT:   Any further collect?

7              MS. ADAMS:   No, Your Honor.

8              THE COURT:   Thank you, you may step down.

9              (Whereupon the witness, Kathy Richert, stepped down

10   from the stand.)

11             THE COURT:   Next witness.

12             MS. HARDWICK:   The Government calls Ronald McCoy.

13                  R O N A L D    M c C O Y,

14      the witness herein, having first been duly sworn or

15   affirmed to tell the truth, was examined and testified as

16   follows:

17                     DIRECT EXAMINATION

18             BY MS. HARDWICK OF RONALD McCOY:

19   Q.   Would you state your full name, please.

20   A.   Ronald D. McCoy.

21   Q.   Mr. McCoy, how are you employed?

22   A.   I'm employed as an identification officer with the

23   Montgomery County Sheriff's Department.

24   Q.   Mr. McCoy, would you slide into the mic, please.

25   A.   Is that better?

```
1    Q.  Yes.
2              How long have you been employed in your present
3    capacity.
4    A.  I have been with the Montgomery County Sheriff's Department
5    in my present capacity for the past fifteen years.
6    Q.  And what do you do with the Montgomery Sheriff's
7    Department?
8    A.  My main function is that of a fingerprint examiner.
9    Q.  And what background, education and experience do you have
10   as a fingerprint specialist?
11   A.  Okay.  I was recruited out of high school by the F. B. I.
12   in nineteen seventy-five, and -- out of Arkansas.  And I became
13   employed with the F. B. I. in Washington, D.C. and I was
14   trained by them as a fingerprint examiner.
15             I worked with the F. B. I. for three years in D. C.
16   before I decided to move back South.  And upon deciding to come
17   back to the South I became employed with the Alabama Bureau of
18   Investigation here in Montgomery.  I worked with them as a
19   fingerprint examiner for fifteen years.
20             MR. BUTLER:  Your Honor, I have seen Mr. McCoy in
21   court.  I'll stipulate that he's qualified.
22             MS. HARDWICK:  If he will stipulate that he is
23   qualified as an expert in latent fingerprint examinations, the
24   Government will accept that stipulation.
25             MR. BUTLER:  I so stipulate.
```

1    Q.  Mr. McCoy, did you have an occasion to examine some prints

2    in the case involving the federal government against Andre

3    Jejuan Smith?

4    A.  Yes, I did.

5    Q.  And did you have at your convenience actual fingerprint

6    cards?

7    A.  Yes, I did.

8    Q.  I'm going to hand you three exhibits.

9           MS. HARDWICK:  May I approach, Your Honor?

10          THE COURT:  Yes.

11   Q.  I'll show you Government's exhibit seventy-four and ask if

12   you recognize Government's exhibit seventy-four.

13   A.  Yes, I do.

14   Q.  And would you tell us what it is?

15   A.  It is a fingerprint card bearings the name of a subject,

16   Andreas Jejuan Smith.

17   Q.  Would you spell the middle name, please?

18   A.  J-e-j-u-a-n Smith.

19   Q.  Have you seen that card before?

20   A.  Yes, I have.  It has my identifying marks on it.

21          MS. HARDWICK:  We'd offer Government's exhibit

22   seventy-four.

23          MR. BUTLER:  No objection.

24   Q.  I'm going to hand you --

25          THE COURT:  Admitted.

 1    Q.   I'm going to hand you Government's exhibit seventy-five.

 2    A.   Okay.

 3    Q.   Have you seen that before?

 4    A.   Yes, I have.

 5    Q.   What is it, please?

 6    A.   It is a fingerprint card bearing the name of Andre J.

 7    Smith, and it has my identifying mark on it.

 8    Q.   And I hand you also Government's exhibit seventy-six and

 9    ask if you recognize Government's exhibit seventy-six.

10    A.   Yes, I do.

11    Q.   And what is that, please?

12    A.   It is a fingerprint card bearing the name Andre J. Smith,

13    and it also has my identifying mark.

14         MS. HARDWICK:  We'd offer Government's exhibits

15    seventy-five and seventy-six.

16         MR. BUTLER:  No objection.

17         THE COURT:  Admitted.

18    Q.   Now, Mr. McCoy, when you get a fingerprint card for the

19    purpose of examining them, what are you looking for?

20    A.   I look at the impressions made by the fingers on the

21    fingerprint card.  I go through the process with a ten print

22    fingerprint card.  I look at all ten fingers to determine if

23    between the three cards they bear the same impressions and the

24    same classification, and then I'll look at individual fingers

25    to see if the characteristics are the same between each

1    fingerprint card.

2    Q.  And did you do that in this case?

3    A.  Yes, I did.

4    Q.  Now let's talk a little bit about the examination and

5    prints.  Have you had experience of lifting prints and

6    comparing prints from crime scenes?

7    A.  Yes, I have.

8    Q.  Could you explain to the ladies and gentlemen of the jury

9    what would prevent you from lifting a good fingerprint that you

10   could do an analysis on?

11   A.  There are a lot of things that come into play when you're

12   dealing with fingerprints.  It depends on the type of surface

13   on the object that the fingers are coming into contact with.

14          We'll start with the hands themselves.  When you look

15   at your hands, on the palmer portion of your hand you have

16   ridges and grooves.  On those ridges you have sweat pores, and

17   in order to leave a print, basically when you touch something

18   it's a latent type print.  "Latent" means it's not readily

19   visible to the naked eye.  So when you touch a surface, there

20   is some type of impression left.

21          It depends on the each individual hand, for starters,

22   as to whether you leave a decent top impression or a good

23   enough impression where the possibility of developing a latent

24   print that is usable can be found.  You have -- As far as the

25   hands go, you can have difficulty with persons that sweat a

1    lot.  When we take prints on some individuals, they sweat

2    profusely and we have to steadily wipe their hands.  That could

3    cause a print to smear, smudge and be distorted to where we

4    couldn't get anything off of it.

5         We also have individuals that have real dry skin.

6    That's a person that's not leaving any sweaty type of residue

7    hardly, and sometimes when we are intentionally trying to

8    create prints on individuals like that, we have to put oil on

9    their hands or lotion or something like that to help them to

10   leave an impression that we could use.

11   Q.  Now, Mr. McCoy, have you had occasion to examine a

12   firearm?

13   A.  Yes, I have.

14   Q.  Are those easy prints to get?

15   A.  No, not at all.

16   Q.  Why is that?

17   A.  Firearms are one of the hardest things to get impressions

18   off of.  One of the big reasons is because you're dealing with

19   a small area.

20        When you're dealing with trying to get a good usable

21   impression, you need a smooth surface, a large enough surface

22   to where you can leave an impression that would hold enough

23   characteristics that if I do retrieve an impression, it leaves

24   enough area where I could get enough characteristics to make an

25   identification.

1    Q.   Now I'm going to make an action, Mr. McCoy, and if you
2    would observe my action.  If I place my hand and do that,
3    what's the likelihood of you getting a good print?
4    A.   Potentially, you could leave one, but looking at the
5    surface that you're speaking of, that would be a smooth
6    surface.  But touching it like that, the possibility is there,
7    but when the hand came off it could have smeared a little bit.
8    If it's not going straight down, coming straight up, so it
9    really varies.
10   Q.   So if a person were to, and if I may use an exhibit that's
11   already in evidence, you haven't seen this firearm before, have
12   you?
13   A.   No, I haven't.
14   Q.   Now just -- Can you see it from where you are?
15   A.   Not real good.
16   Q.   I'm going to come closer to you and I will speak loudly for
17   the jury.
18   A.   Okay.
19   Q.   Mr. McCoy, using this firearm, if I grip it and hold a
20   partial finger there, what's the likelihood that you're going
21   to get a print off that trigger?
22   A.   Slim.
23   Q.   You notice the grip of my hand.  Can you see through it?
24   A.   Yes, I can see through it.
25   Q.   Can you see how my fingers are gripped here?

1    A.   Right.

2    Q.   What's the likelihood of you getting a print off of that?

3    A.   Slim.   Just looking at the grip of that weapon, it's not

4    smooth.

5    Q.   If I grip this firearm to shoot it in this way, what's the

6    likelihood of you getting a print off that?

7    A.   Do that again?

8    Q.   If I grip it to hold it, what's the likelihood of getting a

9    print?

10   A.   Now on the very top there would be some potential.   It

11   really varies as far as how an individual holds it that could

12   make a difference in there.

13   Q.   And if it was -- Is it ever possible that you get a firearm

14   where somebody has actually used it and you get a print like

15   that off of it?

16   A.   Not often at all.

17   Q.   Are you going to normally get prints raised up smoothly

18   that way?

19   A.   No.

20   Q.   And based on your experience and in examining firearms,

21   have you examined a firearm where someone has handled a firearm

22   where they actually make a nice rolled print on it?

23   A.   It's rarely happened.   A lot of times when you do touch it

24   and you do find a print or a decent type of impression by being

25   such a small area, a lot of times you'll find another

1    impression on top of it beside it, or distorting it in some way

2    because if you gripped it in such a way as to where you were

3    going to be, say, shooting it, someone else would grip it the

4    same way.

5    Q.  Now I'm going to go back to the exhibits that have been

6    admitted in Government's exhibits seventy-four, seventy-five

7    and seventy-six.  Now these prints are nice and carefully

8    rolled, is that correct?

9    A.  Right.  That was a controlled impression.

10   Q.  So they are all good prints?

11   A.  Right.

12   Q.  And these are the prints that you use to compare to a

13   non-print card?

14   A.  That's correct.

15   Q.  Based on Government's exhibit number seventy-four, can you

16   read the information contained on Government's exhibit

17   seventy-four?

18   A.  Yes, I can.

19   Q.  And that information indicates an arrest date of what?

20   A.  Seven twenty-one of two thousand seven.

21   Q.  And the charges that are indicated on it?

22   A.  Yes, they are.

23   Q.  The front sides of Government's exhibit seventy-four, what

24   does it normally identify on the front side of that?

25   A.  The individual associated with it.

1    Q.   Does it put any other information concerning that

2    individual?

3    A.   It has the sex, race, alias, names, the date the

4    impressions were made and the subject's signature.  As for this

5    one, I see my identifying marks.

6    Q.   Okay.  I want to ask you about a little card, a section

7    here that may not show it clearly, but these little bar type

8    indications on this card, what do they mean?

9    A.   That's an indication of a gray scale within our computer

10   system.

11   Q.   And what's the purpose of that scale?

12   A.   For getting the clarity and the light intensity, as far as

13   the light or darkness of the prints correct.

14   Q.   Now this card also has a date of birth, is that correct?

15   A.   Yes, it does.

16   Q.   What is that date of birth?

17   A.   Nine eighteen of nineteen eighty.

18   Q.   I'm going to show you -- That was the known print that you

19   had, is that correct?

20   A.   That's correct.

21   Q.   Now where did you get that one from?

22   A.   From a known file that we possess.

23   Q.   At the Sheriff's Department?

24   A.   At the Sheriff's Department.

25   Q.   Would the arrest date on there be in conjunction with when

1    the person was arrested?

2    A.  That's correct.

3    Q.  And with the charges they brought against the person at

4    that time?

5    A.  That's correct.

6    Q.  Now these charges that are listed, do they sometimes vary

7    on the actual indictment when it was actually returned?

8    A.  Do they vary on what, now?

9    Q.  The actual indictment when it's returned.

10   A.  That's correct.

11   Q.  So this is the arrest date?

12   A.  Right.

13   Q.  I'll show you Government's exhibit number seventy-five.

14   Does it indicate a birth date?

15   A.  Yes, it does.  Nine eighteen of nineteen eighty.

16   Q.  And does it indicate a name?

17   A.  Yes, Andre J. Smith, with the alias name of Andreas

18   Smith.

19   Q.  Did you compare Government's exhibit seventy-four to

20   Government's exhibit seventy-five?

21   A.  Yes, I did.

22   Q.  And what did you find in reference to Government's exhibit

23   seventy-five to seventy-four?

24   A.  I found that the impressions made on the two fingerprint

25   cards were made by one and the same individual.

1   Q.  I'm going to show you Government's exhibit seventy-five.

2   And does it indicate when those prints were taken?

3   A.  Yes, it does.

4   Q.  And when is that?

5   A.  November the eleventh, nineteen ninety-nine.

6         MS. HARDWICK:  If I may I approach, Your Honor?

7         THE COURT:  Yes.

8   Q.  I'm going to hand you both of these and ask you if you

9   would compare a couple of things, please.  I'm handing you what

10  has been admitted as Government's exhibit seventy-two.  And

11  then your analysis, your print analysis of Government's exhibit

12  number seventy-five.  Can you compare the charges the date the

13  impressions were made with these two documents to see if they

14  correspond with each other?

15  A.  Yes, they do.

16  Q.  Would the arrest date be the same, eleven eleven nineteen

17  ninety-nine?

18  A.  Let's see.  I see the offense date eleven ten, nineteen

19  ninety-nine and an arrest date eleven eleven ninety-nine.

20  Q.  So those were the same dates the prints were made?

21  A.  Right.

22  Q.  I'm going to hand you Government's exhibit seventy-three

23  with Government's exhibit seventy-six and ask you to compare

24  those two documents.

25  A.  Okay.  They would be related with the same.

1    Q.  If you would leave those two there, please, for one second.

2         The most recent arrest of Andreas Smith charging with

3    the two counts of attempted murder, robbery, and I think it

4    lists the marijuana possession, but particularly the two counts

5    of attempted murder and the robbery in the first degree which

6    was done on July twenty-first, oh seven, do the prints on this

7    card that you analyzed compare to be one and the same person

8    that corresponds with the two certified copies of the

9    convictions.

10   A.  Yes, they do, and it reflects my identifying marks

11   certifying that.

12        MS. HARDWICK:  Those are all my questions for this

13   witness.

14        THE COURT:  Cross?

15        MR. BUTLER:  Yes, Your Honor, briefly.

16              CROSS EXAMINATION

17        BY MR. BUTLER OF RONALD McCOY:

18   Q.  I just want to make sure one thing is clear to the jury.

19   When the Government read off some charges that were on the back

20   of this one card, those, like she said, those are just the

21   preliminary charges they write down when an individual is

22   arrested, that doesn't mean that's what he's charged with or

23   convicted of it or anything like that, that is the attempted

24   murder or the first degree robbery?

25   A.  That's correct.  That's the charges at the time.

1    Q.   As happens, things change.   The charges may change and they

2    have changed in this case.   Are you aware of that?

3    A.   Possible.

4    Q.   The other question I had was how long have you been doing

5    fingerprint examination?

6    A.   Over thirty years.

7    Q.   Over thirty years?

8    A.   Yes.

9    Q.   I'm not trying to be silly but you're not the Maytag

10   repairman just sitting around because nobody ever gets

11   fingerprints, correct?

12   A.   No, I stay very busy.

13   Q.   You're very busy.   We've seen each other multiple times in

14   courtrooms?

15   A.   That's correct.

16   Q.   That's because fingerprints are lifted off of items?

17   A.   Right.

18   Q.   This firearm right here, I don't think anybody is going to

19   argue that someone carries a gun around just on the metal part;

20   based on your experience, that's not how firearms are

21   carried?

22   A.   That's correct, it's not normal to carry it that way.

23   Q.   If prints are lifted off of here, it's because maybe the

24   person put it down briefly, it may be smudged hit a little bit,

25   touched it briefly while putting a bullet in there.   The bottom

1    line is, the prints are usually partial, not full, nice, really

2    neat prints.

3    A.  With latents you never get a perfect print.

4    Q.  You never get a perfect print.

5    A.  Right.

6    Q.  So, for instance, during a trial a defense lawyer who is

7    just trying to make it clear that a print could be lifted off

8    of this by putting a finger on it like that, that's not how the

9    prints are usually lifted off of a firearm.

10   A.  Normally.

11   Q.  Normally, they're always partial because, like you said,

12   you never get a perfect print.

13   A.  You never get a perfect print.

14   Q.  And you have thirty years of experience and a busy schedule

15   to test for how many prints are lifted partially.

16   A.  Right.

17          MR. BUTLER:  Nothing further.

18          MS. HARDWICK:  Nothing further from this witness,

19   Your Honor.  May he be excused?

20          THE COURT:  Yes.

21          (Whereupon the witness, Ronald McCoy, stepped down

22   from the stand.)

23          THE COURT:  Do you rest?

24          Well, we'll have a fifteen minute recess.

25          Before we take a fifteen minute recess, how long do

1    you think your case will take?

2           MR. BUTLER:  A day.

3           THE COURT:  All right.  We'll take a fifteen minute

4    recess.

5           (Whereupon, the jury was escorted out of the

6    courtroom and the following colloquy ensued):

7           MR. BUTLER:  Yes, Mr. Butler?

8           MR. BUTLER:  Your Honor, Dr. Solomon Fulero is here

9    today.

10          THE COURT:  First I'd like to hear any motions so I

11   don't forget them.

12          MR. BUTLER:  Okay.  Your Honor, as I mentioned in

13   chambers outside the presence of the jury, I'll examine any

14   witnesses --

15          THE COURT:  No.  Are you going to make a judgment for

16   motion of acquittal or not?

17          MS. ADAMS:  We have not rested.

18          THE COURT:  Oh, I thought you said you rested.

19          MS. HARDWICK:  No.

20          THE COURT:  Isn't that funny, I heard "yes".

21          And I asked it twice.  Isn't that funny, I wanted to

22   hear "yes".  Well, that's a new one.  I really thought I heard

23   "yes".

24          How many more witnesses do you have?

25          MS. HARDWICK:  One.

```
1              THE COURT:  One more?

2              MS. HARDWICK:  Yes, sir.

3              THE COURT:  Very good.

4              What about your expert?

5              MR. BUTLER:  He's testifying on Monday.  Today is the

6    only day he can be here, so he will be our first witness.

7              THE COURT:  First witness today?

8              MR. BUTLER:  Today.

9              THE COURT:  Now this is your expert you're talking

10   about?

11             MR. BUTLER:  Yes.  That's if the Court allows him,

12   today is the only day we can use him.

13             MS. ADAMS:  Your Honor, we're under the impression

14   that you are going to voir dire the expert out of the presence

15   of the jury?

16             THE COURT:  Yes.  Why don't we go ahead, take a

17   fifteen minute recess.

18             How long will your next witness take?

19             MS. HARDWICK:  Very short, Your Honor.

20             THE COURT:  Very short?  I would have gone and heard

21   that witness because I thought it was probably a short witness.

22   Then we'll hear from that witness, then I'll have to send the

23   jury out so you can make your appropriate motions, and then I

24   will take the expert on voir dire and we'll see what happens

25   after that.
```

1    MR. BUTLER:  Yes, sir, Your Honor.  Thank you.

2    (Whereupon, a recess was taken.)

3    THE COURT:  Proceed.

4    MS. HARDWICK:  The Government calls James Austin.

5    J A M E S    A U S T I N,

6    the witness herein, having first been duly sworn or

7    affirmed to tell the truth, was examined and testified as

8    follows:

9    DIRECT EXAMINATION

10    BY MS. HARDWICK OF JAMES AUSTIN:

11    Q.  Would you state your full name and your employment, please.

12    A.  James David Austin.  I'm a deputy United States marshal.

13    Q.  And, Deputy, were you part of a team that went to

14    Twenty-eight sixty-one Jan Drive in the Woodley Park area on

15    July twentieth, two thousand seven?

16    A.  Yes, ma'am.

17    Q.  Were you there to arrest a person by the name of Andreas J.

18    Smith?

19    A.  Yes, ma'am.

20    Q.  I'm going to hand you some exhibits that were previously

21    admitted and ask you were you part of the searching of that

22    residence?

23    A.  Yes, ma'am, I was.

24    Q.  Let me just show these to you since they have already been

25    admitted and we can expedite it.  Do you recall seeing the

1    firearm that is in Government's exhibit fifty-five?

2    A.  Yes, ma'am.

3    Q.  Where did you first see that firearm?

4    A.  In the living room area next to the sofa, sort of under a

5    coffee table type thing in the living room of the apartment.

6    Q.  Who moved it from that location to the kitchen area?

7    A.  I did.

8    Q.  And why did you move it?

9    A.  We had three individuals that we were trying -- after we

10   had gotten secure, and it was loaded and chambered and I didn't

11   want to leave that firearm within proximity of those

12   individuals.

13   Q.  Was it loaded to capacity?

14   A.  Yes, ma'am.

15   Q.  Had it been fired?

16   A.  No, ma'am, it had not.

17   Q.  Showing you what has been previously admitted as

18   Government's exhibit sixty-one.

19   A.  I recognize it.

20   Q.  Where did you find that?

21   A.  That was in an upstairs bedroom between the mattress and

22   the box springs.  I think it was the bedroom to the left as we

23   went up the stairs.

24   Q.  But it was in one of the bedrooms upstairs, is what you're

25   saying.

1   A.  Yes, ma'am.

2   Q.  And who found it?

3   A.  I did.

4   Q.  Who moved it from upstairs downstairs?

5   A.  I did.

6   Q.  And was it in that condition, or did you undo whatever this

7   is?

8   A.  I removed the magazine from the weapon and ejected a round

9   from the chamber.

10   Q.  So there was a round in the chamber?

11   A.  Yes, ma'am.

12   Q.  Had it been fired?

13   A.  No, ma'am.

14   Q.  Do you recognize Government's exhibit sixty A?

15   A.  Yes, ma'am, I do.

16   Q.  Where did you first see Government's exhibit sixty A?

17   A.  When we were arresting Mr. Andreas Smith that was on the

18   ground -- on the floor, excuse me -- at his feet, near his feet

19   where he was struggling with Deputy Hamilton.

20   Q.  He was struggling with J. C. Hamilton?

21   A.  Yes, ma'am.

22   Q.  Did you assist the U. S. marshal, Mr. Hamilton, in securing

23   Mr. Smith?

24   A.  Yes, ma'am, I did.

25   Q.  And who moved it and placed it on this table?

1    A.  I did.

2          MS. HARDWICK:  Those are all my questions, Your

3    Honor.

4          MR. BUTLER:  Your Honor, one moment?

5          THE COURT:  Yes.

6          (Whereupon, Mr. Butler conferred with Ms. McKee off

7    the record and out of the hearing of the other courtroom

8    participants.)

9                    CROSS EXAMINATION

10                BY MS. McKEE OF JAMES AUSTIN:

11   Q.  Mr. Austin, what is your official title?  I'm sorry, I

12   missed it.

13   A.  My full time is criminal investigator deputy United States

14   marshal.

15   Q.  Okay.  And, Marshal Austin, you stated that you moved some

16   items in the home.

17   A.  Yes, ma'am.

18   Q.  Of Willie Jackson's house when you arrived?

19   A.  Yes, ma'am.

20   Q.  Specifically, we had been shown a picture of a gun in the

21   kitchen.  Specifically, you moved this gun?

22   A.  Yes, ma'am.

23   Q.  Now when you moved that gun, was the crime scene tech there

24   at the time you moved the gun?  Had he arrived and made it to

25   the scene yet?

1  A.  Oh no, ma'am, this was very much an arrest situation.

2  Q.  Okay.  So your main concern when you got in the house was

3  to, number one, secure the individuals in the house?

4  A.  Yes, ma'am.

5  Q.  And I'm assuming since you moved these weapons, to secure

6  any weapons that you found in the home.

7  A.  Yes, ma'am.

8  Q.  In doing those two things, there really wasn't much of a

9  concern of keeping the evidence exactly where it was when you

10  found it when you came in the home?

11  A.  No, ma'am.  We were looking for the individual Andreas

12  Smith.  When there were other individuals in the house, we had

13  a house full of people, a house full of guns, my last concern

14  at that moment was the pristine evidence that we could

15  preserve.

16  Q.  Okay.  Well let me ask you.  You said you had a lot of

17  people in the home.

18  A.  Mr. Jackson and the other gentleman, I forgot his name.

19  Q.  Jamaal Clark?

20  A.  Clark.  Mr. Clark.

21  Q.  But other than those two and Mr. Smith, everyone else

22  inside the home was law enforcement, correct?

23  A.  Yes, ma'am.

24  Q.  So any fear or interest in securing a weapon would have

25  been with regard to obviously the individuals that are not law

1    enforcement.

2    A.   Yes, ma'am.

3    Q.   Because you wouldn't expect anyone in law enforcement, the

4    people you went there with, to harm you in any way.

5    A.   No, ma'am.

6    Q.   So once the individuals were secure, did you at least

7    attempt to place the items back where you originally found them

8    when you came in the home?

9    A.   No, ma'am.  There was no need.  I had already moved the

10   items, so that would have just been making a framed up thing.

11   The items, I had already moved them, there was no sense in

12   putting them back.  We searched the house because we didn't

13   know if those were the only individuals in the house.

14   Q.   Well, sir, those were the only individuals in the house.

15   A.   But we didn't know it at the time.

16   Q.   But you know now that those were the only individuals in

17   the house?

18   A.   Yes, ma'am.

19   Q.   Did you, in fact, tell anyone that you moved this gun and

20   put it in the kitchen?

21   A.   Oh, yes, ma'am.  The other law enforcement personnel

22   there.

23   Q.   Would that include the crime scene tech?

24   A.   Oh.  By the time -- I don't recall so much a crime scene

25   tech coming to the scene as it was detectives.  And they

1  conducted their own search after the scene was secured.  But
2  there was a lot of confusion at the time of the arrest.  After
3  the shots had been fired we put a call in to Montgomery P. D.
4  to let he them know that shots were fired.
5  Q.  Let me ask you this.  You don't recall Detective Davis
6  arriving on the scene while you were still present inside the
7  residence?
8  A.  You would have to remind me who he is.  I remember
9  Detective Marcado and Detective Naquin.
10  Q.  Detective Davis would have been the crime scene tech at
11  Willie Jackson's house.
12  A.  Okay.
13  Q.  He would have been the individual taking pictures in the
14  home.  Did you see an individual around Willie Jackson's house
15  taking pictures?
16  A.  There were people taking some pictures, but I know after we
17  secured the individuals and got them away from the scene they
18  did some more processing of the scene and I had no
19  participation in that.
20  Q.  Sir, you said that you saw several people in the house
21  taking pictures that evening, that night.
22  A.  I don't know if I saw several.  I just know that some
23  pictures were being taken.  I know that Detective Naquin, when
24  he came to the scene, had taken over as the principal
25  investigator of the crime scene.

1  Q. At any point did you stop and tell Detective Naquin, or

2  anyone else you saw taking pictures in the residence, that you

3  had moved this weapon when you got to the home?

4  A. I'm sure I did. I'm sure I told them that I secured the

5  weapons and had unloaded them.

6  Q. So if you told them, we would be able to have some

7  information. That would have been written in some report that

8  this is the original place, now it's been moved and this is who

9  it was moved by?

10  A. I think in my report I wrote where I saw the weapons that

11  were found.

12  Q. And how many reports did you actually do in this case?

13  A. I did one report.

14  Q. Did you in fact move this weapon at all?

15  A. Yes, ma'am.

16  Q. When you were inside the residence?

17  A. I did. I took it out of the bedroom. We were still

18  searching for individuals upstairs.

19  Q. Okay. And this weapon --

20  A. Yes, ma'am, that was on the floor at his feet, Andreas

21  Smith's feet.

22  Q. And, again, if you had told the individual taking the

23  pictures of these, he would know and be able to know where

24  these items were originally found as the crime scene tech?

25  A. I think I may have enumerated every place that I found a

1    weapon, but to say that I definitely said it to Detective

2    Davis, I don't recall that.  I remember telling Naquin and

3    Detective Mercado where I had located the weapons.

4    Q.  So you understand, as you do, that this was a very serious

5    incident that took place here.

6    A.  Yes, ma'am.

7    Q.  So it would have been very important to make sure that

8    every single thing as it was when you found it was recorded

9    accurately, correct?

10   A.  Yes, ma'am.

11   Q.  I want to take you back.  Originally, when you were at the

12   house, you were not actually at Willie Jackson's house to begin

13   with, correct?

14   A.  No, not to begin with.

15   Q.  You were actually across the street?

16   A.  I was across the street in the alleyway behind his mother's

17   house, or town house.

18   Q.  So thinking of a typical neighborhood, the mother's house

19   is across the street from Willie Jackson's house, correct?

20   A.  Yes.

21   Q.  That means the distance you were from Willie Jackson's home

22   would have included his front yard?

23   A.  Yes.

24   Q.  As well as the street?

25   A.  Yes.

1    Q.   As well as the front yard of his mother's residence.

2    A.   Yes, ma'am.

3    Q.   And the tomb length of her house.  But since you were

4    behind that house --

5    A.   Yes, I was in the alleyway.

6    Q.   At some point you came over to Mr. Jackson's home,

7    correct?

8    A.   Yes, ma'am.

9    Q.   When you came over there, you came inside the residence?

10   A.   Yes, ma'am.

11   Q.   And you saw three black males inside?

12   A.   Yes, ma'am.

13           MS. McKEE:  One moment Your Honor.

14           (Whereupon, Ms. McKee conferred with Mr. Butler off

15   the record and out of the hearing of the other courtroom

16   participants.)

17   Q.  Mr. Austin, Marshal Austin, how long did it actually take

18   you to get from the back alleyway behind Mr. Jackson's mother's

19   house across the street to Mr. Jackson's home?

20           MS. HARDWICK:  Your Honor, at this time we're going

21   to object to the relevancy.  And she's also gone beyond my

22   direct examination.  My direct examination was very specific.

23   Where are the firearms were located.  I've allowed quite a few

24   questions, but at this point she's going back over the whole

25   case.

```
 1              THE COURT:  Overruled.
 2   A.  I would say maybe a total of twenty seconds.  When I first
 3   started hearing the radio traffic that he's in the house,
 4   that's when I started that way.  I was coming around the house
 5   as the shots were fired.
 6   Q.  So you say it took you twenty seconds to get from where
 7   your position was behind the mother's house to Mr. Jackson's
 8   louse?
 9   A.  Yes, ma'am, at a full run.
10   Q.  And by "full run" I'm assuming you mean running as fast as
11   you possibly could to get over there?
12   A.  Yes, ma'am.
13   Q.  And it took you about twenty seconds?
14   A.  Maybe thirty seconds, but somewhere in that range.
15   Q.  But by the time you got to Mr. Jackson's residence, other
16   law enforcement officers were already inside the home?
17   A.  Deputy Reccio was at the corner of the residence in the
18   front.  He was at the front of the mother's house and had come
19   across the street.  And he was saying -- hollering, "There were
20   shots fired."
21              I said, "I know, I heard them."
22   Q.  What I'm asking you, there were already law enforcement
23   officers in there at the time?
24   A.  I didn't know that at the time.
25   Q.  When you got over to Mr. Jackson's home there were already
```

1    law enforcement officers there.

2    A.   There were, but I didn't know that when I came across the

3    street.

4    Q.   Yes.  And how many officers were inside the home?

5    A.   I believe there were two.  Detective Task Force Officer

6    Richardson and Deputy Marshal Reccio.  They had already made

7    entrance from the back.

8    Q.   These officers had their guns drawn?

9    A.   I think so, yes.

10   Q.   And at the time you again made it to Mr. Jackson's home,

11   there were three black males inside the house, not law

12   enforcement?

13   A.   Yes, ma'am.

14   Q.   Again, Mr. --

15          THE COURT:  We've gone over this several times,

16   haven't we?

17          MS. McKEE:  Yes, Your Honor.

18   Q.   Sir, inside the house, when you got there to Mr. Jackson's

19   home, two individuals, Mr. Jackson as well as Mr. Clark, were I

20   believe as you put it, surrendered, I guess was the word you

21   used?

22   A.   They weren't making any movements as if they were wanting

23   to fight, but they weren't secured with handcuffs or

24   anything.

25   Q.   Okay.  And there was another individual you said was

1    standing up, correct?

2    A.  They were all three standing up.

3    Q.  Yes.  And the other individual is Mr. Smith?

4    A.  Yes, ma'am.

5    Q.  And Mr. Smith was bleeding from his head when you saw him,

6    wasn't he?

7    A.  He was, but I didn't know he was bleeding at the time.  I

8    mean it was only after I -- when we got him on ground and we

9    were getting him handcuffed that I saw blood on his head.

10    Q.  When you first saw Mr. Smith, when you came in the house

11    were you facing him or was his back to you since you say you

12    didn't see it when you first came in?

13    A.  Well, you've got to understand there was a struggle going

14    on at that time, and --

15    Q.  That's not my question.  What I'm asking is, when you first

16    came in the home and you saw Mr. Smith, were you facing him

17    like me and you were looking at each other now, or when you

18    walked in the home was Mr. Smith's back to you?

19    A.  Ma'am, I don't remember.  I mean there was a fight going on

20    and we were trying to secure him.  So as much as he was facing

21    me or maybe turned away from me all at the same time, I don't

22    know.

23    Q.  So was Mr. Smith handcuffed at the time when you saw him?

24    A.  No.

25    Q.  And in fact -- Let me back up for just a moment.

1          When you were across the street in the alley behind

2    Mr. Jackson's mother's house, you heard some shots fired,

3    correct?

4    A.   When I was coming around the apartment I heard the shots.

5    Q.   And in fact, you heard three shots fired.

6    A.   I think I put in my report three shots, and I think I

7    probably should have put two or three shots because it was very

8    rapid what I heard.  But I think it was two or three.

9    Q.   The date that you did this report was July twenty-third,

10   two thousand seven, correct?

11   A.   Yes, ma'am.

12   Q.   This event happened on July twentieth, two thousand seven.

13   A.   Yes, ma'am.

14   Q.   So you had three days from the time of the incident to the

15   time you wrote your report, and you wrote that you had heard

16   three gunshots, correct?

17   A.   Yes, but we only found two casings.

18   Q.   So you're saying what you heard is not true because you

19   couldn't find the gun shell casings?

20   A.   I thought it might have been three, but I might have made a

21   mistake.  I know I heard gunshots.  I know there was the

22   firecracker smell of a freshly fired gun when I made entry, but

23   whether it was two or three I'm not sure.

24   Q.   So actually, you were, on July twenty-third, you were sure,

25   correct?

```
1    A.   On July twenty-third?

2    Q.   Two thousand seven you were sure.

3    A.   No, ma'am.  I'm just putting it to the best of my memory of

4    what I thought I heard from the position I was running across

5    the street.

6    Q.   So you're trained to write reports about incidents that

7    take place that you're involved with, correct?

8    A.   Yes, ma'am.

9    Q.   As a part of that training, it's explained that it's

10   important to put in here the details of what took place.

11   A.   Yes, ma'am.

12   Q.   Including significant things, aspects of what took place in

13   the residence.

14   A.   Yes, ma'am.

15   Q.   This, involving a shooting, one of the significant things

16   would be the number of shots fired.

17   A.   Yes, ma'am.

18   Q.   And, again, on July twenty-third, two thousand seven when

19   you wrote your report, everything you put in here at that time

20   was true and correct, wasn't it?

21   A.   To the best of my knowledge, yes, ma'am.

22   Q.   Because you wouldn't put anything in here that was false.

23   A.   No, ma'am.

24   Q.   And according to you, you clearly said you heard three

25   gunshots.
```

1    A.    I heard what I thought were three gunshots.

2              THE COURT:  We've been over that.

3              MS. McKEE:  We have no further questions.

4              MS. HARDWICK:  No further questions for this witness,

5    Your Honor.

6              THE COURT:  You step down.

7              (Whereupon the witness, James Austin, stepped down

8    from the stand.)

9              THE COURT:  Next witness.

10              MS. ADAMS:  The United States rests, Your Honor.

11              THE COURT:  Okay.  Members of the jury, I'll have to

12    excuse you again because the Government has now rested.

13    However, this recess will be for probably only -- well, we do

14    have a couple of matters to take up.  This recess will be for

15    twenty minutes at least.  You are excused.

16              (Whereupon, the jury was escorted out of the

17    courtroom and the following colloquy ensued):

18                        MOTIONS IN OPEN COURT

19                      (THE JURY IS NOT PRESENT):

20              MR. BUTLER:  Your Honor?

21              THE COURT:  Yes.

22              MR. BUTLER:  At this time the Defense has a motion.

23              Pursuant to Federal Rule of Evidence twenty-nine, at

24    this time we move for judgment of acquittal as to all counts.

25    As to Mr. Smith, he is charged with four counts.  Number one is

1    bank robbery.  Well I'll just list them.  Bank robbery, felon

2    in possession, discharge of a firearm in obstructing United

3    States law enforcement officers' duties and then discharging a

4    firearm in connection with another felony.

5        Your Honor, it's our position that the Government has

6    not met its burden of proof beyond a reasonable doubt each of

7    these offenses.  As to the bank robbery, Your Honor, which is

8    essentially one aspect of the case, what we have in this case

9    is a victim teller who was not able to identify the individual

10   who committed this offense.  That inability to identify and/or

11   misidentification continued from the time of the offense, which

12   was on June twentieth up until July second of two thousand

13   seven.

14       On July second, two thousand seven, after

15   consistently being unable to identify the robber and, most

16   importantly, identifying an innocent man as the person who

17   committed the offense, her perception suddenly and incredibly

18   improved to the extent that she was then able to identify my

19   client as the individual who committed that offense.

20       THE COURT:  Why isn't this just a jury issue?

21       MR. BUTLER:  Your Honor, it's our position that this

22   Court has, as the gatekeeper of evidence in this case, has the

23   authority in this case one, to let it go to the jury; but,

24   also, to say in the event that it thinks that the evidence is

25   incredible, that it should not go to the jury and judgment of

1    acquittal is warranted.  It is our position, Your Honor, that

2    it is warranted.

3         The Government, I'm sure, is going to argue well,

4    there was also an identification by another bank employee, a

5    Mr. Daniel Robinson.  Well what was made very clear during his

6    examination was that he did not identify the person in that

7    photograph as the person who committed the offense.  What he

8    said was, clearly, all he could see was the bottom portion of

9    his face.

10         When shown that lineup, he said he was six to seven

11   percent -- On a scale of one to ten he was six or seven percent

12   that the suspect had characteristics of the person who had

13   robbed the bank.  But he clearly testified that he did not

14   identify that person as the person who robbed the bank, just

15   that that individual had similar characteristics of the bank

16   robber.  So no identification was actually made by that other

17   person.

18         Your Honor, that is the Government's entire case as

19   to the bank robbery, Your Honor, and it's our position that

20   that simply does not prove guilt beyond a reasonable doubt.

21         As to the incident at the residence, Your Honor,

22   there were three individuals in that residence.  There was one

23   -- well, what appears to be multiple pounds of marijuana in

24   that residence, and packaged in such a fashion that it was

25   being distributed from that residence.  It is found within the

```
 1   residence were two assault rifles and a firearm.

 2           The residence belonged to Mr. Willie Jackson.  Jamaal

 3   Clark, another individual at that residence, has a prior

 4   conviction for firearms related offenses.  It's simply our

 5   position that the evidence is not conclusive that our client --

 6           THE COURT:  Does have it to be conclusive?

 7           MR. BUTLER:  No it does not, Your Honor.  It does not

 8   have to be conclusive, and I should rephrase my -- There is not

 9   evidence beyond a reasonable doubt that my client, Mr. Smith --

10           THE COURT:  Do I have to be convinced beyond a

11   reasonable doubt?

12           MR. BUTLER:  It is our position, Your Honor, that the

13   evidence that goes to the jury has to be evidence which the

14   Court feels would be able to persuade the jury beyond a

15   reasonable doubt that my client possessed the firearm.  It is

16   our position here, Your Honor, that given the dynamic nature of

17   the situation, the multiple persons in there, there is not

18   evidence which establishes beyond a reasonable doubt that our

19   client possessed that firearm.  Possessed the firearm,

20   discharged the firearm, and/or used the firearm in connection

21   with another felony offense.

22           THE COURT:  The motion is denied as to all counts.

23           Ready to proceed with your case?

24           MR. BUTLER:  Yes we are, Your Honor.

25           THE COURT:  I think the first thing is you said that
```

```
 1      -- Do you have your expert here?
 2              MR. BUTLER:  The expert is here.
 3              THE COURT:  So I have the Government's motion in
 4      limine?  I'll hear the arguments on that after I voir dire the
 5      expert.  I see two issues, however, with regard to the motion
 6      in limine.  The first one being whether the motion is timely;
 7      and the second one being the merits of the motion itself.
 8              MR. BUTLER:  Yes, Your Honor.
 9              THE COURT:  Where is your expert?
10              MR. BUTLER:  He's here.
11                    S O L O M O N     F U L E R O,
12         the witness herein, having first been duly sworn or
13      affirmed to tell the truth, was examined and testified as
14      follows:
15                  VOIR DIRE EXAMINATION SUA SPONTE
16                   BY THE COURT OF SOLOMON FULERO
17                    (THE JURY IS NOT PRESENT)
18              THE COURT:  Now I understand you wish to present this
19      expert on two issues?
20              MR. BUTLER:  Yes, Your Honor.
21              THE COURT:  The first one being identification
22      testimony in general, and the second one being cross-racial
23      identification?
24              MR. BUTLER:  Which is based on my conversations, and
25      this expert will help clarify -- it's substantially a subset of
```

```
 1    his overall expertise.
 2              THE COURT:  What's the subset?
 3              MR. BUTLER:  Cross-racial identification.
 4              THE COURT:  Where is his vitae so we don't have to go
 5    over that.  We can go right to your examination.
 6              (Whereupon, the Court examined said document.)
 7              THE COURT:  Why don't you go ahead and examine him as
 8    to what you would like to present as like at his vitae.
 9                         DIRECT VOIR DIRE EXAMINATION
10                    OF SOLOMON FULERO BY MR. BUTLER:
11    Q.  Dr. Fulero, could you state your full name and spell your
12    last name.
13    A.  Dr. Solomon Fulero.  That's spelled F-u-l-e-r-o.
14    Q.  Dr. Fulero, are you a medical doctor?
15    A.  No, I'm not.
16    Q.  Oh.  Okay.
17              Do you currently hold any type of academic
18    positions.
19    A.  I do.
20    Q.  What are those?
21    A.  Professor of psychology at Sinclair College in Dayton,
22    Ohio.  I have been there since nineteen eighty and was chair of
23    the department from ninety-two to two thousand and two.  I also
24    hold a clinical appointment at Wright State University at
25    Dayton and in the school of professional psychology.
```

1    Q.  In order to, I think, address or conduct these proceedings

2    in the fashion the Court wishes, I'm going to -- The judge has

3    your curriculum vitae and is reviewing that.  What I'm going to

4    ask you is do you have any form of expertise in

5    identification?

6    A.  Yes.  I think the answer is yes.  I'm trying to be not too

7    immodest.

8    Q.  One moment.

9          Could you describe for the Court the field of

10   psychology?  Has there been development in the study and

11   analysis of eyewitness identification?

12   A.  The field of -- the study of eyewitness reliability and the

13   factors that affect it and the collection of eyewitness

14   evidence by means of photo spreads and lineups has been a

15   subject of scientific study in psychology since the eighteen

16   nineties.  There have been thousands of published articles.

17         The Attorney General of the United States in the

18   guide that it published that I helped to author in nineteen

19   ninety-nine refers to it as "a valuable body of empirical

20   knowledge to be offered to the legal system."  So I won't

21   disagree with the Attorney General.

22   Q.  Could you describe for the Court the research in this case

23   and how it was conducted?

24   A.  Yeah.  It's conducted in a number of ways.  One of the ways

25   is laboratory experiments.  We sometimes will expose people to

1    a staged crime or filmed event of some sort that they don't

2    know is coming.  We will get their stories.  We will run them

3    through some kind of an eyewitness identification procedure

4    like a photo spread or a lineup.

5            The advantage of those types of studies, that when an

6    eyewitness makes a claim of identification, we know what their

7    credibility or input might have been.  And we know when they're

8    incorrect, unlike in cases.  And we can vary factors that may

9    be of interest or importance to us.

10           If we want to know whether a particular variable is

11   important, one team will get it, one will not.

12   Q.  Dr. Fulero, could you move that microphone just a little

13   bit closer?

14   A.  How's that, better?

15   Q.  Yes.

16   A.  At any rate, the experimental method is one way to do that.

17   Another way to do it is to actually go out into the field and

18   run a study.  If I'm using naturally occurring events, let's

19   say I want to know if witnesses who were under stress and

20   exaggerate the amount of time that they estimate that an event

21   takes, I can ask them.  I could go to victims, people who have

22   been in an earthquake and I could ask them how long did the

23   Earth shake and compare their estimates to the Government's

24   seismograph data.  That's another way to do it.

25   Q.  I kind of interrupt you here in the sense that you're

1    outlining lots of different ways that research can be

2    conducted.  Has that form of research been conducted, and are

3    you familiar with it?

4    A.  Oh, yeah, absolutely, they have --

5    Q.  Could you just list for the Court and for the record some

6    of the items of research, some examples of research that has

7    been done in this area and your familiarity with it.

8    A.  Well, cross-racial identification.  We can vary it in

9    experimental settings.  We can vary the race of the target, the

10   race of the witness.  We can look at it in the field, and we

11   we've also been able to use actual cases as law enforcement has

12   recognized that this research is not just about getting

13   criminal defendants off, but it's also about getting the right

14   person more often so that the wrong one isn't out there to

15   commit more crimes.

16          They worked with us and have opened their books and

17   cases to us and so a lot of these things that we talk about,

18   we're able to look in real cases.  Sometimes, of course,

19   they're after the fact.  We can't run out in the street and

20   hold guns on people, but we can look at real cases and have

21   done so and find that by and large the same factors that we

22   find in our other forms of research which are present in the

23   real cases.

24   Q.  Have you had the opportunity to present testimony in

25   federal courts as an expert on this topic, and have you been

```
1    previously qualified in other courts?
2    A.   I have testified in state and federal the courts probably
3    over a hundred times now in the last twenty-eight years.   In
4    federal court specifically, I have testified in front of
5    juries, in, let's see, the District of Columbia, probably --
6    well, let's see, the District of Columbia, New York, all over
7    the Third Circuit I should say, Pennsylvania, New Jersey, the
8    Virgin Islands, the Sixth Circuit, Ohio, Michigan, Kentucky.  A
9    number of the published case opinions.  And some of those
10   circuits discussed about my testimony.
11             There's a Third Circuit case, U. S. v. Graves; a
12   published case in the Sixth Circuit U. S. v. Smithers reversing
13   a trial judge for not letting me testify.  U. S. v. Sullivan
14   which is a District Court judge's opinion from two thousand and
15   three finding that it meets the Daubert standard.  There's a
16   number of them.
17   Q.   Understood.  I'm not quite sure what's best here, but what
18   I'm going to do is, we have spoken and have you reviewed
19   materials in relation to this case?
20   A.   Yes.
21   Q.   Are you aware that -- of issues that are present in this
22   case involving identification?
23   A.   Definitely, yes.
24   Q.   So the record is clear, what have you had an opportunity to
25   review?
```

1    A.   I think the short answer is that I think almost everything

2    that you have been provided in discovery that relates to the

3    eyewitness I D, I have seen and read it.

4    Q.   Okay.   Now I'm going to turn to factors that affect

5    eyewitness identification and accuracy.   Could you describe

6    what those are?

7    A.   Sure.   Maybe the easy -- What I would testify before the

8    jury about based on, and I've talked a little bit about the

9    research that it's based on -- I want to say of course that

10   this research is published in peer review journals, it's

11   generally accepted, you know, all of the points of --

12            THE COURT:   How recently has it been published?

13            THE WITNESS:   To this very moment people are

14   publishing in peer review journals.   Journals like *Law and*

15   *Human Behavior*.   *Behavioral Sciences and the Law*.   There's a

16   number of peer reviewed scientific outlets for work in

17   eyewitness identification.   Actually, the most recent issue of

18   law and human behavior looked at some of the things that I'm

19   going to.

20            There is a series of articles on some of the things I

21   would testify about having to do with sequential presentation

22   of photographs to have witnesses as opposed to simultaneous.

23   That would be one of the factors.

24            THE COURT:   Go ahead.

25            MR. BUTLER:   And if I didn't offer it, I'll offer it

1    as defendant's exhibit A.  Your Honor has a copy, but that's a

2    copy of his vitae.  In his vitae he lists peer review and

3    scientific journals.  His clinical experience, his other

4    publications outlining the use of this information.  Just so

5    it's part of the record.

6              THE COURT:  Okay.  I have it up here.

7    Q.  The last question from me to you was in assessing and

8    conducting an analysis of eyewitness identification, I'm

9    assuming there are certain factors or things you look at?

10   A.  Yeah.  What I would testify to in front of the jury is the

11   generally accepted theory of memory in psychology.  I would

12   describe that and break memory down into three stages.

13   Q.  Would you go ahead and do that for us.

14   A.  Do you have one of those overhead things?

15   Q.  Yeah, absolutely.

16             MR. BUTLER:  Your Honor, with the Court's permission?

17   A.  I Drew this earlier.  It's not particularly high tech, but

18   it will work -- I hope.

19             MR. BUTLER:  Just so you know, Dr. Fulero has an

20   attorney a very tech high zip drive but I didn't have a

21   computer with me.

22   Q.  I'll call this defendant's exhibit B.

23   A.  I'm not typically drawing myself, but this is fine.

24             What I've done is to draw a time line going to the

25   right with two points on it, point A and point B.  Point A is

1    the event.  In this case it's the crime, but in conceptually it

2    could be anything.  It could be what you had for dinner last

3    night, if I'm interested in it, and whether you can remember

4    that now.  Point B is eventual recall which I've labeled in

5    court which means the witness in court for the final time

6    telling their story and recounting their story before the trier

7    of fact.

8    Q.  That recall, and I'm going to interrupt you as you go

9    through, that recall might take place at other times, for

10   instance a lineup or something like that?

11   A.  Exactly.  And that's in that second right under number two,

12   because what I've done is right above the line you see I've got

13   three numbered circles, and I've labeled them "acquisition"

14   "retention" and "retrieval".

15           In order for anyone to remember anything, there are

16   three things that have to happen.  The first is that at the

17   time of the event you have to put information into your memory,

18   something has to go in.

19           Secondly, you have to keep it for a period of time

20   afterwards.

21           And then the third thing is, you have to be able to

22   get it back out, or retrieve it.

23           And so all three have to work, acquisition, retention

24   and retrieval.  A problem in any one of the three stages leads

25   to memory failure.  What we do in our research is, to look for

1    and focus on factors that each one of these three stages that

2    are relevant to understanding eyewitness memory, and those are

3    the factors I would testify about.

4    Q.  Now one, you've done research on everything that's on here

5    -- acquisition, retention, retrieval -- everything that's on

6    this time line.  Essentially, that's your area of expertise.

7    A.  Yeah.  I mean, there isn't any one person on the planet

8    that does all the research, but it's the generally accepted

9    body of research from which we draw these conclusions that have

10   been done over the years and allow us to draw conclusions about

11   the events of not only these factors at the acquisition stage,

12   but things like exposure time, stress, cross-racial

13   identification and so forth.

14        But what happens afterwards, in the retention phase

15   which is the collection of eyewitness evidence, there is a

16   number of things to be said about things like composites or

17   there are four or five things about lineups and photo spreads

18   in particular that we know that are important that can affect

19   the result.  And then in the retrieval stage the question of

20   why it is that the prosecutors always elicited confidence

21   statements.  And it's the relation of confidence to accuracy,

22   which is particularly important.

23   Q.  We're going to go through each of those.  I don't think

24   it's going to take too long.

25        Acquisition.  What is acquisition and outline for the

1    Court some of the things in general.  And in this case, which

2    can -- which are pertinent to the acquisition of information.

3    A.  All right.  And I'm going to try to, in the interest of

4    shortening the time, I will try to summarize what it is that

5    I'm going to say.  Because some of this will require more

6    explanation, I think, for the trier of fact.

7                But factors in the acquisition stage at the time of

8    the event, the first one would be exposure time.  In summary,

9    with that one the longer that the witness has to view, the more

10   accurate they are.  However, exposure time is not the length of

11   the event from start to finish, which many triers of fact

12   mistakenly focus on.  It is, in fact, the length of time that

13   the witness is doing the task that's necessary for them to make

14   a later facial identification, and that is looking at the face,

15   and that's a smaller amount of time than the time of the event

16   total because witnesses are doing other things during that

17   time.

18   Q.  For instance in this case, let's say that the event itself

19   takes forty-six seconds, the bank robbery.  But there's been

20   testimony elicited that the victim teller could only actually

21   look at the person at a six second period of time and then

22   maybe two other two second periods of time.  Is that what

23   you're -- is that in conformity -- would that be in conformity

24   with issues related to acquisition?

25   A.  It would.  And related to the exposure time, I would also

1    discuss the factor of time overestimation, which has to do with

2    the fact that many times these things revolve around witness

3    estimates of how long they had to do things.  And under stress

4    and when events were exciting or things are happening, time

5    seems to slow down subjectively and things seem to take longer

6    than they actually take.  We know this from studies comparing

7    events to witness estimates.

8    Q.  So in this case, for instance that black, I would never

9    have guessed in a million years it had only taken forty-six

10   seconds.  That would be in conformity with research that you

11   and others have done?

12   A.  That's correct.  And, again, the issue of time

13   overestimation for the particular length of time that a witness

14   may have been or may not have been looking at the face is

15   important for the jury, it's helpful to the jury because it

16   helps them to assess what weight to give the witness's account

17   of time.

18   Q.  Okay.  On your diagram here, after acquisition, I guess

19   what you see has to be transferred into memory?

20   A.  Well there's a number of other acquisition factors.  I

21   don't want to leave them out because --

22   Q.  Please, go ahead.

23   A.  Well, you mentioned one earlier, cross-racial

24   identification.  That's at the time of the event.  I would

25   testify that the studies do show that cross-racial

1    identifications are less accurate than same-race

2    identifications.  This is true not only for African-Americans

3    and whites, but it's true around the world.  Hispanics.

4    Asians.  It's found generally.  Within the two by two of whites

5    and African-Americans, if you will, one with the least accuracy

6    is a white witness identifying an African-American target.

7    Q.  That has been statistically demonstrated?

8    A.  That has been analyzed and it is the case, yes.  And I

9    would explain the theory behind why this occurs to the jury

10   having to do with the experience or the more experienced people

11   have with members of other races the better they get at this.

12   It's not a particularly a prejudice thing as much as it is an

13   inexperienced thing.

14          People who are white who live in Japan get better at

15   distinguishing Japanese from Chinese, let's say.  Or as my

16   friends in Louisiana tell me, you get better at distinguishing

17   alligators from crocodiles the more experience you have.

18   Q.  For instance in this case, an individual who has provided

19   testimony or provides testimony that she, the key witness in

20   this case -- I'm not sure if it was a segregated school or not,

21   but for whatever reason she went to an all white school from

22   childhood through ninth grade -- and then we'll call it she had

23   then attended an integrated school for a period of time.  But

24   the majority of her contact has been with -- all of her

25   contact, essentially, as a minor was with other white children,

1    other than a sprinkling of African-American adults who worked

2    on her farm.

3    A.   Sure.

4    Q.   And then as an adult, the majority of her contacts is with

5    Caucasians as well.  Would that, in your opinion based on your

6    research and experience, be cause to raise an issue as to the

7    acquisition here due to cross-racial identification?

8    A.   Well, I like the way you phrased it, which is, is that

9    cause to raise an issue about it and the answer is yes.  It's

10   important to understand that as an expert witness I'm not going

11   to opine that a particular witness is correct or incorrect.

12   Q.   Understood.

13   A.   That's the province of the jury.  The job of the expert is

14   to provide them with the scientific data on these factors to

15   help them to make that decision.  So I presume what you just

16   said is something you will argue and the Government will argue

17   the other way.  But what's missing if the expert doesn't

18   testify is the scientific basis of the argument.  I learned in

19   law school that, you know, lawyers' argument is not evidence,

20   and in order for the jury to determine all this, it's what's in

21   evidence that counts, I believe.

22   Q.   Other things that affect acquisition, and I'm going to move

23   through these, would be stress?

24   A.   Stress is another one of the acquisition factors I would

25   talk about.  Unlike the common lay perception or the myth or

1    misperception that stress makes people better at things, I

2    would be prepared to testify that under high levels of fear or

3    stress or arousal, eyewitness identification accuracy is worse.

4         While is it true that people may remember the event

5    for the rest of their life, if what you're interested in is

6    eyewitness facial identification accuracy stress makes people

7    worse.  It does not make them better.  It's also the case

8    interestingly enough that the idea that stress makes people

9    better is the basis of the excited utterance exception to the

10   hearsay rule.  It's always one of the things that fascinated

11   me.

12   Q.  Understood.

13        The threat of a weapon being present.

14   A.  Threat of a weapon, presence of a weapon, threat of a

15   weapon increases stress.  If the weapon is implied, the eye

16   goes to where the weapon is.  To the extent that the witness is

17   not looking at the face, eyewitness accuracy decreases.

18   Q.  And then as to acquisition, now we're moving through for

19   time purposes, are there other things that can affect

20   acquisition as well that you might want to discuss?

21   A.  Oh, there are some -- I refer to this as obvious factors

22   just because I'm not surely that unlike these other ones triers

23   of fact need people to tell them.  You know, eyesight, you

24   know, if somebody is Twenty-eight hundred and they're not

25   wearing their glasses, that's probably something to consider.

```
1              Lighting, you know, there has to be enough light to
2    see.  There doesn't need to be a floodlight, there just needs
3    to be enough light to see.  Obstructions that might be in the
4    way, these are all things that I think people can probably
5    assess for themselves, but which are not usually the crux of a
6    case.  Those are usually not the problem.  The problem is the
7    more subtle ones that jurors don't seem to either be aware of
8    or don't weight heavily enough.
9    Q.  We've touched on the event, the crime in this case.
10   A.  Correct.
11   Q.  We'll focus on a bank robbery     and the factors that
12   might affect acquisition.  What else goes into analysis of an
13   identification?
14   A.  Well, all of the factors that I've mentioned up to this
15   point are acquisition factors.  They're factors at the time of
16   the event.  But once the event is over, because memory is
17   reconstructive which is the theory I would be explaining to
18   them to underlie all this, memory is malleable.  And things
19   that happened after an event can affect the memory.
20              The analogy that I've used to explain this to jurors
21   is the way a computer works.  If I create a document and I ask
22   the computer to save it, it will do that and that's fine.  But
23   when I call the backup the next day on the screen, if I make
24   changes to it or alter it in some way, add things, subtract
25   things, whatever, put things in different orders, and I save it
```

1    again, what comes up the next time is the changed version with

2    no way to tell what was there originally from what you did to

3    it afterwards in stage two, as it were.

4         People seem to understand that concept.  And so in

5    the retention phase, then, there are things that happen after

6    the event that can be important.  And this post event

7    information unfortunately involves precisely the methods that

8    we use to collect eyewitness evidence.  And we know a lot now

9    about how to collect eyewitness evidence in ways that maximize

10   the likelihood of getting the right person and minimize the

11   likelihood of getting the wrong one And I would testify about

12   four or five things in that regard.

13   Q.  In this case, could something such as the request to do a

14   composite, what do you call it, a composite sketch?

15   A.  Right.

16   Q.  -- be one of those things?  And I'm using your analogy,

17   that inputting something on into the computer after you've

18   recalled it that could affect it?

19   A.  Yes.  There has been research on composites and their

20   effect on eyewitness accuracy.  Witnesses who participate in

21   composite procedures are less accurate in later photo spreads

22   or lineups than witnesses who do not do that.

23        The reason is that in order to do the composite you

24   have to essentially call the information up from the hard

25   drive, as it were, on to the screen and play with it.  And it

1    seems to muddle memory and decrease accuracy.

2          It's not that that isn't necessarily an investigative

3    tool sometimes, but eyewitness evidence is like any other kind

4    of evidence, it's only as good as how it's collected.  And the

5    collection of it can impact on its accuracy.  The same as blood

6    or D. N. A. or any other form of evidence.

7    Q.  Would it be uncommon, for instance, let's say an individual

8    witnesses an event and doesn't say the person has any facial

9    hair, does a composite -- and all of a sudden puts facial hair

10    on the person -- to then start looking for individuals with

11    facial hair though originally it was never stored in that

12    person's head had facial hair?

13    A.  Absolutely.  You know, it's the same premise as the problem

14    with leading questions.  When you question somebody, a leading

15    question is one that introduces information that wasn't there

16    before.  And the problem, of course, that people may later

17    think that information existed when in fact it didn't.

18    Q.  Okay.  In this case, there was an issue of the eyewitness

19    misidentifying an innocent person subsequent to the event,

20    using your terms.  Is that something that's related to

21    retention or retrieval?  Strike that.  I'm just trying to --

22    A.  I did see that.  That's somewhat unusual.  I haven't seen

23    it very often, but good thing for that gentleman that there

24    seemed to be other evidence to suggest it wasn't him.  And you

25    know, it was essentially a classic false alarm.

1    Q.  Are there waiting -- I'm noticing things such as a double

2    blind technique, other techniques used to make identifications

3    more reliable.  Could you explain that?

4    A.  Yes.  There are four or five things about the manner in

5    which photo spreads ought to include.  It's pretty much the

6    same for lineups as it is for photo spreads; the premises are

7    the same.

8         A lot of this -- I didn't get a chance to say -- is

9    in this pamphlet from nineteen ninety-nine published by the

10   Department of Justice, eyewitness evidence, a guide for law

11   enforcement.

12   Q.  Did you have anything to do with that?

13   A.  I was one of the authors of it.  There were Thirty-four

14   people on the working group, really most of them law

15   enforcement officers, although there were prosecutors and

16   defense attorneys and a group of the six of us scientists who

17   work in the area.  And a number of the techniques are in there.

18        I would talk first about the construction of a spread

19   and some of the principles involved.

20        I would secondly talk about the importance of the

21   instructions that are given and how they're given and what's

22   said and what's not said.

23        I would thirdly talk about simultaneous versus

24   sequential presentation of photos and the effect on accuracy.

25        And fourth, I would talk about double blind

1    presentation or double blind conduct of the lineup by someone

2    who doesn't know the identity of the suspect.  And I dare say,

3    by the way, that none of those things are within the common

4    knowledge of most people, and I can't imagine that they

5    wouldn't be helpful in an assessment of the accuracy of a

6    particular eyewitness presented with evidence in one fashion or

7    another.

8    Q.  Would cross examination from a lawyer such as myself be

9    sufficient to get out everything that you've  just outlined --

10    well, as well as everything else we're talking about?

11    A.  Well, you know, I went to law school.  Let me give you a

12    colloquy about simultaneous versus sequential.  Officer Krupki,

13    I see that you were aware that there are studies that show that

14    sequential presentation deals presentation yields greater

15    accuracy than simultaneous presentation?

16            Answer?  What's sequential, I never heard of it.

17    Q.  That's kind of the end of it?

18    A.  That would be the end of cross, yes.  I would refer the

19    Court, to, actually, it's an article just published in Weidner

20    Law Review, I believe, by a professor named Jules Epstein on

21    the inadequacy of cross examination in cases.  His argument is

22    that cross examination is the greatest tool ever invented to

23    pick up whether somebody is lying or not.

24            But that is inadequate from someone who is mistaken

25    but genuinely believes they're not mistaken and I believe

1    that's correct.

2    Q.  Kind of tying this case to what you're discussing, in the

3    event an officer picks six photographs out of I guess a

4    computer screen, goes to a person's house with those who has

5    made a misidentification as well as initially says they could

6    not identify the person and then shows them to her, is that

7    dynamic something that could affect whether or not she is or is

8    not willing to basically validate what he's doing, try to make

9    a correct identification which is ultimately wrong?

10   A.  Well, we know that very subtle things go on, and that is

11   very important.  You know, there's a last factor of confidence,

12   but I do want to say that the collection of eyewitness evidence

13   typically is the last form of evidence, the actual collection

14   of which is not documented for independent review.

15            Usually you get a piece of paper that says witness

16   identified number three, and there is no way to know what

17   actually happened in that procedure.  And what was tantalizing

18   and frustrating about this particular case is that there's a

19   record of the identification.  That's very unusual.  However,

20   they turned the tape on after it's done so that it starts with

21   now I showed you a group of pictures and you picked number six,

22   is that right?

23            But when the actual procedure isn't taped, when

24   easily it could have been.  And actually, of course, videotape

25   would be better than audiotape because the problem in double

1    blind, or the problem when the presentation is not double blind

2    is the reason why poker players wear sunglasses because the

3    tells are out of your awareness.

4            That's why you don't want the person giving the

5    spread to know which one the suspect is because they can

6    unconsciously communicate it.  These eyewitness reforms have

7    been adopted by statute and by fiat in states like -- by order

8    of the Attorney General in two thousand and one in New Jersey.

9    But last year, North Carolina passed a statute mandating these

10   changes.  Georgia has a bill in process to do the same, and I

11   think Virginia does as well.

12   Q.  And I guess in a nutshell, double blind is where both the

13   person giving it as well as the person trying to make the

14   identification don't know who the alleged suspect is because

15   without knowing people tend to -- Well, I'll rephrase that.

16   Influence and suggestivity could creep into it if it's not

17   double.

18   A.  It can.  In almost every case in which they do it, where

19   the double blind has not been adopted, the person who gives the

20   spread, or puts it together I should say, is also the one who

21   gives it.  And therefore he or she knows the identity of the

22   suspect and, of course, that's one of the most easily remedied

23   things to do.  You just have one person put it together and

24   someone else give it, or better yet bring the witness down to

25   the station, put the pictures down, leave and turn on a

1    videotape recorder and then we'd all know and no one would be

2    talking about it on the back end.

3    Q.  Understood.  Now the final stage of your diagram, it has

4    three three and B, which seem to be interrelated.  That is

5    recall and retrieval.  Could you discuss that?

6    A.  Right.  Actually, the one factor that's most important

7    there is the question of the relation between confidence and

8    accuracy.  You know, people all assume -- people assume that if

9    the more confident somebody is about something, the more likely

10   they should be to be right about it.  The reason the Government

11   asks a witness the question "How sure are you," is because they

12   understand that the triers of fact believe that as well.

13   Otherwise why would they ask the question?

14          And we do -- we've done lots of research on that

15   assumption, the relation between confidences and accuracy.

16   When we do a study when we know whether the witness is correct

17   or incorrect, when a witness makes an identification is very

18   easy to ask the next question, which goes something like on a

19   scale of one to ten or zero to a hundred or whatever scale you

20   want, how sure are you that this identification that you've

21   just made is correct?  And we can look at the correlation

22   between confidence and accuracy.

23          Is it really true that the more confident the witness

24   is, the more accurate they are?  And what we find is, in our

25   research that there's virtually no relation between the

1   confidence that a witness expresses and their likelihood of

2   being correct.  A witness who is a hundred percent sure is just

3   about as likely to be wrong as one one who hems and haws and

4   isn't certain.

5   Q.  So the fact that someone, for instance a witness, maybe in

6   this case is given a photo spread and says she's confident that

7   number, let's call it six, is the person, that might be

8   completely inaccurate and there are multiple reasons that can

9   occur.

10  A.  That's right.  And I can't imagine an argument that says

11  that if the confidence statement has been elicited from the

12  witness in front of the trier of fact, that it wouldn't be

13  helpful to them to understand that scientific research shows

14  that confidence and accuracy are not well related and there is

15  no way for anyone to put that assertion into evidence without

16  someone to talk about the science.

17  Q.  And I think everybody understands.  But just for the

18  record, confidence could be a circumstance where I'm walking

19  down the street and say oh, that's Bob.  Are you sure?  That's

20  Bob, I went to school with him.  Then I get close to him and

21  I'm completely wrong.

22  A.  Right.

23  Q.  For whatever reason a person can be very personally

24  confident and dead wrong.

25  A.  Oh, absolutely.  In cases where we know that people have

1    been dead wrong, the Government has done studies I think now as

2    of two hundred and fourteen cases as of yesterday, the

3    postconviction D. N. A. exoneration cases, which is what

4    stimulated the work in this area, about seventy to eighty

5    percent of those cases are mistaken eyewitness identification

6    cases and sometimes by multiple witnesses up to five at least.

7    And in all of those cases it's worth mentioning, of course,

8    that they were confident enough to impress the jury.

9    Q.   Again, we're talking about retrieval and recall at this

10   time.  Any other things that you would explain to the jury

11   regarding that?

12   A.   I think that is a compressed but fair summary of what I

13   would say before the trier of fact.

14   Q.   We've talked about why cross examination is not sufficient

15   to bring out all this.  Has it been your experience that this

16   is helpful to the trier of fact, I.e., the jury, and why?  You

17   may have said this, but I just want to make it clear.

18   A.   It has been my experience.  It's been discussed in some

19   court opinions that I think about, that I agree with, and I

20   should say that there is an article in the *Alabama Lawyer*

21   somewhere around nineteen seventy-four making the same point.

22   I've testified here in Montgomery before in a postconviction

23   hearing and happened to find that article as I was sitting in

24   the law library.  I can't remember the author's name off the

25   top of my head, but it was sitting in the law library.  So this

1    is expert testimony on this has been around a long time, even

2    before I was around.

3              MR. BUTLER:  Your Honor, nothing further at this

4    time.

5              THE COURT:  Cross?

6                        VOIR DIRE CROSS EXAMINATION

7                        BY MS. ADAMS SOLOMON FULERO

8                        (THE JURY IS NOT PRESENT)

9    Q.  Good afternoon, sir.  I'm Jerusha Adams, and I'm an

10   assistant United States attorney.

11   A.  Good afternoon.

12   Q.  You said that you have been talking about this subject

13   matter for twenty-eight years?

14   A.  First time I testified in front of a jury on this stuff was

15   nineteen eighty-one.

16   Q.  In twenty-eight years have you ever testified for the

17   Prosecution?

18   A.  I've testified for the Prosecution many, many times, just

19   not on this issue, because they have never asked.

20   Q.  So you've never testified for the Prosecution on this

21   specific issue.

22   A.  I've never -- I used to say when I get asked that question

23   I used to say "Every time I have been asked."  And the reason

24   makes pretty good sense.  By the time the case gets to me, the

25   I D has already been made and it's in the Defense's interest to

```
 1    have the jury hear what I have to say, even though if you asked
 2    me it would be exactly the same.  But you couldn't get it in in
 3    your case-in-chief because it would be bolstering.
 4              THE COURT:  I don't quite follow that.  What do you
 5    mean?
 6              THE WITNESS:  As I understand the Rules of Evidence,
 7    the Government would not be allowed to put me on after an
 8    eyewitness to say that person is right.  Isn't that bolstering,
 9    as I recall?  They probably could put me on in rebuttal after
10    the I D was challenged, but I don't think --
11              THE COURT:  I don't think that you would be put on
12    either to say that the eyewitness was right or wrong.
13              THE WITNESS:  Well that's true, but if the Defense's
14    claim is mistaken identification, by the time the case gets to
15    me the I D has already been made.  It logically makes little
16    sense for the Government to call --
17    Q.  I don't know understand why it would not assist the
18    Government because you just testified that your expert
19    testimony would assist the trier of fact.  So wouldn't it
20    assist the trier of fact for either side?
21    A.  Oh, I agree that it would assist.  What I said was I didn't
22    think that you would be able to get it in under the Rules of
23    Evidence in your case-in-chief.
24    Q.  Sir, I wasn't asking you about admission of testimony in
25    relation to trial.  I was asking you about whether or not that
```

1   information would assist the Prosecution?

2   A.   Oh, would assist the Prosecution or the jury?  Are you

3   asking me if it would assist the Government or the jury?

4   Q.   Sir, you just testified that the Prosecution probably

5   wouldn't call you, and hasn't called you in the past

6   twenty-eight years because, you said, that by the time that

7   attorneys call you, that eyewitness identification has been

8   done.

9   A.   That's correct.

10  Q.   So in your view it wouldn't favor the Prosecution to call

11  you.  Is that not what you said?

12  A.   I think logically if the Government's position is that the

13  I D was correct --

14  Q.   Sir, I was asking you if that was what you said.

15  A.   No, that's not exactly what I said.

16  Q.   Okay.  What did you say?

17  A.   What I said was, that logically since the case -- by the

18  time the case gets to me, the posture of the case is the I D

19  has been made, the person has been arrested, their defense

20  claim is mistaken identification.  Okay?  The testimony -- It

21  wouldn't make any sense for the Government to put on evidence

22  about mistaken identification because it's contrary to their

23  position.

24  Q.   Sir, I'm sorry but I thought you said that this is

25  generally accepted theories of memory.

1    A.   Absolutely, that's correct.

2    Q.   It assists the trier of fact.

3         THE COURT:  I'm confused, too, about that.  Are you

4    here to support a claim of mistaken identification, or are you

5    here to support a theory of just how people identify?

6         THE WITNESS:  Well, I think that in this case, as in

7    all of the cases that I seem to get called in, one side is

8    making the assertion that the eyewitness identification is

9    accurate, and the other is making the claim that it's not.

10   Typically, it's the side that says that the identification is

11   not accurate that calls me.

12        THE COURT:  What I'm asking you, though, does your

13   evidence, your testimony go to support either side?

14        THE WITNESS:  Actually, yes, it can.  For example --

15        THE COURT:  "Yes, it can" what?

16        THE WITNESS:  It can assist either side.  For

17   example, if a particular case involves a same race

18   identification, I've certainly been asked on cross examination

19   by the Prosecution or by the Government in a federal case,

20   "Dr. Fulero," isn't it true that the research in your field

21   shows the same race identifications are more accurate than

22   cross racial identifications?"  And I say, "Yes, that's true."

23   And so the Government can use that science in cross to make

24   their own points.  Absolutely.

25        THE COURT:  I still would like to explore one other

1    point a bit more.  You're not saying just because of these

2    factors, identifications are always wrong, are you?

3            THE WITNESS:  Absolutely not.  My answer to that when

4    I'm asked is, "Some identifications are correct, and some are

5    incorrect.  And the trick is telling the difference."  And

6    that's the job of the jury, and the job of the experts is to

7    help them to do that better.

8            THE COURT:  Go ahead.

9    Q.  Sir, you testified that you have been in contact with

10   defense counsel in this case.

11   A.  That's true.

12   Q.  When were you first contacted by the defense counsel?

13   A.  That's an awkward -- I'm really terrible at dates.  This

14   case has been hanging around a while, and I honestly don't

15   remember.  It's been a while ago.  And I think maybe it got put

16   off or -- I'm not really sure.  It's been a long while now,

17   ma'am.

18   Q.  So you don't know?

19   A.  I'm not exactly sure when they contacted me.  Probably

20   sometime last year, but I'm not sure when.  I apologize.

21   Q.  You don't find it to be interesting that you're an expert

22   on general theories of memory but you cannot remember when they

23   contacted you?

24   A.  Oh, I think I'm subject to the same rules of memory as

25   eyewitnesses are, the same as you.

```
1    Q.  So then how is it a science?  Is my question sir.

2    A.  How is it a science?

3    Q.  Yes, sir.

4    A.  Because it sets up a hypothesis.  It tests it

5    systematically, analyzes it and draws conclusions, the same as

6    any science.  The best discussion of that I think would

7    probably be in U. S. v. Sullivan or U. S. v. Smithers.

8    Q.  Let me ask you this question.  How many discussions have

9    you had with defense counsel about this?

10   A.  I've probably -- I think this may be the first time that I

11   laid eyes on Mr. Butler today.  We've talked a couple of times,

12   but mostly I've been looking at the discovery in this case.

13   Q.  So you've a few discussions with him, is that what you're

14   stating?

15   A.  Maybe a couple.  Maybe one or two in a brief way to talk

16   about what it was that -- or what it is that I testify about.

17   I mean I think that would make sense.

18   Q.  During that time have you taken any notes?

19   A.  No.

20   Q.  No notes?

21   A.  No.

22   Q.  You have consistently been referring to, in your testimony,

23   the U. S. Department of Justice Eyewitness Evidence Guide.

24   A.  Yes, I have.

25   Q.  Doesn't that guide state, and I quote, "Opinions or points
```

1    of view expressed in this document represent a consensus of the

2    authors, and do not necessarily reflect the official position

3    of the U. S. Department of Justice"?

4    A.  Yeah.  It's real interesting.  Actually, I will note that

5    the first edition --

6    Q.  Sir, you're being unresponsive.

7              THE COURT:  Answer her question.

8    A.  The answer is the second edition says it, and the first

9    edition does not.  And we had nothing to say about that.

10   Q.  Would that be a yes?  You're not answering my question.

11   A.  The answer is yes and no.  In the first edition it did not

12   say that.  In the first edition when it came out, its first

13   printing.  In the second edition that sentence was inserted.

14   And the first I heard of it was when somebody asked me about it

15   while on the witness stand.

16   Q.  So you would admit that the Department of Justice must have

17   felt it was necessary to add that to the second edition, right?

18              (Whereupon, the witness paused.)

19   Q.  Is that a difficult question, sir?

20   A.  There was a change of administration.

21   Q.  Sir, so would that be a yes or a no?

22   A.  That would be a yes, it was inserted later.  And it would

23   be a yes, no one on the panel had anything to do with the

24   addition of that sentence.  We wrote every other word in this

25   document but not that sentence.

```
 1    Q.   I understand that, sir.

 2              And the bulk of your research, cross-racial

 3    identification, isn't the bulk of that research based on slides

 4    or video?

 5    A.   No, not any more.  That statement would have been true

 6    fifteen years ago or so, but now that has also been established

 7    in real cases and in field studies.

 8    Q.   Okay.  When you say "real cases," what do you mean by "real

 9    cases"?

10    A.   I'm talking about real crimes.

11              You know, again, as law enforcement has recognized

12    the value, I mean who would not want evidence to be collected

13    better?  I mean, our best advocates have been law enforcement.

14    We've had more trouble with prosecutors than we've had with law

15    enforcement.  Law enforcement has opened their files to us in

16    many cities, so we've been able to look at real cases after the

17    fact and look at cases where there's been same race or cross

18    race identification.

19    Q.   So when you say "real cases," you're referring to real

20    cases that you have received from law enforcement?

21    A.   Real crimes.  Actual crimes.  After the fact, of course.

22    But yes, with cooperation of law enforcement in some cities.

23    Q.   So would your testimony not be that the history of this

24    science is based upon slides or videos?

25    A.   Again, I would say that that's one form of the study, but
```

1    it isn't the only one.  Slides and videos found the same

2    results as field studies in actual settings, and also then in

3    real cases.

4    Q.  What type of analysis is performed in these studies, sir?

5    A.  I'm not sure I understand your question.

6    Q.  I'll be more specific.  I want to refer to something in

7    your vitae.  What is meant "meta analytic comparison"?

8    A.  Meta-analysis was actually the subject of the *Daubert* case

9    itself.  And a meta-analysis is a form of analysis where you

10   can take a number of studies on a particular topic on the same

11   topic, each one of which is done slightly differently and

12   combine them into a larger analysis.

13   Q.  So then meta-analysis -- You're testifying that

14   meta-analysis is a comparison of other analyses?

15   A.  No.  It's a method of combining -- Let's say you have

16   fifteen different studies on cross-racial identification; some

17   of which are done in the field, some of which you use slides,

18   they're all -- some of which use real cases.  Some have -- one

19   study has a hundred subjects, one study has five hundred.  It's

20   a way of taking all of those studies and combining them into

21   one analysis with a lot more power because all of the subjects

22   are included.  It's a commonly accepted way of doing things in

23   science and medicine and all sorts of areas, meta-analysis.

24   Q.  Is it your testimony that cross-racial identification

25   theory that you're referring to is based upon that type of

1    analysis?

2    A.  I believe there's been a meta-analysis of the cross race

3    effect, and it's reliably there.  But I don't know that that's

4    all we would base it on.

5    Q.  Isn't it true that in these cases where you look at the

6    factors of cross-racial identification and memory, that the

7    individuals that are involved in these cases don't have actual

8    interaction with the suspect or criminal?

9    A.  No.  There's certainly some studies in which, as you point

10   out, it's a matter of slides and so forth.  But that's not the

11   only way that they're run.  One, off the top of my head,

12   involved convenience store clerks having actual interactions

13   with customers and being asked about to make identifications

14   later with race being systematically varied.

15   Q.  Isn't interaction with customers different than, say, a

16   robbery?

17   A.  No.  I think a robbery is an interaction with a customer,

18   but it's just a bad one.

19   Q.  Okay.  So you're saying that interaction is general and

20   robbery is specific.  What were you referring to when you

21   mentioned interaction with customers in a grocery store?

22   A.  Well it wasn't a robbery, it was a regular interaction.

23   But you asked me wasn't it all slides with no interactions, and

24   I was telling you no.

25   Q.  So, again I ask you, isn't interaction with customers in a

```
 1    grocery store different than dealing with a crime from
 2    someone?
 3    A.  Yes, that's why we also looked at real crimes, as I
 4    mentioned to you before.
 5    Q.  Okay.  I'd like to discuss the specific science.  I'll say
 6    it this way.  You stated that part of your science is based
 7    upon slides or videos.  I'd like to discuss that part of it.
 8    A.  Sure.
 9    Q.  In those slides or videos, what type of people participate
10    in those activities?
11    A.  Well, you know, I think you're asking me are some of these
12    college students.  And the answer is yes, they are college
13    students.  Now of course --
14    Q.  Sir, I'm sorry.  I feel like you're interpreting my
15    questions.  All I asked you was type of people.  I didn't even
16    mention college students?
17    A.  Oh.  Well, the answer is that we use lots of different
18    types of people in our studies.
19    Q.  But you mentioned college students, is that what's
20    primarily used?
21    A.  No, not primarily.  They have been used.  And I wanted to
22    mention that there seems to be an implication that somehow
23    college students are different from everyone else.  The average
24    age of a student where I teach is thirty-three.  College
25    student is us.
```

```
1    Q.  Sir, when you're using these participants in your studies,
2    these participants, as I said before, participated in
3    cross-racial identification based upon slides and videos,
4    correct?
5    A.  In that form of the research, yes.
6    Q.  Okay.  So those participants never physically interact with
7    the alleged criminal in those studies, right?
8    A.  In those particular types of studies, yes, though there are
9    others.
10   Q.  So then those individuals never have to face the every day
11   ramifications of being an eyewitness to a crime, correct?
12   A.  That's correct.  And if their findings were different that
13   what we found in the real cases, that would be a point of real
14   concern.  But since they're the same, it only goes to support
15   the cross racial effect.
16   Q.  Isn't it true that in those cases, that the participants
17   are required to make a choice when they have to identify the
18   alleged criminal they watched in the video?
19   A.  If you're asking me if they can say I don't know or not, I
20   believe they can say they don't know.
21   Q.  You believe?
22   A.  I'm pretty sure in almost all studies that I'm aware of
23   that choices are make an I D or don't make an I D.
24   Q.  Isn't there a huge difference between a video selection and
25   then a victim or I'll say an eyewitness in a case where they
```

1  physically interact with the person and then they have to

2  resort to identifying that person by photos?

3  A.  Yes, that's why we've gone on to do those other forms of

4  the study which find exactly the same.

5  Q.  So you agree that is different and has a different effect

6  on the actual eyewitness?

7  A.  I agree that if the findings were based only on those types

8  of lab studies that you're asking me about, that we would have

9  a problem.  But since that isn't the case, we don't.

10  Q.  Wouldn't it be fair to say that your science that you rely

11  upon conflicts with federal law?

12  A.  The science conflicts with federal law?

13  Q.  Didn't you testify that stress, based upon your science --

14  I want to make sure I get it right -- stress makes people worse

15  in regard to their identification.  And then you use an example

16  of an excited utterance.

17  A.  Yeah, that's right.

18  Q.  But excited utterance is actually a rule of federal

19  evidence, right?

20  A.  You know the people who make the Rules of Evidence are well

21  respected and wonderfully versed, but that doesn't mean they're

22  good scientists necessarily.

23  Q.  My question to you was, isn't an excited utterance a rule

24  of federal evidence?

25  A.  Oh.  I thought you were asking me something else.  Yes, it

1    is a rule of federal evidence, but that doesn't mean that the

2    science is in conflict with federal law.  I think we could

3    probably find cases where the science tells us something

4    different and the law changes.  That's certainly one of them.

5    Confidence and accuracy may might make the same argument.

6    Q.  I would just like to be able to ask you questions and then

7    you answer them, if you don't mind.

8    A.  I'm trying.  You know, yes or no is not always the answer,

9    unfortunately.

10    Q.  I understand.

11            So another example of that would be recollection

12    refreshed, right?  Because you said -- Didn't you just testify

13    that memory is like a computer, so once you go back into it and

14    change it, then it's changed like a computer screen.  So

15    recollection refreshed, which is a part of Federal Rules of

16    Evidence, right, you agree, that recollection refreshed is a

17    Federal Rule of Evidence.

18    A.  Certainly.

19    Q.  So that would conflict with your general theories of

20    memory.

21    A.  I'll defer you to several law review articles where law

22    professors have written about the conflicts between the science

23    and --

24    Q.  I'm asking your opinion, sir.

25    A.  Oh.  I think that there are behavioral Rules of Evidence

1    that don't necessarily comport with the science.

2         THE COURT:  I thought you were saying does that

3    conflict with his own opinion, not the Rules of Evidence.

4         MS. ADAMS:  Yes, Your Honor.

5         THE COURT:  Not the Rules of Evidence.

6         THE WITNESS:  Does what conflict with my own opinion?

7    Q.  I asked you if recollection refreshed conflicted with your

8    expert opinion of the theories of memory, and the fact that

9    memory acts like a computer?

10   A.  If the assumption that underlies it is that the memory

11   couldn't be changed, then that would conflict.  If that's the

12   only part of it.

13   Q.  I want to go back to cross-racial identification.  Didn't

14   you testify that the eyewitnesses' experience with other races,

15   interaction with other races would affect the reliability of a

16   cross-racial identification?

17   A.  I think what I said was that --

18        THE COURT:  You said "would" or could?

19        MS. ADAMS:  I said "would".

20   A.  I think what I said was that the theory behind the

21   cross-racial effect is differential experience.  And I think

22   it's certainly appropriate for both sides in a case to bring up

23   the experience that a particular witness might have, because I

24   think it would go to the weight to be given to it.

25        So the answer is differential experience can mitigate

```
1    the effect.  In other words, the more experience you have with
2    members of other races, the less you see the effect.  You know,
3    look, I grew up in Washington, D.C. --
4    Q.  Sir, I'd really appreciate it if you would give me the
5    opportunity to ask you a question.
6    A.  Oh, I was just trying to explain the answer better.
7    Q.  I understand your answer.
8            I want to make sure I understand cross-racial
9    identification based upon this science and the statistics that
10   you are familiar with.  You are familiar with the statistics on
11   cross-racial identification, yes?
12   A.  I'm familiar with the studies, yeah.
13   Q.  The studies.
14   A.  Mm-hmm.
15   Q.  Which indicated that cross-racial identification are less
16   reliable than same-race identification.
17   A.  That's absolutely correct.
18   Q.  Didn't you just testify that an individual's experience
19   with, and I'll be specific, in this case we have a white bank
20   teller.
21   A.  Correct.
22   Q.  We have a black defendant.
23   A.  Yes.
24   Q.  So isn't it your testimony that based upon the white bank
25   teller's interaction with blacks, that would affect the
```

1  cross-racial identification?

2  A.  I think my job is to put before the jury the studies.  It's

3  going to be your job and Mr. Butler's to argue how they relate.

4  I think he's going to want to argue that the cross-racial

5  effect wasn't mitigated in this case and that you're going to

6  argue the opposite, and that's fine, but the studies show what

7  they show.

8  Q.  Which is what?

9  A.  Which is that cross-racial identifications are less

10  accurate than same race identifications, but a relevant factor

11  to figuring out how much weight to give that finding in a

12  particular case is how much experience the individual has had

13  with members of other races.  I think that's as succinct as I

14  can put it.

15  Q.  Okay.  My next question is, at what level, based upon your

16  sciences and statistical evidence that you are an expert on, on

17  what level would a white person be able to have a reliable

18  identification of a black person?  How much experience is

19  required?

20  A.  This is like asking in law school about bright line rules.

21  There is no bright line rule in what you're asking.

22  Q.  That's kind of my problem, is because there is no bright

23  line rule, but yet you're giving this information to the jury

24  but not telling them how to assess it.

25  A.  Oh, I disagree completely.  You know, if I tell you that

1   cross-racial identification -- You know, science doesn't tell

2   you what's always true, it tells you what's most likely true.

3   Q.  Sir, that's not --

4   A.  It tells you what's most likely to be true, and that's a

5   valuable piece of information as to how to make a decision or

6   bet.  And if you don't think so, maybe we should play cards.

7   Q.  Sir, just like fingerprint evidence, a person who is an

8   expert in fingerprints can make a determination or make

9   conclusions based upon a threshold.  Isn't that correct?

10  A.  Well, I don't know all there is to know about fingerprints.

11  I know that there's a lot of subjectivity to it, and I know

12  that there is some controversy about it because I have been

13  reading some federal cases.  So I don't think it's probably as

14  exact as you're trying to make out.

15  Q.  I'm sorry, sir, but I didn't say it was exact.  I'm trying

16  to ask you some questions.

17          Are you familiar with fingerprint evidence?

18  A.  A little bit.

19  Q.  Are you familiar with areas of threshold?

20  A.  You'd have to explain what you mean by "threshold".

21  Q.  What I mean by "threshold" is that if a person making a

22  fingerprint comparison determines that by the threshold, either

23  regulated by the state or the agency or whatever certifying

24  body there is, does not meet that threshold, then that person

25  would determine that the comparison is not accurate?

1    A.   No.   The way I understand it, it's not exactly that.

2         MR. BUTLER:   Your Honor, I'm going to object slightly

3    here in the sense that we're not calling this expert as a

4    fingerprint expert to say fingerprint one matches fingerprint

5    two.   I'm not calling him to say that her identification on

6    this day was correct because of that.   That's not what we're

7    doing.   This witness, so the analysis in this analysis is

8    false, so to speak.   So I object on that basis.

9         MS. ADAMS:   Would you like for me to respond, Your

10   Honor?

11        THE COURT:   Yes.

12        MS. ADAMS:   Your Honor, since I asked the question of

13   the witness, he did not understand my question regarding

14   threshold.   I was trying to explain it to him so that I would

15   be able to get to the real question I was trying to ask him.

16        Thank you, Your Honor.

17        MR. BUTLER:   That doesn't change my objection, Your

18   Honor.

19        THE COURT:   The objection is overruled.   Go ahead.

20   Q.   I'll be more specific.   In Alabama there's a seven point

21   system.   You don't have seven points that match, then they're

22   not going to say there's a comparison and there's an

23   identification.   Do you understand that?

24   A.   Yeah.   That's interesting.   In most places it was eight,

25   but okay.

1    Q.  But in Alabama it's seven, yes?

2    A.  I know that -- But I think therein lies the problem.  If

3    there are different standards, people will draw different

4    conclusions.  And I do think that you're asking for an exact

5    science, and we're talking about something that -- we're

6    talking about apples and oranges here.  I'm not here to say

7    that there are seven points of comparison along these factors

8    and whether they're correct or incorrect.

9    Q.  Sir, I'm not asking you to say that.  I merely asked you if

10   you understood that in Alabama there are seven points, that's

11   the threshold.

12   A.  Well I do now.  If you say so.

13   Q.  Okay.  So my question to you, using that example is what

14   would be the threshold for the jury to decide that this

15   eyewitness identification, considering the cross-racial factor

16   with --

17          MR. BUTLER:  Objection.  We're not asking this

18   witness to give the jury a threshold.

19          THE COURT:  I think she wants to show that maybe a

20   threshold doesn't exist.  And she can make that argument.

21          MR. BUTLER:  Yes, Your Honor.

22   Q.  My question is, what is the threshold for the jury to

23   consider in evaluating an eyewitness identification and the

24   cross-racial factor?

25   A.  There is no bright line.  The same as when the Prosecution

1    calls an expert on rape trauma syndrome, let's say, and the

2    expert explains rape trauma syndrome to the jury.  There is no

3    -- and nobody seems to get upset about that.  There's similarly

4    no standard to say there has to be a six or seven points.  And

5    then, you know, if you're comparing a form of physical science

6    to a form of social science in a way that's inappropriate -- If

7    I know that cross-racial identifications are less accurate than

8    same-race identifications, that's extraordinarily helpful if

9    that's what the science shows.

10           To a trier of fact that has to make a determination

11   about one of them, that is a factor that's very important in

12   the same way that I know that if ten of the spades have been

13   played out of a deck and I have to bet on the next one, you

14   know, there is no standard or threshold.  The fact of the

15   matter is that that's relevant information.  And it's relevant

16   to the jury to understand that in a given case cross-racial

17   identification less accurate than same-race is something for

18   them to consider.

19           THE COURT:  Let me interrupt at this point.  How much

20   longer with are you going to be?

21           MS. ADAMS:  Your Honor, I have quite a few questions.

22           THE COURT:  Okay.  So you're going to be at least

23   another twenty minutes we would say?

24           MS. ADAMS:  Yes, sir.

25           THE COURT:  We've got an issue here, then.

```
1    Minimally, the Government is going to go until five, and I
2    suspect perhaps further than five.  I thought you said the
3    witness could only be here today.
4            MR. BUTLER:  That's correct, Your Honor.
5            THE COURT:  Then what do you propose we do?
6            MR. BUTLER:  Your Honor --
7            THE COURT:  I have a jury out.  It is now twenty-five
8    of five.
9            MR. BUTLER:  Could I have a moment to consult?
10           THE COURT:  Yes.
11           (Whereupon, Mr. Butler conferred with Ms. Freeman and
12   Ms. McKee off the record and out of the hearing of the other
13   courtroom the participants.)
14           MR. BUTLER:  Your Honor, in response, this is exactly
15   why the motion is untimely.  Your Honor gave us February first
16   to resolve this so we wouldn't be doing this right now during
17   the middle of trial.  Now we are mid trial, we have an expert
18   witness who has a schedule, and because the Government decided
19   to raise this, I believe almost a month after the deadline
20   given, the Defense is now hamstrung.  It is our position that
21   this evidence should go on.
22           THE COURT:  Even if I were to agree for the evidence
23   to go in right now, we could not finish it by five o'clock.
24   Even if I were to stop Ms. Adams right now and, say, you know,
25   the evidence comes in, we still couldn't complete it by five.
```

```
 1    In fact, I doubt we could complete it by six or six-thirty
 2    because what you gave me was a summary of what you were going
 3    to show.
 4              MR. BUTLER:  I'm sorry, Your Honor?
 5              THE COURT:  On your direct you never asked him
 6    exactly what he was going to say, you said tell me the points
 7    you'd like to make.  So I doubt that you could put your
 8    evidence on in front of the jury in thirty minutes.  And the
 9    Government does have a right to cross examine the witness.  So
10    my question is, what do we do?  What you just gave me doesn't
11    resolve the problem.
12              MR. BUTLER:  Your Honor, again, this begs the
13    question we are now in this position because of the
14    Government's untimely filing.  It's our position to resolve
15    this, we should exclude this testimony.  We can give a limiting
16    instruction to the jury.  Of Ms. Nichols and Mr. --
17              THE COURT:  You want me to exclude the testimony of
18    Ms. Nichols?
19              MR. BUTLER:  Your Honor, if we're not allowed to put
20    this witness on because of the misconduct of the Government --
21              THE COURT:  I'm not going exclude the testimony of
22    Ms. Nichols.
23              MR. BUTLER:  Well, I think this testimony is
24    essential for understanding the nature of that, the Government
25    did not --
```

```
1              THE COURT:  What is your conflict?

2              THE WITNESS:  I have to be in court at nine on Monday

3    morning.  I have to be in court in Hartford on Monday.

4              THE COURT:  What do you need to be in court in

5    Hartford, Connecticut.

6              THE WITNESS:  It's a postconviction hearing.  That's

7    been scheduled for a month.  Now if it were --

8              THE COURT:  Well, you're here now, and we're going to

9    finish and you're going to have to report here at nine o'clock

10   on Monday.

11             Anything else?

12             MR. BUTLER:  Your Honor, I would just like to

13   underscore the fact that this dilemma has not been caused by

14   the Defense.

15             THE COURT:  I'm not saying it has been, but I'm not

16   going to exclude the testimony of Ms. Nichols.  That will not

17   happen.

18             MR. BUTLER:  Understood.

19             THE COURT:  Or Mr. Robinson.  That's not fair to

20   anyone.  But this witness will have to be here on Monday.

21             Are you in federal or state court on Monday?

22             THE WITNESS:  State court.

23             THE COURT:  State court?  You'll just to tell them

24   you're under subpoena here, and you're in the middle of your

25   testimony and we'll see what we can do.  You'll have to be here
```

```
 1    at nine on Monday.

 2              THE WITNESS:  I'll cancel the plane tickets.

 3              THE COURT:  I'll see you Monday at nine.  You're

 4    already on the stand.

 5              MR. BUTLER:  Your Honor, because there are

 6    proceedings that are taking place in Hartford, given the fact

 7    that we're about to recess for the weekend, could I inquire to

 8    this witness when he's available to return so that we recess

 9    this trial until he's able to return?

10              THE COURT:  He doesn't know -- How do you know he'll

11    be able to return?

12              THE WITNESS:  It's a postconviction hearing. I've

13    already got a plane ticket from back home in Dayton to Hartford

14    Sunday, coming back Monday night.  So I could be here Tuesday,

15    if I had to.

16              THE COURT:  What's the Government's position on that?

17    I know you haven't even finished your cross.  We would have to

18    resume the trial then on -- well, I guess we could take up all

19    your other witness and then resume the trial on Tuesday.

20    What's your position on this?

21              MS. ADAMS:  Your Honor, it's the Government's

22    position that it would be prejudicial to our witnesses because

23    our witnesses have been under subpoena since Wednesday.  They

24    have been here waiting in the witness room.  They were not able

25    to come just on a day that was convenient for them and then
```

1    return.

2          MR. BUTLER:  Can I respond to that?  They should have

3    thought about that when they --

4          THE COURT:  I have to admit, Ms. Adams, the reason I

5    set this for February one was to avoid this scenario.  I know

6    you said that you had asked for a *Daubert* hearing, but I think

7    that's a very technical way of defining "hearing".  A hearing

8    is whenever the Court considers a matter, and I think you

9    should have anticipated that I might want to set this down for

10   a hearing, which is what I did.  And you've put the Court in a

11   very, very precarious and unfortunate position by waiting until

12   just a week before trial, not only to put this to the Court but

13   to even brief it.

14          I had no idea what was going to come up.  And that's

15   why I set it for February one, which would give us more than

16   adequate time to do this.  So I can't blame Mr. Butler for this

17   scenario by any stretch of the imagination.  At the same time,

18   I don't think it would be fair to the Government to do anything

19   like what Mr. Butler is requesting.

20          But I do think that we can accommodate, in light of

21   the scenario, the schedules of people.  I think that's the

22   least intrusive of all the proposals that have been put

23   forward.

24          MS. ADAMS:  Your Honor, I apologize to the Court for

25   not complying with an order of the Court that the Court is

1    stating that the deadline was February first.  However, it was

2    my intent to not request a *Daubert* hearing because I had not

3    received any information, notes or opinions from this specific

4    expert.

5         In addition, I informed Mr. Butler four weeks prior

6    that I would be challenging his expert's testimony.  So I do

7    not feel that the Defense has been prejudiced.  They had four

8    weeks notice.

9         Also, as I stated in my brief and in my motion,

10   generally in this court motions in limine are due one week

11   before trial, which is why I filed it on that date.

12        THE COURT:  Well, again, you had to have known that I

13   wanted to look at this issue and the complexity that it would

14   pose.  And the issues that were at issue.  Otherwise I wouldn't

15   have set it for February one.  But all that's, you know, what

16   we're confronted here with is a scenario that I think the

17   important thing is to be fair to both sides.

18        MS. ADAMS:  Yes, Your Honor.

19        THE COURT:  And I do have to take into consideration

20   this witness's schedule.

21        MR. BUTLER:  Your Honor, a wiser person than me just

22   came up with a suggestion.  A teleconference by video for the

23   testimony --

24        THE COURT:  No, I don't think that's going to work.

25        MR. BUTLER:  Okay.

1    THE WITNESS:  Your Honor, next week is spring break

2    for me, so I can be here on Tuesday.

3    THE COURT:  Let me ask you this, Mr. Butler.  How

4    many witnesses do you have for Monday.

5    MR. BUTLER:  Let me get an exact number for you, Your

6    Honor.

7    THE COURT:  Because I would like you to complete your

8    cross right now, Your Honor.

9    (Whereupon, Mr. Butler conferred with Ms. McKee and

10   Ms. Mason off the record and out of the hearing of the other

11   courtroom participants.)

12   MR. BUTLER:  Your Honor, we anticipate approximately

13   thirteen to fifteen witnesses.

14   THE COURT:  How long will they take?

15   MR. BUTLER:  At least -- I will alert the parties --

16   Mr. Smith is contemplating testifying, so that's anticipated a

17   day and-a-half.

18   THE COURT:  Okay, then.  Then I don't see a problem

19   then.  We will start promptly on Monday with your witnesses

20   other than the expert.

21   MR. BUTLER:  Oh, I see.  Understood.

22   THE COURT:  And the expert will return on Tuesday and

23   you will continue your cross at that time.

24   MR. BUTLER:  Understood.

25   THE COURT:  Now the question is, Ms. Adams, I'm going

1    to let the jury go until Monday at nine.  But I'd like you to

2    go ahead and use your next fifteen minutes to get as much of

3    your cross in so I can be considering it over the weekend.

4    That would be very helpful to me.

5              MS. ADAMS:  Yes, Your Honor.

6              Why don't you bring the jury back in so I can let

7    them go.

8              (Whereupon, the jury was escorted into the

9    courtroom.)

10             THE COURT:  Have a seat, members of the jury.  I'm

11   going to need your help on a matter.

12             Members of the jury, as you know, and as you must

13   know quite well, it's fifteen minutes of five.  We've been

14   working very hard.  We just have some other matters in order to

15   keep the case going.  It doesn't, however, look like we're

16   going to finish it this afternoon.

17             I'm going to let you go home until Monday morning at

18   nine when we will start back with the defendant's case.  They

19   expect their case will take about a day and-a-half.

20             Now this is where there's a problem.  I understand

21   Ms. Naylor, that you have a conflict on Tuesday.

22             JUROR NAYLOR:  Yes, sir.  I think it can resolved.  I

23   think it can be resolved on Monday if I can tell that --

24             THE COURT:  I understand you have an administrative

25   hearing before an administrative law judge on two Social

```
 1    Security matters for Tuesday at what time?
 2            JUROR NAYLOR:  I think it's either nine-thirty or ten
 3    or ten or ten-thirty.  The one of them is really urgent.  The
 4    other one I think can wait.  But I think that judge has been a
 5    circuit judge before; I believe if I can contact him and tell
 6    him I need to be available for lunch, that he would accommodate
 7    me.
 8            THE COURT:  Very good, then.  If you could do that,
 9    that would be very helpful to us.  We would like to finish this
10    case.
11            We will resume on Monday at nine and Tuesday at nine,
12    too, and then of course you need time to deliberate.
13            JUROR NAYLOR:  What time do we get lunch on Tuesday?
14            THE COURT:  Tuesday would be from twelve until one.
15    I feel somewhat -- You having do a hearing on Tuesday during
16    your lunch hour won't give you any time for lunch.
17            JUROR NAYLOR:  I don't mind.  That's not a big deal.
18    I'm accustomed to that.
19            THE COURT:  We'll accommodate your lunch as well.  I
20    will make sure that if you conduct your hearing, even though it
21    may delay the trial in the afternoon, I will make sure you get
22    lunch.
23            JUROR NAYLOR:  I'm snacking.  I'm good.
24            THE COURT:  We will accommodate you.  I certainly
25    appreciate your efforts to accommodate us.
```

1          But anyway, members of the jury, rather than just

2    keeping you here this afternoon while we take up these matters,

3    I'm going to let you go until Monday morning at nine.

4          Ms. Naylor, if you need to contact your court, or any

5    other matters like that, let us know and we will help you with

6    that, too.  But I would like to finish this case up by Tuesday

7    morning so you can start your deliberations.

8          Again, do not discuss the case among yourselves or

9    with anyone else.  Leave your notes in your chairs and be here

10   by eight forty-five on Monday morning we can start again.

11          (Whereupon, the jury was escorted out of the

12   courtroom and the following colloquy ensued):

13          THE COURT:  Have a seat.

14          Go ahead, Ms. Adams.

15          MS. ADAMS:  Thank you, Your Honor.

16          THE COURT:  Oh by the way, how early will you be here

17   on Tuesday?

18          THE WITNESS:  I have to call the airlines.

19          THE COURT:  I'd like you here at least by --

20          THE WITNESS:  Your Honor, I would guess there's a six

21   a.m. flight.

22          THE COURT:  You're going to have to come here Monday

23   night.

24          THE WITNESS:  I'll have to call the airlines, because

25   right now my flight is from Hartford back to Dayton and it's

```
1    like at night and it gets in at ten-thirty at night.
2             THE COURT:  I would like to resume on Tuesday at
3    seven o'clock, so we can resolve this for the jury by nine.  I
4    don't want to keep the jury out any longer.
5             THE WITNESS:  I'm at the mercy of the people at
6    Hartford.  I'll call them as soon as I get in.
7             THE COURT:  Very good.
8             Go ahead, Ms. Adams.
9             MS. ADAMS:  Thank you, Your Honor.
10   Q.  Sir, isn't it fair to state that cross-racial
11   identification errors vary based upon -- Let me make sure I say
12   this clearly.  Isn't it true that cross-racial identification
13   errors decrease as learning increases?
14   A.  If I understand what you're asking me, it's similar to what
15   I said, which is the more experience you have with members of
16   other races, i.e. that's learning, then the effect diminishes
17   some, yes.
18   Q.  Isn't the factors that can affect a witness's learning of a
19   person of another race, facial features -- Let me put it this
20   way.  Isn't it true that the more direct interaction that an
21   eyewitness has, and I'll just use the word criminal or suspect,
22   of another race, that that lessens the cross-racial
23   identification error?
24   A.  I think that's pretty much what I have been trying to
25   say.
```

1    Q.  Because based on your studies, the more time that that

2    eyewitness spends with that criminal, they learn more of the

3    facial features and the race tends to go away.

4    A.  Oh, if you're asking me just interaction with one person,

5    no.  I mean the wait you're phrasing it, if I understand it

6    right, turns it into a non sequitur.  That is, if I have

7    experience with one person, the criminal, then I'm somehow

8    going to be more accurate.

9         You know, what we know is the more time people spend

10   with anyone, you know, the more accurate, I think I said that,

11   it was exposure time.  But it's also the case that that

12   cross-racial -- the longer you have in exposure time, the more

13   you're looking at the face, the more accurate you'll be

14   generally.  But the cross-racial effect remains.  You'll be

15   more accurate with the white person, white target, you'll be

16   more accurate with the African-American target, but there will

17   still be a racial difference.

18   Q.  So you're testifying that exposure time is one factor, and

19   that cross-racial identification could actually increase error

20   encompassing that exposure time here.  Isn't that what you're

21   saying?

22   A.  I think so.  They're factors that the jury should consider,

23   both of them.

24   Q.  So what is the required exposure time so that the jury can

25   assess how much weight to give to that evidence?

```
1    A.   There is, again, no bright line.  You can't just say
2    magically that, you know, if somebody gets ten seconds they're
3    a hundred percent accurate.  It's not a yes or no or
4    dichotomous situation.  As exposure time increases, so does
5    accuracy.
6            But there is no magic line where it's a hundred
7    percent accurate and zero so there is no bright line.  But it
8    remains a finding that the longer the exposure time, the
9    better.  That's not only true scientifically, but it's true
10   common sensically.
11   Q.   Okay.  So based upon your studies and common sense and
12   science that you have knowledge of, how much time does it take
13   to make an eyewitness identification more reliable?  You just
14   said there is no bright line, but you also have not mentioned
15   any length of time.  You haven't mentioned any --
16   A.   I don't think I had to.  What I'm saying is, the more
17   amount of time, however much that is, as long as you have
18   enough time to process the information, the longer the time the
19   more accurate.
20   Q.   Sir, you have to just forgive me because I guess I'm
21   confused because I thought your science and in the general
22   theories of memory were based upon statistics and studies and
23   reports, correct?
24   A.   They're based on studies.  They're based on statistical
25   analysis, but the question you're asking me is for the magic
```

1  bright line where the witness is a hundred percent accurate

2  above it and zero percent below it.  And just like in most

3  things in social science, and even in regular science, there is

4  no such bright line.

5  Q.  Sir, I am not asking you for a bright line.  What I'm

6  trying to understand is either percentage or some general way

7  that you could give me a background as to how that is assessed

8  based upon the studies and the knowledge that you have.

9  A.  Well I can tell you what the studies do.  The studies vary

10 exposure time.  One group gets a certain amount of time, a

11 second group gets more and a third group gets more.  And for

12 each of those groups you expose them to an event to a person.

13 You run them through an identification procedure and you assess

14 the percentages of accuracy.  The longer the exposure time, the

15 more accurate they become.

16 Q.  That's I'm trying to get to, the percentages.  I knew there

17 was a number somehow associated to the studies.  So what is the

18 scale as far as percentages and time?

19 A.  But you can't do that.  In one study it may be that the

20 lighting in one case is different, so you may yield a different

21 percentage.  What you do in a study, and I think you probably

22 know, is you hold all the other things constant as best you

23 can, and then you vary one particular factor.  And the

24 percentages are not going to be exact across all studies.

25        For example, if I do a study that looks at cancer,

1    lung cancer and cigarette smoking, one study may find one

2    percentage and another study may find a different percentage.

3    But that doesn't prevent people from drawing the conclusion

4    that cigarettes cause lung cancer.

5    Q.  So then you can't make an assessment as to whether or not a

6    witness has received sufficient exposure time in order to

7    affect the cross-racial identification where it's a higher rate

8    of proper identification?

9    A.  I think if you're asking me if I can render an opinion

10   about whether the witness meets all the criteria and therefore

11   they're correct, I think that was Mr. Butler's point.  You're

12   asking me, then, to render an opinion about whether or not this

13   witness is accurate or not based on whether they meet some

14   magical criteria.  And that's not my role.  It's the jury's

15   role to do that.

16          The standard of helpfulness requires that what the

17   expert says helps them to make that determination.  And if

18   cross-racial identifications are less accurate than same-race

19   in a scientific sense, I can't imagine anything more relevant

20   than what the science shows in a case where the individual case

21   has to be bet on.

22          In other words, you know, again, this is basic

23   probabilities and basic card playing.  I may not know what the

24   next card is, but I have to lay a bet.  And that bet is going

25   to be determined on what I know statistically.

1    Q.   What I'm trying to understand, sir, is that you testified

2    that cross-racial identification is less accurate than

3    same-race, and that's true around the world.  Is that your

4    testimony?

5    A.   Yes, that's true for Hispanics, it's true for Asians.

6    Q.   That was your testimony?

7    A.   It was.  Elaborated on, but yes.

8    Q.   So based upon the fact that it is true around the world,

9    are you saying that there is no type of conclusion, or scale,

10   or there is no specific information that you could provide to a

11   jury in order to assist them in weighing the factors that you

12   would be testifying to?

13   A.   I guess I don't agree with the way you're phrasing it.  Let

14   me distinguish two things.  If you're asking me is there a way

15   that I can tell them whether this witness is correct or

16   incorrect, or how they should decide --

17   Q.   That's not my question.

18   A.   Well wait a minute.  Then the answer is no.  If you're

19   asking me is the scientific information that I'm going to

20   provide them helpful in their doing that, then the answer is

21   yes.

22   Q.   And it would be helpful because you would be providing them

23   with specific factors that they can consider, but they don't

24   know how to weigh them, isn't that correct?

25   A.   With all due respect, you know, they know it's a

1    cross-racial identification.  Without knowing what studies

2    show, I would argue that they know less how to weigh them than

3    if they have the studies as part of their decision-making.

4    Q.  Sir, that's what you would be for, right?  You would not

5    provide a copy of the studies to the jury.  That's what your

6    testimony would do, it would be to educate them on how to

7    consider those factors.

8    A.  Oh no, I disagree with you.  It is not my role to tell them

9    how to consider the factors, it is my role to tell them what

10   factors are, which ones are relevant to their consideration.

11   But I think it's probably up to them what weight to give

12   them.

13   Q.  How do you determine which ones are relevant?

14   A.  From what research shows about what factors are important

15   in considering the accuracy of an identification?  And I mean

16   that's how they do it.  I provide them with that.  I assume the

17   lawyers are going to argue one side or the other about what

18   weight to give them and the jury will make that

19   determination.

20   Q.  You just testified that some of the factors and the general

21   theories of memories include obvious factors, isn't that

22   true?

23   A.  Yeah.  I called lighting and eyesight, I think they were

24   obvious factors.  Meaning that I don't think that jurors need

25   an eyewitness expert to tell them that if somebody were

1    hopelessly nearsighted and not wearing their glasses -- I'm

2    reminded, as you may have seen the movie My Cousin Vinie, the

3    cross examination of the eyewitness in the movie, they're funny

4    but they're pretty obvious.

5    Q.  Sir, I'd really appreciate it if you could just answer my

6    questions.

7    A.  I think I did.

8    Q.  I believe you're being non-responsive.

9            THE COURT:  Just go ahead and ask the question rather

10   than arguing.  It will just take us longer.

11           MS. ADAMS:  Yes, Your Honor.

12   Q.  You then are deciding which factors are obvious to the jury

13   and which ones are not, correct?

14   A.  I just gave my opinion that I think eyesight and lighting

15   are obvious.  If you disagree, that's fine.

16   Q.  So that would be a yes?

17   A.  No, I'm not telling people which is obvious.  I rendered my

18   opinion that probably lay people -- We've done surveys of lay

19   knowledge of eyewitness factors.  There's a study even in the

20   judges journal about judges' knowledge about these factors.

21   One of the things that seems pretty clear is that people

22   understand that if there's not enough light, the eyewitness

23   will be less able to identify.  The studies bear that out, but

24   I think that's pretty obvious.

25   Q.  Let's talk about the specific facts of this case.  In this

1    case we do have a cross-racial identification of the defendant,

2    as well as a same-race identification of the defendant.  So

3    wouldn't the same-race identification, since you just testified

4    that same-race identifications are more reliable or have less

5    rate of error than opposite-race identifications, correct?

6            MR. BUTLER:  Your Honor, I'm going to object to that

7    on that point.  There has not been a same-race identification.

8            The testimony from the witness at trial was that the

9    individual --

10           THE COURT:  I'm not going to quibble over that.  You

11    all can put your own spin on it, what Mr. Robinson did.

12           But anyway, what's your question?

13           The objection is overruled.  Go ahead.

14   Q.  My question is to you, sir, is you stated that same-race

15   identifications have less rate of error than cross-race

16   identifications, correct?

17   A.  Correct.

18   Q.  So wouldn't a same-race identification, coupled with a

19   cross race identification, indicate that the eyewitness

20   identifications are more reliable?

21   A.  Not necessarily.  It depends on how the procedure is

22   conducted.  The mere fact that two people pick the same person

23   doesn't in and of itself indicate that the person picked is the

24   perpetrator.  The reason I say that is that if I put together a

25   bad procedure or do it badly, and two people come to the same

```
 1   conclusion, they could come to the same wrong conclusion.
 2           So it's not in and of itself -- And I interject that
 3   while I think what you're asking me is an interesting question,
 4   I think it probably goes to weight and not admissibility
 5   because I think you're assuming the literature in order to ask
 6   the question.
 7   Q.  Sir, I'm not asking you to make a legal analysis as to
 8   whether my questions are weight or admissibility.  I'm trying
 9   to get an understanding of the science that you're an expert
10   of?
11   A.  Mm-hmm.
12   Q.  So let's assume that this is a wonderful job by the police
13   department, according to all of the appropriate guidelines that
14   there could be in having an eyewitness identification
15   procedure.
16   A.  Mm-hmm.
17   Q.  Okay.  Assuming those facts, wouldn't a same-race
18   identification bolster a cross-race identification if the same
19   criminal was identified?
20   A.  Again, I think you're asking me if two identifications,
21   even if it's cross-race, one cross-race and one same-race --
22   Oh, I forgot, you're asking me to assume that everything is
23   done perfectly.
24   Q.  That's correct.
25   A.  Okay, which is a pretty weighty assumption.
```

1          Under those conditions, two identifications of the

2    same person, it depends on the other factors.  Were they the

3    same -- Did they have the same exposure time?  Were they under

4    the same level of stress?  Was the identification procedures

5    done exactly the same way?  What levels of confidence were

6    expressed?  So all of those things are things that the jury

7    would have to assess.

8          I think the question -- there's enough problems with

9    the premise of the question that I have trouble answering it.

10   Q.  I understand, sir.

11         So then you're saying that all the other factors that

12   you have mentioned, or just testified to in your summary

13   actually interrelate and affect the rest of the factors.

14   A.  No, I don't think that's what I said.  What I said was that

15   they all have to be assessed, and you're asking me that if the

16   mere fact that two people identify the same person, one

17   same-race one cross-race, means that the identification is

18   accurate.  And I said no, because the other factors need to be

19   considered, too.  I didn't say they interrelate necessarily, I

20   said that they all need to be considered.

21   Q.  Sir, maybe we're having this confusion because you didn't

22   understand my question.  I was not asking you if a same-race

23   identification that was the same as a cross-race identification

24   made the identification accurate.  My question to you was --

25   A.  I thought that's exactly what you asked me.

1    Q.   My question to you, sir, again, is if a same-race

2    identification of the same defendant, coupled with a cross-race

3    identification, would bolster the cross-race identification?

4    A.   How is that different than what I just said?  The answer is

5    maybe, depending.

6    Q.   Okay.  So what you're saying then is, that all of these

7    factors have to be considered in a totality, correct?

8    A.   I think that the jury needs to consider all of them.  The

9    ones that I mentioned.  And I think that the importance of the

10   expert is that some of them involve myths and misconceptions

11   that people have that they wouldn't be able to know about

12   unless the expert testified.  For example, confidence and

13   accuracy.

14   Q.   Okay.  So since your testimony is that all of the factors

15   have to be considered by the jury and the totality of the

16   circumstances, wouldn't omission of some factors affect the

17   jury's consideration?

18   A.   Omission of some factors?  I don't know if I've omitted

19   any, but I think that's the function of cross.  If I omitted

20   any, I imagine you'll ask me, and that would go to the weight

21   and not the admissibility of the expert testimony, if I

22   understand it.

23   Q.   Sir, that's not my question.  I'm not stating that you have

24   omitted any factors at all.

25   A.   Oh.

1    Q.   I'm merely posing a question to you.  You just testified

2    that the jury should consider all of the factors in a totality

3    of circumstances, correct?

4    A.   What I said was that the jury should consider all of the

5    factors that the science has identified --

6    Q.   Yes.

7    A.   -- that I've testified about.

8    Q.   Yes.  And so omission of some factors would then affect

9    that science that you want the jury to consider, correct?

10    A.   I think if I had omitted any of the ones that I testified

11    about, that would affect their decision-making.  But since I

12    didn't omit any, I don't know what you're asking me.

13    Q.   I wasn't asking you if you have personally omitted any

14    factors.  But if one were to omit factors in presenting expert

15    testimony, let's say you because in this case you would be our

16    expert, if you were to omit factors that are a part of that

17    science to which you are an expert, would that not affect the

18    jury's consideration?

19    A.   Geez, I don't know how to answer that.  I think I can

20    testify to every factor that I think is important from what

21    I've identified.  I don't know that I can identify any others.

22    If I had left any out, we'd have to talk about what they were

23    and then how that would affect it.  I mean I can't answer that

24    in the abstract.

25    Q.   You can't just hypothesize that there could be factors that

1    are missed?

2    A.  No, I can't.

3    Q.  Okay.

4    A.  You asked me what the effect of omitting factors would be,

5    and I would have to know what those factors were in order to

6    say anything about what potential effect that might have.

7    Q.  How is your testimony of certain factors, specifically I'll

8    go back to cross-racial identification since that's one of the

9    main factors posed by Defense counsel, how would your

10   discussion on that science inform the jury, in helping them

11   determine how reliable that eyewitness identification is?

12   A.  Oh, boy am I glad you asked that.  How is it helpful?

13   Okay.  Some of the arguments that are used in opposition to the

14   expert testimony is -- we've talked about this earlier -- can

15   be handled on cross.  Within the kin of the average lay person

16   is another one.

17          And, you know, you might argue that well, people know

18   at some level that cross-racial identifications are less

19   accurate.  And maybe they do to some level, although the

20   studies on juror knowledge about this really discount it in

21   light of a confident eyewitness.  But leaving that aside --

22   Q.  May I stop you for a second, since you just raised an

23   excellent point?

24   A.  Well I'd like to answer your question.

25   Q.  And I'm going to allow you to answer it but I think you

1    just brought up an excellent point.

2         You just said that certain aspects across racial

3    identification is within the kin of the jury.

4    A.  Well, here's what I said.  What I said was, at some level

5    they may know it in the abstract, but we have a finding that we

6    find in our work that's called confidence trumps.  You know,

7    what we mean by that is, you know, jurors may understand at

8    some hypothetical abstract level cross-racial I Ds are less

9    accurate than same-race I Ds.  But when confronted with a

10   witness who is certain and confident and says all the right

11   things, confidence trumps.  Cross-racial I D less accurate?

12   Who cares.  That witness knew what they were talking about.

13   That's the problem.

14        And there is more of a problem about helpfulness

15   that's really more critical to your question.  And that is that

16   without the expert testimony, the jury is deprived of the

17   knowledge that there is a science to back up the attorneys'

18   claims.  Without the science in evidence, the lawyers' argument

19   that cross-racial I D is less accurate than same-race is

20   nothing more than what we learned from law school to be

21   puffery.  It's a lawyer argument.  And without the evidence in

22   the record, that's all it is.

23        So the jury is instructed to consider the evidence.

24   And without the evidence that cross-racial I Ds are less

25   accurate than same-race, it's not in the record.

1  Q.  You just testified, did you not, that confidences would

2  trump the jury's general knowledge of cross-racial

3  identification?

4  A.  What I said was, we find that when the witness is

5  confident, these other factors are discounted by the trier of

6  fact.  It doesn't mean that in the actual setting that they

7  interplay in some way, it means that what we know about jury

8  deliberations in eyewitness cases is that they're very

9  influenced, wrongly the studies would show by confidence, which

10  is another reason why once the Government elicits the

11  confidence statement --

12        You know, one of the things that's been suggested to

13  Defense attorneys is to make a motion in limine to prevent the

14  witness from making a confidence statement.  But once they make

15  a confidence statement, it seems to me that the Defense has the

16  absolute right to tell the jury that that confidence statement

17  elicited by the Government for apparent reasons that we all

18  know, should not be weighted the way that the Government

19  intends it to be.

20        That is confidence is not well related to accuracy by

21  what the science shows.  Now if you don't want to elicit the

22  confidence statement, then the Defense has no need to present

23  that science.  But once it's elicited, I can't imagine anything

24  more relevant.

25  Q.  So it's your testimony that confidence trumps cross-racial

1  identification knowledge of a jury, correct?

2  A.  I think I might agree with it, the way that you phrased it.

3  Confidence, even though -- unless the expert explains there is

4  this factor and this factor, what we appear to find is that

5  whatever holds the Defense's attempts to knock an eyewitness

6  information is trumped by the confidence.

7  People look at the demeanor because they're trained

8  to look for liars, and it's very difficult for people to

9  distinguish people who are mistaken from people who are not.

10  Q.  And so you're testifying that your testimony on

11  cross-racial identification would bolster the jurors' or jury's

12  general knowledge of cross-racial identification.

13  A.  No, those are your words, not mine.  What I testified to

14  was that it supplies the only evidence in the record that in a

15  scientific manner that bolsters that assertion.

16  Q.  And you believe that it's necessary to have evidence in the

17  record of the higher error rate for cross-racial

18  identification?

19  A.  I believe that it's helpful to the jury, and I believe that

20  the Defense should have the right to put it in evidence if it

21  is true and generally accepted under *Daubert* as a science.

22  It's generally accepted enough in New Jersey.  The

23  courts have ordered a jury instruction on it, so I think we're

24  not alone.  *State* v. *Cromley,* I think it is.

25  Q.  So let me ask you this question.  Since it's necessary for

1    expert testimony on cross-racial identification to bolster or

2    enhance the jury's general knowledge of cross-racial

3    identification, then it would be necessary to include evidence

4    as to the eyewitness's interaction with people of other race,

5    exposure of people with other race, time spent with people of

6    other race, would that not be correct?

7    A.   Oh, I think that that would be very appropriate for the

8    lawyers to bring up on direct and cross of the eyewitness.  I

9    have no problem with that.  It doesn't affect the admissibility

10   of the expert, but I think that's perfectly appropriate for you

11   to ask about.  Absolutely.

12   Q.   But it would be required, correct?  How otherwise would the

13   jury be able to assess your testimony?

14   A.   You know, I don't know what you mean "required". "Legally"?

15   "Morally?"  I certainly think that if your goal is to help the

16   jury, then I think that in cases involving cross-racial

17   identification, the lawyers should ask those questions.  In

18   cases where I'm not involved, I have no control over what the

19   lawyers ask or don't ask.

20   Q.   I'm not asking you that question, sir.  My question was, in

21   regard to cases where there is evidence of expert testimony.

22   I'm not specifically trying to direct any questions in any

23   negative light towards you.  I'm asking you specifically -- I'm

24   trying to ask you regarding your wealth of knowledge.

25            So my question was, if expert testimony on

1    cross-racial identification is presented to the jury, then

2    wouldn't it necessarily require that there be evidence of that

3    eyewitness's interaction with the person of another race,

4    social interaction, time, exposure, exposure, so that the jury

5    could fully try to have an understanding as to what your

6    science entails?

7    A.  Well let me answer you.  I think it's the role of the

8    expert to lay out for the jury that different experiences

9    matters as a general matter.  As a scientific finding.  I don't

10    think it's the role of the expert to quiz the eyewitness about

11    all of those things personally, or render some sort of opinion

12    about that eyewitness.  I certainly agree with you that those

13    questions are important, but I think that's the job of the

14    lawyer and not the expert.  The expert says this is what's

15    important, and you may well want to bring those things out.  I

16    agree with you.

17    Q.  I'm not saying that it would be your requirement.  I'm

18    saying wouldn't it be necessary as far as assisting the jury in

19    understanding your testimony and applying it?

20    A.  I think it would be helpful to ask the jury those

21    questions.  I would assume and hope that the eyewitness was

22    asked or would be asked those questions, yes.

23    Q.  Because otherwise you would not assist the jury because

24    they would have no way of having knowledge of those factors,

25    correct?

A.  No, I think what I would say is that as a general matter,
the finding that cross-racial is less accurate than same-race
is helpful even without.  But it would be more helpful with
that line of questioning.

Q.  It's helpful even without specific factors of that
eyewitness?

A.  Yeah, because it's still where you bet your money.  You
know, more statistics or better statistics are better than not
as good statistics.  But, look, if I put up -- if I'm a manager
and I have to put up -- I have to decide whether to bat the
pitcher or a pinch-hitter, and the pinch-hitter is hitting
three hundred and the pitcher is batting a hundred, I still put
in the three hundred and the pitcher is batting a hundred, I
sill put in the three hundred --

Q.  Sir, I just want you to understand.  I don't know anything
about baseball, so --

A.  That's okay, I suspect that the Court does.

Q.  That doesn't help me understand your response to my
question.

A.  What I'm suggesting is that you might not make -- you might
say before I put in the better hitter, I need to know how he
hits on nights where the temperature is sixty-seven degrees and
the humidity is forty percent and all of those things.  And
those would certainly make the decision better, but even
without that information, batting average is helpful in making

1    a decision about who to put in.

2    Q.  That was way over my head.  I don't know anything about

3    baseball so I don't know how to assess that.

4    A.  It's basic probability.

5         THE COURT:  I'm not sure it's even relevant anyway.

6    Let's move on.

7    Q.  Okay.  So I'll go back to my question because I'm really

8    trying to understand.

9         If your expertise is provided regarding cross-racial

10   identification, but you just testified that it's not necessary

11   to present evidence of an eyewitness's interaction with other

12   races, exposure and time, wouldn't that be omitting material

13   facts of your science.

14   A.  No, it wouldn't be omitting any material fact about the

15   science.  It would be depriving the jury of some important

16   information, but that's not the role of the expert and it has

17   nothing to do with the expert testimony.  That's a fault of the

18   lawyers, not of the expert testimony or of the science in any

19   way, shape or form.

20        THE COURT:  My court reporter has to stop.  There's

21   no ifs and or butts about that.

22        But before we quit, the matter you have in Hartford

23   is non-jury, isn't it?

24        THE WITNESS:  Yes, that's right.

25        THE COURT:  I don't see why you can't be heard first

| | |
|---|---|
| 1 | thing in the morning so that you can get here by late Monday |
| 2 | afternoon. |
| 3 | THE WITNESS:  I'm not sure what time it's set for. |
| 4 | I'll call them immediately. |
| 5 | THE COURT:  I'm directing Ms. Adams and Mr. Butler to |
| 6 | get ahold of the people in Hartford.  Let them know he's on the |
| 7 | stand down here.  See if you can get a flight out of Hartford. |
| 8 | If you need me to intercede, let me know as well.  I want to |
| 9 | keep this going, and I also want to disrupt the jury as little |
| 10 | as possible.  I want Ms. Adams to get her evidence in and I can |
| 11 | consider it carefully. |
| 12 | Do you anticipate any redirect on him before we go |
| 13 | back? |
| 14 | MR. BUTLER:  Probably not very long. |
| 15 | THE COURT:  Let's try to keep it to a minimum because |
| 16 | I want to resolve this.  And then I want to get back to the |
| 17 | regular trial. |
| 18 | MR. BUTLER:  With the Court's permission -- Well, |
| 19 | withdrawn.  Nothing. |
| 20 | THE COURT:  Okay.  Anything else? |
| 21 | We'll resume on Monday at nine o'clock.  We'll resume |
| 22 | on Tuesday at seven with this expert and Ms. Adams on her |
| 23 | cross. |
| 24 | Thank you very much. |
| 25 | Court's in recess. |

1           (Whereupon, the proceedings were concluded.)

2                  * * * * * * * *

3

4              COURT REPORTER'S CERTIFICATE

5

6

7       I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled

9    matter as prepared by me to the best of my ability.

10

11       I further certify that I am not related to any of

12    the parties hereto, nor their counsel, and I have no

13    interest in the outcome of said cause.

14

15       Dated this 5th day of May 2008.

16

17                   \s\ Mitchell P. Reisner, CM, CRR

18                   **MITCHELL P. REISNER, CM, CRR**
                        Official US Dist. Court Reporter

19                   Registered Professional Reporter
                        Certified  Real-Time  Reporter

20

21

22

23

24

25