1    **IN THE UNITED STATES DISTRICT COURT**
                          **FOR**
2              **THE MIDDLE DISTRICT OF ALABAMA**

3

4

5

6    THE UNITED STATES
        OF AMERICA
7                                      CRIMINAL ACTION NO.
            vs.                        2:07-CR-165-MHT
8
     ANDREAS JEJUAN SMITH
9

10

11                        REDACTED TRANSCRIPT
12

13

14                        VOLUME III OF VII
                             2ND DAY OF
15                     JURY TRIAL PROCEEDINGS

16

17

18                    * * * * * * * * * *

19

20   HEARD BEFORE:      The Hon. Myron H. Thompson

21   HEARD AT:          Montgomery, Alabama

22   HEARD ON:          March 20, 2008

23   APPEARANCES:       Jerusha Adams, Esq.
                        Tommie Brown-Hardwick, Esq.
24                      Kevin Butler, Esq.
                        Aylia McKee, Esq.
25                      Danielle Mason, Esq.

# **T A B L E   O F   C O N T E N T S**

**ITEM DESCRIPTION**                                    **PAGE NO.**

Table of Contents ........................... 1

Title Page ................................. 2

Preliminary Discussion ..................... 4

Daniel Robinson - Direct Examination
      by Ms. Adams .......................... 12

Daniel Robinson - Cross Examination
      by Mr. Butler ......................... 44

Daniel Robinson - Redirect Examination
      by Ms. Adams .......................... 57

Daniel Robinson - Recross Examination
      by Mr. Butler ......................... 59

Daniel Robinson - Further Redirect Examination
      by Ms. Adams .......................... 61

Haley Kilcrease - Direct Examination
      by Ms. Adams .......................... 62

Haley Kilcrease - Cross Examination
      by Ms. McKee .......................... 68

Raymond McCoy - Direct Examination
      by Ms. Hardwick ....................... 72

Raymond McCoy - Cross Examination
      by Mr. Butler ......................... 82

Raymond McCoy - Redirect Examination
      by Ms. Hardwick ....................... 83

David Hill - Direct Examination
      by Ms. Hardwick ....................... 84

David Hill - Cross Examination
      by Mr. Butler ......................... 109

1

2

3  **ITEM DESCRIPTION**                          **PAGE NO.**

4

5  David Hill - Redirect Examination
         by Ms. Hardwick ........................  152

6

7  David Hill - Recross Examination
         by Mr. Butler ..........................  156

8  John Hamilton - Direct Examination
         by Ms. Adams ...........................  159

9

10  John Hamilton - Cross Examination
         by Mr. Butler ..........................  192

11  John Hamilton - Redirect Examination
         by Ms. Adams ...........................  214

12

13  John Hamilton - Recross Examination
         by Mr. Butler ..........................  217

14  Garland Jamaal Clark - Direct Examination
         by Ms. Adams ...........................  222

15

16  Garland Jamaal Clark - Cross Examination
         by Ms. McKee ...........................  237

17

18

19

20

21

22

23  Court Reporter's Certificate ................  247

24

25                        -o0o-

```
 1    WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE HON.
      MYRON H. THOMPSON ON MARCH 20TH, 2008 AT THE UNITED STATES
 2    COURTHOUSE IN MONTGOMERY, ALABAMA:

 3

 4                         PRELIMINARY DISCUSSION:

 5                      (THE JURY IS NOT PRESENT):

 6         THE COURT:  Counsel, the first order of business is

 7    that one of the jurors reported, I believe that his business

 8    had been broken into and that as a result he asked to be

 9    excused.

10         Who is the juror?

11         COURTROOM DEPUTY CLERK:  Faircloth.

12         THE COURT:  Pardon me?

13         COURTROOM DEPUTY CLERK:  Faircloth.

14         THE COURT:  Faircloth.  And I understand that the

15    Government has no objection to Mr. Faircloth being excused?

16         MS. ADAMS:  That is correct, Your Honor.

17         THE COURT:  And I understand that the defendant has

18    no objection?

19         MR. BUTLER:  That's correct, Your Honor.

20         THE COURT:  Mr. Faircloth is excused.  I believe that

21    the courtroom deputy has already excused him.

22         Are we ready to proceed?

23         MR. BUTLER:  Based on what happened yesterday, the

24    one gentleman in the back, he became the second alternate.

25         THE COURT:  Yes.
```

1    MR. BUTLER:  So the first alternate has now moved in?

2    THE COURT:  That's correct.  I believe it was Parker

3 who was the one that was sleeping, is that correct?

4    MS. ADAMS:  That's correct.

5    THE COURT:  Then the first alternate will become one

6 of the twelve.  Who is that, by the way?

7    COURTROOM DEPUTY CLERK:  Godwin.

8    THE COURT:  Godwin now becomes one of the twelve.

9    Anything else?

10    MS. ADAMS:  Your Honor I just wanted to bring to the

11 Court's attention, I previously advised defense counsel that

12 counsel for Willie Jackson, Mr. Terry Luck is present, and he

13 informed me this morning that Mr. Jackson is going to invoke

14 his Fifth Amendment privilege regarding the marijuana.  So I

15 just wanted to keep the Court up to date.

16    THE COURT:  Then you all would need to research what

17 you do when a witness invokes the Fifth.  Have you researched

18 that?

19    MS. ADAMS:  Yes, Your Honor.

20    THE COURT:  Have you researched it?

21    MR. BUTLER:  Yes, Your Honor.

22    THE COURT:  Is it Mr. Jackson?  When will you be

23 calling him.

24    MS. ADAMS:  He is six witnesses away, Your Honor.

25    THE COURT:  Six witnesses away.  Just so that I and

```
 1    my law clerk can get on top of this, why don't you summarize
 2    what the procedure is that the Court should follow according to
 3    the Government.
 4              MS. ADAMS:  Yes, Your Honor.  If the Prosecution is
 5    to call a witness and has knowledge that that witness is going
 6    to invoke the Fifth Amendment privilege, then the Prosecution
 7    should do so outside the presence of the jury.
 8              THE COURT:  And then what happens?  What happens if
 9    the witness invokes, then what do I do?
10              MS. ADAMS:  Then the Court has to determine whether
11    or not that specific question or subject matter is privileged
12    information to which the Fifth Amendment privilege would apply.
13              THE COURT:  And if it is not, then I just compel the
14    witness to testify?
15              MS. ADAMS:  Yes, Your Honor.
16              THE COURT:  What if the witness still refuses?
17              MS. ADAMS:  Your Honor, I do not know.
18              THE COURT:  We have to be prepared for all
19    contingencies, and I have had that happen so you need to
20    research it.
21              MS. ADAMS:  Yes, Your Honor.
22              THE COURT:  What happens, though, if I find that the
23    -- Well let me put it this way.  What would go to determining
24    whether or not the testimony is privileged?
25              MS. ADAMS:  The factors that the Court would consider
```

1  is whether or not that testimony would incriminate the

2  defendant, would it possibly subject that defendant to criminal

3  charges, or that -- I'm sorry, I'm saying the defendant, but I

4  mean witnesses -- that witness is facing possible criminal

5  charges regarding that testimony.

6        THE COURT:  Can that privilege, or could that

7  privilege have been waived by testifying before the grand jury

8  earlier?

9        MS. ADAMS:  Yes, Your Honor, it could have but it has

10  not been in this case.

11        THE COURT:  Why not?

12        MS. ADAMS:  Because the witness did not testify

13  regarding the marijuana at all in front of the grand jury.

14        THE COURT:  Oh, I thought you said he had testified.

15        MS. ADAMS:  He testified regarding the shooting, but

16  not the marijuana found in his residence.

17        THE COURT:  Mr. Butler -- Yes, ma'am, do you want to

18  inform me as to what you have found?

19        MS. MASON:  I'm Danielle Mason, Counsel for the

20  defense.

21        I found in my research in *Lanette vs. United States*

22  three seventy three, one seventy-nine, in that case the

23  Prosecution is correct that they cannot knowingly put a witness

24  on the stand that they know beforehand will invoke the Fifth.

25  It can amount to prosecutorial misconduct.  However, the Court

1  can correct that issue by offering a curative instruction to

2  the jury that no inference can be made that --

3       THE COURT:  Well it looks like that's not going to

4  happen, because I will assume that when Ms. Adams is ready to

5  call Mr. Jackson, it will be outside the presence of the jury.

6       MS. ADAMS:  Yes, Your Honor.

7       THE COURT:  So what do we do then, ma'am?  After Mr.

8  Jackson is called outside the presence of the jury, what's the

9  next step?

10      MS. MASON:  Well at that point, Your Honor, the Court

11  could decide -- The Defense's position would be that if he is

12  put on the stand and he's compelled to invoke his Fifth

13  Amendment, that it prejudices our client in that situation

14  because questioning must cease, and we're not allowed to cross

15  examine on the issue that is relevant to our case that that

16  witness may have had more interest, and in fact our theory is

17  that he did have more interest in committing the shooting in

18  the home based on what was found there.  And if we could not

19  cross on that information, then we would offer that as

20  prejudice to our client.

21      THE COURT:  What's prejudice to your client?

22      MS. MASON:  The fact that if he is allowed to testify

23  and he invokes his Fifth Amendment on the marijuana in the

24  home, then we are not allowed to present our theory of the case

25  that the witness is biased and has an interest in giving

1    information against our client.

2            THE COURT:  So you're saying the witness should not

3    be allowed to testify at all?

4            MS. MASON:  We would pose that argument, however the

5    Court -- the case that I'm citing does not necessarily call for

6    that extreme of a remedy.

7            THE COURT:  What are you asking for?

8            MS. MASON:  We would just ask for a curative

9    instruction, Your Honor, that the jury be told that if the

10   witness gets on the stand and he invokes his Fifth Amendment,

11   that an instruction be placed to them that no inference can be

12   made that his invocation of that Fifth Amendment right would

13   infer any guilt or any negative implication to our client in

14   this case.

15           THE COURT:  I'm not following you.  If the witness is

16   put before the jury, the witness has previously invoked the

17   Fifth outside the presence of the jury, then what's the purpose

18   of asking the witness in the front of the jury any questions

19   that will lead to his invocation of the Fifth?  I don't

20   understand.  Why not just stay away from the subject matter

21   altogether?

22           MS. MASON:  May I have a moment, Your Honor?

23           THE COURT:  Yes.

24           (Whereupon, Ms. Mason conferred with Mr. Butler off

25   the record and out of the hearing of the other courtroom

1    participants.)

2              THE COURT:  Why don't we proceed while the Defense

3    decides what they want to do.

4              MS. MASON:  Your Honor, our position is that under

5    the case law, *Lanette vs. United States,* we would move that

6    because we know beforehand that Mr. Jackson intends to invoke

7    his Fifth Amendment right, we would move to have his testimony

8    excluded entirely.

9              THE COURT:  Do you have case law that supports that?

10             MS. MASON:  No, I do not.  We did not go as far to --

11             THE COURT:  Get me case law that supports that by

12   noon.

13             MS. ADAMS:  Your Honor, if I may?

14             THE COURT:  Yes.

15             MS. ADAMS:  Based on an Eleventh Circuit case, *United*

16   *States vs. Tebrugge*, citation unpublished, one-thirty four Fed

17   appendix or A P P X two nine one, a witness is allowed to

18   testify regarding, as I said, a specific subject matter.

19   However, if the witness invokes the Fifth Amendment privilege

20   to a different subject matter, if I address him or I question

21   him or elicit his it testimony regarding the shooting, he

22   testifies regarding the shooting, then the Defense can cross

23   him regarding the shooting.

24             It states that "Once a defendant," and I'm placing in

25   this instead of defendant, witness, "voluntarily testifies in

```
1    his or her own behalf she may be cross examined as to one
2    matters reasonably related to the subject matter of the direct
3    examination; and, two, matters affecting credibility."  The
4    United States argues that the possession of the marijuana in
5    the residence or as far as any pending state charges does not
6    affect the witness's, Willie Jackson's, credibility.
7              THE COURT:  Well let's see what cases the Defense
8    comes up with that say the mere fact that he is going to
9    testify about the shooting means that because he may invoke his
10   Fifth Amendment regarding the marijuana I may have to exclude
11   all of his testimony.  You give me some case law that supports
12   that conclusion.
13             MR. BUTLER:  Briefly in response?
14             THE COURT:  Yes.
15             MR. BUTLER:  The Government can't have it both ways.
16   They just want to put on evidence as to the shooting.  What
17   also affects his credibility as to the shootings that they
18   think he's going to invoke the Fifth for --
19             THE COURT:  Get me case law that supports that.
20   Since they want to exclude all of the evidence, let's let the
21   defendant move forward first.
22             MS. ADAMS:  Yes, Your Honor.
23             THE COURT:  Next witness.  And bring in the jury.
24             (Whereupon, the jury was escorted into the
25   courtroom.)
```

1    THE COURT:  Mr. Butler, when you get your case law

2   you should give it to Ms. Adams for her response.

3    MR. BUTLER:  I will.

4    THE COURT:  Who is Mr. Jackson's attorney?

5    MR. LUCK:  I am, Your Honor.

6    THE COURT:  Oh, very good.  Thank you.

7    Next witness.

8    MS. ADAMS:  The United States calls Mr. Daniel

9   Robinson.

10    D A N I E L    R O B I N S O N,

11    the witness herein, having first been duly sworn or

12   affirmed to tell the truth, was examined and testified as

13   follows:

14    DIRECT EXAMINATION

15    BY MS. ADAMS OF DANIEL ROBINSON:

16    THE COURT:  He's been sworn?

17    MS. ADAMS:  Yes, Your Honor.

18   Q.  Good morning, Mr. Robinson.

19   A.  Good morning.

20   Q.  Will you please state your full name for the record and

21   spell your first and last name?

22   A.  Daniel Robinson, Junior.  D-a-n-i-e-l, R-o-b-i-n-s-o-n.

23   Q.  Mr. Robinson, how are you employed?

24   A.  I'm the assistant credit analyst for Compass Bank.

25   Q.  Could you please make sure that you speak into the

1    microphone.

2            THE COURT:  Let me give a cautionary instruction to

3    the jury.  It's critical that you hear all of the testimony.

4    So if a witness speaks softly or you just didn't hear

5    something, raise your hand and say I didn't hear it.  Because

6    if you don't hear it, you can't resolve the case.

7            JUROR:  We're having a hard time hearing the

8    prosecutors.

9            THE COURT:  Exactly.  Even if you can't hear me, say

10   Judge, I can't hear you.  Because if you can't hear, then you

11   can't perform your duty.  We're family here now, we've been

12   here days, we're no longer necessary to be shy and you should

13   be over your nervousness by now.  So just raise your hand and

14   say Judge, I can't hear that witness, I can't hear that lawyer

15   and I can't hear you and we'll all speak louder.

16           The acoustics in this courtroom are not the greatest.

17   I understand sometimes when you can't hear.  So, for instance,

18   I'm going to ask this witness to speak up but, again, for any

19   witness don't forget to not be shy and raise your hand.

20           Go ahead.  And, prosecutors, speak up.

21           MS. ADAMS:  Yes, Your Honor.

22   Q.  Mr. Robinson, could you please restate how you are

23   employed.

24   A.  I'm an assistant credit analyst for Compass Bank.

25   Q.  And how long have you been employed with Compass Bank?

1   A.   Almost ten years now.

2   Q.   What positions have you held with Compass Bank?

3   A.   My first position was a paying and receiving teller, and

4   then I was promoted to a senior teller.  And then I got

5   transferred to the main office where I was admin coordinator,

6   which that position changed into the assistant credit analyst

7   position.

8   Q.   You said "admin coordinator".

9   A.   Yes, just like a file clerk or just basically

10  administrative duties.

11  Q.   So is "admin" short for administrative?

12  A.   Right.

13  Q.   Which Compass branch location do you work at?

14  A.   I work at the main office located in Executive Park.

15  Q.   What is the address of that branch?

16  A.   Thirty-four eighty Eastern Boulevard.

17  Q.   I'm going to show you what's previously been admitted as

18  Government's exhibit one.  Does this picture depict the front

19  of your bank?

20  A.   Yes.

21  Q.   Were you working on June twenty-second, two thousand and

22  seven?

23  A.   Yes, ma'am.

24  Q.   Do you remember anything unusual happening that day?

25  A.   Yes, ma'am.

1    Q.   What unusual event happened?

2    A.   On that day we were robbed.  On that day a robbery

3    occurred.

4    Q.   Now how many robberies have you been involved in during

5    your ten years of employment with Compass Bank?

6    A.   Personally, to my recollection just that one.

7    Q.   Just the one robbery that occurred on June twenty-second,

8    two thousand and seven?

9    A.   Yes, ma'am.

10   Q.   What time of the day did the robbery occur?

11   A.   It was early morning, around ten or so.  The teller line

12   didn't open until ten, so it was kind of immediately

13   following.

14   Q.   So a little bit after ten you're saying?

15   A.   Yes, ma'am.

16   Q.   You mentioned the teller line.  How many teller stations do

17   you have at that branch of Compass Bank?

18   A.   There's two teller stations.

19   Q.   And how many tellers are employed -- Well, let me put it

20   this way.  How many tellers normally work that station every

21   day?

22   A.   There's normally one operating window at the station.

23   Q.   And why is it that you generally have only one station

24   operating?

25   A.   That particular teller line is set up for our corporate

1   customers for any transactions that may occur during their

2   duties.  So the branch is not necessarily set up for a high

3   volume of traffic.

4   Q.  When you speak of "a high volume of traffic," are you

5   referring to every day non-business customers?

6   A.  Right.

7   Q.  So would you say that that branch doesn't receive a lot of

8   traffic?

9   A.  It doesn't because that particular branch doesn't -- they

10  do not service loans for consumers per se.  It's just strictly

11  our business customers.

12  Q.  I'm showing you what has previously been admitted as

13  Government's exhibit two.  What does that depict?

14  A.  That's the teller line.

15  Q.  Now where is your office in relation to the teller line?

16  A.  Facing the teller line, my office is to the right down the

17  corridor and then down the hall.

18  Q.  Can you see that corridor on this picture?

19  A.  Possibly right underneath the stairwell there's a dark

20  area.

21  Q.  Now you can touch this screen and actually mark on it.  You

22  may have to touch a little bit harder, but you can touch it and

23  actually mark on the picture.

24  A.  Well where the arrow is pointing, that's kind of the start

25  of the slant of the wall, the corner of the wall right there.

1    That starts the corridor where the elevators are located.

2    Q.  And your office is located behind that corridor?

3    A.  When you walk into the corridor, there's the elevators on

4    your right and then you'll enter the hallway, which you can go

5    left or right.  If you take that right, my office is down the

6    hall.

7    Q.  I want to go back to June twenty-second, two thousand and

8    seven.  Tell me what you saw regarding the robbery.

9    A.  The teller and I were just having casual conversation, and

10   I was facing the doorway because we have those windows right

11   there at the doorway.  And I noticed a car pull up, which is

12   not unusual.  However, the car pulled in front of the drive,

13   and that is where the suspect exited the car.  And because of

14   the location of where the car ended up, that was kind of

15   suspicious to me.

16   Q.  What do you mean how "the car ended up"?

17   A.  In front of our doors we have a circular drive.  In the

18   middle of the circular drive there's a bunch of shrubbery,

19   bushes, flowers.  Normally people who -- we do have customer

20   parking on the side right next to the building, and we have

21   additional parking on the right side of the building facing the

22   boulevard.

23        So normally customers have the designated customer

24   parking, which is right next to the building and within real

25   close walking distance.  Or they can park on the right side,

1    which is the first parking lot that you enter when you're on

2    the property.  When we have the customers who just want to come

3    in and make their transaction and get out, there's a sign that

4    says "Do not park on the circle," but some customers do park on

5    the circle to keep the car running, run in and run back out.

6    So I'm used to seeing customers who want to get in quickly just

7    stop right there on the circle.

8              On this particular day the car drove around and

9    parked in front of the circle in the drive facing the

10   boulevard.

11             MS. ADAMS:  Your Honor, may I approach?

12             THE COURT:  Yes.

13   Q.  Mr. Robinson, I'm going to hand you what has previously

14   been identified as Government's exhibit twenty-six for

15   identification, Government's exhibit twenty-seven for

16   identification, Government's exhibit thirty for identification,

17   and Government's exhibit thirty-one.  Will you please examine

18   those be exhibits.

19             (Whereupon, the witness complied.)

20   Q.  What are these exhibits?

21             MR. BUTLER:  Your Honor, simply because we couldn't

22   hear, could you please repeat what number of the exhibits you

23   just showed him?

24             MS. ADAMS:  Yes.  Twenty-seven.  Twenty-six.  Thirty,

25   and thirty-one.

1        MR. BUTLER:  Thank you.

2  Q.  What are Government's exhibits twenty-six and

3  twenty-seven?

4  A.  Twenty-six depicts the view from the behind the teller line

5  facing the front doors.

6  Q.  And does that fairly and accurately depict your view on

7  June twentieth the two thousand and seven?

8  A.  Fairly it does.

9  Q.  What is Government's exhibit twenty-seven?

10  A.  Twenty-seven is, if you come up the front doors, it looks

11  like the second teller station window.

12  Q.  Does that fairly and accurately depict the view of the

13  front door of that building on June twenty-second, two thousand

14  and seven?

15  A.  Fairly it does.

16  Q.  What is Government's exhibit thirty?

17  A.  Thirty depicts the view of the front building.

18  Q.  Does that fairly and accurately depict the view of the

19  front of Compass Bank on June twenty-second, two thousand and

20  seven?

21  A.  Yes, it does.

22  Q.  Finally, what is Government's exhibit thirty-one?

23  A.  Thirty-one is the view of the circle in the parking lot

24  from the front doors.

25  Q.  Does that fairly and accurately depict the bank's parking

1    lot on June twenty-second, two thousand and seven?

2    A.  Yes, it does.

3            MS. ADAMS:  Your Honor, we offer Government's

4    exhibits twenty-six, twenty-seven, thirty and thirty-one into

5    evidence.

6            MS. McKEE:  No objection, Your Honor.

7            THE COURT:  Admitted.

8    Q.  Now, Mr. Robinson, you previously testified that

9    Government's exhibit one is the front of the bank that you work

10   at, is that correct?

11   A.  Yes.

12   Q.  Are these doors here the doors to the bank?

13   A.  Yes, ma'am.

14   Q.  And are those doors glass doors?

15   A.  Yes, ma'am.

16   Q.  Now you just stated that you were inside at Ms. Gurley's

17   teller station?

18   A.  Yes.

19   Q.  And you were looking out the front doors?

20   A.  Yes.

21   Q.  I'm showing you what has been admitted as Government's

22   exhibit twenty-six.  Would that have been your view that day?

23   A.  Yes, ma'am.

24   Q.  So you're able to see some of the cars out in the parking

25   lot?

1    A.   Yes, ma'am.  And actually, that picture was taken from

2    behind the teller line, but I was in front.  So the view

3    actually from in front is a little bit better than that is, but

4    that is the view from that area.

5    Q.   How is the view in front of the teller station better?

6    A.   Well, I mean there's a little bit of more of a service area

7    that you can see, because like here you can see there's the

8    counter there, so if you have a short person who is standing

9    behind that counter they may not be able to see on that side of

10   the glass.  But I was in front, so I didn't have those

11   obstructed views.

12   Q.   I see what you're saying.

13            I'm now showing you Government's exhibit number

14   twenty-seven.  Does that depict more of a view that you would

15   have on the other side of the teller station?

16   A.   Yes, ma'am, it does.

17   Q.   How is that better?

18   A.   Because from that end, I could see more of the circle where

19   the shrubbery is located right in there.

20   Q.   Is that what you're referring to when you say "circle"?

21   A.   Yes, ma'am.

22   Q.   Could you go ahead and point to where you're showing to

23   when you referred to "circle".

24            (Whereupon, the witness complied.)

25   A.   This is the circular drive, and this is the shrubbery

1    inside the circle.

2    Q.  So from standing in front of Ms. Gurley's teller station,

3    you're able to see that full circle?

4    A.  Yes, ma'am.

5    Q.  And you usually see cars pull up and park there?

6    A.  Yes, ma'am.  Right in that area some cars will come in and

7    park, sometimes they will park right in front of the door.

8    Sometimes they will park on the side right there.  Sometimes

9    they will park right there.  And it's not -- It's common for

10   customers to do that, even though we do have parking spots

11   available for them.

12   Q.  I'm now showing you Government's exhibit number thirty.

13   You previously testified regarding parking on the side of the

14   bank?

15   A.  Yes.

16   Q.  Does this picture show you some of the parking that you

17   were referring to?

18   A.  Yes.  Right here where the truck is located there are signs

19   designated for visitors and customer parking.  And as you can

20   see, they're in close proximity of the front door, so that's

21   considered the convenience parking for our customers.

22   Q.  And in Government's exhibit thirty-one, is that an outside

23   shot of the circle you've been referring to?

24   A.  Yes, ma'am.

25   Q.  Now can you show on this picture how the car pulled up and

1    where it parked?

2    A.   The car pulled up and parked in front of the shrubbery

3    there.

4    Q.   Can you draw a line instead of just pointing?  I can clear

5    this out so you can actually do that.  Okay?

6    A.   Okay.

7    Q.   So you're saying that the car went around the circle and

8    then parked on the side?

9    A.   Yes, in the drive facing the boulevard.

10   Q.   Now you referred to the boulevard.  What is the

11   boulevard?

12   A.   The boulevard, the street in front.  Not the side street

13   that leads into Executive Park, but the street that's in

14   front.

15   Q.   The actual Eastern Boulevard?

16   A.   Yes, ma'am.

17   Q.   And that's where the car parked?

18   A.   Yes, ma'am.

19   Q.   And then after the car parked what did you see?

20   A.   The suspect got out of the car.

21   Q.   Do you recall what the suspect looked like?

22   A.   African-American male, kind of tall, slim.

23   Q.   Can you describe his clothing?

24   A.   One distinctive factor.  He had on a lot of clothing for

25   the weather, but he had on a long sleeve shirt with another

1    short sleeve shirt on top.  Dark jeans and an apron, kind of

2    like, you know, a restaurant apron.  And a baseball cap.

3    Q.  Do you recall what color the apron was?

4    A.  The apron was a black apron.

5    Q.  And you stated that he was a black male, but did you get

6    any general idea about his age?

7    A.  Just by characteristics.  I would want to say mid

8    twenties.

9    Q.  And what do you mean by "characteristics"?

10   A.  Just by, you know, the way he was walking.  And then, of

11   course, the way he was dressed.  I didn't notice that it was --

12   I didn't notice exactly his pants per se, but they were kind of

13   baggy, which kind of fit the characteristics of a young male.

14   Q.  Now you just said you didn't notice if his pants were

15   sagging.  Just for some individuals on the jury, could you

16   explain that phrase, please?

17   A.  When you wear your pants below the buttocks and it creates

18   a sag in the middle.

19   Q.  And in defining the term "sag" or the phrase "sag" as far

20   as apparel.  What type of jeans are normally warn?  And when I

21   say what "type of jeans," I mean fit of jeans.

22   A.  They're usually oversized.

23   Q.  "Oversized" meaning baggy?

24   A.  Yes, baggy.  Sorry.

25   Q.  So you're saying that the robbery suspect had on baggier

1    type of jeans?

2    A.  They didn't seem way oversize baggy, but they weren't

3    fitted.

4    Q.  So that's part of the reason why you thought it was a young

5    black male?

6    A.  Yes.

7    Q.  Now you also testified that a black male got out of the

8    vehicle.

9    A.  Right.

10   Q.  Can you describe that vehicle?

11   A.  The vehicle was a black Chrysler Seabring.

12   Q.  Do you know what type of make or model?

13   A.  Between the years of maybe ninety-six, ninety-seven until

14   about ninety-nine, two thousand.

15   Q.  Now you have to forgive me because I honestly don't know

16   anything about cars, so if I say something wrong, please just

17   disregard it and correct me.

18        How do you know that it was a ninety-nine or

19   ninety-five type of model Seabring?

20   A.  Well, I mean I know a lot about cars, and I saw some just

21   -- well, just by looking as it I knew it was a Seabring anyway.

22   But all cars have certain characteristics that are general to

23   their make, and that particular car had distinctive lights in

24   the back.  The taillights are distinctive.  But aside from

25   that, I just know about cars.

```
 1   Q.  So how familiar are you with cars?  Are you just a car
 2   fanatic?
 3   A.  Yes, I must say I am.
 4   Q.  Are you able to just easily identify cars based upon your
 5   experience with them?
 6   A.  Yes, ma'am.
 7   Q.  Do you work on cars?
 8   A.  No, ma'am, I do not.
 9   Q.  So you just have an interest in cars?
10   A.  Yes, ma'am.
11   Q.  And how do you feed that interest?
12   A.  I mean, I'm on Auto Trader every other day.
13            MS. McKEE:  Relevance?
14            THE COURT:  How is this relevant?
15            MS. ADAMS:  Your Honor, he stated that he was able to
16   state that this car was unique, and that would only be based
17   upon his knowledge of cars.  And so I asked him how he fed that
18   interest, which would be relevant as to how he developed his
19   knowledge.
20            THE COURT:  Overruled.
21   Q.  You may answer the question.
22   A.  I visit Auto Trader quite often, the Internet site.
23   Q.  I'm sorry, which website?
24   A.  Auto Trader dot com, which is an Internet site for, you
25   know, cars.  And I visit that quite often, so I kind of have a
```

```
 1    feel of different models, different styles, different makes.
 2              MS. ADAMS:  Your Honor, may I approach?
 3              THE COURT:  Yes.
 4    Q.  Mr. Robinson, I'm showing you what has been marked for
 5    identification purposes as Government's exhibit twenty-eight
 6    and twenty-nine.  Will you please look at those exhibits.  What
 7    are these exhibits?
 8    A.  These are pictures of a Chrysler Seabring, kind of around
 9    the make and model that I stated earlier, between ninety-sixish
10    until about ninety-nine.
11    Q.  Is that a fair and accurate depiction of the vehicle you
12    saw on June twenty-second, two thousand and seven?
13    A.  Yes, ma'am.
14              MS. ADAMS:  Your Honor, I offer Government's exhibits
15    Twenty-eight and twenty-nine into evidence.
16              THE COURT:  Admitted.
17              MS. ADAMS:  Thank you.
18    Q.  I'm showing you what has been marked as Government's
19    exhibit Twenty-eight.  Is the picture depicted in this photo,
20    does it resemble at all the vehicle that you saw right before
21    the bank robbery?
22    A.  Yes, ma'am.
23    Q.  How so?
24    A.  The distinctive characteristics on the taillights.
25    Especially with the older models.
```

```
1              Can you erase those arrows for me, please?
2    Q.   Certainly.
3    A.   The question of the taillight on the top is kind of
4    yellowish.  And then on the bottom portion is red, and those
5    are kind of like distinctive characteristics to this particular
6    car between the years of ninety-six until about ninety-nine.
7              So that's one characteristic that caught my attention
8    when I saw the car and was able to identify what kind of car it
9    was.
10   Q.   Now this car looks like it only has two doors.
11   A.   Yes, ma'am.
12   Q.   Is that how that type of vehicle is made?
13   A.   Well, the Seabring between those two periods were only two
14   door coups.  Later on, like from two thousand, two thousand and
15   one, maybe that's when they started the four door coups.
16   Q.   I'm now showing you what has been admitted as Government's
17   exhibit twenty-nine.  Would that just be the opposite side of
18   the same vehicle?
19   A.   Yes, ma'am.
20   Q.   Now does this picture more clearly depict the unique
21   characteristic you were referring to?
22   A.   Yes, ma'am.
23   Q.   Could you point out that characteristic again?
24   A.   That's the yellow borings of the taillights, and then of
25   course underneath you have the red portion.
```

1    Q.  After you saw that vehicle park, you said that you saw the

2    bank robbery suspect.  What did you see him do?

3    A.  He simply exited the vehicle and walked to the front

4    door.

5    Q.  Mr. Robinson, what side of the vehicle did the bank robbery

6    suspect depart?

7    A.  He exited from the passenger side of the vehicle.

8    Q.  Would that be the side of the vehicle that's depicted in

9    Government's exhibit twenty-nine?

10   A.  Yes, ma'am, right here.

11   Q.  I'm going back to Government's exhibit thirty-one.  You

12   previously indicated where the car parked in this exhibit.

13   A.  Yes.

14   Q.  Could you just mark that, please, again.

15   A.  In the drive, right there.

16   Q.  Okay.  And you testified that you watched the suspect walk

17   up to the bank.

18   A.  Mm-hmm.

19   Q.  Is that correct?

20   A.  Yes.

21   Q.  So you saw him walk up from where the car was parked all

22   the way into the bank?

23   A.  Yes, ma'am.

24   Q.  You watched him the whole time?

25   A.  Yes, ma'am.

1    Q.   Was there anything obstructing your view?

2    A.   No, ma'am.

3    Q.   I'm going to show you what has already been admitted as

4    Government's exhibit four.  Mr. Robinson what do you see on the

5    screen right now?

6    A.   That's the view of the lobby from the teller window.

7    Q.   Okay.  Mr. Robinson, do you see yourself anywhere in this

8    photo?

9    A.   Yes, ma'am.

10   Q.   Are these images of Government's exhibit number four?

11   A.   Yes.

12   Q.   Where are you standing again?

13   A.   I'm standing at the teller window.

14   Q.   Mr. Robinson, what are you doing in that image of

15   Government's exhibit four?

16   A.   I'm looking out of the window.

17   Q.   What are you doing at the teller station anyway?

18   A.   I was making a payment, and at the same time just having

19   conversation with Ms. Gurley.

20   Q.   Did your payment take a long to complete?

21   A.   No, ma'am, it did not.

22   Q.   How long were you at the teller station?  Just

23   approximately.  If you can recall.

24   A.   Maybe four or five minutes.  I don't remember exactly, but

25   I mean we were just talking so --

1  Q.  So you were just engaging in conversation with Ms. Gurley

2  after the transaction was completed?

3  A.  Yes, ma'am.

4  Q.  Mr. Robinson, what are you doing in this image?

5  A.  Still looking out of the window.

6  Q.  Are you leaning up against the teller station?

7  A.  Yes, ma'am.

8  Q.  So you were just kind of more relaxed looking out the

9  window?

10  A.  Yes, ma'am.

11          MR. BUTLER:  Your Honor?

12          THE COURT:  Yes.

13          MR. BUTLER:  At this point I may have a motion.  May

14  I ask for a very brief recess of the proceedings?  I need to

15  take a look at something that was provided by the Government to

16  me.

17          THE COURT:  Why don't I excuse the jury.

18          I'll have to excuse the jury.  It's now ten of ten.

19  We've only been going fifty minutes.  Why don't we go ahead and

20  make it a fifteen minute recess.

21          Don't forget to turn your pads over in your chairs so

22  that we can't even see if you've written nothing.  It's none of

23  our business.

24          (Whereupon, the petit jury was escorted out of the

25  courtroom, and the following colloquy ensued):

1          THE COURT:  What is your concern, Mr. Butler?

2          MR. BUTLER:  Your Honor, the Government did provide

3     me with a videotape from the bank.  And I'm sure it was the

4     complete bank robbery -- well my hope is that it was the

5     complete bank robbery, that is all the way back to where we're

6     looking.  Maybe it was me, but I only looked at the stuff where

7     Mr. Smith came in.  But I'm not sure that our video has all of

8     that.  I just wanted to make sure if it doesn't, I'm going to

9     make a request of the Court.

10         THE COURT:  You want to just check to make sure your

11    video has everything that the Government's video has?

12         MR. BUTLER:  That they're playing to the jury.

13         THE COURT:  And if it doesn't, you want to make a

14    request of the Court?

15         MR. BUTLER:  Yes.

16         THE COURT:  How long will this take?

17         MR. BUTLER:  I don't know exactly.  Maybe two

18    minutes.

19         THE COURT:  Very good.  Well, I told the jury fifteen

20    minutes.

21         (Whereupon a recess was taken.)

22         THE COURT:  Let's proceed, go ahead.

23         MS. ADAMS:  Thank you, Your Honor.

24    Q.  Mr. Robinson, we were looking at Government's exhibit

25    number four.  And this is where we stopped.  I see that you're

1    looking at Ms. Gurley.

2    A.   Yes.

3    Q.   Who is the person that's coming in behind you?

4    A.   Looks like the suspect some coming in behind me.

5    Q.   When you described the suspect's clothing, was that the

6    person you were referring to?

7    A.   Yes.

8    Q.   Okay.  Now Mr. Robinson what are you doing at this time?

9    A.   At this time it looks like I'm stepping away from the

10   teller line to walk back towards my office.

11   Q.   Who is behind you at this time?

12   A.   That's the suspect.

13   Q.   Did you ever turn around and see him?

14   A.   No, I did not.

15   Q.   So you didn't have a face-to-face interaction with him like

16   Ms. Gurley did.

17   A.   No, ma'am, I did not.

18   Q.   Now when you also described him before and you didn't

19   particularly describe his face, do you recall the

20   characteristics of his face?  My question is do you recall the

21   characteristics of his face?

22   A.   Yeah.  I just remember the ball cap being pulled down so

23   you couldn't really see the eyes.  I also recall that there

24   wasn't much left underneath the ball cap.  He had a small head,

25   so to speak.

1    Q.  Do you recall the suspect wearing sunglasses?

2    A.  I don't remember any sunglasses.

3    Q.  Now after you walked away, what happened?

4    A.  When I walked away I went down the hall to my office.  And

5    after being there for a while, I guess a few seconds, I heard

6    some commotion.

7    Q.  You say "commotion," but what do you mean when you say

8    "commotion"?

9    A.  Well, you know, because of the acoustics in the building,

10   sometimes the sound travels down the hall and I can kind of

11   hear conversations if people are speaking kind of loudly in the

12   lobby area.  I just kind of heard some commotion.  I believe I

13   heard Ms. Gurley getting kind of loud.

14   Q.  So you heard loud talking?

15   A.  Loud talking.

16   Q.  Were you able to hear specific words?

17   A.  Not necessarily specific words, but just loud talking.

18   Q.  So what did you do after you heard the loud talking?

19   A.  When I heard the loud talking I left my desk and went down

20   to the corner to kind of peek out a little bit.

21   Q.  Now when you say "corner," I just want to make it clear to

22   the jury what you're referring to.

23        MS. ADAMS:  Mr. Green, could you please switch back

24   to the Elmo.

25   Q.  When you say "corner," are you referring to the corner

1    that's depicted in Government's exhibit two?

2    A.  No, ma'am, not that corner.

3    Q.  Okay.  So which corner?

4    A.  That corner is directly as you enter into the kind of foyer

5    into the next hallway.  When you walk around that corner there

6    is an open area where we have the elevators.  And then you walk

7    into the hallway where there is two corners going on your left

8    or going to your right, and I was standing on the right

9    corner.

10   Q.  So you weren't at the corner that's depicted in

11   Government's exhibit two that's by the bank teller, you were

12   further away?

13   A.  Yes, ma'am.  Out of the sight of the suspect.

14   Q.  So after you heard the loud talking and you walked to the

15   corner, what happened?

16   A.  The noise that I heard was kind of suspicious.

17   Q.  How was it suspicious?

18   A.  Just -- I just kind of heard her getting a little bit

19   louder with the customer, which at the time I did feel like it

20   was a customer.  And I may have heard like some banging or

21   something.  I don't really remember, but whatever was going on

22   it kind of got me to the point where I felt like a robbery was

23   taking place.

24   Q.  So after you felt that, what did you do?

25   A.  I went back to my desk and I called Miss Gurley's direct

1    supervisor at the time to let her know that I believe Ms.

2    Gurley was being robbed.

3    Q.  Who was Ms. Gurley's direct supervisor at that particular

4    time?

5    A.  Ms. Patty Caulkin.

6    Q.  And after you spoke to her and advised her of a possible

7    robbery, what did you do?

8    A.  I hung the phone up and I walked back to the area where the

9    robbery was taking place.

10   Q.  What did you see when you reached that area?

11   A.  At that time as I kind of looked around the corner, I saw

12   the suspect running out of the door.

13   Q.  You saw the actual suspect run out of the door?

14   A.  Yes.

15   Q.  Are you talking about the bank door?

16   A.  Yes, ma'am, the front doors.

17   Q.  Did you see which direction the suspect ran?

18   A.  He ran -- If you're, you know, looking out of the doors, he

19   ran to the left.

20   Q.  Could you please show us on Government's exhibit

21   twenty-seven which direction he ran from your view.

22   A.  From my view I saw him running this way to the door, and

23   then when he got outside of the doors he ran that way.

24   Q.  And you saw all of that through the clear doors?

25   A.  Yes, ma'am.

1  Q.  I'm now showing you what's been admitted as Government's

2  exhibit number one.  Could you explain to the members of the

3  jury where, going out of that left door, what direction that

4  would be from the outside of the building?

5  A.  Yes.  It would have been in that direction.

6  Q.  So would that direction be the direction -- Let me correct

7  myself.

8       Would that direction be the opposite direction of

9  where the car was parked that you saw earlier.

10 A.  Yes, ma'am, that is the opposite direction of where the car

11 was parked.  At that time the car was no longer there.

12 Q.  What is the side of the Compass Bank building?

13 A.  On the other side there used to be a furniture store, I

14 want to say.  Maybe Bishop Parker, I don't recall exactly, but

15 it was a furniture store.  And we did not share a parking lot

16 with this building, so there is only one way in and one way out

17 of our parking lot.

18 Q.  I'm now showing you Government's exhibit number thirty, and

19 the line showing the members of the jury the direction into

20 which the suspect ran is still on the screen.  So what is

21 behind -- You said this parking lot is solely Compass Bank's

22 parking lot?

23 A.  Yes, ma'am.

24 Q.  You don't share this parking lot right here with any other

25 business?

1    A.   No, ma'am.

2    Q.   So what's behind the bank back here?  If you know.

3    A.   Right there is the building that is next door.  They have a

4    parking lot as well.  Directly behind the building there's

5    another business a few feet away, but immediately behind the

6    building we have like a little courtyard and grassy area.

7    Q.   What's the business that's a few feet away?

8    A.   I think that it's an insurance company.  I'm not sure.

9    Q.   Okay.  After the suspect left, what did you do?

10   A.   When I noticed the suspect run out of the building and run

11   to the left, that's when I ran out and I saw Miss Patty Corbin

12   running out as well.  We both went to the door.

13   Q.   You said "ran out," you ran out from where?

14   A.   I ran out from my area, my office through the little

15   corridor where the elevator is, and directly in front of the

16   teller line.  Facing the teller line to the left is where Ms.

17   Corbin's office is, and that's where she ran out of.

18   Q.   Could you please show the members of the jury where Ms.

19   Corbin's office is?

20   A.   You can't really see exactly, but her office would be,

21   there are some double doors right there on the side and that's

22   where her office is.

23   Q.   Were the police called to the bank that day?

24   A.   Yes, ma'am.

25   Q.   And were you present when the police arrived?

```
1    A.   Yes, ma'am.

2    Q.   Did you talk to the police?

3    A.   Yes, ma'am.

4    Q.   Did you tell them the details of what you saw?

5    A.   Yes, ma'am.

6    Q.   Do you recall providing a description of the suspect to the

7    police?

8    A.   Yes, ma'am.

9    Q.   Do you recall providing a description of the vehicle to the

10   police?

11   A.   Yes, ma'am.

12   Q.   Now did you later -- I'll take this off the screen, if I

13   can.  Did you later speak to the police and look at six

14   photos?

15   A.   Yes, ma'am.

16   Q.   Do you remember that incident?

17   A.   Yes, ma'am.

18   Q.   And were you able to -- Well, let me ask you this.  How

19   many times did that occur?

20   A.   Twice.

21   Q.   How many times did you identify someone to be the bank

22   robber?

23   A.   The first time I wasn't as sure as the second time.

24   Q.   What do you mean you weren't as sure?

25   A.   Because I was trying to go off of what I could basically
```

```
 1   see and recall.  Most of the characteristics that I was
 2   comfortable with were full view, and, of course, the lineups
 3   were just kind of like chest area up.  So I was trying to
 4   picture what I saw, which was someone with a ball cap down to
 5   their eye level.  And I just wasn't sure during the first
 6   lineup.  And even with the second lineup I picked the best
 7   person out of the lineup that fit the characteristics the
 8   best.
 9   Q.  Are you saying that you picked the best picture out of the
10   lineup according to your memory of the robber?
11   A.  Yes, ma'am.
12   Q.  And where did this occur?
13   A.  The second one occurred at the bank.
14   Q.  Who was there when this happened?
15   A.  The second one?
16   Q.  Mm-hmm.
17   A.  The detective.  I can't remember his last name but I think
18   his first name is David.
19   Q.  Okay.  So would I be wrong if I were to say "David Hill,"
20   does that ring a bell?
21   A.  Yes, ma'am.
22   Q.  Now where, exactly, in the bank did this take place?
23   A.  I was called to Ms. Corbin's office and we went to a
24   secluded area off to the side from the her office and he showed
25   me the pictures.
```

1    Q.  Were you in a separate room?

2    A.  Yeah.  It's like a little copy room.  But it was a separate

3    room.  I mean no one was there.

4    Q.  No one besides whom?

5    A.  Me and the officer.

6    Q.  So Ms. Gurley wasn't there?

7    A.  No, she wasn't present when I did mine.

8    Q.  Do you remember when the second -- or this incident we're

9    discussing, the incident at the bank, do you remember when this

10   occurred?

11   A.  I don't remember exactly.

12   Q.  Do you remember that it occurred in July?  You just don't

13   remember, exactly?

14   A.  Yeah, I don't remember exactly.

15          MS. ADAMS:  Your Honor, may I approach?

16          THE COURT:  Yes.

17   Q.  I'm showing you what has been marked for identification

18   purposes as Government's exhibit number thirty-two.  Do you

19   recognize that exhibit?

20   A.  Yes, ma'am.

21   Q.  How are you able to recognize it?

22   A.  Merely by my handwriting and signatures.

23   Q.  When you were at the bank that day and you said that

24   Detective Hill was with you, did you circle a specific photo?

25   A.  Yes, ma'am.

1   Q.   And circling that photo indicated what?

2   A.   That that was the -- that's the best description of the

3   suspect out of all of these lineups.

4   Q.   Did you sign that photo sheet?

5   A.   Yes, ma'am, I did.

6   Q.   And did you date that photo sheet?

7   A.   Yes, ma'am.

8   Q.   Does this, Government's exhibit thirty-two, fairly and

9   accurately depict that photo sheet?

10  A.   Yes, ma'am.

11  Q.   Is that your signature below?

12  A.   Yes, ma'am, it is.

13           MS. ADAMS:   Your Honor, I offer Government's exhibit

14  thirty-two in evidence.

15           THE COURT:   Admitted.

16  Q.   Now, Mr. Robinson, I'm now showing you Government's exhibit

17  number thirty-two.  This right here, is this your signature?

18  A.   Yes, ma'am, it is.

19  Q.   And is this the date that you signed this sheet?

20  A.   Yes, ma'am.

21  Q.   Is this the photo that you circled?

22  A.   Yes, ma'am, it is.

23  Q.   And there are initials next to this photo.  Whose initials

24  are these?

25  A.   Those are mine.

1   Q.   Now why did you select this photo again?

2   A.   Because it best depicted the description of my recollection

3   of the suspect on that day.

4   Q.   Did you tell Detective Hill how certain you were about that

5   photo?

6   A.   I do recall saying that I wasn't maybe one hundred percent

7   sure, but it was a close percentage that it was.

8   Q.   If I said seventy percent, would you say --

9            MR. BUTLER:  Objection.  Leading.

10           THE COURT:  Sustained.

11  Q.   Could you give me an idea as to how much lower than a

12  hundred percent, if you can recall, as to what you told

13  Detective Hill?

14  A.   Based on the other pictures besides that one, I would say

15  it would be closer to eighty, seventy range.

16  Q.   That's based upon your memory?

17  A.   Yes, ma'am.

18           MS. ADAMS:  One second, Your Honor.

19           THE COURT:  Yes.

20           (Whereupon, Ms. Adams conferred with Ms. Hardwick off

21  the record and out of the hearing of the other courtroom

22  participants.)

23           MS. ADAMS:  Your Honor, I tender the witness for

24  cross.

25           THE COURT:  Cross?

```
 1              MS. ADAMS:  Your Honor, may we have a side bar,
 2    please?
 3              THE COURT:  I don't want to excuse the jury again.
 4              MS. ADAMS:  Or I could just simply object.
 5              THE COURT:  What are you objecting to?
 6              MS. ADAMS:  I'm objecting to the fact that Mr. Butler
 7    raised an objection on direct to my question but --
 8              THE COURT:  Yes.  One lawyer per side per witness.
 9    You can't have several lawyers ganging up on the side.
10              MR. BUTLER:  Understood.
11              THE COURT:  So you're absolutely right, Ms. Adams.
12              MS. ADAMS:  Thank you, Your Honor.
13              THE COURT:  You didn't need a side bar for that.
14                            CROSS EXAMINATION
15                  BY MR. BUTLER OF DANIEL ROBINSON:
16    Q.  Mr. Robinson, you may have answered this question, but how
17    long have you worked at the Compass Bank?
18    A.  Almost ten years now.
19    Q.  Okay.  And on the date of this incident, June
20    twenty-second, how long had you been at the bank prior to the
21    individual entering into the bank?
22    A.  As in how long that day, or how long --
23    Q.  On that day.
24    A.  I arrived at work around eight o'clock that morning, sir,
25    so I would guess about two hours.
```

1   Q.   And prior to this incident taking place -- Well, let me
2   rephrase that.
3          You had been at the teller desk with Ms. Gurber --
4   now Ms. Gurley, -- for how long?
5   A.   I want to say maybe four minutes.  Three minutes.  I mean,
6   longer than it would take to do the transaction, but not very
7   long.
8   Q.   The reason being as you were having a conversation with
9   her, the bank wasn't very busy.
10  A.   Right.
11  Q.   I mean, had customers started to know if you would have
12  wrapped up what you were doing and moved on?
13  A.   Right.
14  Q.   So the reason, again, that you were at Ms. Gurley's teller
15  station was to do a transaction but to converse with a fellow
16  coworker.
17  A.   Yes, sir.
18  Q.   And your attention during that conversation, as during most
19  conversations, is with the person that you're speaking to.
20  A.   Right.
21  Q.   Ms. Gurley, correct?
22  A.   Correct.
23  Q.   Now you did have occasion, you indicated, and we saw it on
24  the video, to turn around and look out the windows of the bank,
25  correct?

```
1    A.   Yes.
2    Q.   You indicated that you saw a person walking towards the
3    bank.
4    A.   Mm-hmm.
5    Q.   Now from Ms. Gurley's teller desk to the front door, that's
6    approximately fifty to a hundred feet, correct?
7    A.   From her desk to the door?
8    Q.   From where you were to the front door of the bank, that's
9    about fifty to a hundred feet, correct?
10   A.   Maybe, yeah.
11   Q.   From the door to -- Let me back up.
12          The car the person got out of, was it parked -- it
13   was parked in the circle by the bank, correct?
14   A.   In front of the circle, correct.
15   Q.   That circle is about another twenty feet from the door,
16   maybe twenty to thirty feet?
17   A.   Maybe.
18   Q.   Thirty feet?
19   A.   Yeah, maybe.
20   Q.   Okay.  So from your location to where you first saw the
21   person get out of the vehicle, that was approximately, and
22   correct me if I'm wrong, my math is bad, about eighty feet,
23   eighty to a hundred feet?
24   A.   Maybe, yes.
25   Q.   You then saw the individual come towards the front door
```

1    which was fifty feet away, correct?

2    A.   Yes.

3    Q.   Fifty to a hundred feet away.

4    A.   Yes.

5    Q.   And started entering the bank?

6    A.   Right.

7    Q.   And you then, at least according to the video, turned and

8    continued your conversation, probably wrapping up your

9    conversation because it looked like a customer was coming into

10   the bank.

11   A.   Right.

12   Q.   I believe your testimony was, then, that after you

13   completed your business you then walked off and went to your

14   office, correct?

15   A.   Right.

16   Q.   While the person was approximately what I'll say thirty to

17   fifty feet from Ms. Gurley, you had stopped looking at the

18   person, would then have completed your business and going off

19   to your office, correct?

20   A.   Mm-hmm.

21   Q.   For instance, like right now I am approximately I don't

22   know, two feet from the prosecutor here.  You were never this

23   close to the individual who walked into the bank.  Let me

24   rephrase that.  You never had a face-to-face viewing of the

25   individual from this distance?

1    A.  That's correct.

2    Q.  Okay.  The most direct viewing you had of the individual

3    was from a distance of approximately what I'll say is

4    thirty-five to fifty feet.  Is that correct?

5    A.  That's about correct.

6    Q.  And it's also your testimony that the individual had a hat

7    pulled down, a brim hat pulled down close to what I'll call eye

8    line right here, correct?

9    A.  Right.

10   Q.  And you could not see directly into his eyes.

11   A.  No.

12   Q.  Okay.  So what you had was -- The closest viewing you had

13   of this individual is from thirty to fifty feet with a hat

14   pulled down to his eye line.  You couldn't see his eyes.  You

15   could possibly see underneath, what I will call his lower face.

16   A.  Mm-hmm.

17   Q.  And that lower face, do you recall what those

18   characteristics you saw were?

19   A.  Kind of slim chin.  And, again, there was in small

20   proximity from I guess you would say around the nose-eye level

21   to the chin.  So it almost looked after the hat there wasn't

22   much left.

23   Q.  So, I mean that's I guess my point.  After the hat there

24   wasn't much left.  What you could really see was his body.

25   A.  Right.

1    Q.   But you couldn't see much of his face because half of the

2    hat there wasn't much left.

3    A.   Right.

4    Q.   You made a comment earlier that I find interesting because

5    it drives me nuts.  You said that he was dressed kind of like a

6    younger person.  That is, the baggy jeans and the loose fitting

7    clothes.

8    A.   Right.

9    Q.   Pants were kind of hung lowish, like maybe not cinched up

10   to his waist, but dangling down low, correct?

11   A.   Yes.

12   Q.   And he had baggy type clothes on.

13   A.   Yeah, the shirts were open size.

14   Q.   That's what you could see clearly.  You couldn't see the

15   face clearly, but you could definitely see what he was kind of

16   wearing?

17   A.   Yes.

18   Q.   When you came running out of the -- your office with I

19   believe another bank employee, you could only see him from

20   behind, the person from behind.

21   A.   Right.

22   Q.   Okay.  So you had no view of the face or anything like that

23   from that perspective, that distance.

24   A.   Right.

25   Q.   Okay.  Now you've provided -- You were interviewed by law

1    enforcement shortly after this event, correct?

2    A.   Yes.

3    Q.   That day.  Where were you interviewed?

4    A.   We were all placed in separate offices, in Ms. Corbin's

5    area, and I was interviewed.  Actually, I was interviewed in

6    her office.

7    Q.   Had you had an opportunity to review the statement you

8    supplied to law enforcement that day?

9    A.   I'm not necessarily sure.

10   Q.   I mean in preparation for today, did the Prosecution show

11   you the statement that you had made to law enforcement?

12   A.   I don't remember if I viewed it exactly.  It was available,

13   but I don't think I viewed it.

14   Q.   That's normal.

15          MR. BUTLER:  Your Honor, may I approach?

16          THE COURT:  Yes.

17   Q.   Just take a moment to take a look at that and review pages,

18   what I would ask would be one, two -- One moment.

19          MR. BUTLER:  May I approach?  I gave him the wrong

20   one.

21          THE COURT:  Yes.

22   Q.   Would you take a look at pages one, two, three -- one, two

23   and three.

24   A.   Yes.

25   Q.   Does that look familiar to you?

1    A.   Yes.

2    Q.   Okay.  What I'm going to do is, I'm going to first focus

3    your attention to page two of the statement.  Again, does this

4    accurately describe what you relayed to law enforcement at that

5    time?

6    A.   Yes.

7    Q.   I'm going to just kind of hit certain the points of it.

8    You told law enforcement that he was about five eleven, a real

9    slender dude.

10   A.   Yes.

11   Q.   He looked skinny, had all those clothes on, had long sleeve

12   shirt, black short sleeve shirt and a black apron.  What you're

13   describing here is not his face, it's his build.

14   A.   Right.

15   Q.   Because as you've testified to, what you could see best was

16   not his face, but what he was wearing.  I think you used how he

17   walked, his walk, his demeanor physically, but you couldn't see

18   his face.

19   A.   Yes.

20   Q.   Now on the next page you do attempt to describe some of his

21   facial characteristics, but you state that, "I can't remember

22   exactly.  He may have had a mustache, but I don't remember

23   because I didn't stay there."

24        You then go into, "He could have had kind of a small

25   space, it could have been kind of round."  That's essentially

1    all you say regarding what his facial characteristics were.  Is

2    that correct?

3    A.  Yeah, that's correct.

4    Q.  You then go into the fact that he had a white hat on.

5    Again, describing honestly to the officers what you could see.

6    But you don't go into any details of, you know, his nose was

7    small, it was this, he was Caucasian, he was black.  He was

8    black, though, wasn't he?

9    A.  Yes.

10   Q.  All right.  And his skin tone, that he was dark skinned.

11   That he had any scars or tattoos.  Because those are things

12   that you could not see.

13   A.  Mm-hmm.

14   Q.  Following the bank robbery, did you converse with your

15   colleagues, I guess it would be normal, regarding what had

16   taken place?  Your colleagues at the bank, did you talk with

17   Ms. Nichols now Ms. Gurley, regarding what had taken place, how

18   she was, how she felt?

19   A.  Yeah, afterwards.

20   Q.  Yeah.  Did you guys compare stories, for lack of a better

21   word?  Yeah, I saw him come in, and did you guys talk to each

22   other about, you know, what took place?

23   A.  We talked about it some.

24   Q.  The lineup, when -- You indicated that you were shown two

25   lineups, correct?

1   A.   Yes.

2   Q.   The first lineup you were shown approximately four days

3   after the event, on or about three or four days, June

4   twenty-fifth, correct?

5   A.   Mm-hmm.

6   Q.   Where did you go to view that lineup?

7   A.   I went to the police station.

8   Q.   You went to the police station.  What were the

9   circumstances of that?  Who was in the room?  Where did you

10  go?

11  A.   During that particular lineup it was just myself and

12  another officer.  He showed me the photos.

13  Q.   Were you shown -- How many photos were you shown?

14  A.   I was shown six at that time.

15  Q.   That was all?

16  A.   Mm-hmm.

17  Q.   The next lineup that you were shown, you were shown on July

18  second, correct?

19  A.   Yes.

20  Q.   Now that was approximately two weeks after this event.

21  A.   Mm-hmm.

22          MR. BUTLER:  Your Honor, could I have one moment?

23          THE COURT:  Yes.

24          (Whereupon, Mr. Butler conferred with Ms. McKee off

25  the record and out of the hearing of the other courtroom

1  participants.)

2  Q.  When the individual ran from the bank, you had an

3  opportunity to view him from behind, correct?

4  A.  Mm-hmm.

5  Q.  How close were you -- You ran to the front of the building,

6  and I'm assuming you went around the corner.  Using the

7  Government's exhibit, you went to the front of the bank, ran

8  around to this corner to try to get a view of him, correct?

9  A.  Yes, I did.

10  Q.  And the person had taken off down where I'm pointing at

11  this tree, correct?

12  A.  Yes.

13  Q.  In that direction?

14  A.  In that direction, right.

15  Q.  And he wasn't casually strolling, he was hussling himself

16  out of there.

17  A.  Yeah, he was.

18  Q.  So at that point he's maybe two, three hundred yards maybe,

19  away from you guys.

20  A.  He was actually -- By that point he was out of sight by

21  that point.

22  Q.  Oh, okay.  So you never saw him -- Well let's put it this

23  way:  You heard a commotion, you went to the front, you went

24  around the corner but you never saw him?

25  A.  I saw him exit the door and run to the left from the

1    inside.

2    Q.   Oh, I see.

3    A.   And when we got to the door he was out of sight, so there

4    was no other way but to the left.  I mean we didn't see him out

5    in the parking lot, so it had to be that way.

6    Q.   I understand.  So he had hightailed it out of there by the

7    time you had made it to the corner of the building.

8    A.   Right.

9    Q.   You testified that the person had a baseball cap on and it

10   was pulled down, correct?

11   A.   Correct.

12   Q.   Were you aware -- Well, let's put it this way:  Have you

13   ever seen an individual curl his hair up underneath a baseball

14   cap?  By that I mean, a person with longer hair, they can curl

15   their hair, bunch it up and then put a hat on.  Did you ever

16   see that take place?

17   A.   Yeah, I think so.

18   Q.   From your vantage point, you couldn't tell whether the hair

19   was or was not curled up and put up underneath the hat.

20   A.   No, I couldn't tell that.

21   Q.   Were you ever asked to provide a composite photograph to

22   law enforcement?

23   A.   No.

24   Q.   The only time that you were interviewed regarding this bank

25   robbery, you were interviewed -- excuse me -- interviewed

1    specifically regarding what you saw at the bank robbery was on

2    the day of the robbery.  You were shown two lineups, but you

3    only were interviewed once.

4    A.   That's correct.

5    Q.   And as you testified to, during that interview you couldn't

6    describe any facial features because the hat was pulled down

7    and all you could see was the bottom part of the face.

8    A.   Correct.

9    Q.   You couldn't see the eyes.

10   A.   Could not see the eyes.

11   Q.   So this photograph -- When you were shown this lineup,

12   essentially all you could with any type of accuracy possibly

13   describe, because you couldn't tell whether the person had a

14   mustache, would be something on -- I'm using number one right

15   now -- something along that line, or as to number two something

16   along that line.

17   A.   Right.

18   Q.   The reason being is you had no view of, and I'm using

19   number six, of the eyes and the forehead because the hat was

20   pulled down low like this, correct?

21   A.   That's correct.

22   Q.   So your description of number six is not a hundred percent

23   certain.  It's your position that this person had

24   characteristics similar to what you could see given that the

25   hat was pulled down.

1    A.   Yeah.   The small face and, I guess, could you say the

2    distance between the shoulders and I guess the neck line, if

3    you will.

4    Q.   So if for whatever reason another person with a long skinny

5    neck was in there with similar features, you might have I D'd

6    him or her too, because you couldn't see the eyes, the

7    forehead, these other distinguishing characteristics,

8    essentially everything above the nose?

9    A.   Yeah.   The second one would have skewed it slightly.

10   Q.   So you're not a hundred percent positive -- Well, this

11   isn't an identification, as this is the person who did this.

12   It's your position that this is the person who has

13   characteristics similar to the person that committed this

14   offense.

15   A.   The best description.

16   Q.   The best possible description of those characteristics.

17   A.   Right.

18            MR. BUTLER:   One moment, Your Honor.

19            (Whereupon, Mr. Butler conferred with Ms. McKee off

20   the record and out of the hearing of the other courtroom

21   participants.)

22            MR. BUTLER:   Nothing further, Your Honor.   Thank you.

23                     REDIRECT EXAMINATION

24            BY MS. ADAMS OF DANIEL ROBINSON:

25   Q.   Mr. Robinson, do you know the difference between a twenty

1    year old black male and a nearly fifty year old black male?

2    A.  I believe I could tell the difference between the two.

3    Q.  Have you ever seen a black male lift his hair up and put it

4    up under a cap?

5    A.  I believe that it could be done.

6    Q.  Have you ever seen it?

7    A.  I think I've seen it but, I mean, some would be hanging

8    out.  But I've seen it done before.

9    Q.  So you have seen it?

10   A.  Yeah.

11   Q.  Do you remember whether or not that's what you saw when you

12   saw the bank robber?

13   A.  No, I don't remember his hat being like that.

14   Q.  I'm showing you what is Government's exhibit number

15   thirty-two.  Now defense counsel has been asking you about that

16   picture and the fact that you circled number six.  Defense

17   counsel asked you about whether or not you had discussed the

18   bank robbery with Ms. Gurley, the teller, and you said that you

19   had, is that correct?

20   A.  Yes.

21   Q.  Did you discuss with her what the bank robber looked

22   like?

23   A.  I don't recall discussing that with her.

24   Q.  You don't recall discussing with her characteristics of the

25   bank robber?

1    A.   Mainly like what he had on, but I just don't remember us

2    comparing notes exactly about what we saw.

3    Q.   You said you talked about, before, that Ms. Gurley was not

4    present in the room when you picked out this picture.

5    A.   No, she was not in the room.

6            MS. ADAMS:   No further questions.

7            MR. BUTLER:   Your Honor, briefly.

8                         RECROSS EXAMINATION

9            BY MR. BUTLER OF DANIEL ROBINSON:

10   Q.   During your original direct testimony from the Government

11   you said that you thought the person was in his twenties and

12   thirties because of the way he was carrying himself.  That is

13   the baggy clothes, the low hanging jeans, the hat that they

14   wear, that young people tend to wear low down.

15   A.   Mm-hmm.

16   Q.   That's why you thought it was a younger person, correct?

17   A.   Right.

18   Q.   It's not because of his face, because you could only see a

19   limited portion of his face.

20   A.   Right.

21   Q.   It's because of his demeanor.

22   A.   Right.

23   Q.   If a slender old person had baggy clothes on, low cut and

24   decided to wear them low, keep his hat low, it's possible to

25   confuse an older person for a young person if that's how he

1    decided to carry himself; that is, with those type of clothes

2    on and acting -- well I won't say "acting," dressing young and

3    carrying himself like that, correct?

4    A.    That is possible.

5    Q.    Thank you.

6            One other question.  The first lineup that you were

7    given was at the police station.  You were called up and asked

8    to come down and see if you could identify the robber.

9    A.    Mm-hmm.

10   Q.    The second lineup, the officer came to you seven weeks

11   later with this lineup.

12   A.    Mm-hmm.

13   Q.    In the event that you and Ms. Gurley -- Well, it's normal.

14   And it appears -- Ms. Gurley talked about each other and talked

15   to each other about this event, and that's normal, what you

16   could have conveyed to her is that you conveyed in your

17   statement to police, that is you were pretty clear on what that

18   person was dressed like.

19   A.    Right.

20   Q.    You couldn't see his face.

21   A.    Right.

22   Q.    What she could convey to you is what she had observed,

23   correct?

24   A.    Correct.

25            MR. BUTLER:  Nothing further.

```
 1              MS. ADAMS:  Your Honor, if I may?  Briefly, two
 2    questions.
 3              THE COURT:  Okay.  Go ahead.
 4                       FURTHER REDIRECT EXAMINATION
 5                   BY MS. ADAMS OF DANIEL ROBINSON:
 6    Q.  Mr. Robinson, did you see a part of the bank robber's
 7    face?
 8    A.  Yes, the bottom portion.  Briefly.
 9    Q.  My second question is, on the day of the bank robbery, you
10    said that you believe the bank robber was in his twenties,
11    right?
12    A.  Yes.
13    Q.  You did not describe him as an old man dressed up young?
14    A.  No, ma'am, I didn't L.
15              MS. ADAMS:  No further questions, Your Honor.
16              THE COURT:  You may step down.
17              (Whereupon the witness, Daniel Robinson, stepped down
18    from the stand.)
19              THE COURT:  Who is your next witness?
20              MS. ADAMS:  The United States calls Haley Kilcrease.
21                   H A L E Y    K I L C R E A S E,
22       the witness herein, having first been duly sworn or
23    affirmed to tell the truth, was examined and testified as
24    follows:
25                            DIRECT EXAMINATION
```

```
1                      BY MS. ADAMS OF HALEY KILCREASE:
2        Q.  Good morning, Ms. Kilcrease.
3        A.  Good morning.
4        Q.  Could you please state your full name for the record and
5        spell your first and last name.
6        A.  Sure.  Haley Kilcrease.  H-a-l-e-y K-i-l-c-r-e-a-s-e.
7        Q.  Ma'am, how are you employed?
8        A.  Excuse me?
9        Q.  How are you employed?
10       A.  With Blue Cross/Blue Shield of Alabama.
11       Q.  What's your position with Blue Cross/Blue Shield of
12       Alabama?
13       A.  I'm a group service representative.  I'm in marketing.
14       Q.  How long have you been in that position?
15       A.  I have been with the company for nine years, in that
16       position for eight years.
17       Q.  So what was your position with Blue Cross/Blue Shield prior
18       to the position that you're in now?
19       A.  I was in customer service.
20       Q.  So you were in customer service for one year?
21       A.  Yes.  Nine months.
22       Q.  Nine months.
23              Where, exactly, is your office located?
24       A.  We're on forty-four sixty-five Park Boulevard right on the
25       Eastern Boulevard.
```

```
 1            MR. BUTLER:  Your Honor, something just got brought
 2    to my attention and I think I have an obligation to inform
 3    Government counsel of it.  But we need to do it out of the
 4    presence.
 5            THE COURT:  Why don't you tell Ms. Adams first.
 6            (Whereupon, Mr. Butler conferred with Ms. Adams and
 7    Ms. Hardwick off the record and out of the hearing of the other
 8    courtroom participants.)
 9            MR. BUTLER:  Thank you, Your Honor.
10            THE COURT:  Has it been resolved?
11            MR. BUTLER:  Yes.
12            THE COURT:  Good.  Keep going.
13    Q.  Now you stated that Blue Cross/Blue Shield is located, you
14    said, off of Eastern Boulevard?
15    A.  In Executive Park.
16    Q.  In Executive Park.  Are you located close to Compass
17    Bank?
18    A.  Yes, we're directly behind Compass Bank.
19    Q.  Ms. Kilcrease, I'm showing you what is Government's exhibit
20    number thirty.  Do you recognize that building?
21    A.  Yes.
22    Q.  What is that building?
23    A.  That is Compass Bank.
24    Q.  Now could you please indicate to the members of the jury
25    where your building is located in reference to Compass Bank in
```

1    this picture?

2    A.   Sure.   We are directly behind them.

3    Q.   Now, Ms. Kilcrease --

4    A.   That's the front of the building.   We're located directly

5    behind that.

6    Q.   Ma'am, you can touch the actual screen in front of you and

7    indicate where on the picture your building is located.

8    A.   Well, I mean I guess if I touch the top of the picture,

9    we're literally right behind it.

10   Q.   You may have to press hard but if you touch it there will

11   be a mark.

12   A.   Okay.   I guess if you go to the back of that building,

13   we're literally directly behind it.

14   Q.   Ma'am, were you working on the day that Compass Bank was

15   robbed?

16   A.   Yes, I was.

17   Q.   And do you remember providing a statement to the police?

18   A.   Yes, I do.

19   Q.   What did you see on that day that the bank was robbed?

20   A.   I was sitting at my desk working.   It's an open window to a

21   field right in front of me.   And I just saw someone running,

22   literally like they were running down a football field, in an

23   open field straight in front of my window.

24   Q.   So when you say your window, are you referring to the

25   window in your office?

1    A.  The window right in front of my desk.  When I work, I'm

2    looking straight out the window.

3    Q.  How big is this window?

4    A.  Floor to ceiling.

5    Q.  And you said it's from "floor to ceiling," but what about

6    width?

7    A.  The whole wall of the building is all glass.

8    Q.  All clear glass you could see through?

9    A.  Yes.

10   Q.  Are there any obstructions in your view?

11   A.  Blinds.

12   Q.  I beg your pardon?

13   A.  Just the blinds of the window, but nothing.  A parking lot,

14   no cars there.

15   Q.  Open field?

16   A.  Yes.

17   Q.  Are there trees?

18   A.  No.

19   Q.  Any bushes in the open field?

20   A.  There are some hedges between our parking lot in the field,

21   but that's it.

22   Q.  Now where exactly did you see this person running in regard

23   to the hedges of the open field?

24   A.  Well, he wasn't near the hedges, he was out in the middle

25   of the open field.  You know, it just caught my eye coming like

1   from the direction of the bank down towards the neighborhood
2   section.
3   Q.  Did you say anything when you saw that person?
4   A.  Yes.
5   Q.  What did you say?
6   A.  I literally -- I said to my coworker that sits right beside
7   me, "Look at this, this boy is running like he has just robbed
8   somebody."  And then I got up and walked to the fax machine.  I
9   didn't follow through.  I just wouldn't have thought anything
10  about it.  I kind of made a joke, honestly.
11  Q.  Why did you refer to the person as a "boy"?
12  A.  It was very obviously a young man, good shape, lean.
13  Q.  Now you said he was running like he robbed somebody.
14  A.  Yeah.
15  Q.  Are you making a reference to his speed?
16  A.  I mean it was obvious he was not exercising.  I mean, that
17  was just the first thing that came to my mind.
18  Q.  Do you know where he ran to?  Or let me put it this way.
19  Did you see the direction into which he ran?
20  A.  Yes.
21  Q.  And what is located in that direction?
22  A.  A residential section.  Residential houses where the field
23  ends.
24  Q.  Did you actually see him run into that residential
25  section?

1    A.   No, I got up and walked away.

2    Q.   Do you know any of the streets in that residential

3    section?

4    A.   I don't.

5    Q.   Are you able to describe that person as to what he was

6    wearing?

7    A.   Yes.

8    Q.   What was he wearing?

9    A.   Blue jeans, white T-shirt.

10        What did get my attention that day, on his right --

11   Let me see.  It would have been on his left arm I thought it

12   was a, not a backpack, one of those back sacks that you can

13   just kind of throw over your arm, on his left arm holding it

14   was red, running.  But besides that it was jeans and a white

15   shirt.

16   Q.   You described him as holding a sack, you said?

17   A.   I thought it was like a back sack.  Not a backpack, but it

18   was something on his arm.

19   Q.   But do you know for certain what that person was

20   carrying?

21   A.   No.  I didn't have any idea.

22   Q.   That was just what you saw.

23   A.   Yes.

24        MS. ADAMS:  One moment, Your Honor.

25        (Whereupon, Ms. Adams conferred with Ms. Hardwick off

```
 1    the record and out of the hearing of the other courtroom
 2    participants.)
 3              MS. ADAMS:  The United States tenders this witness
 4    for cross.
 5                         CROSS EXAMINATION
 6              BY MS. McKEE OF HALEY KILCREASE:
 7    Q.  Is it Miss Kilcrease?
 8    A.  Kilcrease.
 9    Q.  Ms. Kilcrease, where does your desk actually sit compared
10    to the -- Let me ask you this first.  You see this entire wall
11    sitting behind the jury?
12    A.  Yes.
13    Q.  Are you saying you the window would replace the entire
14    wall?
15    A.  Yes.
16    Q.  Where would the your desk be in relation to that entire
17    window?
18    A.  My desk is flush against the wall.
19    Q.  So the podium where I'm standing is your desk, and you're
20    working at your desk.  Where is your computer?
21    A.  Like yours, catty-corner.
22    Q.  Okay.  And you're saying the window is directly in front of
23    you?
24    A.  Yes.
25    Q.  So whether you're working on the computer, and you've got a
```

```
1   complete view of this open field?

2   A.  I do.

3   Q.  Do you all, in your office, have -- Does your office

4   provide like coffee and things like that in the office, like a

5   little break room?

6   A.  Yeah.

7   Q.  Where is that located in relation to your desk?

8   A.  Upstairs.

9   Q.  Does that break room also have a view to that big glass

10  window?

11  A.  Yes, it does.

12  Q.  And if there's a coffee machine to be found in your office,

13  it would be, I'm assuming, in that break room upstairs?

14  A.  Yes.

15  Q.  Not on the floor where your desk would be?

16  A.  No.

17          There's also on the floor of my desk there's a

18  conference room that looks out into the same field that does

19  have a little coffee area.

20  Q.  Now you described seeing a man running from the bank across

21  the field.

22  A.  I didn't know it was from the bank, but from the direction

23  of the bank.

24  Q.  But you did not see his face?

25  A.  No.
```

1    Q.  Because, again, you were at least fifty yards away from

2    this individual.

3    A.  I was approximately fifty yards away.

4    Q.  And that's about half the length of a football field,

5    right?  And this individual never got any closer to you than

6    those fifty yards.

7    A.  No.

8    Q.  The individual that you saw running was not holding

9    anything, correct?

10   A.  You know, I saw from the side, you know, and I saw not with

11   his left hand, but he was holding a sack.  He was like holding

12   a sack up.

13   Q.  And that's the red sack that you saw?

14   A.  Yes.  I couldn't honestly see the whole -- I didn't

15   notice.

16   Q.  You were asked why you referenced him, why you used the

17   term "boy".  You said you saw someone running across the field.

18   The reason for the term "boy" was because it was obvious that

19   he was a young man?

20   A.  Mm-hmm.

21   Q.  And you went on to state that apparently your basis for him

22   being a young man is because he was in good shape and lean, is

23   that correct?

24   A.  When I saw him --

25   Q.  I'm just asking, is that correct of what you stated?

A.   Yes.  I thought he looked fifteen or sixteen.

Q.   Okay.  Let me ask you a question first.

     Let me ask you, have you ever seen an individual that is older but is in very, very good shape?

A.   Yes.

Q.   Do older individuals who are in very good shape, do they tend to look younger than probably what their age is?

A.   I'm sure at times they do.

     MS. McKEE:  One moment, Your Honor, if I may.

     (Whereupon, Ms. McKee conferred with Mr. Butler off the record and out of the hearing of the other courtroom participants.)

     MS. McKEE:  No further questions.

     THE COURT:  Any further direct?

     MS. ADAMS:  No further direct, Your Honor.

     THE COURT:  Thank you.  You may step down.

     (Whereupon the witness, Haley Kilcrease, stepped down from the stand.)

     THE COURT:  Next witness.

     MS. HARDWICK:  The Government would call Raymond McCoy.

     MR. BUTLER:  And I have something to present to the Court on that other issue that we discussed earlier and we needed to do research on.

     THE COURT:  Pardon me?

```
 1              MR. BUTLER:  We have resolution to that issue that we
 2     did research on.
 3              THE COURT:  Oh, you do?  We can wait on this.
 4                        R A Y M O N D     M c C O Y,
 5         the witness herein, having first been duly sworn or
 6     affirmed to tell the truth, was examined and testified as
 7     follows:
 8                        DIRECT EXAMINATION
 9              BY MS. HARDWICK OF RAYMOND McCOY:
10     Q.  Would you state your full name and the spelling of your
11     first and last names?
12     A.  R-a-y-m-o-n-d, last name McCoy, M-c-C-r-o-y.
13     Q.  And, Mr. McCoy, could you speak clearly into the mic and
14     keep your voice up.
15     A.  Yes.
16     Q.  Mr. McCoy, without giving the numerical number of your
17     house, can you tell us where you live?
18     A.  On Lisa Court.  It's the second house on the left-hand
19     side.
20     Q.  And you're going to have to speak up, Mr. McCoy.
21     A.  All right.
22     Q.  Were you living at that address on June twenty-second, two
23     thousand and seven?
24     A.  Yes.
25     Q.  And do you recall learning that day that the Compass Bank,
```

```
 1   which is a short distance from your house, had been robbed?
 2   A.  Yes.
 3   Q.  And after having learned that information, did you have an
 4   occasion to speak with some law enforcement officers?
 5   A.  Yes.
 6   Q.  And did you give them a statement regarding what you saw?
 7   A.  Yes.
 8   Q.  Mr. McCoy, how are you employed?
 9   A.  I'm sorry?
10   Q.  Are you employed?
11   A.  Yes.
12   Q.  And do you go to school?
13   A.  No.
14   Q.  Where are you employed?
15   A.  I'm a bill collector for A. T. & T.
16   Q.  I'm not understanding you.
17   A.  I'm a bill collector for A. T. & T.
18   Q.  Thank you.
19            Were you home during the morning hours of June
20   twenty-second?
21   A.  Yes.
22   Q.  Was there anyone else home with you?
23   A.  Yes.
24   Q.  Who else was that?
25   A.  My younger sister, Sxxxxxxx.
```

1   Q.   Sxxxxxxx?

2   A.   Yes.

3   Q.   And how old is Sxxxxxxx, or how old was she on June

4   twenty-second?

5   A.   She was ten at the time.

6   Q.   Now was there something that happened on that day that

7   caused you to go outside, or go to the door?

8   A.   Yes, ma'am.  I was in the house actually watching TV in the

9   den.  Sxxxxxxx was outside, and she was outside by herself.

10  And I just heard her talking as far as like she was saying

11  "people," "people," "people."  I'm thinking okay, who is she

12  talking to?  So I get up to the door to see what she was doing,

13  and when I got to the door there was a black Chrysler --

14  Q.   Let me stop you there.  You said she was outside alone and

15  you heard her talking like she was talking to somebody.

16  A.   Yeah, she was just yelling out "people".

17  Q.   When you went outside -- I'm going to show you some

18  pictures before we go into that.

19          MS. HARDWICK:  May I approach, Your Honor?

20          THE COURT:  Yes.

21  Q.   Mr. McCoy, I want to show you a series of pictures and ask

22  you to take a look at all of them with the permission from

23  defense counsel and to tell me whether you recognize them and

24  then we will offer them.  Okay?  I'm going to hand you

25  Government's exhibit thirty-three.  Do you recognize it?

```
1    A.   Yeah.
2    Q.   Does it accurately depict -- In all of these pictures the
3    final question will be whether they accurately depict the scene
4    on June twenty-second, two thousand and seven.   Okay?   So my
5    first question is, do you recognize it?
6    A.   Yes.
7    Q.   Government's exhibit thirty-four, do you recognize it?
8    A.   Yes.
9    Q.   Government's exhibit thirty-five, do you recognize that
10   photograph?
11   A.   Yes.
12   Q.   Government's exhibit thirty-six, do you recognize that
13   photograph?
14   A.   Yes.
15   Q.   Do you recognize Government's exhibit thirty-seven?
16   A.   Yes.
17   Q.   Do you recognize Government's exhibit thirty-eight?
18   A.   Yes.
19   Q.   Do you recognize Government's exhibit thirty-nine?
20   A.   Yes.
21   Q.   Do you recognize Government's exhibit forty?
22   A.   Yes.
23   Q.   And do you recognize Government's exhibit forty-one?
24   A.   Yes.
25   Q.   Now do Government's exhibits thirty-three through forty-one
```

1  that you've just testified that you recognize, accurately

2  depict what you saw on June twenty-second, two thousand and

3  seven?

4  A.  Yes, ma'am.

5       MS. HARDWICK:  Your Honor, we'd offer Government's

6  exhibits thirty-one through forty-one.  Thirty-three, I'm

7  sorry, through forty-one.

8       THE COURT:  Say that again, now.

9       MS. HARDWICK:  We offer Government's exhibits

10  thirty-three through forty-one.

11       THE COURT:  They are all admitted.

12       MS. HARDWICK:  Mr. Anthony (sic.), could we have the

13  Elmo, please.

14  Q.  I'm displaying what has been admitted as Government's

15  exhibit thirty-three.  Can you tell the jury what that is to

16  you?

17  A.  That is my godbrother's Tahoe truck.

18  Q.  Whose residence is that?

19  A.  Oh, that's our house.

20       THE COURT:  That's whose residence?

21       THE WITNESS:  My godparents' and my godsister.

22  Sxxxxxxx and myself.

23  Q.  Is that where you were on June twenty-second in the morning

24  hours?

25  A.  Yes, ma'am.

1    Q.   Now from this photograph I'm going to switch to

2    Government's exhibit thirty-four.

3         Can you tell from Government's exhibit thirty-four

4    the area that your little godsister, Sxxxxxxx, was playing

5    in?

6    A.   When I came to the door, she was standing like around in

7    front of the bushes.

8    Q.   If you touch that screen, Mr. McCoy, it will show up.

9         She was in that area?

10   A.   Like on the grass.

11   Q.   I'll clear that for you.

12        From this photograph can you tell us which door or

13   window you came to?  If you can see it.

14   A.   Well the van was not there when I came to the door, but the

15   front door --

16   Q.   Speak up a little louder.

17   A.   The van were not in the driveway when it happened, but the

18   front door is where I pointed at.

19   Q.   The front door is the area that you've just pointed to and

20   the vans were not there --

21   A.   Correct.

22   Q.   -- at the time this incident happened?

23   A.   Correct.

24   Q.   Okay.  Can you still see the bush area where your little

25   sister was playing?

```
 1    A.   Yes, ma'am.
 2    Q.   Now I want you to describe for me what's depicted across
 3    the street.  What do you know that area to be?
 4    A.   Our neighbors, the Franklins, live at this house to the
 5    left right here, and --
 6    Q.   Let me change and give you another photograph.
 7    A.   No problem.
 8    Q.   Does that photograph give you a better view of the
 9    Franklins', your neighbors' house?
10    A.   Yes, ma'am.
11    Q.   Now can you see all of those people in those cars, were
12    they out there that day?
13    A.   No, ma'am.
14    Q.   So at the time this incident had happened, none of the cars
15    that are depicted here were in that area?
16    A.   Except for the Tahoe truck.
17    Q.   Tell me which truck are you talking about.  You can touch
18    the screen.
19              That truck was there?
20    A.   Yes, ma'am.
21    Q.   Now, can you see any lots or anything from the Franklins'
22    residence?
23    A.   Any lots?
24    Q.   Any lots, or open fields, or anything of that nature?
25    A.   Yes, ma'am.
```

```
 1    Q.   What can you see?

 2    A.   That's a field right next to their house.

 3    Q.   Will you touch it so they will know what you're talking

 4    about.

 5               (Whereupon, the witness complied.)

 6    Q.   Where does that field lead?

 7    A.   To a business area that I know of.

 8    Q.   Did you say a "business area"?

 9    A.   Business area, yes, ma'am.

10    Q.   Do you know where Compass Bank is in your neighborhood?

11    A.   Yes, ma'am.

12    Q.   Do you know whether or not Compass Bank is in that

13    direction?

14    A.   Yes, ma'am.

15    Q.   Okay.  Now at the time that you came to the door to see who

16    or what your little sister may have been talking about, can you

17    tell us what you saw?

18    A.   Yes, ma'am.  By the time I got to the door to see what

19    Sxxxxxxx was speaking about, a passenger door was closing.  And

20    on this street there is -- there is only one way in and one way

21    out, so how this car is facing, you'd have to do a U-turn to

22    get back out to Fairlane.  So by the time I got to the door,

23    the passenger's door was closing.  They made a U-turn, went up

24    the street and made a left.

25    Q.   Would it be a fair assessment to say you live in a
```

1    cul-de-sac?

2    A.   Yes, ma'am.

3    Q.   Now where was the car, if you can tell us, you can put an

4    arrow there, is that where the car was?

5    A.   No, ma'am.  It was like right in front of the tree area,

6    maybe in front of the driveway across the street from the

7    Franklins.

8    Q.   Can you touch it on the screen for us?

9            (Whereupon, the witness complied.)

10   A.   The truck's in the way.  I can't really --

11   Q.   Can you touch above the truck, a general area for us?  When

12   you say "the tree," that's the tree you're talking about?

13   A.   Yes, ma'am.

14   Q.   And you testified, Mr. McCoy, that the passenger door was

15   closing.

16   A.   Correct.

17   Q.   And what did you observe the car do?

18   A.   Turn around and head up the street and make a left turn on

19   to Fairlane.

20   Q.   I'm showing you Government's exhibit thirty-five.  When the

21   car turned around, can you tell us -- and if you draw on that

22   screen it will show up -- which direction the car went in?

23   A.   Okay.  This is the car on the Franklin side, turn around,

24   turned around, go up the street and they made a left on to

25   Fairlane.

1  Q.  Okay.  I'm going to show you a car that's pointed in that

2  direction.  And we're not saying this is the car.  Is that the

3  direction that the car went in that you saw?

4  A.  Yes, ma'am.

5  Q.  And when it went to the end of the street, do you recognize

6  Government's exhibit number thirty-nine?

7  A.  Yes, ma'am.

8  Q.  Is that the end of your street, Mr. McCoy?

9  A.  Yes, ma'am.

10  Q.  At the end of that street which direction, if you draw it,

11  which direction did the car go in?

12  A.  It would be turning this way.

13  Q.  Let me just identify these streets.  The street says

14  "Lisa".  Is that the street you live on?

15  A.  Lisa Court, yes, ma'am.

16  Q.  And the other street says "Fairlane".  Is that the street

17  that crosses your street?

18  A.  Correct.

19  Q.  Which street is being depicted in Government's exhibit

20  forty?

21  A.  It's Fairlane.

22  Q.  And which direction did the car go on Fairlane?

23  A.  After that, the car turned off of Lisa Court and made a

24  left turn on to Fairlane.

25  Q.  Would you tell us what direction that would have been?

1    A.   It would be going back this way.

2    Q.   I'm going to show you Government's exhibit number

3    forty-one.  Do you recognize that?

4    A.   Yes, ma'am.

5    Q.   And can you tell us what does Government's exhibit

6    forty-one mean to you?

7    A.   It looks like the car that I seen on Lisa Court that turned

8    onto Fairlane.

9    Q.   You'll have to speak clearer again for me.

10   A.   All right.

11   Q.   Now is there anything missing from that car that you saw on

12   that day?

13   A.   There was a yellow sticker.  One of the "support your

14   troops" stickers.

15   Q.   And where was that on that car?

16   A.   Like around in this area.

17        MS. HARDWICK:  Those are all my questions.  We tender

18   the witness, please.

19                    CROSS EXAMINATION

20              BY MR. BUTLER OF RAYMOND McCOY:

21   Q.   Mr. McCoy, hi.  My name is Kevin Butler, and I have a few

22   really brief questions.

23   A.   All right.

24   Q.   You came to the door of your residence.  Well you were

25   alerted to the door because your godsister, Sxxxxxxx, was

1   saying something.

2   A.   Yeah.

3   Q.   By the time you got to the door, the passenger door of that

4   car, or the driver's door of that car, was being shut?

5   A.   The passenger's door.

6   Q.   The passenger door was being shut.

7   A.   Yeah.

8   Q.   You then saw the vehicle, I believe the Government said

9   make a U-turn in that cul-de-sac and turn I guess right down

10  Fairlane.

11  A.   A left on Fairlane.

12  Q.   Excuse me.  Left down.  Did I use the right street,

13  Fairlane?

14  A.   Fairlane, yes.

15  Q.   That's what you saw that day?

16  A.   Correct.

17  Q.   You didn't see the person get into the vehicle.  You just

18  saw the door shutting?

19  A.   I just saw the door shutting.  Yes, sir.

20          MR. BUTLER:  One moment, Your Honor?

21          (Whereupon, Mr. Butler conferred with Ms. McKee and

22  Ms. Mason off the record and out of the hearing of the other

23  courtroom participants.)

24          MR. BUTLER:  Nothing further.

25          MS. HARDWICK:  Just one question.

```
1                          REDIRECT EXAMINATION
2                      BY MS. HARDWICK OF RAYMOND McCOY:
3     Q.  Mr. Butler asked you whether or not you saw the people.  As
4     the car turned to go down the street, could you tell the race
5     of the people in the car?
6     A.  Yes.
7     Q.  And what race were they?
8     A.  Black.  African-American.
9     Q.  How many people were in the car?
10    A.  Two.
11    Q.  Did know the any the people in the car?  Do you know if
12    they were male or female?
13    A.  Two males.
14    Q.  Thank you.
15            MR. BUTLER:  Nothing further, Your Honor.
16            THE COURT:  Thank you.  You may step down.
17            (Whereupon the witness, Raymond McCoy, stepped down
18    from the stand.)
19            THE COURT:  Next witness.
20            MS. HARDWICK:  The Government calls David Hill.
21                       D A V I D     H I L L,
22            the witness herein, having first been duly sworn
23    or affirmed to tell the truth, was examined and testified as
24    follows:
25                          DIRECT EXAMINATION
```

```
 1                    BY MS. HARDWICK OF DAVID HILL:
 2   Q.  Good morning, Mr. Hill.
 3   A.  Good morning.
 4   Q.  Can you state your full name and your employment, please.
 5   A.  Detective Dave Hill.  Montgomery Police Department, City of
 6   Montgomery.
 7   Q.  Detective Hill, were you working for the Montgomery Police
 8   Department on June twenty-second, two thousand and seven?
 9   A.  Yes, ma'am.
10   Q.  Did you have an occasion to go to a bank robbery?
11   A.  Yes, ma'am, I did.
12   Q.  Now prior to working this bank robbery how long had you
13   been with the Montgomery Police Department?
14   A.  I had been with the police department since April of two
15   thousand and two.  Approximately six years.
16   Q.  And, Detective Hill, I'm going to ask you to kind of lean
17   into your mic.  Just speak into it, okay?
18   A.  Yes, ma'am.
19   Q.  Okay.  You say that you had been there six years.  Which
20   area did you start in?
21   A.  I started as a trainee in the academy to a patrol
22   officer.
23   Q.  And how long were you a patrol officer?
24   A.  Until October of two thousand three, I became a
25   detective.
```

1    Q.  And working as a detective on this case, did you actually

2    go to the crime scene?

3    A.  Yes, ma'am, I did.

4    Q.  And when you went there, was it already secured?

5    A.  It was.

6    Q.  And would you explain to the jury what I mean when I'm

7    saying that it was "already secured".

8    A.  Officers have already responded to the call and secured the

9    scene for the detectives upon our arrival.

10   Q.  Do they rope it off with yellow tape like you see on

11   television sometimes?

12   A.  Not on this occasion, they didn't.

13   Q.  So on this case people were out of the area where the

14   robbery took place?

15   A.  Correct, they didn't let anybody else into the bank after

16   it occurred.

17   Q.  Did you get information on that day of a description of

18   what happened?

19   A.  Yes, ma'am.

20   Q.  And did you secure any evidence from anyone there?

21   A.  I did.

22   Q.  What kind of evidence did you get?

23   A.  I secured the F. D. I. C. certificate.  A tally sheet.  And

24   -- let's see --

25   Q.  Did you get a copy or --

1    A.   The video.

2    Q.   Did you get a copy of the actual note that the robber gave

3    her?

4    A.   Yes, ma'am.

5         MS. HARDWICK:   May I approach, Your Honor?

6         THE COURT:   Yes.

7    Q.   Let me show you Government's exhibit number eight that's

8    already been admitted.   Do you recognize that?

9    A.   Yes, ma'am, I do.

10   Q.   And what is that?

11   A.   This is the note the suspect left at the robbery scene.

12   Q.   I'm going to hand you Government's exhibit forty-two that

13   has not been admitted.   Do you recognize Government's exhibit

14   forty-two?

15   A.   Yes, ma'am, I do.

16   Q.   What is that?

17   A.   This is the original note, and it's been processed.

18   Q.   Now does it accurately depict the robbery note after it was

19   processed?

20   A.   Yes, ma'am.

21        MS. HARDWICK:   We'd offer Government's exhibit

22   forty-two.

23        MR. BUTLER:   No objections.

24        THE COURT:   Admitted.

25   Q.   Now that's Government's exhibit number eight.   And you said

1    that that is the robbery note that was left at the scene and

2    given to you on June twenty-second?

3    A.  Yes, ma'am.

4    Q.  We've just admitted Government's exhibit forty-two.  Can

5    you explain to the jury what has happened to that robbery

6    note?

7    A.  It has been dusted for fingerprints.  That's basically the

8    colors you see, the darker color.

9    Q.  Could you keep your voice up and speak into the mic?

10   A.  Yes, ma'am.  Basically it's just been processed with the

11   fingerprint dust.  That's the darker color you see on the

12   note.

13   Q.  And other than that, Government's exhibit forty-two is the

14   same as Government's exhibit eight?

15   A.  Correct.

16   Q.  Were you able to get any -- not you, but were they able to

17   get any viable prints, to your knowledge, off of Government's

18   exhibit eight?

19   A.  No, ma'am.

20   Q.  Now, Detective Hill, when you got to the scene, did you get

21   a description of a car?

22   A.  Yes, ma'am, I did.

23   Q.  And in getting that description, was there ever a time that

24   you thought or you believed that you saw the car that matched

25   the description of what you were given on June twenty-second?

1    A.    Yes, ma'am.

2    Q.    Can you tell us when that was?

3    A.    That was June twenty-ninth.

4    Q.    And on what occasion did you see a car that matched the

5    description to the one you were given of the robbery?

6    A.    On that day I was responding to a separate robbery call off

7    of Calamar Drive just off the boulevard, and as I was sitting

8    at the red light there, I looked in my rear view mirror and I

9    saw a vehicle that matched the description of the bank robber's

10    suspect vehicle.

11    Q.    What did you do?

12    A.    I initiated a traffic stop on the vehicle and made contact

13    with the driver.

14    Q.    When you saw this vehicle, were there any signs, or

15    anything on it that drew your attention?

16    A.    Yes, ma'am.

17    Q.    What was that?

18    A.    Just as in the lookout, it had the "Support Our Troops"

19    sticker on the left-hand side of the car, and the same vehicle

20    basically, that was placed on the lookout for the robbery

21    vehicle.

22    Q.    Now when you stopped the car, did you find out who the

23    owner of that car was?

24    A.    Yes, ma'am, I did.

25    Q.    And who was the owner of that car?

1    A.   Glenn Teague.

2    Q.   Did you also get a tag number of the car?

3    A.   I did.

4    Q.   I'm going to show you two exhibits here.  I'll show you

5    Government's exhibit forty-one that's already been admitted.

6    Do you recognize Government's exhibit forty-one?

7    A.   Yes, ma'am, I do.

8    Q.   And what is it?

9    A.   That is the -- It is the nineteen ninety-nine Chrysler, the

10   defendant's father's vehicle.

11   Q.   I'm going to show you Government's exhibit forty-four.  Do

12   you recognize that?

13   A.   Yes, ma'am, I do.

14   Q.   What is it?

15   A.   That is the tag to the suspect vehicle.

16   Q.   When you say "suspect vehicle," are you referring to the

17   vehicle that was used in the robbery?

18   A.   Yes, ma'am.

19   Q.   And you're not referring to the person that you stopped

20   driving that car?

21   A.   Correct.

22   Q.   Would you lower the microphone a little bit.

23        MS. HARDWICK:  If we haven't offered it, we're

24   offering Government's exhibit forty-four.

25        MR. BUTLER:  No objection.

```
 1              THE COURT:  Okay.  Very good.  It's admitted.
 2    Q.  Did you take the photograph in Government's exhibit
 3    forty-four?
 4    A.  Yes, ma'am, I did.
 5    Q.  Detective Hill, when you got that information, did you try
 6    to develop whether or not there was anyone else who drove that
 7    particular car?
 8    A.  Yes, ma'am.
 9    Q.  And did you later learn whether or not Andreas Jejuan Smith
10    ever drove that?
11              MR. BUTLER:  Objection.  Hearsay, Your Honor.
12              THE COURT:  Why isn't this hearsay?
13              MR. BUTLER:  Your Honor --
14              THE COURT:  No no no, I'm asking the Assistant U. S.
15    Attorney why isn't it hearsay.
16              MS. HARDWICK:  I'll rephrase the question.
17              THE COURT:  Okay.
18    Q.  Did you do an investigation?
19    A.  Yes, ma'am.
20    Q.  And during the course of your investigation did you
21    identify the owner of the car?
22    A.  I did.
23    Q.  Did you identify any other drivers of the car?
24    A.  I did.
25    Q.  Do you know you've learned who the defendant is in this
```

1    case, is that correct?

2    A.   Yes, ma'am.

3    Q.   Do you know whether or not there's a relationship between

4    the defendant and the owner of the car?

5    A.   Yes, I do.

6    Q.   Now learning that information, did you prepare a photograph

7    lineup that included the defendant based on his connection to

8    this car to present to anyone?

9    A.   Yes, ma'am, I did.

10   Q.   And who did you prepare that lineup for?

11   A.   I prepared the lineup for the clerk and the witness at the

12   bank, Daniel Robinson.

13   Q.   When I'm saying "lineup," Detective Hill, I'm saying was

14   that a photographic lineup?

15   A.   Yes, ma'am.

16   Q.   Now when you prepared it, do you normally do that with

17   several individuals, or do you do it separately?

18   A.   Several individuals.

19   Q.   How many people did you have in this photograph lineup?

20   A.   A total of six, including the defendant.

21   Q.   When you showed it, do you remember whether you showed it

22   to Ms. Gurley who was then Ms. Nichols first, or Mr.

23   Robinson?

24   A.   I showed it to Mr. Robinson first.

25   Q.   And where did you show it to Mr. Robinson?

1    A.  At his place of employment at the Compass Bank.

2    Q.  Was there anyone else present in the room with you and Mr.

3    Robinson when you showed him the photograph?

4    A.  My detective trainee was present.

5    Q.  Any other bank employees?

6    A.  No, ma'am.

7    Q.  And when you showed it to him, was he able to select a

8    person?

9    A.  He was.

10   Q.  And did he give you any certainty of -- his level of

11   certainty from his identification?

12          MR. BUTLER:  Objection.  Hearsay.  That witness has

13   testified as well.  What he said to him is hearsay.

14          THE COURT:  How is this not hearsay?

15          MS. HARDWICK:  Your Honor, it's just in the course of

16   his investigation.  We can recall him to have him give it.

17   It's not a problem.

18          THE COURT:  Very good.  Have the person who has

19   firsthand knowledge testify.

20   Q.  Detective Hill, did he select a person?

21   A.  Yes, ma'am, he did.

22   Q.  And which person did he select?

23   A.  The defendant, number six.

24   Q.  And at the time, did he know who number six was?  Had you

25   given him that information?

```
1    A.   No, ma'am.
2    Q.   Had anyone to your knowledge told him who number six was?
3    A.   No, ma'am.
4    Q.   To your knowledge did he know that number six had any
5    connection to the car that you had taken a photograph of?
6    A.   No, ma'am.
7    Q.   Did he know anything else in relationship to your
8    investigation from you?
9    A.   No, ma'am.
10   Q.   So on that day he selected a person not knowing the
11   person's name or anything else about him?
12   A.   Correct.
13   Q.   Now, did you show that same photograph lineup to Ms.
14   Gurley, Nichols at the time?
15   A.   Yes, ma'am, I did.
16   Q.   And did you show it to her on a separate occasion?
17   A.   I did later that day.
18   Q.   Where was she when you showed it to her?
19   A.   She was at her residence.
20   Q.   So she wasn't even at the bank?
21   A.   No, ma'am, she was in the course of moving to a new
22   residence.
23   Q.   When you showed the photograph to her, did she make a
24   selection?
25   A.   Yes, ma'am, she did.
```

```
1    Q.   And which number did she select?
2    A.   The defendant, number six.
3    Q.   At the time, did she know he was the defendant?
4    A.   No, ma'am.
5    Q.   Did she know a name?
6    A.   No, ma'am.
7    Q.   Had you told her that this person had any connection to the
8    car that you had located in this case?
9    A.   No.
10   Q.   Did she know that you had taken a picture and made a
11   connection between the owner of that car and the defendant?
12   A.   No, ma'am.
13   Q.   So she just selected a photograph?
14   A.   Correct.
15   Q.   Now, Detective Hill, after they identified the person, what
16   name were you able to attach to that person?
17   A.   Andreas Jejuan Smith.
18   Q.   Is that person in the courtroom today?
19   A.   He is.
20   Q.   And would you identify him for the jury, please.
21   A.   Yes, ma'am.  Sitting beside the young lady, wearing a
22   coat.
23   Q.   You're not being clear.  I'm not understanding you clearly.
24   A.   Yes, ma'am.  I see him sitting beside his attorney right
25   there.
```

1           MS. HARDWICK:  Let the record reflect that he's

2   sitting beside Mr. Butler, his attorney.

3   A.   Yeah.

4   Q.   Now when you were able to attach a name to the photograph

5   that had been selected by both Mr. Robinson and Ms. Gurley,

6   what did you do next?

7   A.   After I got identification lineups and identification from

8   the vehicle, I completed a warrant for his arrest.

9   Q.   And what was that warrant for?

10  A.   Robbery first degree.

11  Q.   Now let me back up and ask you a question, Detective Hill,

12  regarding an incident that happened regarding Hooters

13  Restaurant here in Montgomery.

14  A.   Yes, ma'am.

15  Q.   Are you familiar with what happened there?

16  A.   Yes, ma'am, I am.

17  Q.   Now Hooters I'm not that familiar with, is that H-o-t-t-e-r

18  apostrophe S?

19  A.   That's correct.

20  Q.   And can you tell us whether or not a photographic lineup

21  was prepared in reference to the Hooters incident?

22  A.   Yes, ma'am, it was.

23  Q.   And did you handle that photograph lineup?

24  A.   I did.

25  Q.   Did you present that photograph lineup to Mr. Robinson?

```
1    A.  I did.

2    Q.  Did Mr. Robinson select anybody on that photograph

3    lineup?

4    A.  He did not.

5    Q.  Did you present the photograph lineup to Ms. Gurley?

6    A.  Yes, ma'am, I did.

7    Q.  Did Ms. Gurley select anyone from the photograph lineup?

8    A.  No, she did not.

9    Q.  Now you did a lot of the investigation in this case, didn't

10   you?

11   A.  Yes, ma'am.

12   Q.  Did you have an occasion to go to interview or talk to Mr.

13   Smith, the defendant?

14   A.  Yes, ma'am, I did.

15   Q.  Where did you go to do that?

16   A.  At the Montgomery County Jail detention facility.

17   Q.  You testified earlier that you got a warrant for his

18   arrest.

19   A.  I'm sorry?

20   Q.  You testified earlier that you got a warrant for his

21   arrest.

22   A.  Yes, ma'am.

23   Q.  Okay.  After that arrest, did you go to talk to him?

24   A.  I did.

25   Q.  Now without --
```

1          MS. HARDWICK:  Your Honor, if I could have one moment

2    please?

3          THE COURT:  Yes.

4          (Whereupon, Ms. Hardwick conferred with Mr. Butler

5    off the record and out of the hearing of the other courtroom

6    participants.)

7    Q.  When you went to talk to Mr. Smith, when you went there,

8    what was your purpose in going there?

9    A.  To take a photograph of his neck.

10   Q.  And why did you want to take a photograph of his neck?

11   A.  Because he had a tattoo on his neck.

12   Q.  Had you received information in the course of your

13   investigation regarding something about his neck?

14   A.  Yes, ma'am.  He had a bandage over it during the course of

15   the robbery.

16   Q.  You still need to speak up, please.

17   A.  Yes, ma'am.  During the bank robbery, the suspect had a

18   over the left side of his neck exactly where the tattoo is.

19   Q.  I'm going to show you Government's exhibit forty-three.  Do

20   you recognize Government's exhibit forty-three?

21   A.  Yes, ma'am, I do.

22   Q.  What is it?

23   A.  That's the tattoo on the defendant's neck.

24   Q.  Who took that photograph?

25   A.  I did.

```
1              MS. HARDWICK:  We'd offer Government's exhibit
2    forty-three.
3              MR. BUTLER:  No objection.
4              THE COURT:  Admitted.
5    Q.  Detective Hill, you've had an opportunity to view the video
6    from the bank robbery, is that correct?
7    A.  Yes, ma'am.
8    Q.  Is that tattoo in the same position as the bandages
9    depicted in those videos?
10   A.  Yes, ma'am.
11   Q.  I'm going to hand you -- Okay.  Let me ask you this
12   question:  Also, did you -- the statements include a
13   description of an apron?
14   A.  Correct.
15   Q.  I'm going to hand you Government's exhibit number
16   forty-five.  Do you recognize Government's exhibit
17   forty-five?
18   A.  Yes, ma'am, I do.
19   Q.  What is Government's exhibit forty-five?
20   A.  A picture of a black apron.
21   Q.  Were you present when this photograph was taken?
22   A.  Yes, ma'am, I was.
23             MS. HARDWICK:  We'd offer Government's exhibit
24   forty-five.
25             MR. BUTLER:  Objection.
```

```
1              THE COURT:  Why?

2              MR. BUTLER:  Well, it's just being  -- Withdrawn.

3              THE COURT:  Okay, it's admitted.

4    Q.  Where was Government's exhibit forty-five taken?

5    A.  Picadilee's (ph.)

6    Q.  Excuse me?

7    A.  Picadilee's (ph.)

8    Q.  Here in Montgomery?

9    A.  Yes, ma'am.

10   Q.  Part of the uniforms at Picadille's (ph.) doesn't include

11   that apron?

12   A.  Yes, ma'am.

13   Q.  Do you know whether or not if Mr. Smith ever worked at

14   Picadille's (ph.)?

15             MR. BUTLER:  Objection.  Hearsay.

16             THE COURT:  Only if you personally know.  If you saw

17   him working there, not what somebody told you.

18             (Whereupon, there was no response from the witness.)

19             MR. BUTLER:  Hearsay.

20             THE COURT:  If you don't have personal knowledge, you

21   can't say.

22   Q.  Detective Hill, when you were working this case and you

23   connected the identifications of the defendant, the tag number

24   and the car back to him, was that the basis for his arrest?

25   A.  Yes, ma'am.
```

1    Q.  Now when you went to talk to him, I'm sorry, to take that

2    photograph, did you ask him any questions?

3    A.  I did.

4    Q.  Did he ask you a question?

5    A.  Yes, ma'am.

6    Q.  What did he ask you?

7              MR. BUTLER:  Objection.

8              (Whereupon, Mr. Butler conferred with Ms. Hardwick

9    off the record and out of the hearing of the other courtroom

10   participants.)

11             MR. BUTLER:  Your Honor, I'm going to maintain my

12   objection.

13             THE COURT:  Ask your question again.

14   Q.  Did Mr. Smith ask you any questions?

15             THE COURT:  Why is that a --

16             MR. BUTLER:  Yes, it's from the defendant, Your

17   Honor, but it's unrelated to the matter before the Court.

18             THE COURT:  I have no idea what the answer is going

19   to be.  That's why I can't resolve it until I hear the answer.

20             MR. BUTLER:  I'd ask that the jury be excused.

21             THE COURT:  I apologize, members of the jury.  This

22   is an important case to both sides and I'll have resolve this

23   outside your presence first.

24             (Whereupon, the jury was escorted out of the

25   courtroom and the following colloquy ensued):

1          THE COURT:  Ask your question.

2    Q.  Detective Hill, when you went in to take that photograph

3    from the defendant, did the defendant start asking you

4    questions?

5    A.  Yes, ma'am, he did.

6    Q.  What was the first question the defendant asked you?

7    A.  He wanted to know what he was being charged with.

8          THE COURT:  What?

9          THE WITNESS:  He wanted to know what he was being

10   charged with.

11         THE COURT:  Okay.

12   Q.  Did you tell him what he was being charged with?

13   A.  Yes, ma'am.

14   Q.  In response -- What did you tell him he was being charged

15   with?

16   A.  With robbery first, and two counts of attempted murder.

17   Q.  And please keep your voice up because I'm having trouble

18   hearing you.

19   A.  Robbery first degree and two counts of attempted murder.

20   Q.  And after you told him that he was being charged with

21   robbery first and two counts of attempted murder, did he say

22   anything to you?

23   A.  Yes, he did.

24   Q.  Excuse me?

25   A.  Yes, ma'am, he did.

1    Q.  What did he tell you?

2    A.  He knew he was wanted.

3            THE COURT:  He what?

4            THE WITNESS:  He knew that he was wanted by the

5    police, and that his mother told him he was wanted and he

6    didn't want to go to jail.

7            MS. HARDWICK:  Those are going to be the questions,

8    Your Honor.

9            THE COURT:  How is this relevant?

10           MS. HARDWICK:  Your Honor, at the time, then, the

11   next charge that's coming up that we'll start presenting

12   evidence in, it's in reference to him shooting at the United

13   States marshals.  When the marshals went to the door to arrest

14   the defendant based on the arrest warrant, the defendant

15   himself answered the door.  There will be testimony from an

16   officer that he announced that he was a marshal and asked the

17   defendant to come on out.  This supports the fact that the

18   defendant knew he was wanted.  He was attempting to resist

19   arrest when the shooting at the marshals occurred.

20           THE COURT:  Okay.

21           MR. BUTLER:  Your Honor, if the question to the

22   witness is during your interview did Mr. Smith make any

23   statements regarding whether or not he was wanted by law

24   enforcement, I would withdraw my objection.

25           THE COURT:  Say that again, now?

1          MR. BUTLER:  If the question that was posed to this

2    witness is, did Mr. Smith make any statements whether or not he

3    knew he was wanted, and --

4          THE COURT:  What part of the testimony are you

5    objecting to?

6          MR. BUTLER:  The first part.  Did he ask you any

7    questions.  Did he ask you what were my charges.  There is no

8    relevance there.  I can see the relevance to that part about

9    him -- whether or not he knew he was wanted.  The other part --

10          THE COURT:  Well, I think it's important that the

11    Government show what he thought he was wanted for, because it's

12    one thing to be wanted for a traffic ticket, and it's another

13    thing to be wanted for a robbery.

14          MR. BUTLER:  But he doesn't say that.  He's asking

15    what the charges are.  He says he knows --

16          THE COURT:  What did you say to that?

17          THE WITNESS:  He knew he was wanted for bank robbery.

18    THE COURT:  Is that what he told you?

19          THE WITNESS:  Yes.

20          THE COURT:  The objection is overruled.  It's

21    overruled.

22          MR. BUTLER:  Could I have one moment?

23          THE COURT:  Yes.

24          (Whereupon, Mr. Butler conferred with Ms. McKee and

25    Ms. Mason off the record and out of the hearing of the other

```
 1    courtroom participants.)
 2              THE COURT:  Yes?
 3              MR. BUTLER:  Your Honor, his statements as to the --
 4    We understand the Court's ruling as to his statement if he knew
 5    as to the why he thought they wanted him.  It's still our
 6    position that the preliminary questions, what am I being
 7    charged with, is irrelevant and actually prejudicial.  First
 8    degree murder, the jury doesn't need to hear that.
 9              THE COURT:  Did he say he was being charged with
10    first degree murder?
11              MR. BUTLER:  That's what he was saying --
12              THE WITNESS:  Attempted murder.  Two counts of
13    attempted murder.
14              MR. BUTLER:  That's irrelevant.
15              THE COURT:  I think there is prejudice here, but I
16    think it should come in.  I think the probative value outweighs
17    the prejudice.  I think the seriousness of the charge is
18    exactly why he might have resisted arrest.
19              As I said, if he had been told he was wanted for a
20    traffic ticket he might not have resisted arrest.  If he was
21    told he was wanted for attempted robbery and attempted murder,
22    that's another story.
23              You're overruled.
24              It's now four of twelve.  How close are you to being
25    through?
```

```
1              MS. HARDWICK:  Very close.

2              THE COURT:  Bring the jury back in.  Once you finish

3   we'll rest and then we'll have the cross.

4              (Whereupon, the jury was escorted into the

5   courtroom.)

6              MS. HARDWICK:  May I proceed, Your Honor?

7              THE COURT:  Yes.

8              I thought we were waiting on some jurors.  We just

9   have a few in the restrooms.

10             (Whereupon, said individual jurors were escorted into

11  the courtroom.)

12             THE COURT:  Okay.  Members of the jury, the

13  Government is just about through with their witness.  So we're

14  going to finish this witness, and then we'll go to lunch.

15             Go ahead.

16             MS. HARDWICK:  Thank you, Your Honor.

17  Q.  Detective Hill, when you were there to take the photograph

18  that we have shown of -- forty-three of the defendant's neck,

19  did he ask you a question?

20  A.  Yes, ma'am.

21  Q.  And what was the first thing he asked you?

22  A.  He asked what he was being charged with.

23  Q.  And what did you tell him?

24  A.  Robbery first degree and two counts of attempted murder.

25  Q.  Did he tell you anything in reference to his charges?
```

1    A.    Yes, ma'am.    He said he knew he was wanted for the robbery

2    because his mother told him so.

3              MS. HARDWICK:    Those are all my questions, Your

4    Honor.

5              THE COURT:    Okay.    We'll take one hour for our lunch

6    break.

7              Members of the jury, you're under the same

8    instructions that I gave you earlier about not discussing the

9    case among yourselves or with anyone else.    Nor should you have

10    any contact with the attorneys or parties involved.    Don't

11    forget to turn your notes over in the chairs.

12              Do you want them to meet up here in the jury room or

13    over in the other building?

14              COURTROOM DEPUTY CLERK:    The jury room back here.

15              THE COURT:    You should be back in the jury room up

16    here.    I'll see you back here at one o'clock.

17              MS. HARDWICK:    Your Honor, we have one witness, Mr.

18    Robinson.    Can we excuse him?

19              THE COURT:    Is there any reason why we should keep

20    Mr. Robinson?

21              MR. BUTLER:    Yes, Your Honor.

22              THE COURT:    The jury is excused.

23              (Whereupon, the jury was escorted out of the

24    courtroom, and the following colloquy ensued):

25              THE COURT:    Counsel, I'll see you back here at one

1    o'clock.

2            MR. BUTLER:  Your Honor, we'll withdraw our request

3    to exclude the witness if he invokes his right to the Fifth as

4    to the drugs.  However, as I stated in my previous motion,

5    that's not precluding us from bringing up the drugs through

6    other means.

7            THE COURT:  Right.  Well, yes, I think the Government

8    -- Do you still have a motion to exclude any evidence about the

9    drugs?

10           MS. ADAMS:  No, Your Honor.

11           THE COURT:  Then you may bring up the drugs.

12           MS. ADAMS:  Your Honor, there is something I should

13   raise.  Mr. Jackson's attorney, Mr. Terry Luck, actually has a

14   doctor's appointment at one forty-five.  He wanted to be able

15   to attend the doctor's appointment.  He said he would return by

16   three o'clock.

17           THE COURT:  Okay, then.  Well why don't we just

18   briefly discuss how we're going to proceed with Mr. Jackson.  I

19   assume that because you know he's going to invoke the fifth,

20   you're not going to raise anything about marijuana, is that

21   right?

22           MS. ADAMS:  Yes, Your Honor.

23           MR. BUTLER:  And neither will I as to Mr. Jackson.

24           THE COURT:  You're not going to ask Mr. Jackson

25   anything about his possessing marijuana?

```
 1              MR. BUTLER:  That's correct.

 2              THE COURT:  That's a promise from both sides?

 3              MS. ADAMS:  Yes, Your Honor.

 4              THE COURT:  Then the issue is moot.

 5              Very good.  I'll see you back here at one.

 6              (Whereupon, the luncheon recess was taken.)

 7              COURTROOM DEPUTY CLERK:  Please remain seated.  Court

 8   is in session.

 9              THE COURT:  Proceed.

10              MR. BUTLER:  Prior to proceeding, Government's

11   counsel and I spoke, and I think there are one or two more

12   questions that still need to be asked, so I'll wait.

13              THE COURT:  Go ahead.

14              MS. HARDWICK:  Thank you, Your Honor.

15   Q.  Detective Hill, you indicated right before we took the

16   lunch break that Mr. Smith made comments to you in reference to

17   knowing that he was wanted by the police, is that correct?

18   A.  Yes, ma'am.

19   Q.  Did he make any reference to you about any jail?

20   A.  He did not want to go to jail, he said.

21              MS. HARDWICK:  That's all.

22              THE COURT:  Proceed.

23                        CROSS EXAMINATION

24              BY MR. BUTLER OF DAVID HILL:

25   Q.  Officer Hill, I believe you made reference to this, but I'm
```

```
 1    going to go back to it.  You're employed, again, with the
 2    Montgomery Police Department?
 3    A.  Yes, sir.
 4    Q.  And you have been employed there how long?
 5    A.  Six -- Almost six years.
 6    Q.  Almost six years.  So when did you begin with the
 7    Montgomery Police Department?
 8    A.  April of two thousand two.
 9    Q.  Now when you began -- Where are you employed right now?
10    What unit or division?  I believe there is like Patrol --
11    A.  Detective Division.
12    Q.  Detective Division.
13            And on or about June twenty-second, two thousand
14    seven where were you employed?
15    A.  I was a detective in the Detective Division as a
16    detective.
17    Q.  You were in the Detective Division as of that time?
18    A.  Yes, sir.
19    Q.  When you began in the Montgomery Police Department, what
20    were your duties?
21    A.  I was in training at the academy when I started.  Then I
22    became a patrol officer.  Then I went into the Detective
23    Division.
24    Q.  Okay.  So from patrol you went into the Detective Division.
25    When did you move into the Detective Division?
```

1    A.   October of two thousand three.

2    Q.   Okay.  Now, the Detective Division encompasses a lot of

3    different specialties.  There are detectives who do, for

4    instance, homicide; detectives who do vice.  In June two

5    thousand and seven what division of the detectives were you

6    in?

7    A.   Robbery/Homicide.

8    Q.   Robbery/Homicide.  When did you move into

9    Robbery/Homicide?

10   A.   It was March of last year.

11   Q.   March of two thousand seven?

12   A.   Correct.

13   Q.   So you had been in Robbery/Homicide approximately four

14   months prior to this incident.

15   A.   Yes, sir.

16   Q.   This is a bank robbery, correct?

17   A.   Correct.

18   Q.   This was your first bank robbery investigation, correct?

19   A.   Yes, sir.

20   Q.   You did what I'll call the bulk of the work in

21   investigating this offense, correct?

22   A.   Yes, sir.

23   Q.   You had supervision from outside of your office?

24   A.   Yes, sir, with Special Agent Drew.

25   Q.   But all the witness interviews -- Well, let's put it this

```
 1    way:  The witness interviews at Ms. Nichols' house, at the

 2    Compass Bank on July second, you did those by yourself?

 3    A.   At the bank I had my trainee with me.

 4    Q.   You had a trainee?

 5    A.   Yes.

 6    Q.   But was anybody your supervisor with you?

 7    A.   No, sir.

 8    Q.   You had only been in -- This was your first bank robbery,

 9    but was anybody assisting you?

10    A.   No.

11    Q.   You arrived -- the bank -- We've got a video of it.  The

12    bank was robbed at around ten-fifteen or eighteen on the

13    twenty-second.

14    A.   Correct.

15    Q.   You -- How did you come to know that the bank had been

16    robbed?

17    A.   I overheard it on the radio, our police radio.

18    Q.   What did you overhear?

19    A.   That a bank robbery did occur and a description was given

20    out of the suspect.

21    Q.   And what was that description?

22    A.   Five seven or eight.  Height was about five seven or eight.

23    He was a black male wearing a white hat, blue jeans and a white

24    shirt.

25    Q.   How long have you been -- Well you just testified you have
```

1    been in law enforcement for six years now, correct?

2    A.   Almost, yes, sir.

3    Q.   As part of your duties, it's your responsibility to be able

4    to assess people's makeup, build and appearance on a

5    professional level because you might have to effectuate

6    arrests, might have to stop them and question them.  So you

7    have been trained to be observant, correct?

8    A.   Correct.

9    Q.   You have been trained to observe height, correct?  Height

10   as well as build and complexion and facial features, correct?

11   A.   Yes.

12            MR. BUTLER:  Could you please stand up, Mr. Smith.

13            (Whereupon, the defendant stood in place.)

14   Q.   I'm six foot one and Mr. Smith is -- he is shorter than

15   me?

16   A.   Yes.

17   Q.   Slightly shorter than me, correct?  He's taller than five

18   seven or five eight, is he not?

19   A.   He is.

20   Q.   This was the description that came out right after the bank

21   was robbed.

22   A.   Correct.

23   Q.   There was another proceeding in which we spoke, and during

24   that proceeding you indicated that based upon your experience,

25   people's perception -- It's been your experience and training

```
1    that people's perceptions and memory tend to fade over time.
2    A.  Yes.
3    Q.  Okay.  And the information at least that you had received
4    closest to the event was that the individual who had done this
5    was five seven or five eight, correct?  That's what you
6    overheard on the radio.
7    A.  The police radio, correct.
8    Q.  Thank you.
9            Now you went, then, to the bank, correct?
10   A.  Yes, sir.
11   Q.  You got there around when, ten forty-five?
12   A.  Sir?
13   Q.  When did you get there?
14   A.  I don't know the exact time.
15   Q.  Approximately how long did it take you to get to the bank
16   after you overheard the alert come over the radio?
17   A.  No longer than thirty minutes.
18   Q.  I'm sorry?
19   A.  No longer than thirty minutes.
20   Q.  No longer than thirty minutes.  So you got there fast.  You
21   got there within fifteen minutes or so of the event.  When you
22   got there what did you do?
23   A.  I first made contact with the Officer Dave Lasort (ph.).
24   He briefed me about the case and began to interview the
25   witnesses.
```

1   Q.  Was one of the individuals that you interviewed at the time

2   of the offense Ms. Annette Nichols?  Her name now is Ms.

3   Annette Gurley.

4   A.  Yes, sir.

5   Q.  Okay.  It's important to talk to, I think they use the word

6   on TV and correct me if I'm using an incorrect term, canvas the

7   scene as soon as possible so as to preserve evidence.

8           That evidence takes many forms.  That evidence can be

9   the note for example, something physical.  Another form of

10  evidence is testimony -- well recollection of what people saw,

11  what people observed, correct?

12  A.  Yes, sir.

13  Q.  And so you were doing your job when you got there and you

14  went and talked to the persons that were party to -- who

15  witnessed the events that took place that day.

16  A.  Yes, sir.

17  Q.  And one of those persons was Miss Annette Nichols,

18  correct?

19  A.  Correct.

20  Q.  When you spoke to her, did you record that conversation?

21  A.  I did.

22  Q.  You used a tape recorder?

23  A.  Yes, sir.

24  Q.  Again, this is good police work.  The reason that you use

25  that tape recorder is to make sure that mistakes aren't made.

1  She says the person had a white hat but by mistake you write

2  down red hat; well by having the tape recorder there you

3  memorialize accurately what she's telling you.

4  A.  Yes.

5  Q.  And --

6          MR. BUTLER:  May I approach the witness, Your Honor?

7          THE COURT:  Yes.

8  Q.  After that taped interview was completed, you took the tape

9  back to your department and had it transcribed?

10 A.  Correct.  Yes, sir.

11 Q.  And the transcription of that tape -- Well, could you

12 review what document I've just provided to you and tell me if

13 you recognize what that is?

14 A.  Yes, sir, I do.

15 Q.  Okay.  And is that the transcription of the tape of the

16 interview of Ms. Nichols?

17 A.  Yes, sir.

18 Q.  And you've reviewed that transcription in the course of

19 your investigation, and possibly even in preparation of your

20 testimony today.

21 A.  Correct.

22 Q.  And what's contained in that transcription is what was

23 accurately told to you by Ms. Nichols on the date of the

24 incident approximately, I would guesstimate, an hour to two

25 hours after it had taken place, correct?

1    A.  Yes, sir.

2    Q.  Thank you.

3         The same thing was done with Mr. Daniel Robinson.   He

4    also provided a statement to you which you tape recorded and

5    then had transcribed.

6    A.  Corporal Wilson.

7    Q.  Excuse me, this was done by Corporal Wilson?

8    A.  Correct.

9    Q.  Did you have an opportunity to review that tape and/or the

10   transcription of that tape after they were made?

11   A.  I did.

12   Q.  And does this statement accurately reflect what was

13   communicated to you to law enforcement by Daniel Robinson after

14   the event?

15   A.  Yes, sir.

16   Q.  Again, these were the statements that were made closest to

17   the event.  And as you've testified, it is your training to try

18   to gather information as close to the event as possible because

19   that tends to -- because you want to preserve that evidence as

20   close to the time of the event, correct?

21   A.  Correct.

22   Q.  Because it's usually the most accurate, correct?

23   A.  Right.

24   Q.  Thank you.

25        At that time Ms. Nichols expressed an inability --

1   she was not certain that she would be able to identify the

2   person who committed this offense.

3   A.   She was.

4   Q.   In her statement to you she stated that she was not sure

5   that she'd be able to identify the person who committed the

6   offense.

7   A.   Sounded like she was stuttering when she made that

8   statement.  It's more clear on the audio.

9   Q.   Well let me just show you the transcription that I have.

10  In the transcription that I have, and I'll point to this first

11  paragraph, when asked will she be able to identify this guy,

12  maybe you're right, she says, "I think," but then she says, "I

13  mean, you know, I couldn't."  But then she says, "Well, I think

14  so."  Correct?

15  A.   That's correct.

16  Q.   So she expressed well maybe I can and maybe I can't type

17  answer.  At least that's what's written here.

18  A.   Transcribed, yes.

19  Q.   Thank you.

20          Additionally, in that audiotaped statement there's no

21  mention of a suspect having -- Excuse me.  In the conversation

22  you had with Ms. Nichols immediately after the event, she does

23  not describe the suspect as having facial hair.  As a matter of

24  fact, in direct response to that, to that question she says,

25  "No, I don't think so."  Do you recall that?

```
 1    A.  Yes, sir.
 2    Q.  Now -- And this is where I get confused.  Did you speak to
 3    Ms. Nichols -- We know that you were contacted by Ms. Nichols
 4    approximately on the twenty-sixth regarding an incident at
 5    Hooters, correct?
 6    A.  Yes, sir.
 7    Q.  Prior to that, did you have any -- Between the bank robbery
 8    and the incident at Hooters, did you have any other
 9    conversations with Ms. Nichols?
10    A.  After the Hooters incident?
11    Q.  Let me be clear because this is where I'm confused.  The
12    bank robbery takes place on the twenty-second.
13    A.  Correct.
14    Q.  You interview her, that's tape recorded and transcribed.
15    Did you meet with her -- Then on the twenty-sixth we know there
16    was an incident at Hooters.
17    A.  Correct.
18    Q.  When these statements are prepared and the incident at
19    Hooters, between that time, did you meet with Ms. Nichols again
20    at, for instance, the police station or someplace else?
21    A.  Yes, sir.
22    Q.  Okay.  I think it just kicked in.  Was that done for
23    purposes of putting together a composite?
24    A.  Yes, sir.
25    Q.  Did you do the composite thing?
```

```
 1   A.  No, sir, I did not.
 2   Q.  Another officer or employee of the police department
 3   assisted her in preparation of that?
 4   A.  Yes, sir.
 5   Q.  When that composite was being prepared, did you review --
 6   Well let's put it this way:  As part of your investigation,
 7   it's your responsibility to maintain all the documents prepared
 8   in connection with this case.
 9   A.  Correct.
10   Q.  And at the time the composite was prepared, you saw an
11   example she put together.
12   A.  Yes, sir.
13   Q.  And what -- For the first time, the person now had facial
14   hair, correct?
15   A.  Yes, sir.
16   Q.  Though when she was interviewed immediately after the
17   event, she didn't say the person had facial hair.
18   A.  That's correct.
19   Q.  Okay.  Do you know whether Ms. Nichols had talked to Mr.
20   Robinson at all in between the event and doing the composite?
21   A.  I don't know.
22   Q.  Okay.  She did also inform the officer that -- did -- Was
23   it an officer who did the composite?
24   A.  Detective, yes, sir.
25   Q.  The officer that she tried her best but she wasn't
```

1    particularly confident in what she had done.

2    A.   Correct.

3    Q.   So what we've got here now is a statement recorded right

4    after the event in which she says I think, I don't think, well

5    maybe I can identify the person, she's putting together a

6    composite which she says, you know, I'm not very confident in

7    that composite interview.   I mean I'm summarizing, but that's

8    essentially what's happened so far.

9    A.   Yes.

10   Q.   Now, on the following day, the twenty-sixth, do you receive

11   a call from Ms. Nichols and/or an employee of Compass Bank?

12   A.   I personally didn't, no, sir.

13   Q.   Okay.   Was law enforcement, Montgomery police specifically,

14   contacted by Ms. Nichols and/or an employee of Compass Bank

15   regarding activity related to this case?

16   A.   Yes, sir.

17   Q.   Do you know who was contacted?

18   A.   My deputy chief was contacted, and in turn contacted my

19   major and went down the ranks until it got to me.

20   Q.   Tends to happen.   When something happens, it makes its way

21   down to the person who they want to jump.   And you were

22   contacted by your supervisors who said -- Well, strike that.

23          Based on having been contacted, what did you do?

24   A.   Well I had to respond to investigate what took place.

25   Q.   Okay.   Did you respond to a Hooters Restaurant?

```
1    A.   No.

2    Q.   Where did you go?

3    A.   I went to the Detective Division.

4    Q.   And when you arrived at the Detective Division was someone

5    there for you to interview and/or speak to?

6    A.   Yes, sir.

7    Q.   Who was that person?

8    A.   Edmond Oliver.

9    Q.   Do you know where Mr. Oliver was employed?

10   A.   Hooters.

11   Q.   Who had brought Mr. Edmond Oliver to the Detective

12   Division?

13          MS. HARDWICK:  Your Honor, I'm going to object to any

14   further questions regarding this.  Unless this officer has

15   firsthand knowledge and was present, it would call for hearsay.

16          THE COURT:  Say that again now?

17          MS. HARDWICK:  Beg your pardon?

18          THE COURT:  I didn't understand you.

19          MS. HARDWICK:  We would object.  He's beginning to

20   ask him questions along the line of who did what.  He had

21   testified earlier that he did not go to Hooters, so any

22   information --

23          THE COURT:  Oh, hearsay.

24          MR. BUTLER:  Your Honor, just briefly in response to

25   that, because I can do this without that.  He is the case
```

```
 1   agent, he did maintain the documents.  All documents were
 2   maintained in his police file --
 3             THE COURT:  That doesn't mean it's not hearsay.
 4             MS. HARDWICK:  Your Honor, if we could have a slight
 5   side bar --
 6             THE COURT:  Why don't you talk to him and see if you
 7   can resolve it.
 8             (Whereupon, Ms. Hardwick conferred with Mr. Butler
 9   off the record and out of the hearing of the other courtroom
10   participants.)
11   Q.  When you got to the police station there was a Mr. Edmond
12   Oliver there.
13   A.  Correct.
14   Q.  Okay.  Had Mr. Oliver decided to stroll into the police
15   station on his own accord?
16   A.  No, sir.
17   Q.  Someone had brought him there.
18             MS. HARDWICK:  Again, Your Honor, unless this officer
19   was present he's already indicated --
20             THE COURT:  Sustained, unless he has personal
21   knowledge.
22   Q.  Do you have personal knowledge of whether or not someone
23   from the Montgomery Police Department brought him there?
24             THE COURT:  Did you see it?
25   A.  I saw him, yes.
```

```
 1              THE COURT:  Go ahead, then.
 2   Q.  Now, you questioned Mr. Oliver, did you not?
 3   A.  Yes, sir.
 4   Q.  And you questioned him regarding whether he was involved in
 5   the Compass Bank, correct?  I mean the Compass Bank robbery.
 6   A.  Correct.
 7   Q.  Do you have any personal knowledge as to who identified Mr.
 8   Oliver as a suspect?
 9   A.  Nobody identified him.
10   Q.  Do you have personal knowledge as to why he ended up
11   there?
12   A.  Because he resembled the description of the suspect.
13   Q.  Okay.  Did you question him?
14   A.  Yes, sir.
15   Q.  Okay.  Was he arrested and charged with robbing the Compass
16   Bank?
17   A.  No, sir.
18   Q.  How was he dressed when he got there, do you know?  When he
19   came inside and you saw him, did he have his Hooters uniform
20   on, or was he dressed out in casual clothes?  Do you
21   remember?
22   A.  I don't recall.
23   Q.  Okay?  I'm showing you what's been marked as defendant's
24   exhibit fifty-two.  Is Mr. Oliver in that lineup?
25   A.  Yes, sir.
```

```
 1    Q.   And what number is he?
 2    A.   Three.
 3    Q.   Three?  Thank you.
 4              MS. HARDWICK:  Excuse me, Your Honor --
 5              MR. BUTLER:  You're right.  Was this the -- Did you
 6    prepare this lineup.
 7    A.   Yes, sir.
 8    Q.   Okay.  And does this accurately -- truly and accurately
 9    reflect the lineup that you prepared on the date -- on or about
10    the date that Mr. Oliver was brought to the police
11    department?
12    A.   Yes, sir.
13              MR. BUTLER:  At this time we move to admit
14    defendant's exhibit fifty-two.
15              MS. HARDWICK:  No objection.
16              THE COURT:  Admitted.
17    Q.   What number is Mr. Oliver?
18    A.   Number three.
19    Q.   So Mr. Oliver is number three.
20    A.   Correct.
21    Q.   Whether he, because of the way the photograph was taken, or
22    simply his actual skin tone, he appears to be -- does he appear
23    to be darker skinned to you than, for instance, number four?
24    Does he appear to have darker skin?
25    A.   I can't really tell.
```

```
 1   Q.  That's fair enough.
 2            I'm putting on the screen what's been marked as
 3   Government's exhibit eighty-one.  Would you agree that the
 4   person at number three where my finger just pointed is darker
 5   skinned than -- I mean lighter skinned than Mr. Oliver?  That
 6   his skin tone is lighter, or at least different?
 7   A.  It looks different, but I can't tell.  I can't see -- It's
 8   different backgrounds.
 9   Q.  I'm sorry?
10            MS. HARDWICK:  Your Honor -- Can you speak into the
11   mic.
12            THE WITNESS:  I'm sorry.
13   A.  It appears that it's lighter on the bottom number three.
14   Q.  Thank you.
15            Now, these are -- You took this lineup and showed it
16   to individuals.  I mean showed it to, excuse me, Ms. Nichols
17   and to Mr. Robinson, correct?
18   A.  Correct.
19   Q.  You would agree that the person on the top of this
20   photograph is, for whatever reason, camera angle or actual skin
21   tone, is of a different color, hue, than the person underneath.
22   I'm talking about number three and number six.
23   A.  It appears that way.
24   Q.  I'm sorry?
25   A.  It appears that way.
```

1    Q.   Okay, thank you.

2         When you showed Ms. Nichols this photograph, did she

3    identify Mr. Edmond Oliver?

4    A.   No, sir.

5    Q.   So the very person who had led to him being arrested that

6    day didn't even identify him --

7         MS. HARDWICK:   Your Honor, there is no testimony that

8    Mr. Oliver was arrested.

9         MR. BUTLER:   Withdrawn.

10   Q.   So what you have so far, and again the robbery happened on

11   the twenty-second, we're now -- this happens on or about June

12   twenty-six, is a teller who says -- who waffles on whether or

13   not she can identify the person at the bank, who is not very

14   certain about being able to put together a composite, who you

15   interviewed someone who for whatever reason has been brought to

16   the police station as a suspect of the Compass robbery but

17   nobody is able to identify him, so that's what you've got at

18   this stage, as of the twenty-sixth.

19   A.   Yes.

20   Q.   Ms. Nichols hasn't been able to identify the robber as of

21   this date, correct?

22   A.   Correct.

23   Q.   Now July, time goes by.  You and Government counsel

24   discussed this, and come across a vehicle that you stopped or

25   did stop that matches the description of the vehicle that was

1    in the robbery.

2    A.   I stopped.

3    Q.   I think -- Could you tell the jury how you came across this

4    vehicle?  Were you out looking for it, or was it

5    happenstance?

6    A.   I actually wasn't out looking for it.  I was going to a

7    separate robbery call.  As I was sitting on the boulevard I

8    looked in my rear view mirror and observed a vehicle that

9    matched the robbery suspect's vehicle.  At that time I allowed

10   it to pass by me to initiate a traffic stop.

11   Q.   Sometimes it's better to be lucky than good.

12           You pull up to the light, you look in the mirror and

13   you go damn, that looks like the car.  It pulls around you and

14   you stop the vehicle.  I don't want to mess up.  One second.

15           When you stopped the vehicle, I'm assuming you

16   approached the driver's side?

17   A.   Well, at one point I did, but I do different techniques as

18   I approach vehicles.

19   Q.   Let's talk about the technique you used.  What did you do?

20   Tell us what you did.

21   A.   I walked towards the driver's side of the car, and then I

22   turned over to the passenger's side before I actually made

23   contact with the driver.

24   Q.   So just so the jury has -- You get out of your car, the car

25   stopped in front of you, you're walking toward the driver's

1    side but you decided to go around to the passenger's side to

2    talk to the person?

3    A.   Yes.

4    Q.   Okay.  Do you ask for his identification?

5    A.   I did.

6    Q.   And did he provide you with identification?

7    A.   No.

8    Q.   Did he have a driver's license?

9    A.   No.

10   Q.   Okay.  Did he tell you his name?

11   A.   He did.

12   Q.   And what was the name he told you?

13   A.   Glen Leroy Teague.

14   Q.   Okay.  Did you take that information and do anything with

15   it?

16   A.   I did.

17   Q.   And what did you do?

18   A.   I checked to see if he had any warrants before I responded

19   to my robbery call.

20   Q.   Did that person have any warrants?

21   A.   He did not.

22   Q.   What else did you do?

23   A.   I received information that his son also drives that car.

24   Q.   Where did you receive that information?

25   A.   From Mr. Teague.

Q.  Of course.  Did he just volunteer that, or did you ask
him?

A.  I asked him if --

Q.  Okay.  Now, did you gather up any other information about
Mr. Teague's background at that time?  Did you investigate his
background at that time?  What I'm getting at ia, he's parked
on the side of the road, you just asked him for his driver's
license.  Did you do any background check on him at that time?

MS. HARDWICK:  Your Honor, we would object to the
relevancy of the driver, unless he's connecting him directly
with the offense --

THE COURT:  I'm having trouble hearing you, Ms.
Hardwick.

MS. HARDWICK:  I don't know whether the mic is on or
not, but I have it almost in my mouth.

Your Honor, we would object to the relevancy of the
questions regarding Mr. Teague's criminal background.  He is
not a subject in this investigation.  He's not charged with
anything in this investigation.

MR. BUTLER:  Your Honor, I believe the Government's
original position was unless they can show that he's connected
to this offense, and this officer has just testified that Mr.
Teague was driving the car that was viewed at the offense.  I
think the connection is pretty clear.  That's why I believe
it's relevant.

1          THE COURT:  And you want to ask what, now?

2          MR. BUTLER:  Whether or not he did a background

3    investigation as to Mr. Teague, the driver of the vehicle.

4          THE COURT:  What difference does it make whether he

5    did a background investigation?

6          MR. BUTLER:  I think what information he determines

7    is relevant to whether or not Mr. Teague committed this

8    offense.

9          THE COURT:  Based on what?

10          MR. BUTLER:  He's driving the get-away car.  He was

11    driving the car that was at the scene of the robbery.

12          THE COURT:  My concern is why does it make a

13    difference whether he did a background investigation.  If you

14    know something about Mr. Teague that's relevant, then you can

15    ask him about it.  But just the fact that he did a background

16    investigation --

17          MR. BUTLER:  I understand.  Thank you, Your Honor.

18          MS. HARDWICK:  Your Honor, before he asks a question,

19    the problem is the only thing the officer has testified to is

20    that he saw a car that matched the description of the get-away

21    car that was involved in the bank robbery.  He has not yet

22    established that he indeed saw the car.  So now we've jumped

23    from that point to a background check on the driver.

24          MR. BUTLER:  If the Government is willing to

25    stipulate, Your Honor, that the photographs they have been

```
 1    showing to this witness are not -- not this witness, to the
 2    other witnesses -- are not photographs of the car that was
 3    involved in the bank robbery, I'll be more than glad to
 4    withdraw this line of questioning.
 5              MS. HARDWICK:  Again, Your Honor, we will not
 6    stipulate to that because that's not the issue.  The issue is
 7    he's asking this officer --
 8              THE COURT:  I just sustained your objection about the
 9    question about a background check.
10    Q.  I'll ask you this way.  Did you determine that Mr. Teague
11    had been convicted of --
12              MS. HARDWICK:  Your Honor, exactly.  May we have a
13    side bar, please?
14              THE COURT:  I'll excuse the jury for just a minute.
15              (Whereupon, the jury was escorted out of the
16    courtroom and the following colloquy ensued):
17              THE COURT:  Go ahead and ask your questions.
18    Q.  After stopping Mr. Teague, did you run a criminal history
19    background check on him?
20    A.  Yes.
21    Q.  Did you -- Were you able to determine that based on that
22    and your investigation, that he had a prior conviction for
23    robbery?
24    A.  Yes.
25              THE COURT:  How is that relevant?
```

```
1              MR. BUTLER:  At issue here is a robbery.  He's

2     driving the car that was involved in the robbery.  I think the

3     jury is allowed to possibly make the -- put together the dots

4     in determining maybe this was the person who committed the

5     robbery.

6              THE COURT:  Because he had a conviction of robbery?

7              MR. BUTLER:  That is allowable under six oh -- well,

8     yes.

9              THE COURT:  Allowable under what?

10             MR. BUTLER:  Well he hasn't testified yet.  Because

11    of the background check that was done.

12             THE COURT:  Is he being called, Mr. Teague, as a

13    witness?

14             MR. BUTLER:  Yes.

15             THE COURT:  I'll sustain the objection at this time.

16             MS. HARDWICK:  By who?  Are you going to call him?

17             MR. BUTLER:  Mm-hmm.

18             THE COURT:  I'll sustain the objection.  Bring the

19    jury back.

20             MS. HARDWICK:  Your Honor, we'd also move to strike

21    Mr. Butler's last question to the officer.

22             THE COURT:  Well there was no answer, and I've

23    already told the jury not to consider questions that have been

24    overruled.

25             (Whereupon, the jury was escorted into the
```

1    courtroom.)

2    Q.  You've gathered information from Mr. Teague, and -- Did you

3    do any form of investigation at the scene right there?

4    A.  Yes, sir.

5    Q.  What was that?

6    A.  That was gathering his name, son's name who drives the

7    car.

8    Q.  According to the father?  Let's put it this way:  There

9    wasn't a sign on the car that said Andreas Smith drives this

10   car.

11   A.  According to him, he said he did.

12   Q.  It came from the occupant of the car, correct?

13   A.  Yes, sir.

14   Q.  All right.  Go ahead.  So there wasn't a sign or any

15   physical evidence saying Andreas Smith drives this car,

16   correct?

17   A.  Correct.

18   Q.  It came from Mr. Teague?

19   A.  Correct.

20   Q.  Okay.  Go ahead.  What else did you do?

21   A.  I observed the sticker that was on the vehicle, and that's

22   from that point --

23   Q.  Okay.  I'm going to show you what's been marked as

24   defendant's exhibit one.  Do you recognize who was on, I guess

25   the left side of the photograph?  I'll just point to him.  Do

1   you recognize who that person is right there?

2   A.   Yes.

3   Q.   And who is that?

4   A.   That's Glen Teague.

5   Q.   Does this individual appear to you to fit the same physical

6   description at about the time of this offense, at or about the

7   time of this vehicle stop?

8           MS. HARDWICK:  Your Honor, may we take the witness on

9   voir dire before we go any further with this testimony?

10          THE COURT:  Ask your question again, now.

11  Q.   Does this person appear to be -- Mr. Teague appear to be of

12  the same physical description in this photograph that he was at

13  or about the time that you stopped him on July seven?

14          THE COURT:  Now you want to do what, now?

15          MS. HARDWICK:  I'd like to take the witness on voir

16  dire in reference to time, date, place.

17          THE COURT:  Why?

18          MS. HARDWICK:  In reference to time, date, place, we

19  don't know where he's coming from.

20          THE COURT:  When was this picture taken?

21          MR. BUTLER:  June twenty-third, two thousand seven.

22          MS. HARDWICK:  And we don't know where, by whom or

23  anything else, Your Honor, and he's attempting to get it in

24  through this witness.

25          MR. BUTLER:  Your Honor, by way of response, I think

1    the Government's position as to this photograph is mistaken in

2    the sense that a person identifies a person in the photograph,

3    and that person --

4            THE COURT:  I'll allow you to do this, but just make

5    sure you connect it up later.

6            MR. BUTLER:  Yes, Your Honor.

7    Q.  Does he appear -- I mean the same?

8    A.  Yes, sir.

9            MR. BUTLER:  At this time, Your Honor, I am going to

10   move to enter defendant's exhibit one.

11           MS. HARDWICK:  We do object to the relevancy of that.

12           THE COURT:  Pardon me?

13           MS. HARDWICK:  We do object to the relevance of it.

14           THE COURT:  You want to admit that photograph?

15           MR. BUTLER:  Yes, Your Honor.

16           THE COURT:  I'll sustain that.  That doesn't show

17   where it was taken or how it was relevant.

18           MR. BUTLER:  Your Honor, we can tie it together

19   later.  It is our position that a witness can identify --

20   whether he took the photograph or not, if the person in the

21   photograph is in fact who he is saying it is, I think that

22   would be sufficient grounds --

23           THE COURT:  You just want to introduce the photograph

24   of Mr. Teague?  Is that all you're trying to do?

25           MR. BUTLER:  There are two other individuals in the

1    photo.

2         THE COURT:  Until you can show me the relevance of

3    the two other individuals, I'll sustain it.  I thought you just

4    wanted to show Mr. Teague.

5         MR. BUTLER:  Understood, Your Honor.

6    Q.  We're still at the vehicle stop.  Did you place Mr. Teague

7    in custody?

8    A.  No, sir.

9    Q.  Is he driving a vehicle that matches the description of

10   what you've come to believe as the vehicle that was utilized in

11   the bank robbery, correct?

12   A.  Yes, sir.

13   Q.  You -- However, you did not place him in custody?

14   A.  No, sir.

15   Q.  During an earlier proceeding I asked you some questions

16   regarding your work in the fact that persons involved in

17   robberies often, or at times, present alibis.  I was someplace

18   else.  Is that correct?

19   A.  Would you ask that again, please?

20   Q.  That persons who are suspects in robberies when questioned

21   present you with what I'll call an alibi.  That is, you think

22   he robbed X but he says no, I was Y.  That's happened before,

23   correct?  Does that not happen in your line of work?

24   A.  Yes.

25   Q.  Now, did you ask Mr. Teague at that time whether or not he

1    was involved in the Compass Bank robbery?

2    A.   No.

3    Q.   So you pulled over a car driven by -- a car that matches

4    the description of the get-away vehicle, and you don't bother

5    to ask the driver whether or not he was involved in the

6    offense?

7    A.   That's not how I investigate.

8    Q.   So you didn't do it?

9    A.   I might have told him I'm investigating a crime with the

10   vehicle matching this description, but I'm not going to tell

11   him what it's for.

12   Q.   Okay.  After you inquired about who the other drivers were

13   and you got the response, what did you do?

14   A.   Could you ask that again?

15   Q.   Could you seize the vehicle as potential evidence in

16   relation to Compass Bank?

17   A.   No, sir, I released him.

18   Q.   And you didn't just release him, you let the car go on its

19   way as well.

20   A.   Yes, sir.

21   Q.   Did you have an opportunity to interview Mr. Teague

22   again?

23   A.   I did.

24   Q.   And when did that interview take place?

25   A.   That was -- Sir, I don't remember the exact date.

1  Q.  Okay.  So where did that interview take place?

2  A.  I first saw him at the Pardons and Parole building.  An

3  interview took place --

4          MS. HARDWICK:  Your Honor, again, we would object to

5  any lines of questions regarding the interview with Mr. Teague

6  that would call for hearsay.

7          MR. BUTLER:  I'm not asking for what was said.

8          MS. HARDWICK:  Your Honor, I'm objecting to any line

9  of questions regarding an interview with Mr. Teague that would

10  call for hearsay, and the responses he would give.

11          MR. BUTLER:  Your Honor, I'm not asking for his

12  responses.  I'm asking whether he interviewed and where.

13          THE COURT:  I'll allow that.

14          MS. HARDWICK:  He's already answered that, so the

15  next objection would be asked and answered.

16          MR. BUTLER:  Your Honor, I didn't hear it because

17  Government counsel was jumping up.

18          THE COURT:  Did you interview Mr. Teague?

19          THE WITNESS:  Yes, sir.

20  Q.  And where did that interview take place?

21  A.  In my office.

22  Q.  Was this your only other interview with Mr. Teague?

23  A.  No.

24  Q.  When else did you interview Mr. Teague?

25  A.  At the pardons and paroles building.

1    Q.  Prior to your interview with Mr. Teague, you had no

2    identification and/or name of the individual who committed the

3    Compass Bank robbery, correct?  Who committed the offense at

4    the Compass Bank.  You had no leads as to who the name or the

5    identity of that person was, correct?

6    A.  Yes, I did.

7    Q.  Prior to the interview with Mr. Teague?  Maybe I missed

8    something.  So prior to you stopping Mr. Teague's vehicle and

9    talking to him, you had a name --

10   A.  No, sir, I did not.

11   Q.  Okay.  And, again, I think it's been made pretty clear to

12   the jury.  Mr. Teague is the father of who?

13   A.  Andreas.

14   Q.  Now was it after your interview of Mr. Teague at the

15   Pardons and Parole office -- Who else was present during that

16   interview at Pardons and Parole?

17   A.  My trainee.

18   Q.  Anyone else?

19   A.  Parole officer.

20   Q.  There was a parole officer?  And whose parole officer?

21          MS. HARDWICK:  Again, we're getting into a line of

22   questioning that has already been sustained.  We object to the

23   relevancy of who was present, that it directly treats that

24   subject matter.

25          MR. BUTLER:  It goes to the credibility of what's

1    being said, and the circumstances surrounding the interview.  I

2    think I'm allowed to --

3              THE COURT:  Overruled.  Go ahead.

4    Q.  The name of the parole officer and whom that individual was

5    a parole officer for?

6    A.  Glenn Teague.

7    Q.  Who is Glenn Teague the prosecute parole officer for?

8              MS. HARDWICK:  We object.  It goes to the same area

9    of questioning --

10             THE COURT:  Yes.  Where are you going with this?

11             MR. BUTLER:  Your Honor, I'm just trying to get the

12   scope, nature and extent of his investigation --

13             THE COURT:  His investigation is not relevant.

14             MR. BUTLER:  I think it is.

15             THE COURT:  No, it's not relevant because whether he

16   did a good or bad investigation is not relevant.  What the jury

17   should decide is the evidence that comes out in court today.

18   Whether his investigation was bad or not is not the issue at

19   this trial.  What is at issue is, the evidence the jury hears

20   in court.  I'm not putting the investigation on trial.

21             MR. BUTLER:  I agree, but I do not agree, Your Honor,

22   in the sense that if this witness says it was a sunny day on

23   Tuesday but it turns out that it was a cloudy day and a very

24   overcast day --

25             THE COURT:  I have sustained that objection because

1    whether it was sunny is irrelevant.

2         MR. BUTLER:  But it goes to his truthfulness.

3         THE COURT:  But you don't attack truthfulness by just

4    having an argument with the witness about irrelevant things.

5         The objection is sustained.  Move on.

6         MR. BUTLER:  Yes, Your Honor.

7    Q.  So, you interviewed -- Was it after your interview at the

8    Pardon and Parole building with the parole officer and your

9    trainee that you went and spoke to -- that you put together a

10   supplemental lineup?

11   A.  I'm sorry, could you ask is that one more time, please?

12   Q.  You showed a supplemental lineup to Annette Nichols and Mr.

13   Robinson, correct?

14   A.  Yes, sir.

15   Q.  That lineup was prepared after an interview with Mr.

16   Teague, correct?

17   A.  At the vehicle stop?

18   Q.  That was, I guess, maybe that's my question.  When was that

19   supplemental lineup prepared?  Was it prepared right after the

20   vehicle stop or was it prepared after those interviews?

21   A.  After the vehicle stop.

22   Q.  Now, did you go and speak to Ms. Nichols and Mr. Robinson

23   and show them this lineup before or after you had interviewed

24   Mr. Teague supplemental times?

25   A.  I don't recall.

1    Q.   My point is this.  You stop the car, you talk to him, you
2    put together a lineup.
3    A.   Correct.
4    Q.   That lineup has Mr. Andreas Smith in it.
5    A.   Yes, sir.
6    Q.   Do you then have the -- Do you then talk to Mr. Teague
7    supplemental times and then go and see Ms. Nichols, or
8    immediately after preparing it and even before talking to Mr.
9    Teague, do you go and show Ms. Nichols and Mr. Robinson the
10   lineup?
11   A.   July second is when I showed the lineup.
12   Q.   So you can't recall whether or not you had spoken to Mr.
13   Teague additional times before you went and showed these
14   lineups to Ms. Nichols and Mr. Robinson?
15   A.   I don't recall.
16   Q.   Okay.  And, again, this is your first investigation?
17   A.   Sir?
18   Q.   This is your first bank robbery investigation?
19   A.   Bank robbery, yes.
20   Q.   You didn't take notes about when you met with Ms.
21   Nichols?
22   A.   When I met with Ms. Nichols?
23   Q.   The second time you were showing her the lineup with Mr.
24   Smith in it.
25   A.   July second.

```
 1   Q.  When?  I mean A specific time, other than date, when you

 2   went to her residence.  You didn't take any notes of that?

 3   A.  No, sir.

 4   Q.  Did you take -- Strike that.

 5        Were the interviews of Mr. Teague at your office, was

 6   it recorded?

 7   A.  It was not.

 8   Q.  Was the interview of Mr. Teague at the Pardon and Paroles

 9   office recorded?

10   A.  No.

11   Q.  I'm sorry?

12   A.  No, sir.

13   Q.  Now, you're aware at the time -- When preparing the lineup

14   that you showed to Ms. Nichols after the vehicle stop which had

15   Mr. Teague, you had received a copy of the composite photo,

16   correct?

17   A.  Yes.

18   Q.  And you had seen it?

19   A.  Yes.

20   Q.  And you're aware that this is that composite, correct?

21   A.  Yes, sir.

22   Q.  And you see the facial hair above the upper lip which is

23   commonly called a mustache, and the hair at the bottom which is

24   the goatee?

25   A.  Correct.
```

1    Q.  Now we had this conversation before.  You're aware of the

2    numbers one, three and five.  One, three and five do not have

3    mustaches or goatees, correct?

4    A.  They had facial hair.

5    Q.  The question, though, not facial hair, mustaches and

6    goatees, that one, three and pretty much all men have facial

7    hair.  One, three and five do not have a mustache and goatee,

8    correct?  Do you recall your prior testimony in another

9    hearing?

10   A.  I don't recall everything I said.

11   Q.  So you don't recall testifying that numbers one, three and

12   five in your opinion did not have facial hair?

13   A.  I said they did not have facial hair?  Clearly they had

14   facial hair.

15   Q.  A mustache and a goatee.

16   A.  Number three doesn't look like has as much.  I can't tell

17   very good with this picture.

18   Q.  I'm sorry?

19   A.  I can't tell very clearly with this picture.

20   Q.  Well, let me just hearken you back to a suppression hearing

21   -- excuse me, a hearing that we had in this case.  Do you

22   recall testifying during that hearing?

23   A.  Yes, sir.

24   Q.  Do you recall me asking you questions regarding the

25   individuals in this photograph?

```
 1    A.   Yes.
 2    Q.   At that hearing you swore to tell the truth, the whole
 3    truth, and nothing but the truth.  Do you remember doing
 4    that?
 5    A.   That's correct.
 6    Q.   Okay.  And during that hearing you recall me asking you
 7    questions regarding whether or not the individuals in these
 8    photographs have facial hair?
 9    A.   Yes, sir.
10    Q.   Do you recall me asking you whether or not the individual
11    in photograph number one had facial hair?  Do you recall
12    that?
13    A.   I don't recall which question you asked.
14    Q.   Okay.  All right.  So in response -- Well, while I'm
15    looking for this, could you answer me one question?  Did you
16    include in any photo lineup a photograph of Mr. Teague to show
17    to Ms. Nichols?
18    A.   No, sir.
19    Q.   Mr. Teague is the individual who was -- you originally
20    stopped in the car, correct?
21    A.   Correct.
22    Q.   But you didn't take a photograph him to show to Ms.
23    Nichols, did you?
24         MS. HARDWICK:  Your Honor, again we'd object.  It's
25    following the same subject matter that the Court has previously
```

1    sustained.

2            MR. BUTLER:  I'm asking him whether or not he showed

3    a photograph of Mr. Teague to Ms. Nichols.

4            THE COURT:  I'll allow that.

5    Q.  And did you show a photograph of Mr. Teague to Ms.

6    Nichols?

7    A.  No, sir.

8    Q.  You didn't put Mr. Teague in a lineup?

9    A.  No.

10   Q.  You only put the person in the lineup that Mr. Teague --

11           MS. HARDWICK:  Objection, Your Honor.  The witness

12   has clearly testified that he showed the photo array

13   immediately after the traffic stop and before the interviews.

14           MR. BUTLER:  I misunderstood --

15           THE COURT:  Go ahead and ask your question again.

16   Complete your question.

17           MR. BUTLER:  Your Honor, I have no question for the

18   witness.  He's made it clear he didn't show a photograph to Mr.

19   Teague.

20   Q.  Okay.  During the hearing, in response I was showing you

21   what's been marked as Government's exhibit eighty-one.  You do

22   remember me at least showing you that, do you not?

23   A.  Yes, sir.

24   Q.  Okay.  You do not recall telling me one, that they do have

25   facial hair?  And then my follow-up question was do they have

1   mustaches and your answer was "No."  That was under oath and

2   you said, "No, sir."  So, again, this is number one -- Excuse

3   me, one, three and five.

4   A.  What was your question again?

5   Q.  Anyway, the question is, and I'll be real slow, numbers one

6   -- watching me?  Tell me if I'm going too fast.  Three and

7   number five.  They don't have mustaches, do they?

8   A.  Number five doesn't appear that he has a mustache.

9   Q.  Let's go back to number one.  Number one doesn't have a

10  mustache, either.

11  A.  It looks like he has hair above his lip.

12  Q.  So you lied during the suppression hearing?

13  A.  No, I didn't lie.

14  Q.  Okay.  During the suppression hearing you told me no, he

15  doesn't have hair.

16  A.  I was asked a question?

17  Q.  Does he have a mustache?

18  A.  He's got hair above his lip.

19  Q.  What's that?

20  A.  Sir, he has hair above his lip.

21  Q.  Does he have a mustache?

22  A.  What's considered a mustache, hair above his lip?

23  Q.  You tell me.  What's a mustache?

24  A.  Hair above his lip.

25  Q.  Okay.  So when you said "No" during the suppression hearing

```
 1    that he did not have a mustache, did you just get stupid or
 2    something?
 3              MS. HARDWICK:  Your Honor, we would object.
 4              THE COURT:  Sustained.  I don't want any sarcasm in
 5    the court.  This is a serious matter for both sides.
 6              MR. BUTLER:  Yes, Your Honor.
 7              THE COURT:  Don't let me hear any more.
 8              MR. BUTLER:  Yes, Your Honor.
 9    Q.  During the suppression hearing, and I'll speak nice and
10    slow so you can catch it, you testified that the people did not
11    have mustaches, correct?
12    A.  You asked so many questions I can't remember what I said,
13    sir.
14    Q.  Okay.  Let me show you your suppression hearing testimony.
15    Do you want me to read it to you, or can you read it?
16              Now, it is starting right here at line twenty,
17    forty-seven line twenty, can you read that?
18    A.  Would you like me to?
19    Q.  I'm asking you, can you?
20    A.  I'd be glad to read it if you want me to.
21    Q.  Please do.  Read it aloud to the jury.
22    A.  "The person in photograph number three, one and five do not
23    have mustaches, correct?"
24              "They have facial hair."
25              "My question is, do they have mustaches?"
```

1           "No, sir."

2   Q.   Thank you.

3           Now, your testimony during that hearing was correct,

4   correct?

5   A.   Yes, sir.

6   Q.   Your testimony during that hearing was accurate, correct?

7   A.   Yes, sir.

8   Q.   All right.  Now as to the photograph number two, do you

9   recall that there was some concern whether or not that person

10  might have what was called a goatee underneath his chin, it

11  could be part because of a shadow, it could be because he

12  actually has a goatee, but it was unclear.  Do you recall that?

13  Do you recall that testimony during the hearing?

14  A.   Yes.

15  Q.   Okay.  What we were able to determine during that hearing

16  is that numbers four and number six are individuals with

17  goatees and mustaches.  Do you recall that?

18  A.   Yes.

19  Q.   Okay.  Those two individuals had the facial characteristics

20  of the composite that was given by Ms. Nichols.

21  A.   Yes.

22  Q.   Thank you.

23          Were you present when Mr. Smith was arrested?

24  A.   No.

25  Q.   Now at the Detective Division, if -- Let's put it this way:

1    If I was a patrol officer, or traffic patrol officer, and never

2    wrote any tickets, would I be subject to review?

3    A.   Sure.

4    Q.   In your division, if you never clear any robberies, are you

5    subject to review?

6          MS. HARDWICK:   Your Honor, we'd object to the

7    relevancy of whether or not he would be subject to review on

8    whether he clears a robbery conviction.

9          MR. BUTLER:   The relevance is his desire to clear

10   this case.  Possible bias.

11         THE COURT:   What does his desire do what, now?

12         MR. BUTLER:   To clear this case.

13         I'll withdraw it, Your Honor.

14         THE COURT:   Okay.

15   Q.   Was Mr. Oliver ever -- the person from Hooters that you

16   questioned at the police station, was he ever placed in custody

17   in regards to this offense?

18   A.   No.

19   Q.   Did you ever have an opportunity to go by Hooters?

20   A.   Yes, sir.

21   Q.   Was that before or after you interviewed Mr. Oliver?

22   A.   After.

23   Q.   Were you able to observe the, what do you call it, the

24   attire entire of the individuals at Hooters, what they were

25   wearing?  I think it's common knowledge what some of the female

1    employees wear.  Did you have an opportunity to observe what

2    some of the male employees were wearing?

3    A.  I didn't see.

4    Q.  Okay.  Do you remember during the hearing in response to

5    questioning from me indicating that parents and siblings and

6    vice versa, siblings and parents, often share similar

7    characteristics and features?

8    A.  Yes, sir.

9    Q.  It wouldn't be uncommon, I'm not saying it's true, but it

10   wouldn't be uncommon for Mr. Teague, being Mr. Smith's father,

11   to share similar characteristics with his son, Mr. Smith.

12   A.  Yes.

13   Q.  Mr. Teague was the driver of the vehicle that you failed to

14   show his photo --

15            MS. HARDWICK:  We would object.  It's been asked and

16   answered several times, and we object to the constant

17   interjection of Mr. Teague.  He's not on trial here.

18            MR. BUTLER:  Maybe he should be.

19            Nothing further.

20            THE COURT:  Any further direct?

21            MS. HARDWICK:  Yes, Your Honor.

22                      REDIRECT EXAMINATION

23                BY MS. HARDWICK OF DAVID HILL:

24   Q.  Detective Hill, this is the note array that was shown to

25   you that was prepared in reference to Hooters, is that

1    correct?

2    A.   Yes, ma'am.

3    Q.   If I zoom that photograph, does it show as clearly as it

4    does when it's close up?

5    A.   No, ma'am.

6    Q.   Can you see that individual clearly when I zoom in

7    individually?

8    A.   Yes, ma'am.

9    Q.   Is it less clear if it's zoomed out?

10   A.   Yes.

11   Q.   If you zoom in on picture two, does it appear more that he

12   has a mustache and goatee more than when it's zoomed away from

13   him?

14   A.   Yes, ma'am.

15   Q.   If you zoom in on photograph one, does it appear that he

16   has more of a mustache and goatee than he does?

17   A.   Yes, ma'am.

18   Q.   If you zoom away -- If you zoom in on number five, however

19   slight, does it appear that he may have a mustache and some

20   goatee?

21   A.   Yes, ma'am.

22   Q.   Do you know during the hearing how many times this

23   photograph may have been zoomed in or out?  Do you recall

24   that?

25   A.   No, ma'am.

```
1    Q.  Have you had an opportunity to review your transcript from
2    your previous hearing?
3    A.  Yes, ma'am.
4    Q.  Is there any reflection in that transcript on whether or
5    not the person operating and showing you the photograph is
6    zooming in or out when they're asking you questions?
7    A.  No, ma'am.
8    Q.  So there is no way you can say today whether those
9    photographs were zoomed in or out when you answered those
10   questions.
11   A.  That's correct.
12   Q.  Now, Mr. Butler has asked you a lot of questions on
13   identification and Government's exhibit eighty-one where the
14   defendant was identified.  Was Mr. Robinson the first person
15   who had come out?
16   A.  Yes, ma'am.
17   Q.  Was Annette Gurley, then Annette Nichols, the second person
18   who identified him?
19   A.  Yes, ma'am.
20   Q.  Based on that information and that car in connection, did
21   you get an arrest warrant for the defendant, Mr. Andreas
22   Smith?
23   A.  Yes, ma'am.
24   Q.  Now questions were asked of you regarding the arrest or
25   composites of other people.  Detective Hill, if someone gave
```

1    you a description, or saw Mr. Butler in a location and thought

2    he resembled a person involved in a bank robbery you were

3    investigating, would you go talk to him?

4    A.  I'd have to do a little further investigation before I --

5    but yes.

6    Q.  If a person gives you a description or sees a person that

7    they believe was involved in any criminal activity that you are

8    investigating, would you ultimately go talk to that person?

9    A.  Yes.

10   Q.  Would that be part of your investigation?

11   A.  Yes, ma'am.

12   Q.  Is that what the office did, the police department did in

13   reference to Mr. Oliver?

14   A.  Yes, ma'am.

15   Q.  No one ever picked Mr. Oliver out, is that correct?

16   A.  That's correct.

17   Q.  And he was never arrested?

18   A.  Correct.

19   Q.  Now the composites that are done, would you explain to the

20   ladies and gentlemen of the jury how does a composite come

21   together.

22   A.  Okay.  It's a computer program where we basically sit with

23   the victim.  And I've seen similar characteristics of the

24   subject in question.  Of course she was not very sure as the

25   picture looked of the guys as the actual suspect.

Q.  And once the composite was completed, did she identify that
person?

A.  No, ma'am.

Q.  Now, once you showed Ms. Gurley Government's exhibit six --
I'm sorry, Government's exhibit eighty-one, did she make an
identification?

A.  Yes, ma'am.

Q.  Was Government's exhibit eighty-one her first and only
identification?

A.  Yes, ma'am.

Q.  Now did she have any problems or hesitation in making that
identification?

A.  No, ma'am.  She pointed straight to the defendant.

        MS. HARDWICK:  Those are all my questions.

        MR. BUTLER:  Briefly, Your Honor.

                    RECROSS EXAMINATION

                BY MR. BUTLER OF DAVID HILL:

Q.  You indicated that you reviewed your suppression hearing
testimony prior to testifying today?

A.  Yes, sir.

Q.  So this rigmarole that we went over that you couldn't
remember wasn't true because you had reviewed your suppression
hearing testimony.

A.  Yes, sir.

Q.  So what, you were lying to me when you said you couldn't

1    remember?

2         MS. HARDWICK:  Your Honor, again, I object to the

3    characterization of the question to the witness.

4         THE COURT:  Just ask him to explain the difference.

5    Q.  Why couldn't you say you remembered it when you told the

6    Prosecution that you had reviewed your prior testimony?  You

7    just forgot overnight?

8    A.  No, sir.

9    Q.  So you could remember your testimony from the suppression

10   hearing transcript.

11        MS. HARDWICK:  Your Honor, again, I would object to

12   the form of the question.  My question to this witness was

13   whether or not he saw any references, not whether he remembered

14   all of his testimony, but whether or not he saw any references

15   in that transcript of when the person showing him the pictures

16   was zooming in and out.

17        MR. BUTLER:  That is not what she asked.

18        THE COURT:  The jury heard what he said, and I'll

19   leave it at that.

20        MR. BUTLER:  All right, Your Honor.

21        THE COURT:  Anything else?

22        MR. BUTLER:  Yes, Your Honor.

23   Q.  Now, in that suppression hearing transcript, again, your

24   testimony under oath in front of this Court was, when asked if

25   the person had any mustaches, your answer was "No, sir."

1    Correct?

2    A.   Correct.

3    Q.   Thank you.

4             MS. HARDWICK:  Nothing further, Your Honor.

5             MR. BUTLER:  I'm still asking questions.

6             THE COURT:  Oh.  I'm sorry.  Go ahead.

7    Q.   Up until you went to her home with this lineup, Ms. Nichols

8    had not made any identification of anyone, correct?

9    A.   Correct.

10   Q.   Her testimony to you initially was she didn't think she

11   could, correct?

12   A.   Yes, sir.

13   Q.   She then said she wasn't very confident in her composite,

14   correct?

15   A.   And our composite, yes.

16   Q.   Your composite.

17            But then when you went to her home -- You didn't

18   bring her to the police station, did you?

19   A.   No, sir, I didn't.

20   Q.   Okay.  Then when you went to her home, that's where she was

21   suddenly able to make the identification from the picture?

22   A.   That's correct.

23   Q.   Okay.  Now Government counsel asked you if in the event I

24   was a suspect in a crime, it would be good police work to go

25   and talk to me, correct?  Did you simply go and talk to Mr.

```
1    Oliver, or was Mr. Oliver conveniently placed at your police
2    station for talking to?
3    A.  It was at the police station when I talked to him.
4    Q.  Did he go down there voluntarily, or do you know?
5    A.  I don't know.
6            MR. BUTLER:  Nothing further.
7            MS. HARDWICK:  Nothing further from the Government,
8    Your Honor.
9            THE COURT:  Okay.  You may step down.
10           (Whereupon the witness, David Hill, stepped down from
11   the stand.)
12           MS. ADAMS:  The United States calls John C. Hamilton.
13           THE COURT:  Mr. Hamilton.
14                    J O H N    H A M I L T O N,
15       the witness herein, having first been duly sworn or
16   affirmed to tell the truth, was examined and testified as
17   follows:
18                   DIRECT EXAMINATION
19             BY MS. ADAMS OF JOHN C. HAMILTON:
20           MS. ADAMS:  Your Honor, may I approach the witness
21   quickly?
22           THE COURT:  Yes.
23           (Whereupon, Ms. Adams conferred with the witness off
24   the record and out of the hearing of the other courtroom
25   participants.)
```

```
1    Q.  Sir, will you please state your name for the record and

2    spell your first and last name?

3    A.  John C. Hamilton.  J-o-h-n, H-a-m-i-l-t-o-n.

4    Q.  How old are you, sir?

5    A.  Forty-four.

6    Q.  How are you employed?

7    A.  I'm a deputy U. S. marshal.

8    Q.  How long have you been a deputy U. S. marshal?

9    A.  A little over twenty years.

10   Q.  How were you employed prior to becoming a deputy United

11   States marshal?

12   A.  I had worked at the United States Postal Service in

13   Birmingham before I became a deputy U. S. marshal.

14   Q.  Is your position with the U. S. marshal's service, is that

15   the only law enforcement position you've had?

16   A.  Yes, ma'am.

17   Q.  What are some of your duties as a deputy United States

18   marshal?

19   A.  I investigate federal and state fugitives.

20   Q.  Now you said that you "investigate federal and state

21   fugitives";  what do you mean when you refer to a federal or a

22   state fugitive?

23   A.  We try to locate and arrest any person wanted on a state or

24   federal offense.

25   Q.  How do you know whether or not someone is being sought for
```

1    a federal or state offense?

2    A.   Well, there would be an arrest warrant in existence, either

3    a complaint or a grand jury arrest warrant.

4    Q.   So then when you referred to a federal or state fugitive,

5    are you basing that status on the arrest warrant?

6    A.   Yes, ma'am.

7    Q.   So if it is a state arrest warrant what do you consider

8    that person to be?

9    A.   I'm sorry?

10   Q.   I'm trying to understand.  If you say a state fugitive, is

11   that based on a state arrest warrant?  Is that the

12   distinction?

13   A.   Yes, ma'am.  That means the individual has been charged

14   with a state crime.

15   Q.   What's your current assignment?

16   A.   I'm assigned to the U. S. Marshal's Service Gulf Coast

17   Regional Fugitive Task Force.

18   Q.   Were you assigned to that task force in June of last

19   year?

20   A.   Yes, ma'am.

21   Q.   How long have you been with that task force?

22   A.   Almost two years now.

23   Q.   As a member of that task force, do you do anything

24   differently than your usual deputy United States marshal

25   service duties?

```
 1   A.  Well, we work on the federal and state fugitives.  That's
 2   all we do.
 3   Q.  Is it part of your official duties to arrest people based
 4   upon those arrest warrants?
 5   A.  Yes, ma'am.
 6   Q.  How many -- Just generally speaking, how many
 7   investigations would you say that you participate in a week?
 8   A.  In a week's period of time?
 9   Q.  Week's period of time.
10   A.  Roughly, we average probably three, four a week.
11   Q.  And would it depend upon the specific facts of the case?
12   A.  It just depends on what I have been assigned.  Sometimes
13   it's more, sometimes it's less.
14   Q.  As a deputy United States marshal, have you received
15   firearms training?
16   A.  Yes, ma'am.
17   Q.  What type of firearms training have you received?
18   A.  Well, I grew up around firearms, and then I attended the U.
19   S. Marshals' Criminal Investigators Basic Deputy School in
20   nineteen eighty-eight.  It was a fifteen week academy.
21   Q.  Okay.  You said that you "grew up around firearms".  What
22   do you mean by that statement?
23   A.  Hunting.  Working on them.  That type of thing.
24   Q.  You just said "working on them".  What do you mean by
25   "working on them"?
```

1    A.   I would disassemble them, reassemble, blue, refinished,

2    repair.  Done that since I was probably in junior high.

3    Q.   So would that include cleaning farms?

4    A.   Yes, ma'am.

5    Q.   I'm very unfamiliar with guns, so please correct me if I

6    use the wrong term.

7    A.   Okay.

8    Q.   And would that experience include numerous firearms?

9    A.   Yes, ma'am.  Rifles, shotguns, pistols, revolvers.  All

10   types of firearms.

11   Q.   So do you have experience with loading and firing

12   firearms?

13   A.   Yes, ma'am.

14   Q.   I know that you said that you have grown up around them, so

15   how many years would you say that you have been working with

16   firearms?

17   A.   Thirty years.

18   Q.   What is the nomenclature of a weapon?

19   A.   It's just -- You could look at the outline of a weapon,

20   tell the trigger, the slide, upper receiver, lower receiver,

21   just what makes up a weapon, a firearm.  The different parts of

22   the firearm.

23   Q.   And what are you supposed to be able to tell based upon the

24   nomenclature?

25   A.   You can tell what type of firearm it is.  If it's a rifle,

```
 1   a shotgun, a pistol or revolver, semiautomatic.
 2   Q.  And that would be just based upon just looking at it?
 3   A.  Yes, ma'am.
 4   Q.  And when I say "looking at it," is that a shadow or is that
 5   just visual observation of a weapon?
 6   A.  Well I guess it could be a shadow, depending on the
 7   lighting conditions.  Just looking at a weapon you can tell
 8   what type of weapon -- you may not be able to tell what brand
 9   it is, but sometimes you can tell what brand it is by looking
10   at the nomenclature.
11   Q.  Did you investigate, as a deputy United States marshal, Mr.
12   Andreas Smith?
13   A.  Yes, ma'am.
14   Q.  Why did you investigate Mr. Smith?
15   A.  We had received a request from the Montgomery Police
16   Department requesting that we help locate and arrest Mr. Smith
17   based on a state bank robbery charge.
18   Q.  Did you actually receive a copy of that warrant?
19   A.  Yes, ma'am, we did.
20   Q.  When did that investigation begin?
21   A.  Probably middle of July, I would say.
22   Q.  Of what year?
23   A.  Of two thousand eight.  I'm sorry, two thousand seven.
24   Q.  So what did your investigation entail?
25   A.  Basically, we tried to locate and arrest the individual on
```

```
1    the warrant.  We'll talk to family members, associates, job
2    history, looking at his criminal record, see who he's
3    associated with during some of the prior crimes, things of that
4    nature.
5    Q.  Do you conduct surveillance?
6    A.  Yes, ma'am.
7    Q.  Do you receive pictures of that individual?
8    A.  Yes, ma'am, photographs, driver's license, mug shots.  If
9    they're available, of course, not all times are they
10   available.
11   Q.  Who was the lead investigator on the case for Mr. Smith?
12   A.  Deputy Scott Sides (ph.)
13   Q.  And did you actually review photos of Mr. Smith that you
14   received?
15   A.  Yes, ma'am, I did.
16   Q.  Do you see Mr. Smith in the courtroom today?
17   A.  Yes, ma'am.
18   Q.  Can you point him out to the members of the jury, please.
19   A.  Yes, ma'am.  He's sitting next to Mr. Kevin Butler.  He's
20   got, it looks like a suit jacket and white shirt on unbuttoned
21   at the top, no tie.
22          MS. ADAMS:  Your Honor, may the record reflect the
23   witness has identified the defendant?
24          THE COURT:  Yes.  Go ahead.
25   Q.  Was your investigation successful in this case?
```

1   A.   Yes, ma'am.

2   Q.   So your investigation led to the arrest of Mr. Smith?

3   A.   Yes, ma'am.

4   Q.   I'd like to discuss that arrest with you.  Did you

5   participate in the arrest of Mr. Smith?

6   A.   Yes, ma'am, I did.

7   Q.   When did that occur?

8   A.   It occurred on July twentieth, two thousand seven at

9   approximately eleven p.m.

10  Q.   What type of weather was occurring around that time?

11  A.   It was dark.  It was clear.  No rain.  And it was warm.

12  Q.   And you said it was around eleven-thirty p.m.?

13  A.   Yes, ma'am, eleven, eleven-thirty p.m.

14  Q.   Where did you locate Mr. Smith on July twentieth, two

15  thousand and seven around eleven or eleven-thirty?

16  A.   We were able to locate and arrest Mr. Smith at Mr. Willie

17  Jackson's, Junior's residence, and I believe it's at

18  Twenty-eight sixty-one Jan Drive.

19  Q.   Now you said "we".  Were there other people with you?

20  A.   Yes, ma'am.  We had a team of deputy U. S. marshals and U.

21  S. marshal task force officers.

22  Q.   Are all of the members of that task force deputized?

23  A.   Yes, ma'am.  They're federally deputized.

24  Q.   Who was present with you on that day?

25  A.   Deputy U. S. Marshals Jim Austin, Scott Reccio and U. S.

1    Marshals Task Force Officers Ted Williams and Duane

2    Richardson.

3    Q.   What was the task force plan of operations that night?

4    A.   I developed information that Mr. Andreas Smith had a close

5    relationship since childhood with Mr. Willie Jackson, Junior.

6    During the course of that investigation we also discovered that

7    Mr. Jackson's mother, Miss Christine Jackson, lived across the

8    street from Mr. Jackson.

9    Q.   When you say "from Mr. Jackson," you mean on Jan Drive, the

10   same street?

11   A.   Same street, but not quite exactly across from each other,

12   maybe two or three houses across.

13   Q.   So what was the task force going to do that night?

14   A.   Well, we did a little surveillance and see if we could spot

15   him.  We thought we had spotted him earlier, and then we lost

16   the individual who we thought might be Mr. Smith.  So we

17   decided to do what we call a knock and talk at both

18   residences.

19   Q.   Could you please explain to the members of the jury what a

20   "knock and talk" is?

21   A.   Simply, you go up to the residence that you think the

22   individual might be staying at, and you knock and try to get

23   in.  And we'll try to get Mr. or Mrs. Jackson at the door and

24   see if they had any knowledge of Mr. Smith's whereabouts.

25   Q.   Now, did you have a set order as to which residences you

```
 1    were going to knock and talk on first?

 2    A.  Yes, ma'am.

 3    Q.  What was that order?

 4    A.  We decided to talk to Miss Christine Jackson to start

 5    with.

 6    Q.  And did you perform that knock and talk?

 7    A.  We attempted to, but we couldn't get anybody to the door.

 8    Q.  So then what was the next strategy?

 9    A.  Go to the next house, which was Mr. Willie Jackson's house,

10    and attempt to get someone at the door at that residence.

11    Q.  Let me ask you, what were you wearing that night?

12    A.  I was wearing blue jeans.  I was wearing a sports type

13    shirt like a golf shirt.  I had my U. S. marshals belt badge,

14    and of course on my gear to include my weapon.

15    Q.  You referred to a "belt badge".

16    A.  Yes, ma'am.

17    Q.  Specifically what is that, a belt badge?

18    A.  It's a badge, silver badge.  It's like a star, and you put

19    it on your belt when you're wearing plain clothes to identify

20    yourself as a law enforcement officer.

21    Q.  And you said that you had a button up shirt on?

22    A.  Yes, ma'am.  Like a golf shirt, sports shirt.  Three

23    buttons here, and then it's got an emblem, a U. S. Marshals

24    Service emblem on the left breast.

25    Q.  Okay.  You said the next step the task force was going to
```

1   take was to knock on the residence of Willie Jackson.

2   A.  That is correct.

3   Q.  Okay.  Where were you in regard to knocking on the

4   residence?

5   A.  I was at the front door at Twenty-eight sixty-one Jan

6   Drive.

7   Q.  Did anyone else participate in knocking on that front door

8   with you?

9   A.  Yes, ma'am.  Task Force Officer Duane Richardson was beside

10  me, and Task Force Officer Teddy Williams was located at the

11  back of the residence.

12  Q.  Where were the other three task force officers located?

13  A.  They were at Miss Christine's Jackson's house.  They stayed

14  there in case someone left while we were knocking on Mr. Willie

15  Jackson's house.  We thought they might have seen us and

16  wouldn't answer the door, so we went back and watched a little

17  ways to see if anybody came out of the Jackson house.

18  Q.  What happened after you and Mr. Richardson, or Task Force

19  Officer Richardson, were at the front door?

20  A.  I knocked on the door and someone answered the door.

21  Q.  Who answered the door?

22  A.  Mr. Andreas Smith answered the door.

23  Q.  How do you know that it was Mr. Smith that answered the

24  door?

25  A.  I recognized him from the photographs that we had

```
 1    obtained.
 2    Q.   How far was the door opened by Mr. Smith?
 3    A.   He opened it approximately six to eight inches.  Just
 4    enough that I could see his head.  He peeked around.
 5    Q.   Did you say he peeked around?
 6    A.   Peeked around the door, yes, ma'am.
 7    Q.   What happened after he answered the door?
 8    A.   I identified him and I said, "Mr. Smith, U. S. marshals,
 9    police, open up.  Come on out."
10    Q.   After you made that statement, what happened?
11    A.   He closed the door.
12    Q.   He closed the door on you?
13    A.   Yes, ma'am.  Rather quickly.
14    Q.   So then what did you do?
15    A.   I tried to catch the door before closed it, but it had only
16    been open just a little ways.  I was unable to prevent him from
17    closing it, so I attempted to kick the door open.
18    Q.   Let me stop you for a second.  You said you tried to
19    prevent the door from closing.
20    A.   Yes, ma'am.
21    Q.   How did you try to do that?
22    A.   Put my body into it and my foot, but he had already got it
23    closed before I got my foot or body into it.
24    Q.   And you tried to put your foot in the doorway?
25    A.   Yes, ma'am.
```

1    Q.   And what happened with that?

2    A.   He had already gotten it closed before I could do that and

3    locked the door.

4    Q.   You also said that you tried to kick the door open.

5    A.   Yes, ma'am.  I tried to kick it with my right leg.

6    Q.   And how did that work?

7    A.   Not well.

8    Q.   Why not?

9    A.   I've got a bum knee.  I had surgery back in January, and

10   hadn't fully recovered.

11   Q.   So your kick was unsuccessful?

12   A.   Yes, ma'am.

13   Q.   So what happened after your kick was unsuccessful?

14   A.   My partner was able to kick the door open.

15   Q.   Your partner, are you referring to Task Force Officer

16   Richardson?

17   A.   Yes, ma'am, I am.

18   Q.   Once the door was kicked open, what happened?

19   A.   Two shots were fired through the door.

20   Q.   When the door was actually opened by the kick, did you see

21   anything?

22   A.   No, ma'am, I did not.

23   Q.   Did you hear anything?

24   A.   I heard two rounds come from a firearm.

25   Q.   Now what made you think that happened rounds were coming in

1    your direction?

2    A.  Holes appeared in the door and the doorjamb, the door

3    facing.

4    Q.  And how many shots did you actually hear?

5    A.  I heard two.

6    Q.  After you heard those gunshots what did you do?

7    A.  Very quickly I realized that Task Force Officer Williams

8    was by himself at the back of the residence, and I believed

9    from experience that Mr. Smith would try to run out the

10   backdoor since he knew we were at the front.  So I ran to the

11   back to back up Task Force Officer Williams.

12   Q.  At any point did you inform the other officers with you

13   that shots had been fired?

14   A.  Yes, ma'am.  I yelled the shots fired twice, three times I

15   believe.

16   Q.  Now you said that you yelled.

17   A.  Yes, ma'am.

18   Q.  You mean just yelled in the air?

19   A.  Yes, ma'am, I yelled it out.

20   Q.  Did you have any equipment with you to talk with the other

21   officers?

22   A.  I did, but I couldn't get to my radio in a quick manner so

23   I decided to yell it out to get out the warning as soon as I

24   could in case the other guys hadn't heard the gunshots.

25   Q.  Okay.  You ran around to the back of the residence, and

1    then what happened?

2    A.   There's a privacy fence around the back of the residence,

3    the town house setup.  Went through the back gate, it was

4    opened.  Advised Task Force Officer Williams what was going on,

5    and observed a sliding glass door close with the curtain

6    pulled.

7    Q.   You said a sliding glass door; are you referring to that

8    residence?

9    A.   Yes, ma'am, I'm sorry, to that residence.

10   Q.   You said the curtain was pulled?

11   A.   Yes, ma'am, it was drawn.  You couldn't see inside.

12   Q.   So what did you do?

13   A.   I decided to make entry into the residence.

14   Q.   And how did you make entry into the residence?

15   A.   There was a set of cast iron weights on the patio on a

16   bench press.  I grabbed those and used those set of barbells to

17   get into the residence through the glass door.

18   Q.   How did you use those barbells to get through the door?

19   A.   Threw the barbells through the glass door.

20   Q.   And so after you threw the barbells, what did you do?

21   A.   We made entry into the residence at Twenty-eight sixty-one

22   Jan Drive.

23            MS. ADAMS:  Your Honor, may I approach?

24            THE COURT:  Yes.

25   Q.   I'm handing you what has been previously marked for

1    identification purposes as Government's exhibit forty-six.

2    A.   Yes, ma'am.

3    Q.   Do you recognize that exhibit?

4    A.   I do.

5    Q.   And what is it?

6    A.   It appears to be a diagram of the residence at Twenty-eight

7    sixty-one Jan Drive.

8    Q.   Are you familiar with the layout of that residence?

9    A.   Yes, ma'am, I am.

10   Q.   Does this exhibit fairly represent the layout of that

11   residence?

12   A.   It does.

13   Q.   Is it specific as to the whole residence?

14   A.   Well no, ma'am, not the upstairs.

15   Q.   So are you saying that this is only the downstairs of that

16   residence?

17   A.   That's what I'm saying.

18        MS. ADAMS:  Your Honor, we offer Government's exhibit

19   number forty-six into evidence.

20        MR. BUTLER:  Objection.  Objection, Your Honor.

21        THE COURT:  Objection?

22        MR. BUTLER:  Yes.  At issue here, as to this count is

23   where persons were located within the residence, what could

24   have taken place within the residence, given their locations

25   and the internal makeup of that residence, it's our position

```
1     that this diagram does not accurately depict the inside.

2            What best depicts it are actual photographs.  This is

3     hand drawn.  It's not to scale --

4            THE COURT:  Who Drew it?  You drew it?

5            THE WITNESS:  No, sir, I did not draw it.

6            THE COURT:  Where did you get it?

7            MS. ADAMS:  From a police officer, Your Honor.

8            THE COURT:  May I see it?

9            MS. ADAMS:  Yes.

10           (Whereupon, the Court examined said document.)

11           THE COURT:  Which officer drew it?

12           MS. ADAMS:  Officer Naquin, Guy Naquin, Your Honor.

13    And I did not ask the witness if it was to scale, I asked if it

14    fairly represented the layout.

15           THE COURT:  Does anyone have a diagram that

16    accurately represents the layout?

17           MR. BUTLER:  No, Your Honor.  We do not -- That is,

18    it's our position that this one does not.

19           THE COURT:  Is this supposed to be the entire

20    residence?

21           MR. BUTLER:  The bottom floor, Your Honor.

22           THE WITNESS:  Judge, it's the bottom floor, and it

23    does accurately reflect what I saw that night.

24           THE COURT:  With the jury's understanding that the

25    diagram is not to scale, I will allow it in.  The objection is
```

1   overruled.  Admitted.

2        MS. ADAMS:  Thank you, Your Honor.

3   Q.  Deputy United States Marshal Hamilton, I'm now publishing

4   to you Government's exhibit number forty-six.  Could you please

5   tell me where the front door is located on this exhibit?

6   A.  Yes, ma'am.  You want me to point to it?

7   Q.  Yes.  You can do so on the screen.

8   A.  Front door is right here.

9   Q.  I don't see anything.  You can actually touch the screen to

10  make a mark.

11       Now, you said that you threw barbells through the

12  sliding glass door?

13  A.  Yes, ma'am, correct.

14  Q.  What sliding glass door are you referring to?

15  A.  Right here.

16  Q.  Now is that where you entered the residence?

17  A.  That's where we eventually entered the residence, yes,

18  ma'am.

19  Q.  So what happened after you entered the residence at that

20  spot?

21  A.  I spotted an individual, a male, on the sofa.  Do you want

22  me to point the sofa where I saw him on?

23  Q.  Yes.

24  A.  It was a black male individual located right here.

25  Q.  Now you said "on the sofa".  What do you mean by "on the

1    sofa"?

2    A.  He was on the sofa.  Like a kind of on his belly.

3    Q.  Okay.  Did you know who that individual was when you saw

4    him?

5    A.  No, ma'am.

6    Q.  Did you later learn who that individual was?

7    A.  Yes, ma'am.

8    Q.  And who was that individual?

9    A.  Mr. Willie Jackson, Junior.

10   Q.  Now you stated before that Twenty-eight sixty-one Jan Drive

11   is Mr. Jackson's residence.

12   A.  Correct.

13   Q.  Is that one and the same that you're referring to?

14   A.  One and the same.

15   Q.  And did you see anything next to Mr. Jackson?

16   A.  Yes, ma'am.  I saw what appeared to be an S K S type

17   rifle.

18   Q.  Was that -- Where was that located in regard to Mr.

19   Jackson?

20   A.  It was on the floor beside him.

21   Q.  Did you see anyone else?

22   A.  Yes, ma'am, I did.

23   Q.  Who else did you see?

24   A.  I saw another black male that I now know to be Mr. Jamaal

25   Garland Clark.

1    Q.   And where was Mr. Clark located when you entered the

2    residence?

3    A.   In this corner.

4    Q.   Was there anything next to him?

5    A.   Not that I could see, no, ma'am.

6    Q.   So what did you do after you entered the residence and

7    observed those two individuals?

8    A.   You're talking a split second.  I saw another black male

9    come around the table where the four chairs are toward the pool

10   table.

11   Q.   Now you can actually draw on the diagram.  Can you please

12   display to the jury where you saw that person.

13   A.   I saw an individual run around this way, and then throw

14   down what appeared to be a semiautomatic handgun.

15   Q.   Now you said "throw down".  What do you mean by "throw

16   down"?

17   A.   He tossed it on the floor.

18   Q.   And you said that this was a table?

19   A.   Yes, ma'am.

20   Q.   What is this over here?

21   A.   That is the kitchen area.

22   Q.   Was he running from this kitchen area?

23   A.   Yes, ma'am.

24   Q.   And he was running where?

25   A.   He was running where I just drew toward the pool table

```
 1   right here they had set up in the living room, and he's running
 2   in this direction.  He dropped the weapon about right there.
 3   Q.  Now as you entered the residence, did you say anything?
 4   A.  I identified myself as police, and "Let me see your hands,"
 5   to Mr. Willie Jackson, Mr. Garland Clark and Mr. Andreas
 6   Smith.
 7   Q.  After you saw Mr. Smith discard the handgun, what did you
 8   see?
 9   A.  I saw Mr. Smith attempt to go out the backdoor that I just
10   breached with the weights.
11   Q.  How did he attempt to go out the backdoor?
12   A.  Running.
13   Q.  Are you saying he was running towards you?
14   A.  Yes, ma'am, running toward me.  I was standing in the front
15   door.  These are weights right here.  These are the weights I
16   used to break the door.  He was running through it.  It would
17   now be an open broken glass door.
18   Q.  Okay.  This is getting a little confusing with all of these
19   red marks.
20   A.  Yes, ma'am.
21   Q.  So what I would like you to do to make it a little clearer,
22   you've already testified that Mr. Jackson was by the sofa or on
23   the sofa?  Could you put a J where he was located, if you can
24   write it on the screen.
25   A.  That's a J? Okay.
```

1   Q.   If you could draw, please, just place a C where you saw Mr.

2   Clark.

3   A.   I'm trying.

4   Q.   Let me delete this arrow.

5          Go ahead and make a C, please.  Please mark with an S

6   where you saw Mr. Smith.

7   A.   Where I first saw him?

8   Q.   Yes.

9          Okay.  Now you said that he dropped the gun and he

10  ran in your direction.

11  A.   Yes, ma'am.

12  Q.   So what did you do?

13  A.   I had my weapon drawn.  I felt like I didn't have time to

14  holster it and prevent him from escaping, or trying to take my

15  weapon away, so I struck him in the head with my pistol.

16  Q.   Were you able to restrain him?

17  A.   Yes, ma'am.

18  Q.   And you were able to put handcuffs on him?

19  A.   Yes, ma'am.  He struggled for a while, but we eventually

20  had him handcuffed and had him restrained.

21  Q.   Deputy Hamilton, after Mr. Smith was restrained, was Mr.

22  Clark and Mr. Jackson restrained?

23  A.   Yes, ma'am.

24  Q.   And did you walk around the residence at all?

25  A.   Yes, ma'am.

```
 1    Q.  Did you observe what was located in the residence?

 2    A.  Yes, ma'am.

 3    Q.  At that time?

 4    A.  Yes, ma'am.

 5              MS. ADAMS:  Your Honor, may I approach?

 6              THE COURT:  Yes.

 7              MS. ADAMS:  If I may, I'd like to speak with you

 8    regarding a group of photos, Mr. Butler, not do it one at a

 9    time.

10              THE COURT:  What's your question?

11              MS. ADAMS:  I just wanted to know if he had any

12    objection to me questioning the witness at the witness box

13    instead of doing it one at a time to question him about all of

14    the photos.

15              THE COURT:  Have they been admitted?

16              MS. ADAMS:  No.  I'm saying instead of doing it one

17    at a time.

18              THE COURT:  Okay.

19              MR. BUTLER:  Your Honor, because we're dealing with

20    the diagram which is not to scale, I think this jury is

21    entitled to have some sense, maybe possibly through a one at a

22    time display, of how far this, that and the other is from --

23              MS. ADAMS:  I'm not asking him about that at this

24    point. I was --

25              THE COURT:  Let's speed things up.  It really depends
```

```
1    on your question.  Your question may be appropriate for all of
2    the photographs or it may not.
3               MS. ADAMS:  Okay, I'll be specific  I just wanted to
4    lay the foundation.  That's all.
5               THE COURT:  Well it's time for our afternoon recess.
6    When we come back you can ask him about those photographs at
7    that time.
8               MS. ADAMS:  Thank you, Your Honor.
9               THE COURT:  Court's in recess for fifteen minutes.
10              (Whereupon a recess was taken.)
11              THE COURT:  Proceed.
12   Q.  Deputy Hamilton, I'm handing you what's previously been
13   marked for identification purposes as Government's exhibit
14   forty-seven, forty-eight, forty-nine, fifty, fifty-one,
15   fifty-two, fifty-three, fifty-four, fifty-five, fifty-six,
16   fifty-eight, fifty-nine, sixty A, sixty-one, sixty-two,
17   sixty-three and sixty-four.  Will you please examine those
18   exhibits.
19   A.  Yes, ma'am.
20              (Witness complied.)
21   Q.  What are those exhibits?
22   A.  They're photographs of the outside and inside of the
23   residence located at Twenty-eight sixty-one Jan Drive.
24   Q.  Do those exhibits fairly and accurately depict the outside
25   of the residence and the inside of the residence as you
```

1    observed them on July twentieth, two thousand seven?

2    A.  They do.

3            MS. ADAMS:  Your Honor, we offer those exhibits into

4    evidence.

5            MR. BUTLER:  No objection.

6            THE COURT:  Admitted.

7    Q.  Deputy Hamilton, I'm showing you what's been admitted

8    Government's exhibit forty-seven.  What does that picture

9    depict?

10   A.  That is a photograph of the residence located at

11   Twenty-eight sixty-one Jan Drive, the front of the residence.

12   Q.  Is that Mr. Willie Jackson's home?

13   A.  Yes, ma'am.

14   Q.  Now is that how the residence looked on July twentieth, two

15   thousand seven around eleven o'clock that night?

16   A.  The front window, there was no light on.  It was dark.  And

17   on the side to the right there were some headlights on from

18   other vehicles that were present at the shooting.  Those

19   weren't there.

20   Q.  I am now showing you Government's exhibit number

21   forty-eight.  What does that picture depict?

22   A.  The front of the residence located at Twenty-eight

23   sixty-one Jan Drive.

24   Q.  Is Government's exhibit number forty-eight just a closer

25   version of the same house?

1   A.  Yes, ma'am.

2   Q.  Now could you please point on the screen that you have in

3   front of you and indicate to the members of the jury where you

4   were located when you were in front of the front door.

5   A.  I was standing approximately here.

6   Q.  And where was Task Force Officer Richardson?

7   A.  He was just to the right of where I was standing on the

8   other side of the door.  About here.

9   Q.  I'm now showing you Government's exhibit number forty-nine.

10  What does that picture depict?

11  A.  It's the side view of the residence located at Twenty-eight

12  sixty-one Jan Drive, and the privacy fence that is located

13  around the rear of the house in the yard.

14  Q.  And Government's exhibit number fifty?

15  A.  It's a photograph of the rear of the residence located at

16  twenty-eight sixty-one Jan Drive.

17  Q.  And that's the same privacy fence that you were referring

18  to before?

19  A.  Yes, ma'am.

20  Q.  You stated that you were able to enter the back of -- the

21  backyard, I'll say, of the residence from that fence?

22  A.  Yes, ma'am.

23  Q.  Was that fence unlocked?

24  A.  Yes, ma'am.

25  Q.  And this right here, is this the opening that you entered

1    through?

2    A.  Yes, ma'am.  The door -- the gate is ajar, and we entered

3    there.

4    Q.  I'm now showing you what has been admitted as Government's

5    exhibit number fifty-one.  What does that picture depict?

6    A.  It's a closeup photograph of the door located at

7    Twenty-eight sixty-one Jan Drive, and it depicts a bullet hole

8    through the door.

9    Q.  And what is depicted in Government's exhibit number

10   fifty-two?

11   A.  Still the front door, Twenty-eight sixty-one Jan Drive,

12   another bullet hole.

13   Q.  You said "another bullet hole".  Would that be a second

14   bullet hole?

15   A.  Yes, ma'am.

16   Q.  What is depicted in Government's exhibit number

17   fifty-three?

18   A.  This is a photograph taken from inside the residence of

19   Twenty-eight sixty-one Jan Drive of the front door.

20   Q.  So are you saying that that's the inside of the front

21   door?

22   A.  Yes, ma'am.

23   Q.  What is this right here in this exhibit?

24   A.  That's the stairs going upstairs.

25   Q.  And what is this exhibit?

1    A.   That's a bullet hole.

2    Q.   And this?

3    A.   Another bullet hole.

4    Q.   What is depicted in Government's exhibit number

5    fifty-four?

6    A.   It's a photograph of a closet door open inside the

7    residence at Twenty-eight sixty-one Jan Drive looking toward

8    the living area.

9    Q.   This would be looking toward the, did you say the living

10   area?

11   A.   Yes, ma'am.  Living room.

12   Q.   Living room area?  And where would you be standing?

13   A.   You would be standing at the front door, inside the front

14   door.

15   Q.   What is depicted in Government's exhibit number

16   fifty-five?

17   A.   A photograph of the kitchen and the S. K. S. rifle.

18   Q.   When was the first time that you saw that rifle?

19   A.   When I made entry through the sliding glass window.

20   Q.   And where was it located when you made entry?

21   A.   On the floor beside the sofa.

22   Q.   What is depicted in Government's exhibit fifty-six?

23   A.   This is a photograph taken from inside the kitchen pointing

24   out the window toward the street at Twenty-eight sixty-one Jan

25   Drive.

1    Q.   So would that be inside the kitchen window?

2    A.   Yes, ma'am.

3    Q.   What is depicted in Government's exhibit fifty-eight?

4    A.   It's a photograph of a forty caliber shell casing inside

5    the residence at Twenty-eight sixty-one Jan Drive.

6    Q.   What room is this picture taken in?

7    A.   Kitchen.

8    Q.   And what is depicted in Government's exhibit number

9    fifty-nine?

10   A.   A shell casing from a forty caliber handgun in the kitchen

11   located at Twenty-eight sixty-one Jan Drive.

12   Q.   Is this the same picture window that we saw earlier?

13   A.   Yes, ma'am, that's the same window.  The only window.

14   Q.   And is that a closeup view of the shell casing?

15   A.   Yes, ma'am, and then glass from the broken window.

16   Q.   What is depicted in Government's exhibit sixty A?

17   A.   That's a Smith & Wesson forty caliber semiautomatic

18   handgun.

19   Q.   Now when is the first time that you saw this weapon?

20   A.   Maybe a second or two after I made entry into the residence

21   from the sliding glass door.

22   Q.   And where was this weapon when you first saw it?

23   A.   It was in Mr. Andreas Smith's hands.

24   Q.   Let me go back a second.  You stated that you know

25   Normenclature Firearms.  What kind of a firearm is that?

1    A.   It's -- Just by looking at it you can tell it's a

2    semiautomatic pistol.

3    Q.   You previously testified that sometimes firearms have

4    writing that would identify them?

5    A.   Yes, ma'am.

6    Q.   Does this pistol have writing which identifies it?

7    A.   Yes, ma'am, it's a Smith & Wesson forty caliber.

8    Q.   Deputy Hamilton, did you not just testify that the two

9    shell casings depicted in Government's exhibit fifty-nine and

10   fifty-eight were forty caliber casings?

11   A.   Yes, ma'am, I did.

12   Q.   What does that mean, to be a forty caliber casing?

13   A.   I'm sorry?

14   Q.   What does that mean, to be a forty caliber casing?

15   A.   That's the size caliber that it is.

16   Q.   And what is a casing?

17   A.   That's where the gunpowder is located.  The bullet is

18   actually inside that.  It's crimped, and when the firing pin

19   hits the primer, the powder explodes propelling the bullet out

20   the barrel.

21   Q.   So is that what is considered a live bullet?

22   A.   No, ma'am, that's a casing.  That's what a bullet used to

23   be in.  It's a spent casing.

24   Q.   So what does "spent" mean?

25   A.   It's been fired.

1    Q.   So that's the casing of a fired bullet?

2    A.   Yes, ma'am.

3    Q.   What is depicted in Government's exhibit number

4    sixty-one?

5    A.   That is a three oh eight caliber rifle.

6    Q.   And when was the first time that you saw this weapon?

7    A.   After we had all the individuals in the residence

8    restrained, handcuffed.

9    Q.   When you first entered the residence, did you see that

10   weapon?

11   A.   No, ma'am.

12   Q.   When did you see that weapon?

13   A.   I saw it a few minutes after we had gotten everything under

14   control and done an officer's safety sweep of the residence.

15   Q.   Do you know where it came from?

16   A.   Yes, ma'am.

17   Q.   Where did it come from?

18   A.   From upstairs, a bedroom.

19   Q.   What is depicted in Government's exhibit number

20   sixty-two?

21   A.   That is a photograph of the residence at Twenty-eight

22   sixty-one Jan Drive, what used to be the sliding glass door.

23   Q.   Now is this from the outside or inside of the residence?

24   A.   From the outside looking toward the inside.

25   Q.   What is this right here?

```
1    A.   That is a cushion from a sofa.

2    Q.   Is that the same sofa that you referred to earlier?

3    A.   Yes, ma'am.

4    Q.   And why would the cushion be outside?

5    A.   It must have gotten thrown outside when we were searching

6    for any more weapons.

7    Q.   So the sofa was searched for weapons?

8    A.   Yes, ma'am.  Any type we arrest somebody, we make sure they

9    don't have access to any other weapon or any weapons.  We look

10   under the cushions, under carpet, throw rugs, things like

11   that.

12   Q.   And why would you look for weapons?

13   A.   We don't want to be injured.  It's officer safety.

14   Q.   What is depicted in Government's exhibit number

15   sixty-three?

16   A.   It's a photograph of the sliding glass door, and you can

17   see the barbell with the weights on it.

18   Q.   Is this from the outside or inside of the residence?

19   A.   From the outside looking in.  You can see the patio, the

20   concrete patio in the foreground.

21   Q.   What is this right here that's depicted in the

22   photograph?

23   A.   A curtain.

24   Q.   Was that the curtain that you were referring to earlier?

25   A.   Yes, ma'am.
```

```
1    Q.   And what is this right here?

2    A.   The weights.

3    Q.   When you said "the weights," are you referring to the

4    barbell?

5    A.   Yes, ma'am, a barbell with weights on it.

6    Q.   Now what's the policy as far as entering a residence when a

7    fugitive is there?

8    A.   If we know a fugitive to be in the residence, we spotted

9    him and he runs into the residence, we're allowed to follow him

10   in there and effect an arrest.

11   Q.   You don't need a warrant?

12   A.   No, ma'am.

13   Q.   What is depicted in Government's exhibit number sixty-four?

14   A.   This is a picture, a photograph of inside the living room

15   area.  You can see the weights to the side and a sofa cushion

16   also to the side and on the floor.

17   Q.   Using Government's exhibit number forty-six, could you

18   please make an X where the pool table is we just saw.

19            (Whereupon, the witness complied.)

20   A.   The pool table is there.

21   Q.   Deputy Hamilton, did you ever see Mr. Jackson with a gun?

22   A.   In his hands?  No, ma'am.  I did not see him with a weapon

23   or gun, firearm.

24   Q.   In his hands?

25   A.   Correct.
```

1    Q.   Did you ever see Mr. Clark with a gun in his hands?

2    A.   No, ma'am.

3    Q.   Based upon your training and experience and what you saw

4    and heard that night, who shot at you?

5    A.   Without a doubt, Mr. Andreas Smith.

6              MS. ADAMS:   I tender the witness for cross, Your

7    Honor.

8                         CROSS EXAMINATION

9              BY MR. BUTLER OF THE JOHN HAMILTON:

10   Q.   Got to go backwards on this one.  You indicated that you

11   came in through the backdoor of the residence after throwing a

12   weight in, correct, throwing a weight through the patio door,

13   you came in through the back?

14   A.   Yes, sir.

15   Q.   When you came in through the back you saw Andreas Smith --

16   I'll do it this way.  Rounding this corner, correct?

17   A.   Yes, sir.

18   Q.   And it's your testimony that you saw him toss a firearm?

19   A.   Yes, sir.

20   Q.   Okay.  You never saw him discharge that firearm?

21   A.   That is correct, I never did.

22   Q.   Okay.  The last question to you is based on your knowledge

23   and experience as a law enforcement officer, it is your

24   position that he fired the gun, even though you didn't see him

25   discharge it?

1    A.   That's correct, Mr. Butler.
2    Q.   Okay.  Now going from the beginning.  You were looking for
3    Andreas Smith because you had an arrest warrant.
4    A.   Yes, sir.
5    Q.   You had developed through investigation information that
6    Andreas Smith may be at Willie Jackson's home, or the home
7    across the street, which is Willie Jackson's mother's home.
8    A.   Yes, sir.
9    Q.   How many marshals were with you when you guys went out
10   looking for Andreas Smith?
11   A.   I believe it was five.
12   Q.   Okay.  Moving back to a movie I once watched, you were
13   looking for him because you had an arrest warrant that had been
14   issued pursuant to a bank robbery, correct?
15   A.   Yes, sir.
16   Q.   You had none information or knowledge regarding whether he
17   did or didn't do it, you just knew that an arrest warrant had
18   been issued for him.
19   A.   Yes, sir.
20   Q.   That arrest warrant wasn't evidence of anything, it's just
21   your marching orders to go and get this person.
22   A.   Yes, sir.
23   Q.   In the event that for whatever reason he was inaccurately
24   charged and you're seeking him by accident, that's not for you
25   to sort out, that's for later down the line.

```
 1              MS. ADAMS:  Objection, Your Honor.  The witness has
 2    already answered it was based upon an arrest warrant.
 3              MR. BUTLER:  I'll move on.
 4              THE COURT:  Go ahead.
 5    Q.  You get to the neighborhood -- Oh.  How many officers are
 6    with you?
 7    A.  Five.
 8    Q.  Are they all United States marshals?
 9    A.  Yes, sir.  We've got two task force officers that are
10    especially deputized U. S. marshals.
11    Q.  Okay.  Those task force officers, they're specially
12    deputized U. S. marshals but what are their other duties?
13    A.  The same duties that we have.
14    Q.  So they don't have a second job, they're just --
15    A.  Oh, yes, sir.  They have a sponsoring agency.  I'm sorry, I
16    misunderstood you.
17    Q.  What's that sponsoring agency?
18    A.  Officer Williams was with the Alabama State Pardons and
19    Parole Board, and Officer Richardson is with the Alabama
20    Department of Corrections.
21    Q.  Okay.
22    A.  We also have another one.  He wasn't present.  He's with
23    the Alabama Department of Public Safety.
24    Q.  I made a mistake.  You said Williams and Richardson,
25    right?
```

1    A.   Yes, sir.

2    Q.   And Williams was with Pardons and Parole, and Richardson

3    was with Public Safety?

4    A.   The Department of Corrections.

5    Q.   The three marshals were you, Marshal Reccio and Marshal --

6    A.   Austin.

7    Q.   Austin.   Okay.

8         So you guys go to this area.   Do you all then first

9    go to the mother's residence across the street?

10   A.   Yes, sir, and we've got someone keeping an eye on Mr.

11   Willie Jackson's house.

12   Q.   And who was that?   I'm just trying to get a sense what's

13   going on.

14   A.   Officer Williams.

15   Q.   How far apart are -- If this is the front door of Mr.

16   Jackson's house, directly across the street is his mother's

17   house?

18   A.   It is across the street but, Mr. Butler it's looking at

19   this it will be --

20   Q.   Where my finger is going that way?

21   A.   Yes, sir, that way, maybe about thirty yards.

22   Q.   Thirty yards.   So about three hundred feet.

23   A.   Well, about ninety.   My math is not good.   I don't think

24   that's three hundred feet.   Thirty yards?

25   Q.   Well that's ninety feet.   I did it wrong.   You're right.

1    Thank you.

2            This photograph was taken immediately after the

3    incident, correct, that night?

4    A.  Yes, sir.

5    Q.  The lights are on in the house?

6    A.  They are now.  They weren't at the time.

7    Q.  There seems to be a bright light over here.  Do you know

8    what that is?

9    A.  I believe it's someone's headlights.

10   Q.  It was a clear night, but it was very dark?

11   A.  They have streetlights, but it was dark, yes, sir, late at

12   night.

13   Q.  I'm noticing something from this photograph.  Hopefully it

14   will show up on everybody else's.  Right here there appears to

15   be a hole on the size of the residence?  Do you notice that?

16   A.  Yes, sir.

17   Q.  Right here, can you see it a little bit closer.

18   A.  Yes, sir.

19   Q.  Okay.  I'm going to show you -- Well, we'll get to that in

20   a minute.

21           So Officer Williams is keeping an eye on the front of

22   this house while the four other officers are at -- What's Ms.

23   Jackson's first name, do you know?

24   A.  Christine.

25   Q.  At Ms. Christine Jackson's residence, correct?

1    A.   Correct.

2    Q.   Nobody answers the door?

3    A.   That's correct.

4    Q.   Do you five then get together and say let's go and see if

5    Mr. Smith is over at Mr. Willie Jackson's house?

6    A.   We left two at Twenty-eight forty-eight Miss Christine

7    Jackson's house in case somebody was trying to slip out.

8    Q.   What two were left at Christine Jackson's?

9    A.   Deputy Austin and Deputy Reccio.

10   Q.   Okay.  Austin and Reccio.  So yourself -- Are you kind of

11   the lead or the senior officer there?

12   A.   Yes, sir.  This particular night I was.

13   Q.   So you and Officer Williams go to the front of this

14   residence?

15   A.   No, sir.  Officer Richardson and I went to the front.  Then

16   Officer Williams went to the back.

17   Q.   So Officer Williams goes around back and Officer Richardson

18   is up front.

19   A.   Yes, sir.

20   Q.   I missed some of the details, or maybe they didn't come out

21   so I'm going to go through it again.  Normal knock on the door,

22   knock knock knock?

23   A.   Yes, sir.

24   Q.   You don't announce yourself, you just knock?  I think you

25   used an expression, knock and peep or -- what is it called?

1    A.   Knock and talk.

2    Q.   Knock and talk.  You're doing a knock and talk to see if

3    after they open the door you can talk to somebody who might

4    lead to the presence of the person you're looking for?

5    A.   Yes, sir, that is correct.

6    Q.   You knock on the front door, it opens about six inches.

7    A.   Six to eight inches.

8    Q.   Six to eight inches.

9         Enough so you say you can see the person on the other

10   side of the door, and that person is Mr. Andreas Smith?

11   A.   Yes, sir.

12   Q.   Okay.  Now this is where time kind of gets critical.  Mr.

13   Smith, you stated that Mr. Smith -- What do you say?

14   A.   I told him my name, police, U. S. marshals, open up and

15   come on out.

16   Q.   And at that point it's your position and the door is shut

17   back?

18   A.   Yes, sir, it's closed.

19   Q.   Okay.  All right.  It will take a little bit of time, but

20   so the jury gets a sense of what the dynamics of the situation

21   were.  You are at this front door right here, correct?

22   A.   Yes, sir.

23   Q.   And I'm showing you what's been marked as Government's

24   exhibit forty-six.

25        I am now showing you what's been marked as

1   Government's exhibit forty-eight.  This isn't the best photo,

2   but it's what we've got.  In the sense that this side wall,

3   from where my finger is here to the back where this gate

4   starts, is the side of the house, correct.

5   A.  Yes, sir.

6   Q.  And that corresponds to this wall, I'm not going to write

7   on this, this wall on the side, the left side of this diagram,

8   correct?

9   A.  Yes, sir.

10  Q.  All right.  Now, the door is shut in your face.

11  A.  Correct.

12  Q.  How much time do you recall before hearing gunshots?

13  A.  Just a matter of seconds.  Maybe two seconds, three

14  seconds.  I can't be precise, but that's as close as I can get.

15  Q.  All right.  Now, we've seen the photographs of Government's

16  exhibit fifty-two and fifty-one.  That's the front door of the

17  residence.

18  A.  Yes, sir.

19  Q.  It appears, and I'm just trying to get a sense, the front

20  door might be made out of metal?

21  A.  Yes, sir, it's a hollow metal door.

22  Q.  Okay.  So bullets never -- did they ever penetrate the

23  door?  Did they go out through the door?

24  A.  Oh, yes, sir.

25  Q.  So this is just caulking or something filling it in?

1    A.   There's insulation, Mr. Butler, like a phone type

2    insulation.

3    Q.   So that's the foam insulation from inside the door?

4    A.   Yes, sir.

5    Q.   All right.  I'm going to show you what's been marked as

6    what I am now marking, and let me approach you first, a lot of

7    photos.

8         MR. BUTLER:  Anthony, this is going to be defendant's

9    exhibit fifty-three.

10   Q.   Do you recognize that as one of the photographs that was

11   taken that night?

12   A.   Yes, sir.

13   Q.   And does this accurately depict the residence, at least

14   this portion of the residence that night?

15   A.   Yes, sir.

16        MR. BUTLER:  Your Honor, I move to admit fifty-three.

17        MS. ADAMS:  No objection.

18        THE COURT:  Admitted.

19   Q.   Located where my pen is pointed, there appears to be a hole

20   coming through the side of the residence.

21   A.   Yes, sir.

22   Q.   That's a bullet hole, as well?

23   A.   Yes, sir.

24   Q.   Thank you.

25        I'm going to show you what's been previously marked

```
 1    as defendant's exhibits two, three and four.  If you would just
 2    take a look at the top photograph on each one.  Is that the
 3    front of the residence?
 4    A.  Yes, sir.
 5    Q.  Okay.  You can shut that one.
 6            Does that accurately depict how the residence looked
 7    like on the night of Mr. Smith's arrest?
 8    A.  Yes, sir.
 9    Q.  This is the front window on that residence?
10    A.  Yes, sir.
11    Q.  And this is a more zoomed up photograph of that.  Is that
12    correct?
13    A.  Yes, sir.
14    Q.  Again, all of these accurately -- all of these photographs
15    accurately depict how the residence appeared on the night of
16    Mr. Smith's arrest?
17    A.  Yes, sir.
18            MR. BUTLER:  Your Honor, at this time I move to enter
19    two, three and four.
20            MS. ADAMS:  I'd like to see the photos, Your Honor.
21            THE COURT:  Yes.  Definitely.
22            (Whereupon Ms. Adams and Mr. Butler conferred off the
23    record and out of the hearing of the other courtroom
24    participants.)
25            MS. ADAMS:  No objection.
```

1        THE COURT:  Okay.  Admitted.

2   Q.  This photograph, defendant's exhibit two, shows a hole that

3   that we pointed out before, correct, on the side of the

4   house?

5   A.  Yes, sir.

6   Q.  A bullet hole in the door?  Two bullet holes in the door?

7   A.  Yes, sir.

8   Q.  And located to the left of the photographs there are two

9   panes that have been broken out.

10  A.  Yes, sir.

11  Q.  Okay.  I mean, it's pretty obvious but if a bullet is shot

12  through a windowpane, it has the potential of breaking out that

13  windowpane?

14  A.  Yes, sir, it would have that potential.

15  Q.  Using this photograph, there's one -- there are three

16  bullet holes for sure on or about the front door.  Because the

17  panes are -- well appear more or less to be completely blown

18  out, there is no remnants of a bullet hole or exit from these

19  two panes, correct?

20  A.  Correct.

21  Q.  However -- Well, nothing further as to that.

22        Now, showing you what's marked as Government's

23  exhibit fifty-five, this gun that's on the counter here, that

24  gun wasn't there when you came into the residence.  You said

25  that gun was by the sofa, by Willie Jackson, correct?

1   A.  Yes, sir.

2   Q.  Possibly as you were inventorying what was there or

3   whatever, it made its way to the front, but that's not where it

4   originally was.

5   A.  Correct.

6   Q.  Using my finger, the front door is kind of where my finger

7   is, and this is the kitchen area off to the side of the front

8   door?

9   A.  Yes, sir.

10  Q.  And that front window would be kind of where my finger is

11  right now, off that?

12  A.  Yes, sir, that's correct.

13  Q.  What goes around here where my finger is up here, is this

14  the entrance into over from this area, correct?

15  A.  Yes, sir, you're correct.

16  Q.  Mr. Smith was -- It's your testimony you first viewed

17  here-ish.  Is that accurate?

18  A.  I first saw Mr. Smith --

19  Q.  At the front door.  I'm sorry.  After you went around to

20  the back, I'm sorry, you saw Mr. Smith here, correct?

21  A.  Correct.

22  Q.  The area that has a straight line to the front door is

23  essentially from this sofa straight up this hall, correct?

24  A.  Yes, sir, correct.

25  Q.  And the person that you found on this sofa was Mr. Willie

1  Jackson.

2  A.  Mr. Willie Jackson, Junior.

3  Q.  Willie Jackson, Junior.  There is a wall in this kitchen

4  area here.  There is a sink, and there appears to be a wall are

5  in front of you, is that correct?

6  A.  That is correct.

7  Q.  There were no bullet holes in this wall area in the

8  kitchen.

9  A.  No, sir, not that wall.

10  Q.  Mr. Clark, Jamaal Clark, he's found in the residence right

11  here, correct?

12  A.  Approximately, yes, sir.

13  Q.  Approximately.  Now this is a pool table right there,

14  right?

15  A.  Yes, sir.

16  Q.  I don't know, it goes to about yea high (indicating),

17  typical height of a pool table, four feet high I guess?

18  A.  Yes, sir.

19  Q.  Is there any type of -- Let me rephrase this.

20        The only opening into the back of the house is

21  through here, correct?

22  A.  Yes, sir.

23  Q.  Now, you've heard the expression "line of sight"?

24  A.  Yes, sir.

25  Q.  In the sense that a person outside of here, their line of

1    sight might be that way and that way, correct?

2    A.  Are you referring to peripheral vision?

3    Q.  Yes, peripheral vision.

4    A.  Yes, sir, roughly I suppose.

5    Q.  And Jamaal Clark was roughly on, at least as I've drawn it,

6    was roughly on just the outside of the peripheral vision to

7    this door right here.

8    A.  Yes, sir, to my immediate right.

9    Q.  Okay.  So, like hypothetically speaking, based on your

10   experience in law enforcement as the Government relied upon, if

11   somebody for instance wanted to surprise somebody coming in

12   through the backdoor, one of the better locations in this

13   residence might be over here, because they're out of the line

14   of sight of a person in the back.

15   A.  I suppose.  Yes, sir.

16   Q.  And, again, that's where Jamaal was found.

17   A.  Yes, sir.

18   Q.  And, again, Mr. Jackson was found with the -- I mean the

19   straight line to the front door, correct?

20   A.  On the sofa, yes, sir, face down.

21   Q.  For lack of a better word, no disrespect intended, Mr.

22   Smith, Andreas was just running around.  He was running over

23   here towards wherever, and then he tried to make his way out

24   towards the front door.

25   A.  Towards the backdoor.

```
1    Q.   I mean towards the backdoor.
2    A.   Yes, sir.
3    Q.   He wasn't in a defensive position, he was just out there
4    running.
5    A.   Yes, sir.
6    Q.   As a result of your line of work, and I applaud you for
7    this, you place yourself in circumstances where it's dangerous,
8    correct?
9    A.   At times, yes, sir.
10   Q.   As in this case, gunshots were fired.  I've heard the
11   expression, and you can correct me if I'm wrong, there's
12   nothing more sobering than when you hear a gunshot.  It alerts
13   you and heightens your senses.
14   A.   Yes, sir, that's correct.
15   Q.   But things also can get kind of frenetic and crazy.  When I
16   say "frenetic" -- Let me rephrase that.
17            You're trained not to be crazy, correct?
18   A.   Yes, sir.
19   Q.   But things get frenetic.  You started taking off to the
20   backdoor to cover your person that you're responsible for.  You
21   got somebody in the front.  My point is, while all of that is
22   going on, all fast, it's possible that a third gunshot came out
23   through the front.  Is that not possible?
24   A.   No, sir, not in my opinion.
25   Q.   In your opinion.  But there is a third gunshot.  I mean,
```

1    there is a bullet hole in the front of the house.

2    A.   Mr. Butler, that's going to be from the same round.  If you

3    look at that door you'll see how it's kind of peeled back.  It

4    went through, the door being opened, and he was shooting

5    simultaneously.  One was more of a clean shot, the other went

6    through the door as being opened, glanced off the door, through

7    the doorjamb and out the side.  That's going to be the same

8    round.

9    Q.   With all due respect, did you do a forensic analysis?

10   A.   No, sir.

11   Q.   Was that forensic analysis that supports that conclusion

12   done by anyone?

13   A.   Not to my knowledge.

14   Q.   Just base the on your experience?

15   A.   Based my experience and the other officers' experience, at

16   the scene we looked at it for quite a while.

17   Q.   We can only speak as to you.

18   A.   Yes, sir, I understand that.

19   Q.   Additionally, there are what appears to be two busted out

20   panes in the front of the house.

21   A.   Yes, sir.

22   Q.   And it's been your testimony that that could have been from

23   the --

24   A.   Can you move it up just a little bit, Mr. Butler?

25   Q.   Mm-hmm.

1    A.   You can't see it in this photograph, but there are some

2    landscaping stones, I'll call them.   Officer Richardson, as a

3    diversionary tactic, threw one or two stones through the

4    window.

5    Q.   So it's Richardson who threw those stones?

6    A.   Yes, sir.

7    Q.   Did you see him throw those stones, or were you in the

8    back?

9    A.   I was in the process of running around the side of the

10   house when he was throwing the stones.

11   Q.   Well, so your focus was getting around the side?

12   A.   Yes, sir, but I could see him picking up something and then

13   I heard glass shattering.   I didn't see the stone actually go

14   through the glass, but I saw him picking one up and it leaves

15   his hand.

16   Q.   Those stones are visible in other photographs?

17   A.   Yes, sir.   They're kind of ornate, what you would buy at

18   Lowe's or Home Depot or even Wal-Mart.

19   Q.   Okay.   But you would concur that the -- Well, a couple of

20   things.   Number one, you never saw Mr. Smith discharge the

21   firearm.

22   A.   No, sir.   That is correct.

23   Q.   All right.   Two, you're assuming that what happened with

24   these the two window panes is that stones came through them,

25   correct?

```
1    A.   That's correct, yes, sir.
2    Q.   And it's your position, based on your expertise in
3    firearms, that this bullet hole is a ricochet somehow from the
4    door.
5    A.   Yes, sir.
6    Q.   But to your knowledge, no forensic analysis has ever been
7    done to confirm that?
8    A.   That's a correct statement.
9    Q.   Did you, or any other member of your team or another team,
10   to your knowledge ever, what do you call it, do any analysis on
11   Mr. Smith or any of the occupants as to powder marks or
12   burns?
13   A.   I know we did not.  I'm not sure if any other agency did.
14   Q.   Okay.  Did you or any other agency to your knowledge ever
15   do any fingerprint analysis as to the firearms that were found
16   within the residence?
17   A.   I know my agency did not.  I can't speak of any other
18   agency.
19   Q.   Okay.  Based upon your experience and training, other than
20   the assertion that Mr. Smith had robbed the bank, did you have
21   any knowledge that Mr. Smith had ever possessed or discharged
22   firearms before, other than the assertion that he possessed a
23   firearm during this bank robbery?
24   A.   Just the bank robbery, is all I was aware of.
25   Q.   When you went to that residence, did you have any idea that
```

1    Jamaal, the guy Jamaal --

2    A.   Jamaal Clark.

3    Q.   Jamaal Clark would be there?

4    A.   No, sir, I had no idea.

5    Q.   Okay.  Did you do a background check on the firearms that

6    were found in there as far as ownership and possession?

7    A.   I did not.  My agency did not.

8    Q.   Are you aware of whether or not Mr. -- Well let me rephrase

9    that.  Strike that.

10          You indicated -- Oh, critical.  The million dollar --

11   Almost forgot.  Final question.  You indicated that you, as

12   well as other officers, conducted a search of the residence?

13   A.   Yes, sir.

14   Q.   And on questioning by the Government you pointed out that a

15   firearm was found upstairs.

16   A.   Yes, sir.

17   Q.   One second.

18          A couple of other things.  I'm going to show you

19   what's been marked as defendant's exhibit fifteen.  Do you

20   recognize this?

21   A.   Yes, sir.

22   Q.   Okay.  Does that accurately -- truly and accurately depict

23   items that were found within the residence at the time of the

24   arrest of Mr. Smith?

25   A.   Yes, sir.

1    Q.   I just want to point out that in the bottom portion of this
2    screen is what I'll call a tray of bullets.
3    A.   Yes, sir.
4    Q.   So that tray of bullets was found in the residence,
5    correct?
6    A.   Yes, sir.
7    Q.   Also, up in the upper left corner there is another tray of
8    bullets.
9    A.   Yes, sir.
10   Q.   This, Government's exhibit sixty-one, shows a banana clip
11   and a smaller banana clip that I'm assuming goes inside the gun
12   that's on the pool table?
13   A.   I don't know if that in fact goes to that weapon.
14   Q.   Do you know whether or not these clips contain bullets?
15   A.   I don't recall.
16   Q.   Okay, that's fine.
17        What you do recall is seeing that, correct?
18   A.   I see on the photograph, Mr. Butler.  I don't recall it
19   being there from that exact location that night.
20   Q.   Okay.  Did you see those items inside that residence that
21   night, or not?
22   A.   To be honest, I don't recall.  I recall seeing the rifles.
23   As far as ammunition, I just can't tell you exactly where the
24   ammunition was found.
25   Q.   Okay.  That amount of ammunition would allow a gun to

1   discharge several times.

2   A.  Yes, sir.

3   Q.  Do you know whether or not the area of Mr. Willie Jackson's

4   home was known for quail shooting, or deer hunting, or anything

5   like that?

6   A.  No, sir.

7           MR. BUTLER:  Your Honor, if I didn't already, I'm

8   going to move to enter defendant's exhibit fifteen.

9           THE COURT:  Admitted.

10  Q.  I'm going to show you what's been marked as Government's

11  exhibits --

12          MR. BUTLER:  Anthony, what were the last two numbers

13  that I used?  The last number.  Fifty-three?

14          COURTROOM DEPUTY CLERK:  Fifty-five.

15  Q.  I'm going to show you what's been marked as defendant's

16  exhibits fifty-six and fifty-seven.  Do you recognize these

17  items at all?

18  A.  Yes, sir.

19  Q.  Were these items seized within the residence that

20  evening?

21  A.  Yes, sir.

22  Q.  Do these photographs accurately and truly depict what was

23  seized that night?

24  A.  Yes, sir.

25          MR. BUTLER:  Your Honor, at this time I move to enter

1    fifty-six and fifty-seven.

2          THE COURT:  Admitted.

3    Q.  What's depicted in exhibit fifty-six is what appears to be

4    a green leafy substance inside a plastic bag.  Is that an

5    accurate description?

6    A.  Yes, sir, it is.

7    Q.  Fifty-seven is just another photograph of that.  Is that

8    not correct?

9    A.  That is correct, sir.

10   Q.  Did you, or anyone from your agency, have an opportunity to

11   perform any type of analysis on that substance?

12   A.  That substance was turned over to the Montgomery Police

13   Department.

14   Q.  Okay.  So you didn't do -- You, or your agency, or other

15   officers didn't do any analysis on that?

16   A.  No, sir.

17   Q.  In your time and experience as a law enforcement officer,

18   have you ever entered residences in which controlled substances

19   were found?

20   A.  Yes, sir, I have.

21   Q.  Based on your training and experience and expertise, is it

22   uncommon or is it common for firearms to be found within some

23   of these residences?

24   A.  It is common, yes, sir.

25   Q.  Thank you.

```
 1              I can ask you this:  Based on your training and
 2    experience and expertise, do individuals who possess these
 3    items, that is the drugs, possess the firearms in order to
 4    protect their narcotics?
 5    A.  That sometimes does occur, to my understanding, yes, sir.
 6              MR. BUTLER:  Your Honor, I may be finished.
 7    Q.  Just -- I'm curious.  Have you ever had any --
 8              MR. BUTLER:  One moment, Your Honor.
 9    Q.  Have you ever been employed by the Alabama Department of
10    Forensic Sciences?
11    A.  No, sir.
12              MR. BUTLER:  Nothing further.
13                        REDIRECT EXAMINATION
14                   BY MS. ADAMS OF JOHN HAMILTON:
15              MS. ADAMS:  If I may, Your Honor?
16              THE COURT:  Yes.
17    Q.  Deputy Hamilton, after the shots were fired through the
18    front door of Mr. Jackson's residence, did any deputy United
19    States marshal return fire?
20    A.  No, ma'am.
21    Q.  Now you said that before the shots were fired Mr. Smith
22    answered the front door of the residence.
23    A.  That's correct.
24    Q.  How were you able to clearly see his face?
25    A.  The lighting was sufficient.  He kept the door open just
```

1  enough and long enough.  He looked just like the photograph

2  that we had been provided.  I was certain.  I called him by

3  name.

4  Q.  You said "the lighting was sufficient".  What lighting are

5  you referring to?

6  A.  There are streetlights along that neighborhood, adequate

7  lighting.  And there may have been some backlighting in the

8  residence.

9  Q.  What -- and what is backlighting?

10  A.  Like there's light inside the residence, a light inside the

11  hallway.

12  Q.  I'm showing you Government's exhibit number forty-six.  Now

13  defense counsel asked you about this area right here, and you

14  said that that was the entrance to the kitchen?

15  A.  Yes, ma'am.  A walkway entrance/exit.

16  Q.  So you can enter the kitchen from both sides?

17  A.  That's correct, yes, ma'am.

18  Q.  How many casings did you observe in that house?

19  A.  Two.

20  Q.  And where were those casings located?

21  A.  In the kitchen area on the floor.  And they were forty

22  caliber casings.

23  Q.  Let me ask you a question.  If the handgun depicted in

24  Government's exhibit sixty A, discharged a bullet, what would

25  happen to the casing?

```
1    A.   It would be ejected out, and a new round would be
2    chambered.
3    Q.   Now if this rifle discharged a bullet, what would happen to
4    the casing?
5    A.   It, too, would be ejected.
6              MR. BUTLER:  Your Honor, I apologize to the Court --
7    Nothing.  Withdrawn, Your Honor.
8    Q.   If this weapon was discharged, would there be any
9    casings?
10   A.   Yes, ma'am.
11   Q.   And what would happen to the casings?
12   A.   It would be ejected.
13   Q.   How would casings be ejected from that forty caliber
14   handgun?  Meaning, in what direction would they fall?
15   A.   On this particular weapon, on most of them -- all of them
16   that I know of, they go out the right.
17   Q.   Did you observe any casings at the rear of the residence?
18   A.   No, ma'am.
19   Q.   The only two casings that you observed were in the
20   kitchen?
21   A.   That is correct, yes, ma'am.
22   Q.   Now defense counsel asked you about Mr. Smith when you saw
23   him, when you entered from the rear.  And he asked you about
24   you seeing Mr. Smith running.
25   A.   Yes, ma'am.
```

1    Q.   Was Mr. Jackson running?

2    A.   No, ma'am.

3    Q.   Was Mr. Clark running?

4    A.   No, ma'am.

5    Q.   So was Mr. Smith doing anything besides running?

6    A.   He had a -- the forty caliber semiautomatic handgun that

7    was for a split second in his hand as he was tossing it on the

8    floor.

9    Q.   When your agency searched the residence, Mr. Jackson's

10   residence, what specifically were you looking for?

11   A.   When we searched the residence we were looking for any

12   other weapons and any other individuals that might be located

13   in that residence.

14   Q.   Do you normally look for controlled substances?

15   A.   No, ma'am.  This is an officer safety sweep.

16            MS. ADAMS:  No further questions, Your Honor.

17            MR. BUTLER:  Briefly, Your Honor.

18                         RECROSS EXAMINATION

19                 BY MR. BUTLER OF JOHN HAMILTON:

20   Q.   As Government counsel pointed out, the person who was

21   stationary and in direct line of sight of the front door was

22   Willie Jackson, correct?

23   A.   Yes, sir.

24   Q.   The person who was stationary just outside of the purview

25   of peripheral vision or maybe just inside, these are my words,

1    was Mr. Jamaal Clark.

2    A.   Yes, sir.

3    Q.   It was Mr. Smith who was moving, correct?  And using this

4    diagram, he appeared to be moving from this direction to this

5    direction.

6    A.   Roughly, yes, sir.

7    Q.   Okay.  Now there's an expression, "take cover."  You've

8    heard that, especially in your line of work.

9    A.   Yes, sir.

10   Q.   That being that if someone is potentially going to fire, or

11   is firing weapons at you, you should be in a position where

12   something could interject, I mean be in between you and the

13   bullets, correct?

14   A.   Yes, sir.

15   Q.   Mr. Smith, though, was running in front of what is

16   described here as the "rear glass".

17   A.   Yes, sir.

18   Q.   Has it been your experience in law enforcement, again I

19   fall back on TV and movies, that at times when weapons are

20   discharged and/or it's a frenetic, very active, dangerous

21   situation, some people panic.  They run, they don't behave

22   rationally.  Is that an accurate --

23   A.   I guess it depends on the individual, yes, sir.

24   Q.   Based on your experience in law enforcement, you're

25   actually trained, you try to do just the opposite; that is,

1    when things are frenetic and dangerous, to be calm and cool.

2    A.  Yes, sir.

3    Q.  To assess the situation.

4            The persons who were in the best position from a

5    cover standpoint in the residence, to cover the front door

6    would have been Mr. Willie Jackson, and to cover the backdoor

7    without it, again, being potentially in the line of fire, would

8    have been Jamaal Clark.

9    A.  Yes, sir.  Theoretically.

10   Q.  Theoretically.

11   A.  Yes, sir.

12   Q.  Thank you.

13           MR. BUTLER:  One moment, Your Honor.

14           (Whereupon, Mr. Butler conferred with Ms. McKee off

15   the record and out of the hearing of the other courtroom

16   participants.)

17   Q.  Oh, there is one more point.  I've got to get this in.

18   I've got to show you two photographs.  I'll just use this one.

19   I did have a better one, but I'll use this one.  The front --

20   It's really bright from this window, but it's these two panes

21   right here that were busted out.

22   A.  Yes, sir.  And they're the pavers I was talking about, Mr.

23   Butler.  The landscaping stones.

24   Q.  Oh, I see them.  These things?

25   A.  Yes, sir.

1   Q.  That some of those had been thrown through the window?

2   A.  Yes, sir.

3   Q.  But we also -- You also testified that there were no holes

4   in the front in this wall right here, correct, to your

5   knowledge?

6   A.  Correct.  Yes, sir.

7   Q.  I had actually got it all wrong.  But my point is, someone

8   running this way, firing potentially back this way, may have

9   left bullet holes through this front -- through this wall but

10  there weren't any.

11  A.  If, in fact, they had fired from -- and I'll mark this with

12  my finger right here -- then of course there would be a bullet

13  hole through where the arrow was.  But the casings were found

14  up here in the kitchen area.

15  Q.  Were found where?

16  A.  Around that area.  It's not precise, but on that tile

17  floor.

18  Q.  And the forensic analysis, I'll fall back on my TV show,

19  that the bullet entered the door this way and end up over here,

20  that was -- who completed that?

21  A.  I'm sorry, sir?

22  Q.  The forensic analysis which shows the bullets' trajectory

23  upon entering the door here and/or there with the little

24  arrows, who completed that analysis?

25  A.  The Montgomery Police Department, I believe, did that.

```
1    They had a crime scene investigator out there.
2    Q.  Have you seen that forensic analysis?
3    A.  No, sir.
4    Q.  All you know is that the casings -- you found casings over
5    here?
6    A.  Yes, sir.
7    Q.  Did you find them?  Are you the officer who found those
8    casings?
9    A.  I think someone else found them.  They pointed them out to
10   me and I walked up to look at them to try to decide exactly
11   where Mr. Smith was when he fired the rounds.
12   Q.  Again, you never saw him firing them, but --
13   A.  Yes, sir.
14   Q.  Thank you?
15   A.  Yes, sir.  You're welcome.
16            MR. BUTLER:  Nothing further.
17            MS. ADAMS:  Nothing further from this witness, Your
18   Honor.
19            THE COURT:  Very good.  You may step down.
20            (Whereupon the witness, John Hamilton, stepped down
21   from the stand.)
22            THE COURT:  Next witness.
23            MS. ADAMS:  May he be excused, Your Honor?
24            THE COURT:  Yes.
25            MS. ADAMS:  The United States called Garland Jamaal
```

```
 1   Clark.
 2                    G A R L A N D   J.   C L A R K,
 3        the witness herein, having first been duly sworn or
 4   affirmed to tell the truth, was examined and testified as
 5   follows:
 6                          DIRECT EXAMINATION
 7                BY MS. ADAMS OF GARLAND JAMAAL CLARK:
 8   Q.  Good afternoon, Mr. Clark.
 9   A.  Good afternoon.
10   Q.  Could you please state your full name and spell your first
11   and last name for the record.
12   A.  Garland Jamaal Clark.
13   Q.  Would you spell your first and last name?
14   A.  G-a-l-r-a-n-d, J-a-m-a-a-l, C-l-a-r-k.
15   Q.  How are you commonly referred to?
16   A.  Jamaal.
17   Q.  Usually your friends call you Jamaal?
18   A.  Yes, ma'am.
19   Q.  Mr. Clark, how old are you?
20   A.  Twenty-six.
21   Q.  And are you employed?
22   A.  Yes, ma'am.
23   Q.  Where do you work?
24   A.  At Lose Ends Barbershop.
25   Q.  What do you do at Loose Ends Barbershop?
```

1    A.   A barber.

2    Q.   How long have you been a barber?

3    A.   Probably about three months.

4    Q.   And what did you do before you became a barber?

5    A.   I owned my own used car lot.

6    Q.   I'm sorry?

7    A.   I owned my own used car lot.

8    Q.   So you sold used cars?

9    A.   Yes, ma'am.

10   Q.   And how long did you sell used cars?

11   A.   Seven, eight months.

12   Q.   Mr. Clark, how familiar with you with Mr. Willie Jackson?

13   A.   I know Willie a long time.

14   Q.   How long?

15   A.   Ever since I moved to Alabama.

16   Q.   And when did you move to Alabama?

17   A.   Probably like eighty-nine.

18   Q.   Would that be nineteen eighty-nine?

19   A.   Yes, ma'am.

20   Q.   So what type of relationship would you say that you have

21   with Mr. Jackson?

22   A.   It's a good one.

23   Q.   A good relationship?

24   A.   Yes, ma'am.

25   Q.   Are you two close friends?

1    A.   Yes, ma'am.

2    Q.   Where does Mr. Jackson live?

3    A.   In Willie Park on Jan Drive.  I don't know the address.

4    Q.   If I were to say Twenty-eight sixty-one Jan Drive, does

5    that sound fair?

6    A.   I'm saying on the address, I don't know the address.  I

7    know it's on Jan Drive.

8    Q.   I'm showing you defendant's exhibit two.  Is that the front

9    of Mr. Jackson's residence?

10   A.   Yes, ma'am.

11   Q.   How many times have you visited Mr. Jackson's house?

12   A.   Numerous times.

13   Q.   Is it common for you to be over at his house?

14   A.   Yes, ma'am.

15   Q.   Does he come and visit you at your house?

16   A.   I stay on the other side of town, so I usually be over

17   there all the time.

18   Q.   What's the other side of town?

19   A.   We stay on like on the east side.

20   Q.   So where on the east side do you live?

21   A.   Brighton Estates.

22   Q.   And Brighton Estates is located off of what main street?

23   A.   Vaughn Road and Bell Road.

24   Q.   Do you know Andreas Jejuan Smith?

25   A.   A little bit.

1    Q.   When you say "a little bit," what do you mean?

2    A.   I don't really know him like I know Willie.

3    Q.   Are you friends with Mr. Smith?

4    A.   No, ma'am.

5    Q.   What type of relationship would you say that you have with

6    Mr. Smith?

7    A.   "What's up?"  If I see you, you speak.

8    Q.   How did you meet Mr. Smith?

9    A.   It's been a little while back that I met him.

10   Q.   A little while back?

11   A.   It would be a couple of years ago, but we never hung

12   together.  I know one of his brothers.

13   Q.   Would it be fair to say that Mr. Jackson is more of Mr.

14   Smith's friend than you?

15   A.   Yes, ma'am.

16   Q.   Do you see Mr. Smith in the courtroom today?

17   A.   Yes, ma'am.

18   Q.   Could you please describe to the members of the jury where

19   he's located and what he is wearing?

20   A.   He's sitting right there with the suit on with the white

21   shirt and black jacket.

22          MS. ADAMS:  Your Honor, may the record reflect that

23   the witness has identified the defendant.

24          THE COURT:  Proceed.

25   Q.   Mr. Clark, have you been convicted of a felony?

```
 1    A.   Yes, ma'am.

 2    Q.   And what conviction would that be?

 3    A.   I had a marijuana in the first.

 4    Q.   What's the status of that conviction?

 5    A.   Say again?  I ain't understand what you mean.

 6    Q.   What's the status of that conviction?

 7    A.   What I got for it?  What did I receive any jail time?  Are

 8    you asking am I still on probation or whatever?

 9    Q.   I'll clarify because you don't understand my question.

10    Have you hired an attorney?

11    A.   Yes, ma'am.

12    Q.   And is that attorney working on that conviction?

13    A.   Yes.  I'm going through appeal court to have that

14    overturned.

15    Q.   I want to draw your attention to July twentieth, two

16    thousand and seven.

17    A.   Yes, ma'am?

18    Q.   Do you remember when a shooting occurred at Mr. Jackson's

19    house?

20    A.   Yes, ma'am.

21    Q.   Were you present?

22    A.   Yes, ma'am.

23    Q.   What time of day did that shooting occur?

24    A.   Night.

25    Q.   So was it dark?
```

```
1    A.  Yes, ma'am.

2    Q.  Who else was present when that event occurred?

3    A.  Me, Willie and Dre (ph.)

4    Q.  Who is Dre?

5    A.  Andreas.

6    Q.  You usually refer to him as "Dre"?

7    A.  Yes, ma'am.

8    Q.  Is that D-r-e?

9    A.  Yes, ma'am.

10   Q.  At what time did you arrive at Mr. Jackson's house?

11   A.  I really don't remember.  I don't remember the exact time I

12   got there.

13   Q.  Was it that evening?

14   A.  Yes.  It was already dark.

15   Q.  And who was at the house when you arrived?

16   A.  Me, Willie, Dre, and like two more people there.

17   Q.  What happened when those individuals were at Mr. Jackson's

18   residence?  What were y'all doing?

19   A.  Some were playing dominoes.  Some on the pool table.

20   Q.  What were you doing?

21   A.  I was playing dominoes.

22   Q.  What was Mr. Smith doing?

23   A.  At that time I don't remember.

24   Q.  Do you remember what Mr. Jackson was doing?

25   A.  I was playing dominoes against him.
```

```
1    Q.   Okay.  Who was winning that game?

2    A.   I was.

3    Q.   You were winning?

4    A.   Yes, ma'am.

5    Q.   You're pretty good?

6    A.   No.

7    Q.   Just better than Mr. Jackson?

8    A.   No.  On the domino level I'm like the weak link.

9    Q.   Okay.  I'm going to show you Government's exhibit number

10   forty-six.  Do you recognize this exhibit?

11   A.   Yes, ma'am.

12   Q.   Does this look like a layout of Mr. Jackson's residence on

13   July twentieth, two thousand seven?

14   A.   Yes, ma'am.

15   Q.   Now you have a screen in front of you.  You can touch that

16   screen and actually make marks on the exhibit.  Okay?

17   A.   Yes, ma'am.

18   Q.   Where does the pool table in the diagram?

19            (Whereupon, the witness indicated.)

20   Q.   And where is the kitchen?

21            (Whereupon, the witness indicated.)

22   Q.   So where were you playing dominoes with Mr. Jackson?

23            (Whereupon, the witness indicated.)

24   Q.   Could you please mark with an X which seat you were sitting

25   in.
```

```
 1              (Whereupon, the witness complied.)
 2    Q.   And mark with a circle which seat Mr. Jackson was sitting
 3    in.
 4              (Whereupon, the witness complied.)
 5    Q.   What happened that evening?
 6    A.   Me and Willie were playing dominoes.  I had just won, so I
 7    went to the bathroom and used the bathroom.  While I was in the
 8    bathroom I heard a knock at the door.
 9    Q.   Let me stop you for a second.  Where does the bathroom on
10    this diagram?
11    A.   I guess there is the hallway right here, so this is like
12    somewhere in the hallway.
13    Q.   Okay.  So you said that you heard a knock on the door, and
14    this is while you were in the bathroom?
15    A.   Yes, ma'am.
16    Q.   Did you hear anything else at that time?
17    A.   No, ma'am.
18    Q.   So what happened after you exited the bathroom?
19    A.   I came out the bathroom and I seen Dre at the door.
20    Q.   You saw Mr. Smith at the front door?
21    A.   Yes, ma'am.
22    Q.   What was Mr. Smith doing?
23    A.   He was looking through the peephole.
24    Q.   Did you notice anything about Mr. Smith?
25    A.   Yes, ma'am.
```

1    Q.  What did you notice?

2    A.  He had a gun in his hand while he was looking through the

3    peephole.

4    Q.  You said "the gun".

5    A.  Yes, ma'am.

6    Q.  What type of gun was it?

7    A.  A handgun.

8    Q.  I'm showing you Government's exhibit sixty A.  Would that

9    be the handgun you're referring to?

10   A.  Yes, ma'am.

11   Q.  And you said Mr. Smith had this at the front door?

12   A.  Yes, ma'am.

13   Q.  So what did you do?

14   A.  I went back and sat down.

15   Q.  Did you return to the same seat?

16   A.  Yes, ma'am.

17   Q.  What happened next?

18   A.  I think it was another knock at the door.  I don't know if

19   he was saying who is it or what.  I don't remember that.  The

20   next thing, I heard a kicking or bumping or something at the

21   door.

22   Q.  I'm sorry, kicking or what?

23   A.  I heard a kicking or bumping at the door.  I can't see

24   through the -- Like right here there's a wall.  There's

25   supposed to be a wall right here, too.  I'm saying that the

1    chair is sitting where the table's at.  So I was sitting right

2    here, but I can't see that way.  I just heard like a bumping or

3    kicking at the door.

4    Q.  So you couldn't see Mr. Smith at the door from where you

5    were sitting?

6    A.  No, ma'am.

7    Q.  You couldn't see him open the door?

8    A.  No, ma'am.

9    Q.  And you couldn't see what was going on?

10   A.  No, ma'am.

11   Q.  So after you heard bumping, what happened?

12   A.  I'm not sure if Willie got up first or what.

13           THE COURT:  "Willie" being, the last name?

14           THE WITNESS:  Jackson.

15   A.  I'm not sure if Mr. Jackson got up first or what.  I know

16   after the kicking, I know I got up and I was going to the back

17   of the house.  I stumbled over the chair next to me, and as I

18   stumbled over the chair I heard like two gunshots or three

19   gunshots.  Something like that.

20   Q.  So you said after you heard the kicking, you were trying to

21   get up to leave through the back of the house?

22   A.  Yes.  I think Mr. Jackson had got up first, and he was

23   trying to get from over -- to the other chair because like the

24   chair where Mr. Jackson was sitting was the wall.  He bigger

25   than me, so he had to like climb over the other chair and I

1    tripped over the chair next to me.

2    Q.  Okay.  Hold up one second because you're referring to a lot

3    of chairs.

4    A.  Yes, ma'am.

5    Q.  So please mark again the circle where Mr. Jackson was

6    sitting.

7         (Whereupon, the witness complied.)

8    Q.  Now on which direction did he try to leave the table?

9         (Whereupon, the witness indicated.)

10   Q.  So you're saying the chair next to him was the one he

11   stumbled over?

12   A.  I'm talking about me.  I stumbled over the chair next to me

13   trying to get toward the back of the house.

14   Q.  And that's when you heard the gunshots?

15   A.  Yes, ma'am.  As I stumbled over the chair.

16   Q.  How many gunshots did you hear?

17   A.  Maybe two or three.

18   Q.  You don't know whether it was two or three?

19   A.  At the time I think it was like two, though.

20   Q.  Just whether or not you know.  I'm not asking you to be

21   specific, I was just trying to find out what you meant when you

22   said "two or three."

23   A.  It was either two or three.

24   Q.  Okay.  So were you able to actually leave the residence?

25   A.  Was I able to leave?

1    Q.  Yes.

2    A.  No, ma'am.

3    Q.  You said you were trying to go towards the backdoor.  What

4    happened?

5    A.  On the way out the back, I got -- I stumbled over my chair

6    and the other chair, the gunshot, I was going past the pool

7    table because the slide, it got a pole behind it, you can't

8    slide it without lifting the pole up.  Before I got to the

9    curtain they threw the weight through the glass door in the

10   back.

11   Q.  Let me stop you one second.  You said there's a pole in the

12   sliding door?

13   A.  Yes, ma'am.

14   Q.  So you can't open it?

15   A.  Yeah.  It's -- The only thing, it locks.  Like a sliding

16   door had a little lock on it.  I don't think he had a lock for

17   it.  I think he just had the pole behind the door.

18   Q.  So the pole was actually propped up in the door?

19        MS. McKEE:  Objection.  Leading.

20        THE COURT:  Sustained.

21   Q.  Where was the pole located in reference to the sliding

22   glass door?

23   A.  I guess you could say in the groove of the door where you

24   slide it back on the floor.

25   Q.  So could you please show on the diagram in which direction

```
1    you ran to the backdoor.
2    A.  This way.
3    Q.  Is that where you stopped?
4    A.  I was stopping about right here, because by then the
5    weights were coming through the door.  I mean the window, the
6    back window, the sliding door.
7    Q.  What is located right here?
8    A.  That's the pool table.
9    Q.  So you made it to the pool table?
10   A.  Yes, ma'am.
11   Q.  After the weight bench came through the back sliding glass
12   door what happened?
13   A.  I got on, I jumped on the floor.
14   Q.  Why did you jump on the floor?
15   A.  Because I was -- Well actually, I was running forward
16   during the weight bench came through the glass.  I kind of
17   jumped backwards and fell on the floor.
18   Q.  What did you see after that weight bench broke the sliding
19   glass door?
20   A.  Police.
21   Q.  How did you know they were police?
22   A.  The first dude I seen, he was a black dude.  I think he had
23   like a vest on.
24   Q.  You say "a vest"?
25   A.  Yes.
```

```
1    Q.   What do you mean when you refer to "a vest"?
2    A.   A vest.  I think it had "police" on the front of it, like a
3    bulletproof vest.
4    Q.   Okay.  And so you said that you saw a black police officer
5    come through the backdoor?
6    A.   Yes, ma'am.
7    Q.   That's what you believe happened?
8    A.   Yes, ma'am.
9    Q.   So what happened after that?
10   A.   They came in from the back.  I think it was like two more
11   came in from the back.  I was right here.  Mr. Jackson was on
12   this side, and Dre was on this side.
13   Q.   So you actually saw Mr. Jackson standing right there?
14   A.   Yeah.  Where I marked at.
15   Q.   Did he have anything in his hands?
16   A.   No, ma'am.
17   Q.   Did you have anything in your hands?
18   A.   No, ma'am.
19   Q.   Did Mr. Smith have anything in his hands?
20   A.   At the time, I don't know.  Like before then, the last time
21   I seen him was at the door.
22   Q.   If you don't know, that's fine.
23   A.   Okay.
24   Q.   So after the police came in, then what happened?
25   A.   Somebody hit him in the head.
```

1   Q.  Hit who in the head?

2   A.  Dre.

3   Q.  Mr. Smith?

4   A.  Yes, ma'am.

5   Q.  You said that you were lying on the floor.

6   A.  Yes, ma'am.

7   Q.  Was the pool table obstructing your view?

8   A.  I could see up under it.

9   Q.  You could see up under the pool table?

10  A.  Yes, ma'am.

11  Q.  When was the next time that you saw this gun?  You said

12  that you saw Mr. Smith holding that gun at the front door.

13  When was the next time you saw it that night?

14  A.  When the police picked it up.

15  Q.  Where did they pick it up from?

16  A.  From beside Dre.

17  Q.  From beside Mr. Smith?

18  A.  Yeah.  I'm sorry.

19  Q.  How many guns did you see in the house that night?

20  A.  Before the police came, just one.

21  Q.  Which one did you see before the police came?

22  A.  The one on the screen.

23  Q.  And how many did you see after the police arrived?

24  A.  Two more.

25  Q.  Would that be one of the guns out of the two?

```
1    A.   Yes, ma'am.

2    Q.   Would this be the second gun?

3    A.   Yes, ma'am.

4    Q.   Were you taken to the police station that night?

5    A.   Yes, ma'am.

6    Q.   Did you tell them what happened?

7    A.   Yes, ma'am.

8    Q.   Mr. Clark, did you see Mr. Jackson shoot at the police

9    officers?

10   A.   No, ma'am.

11   Q.   Did you see Mr. Jackson with a gun in his hands that

12   night?

13   A.   No, ma'am.

14   Q.   Did you have a gun in your hand that night?

15   A.   No, ma'am.

16   Q.   And did you shoot at the police officers?

17   A.   No, ma'am.

18          MS. ADAMS:   I tender the witness for cross, Your

19   Honor.

20          THE COURT:   Cross?

21                       CROSS EXAMINATION

22          BY MS. McKEE OF GARLAND JAMAAL CLARK:

23   Q.   Mr. Clark, this shooting took place back on July twenty,

24   two thousand seven, right?

25   A.   Yes, ma'am.
```

1    Q.    And you'd agree that closer to that time, back on July

2    twentieth, two thousand seven, your memory was the best and the

3    freshest then, correct, when this incident happened?

4    A.    Say again?

5    Q.    Your memory of the events that happened in the house that

6    day were the best closer to the date of July twentieth, two

7    thousand and seven when this event actually occurred.

8    A.    Yes, ma'am.

9    Q.    And you actually gave a statement the very next day on July

10    twenty-first, two thousand seven.

11    A.    Yes, ma'am.

12    Q.    So let me ask you.  The statement that you gave, gave that

13    first statement the day after the shooting to Detective Naquin,

14    correct?

15    A.    Yes, ma'am.

16    Q.    In that statement you understood that when Detective Naquin

17    was talking to you, he wanted to know what actually took place

18    inside the house on July twentieth, two thousand seven.

19    A.    Yes, ma'am.

20    Q.    And that's because when the shooting actually took place,

21    there was no one else inside the home except yourself, Mr.

22    Smith and as well as Willie Jackson.

23    A.    Yes, ma'am.

24    Q.    So the only people who would be able to tell what happened

25    in there would be you three.

1    A.  Yes, ma'am.

2    Q.  And in order for Detective Naquin to find out what happened

3    inside the house, you understood he needed you to tell him the

4    truth, correct?

5    A.  Yes, ma'am.

6    Q.  And that's what you were doing?

7    A.  Yes, ma'am.

8    Q.  And you had an opportunity to review your statement since

9    you've given it on July twenty-first, two thousand seven.  Have

10   you ever seen that statement?

11   A.  Have I seen it on paper?

12   Q.  Yes.  Or have you listened to the recording?  Have you seen

13   the paper document of it?  Yes.  Have you seen anything?

14   A.  Not that I remember.

15   Q.  In preparation for this case you did not review your

16   statement?

17   A.  I remember what I told him.

18   Q.  And what you told him on July twenty-first, two thousand

19   seven is what happened on July twentieth, two thousand seven,

20   the day before.

21   A.  Yes, ma'am.

22   Q.  So isn't it true that in the statement that you gave the

23   day after the shooting, on July twenty-first, two thousand

24   seven, you and Detective Naquin talked just briefly before you

25   actually began to tell your story of what happened the day

1  before.  Right?

2  A.  Yes, ma'am.

3  Q.  And in part of that talking, Detective Naquin told you at

4  that time that you weren't charged with anything at this point.

5  Isn't that what Detective Naquin told you?

6  A.  Yes, ma'am.

7  Q.  Detective Naquin, after telling you that, the very next

8  thing he told you was that this was an --

9          MS. ADAMS:  Objection, Your Honor.  There's been no

10  testimony as to what Mr. Naquin said to Mr. Clark.

11          THE COURT:  I guess you can ask him did he say

12  something.

13          MS. McKEE:  Your Honor, I have asked, and Mr. Clark

14  stated that yes, Detective Naquin did tell him something.

15          THE COURT:  Did Detective Naquin tell you

16  something.

17          THE WITNESS:  He said I wasn't being charged with

18  nothing.  He said I was just a witness at the time.

19          THE COURT:  Go ahead.

20  Q.  And he informed you that the reason you apparently were at

21  the house was --

22          MS. ADAMS:  Your Honor, I object again to counsel

23  testifying as to what Mr. Naquin said.

24          THE COURT:  She can lead him.  I assume it's a

25  leading question.

1          MS. McKEE:  Yes.

2          MS. ADAMS:  It's also hearsay.

3          THE COURT:  Now that's a different matter.  Let me

4    hear your question.

5          MS. McKEE:  I was beginning to ask Mr. Clark whether

6    Detective Naquin informed him whether he was there for an

7    attempted murder investigation.

8          THE COURT:  Overruled.  It's a fact statement.

9    Q.  Mr. Clark, did Mr. Naquin tell you after telling you that

10   you were not charged with anything at this point, the very next

11   thing he said to you was that this was a murder investigation

12   about the marshals that came to the house.  Did he tell you

13   that?

14   A.  I don't remember the very next thing he said, but he told

15   me that, though.

16   Q.  And you'd agree that an investigation for attempted murder,

17   it sounds and it is very serious.

18   A.  Yes, ma'am.

19   Q.  So you understood that anything you told Detective Naquin

20   involved a very serious matter involving an attempted murder

21   charge against United States marshals, correct?

22   A.  Say again?

23   Q.  You understood that what you were about to tell Detective

24   Naquin was going to be information about the attempted murder

25   case investigation, correct?

1    A.   Yes, ma'am.

2    Q.   And at that time you told Detective Naquin that you were at

3    a friend's house, at Willie Jackson's house.

4    A.   Yes, ma'am.

5    Q.   You told him you had been at the house about thirty minutes

6    before any officers had shown up.

7    A.   Yes, ma'am.

8    Q.   Now you had only known -- At that time you told Detective

9    Naquin you had only known Mr. Smith for a couple of days.

10   A.   I told him I know his brother's in there.

11   Q.   But that you and Mr. Smith did not have a close

12   relationship?

13   A.   Yeah, that we weren't like a brother was.

14   Q.   At that time on July twenty-first, the day after the

15   shooting, you also told Detective Naquin about some guns in the

16   house, didn't you?

17   A.   Some guns in the house?

18   Q.   Yes.  So you told Detective Naquin that a wood grain gun

19   was by the couch?

20   A.   Oh, yeah.  That's what the police pulled out after they got

21   in the house.

22   Q.   Okay.  But that's not my question.

23        Did you tell Detective Naquin that there was a wood

24   grain gun by the couch?

25   A.   Yeah, I told him that.

1    Q.   I'm showing you what's been admitted as Government's

2    exhibit forty-six.  Would the couch that you're referring to

3    inside the home be this couch here?

4    A.   Yes, ma'am.

5    Q.   So you also said that there was a gun at the end of the

6    table, correct?

7    A.   Yes, ma'am.

8    Q.   And the table you were referring to would have been this

9    table here with the chairs.

10   A.   Yes, ma'am.

11   Q.   So the gun was somewhere at the end of this table.

12   A.   Yes, ma'am.

13   Q.   Now you testified on direct that you and Mr. Jackson were

14   the individuals at this table playing dominoes, correct?

15   A.   Yes, ma'am.

16   Q.   So you also told Detective Naquin on July twenty-first that

17   you saw Mr. Smith standing at the peephole.

18   A.   Yes, ma'am.

19   Q.   Has that refreshed your memory?

20   A.   What I'm saying --

21   Q.   Just yes, or no.  Has it refreshed your memory?

22   A.   Not to the question you asked.

23   Q.   Not to the question I asked?

24   A.   No.  You asked me did I --

25   Q.   What I asked was did you ever tell Detective Naquin that

1    you never saw Mr. Smith pick up the gun from the table, and you

2    said you didn't remember.  So I'm just asking if you can read

3    this to refresh your memory?

4    A.  I don't remember.

5    Q.  Specifically, you don't remember telling Detective Naquin

6    that you never saw Mr. Smith pick up the gun from the table?

7    You don't remember that?

8          MS. McKEE:  May I approach the witness?

9          THE COURT:  Yes?

10   Q.  You don't have to read it, just look at it.  It's this

11   question right here.

12          (Whereupon, the witness examined said document.)

13   Q.  Just yes, or no, has that refreshed your memory?  What I

14   asked was, did you ever tell Detective Naquin that you never

15   saw Mr. Smith pick up the gun from the table?  And you said you

16   didn't remember.  So I'm just asking you to read this to

17   refresh your memory.

18          MS. ADAMS:  Your Honor, I have to object.  That was

19   not the question that she asked him.

20          THE COURT:  Well, he can take that question instead.

21   Go ahead.

22   A.  Well I couldn't have told him I seen him pick it up because

23   I was in the bathroom.

24   Q.  Hold on.  Does this refresh your memory about what you told

25   Detective Naquin about what happened the day before?

```
1   A.   No.

2   Q.   This does not refresh your memory?

3   A.   No, ma'am.

4   Q.   So do you have any reason to believe that anything in this

5   statement would be wrong?

6   A.   Is anything in there wrong?

7   Q.   Yes.  If the words say that that's what you said.

8   A.   No, ma'am.

9   Q.   So if it's in here, you said it as well as the questions

10  that Detective Naquin asked you, they're all written down in

11  this sheet, correct?

12  A.   Well Naquin asked me, but what you asked me, I can't answer

13  that because you're saying did I ever tell him.

14  Q.   I'll ask you another question.  We'll move on to this one.

15          Did you ever see the bank robber guy pick up the

16  handgun from the table?  And these are not my words, this is

17  what Detective Naquin asked you.

18  A.   No.

19  Q.   His question, and what is your answer?

20  A.   "No."

21  Q.   In fact, you went on to tell Detective Naquin that you

22  never saw Mr. Smith shoot a gun.

23  A.   No, ma'am.  I can't see through the wall.

24  Q.   So that's not the only time on July twenty-first that you

25  told that story, correct?
```

1   A.   When I had to go to the grand jury.

2   Q.   Well let me ask you this.  You did not tell the same story

3   to the grand jury.

4   A.   I ain't lied neither, though.

5   Q.   So let me ask you this.  Later, on August fifteenth, two

6   thousand seven, you later changed your story, correct?

7   A.   I ain't changed it.  I ain't changed it.

8   Q.   Sir, on August fifteenth, two thousand seven, you changed

9   your story and said that you did see Mr. Smith with a gun at

10  the peephole.

11  A.   He never asked me that.  He asked me if he seen me picking

12  it up from the table.

13  Q.   So if you had seen Mr. Smith with the gun at the peephole,

14  would you have told Detective Naquin?

15  A.   At the time I was just -- I wasn't going to be like I

16  wasn't telling nobody.

17          THE COURT:  It's actually five after five.  How much

18  longer are you going to be?

19          MS. McKEE:  It would be at least half an hour.

20          THE COURT:  Pardon me?

21          MS. McKEE:  It would be at least, I would say, a half

22  an hour.

23          THE COURT:  We'll recess, then, until tomorrow at

24  nine.

25          The jury is under the same cautionary instructions.

1    I'll see you here by eight forty-five so we can start

2  at nine.

3          (Whereupon, the proceedings were concluded.)

4                    * * * * * * * *

5              COURT REPORTER'S CERTIFICATE

6

7    I certify that the foregoing is a correct transcript

8  from the record of proceedings in the above-entitled

9  matter as prepared by me to the best of my ability.

10    I further certify that I am not related to any of

11  the parties hereto, nor their counsel, and I have no

12  interest in the outcome of said cause.

13          Dated this 29th day of April 2008.

14

15

16          \s\ Mitchell P. Reisner, CM, CRR
           **MITCHELL P. REISNER, CM, CRR**
17          Official US Dist. Court Reporter
           Registered Professional Reporter
           Certified Real-Time Reporter
18

19              * * * * * * * * * * *

20              **COURT REPORTER'S**

21              **REDACTION CERTIFICATE**

22    I certify that the foregoing is a true and correct copy of

23  the transcript originally filed with the clerk of court on June

24  2, 2008 and incorporating redactions of personal identifiers

25  requested by the following attorneys of record:  Jerusha Adams,

1    Esq. in accordance with Judicial Conference policy.  Redacted

2    characters appear as an "x" in the transcript.

3        Dated on this 15th day of July, 2008.

4

5                                s\s\ Mitchell P. Reisner, RMR, CRR

6                                **MITCHELL P. REISNER, RMR, CRR**
                                 Official Court Reporter
7                                U. S. D. C. Mid. Dist. of Alabama

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25