1    **IN THE UNITED STATES DISTRICT COURT**
**FOR**
2    **THE MIDDLE DISTRICT OF ALABAMA**

3

4

5

6    THE UNITED STATES
OF AMERICA
7                                        CRIMINAL ACTION NO.
vs.                        2:07-Cr-165-MHT
8
ANDREAS JEJUAN SMITH
9

10

11
REDACTED TRANSCRIPT
12

13

14                        VOLUME VII OF VII
6TH DAY OF
15              JURY TRIAL PROCEEDINGS

16

17

18                    * * * * * * * * * *

19

20    HEARD BEFORE:        The Hon. Myron H. Thompson

21    HEARD AT:            Montgomery, Alabama

22    HEARD ON:            April 1, 2008

23    APPEARANCES:         Kevin Butler, Esq.
Aylia McKee, Esq.
24                         Danielle Mason, Esq.
Tommie Brown-Hardwick, Esq.
25                         Jerusha Adams, Esq.

# T A B L E   O F   C O N T E N T S

ITEM DESCRIPTION                                    PAGE NO.

Table of Contents .............................    1

Title Page ....................................    2

Discussion in open court
      (The jury is not present) ...............    5

Guy Naquin - Direct Examination
      by Mr. Butler ...........................   11

Guy Naquin - Cross Examination
      by Ms. Hardwick .........................   22

Guy Naquin - Redirect Examination
      by Mr. Butler ...........................   38

Guy Naquin - Recross Examination
      by Ms. Hardwick .........................   40

Guy Naquin - Further Redirect Examination
      by Mr. Butler ...........................   41

Guy Naquin - Further Recross Examination
      by Ms. Hardwick .........................   42

Glenn Teague - Direct Examination
      by Mr. Butler ...........................   46

Andreas Smith - Direct Examination
      by Mr. Butler ...........................   49

Andreas Smith - Cross Examination
      by Ms. Hardwick .........................   51

Andreas Smith - Redirect Examination
      by Mr. Butler ...........................   53

Sarah Allen - Direct Examination
      by Ms. McKee ............................   56

Sarah Allen - Cross Examination
      by Ms. Hardwick .........................   63

✗          MITCHELL P. REISNER, CM, CRR
              Official U. S. Court Reporter
               Middle District of Alabama
                    (334) 265-2500

**T A B L E    O F    C O N T E N T S**

ITEM DESCRIPTION                                    PAGE NO.


Sarah Allen – Redirect Examination
     by Ms. McKee ...........................   65

Sarah Allen – Recross Examination
     by Ms. Hardwick ........................   66

Deanne Peters – Direct Examination
     by Ms. McKee ...........................   68

Deanne Peters – Cross Examination
     by Ms. Adams ...........................   78

Deanne Peters – Redirect Examination
     by Ms. McKee ...........................   81

Deanne Peters – Recross Examination
     by Ms. Adams ...........................   84

Herculese Walker – Direct Examination
     by Mr. Butler ..........................   85

Herculese Walker – Cross Examination
     by Ms. Adams ...........................   98

Herculese Walker – Redirect Examination
     by Mr. Butler ..........................  100

Herculese Walker – Recross Examination
     by Ms. Adams ...........................  102

Herculese Walker – Further Redirect Examination
     by Mr. Butler ..........................  102

Andreas Smith – Further Redirect Examination
     (Recalled)
     by Mr. Butler ..........................  103

Andreas Smith – Further Recross Examination
     by Ms. Hardwick ........................  126

Andreas Smith – Further Redirect Examination
     by Mr. Butler ..........................  132

**T A B L E     O F     C O N T E N T S**

**ITEM DESCRIPTION**                                    **PAGE NO.**

Andreas Smith - Further Recross Examination
    by Ms. Hardwick ........................  133

Andreas Smith - Further Redirect Examination
    by Mr. Butler ..........................  140

Willie Jackson - Rebuttal Direct Examination
    by Ms. Adams ...........................  146

Willie Jackson - Rebuttal Cross Examination
    by Mr. Butler ..........................  151

Motions in open court
    (The jury is not present) ..............  154

Closing Arguments
    by Ms. Adams ...........................  169

Closing Arguments
    by Mr. Butler ..........................  184

Rebuttal closing Arguments
    by Ms. Hardwick ........................  203

Charge to the jury
    by the Court ...........................  209

Court Reporter's Certificate ................  229

-o0o-

```
1    WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE HON.
     MYRON H. THOMPSON ON APRIL 1, 2008 AT THE UNITED STATES
2    COURTHOUSE IN MONTGOMERY, ALABAMA:

3

4                          DISCUSSION IN OPEN COURT:

5                          (THE JURY IS NOT PRESENT):

6            MR. BUTLER:  Your Honor, I believe the parties have

7    reached an agreement.

8            THE COURT:  Okay.

9            MR. BUTLER:  Specifically, the Defense, during trial,

10   will be recalling Mr. Glenn Teague and asking him for the

11   preliminary purpose of asking him questions of events that took

12   place in the hotel room.  Depending on that answer, I will be

13   recalling Mr. Andreas Smith.  And I believe that's the

14   agreement.

15           THE COURT:  Do I have to give any special charge or

16   instruction?

17           MS. HARDWICK:  Yes, Your Honor.  The Government is

18   requesting that the Court give a limiting instruction.  The

19   agreement Mr. Butler has stated is --

20           MR. BUTLER:  I haven't seen the instruction.

21           MS. HARDWICK:  It's a pattern instruction, Your

22   Honor.  It's trial instruction number five.

23           THE COURT:  Let him see it.

24           (Whereupon, Mr. Butler examined said document.)

25           MS. HARDWICK:  And the agreement, Your Honor, is that
```

1   the testimony will be offered for impeachment purposes only,

2   and that in their closing argument or any other references

3   before this jury, it is not a confession by Mr. Teague, nor a

4   confession to the defendant by Mr. Teague.  It is only offered

5   for impeachment, which the argument will only go to the

6   credibility of Mr. Teague because there have been numerous

7   references made as if it is a confession.

8           It is not a confession.  It only comes in for

9   impeachment, and it does not come in to prove the truth of the

10  matter asserted.  That's the only thing the Government would

11  ask that the Court make clear that in their closing argument it

12  is not referenced if it is a substantive argument as a

13  confession by Mr. Teague.

14          MR. BUTLER:  In response, I will say that we will not

15  reference his statement in the hotel room as a confession to

16  the robbery.  But we will argue that other facts and

17  circumstances show that Mr. Teague in fact committed this

18  robbery.  Mr. Teague and/or others.

19          THE COURT:  Okay.  Is that acceptable to both sides?

20          MS. HARDWICK:  As long as it's not referenced

21  regarding this statement.

22          THE COURT:  Now that means that neither side will

23  argue the statement as a confession, is that right?

24          MS. HARDWICK:  Exactly.

25          THE COURT:  I don't understand your proposed

1    instruction.  "When a witness is questioned about an earlier

2    statement he or she may have made, such questioning is

3    permitted in order to aid you in evaluating the truth of

4    accuracy of the witness's testimony here at trial.  Earlier

5    statements made by a witness are not ordinarily offered as

6    evidence of the truth or accuracy of those statements but are

7    referred to for the purpose of giving you a comparison --"

8            I don't think the jury is going to know what in the

9    heck I'm talking about here.

10            MS. HARDWICK:  Your Honor, you're fading --

11            THE COURT:  I don't think the jury is going to know

12    what I'm talking about here in this jury instruction.  You read

13    it yourself.

14            MS. HARDWICK:  I did read it.

15            THE COURT:  When a witness is questioned about an

16    earlier statement he or she may have made, such questioning is

17    permitted in order to aid you in evaluating the truth or

18    accuracy of the witness's testimony here at trial.  Earlier

19    statements made by a witness are not ordinarily offered as

20    evidence of the truth or accuracy of those statements, but are

21    referred to for the purpose of giving you a comparison --"  I

22    don't think the jury will know what statement I'm talking about

23    here.

24            This is just sort of a general statement about

25    anything during the trial.  So what -- I've got to tailor it to

1    meet what it is you want them to consider under a limited

2    purpose -- for a limited purpose.

3           MS. HARDWICK:  Your Honor, first of all, I think that

4    they will understand it, coupled with the credibility charge

5    that the Court is going to give --

6           THE COURT:  Well if you want me to give this limiting

7    instruction I'll be happy to give it.  I just think that it's

8    not going to be intelligible.  But since you're the one who is

9    requesting it I will give it as you've requested it.  If you

10   read it -- Just imagine you're a juror hearing this.  Would you

11   have any idea what statement I'm talking about?

12          It says the "statements during the trial."  It

13   doesn't say what statement I'm talking about.  It could be a

14   statement that was two days ago.  I could say, for instance,

15   earlier statement -- an earlier statement made by the witness

16   blank to the effect of blank should be considered by you only

17   as for that purpose and not for on the merits.  But the way you

18   have it worded, it's just out there.

19          He's going to be calling witnesses and you're going

20   to be calling witnesses and they're not going to know what

21   statement we're talking about.  There will be loads of

22   statements.  You don't see what you're saying?

23          MS. HARDWICK:  Judge, I hear you, I see what you're

24   saying, but I can't respond --

25          THE COURT:  Tailor it to what you want me to say.

1        MS. HARDWICK:  I understand that.

2        THE COURT:  I could say the earlier statement made

3    by, who is it, is it the defendant here, Mr. Smith?  Regarding

4    -- Listen, if you want me to give it this way I'll give it this

5    way.

6        MS. HARDWICK:  I have no problem with what you're

7    saying, but every time I get ready to give an explanation to

8    the Court, I don't get a chance to finish what I'm saying;

9    therefore, I'm not getting across to the Court --

10        THE COURT:  What do you want me to do?

11        MS. HARDWICK:  We can tailor the instruction as the

12    Court wishes to have it done so that the Court believes and we

13    can make it clear to the jury, and that's what I was trying to

14    get out to say.

15        (Two speaking at once.)

16        MS. HARDWICK:  We're talking, but I don't think we're

17    hearing each other.  I understand what the Court is saying and

18    I have no problem with tailoring it.  I don't think we're

19    hearing each other.  I understand what the Court is saying, and

20    I have no problem with tailoring this statement to make it more

21    specific to the witness's testimony regarding the defendant

22    that's going to be recalled.  I have no problem with doing

23    that, so it is clear to the Court.

24        THE COURT:  Tailor it.

25        MS. HARDWICK:  Thank you, Your Honor.

```
 1          THE COURT:  That's all I'm asking.  Tailor it.

 2          MS. HARDWICK:  Thank you, Your Honor.

 3          MR. BUTLER:  Your Honor, our witnesses are arriving

 4   at their leisurely place.

 5          THE COURT:  It's nine o'clock.  We're supposed to

 6   start at nine.

 7          MR. BUTLER:  They were told they're under subpoena

 8   and we are doing everything we can to get them here timely.

 9   Your Honor, could we have --

10          THE COURT:  Whom are you missing?

11          MR. BUTLER:  Your Honor, his father, a counselor from

12   Florida, one of our witnesses as to the firearm episode.  Those

13   three witnesses.

14          THE COURT:  Check outside and see if the father is

15   here; otherwise, let's move on to another witness.

16          MR. BUTLER:  Yes, Your Honor.

17          THE COURT:  I want to keep the trial moving.

18          THE BAILIFF:  The jury is entering the courtroom.

19          (Whereupon, the jury was escorted into the

20   courtroom.)

21          THE COURT:  Next witness.

22          MR. BUTLER:  Yes, Your Honor.  We call at this time

23   Officer Naquin.

24                    G U Y    N A Q U I N,

25      the witness herein, having first been duly sworn or
```

```
1   affirmed to tell the truth, was examined and testified as
2   follows:
3                        DIRECT EXAMINATION
4                  BY MR. BUTLER OF GUY NAQUIN:
5   Q.  Could you state your name and spell your last name for the
6   record.
7   A.  Guy Naquin.  N-a-q-u-i-n.
8   Q.  Officer Naquin, where are you employed?
9   A.  With the Montgomery Police Department.  I'm a detective
10  assigned to the homicide unit.
11  Q.  How long have you been employed as a detective?
12  A.  I have been on the homicide unit a little over eleven
13  years.
14  Q.  And how long have you been a police officer?
15  A.  Since nineteen eighty-one.
16  Q.  Do you recall doing an investigation at a residence located
17  on Jan Street in Montgomery on or about July thirtieth --
18  excuse me, July twentieth, two thousand and seven?
19  A.  On the twenty-first, yes, sir.
20  Q.  On the twenty-first?
21  A.  Yes, sir.
22  Q.  How were you notified of that -- How were you notified to
23  go to that residence?
24  A.  I was called at my residence.  I was off duty, and by my
25  sergeant I was instructed to respond to that location to
```

1   investigate a shooting in which a person that had a bank

2   robbery warrant was taken into custody.

3   Q.  Again, only relay what you did, not what other people told

4   you, to the best you can.

5         When you arrived at the residence, do you recall what

6   time it was.

7   A.  Roughly zero zero forty-five hours.  About forty-five

8   minutes after midnight.

9   Q.  Okay.  Forty-five minutes after midnight?

10  A.  Yes.

11  Q.  When you arrived, were there other persons there, other law

12  enforcement?

13  A.  Yes.

14  Q.  Do you recall how many?

15  A.  I don't.  I remember some specific individuals.  There were

16  several members of the U. S. marshals task force.  Some of them

17  which were officers assigned, and some of which were marshals.

18  And there were M. P. D. personnel, specifically the sergeant

19  that called me at home and asked me to come out there.

20  Q.  He was there as well?

21  A.  Yes.

22  Q.  Do you remember an officer Davis being present, an evidence

23  technician?

24  A.  Yes, he came out also to process the scene there.

25  Q.  Did he come out with you, or did he come out there before

1   or after you arrived?

2   A.  I don't know if they called him before or after they called

3   me.  I don't specifically remember whether he got there before

4   I did or afterwards.

5   Q.  Okay.  And I'm a little confused on roles.  Officer Davis

6   was the evidence preserver slash collector.  His job was to go

7   there, see what was there and then gather it?

8   A.  His job is to respond; document evidence by any means he

9   deems necessary, i.e. photographs, video or any other methods

10  he deems necessary; process evidence if it's required there.

11  Q.  Like fingerprints, something like that?

12  A.  If it's necessary, or D. N. A., or blood, or trace evidence

13  in some cases and collect evidence.  And once it's collected,

14  he may continue to process if I submit a request evidence

15  that's been collected and he's responsible for sending any

16  evidence off to a specific lab for other testing, like the

17  Department of Forensic Sciences or the F. B. I. laboratory.

18  Q.  Your role there was not to gather and process the evidence.

19  What was your role at the scene?

20  A.  To conduct the on-scene investigation.  Interviewed

21  individuals and witnesses determine what occurred.  And if

22  necessary, pursue criminal charges against a defendant.

23  Q.  So you were essentially in charge of the criminal

24  investigation as regarding what actually had happened at that

25  house.

1   A.   Yes.   I was assigned as the case agent, and I'm in charge

2   of the actual warrant scene investigation.

3   Q.   The incident involved the marshals and their apprehension

4   of an individual there, but jurisdiction over the case rested

5   with the City, I'm assuming, because the shooting took place

6   within the city?

7   A.   Yes.

8   Q.   I see.   In the course of your investigation you went around

9   the residence and viewed what was there for your purposes, not

10   necessarily the same purposes as the evidence technician but

11   for your investigation.   You saw what was there and viewed it,

12   correct?

13   A.   Yes.   I actually saw and documented what I saw.

14   Q.   My follow-up question, and you already got there, you

15   documented what you saw?

16   A.   Yes.

17   Q.   And, again, the reason you do this is, well, it's kind of

18   common sensical.   Memories fade, evidence is destroyed, the

19   home would be returned to its normal state.   So you need to

20   document and preserve things there, correct?

21   A.   Yes.

22   Q.   Now, when you got there what was the first thing you did?

23   A.   I spoke to the officers that were there and the marshals

24   that were there and I was briefed as to what occurred.   And

25   then I conducted my visual observation of the scene and

1    documented what I observed.

2    Q.  That documentation of what you observed, was that -- how

3    did you do that?

4    A.  In this particular case by two methods.  I actually did a

5    report, which is a typed report that I dictated, and I also

6    made a rough sketch diagram of what I observed.

7    Q.  I understand.  I'm going to approach you and show you

8    what's been marked as defendant's exhibit forty-seven.  Do you

9    recognize what I've just handed to you as defendant's exhibit

10   forty-seven?

11   A.  Yes.  This is a copy of the rough sketch diagram that I

12   completed.

13   Q.  Okay.

14        MR. BUTLER:  Your Honor, at this time I move to enter

15   defendant's exhibit forty-seven.

16        THE COURT:  Admitted.

17   Q.  I'm also going to show you what's been previously marked as

18   Government's exhibit forty-six.  I'm going to put it right next

19   to it.  So what we have on the screen is forty-seven and

20   forty-six.

21   A.  Yes, sir.

22   Q.  What appears on this side of the screen where my hand is,

23   is a diagram that you did, correct?

24   A.  Yes, sir.

25   Q.  What appears on the left side of the screen where my hand

```
 1    just was appears to be what I'll use the term a redacted
 2    version of your diagram.  That is what you Drew but everything,
 3    the writing removed?
 4    A.  Some stuff is removed, yes, sir.
 5    Q.  Some stuff is removed.
 6    A.  Yes, sir.
 7    Q.  Okay.  Now, on your diagram you indicate that on the pool
 8    table when you went through there, through the house, there was
 9    a three oh eight rifle and a clip, correct?
10    A.  Yes.
11    Q.  You also described the rifle being in the front counter
12    with boxes of rifle bullets in both locations.
13    A.  Yes.
14    Q.  And, again, these are where the items were when you arrived
15    at the residence.
16    A.  That's correct.
17    Q.  You also indicate that there was a bullet hole in the side
18    of the wall.
19    A.  Yes.
20            MS. HARDWICK:  Your Honor, we'd object to the
21    leading.  The witness drew the sketch.  He's acknowledged the
22    authenticity of it.  Mr. Butler can ask him what those items
23    are.
24            MR. BUTLER:  Okey-dokey.
25    Q.  Could you read for the ladies and gentlemen of the jury
```

1    what is above this little dot right here?

2    A.   It's a designation of a bullet hole.

3    Q.   And exactly what does it say?

4    A.   It says "bullet hole in wall."

5    Q.   Okay.  Now at the front there are two arrows going through

6    an area.  What do those arrows represent?

7    A.   A straight line between the bullet holes in the wall and

8    the door frame in the kitchen and the two bullet holes in the

9    doorway.

10   Q.   On your diagram at least there are three bullet holes.

11   A.   Yes.

12   Q.   Not two.

13   A.   No.

14   Q.   I'm going to show you -- Do you have the exhibits?

15            MS. ADAMS:  Yeah, they're here.

16            MR. BUTLER:  All right.  I don't want to mess things

17   up.

18   Q.   You had an opportunity, as you've testified, to go around

19   the house and inspect the residence, correct?

20   A.   Yes.

21   Q.   Okay.  One thing.  Also on this diagram, the diagram in

22   front of you, does it indicate anywhere on this diagram where

23   these items may have been previously placed?

24   A.   No, it does not.

25   Q.   Okay.  So an individual without, for instance, knowledge of

```
1    either your written report and/or knowledge of the actual
2    scene, when seeing this diagram would see that when you got
3    there there was a rifle located on whatever is marked by this
4    square area which was a pool table.
5    A.   Yes.
6    Q.   But there was a rifle on the front counter.
7    A.   Yes.
8    Q.   And that there was a firearm on the table?
9    A.   Yes.
10   Q.   You would agree that a bullet traveling within the
11   residence could -- I'm using this other piece of paper.
12   Again, I'm looking at what you've marked as "bullet hole".
13   A.   Yes.
14   Q.   Based on your training and experience and knowledge of
15   firearms, could a bullet fired within the residence along this
16   radius that I'm moving this piece of paper, go through that
17   wall where you have the "bullet hole"?
18   A.   I'm not sure what you're asking.  That bullet hole was made
19   by a bullet, and I don't know where it came from.
20   Q.   Yes.  You don't know where it came from.  But what I am
21   saying is, you are trained in firearms, correct?
22   A.   I'm trained to use a firearm.  I'm not a ballistic
23   expert.
24   Q.   And that's fine.  Based on your knowledge and experience,
25   and if you don't know then we won't go any further, do you know
```

1    whether firearms would be able to travel through the wall where

2    this bullet hole was located?

3    A.  It depends on the firearm.

4    Q.  Depends on the firearm.

5    A.  Yes.

6    Q.  Okay.  What type of firearm might be able to put a hole

7    through the wall based on your knowledge and experience?

8    A.  I'm not going to speculate on that because I'm not an

9    expert.

10   Q.  All right.  In investigating homicides, is -- homicides and

11   attempted homicides, is not the location of evidence within a

12   certain scene of importance for your work?

13   A.  Sometimes it is and sometimes it isn't.

14   Q.  Sometimes it is and sometimes it isn't.

15   A.  Yes.

16   Q.  For example, if for whatever reason I was charged with

17   attempting to shoot someone in this room, and during the course

18   of whatever took place I was injured or maimed and next to me

19   fell the firearm, the fact that that firearm is in close

20   proximity to me would be of relevance in the investigation of

21   my attempted discharge of the firearm.

22   A.  Sometimes, not always.

23   Q.  Not always, but sometimes.

24   A.  Yes.

25   Q.  However, for example, if I was charged with trying to

```
1    discharge a firearm in this room, after the alleged discharge
2    it fell to the floor, but the firearm is found in her pocket,
3    that could create questions regarding whether or not I
4    discharged the firearm, correct?
5    A.   It's possible, yes.
6    Q.   It's possible.  My point is, evidence should be preserved
7    in the locations, to the best as possible, where that evidence
8    I guess fell at the scene.
9    A.   Under normal circumstances, yes.  In this case that's
10   incorrect because there's a safety issue --
11   Q.   I'm not asking you about this case.
12          MS. HARDWICK:  Your Honor, we would object.  He asked
13   the witness a question and then he would not allow him to
14   answer the question.
15          MR. BUTLER:  He did answer the question and then
16   started to editorialize, Your Honor.
17          THE COURT:  What's your next question?
18   Q.   My next question is, did you walk around the -- You walked
19   around the residence, correct?
20   A.   Downstairs and outside, yes.
21   Q.   Downstairs and outside.
22          I'm showing you what's been previously marked as
23   defendant's exhibit two.  You observed the front windowpane,
24   correct?
25   A.   Yes.
```

1    Q.  You observed that there were two busted out panes at the

2    front?

3    A.  I saw it was broken.

4    Q.  Additionally, near that pane, on the other side of that

5    pane, tell me if I remember this correctly, was the inside of

6    the kitchen, correct?

7    A.  Yes, that's inside the kitchen.

8    Q.  And located at the bottom of that pane are not any what

9    I'll call gardening stones or bricks.  This photograph doesn't

10   show any gardening stones or bricks, does it?

11   A.  I'm sorry?

12   Q.  Are there any stones or bricks on the inside of this

13   glass?

14   A.  I don't see any, no.

15   Q.  But there is a shell casing located here, correct?

16   A.  I can't tell by looking at the photo, but that is a shell

17   casing in the picture.  There were two shell casings there.

18   Q.  Here's your diagram.  You indicated that there were two

19   shell casings in the kitchen.

20   A.  There were.

21          MR. BUTLER:  Your Honor, I may be done.  One moment.

22          (Whereupon, Mr. Butler conferred with Ms. McKee off

23   the record and out of the hearing of the other courtroom

24   participants.)

25          MR. BUTLER:  Nothing further, Your Honor.

1    MS. HARDWICK:  Your Honor, may I proceed?

2    THE COURT:  Yes.

3                    CROSS EXAMINATION

4              BY MS. HARDWICK OF GUY NAQUIN:

5    Q.  Detective Naquin, I'm Tommie Hardwick, an Assistant United

6    States Attorney, and I just have a few questions for you.

7              When you went out to the scene to do the

8    investigation, Mr. Butler asked you several questions regarding

9    the diagrams that were admitted both by the Defense and the

10   Government.

11   A.  Yes, ma'am.

12   Q.  The diagram that you drew, all of the writing on there is

13   what you perceived when you went to the residence, is that

14   correct?

15   A.  Yes.  That's what I saw.

16   Q.  So anyone else testifying to that would be saying what you

17   said you saw.

18              MR. BUTLER:  Objection.  To say what someone else

19   says based on what they saw --

20              THE COURT:  Ask your question again.

21   Q.  The writing that is on this diagram, you placed it there?

22   A.  Yes, ma'am.

23   Q.  And anyone else testifying to your writing would be

24   testifying based on something that they believe you saw, based

25   on your description.

1    A.  If they were reading from my writing, it would be

2    testifying as to what I wrote on the diagram.

3    Q.  And it would not be their firsthand knowledge to what you

4    placed on that diagram, is that correct?

5    A.  I don't know.  If they were there and observed the things

6    themselves, they would have firsthand knowledge.

7    Q.  Let me ask you this.  Did anyone help you draw this

8    sketch?

9    A.  No.

10   Q.  So that is your personal perception of what all the

11   evidence was, is that correct?

12   A.  Yes, ma'am.

13   Q.  And you are the best person to tell this jury what that

14   information is on that document?

15   A.  Absolutely.

16   Q.  Now Mr. Butler asked you about a redacted version.  So that

17   simply eliminates what you personally placed on the document,

18   right?

19   A.  It eliminates the items that were written.

20   Q.  By you?

21   A.  Yes.

22   Q.  And there is nothing else different from this document that

23   the Government placed into evidence other than the fact that

24   your handwriting and your perception does not appear.

25   A.  Yes, ma'am.

1  Q.  Other than that, is the Government's exhibit accurate?

2  A.  Yes, ma'am.

3  Q.  Now you testified that when you got on the scene, that you

4  went around the residence and made certain observations.

5  A.  Yes.

6  Q.  And you indicated that you saw an indication of various

7  bullet holes.

8  A.  Yes.

9  Q.  Now you've acknowledged that you're not a firearms expert,

10  or ballistics expert, but are you familiar with the ejection of

11  shell casings when a firearm is fired?

12  A.  It depends on which kind of firearm.

13  Q.  Okay.  I'm going to ask you specifically about the kind of

14  firearm that's been admitted into evidence in this case.  And

15  I'm going to show you this firearm.  I believe it is a forty

16  caliber.  Do you recall seeing photographs?

17  A.  Yes, ma'am.

18  Q.  Can you see it from where you are?

19  A.  Yes.

20  Q.  So are you familiar with seeing this firearm?

21  A.  Yes.

22  Q.  And you, in fact, drew a description of this firearm and I

23  believe that you labeled it a forty caliber on the table.

24  A.  Yes.

25  Q.  But, Detective Naquin, you're not here to tell the jury

1    where this firearm was prior to you arriving on the scene?

2    A.  No.

3    Q.  You also indicated that a seven point six two rifle was in

4    the kitchen area.  Do you know where that firearm was prior to

5    you getting to the scene?

6    A.  I wasn't there when it was collected.  I was informed of

7    where it was recovered.

8    Q.  And without saying what anyone told you, you don't know,

9    other than what they told you, where that firearm was located

10   originally?

11   A.  Other than what they told me, that's correct.

12   Q.  And there is a firearm indicated on a pool table with

13   clips.  When you arrived at the scene, that's where that

14   firearm was, is that correct?

15   A.  Yes, ma'am.

16   Q.  And you're not here to say where it was prior to your

17   arrival?

18   A.  No.

19   Q.  Would it be a fair statement, Detective Naquin, to say that

20   all the shooting was over?

21   A.  Yes, ma'am.

22   Q.  The three bullet holes that Mr. Butler had questioned you

23   about, other than what someone told you, you don't know when

24   they were placed at that residence.

25   A.  The two in the door, that's an incorrect statement.  They

1    were not there when --

2              THE COURT:  Pardon me, I can't hear you.

3              MR. BUTLER:  This witness doesn't have knowledge of

4    when these bullet holes were placed.  He has knowledge as to

5    what he saw and observed, and we have no objection to that.

6    Anything else would be hearsay if he testifies regarding

7    anything else.

8              MS. HARDWICK:  Your Honor, I think my question was

9    that he didn't know when they were placed there.

10             THE COURT:  Very good.  Go ahead, then.

11   Q.  Do you know when the first two bullets were placed there in

12   the door?

13   A.  I know when the bullet holes were placed in the door,

14   yes.

15   Q.  How do you know that?

16             THE COURT:  She said do you know when they were

17   placed there.

18   A.  After -- Before they called me to come out and investigate

19   the shooting, that night.

20   Q.  Now you indicated that there were some shells found.  How

21   many shells did you find?

22   A.  By "shells," you mean shell casings?

23   Q.  Shell casings.  Yes, I'm sorry.

24   A.  There were two in the kitchen as noted on the diagram.

25   Q.  Did you find any shell casings that had been fired from a

1    firearm at that residence on July twenty-first, two thousand

2    and seven anyplace else in your investigation?

3    A.  Not other than the two that were in the kitchen.  We found

4    no others.

5    Q.  And Mr. Butler asked you numerous questions about your

6    investigations and what you typically do in the your

7    investigations.  Had you found any other shell casings,

8    Detective Naquin, which you have indicated them on your

9    diagram?

10   A.  Yes.

11   Q.  Now there was ammunition in the residence, and it's

12   indicated, is that correct?

13   A.  Yes, ma'am.

14   Q.  But not other shell casings?

15   A.  There were no other shell casings that we observed,

16   otherwise they would have been collected and we'd have tried to

17   match them up to the gun that they came from.

18   Q.  And based on your experience as a homicide investigator,

19   would that indicate to you that no other shots were fired in

20   that residence that night?

21   A.  It would indicate that to me, yes.

22   Q.  Now let me ask you some questions regarding the

23   preservation of the evidence.  Mr. Butler asked you wouldn't it

24   be important to the investigation to preserve the evidence

25   where it was originally.  Specifically, I want to direct your

1    attention to a firearm as he indicated to you being in close

2    proximity to an individual that you believe may have fired that

3    firearm.

4    A.  Yes, ma'am.

5    Q.  What would you have done as a trained officer investigating

6    a homicide, or an attempted homicide, if you saw a firearm --

7             MR. BUTLER:  Objection.  This witness is now taking a

8    turn as an expert.  I called this witness to describe that

9    which he saw.  The Government is now asking this witness what

10   he would do based on his professional experience given the

11   circumstances.

12            We did not receive notice that he would be used as an

13   expert, and this testimony is beyond the scope of direct and

14   inappropriate.  It's also being used to vouch for other

15   testimony.

16            MS. HARDWICK:  Your Honor, it's not being offered for

17   any of the reasons Mr. Butler just stated.  Mr. Butler

18   specifically asked this officer about evidence that should be

19   preserved and whether or not it would be important to preserve

20   the evidence in a particular location.

21            THE COURT:  Didn't you put the witness forward as an

22   expert?

23            MR. BUTLER:  No.  I just asked him what his job is.

24            THE COURT:  Why isn't that expert testimony?

25            Mr. BUTLER:  I believe -- Maybe I misheard the

1    question.  If she is asking what someone else would do in this

2    circumstance, that's inappropriate.  If she's asking what this

3    expert did in this circumstance, that's fine.

4              THE COURT:  Well first of all I'm not sure that's her

5    question, but what's the difference?  You're still asking him

6    for his professional opinion as to what someone should or

7    should not have done.

8              MR. BUTLER:  Again, it's our position that this is

9    beyond the scope of our direct --

10             THE COURT:  What is your question again?

11             MS. HARDWICK:  What is the procedure if a firearm was

12   next to a person that you believed was involved in an attempted

13   homicide and believed that that person fired that firearm, what

14   would you do?

15             THE COURT:  I'll allow that.  You've opened the door

16   for this line of questioning.

17   Q.  What is the procedure if a firearm is near a person that

18   you believe is involved in an attempted homicide?

19   A.  You remove the weapon from the proximity of the suspect and

20   make it safe, unload it, put it somewhere where it can't be

21   reached until the scene can be secured and any other persons in

22   the house can be secured so they can't have access to the

23   weapons.

24   Q.  And why would you do that?

25   A.  For safety reasons.

1   Q.  Would that be officers' safety?

2   A.  Yes, ma'am.

3   Q.  So in this case the fact that the firearm was on the dining

4   room table and on the pool table and on the kitchen counter,

5   could there have been a reason that they were placed there?

6   A.  Yes.

7   Q.  Now Mr. Butler also asked you several questions about your

8   involvement and your investigation in this case.  After you

9   finished your investigation there at the residence on Jan

10   Drive, did you have an occasion to do anything else regarding

11   your investigation?

12   A.  Yes, ma'am.

13   Q.  Do you have a practice, Detective Naquin, of listening to

14   telephone conversations of suspects when they're charged?

15   A.  On occasion.

16   Q.  In this case did you do that?

17   A.  Yes.

18   Q.  And, specifically, did you listen to a conversation between

19   Mr. Smith and another individual?

20   A.  Yes.

21   Q.  And how were you able to listen to that conversation?

22   A.  When people are in the county jail, the conversations are

23   recorded and we have access to those recordings.  We can

24   actually supply them to the Defense and the District Attorney

25   or the U. S. Attorney if it's relevant in the case, and it will

```
1    be a digital recording of what was said by both parties.
2            MS. HARDWICK:  May I approach, Your Honor?
3            THE COURT:  Yes.
4            MS. HARDWICK:  Thank you.
5    Q.  I'm going to show you what's been marked as Government's
6    exhibit eighty-three and ask whether you recognize it.
7    A.  Yes.  This is a disk containing that recorded phone call
8    that I listened to this morning.
9            MS. HARDWICK:  Your Honor, we would offer
10   Government's exhibit eighty-three.
11           THE COURT:  Eighty-three?
12           MS. HARDWICK:  Yes, Your Honor.
13           THE COURT:  Admitted.
14           MR. BUTLER:  Sufficient foundation -- They're almost
15   there, but sufficient foundation still hasn't been laid for
16   eighty-three regarding voices, who's on it, what we have right
17   now.  So I'd object at this time.
18           THE COURT:  You need to show or authenticate the
19   voices and so forth.
20   Q.  Detective Naquin, when you say that you listened to the
21   sounds of the recordings at the jail, are people assigned
22   certain numbers?
23   A.  They are.  They're assigned a P. I. N. number, and that's
24   how we track who is using the phone.  An inmate is given a
25   number, and they have to use that number when they make a phone
```

```
1    call and we can trace the call as to who it went to, a
2    particular number.
3    Q.  Who did you trace the number with?
4    A.  Andreas Smith.
5              MS. HARDWICK:  Your Honor, I do believe that's
6    sufficient.
7              MR. BUTLER:  Your Honor, we still haven't heard the
8    tape.  I mean, we're this close.
9              THE COURT:  What do you mean?
10             MR. BUTLER:  He said he did a trace.  He matched the
11   person who made a call to the person who was at the city jail.
12   We now purportedly have something that is that.  We just need
13   to tie it together.
14             THE COURT:  What is missing?
15             MR. BUTLER:  They haven't established that this is
16   that phone call, how it got on this C. D.
17             THE COURT:  Do you want to show how they took down
18   the phone call and how it got to that particular C. D. and
19   things like that?
20             MR. BUTLER:  Yes.
21             THE COURT:  So you want to just connect it altogether
22   step by step?
23             MR. BUTLER:  Yes, Your Honor.
24             THE COURT:  Do you know Mr. Smith's voice?
25             THE WITNESS:  I interviewed him and I listened to the
```

1    recording.

2              THE COURT:  Is the voice you heard on the recording

3    the same voice that you heard when you interviewed Mr. Smith?

4              THE WITNESS:  It appears to be.

5              THE COURT:  I'll admit it in.  Admitted.

6              Members of the jury, it's up to you to decide whether

7    that voice is in fact his voice on the tape.  You heard him

8    testify here today and you can make your own independent

9    assessment as to whether the voice on the tape is in fact the

10   defendant's in this case.  I'm just allowing it in for you to

11   make that determination.

12             (Whereupon, said audio recording was played before

13   the Court and jury.)

14             THE COURT:  Could you stop it for a second?  I can't

15   hear it, and I think the jurors can't hear it.

16             Has there been a transcription made of the phone

17   call?

18             MS. HARDWICK:  No, Your Honor.

19             THE COURT:  Or maybe we can put it on the court

20   system and put on earphones.  But I don't think we can make it

21   out.

22             MS. HARDWICK:  We'll reserve it to play it later.

23   I'll go and ask other questions.

24             THE COURT:  Thank you.

25             MS. HARDWICK:  And we'd reserve to call this witness

1    if necessary with some speakers attached.  Thank you, Your

2    Honor.

3    Q.  Detective Naquin, you recorded that conversation and

4    provided it to the Government, right, for discovery purposes?

5    A.  I recorded it in the case file, and the case file was

6    furnished to the Government, yes.

7    Q.  Let me get back to some of the questions that you did on

8    cross examination.  One thing you said when Mr. Butler asked

9    you, and I think you responded yes, he asked you whether or not

10   the jurisdiction of the shooting on Jan Drive rests with

11   Montgomery County, or the Montgomery City Police Department.

12   Is that correct?

13   A.  Yes.

14   Q.  Is it also true, Detective Naquin, that there are sometimes

15   jurisdictions where offenses are charged both federally and by

16   the state?

17   A.  Yes, ma'am.

18   Q.  And did that happen in this case?

19   A.  Yes, ma'am.

20   Q.  I just wanted to clear that up.

21         And you did a report regarding your sketch?

22   A.  Yes, ma'am.

23   Q.  And the bullet holes that you noted, just to be clear, at

24   the residence were just indications of wherever you saw

25   something that may have looked like a bullet hole.

1    A.  Yes.

2    Q.  You indicated an angle on the -- It's still before you.

3    You indicated an angle on the bullet with arrows from the

4    kitchen area by the window going out the front door.

5    A.  Yes.

6    Q.  So in reference to where that broken glass may have been,

7    you were not saying that these shell casings went through that

8    glass?

9    A.  No.

10   Q.  So based on your drawing you believe that those shell

11   casings went through that door at an angle, both those shots?

12   A.  The shell casings didn't.  The two projectile bullets went

13   through the wall, the kitchen and the door frame, to the other

14   side of that wall in the kitchen and then penetrated the door

15   and exited the outside.

16        MR. BUTLER:  Your Honor, he said he's not a

17   ballistics expert, but he sure all of a sudden sounded like

18   one.  I ask that portion of his answer be struck from the

19   record.  If he is a ballistics record --

20        THE COURT:  Are you a ballistics expert?

21        THE WITNESS:  No.

22        THE COURT:  I'll sustain the objection.  The jury is

23   to ignore the last response.

24   Q.  Understanding that you're not a bullet expert or ballistics

25   expert, can you view Government's exhibit sixty-five?

1    A.   Yes, ma'am.

2    Q.   What is that?

3    A.   That's a photograph of the holes in the door and the wall,

4    or door frame.

5         MR. BUTLER:  Your Honor, I'm going to object.  This

6    is cumulative.  We've had multiple witnesses testifying to

7    bullet holes in the door.

8         THE COURT:  I don't know where the attorney is going.

9    I assume she's laying a foundation for something else.

10        MS. HARDWICK:  Your Honor, this was on cross

11   examination when Mr. Butler asked something specifically about

12   the hole.  As a matter of fact, Mr. Butler used the

13   Government's diagram with a blank sheet of paper, Your Honor,

14   to ask this witness by moving this paper around the direction

15   of the bullet holes and now he's objecting to the Government

16   asking similar questions.

17        MR. BUTLER:  His answer, by the way, that he was not

18   a ballistics expert so he couldn't give an answer to that and

19   the Court sustained that.  And so I asked no further questions.

20        MS. HARDWICK:  And that was regarding one bullet

21   hole.  I'm specifically asking him about the other two experts.

22        THE COURT:  As long as it's not something that deals

23   with him not being a ballistics expert.  Go ahead.

24        MR. BUTLER:  I would also add, Your Honor, this is

25   cumulative.

```
1          THE COURT:  Overruled on cumulative.  She's entitled
2   to go over it again.
3   Q.  Can you see the photograph?
4   A.  Yes, ma'am.  It's very dark, though.  It's hard to
5   discern.
6   Q.  Can you tell what's depicted in that photograph?
7   A.  Yes, ma'am.
8   Q.  What is it?
9   A.  The front door and the door frame with two holes.
10  Q.  I'm going to crisscross that the with the this diagram that
11  you drew.  Is that one of the angles that you drew into your
12  sketch?
13  A.  That's the holes that I Drew in the doorway that's depicted
14  on the photograph.
15  Q.  And the arrows that you have on your sketch, does your
16  arrows go through those holes?
17  A.  Yes.
18  Q.  Government's exhibit fifty-one, again, do you see what's
19  depicted?
20  A.  Yes, ma'am.
21  Q.  Does your arrow go through that hole?
22  A.  Yes.
23  Q.  So based on your sketch of what you saw, that was the
24  direction.
25  A.  That's a straight line between the holes in the wall and
```

1    the holes in the door.

2    Q.  The holes in the kitchen wall going through into the front

3    door?

4    A.  Yes.

5    Q.  From the kitchen area where the casings were found?

6    A.  Yes.

7              MS. HARDWICK:  Your Honor, those are all my questions

8    for this witness, with the Court's indulgence for a possible

9    recall for the tape.

10                   REDIRECT EXAMINATION

11              BY MR. BUTLER OF GUY NAQUIN:

12   Q.  You told me that you're not a ballistics expert, correct?

13   A.  I'm not a ballistics expert, correct.

14   Q.  Your ballistics analysis therefore here is just based on

15   your opinion not because you're a ballistics expert, correct?

16   A.  That's correct.

17   Q.  Because you're not a ballistics expert you can't say

18   definitively how those bullets traveled through the wall and

19   the door, correct?

20   A.  That's correct.

21   Q.  You would agree that in addition to wanting to remove

22   firearms from near suspected dangerous individuals, another key

23   to do a good investigation is once the scene is secure to not

24   disturb evidence, correct?

25   A.  Yes, sir.

1    Q.  For instance, in the event multiple -- well, let me put it

2    this way, if based upon your professional experience you were

3    called to a scene in which there was a radio call of multiple

4    gunshots, maybe five, six, you went TO that residence and you

5    only found one shell casing and the bullets were coming outside

6    the residence and you only found one shell casings, that might

7    catch your attention, correct?

8    A.  Are you saying all five came from inside out?

9    Q.  Inside the residence --

10   A.  Then we would probably be looking at a revolver that

11   wouldn't have ejected the casings.

12   Q.  In the event multiple shots were said to have come out of a

13   residence, let's call it five, six, seven eight, you go into

14   the residence and you find one shell casing, that would catch

15   your attention because they are not shell casings matching the

16   other bullets discharged?

17   A.  Yes.  If there were five bullet holes, we'd be looking for

18   more casings or a different weapon.

19   Q.  In this case you observed at least three bullet holes but

20   found two casings?

21   A.  That's correct.

22   Q.  Additionally, there is busted out glass in the front and

23   there's no bricks or anything at the base of that, correct?

24   A.  There's no bricks at the base, no.

25   Q.  And there were two shell casings in the kitchen, but that's

1   all that was found?

2   A.  Yes.

3   Q.  It's your position that those two shell indicates, again,

4   this is not a ballistics analysis, went through the front door.

5   That's just your opinion, correct?

6   A.  I'm not going to speculate on that --

7          THE COURT:  You're asking him now whether the bullets

8   went through the front door.  All he said was he drew lines.

9   You're going to open the door on this.

10          MR. BUTLER:  I'll rephrase the question.

11  Q.  You drew lines through the front door correct?

12  A.  Yes.

13  Q.  Based on your investigation you saw two shell casings in

14  the kitchen, correct?

15  A.  Correct.

16  Q.  You saw no other shell casings in the kitchen corresponding

17  to potential discharging of firearms outside the glass?

18  A.  That's correct.

19  Q.  You also never found any shell casings beside the residence

20  corresponding to that third bullet hole.

21  A.  Yes, sir, that's correct.

22          MR. BUTLER:  Nothing further.

23          MS. HARDWICK:  Just briefly, Your Honor.

24                    RECROSS EXAMINATION

25            BY MS. HARDWICK OF GUY NAQUIN:

1    Q.  Based on your report and all of the evidence that you saw,

2    did you see a revolver?

3    A.  No.

4    Q.  Now the revolver would be the one Mr. Butler said that

5    would hold its casings once you fired it.

6    A.  Yes.

7    Q.  And nothing comes out on the floor?

8    A.  That's correct.

9    Q.  So this forty caliber is a semi, right?

10   A.  Yes.

11   Q.  So its casings come out?

12   A.  Yes.

13   Q.  And the casings that were found, did they match a forty

14   caliber firearm?

15   A.  Yes.

16   Q.  They were from a forty caliber firearm?

17   A.  Yes.

18   Q.  And no revolver is in your report anywhere that you made?

19   A.  No.

20        MS. HARDWICK:  That's all.

21        MR. BUTLER:  Briefly, Your Honor.  I think I may have

22   created this.

23                    FURTHER REDIRECT EXAMINATION

24                    BY MR. BUTLER OF GUY NAQUIN:

25   Q.  Never mentioned a revolver.  My position is simply this.

```
 1    If you go to a residence where you have been informed multiple
 2    bullets had been discharged from the residence, you're informed
 3    that it was six or seven, you get to the residence and you find
 4    only one shell casing, that would be of concern and of
 5    suspicion to you.
 6    A.  It would cause me to look further for more -- to see if
 7    there were any more, and there may not be for the reasons I
 8    previously state but we would look.
 9    Q.  That being it was a revolver?
10    A.  Yes.
11    Q.  But let's assume it's a nine millimeter that the Government
12    held up, your experience would say that there should be more
13    shell casings in that residence, correct?
14    A.  Yes, unless they were moved or picked up or it was altered
15    in some way, yes.
16            MR. BUTLER:  Nothing further.
17            MS. HARDWICK:  Your Honor, just to clarify.
18                      FURTHER RECROSS EXAMINATION
19                      BY MS. HARDWICK OF GUY NAQUIN:
20    Q.  What the Government held up is not a nine millimeter is,
21    it?
22    A.  No.
23    Q.  Thank you.
24            THE COURT:  Anything else for this witness subject to
25    him being recalled as to the tape?
```

1          MS. HARDWICK:  Yes, sir.

2          MR. BUTLER:  Nothing further, Your Honor.

3          THE COURT:  Very good.  You may step down, but you're

4    not free to the go yet.

5          (Whereupon the witness, Guy Naquin, stepped down from

6    the stand.)

7          THE COURT:  Next witness.

8          MR. BUTLER:  Mr. Glenn Teague.

9          THE COURT:  Mr. Teague.

10                    G L E N N    T E A G U E,

11     the witness herein, having first been duly sworn or

12   affirmed to tell the truth, was examined and testified as

13   follows:

14                      DIRECT EXAMINATION

15              BY MR. BUTLER OF GLENN TEAGUE:

16          MS. HARDWICK:  Your Honor, we have a draft of what we

17   discussed before.

18          THE COURT:  Let me see it.

19          I'll just have to excuse the jury for a minute.  It

20   will be at least ten minutes.

21          (Whereupon, the jury was escorted out of the

22   courtroom, and the following colloquy ensued):

23          THE COURT:  I have your proposed jury instruction

24   here.

25          MS. HARDWICK:  Yes, sir.

1    THE COURT:  You say when witness Glenn Teague is

2  questioned about an earlier statement he may have made?

3    MS. HARDWICK:  Yes, sir.

4    THE COURT:  I am misunderstanding what it is you want

5  the instruction to address.  I didn't think it was Mr. Teague's

6  statement, but I thought it was Mr. Smith's statement.

7    MS. HARDWICK:  Your Honor, I think it is Mr. Teague's

8  statement.  I believe what the --

9    THE COURT:  Unless I'm misunderstanding what's going

10  on, but go ahead.

11    MS. HARDWICK:  Your Honor, I believe it is Mr.

12  Teague's statement to his son in Florida that Mr. Teague will

13  be asked about.  Depending on his response to that question,

14  then Mr. Smith will be recalled and asked about that same

15  conversation or subject matter conversation.

16    THE COURT:  I thought it was Mr. Smith's statements,

17  though, that are --

18    MS. ADAMS:  Excuse me, Your Honor, I hate to

19  interrupt, but we have the witness on the stand.

20    THE COURT:  You're absolutely right.  If you'll step

21  out.

22    (Whereupon the witness, Glenn Teague, was escorted

23  out of the courtroom and the following colloquy ensued):

24    THE COURT:  Let me just lay out what I thought you

25  were supposed to be doing.  I thought that Mr. Butler is going

1    to ask Mr. Teague did he rob the bank.  Is that correct?

2            MR. BUTLER:  I'm going to ask Mr. Teague whether he

3    informed Andreas Smith that he had robbed the bank.

4            THE COURT:  And he's going to say no, I assume.  Then

5    you're going to call Mr. Smith to the stand.

6            MR. BUTLER:  That is correct.

7            THE COURT:  And you're going to ask Mr. Smith whether

8    in fact his father told him he had robbed the bank.

9            THE COURT:  That is correct.

10            THE COURT:  I thought it was Mr. Smith's statement

11    that his father said that, that it could only come in for

12    purposes of impeaching Mr. Teague, it cannot come in for the

13    purpose of showing that his father in fact robbed the bank.

14            MS. HARDWICK:  Your Honor, we agreed that the

15    testimony from Mr. Smith regarding what his father told him

16    only comes in for the purpose of impeaching his father's

17    testimony.

18            THE COURT:  Right.  But your instruction is not

19    worded that way.  It's Mr. Smith's testimony that would only

20    come in for impeachment purposes.  I think it should be that

21    the statement that Mr. Smith gives about what his father said

22    can only be considered for impeachment purposes and cannot be

23    considered for whether in fact his father in fact robbed the

24    bank.

25            MS. HARDWICK:  That is correct.

```
 1              MR. BUTLER:  That's correct.

 2              THE COURT:  So it's really Mr. Smith's statement

 3    that's the subject of the charge, not what Mr. Teague is saying

 4    right now.

 5              MS. HARDWICK:  I understand, Your Honor.

 6              THE COURT:  In fact, if you want me to I can just

 7    restate what I just said to the jury.

 8              MS. HARDWICK:  Yes, sir, that's fine.

 9              THE COURT:  We'll take ten minutes.  I'll give that

10    instruction when you call Mr. Smith and I'll say that Mr.

11    Smith's statement can only come in for the limited purpose of

12    impeachment.

13              MS. ADAMS:  Thank you, Your Honor.

14              (Whereupon, a recess was taken.)

15              THE COURT:  Bring in the jury.

16              (Whereupon, the jury was escorted into the

17    courtroom.)

18              MR. BUTLER:  Your Honor, may I begin?

19              THE COURT:  Yes.

20                      G L E N N    T E A G U E,

21       the witness herein, having first been duly sworn or

22    affirmed to tell the truth, was examined and testified as

23    follows:

24                      DIRECT EXAMINATION

25              BY MR. BUTLER OF GLENN TEAGUE:
```

1    Q.  Mr. Teague, yesterday you testified that you and your son

2    were staying at a hotel in Florida, correct?

3    A.  Yes, sir.

4    Q.  And that area was Perry, Florida?

5    A.  Yes.

6    Q.  You also testified that on Sunday morning you and your son

7    returned from a second barbecue Saturday to the hotel room,

8    correct?

9    A.  No.  That wasn't my statement.  My statement was Sunday

10   morning when we had the altercation that night.  We was there

11   Sunday morning.  It's something like four in the morning.

12   Q.  Four o'clock in the morning you and your son had an

13   altercation?

14   A.  Right.

15   Q.  And that was at the hotel room?

16   A.  Yes.

17   Q.  Okay.  I think we're on the same page.

18   A.  Okay.

19   Q.  During that altercation, you informed your son that you had

20   robbed the Compass Bank for him and that you were not going

21   back to jail, is that what you told him?

22   A.  No, sir.

23   Q.  You also informed him that you were his father --

24          MS. HARDWICK:  Your Honor, we object to the leading.

25   He's stating the question rather than asking Mr. Teague what he

1    said.

2            THE COURT:  Sustained.

3    Q.  Did you inform your son anything regarding anything -- Did

4    you threaten to kill your son?

5    A.  What?  No.  I ain't never threatened to kill anyone, let

6    alone my son.

7    Q.  Okay.

8            MR. BUTLER:  One moment, Your Honor.

9            (Whereupon, Mr. Butler conferred with Ms. Mason off

10   the record and out of the hearing of the other courtroom

11   participants.)

12           MR. BUTLER:  Nothing further, Your Honor.

13           MS. HARDWICK:  Nothing from this witness.

14           THE COURT:  Thank you, you may step down.

15           (Whereupon the witness, Glenn Teague, stepped down

16   from the stand.)

17           THE COURT:  Mr. Butler?

18           MR. BUTLER:  At this time I'd call Andreas Smith.

19           THE COURT:  Mr. Smith.

20           MR. BUTLER:  And the testimony is going to be in

21   regards to what was discussed out of court.  I'm not sure

22   whether the Government wants to make an instructions.

23           THE COURT:  Are you going to merely ask whether Mr.

24   Teague threatened to kill him?

25           MR. BUTLER:  And his statement whether he did the

1  robbery.

2          THE COURT:  The statement whether he threatened and

3  to kill him was not hearsay.  So that doesn't need a limiting

4  instruction.  The other question will require an instruction.

5                  A N D R E A S    S M I T H,

6      the witness herein, having first been duly sworn or

7  affirmed to tell the truth, was examined and testified as

8  follows:

9                  DIRECT EXAMINATION

10                 BY MR. BUTLER OF ANDREAS SMITH:

11  Q.  Mr. Smith, you and your father -- Could you describe

12  whether or not tensions were developing between you and your

13  father while you were in Florida on this trip that he invited

14  you on.

15  A.  There was tension.

16  Q.  Okay.  Yesterday you indicated that the tension that was

17  developing stemmed from your observations of him and his

18  behavior, is that correct?

19  A.  Yes, sir.

20  Q.  On Sunday morning did you and your father return to the

21  hotel room which had been rented by him or you?

22  A.  Yes, sir.

23  Q.  And who had rented that hotel room?

24  A.  He did.

25  Q.  Okay.  Do you recall, or did you observe how he paid for

1  that hotel room?

2  A.  Yeah, he had money.

3  Q.  I'm sorry, sir.

4  A.  He had money.  He paid for the room.

5  Q.  Okay.  You indicated on yesterday that you had seen money

6  in the console of the car, as well as the visor of the car.

7  Did you see money on your father in other places?

8  A.  Yeah, in his pocket.

9  Q.  Okay.  Any other parts of his person that you saw?

10  A.  In his shirt.  His shirt and his pockets.

11  Q.  Okay.  I don't think I asked you.  What were the

12  denominations?  Were you able to see what type of money?  By

13  that I mean was it ones, fives?  What type of money was it?

14  A.  He never pulled it out and counted it in front of me.

15  Q.  Okay.  You get back to the hotel room on Sunday.  Did you

16  ask your father where the money had come from?

17  A.  Yes.

18  Q.  What did your father tell you regarding the money?

19  A.  That he robbed a bank.

20  Q.  Did he tell you why he had robbed the bank?

21  A.  He just told me that he was grown.  He was a grown man and

22  he'd do what he wanted to.

23  Q.  Did he make any threats towards you?

24  A.  No.  I told him to take me home and he wasn't taking me

25  nowhere.

1    Q.   I believe this is where you indicated that he left the

2    hotel room?

3    A.   Yes, sir.

4    Q.   Okay.  One more time so we're clear.  What did you do after

5    -- you made the request for him to take you home and he leaves

6    the hotel room, what did you do?

7    A.   I laid down on the bed and flipped the remote.

8    Q.   What's the next thing that you then remember?

9    A.   Getting up from the side of the road.

10             MR. BUTLER:  Nothing further, Your Honor.

11             THE COURT:  Now, members of the jury, you've heard

12    Mr. Smith testify or give testimony regarding what he contends

13    were statements made to him by Mr. Teague that Mr. Teague had

14    robbed the bank.  The statement by Mr. Smith about what Mr.

15    Teague said is admitted for the limited purpose of impeachment.

16    That is, by the defendant Smith to challenge the veracity or

17    truthfulness or credibility of Mr. Teague.

18             The statement has not been admitted and should not be

19    considered by you, the jury, for the actual truthfulness of the

20    substance of that statement.

21             Anything else, Counsel?

22             MS. HARDWICK:  Yes, Your Honor.

23                          CROSS EXAMINATION

24                 BY MS. HARDWICK OF ANDREAS SMITH:

25    Q.   Mr. Smith, you indicated that there was tension developing

1   between you and your father, is that correct?

2   A.  Yes.

3   Q.  And tension can develop between two people who have a

4   relationship, isn't that correct?

5   A.  Yes, ma'am.

6   Q.  And you believe that the tension was because of his

7   behavior.  Are you still talking about the behavior of him

8   eating the meat from the grill?

9   A.  It was probably because I was questioning him.

10  Q.  You think it was because of that and because you were

11  questioning him?

12  A.  Yes.

13  Q.  And then you asked him where the money came from and you

14  said that he told you that he robbed the bank.

15  A.  Yes, ma'am.

16  Q.  And after -- And he told you he robbed the bank because he

17  was grown.  He was a grown up man.

18  A.  Yeah.

19  Q.  And then the next thing that happened was that he left the

20  room.

21  A.  Yes, ma'am.

22  Q.  And you were left in the room.

23  A.  Yes.

24  Q.  And are you being truthful about what you're testifying to

25  that transpired in that room regarding this incident?

1    A.   Yes, ma'am.

2    Q.   Just this specific incident?

3    A.   You asked me what happened in the room and I told you.

4    Q.   And you've told us everything that happened in that room?

5    A.   Yes, ma'am.

6    Q.   And you're sure about that?

7    A.   Yes, ma'am.

8    Q.   So he never threatened you.

9    A.   What you mean?

10   Q.   Mr. Smith, we just went over it again to be very sure.  You

11   said there was tension that was developing.  You said that it

12   was because of the meat and because you were questioning him

13   about the money.  That he told you that he robbed the bank.

14   You asked him to take you home, he said no and he left the room

15   and you stayed in the room.  And I asked you very clearly was

16   that all that happened in that room.  And you said yes.

17   A.   He said he wasn't going back to jail.

18   Q.   That's still not a threat.

19           MS. HARDWICK:  Those are all my questions Your Honor.

20           MR. BUTLER:  Briefly.

21           THE COURT:  Yes.

22                     REDIRECT EXAMINATION

23           BY MR. BUTLER OF ANDREAS SMITH:

24   Q.   The next thing you remember after flicking the TV on is, I

25   think your words were waking up on the side of the road.

1   A.  Yes, sir.

2   Q.  You were then transported to someplace.  To a hospital,

3   correct?

4   A.  Yes, sir.

5   Q.  Did you have concerns regarding your safety at the hospital

6   given what had transpired in the room?

7           MS. HARDWICK:  Your Honor, we would object.  It's

8   been gone over before when Mr. Smith testified yesterday

9   regarding this.  We went through this detailing what he said

10  and what his concerns were.  It's been asked and answered.

11          THE COURT:  Are you bringing up anything that we

12  haven't heard before?  Otherwise we just don't need to go over

13  it again.

14          MR. BUTLER:  I understand.  I was just trying to

15  clarify what he said.

16  Q.  I'll ask you this.  While you were in the hospital, you

17  indicated that some of your family members came down.

18  A.  Yes, sir.

19  Q.  Okay.  Did any of your father's family members come?

20          MS. HARDWICK:  Again, Your Honor, this testimony we

21  went over yesterday regarding which family members came over to

22  see him.  Both his mother and the phone call he received.  It's

23  been asked and answered.

24          MR. BUTLER:  Maybe my memory is bad --

25          THE COURT:  I'll allow it.  Go ahead.

1           MR. BUTLER:  I'm sorry, I just don't remember.

2    Q.  Did any of your father's family members come to the

3    hotel?

4    A.  Yes, sir.

5    Q.  Given the fact that your father said to you in the hotel

6    room that he was not going back to jail, and the fact that his

7    family members are now showing up at the hospital, how did that

8    make you feel?

9    A.  I was suspicious.

10   Q.  Suspicious of -- What do you mean "suspicious"?

11   A.  I felt like my father had something to do with it anyway.

12   Q.  To do with what?

13   A.  Leaving me on the side of the road.  He's the only person

14   with a key to the hotel room.

15   Q.  And now his family members that -- I mean this was the

16   first time that you had seen them in twenty-seven years,

17   correct?

18   A.  Yes, sir.

19   Q.  And now they're showing up in your hospital room?

20   A.  Yes, sir.

21   Q.  Did you have concerns for your safety?

22           MS. HARDWICK:  Your Honor, again, we've been over all

23   of this yesterday.

24           THE COURT:  I think he already answered that earlier

25   today.

```
1            MR. BUTLER:  Nothing further.

2            MS. HARDWICK:  No further questions.

3            THE COURT:  Okay.  Thank you.  You may step down.

4            (Whereupon the witness, Andreas Smith, stepped down

5       from the stand.)

6            THE COURT:  Next witness.

7            MS. McKEE:  The Defense calls Sarah Allen.

8                        S A R A H    A L L E N,

9        the witness herein, having first been duly sworn or

10      affirmed to tell the truth, was examined and testified as

11      follows:

12                        DIRECT EXAMINATION

13                  BY MS. McKEE OF SARAH ALLEN:

14      Q.  Hi, Ms. Allen.  You're still under oath.

15      A.  Yes, ma'am.

16      Q.  If you would please state your name for the record.

17      A.  Sarah Allen.

18      Q.  And, Ms. Allen, we spoke to you yesterday, and just so we

19      recall, you are a nurse.

20      A.  Yes, ma'am.

21      Q.  At a Florida hospital, Doctors Memorial Hospital?

22      A.  Yes, ma'am.

23      Q.  And we also spoke yesterday regarding the fact that you had

24      met Andreas Smith while you were a nurse at the Doctors

25      Memorial Hospital in Florida.
```

1   A.   Yes, ma'am.

2   Q.   And, again, the time period when you met Mr. Smith was in

3   June of two thousand seven.

4   A.   Yes, ma'am.

5   Q.   Particularly around the dates of June twenty-sixth and

6   twenty-seventh.

7   A.   Yes, ma'am.

8   Q.   Ma'am, could you describe for us -- Well let me ask you,

9   are you familiar with a wayside rest area in Florida?

10  A.   Yes, I know where it's at.

11  Q.   Is that -- What's the nearest highway or road near the

12  wayside rest area?

13  A.   U. S. nineteen and twenty-seven.

14  Q.   And where is the nearest hospital?

15  A.   The closest one to that is Doctors Memorial Hospital.

16  Q.   How far away is Doctors Memorial Hospital from that wayside

17  rest area on Highway Nineteen?

18  A.   Approximately six to seven miles.

19  Q.   Ma'am, with regard to your care of Mr. Smith during the

20  period of time that he was there, do you recall how long Mr.

21  Smith stayed at Doctors Memorial Hospital?

22  A.   No, ma'am, not exactly.  I think I recall taking care of

23  him two days myself.

24  Q.   And I believe you met him on, you said, the twenty-seventh,

25  the day after he arrived at the hospital?

1    A.   Yes, ma'am.

2    Q.   So you would have cared for him at least on the

3    twenty-seventh and the twenty-eighth?

4    A.   Yes, ma'am.

5    Q.   Would it refresh your memory at all if I showed you a

6    document regarding when Mr. Smith was checked out of Doctors

7    Memorial Hospital?

8    A.   Yes, ma'am.

9            MS. McKEE:  May I approach the witness, Your Honor?

10           THE COURT:  Yes.

11   Q.   Without reading anything from it, if you can just look at

12   that.

13   A.   Mm-hmm.

14   Q.   Does that refresh your memory?

15   A.   Mm-hmm.

16   Q.   Ma'am, do you recall a date -- or how long Mr. Smith stayed

17   in the hospital at Doctors Memorial Hospital?

18   A.   According to the document, he left on the twenty-ninth of

19   June.

20   Q.   So he would have been there about three or four days total.

21   A.   Yes, ma'am.

22   Q.   What was Mr. Smith's condition the first day when you came

23   into contact with him?

24   A.   Like I say, he was withdrawn.  He had a lot of scratches.

25   He had, like I say, the ant bites down his neck and down his

1    back.

2    Q.  As he appeared to you when you met him on the

3    twenty-seventh -- Excuse me.  At that point when you met him on

4    the twenty-seventh, what was his mental state as far as knowing

5    where he was?  If you know.

6         MS. HARDWICK:  Your Honor, we would object.  She's

7    testified that she is an L. P. N. and she can only testify to

8    her observations of an individual, not his mental state.

9         MS. McKEE:  Your Honor, this individual was caring

10   for --

11        THE COURT:  She can testify about what she observed.

12   She can't make a diagnosis.  Like was he agitated or she can

13   describe the way he appeared.

14        MS. McKEE:  Yes, Your Honor.  If I may respond to

15   Government's objection?  What I'm asking this witness is in

16   regards to her care over the period of time, if she had

17   knowledge or if she was aware if Mr. Smith was aware where he

18   was and what was going on with him during that period of time.

19   And if she does not know, then she can say no she doesn't.

20        MS. HARDWICK:  Your Honor, we would include, then, it

21   would call for hearsay unless he told her because, again, she

22   would be speaking to what's in his mind or something he may

23   have said to her.

24        THE COURT:  Repeat your question again.

25   Q.  Miss Allen, are you aware of what was the mental state of

1  Mr. Smith as you cared for him on the twenty-seventh when you

2  met him?

3       THE COURT:  What you observed.

4  A.  Like I say, what I observed, he was very withdrawn.  He

5  would not look you in the eye.

6  Q.  Were any tests that you know of, were any tests performed

7  on Mr. Smith as part of his care?

8  A.  There was lab work.  I'm not exactly sure what type of lab

9  work but there was lab work.  I'm sure there was x-rays,

10  possibly.

11  Q.  Are you aware if any type of assault kit or anything was

12  done on Mr. Smith at the hospital?

13  A.  No, ma'am.  I wouldn't have that.

14  Q.  Isn't an assault kit something that would normally be done

15  at the hospital?

16       MS. HARDWICK:  I'll object to any further questions

17  about --

18       THE COURT:  She said she didn't know.

19       MS. McKEE:  Yes, Your Honor.

20       May I have a moment?

21       THE COURT:  Yes.

22       (Whereupon, Ms. McKee conferred with Mr. Butler off

23  the record and out of the hearing of the other courtroom

24  participants.)

25  Q.  Miss Allen, how long have you actually practiced as an L.

1    P. N., as a nurse?

2    A.  Eight years.

3    Q.  In the eight years that you've practiced as an L. P. N.,

4    how often would you come in contact and treat individuals that

5    have been subject to abuse?

6            MS. HARDWICK:  Your Honor, again we would object to

7    the relevancy of this line of questions.

8            THE COURT:  How is it relevant?

9            MS. McKEE:  Your Honor, it's very relevant in this

10   particular case.  Mr. Smith, there's already been testimony

11   that he was found on the side of the road.  This is the

12   individual that treated Mr. Smith for two days of the four days

13   while he was actually in Florida at the Doctors Memorial

14   Hospital.

15           THE COURT:  We may have evidence that someone

16   assaulted someone, but what evidence do we have of abuse?

17           MS. McKEE:  Your Honor, the fact that Mr. Smith was

18   lying on the side of the road, he didn't know how he got there

19   was from Ms. Allen yesterday during her direct examination

20   regarding the fact that he was withdrawn, would not look at

21   you, spoke very low, she stated yesterday that those were all

22   signs of abuse.

23           MS. HARDWICK:  Your Honor, the Government doesn't

24   recall her giving the conclusion.  She referenced on yesterday

25   that they looked like scratches.  She talked about the fact

1    that he would not make eye contact, that there were ant bites,

2    and she referred to the doctor's orders.  And she started to

3    ask her questions and she said there was dehydration and

4    possibly a level of renal failure.  I have no notes and I made

5    sure that -- and then when she started to go into that area,

6    there was an objection, not an answer and nothing further.

7    Same objection, relevancy.

8                THE COURT:  Are you familiar with signs of abuse?

9                THE WITNESS:  Yes.

10               THE COURT:  What do you base it on?

11               THE WITNESS:  You base it on their appearance.  Like

12   I say, children, people that have been abused, they do not make

13   eye contact because of the shame of it.  Then they do what when

14   they're withdrawn --

15               THE COURT:  Where did you learn this?

16               THE WITNESS:  In school, and reading, and you see a

17   lot of it.

18               THE COURT:  I'll allow it in.  Overruled.

19               MS. HARDWICK:  Your Honor, again, the objection is

20   also relevancy to this case.  There's been no testimony

21   regarding this.  The defendant has taken the stand twice

22   already, and there's been no reference to it.

23               THE COURT:  She can draw it out through this witness.

24   Overruled.  Go ahead.

25   Q.  Miss Allen, again, in the eight years that you have been an

1    L. P. N. nurse, how often would you say you came into contact

2    with individuals that were subject to abuse?

3    A.  Not often enough.  I mean you see it, you know, and you may

4    see two or three cases a year in the Med./Surg. that I'm on.

5    But we do see it.

6    Q.  Even though you see two or three cases a year, are you

7    trained at all to deal and handle individuals that are subject

8    to abuse?

9    A.  Yes, ma'am.

10   Q.  And as a part of that training what factors typically, as

11   you learned through your schooling as well as your experience

12   in your eight years as an L. P. N., what factors typically

13   demonstrate abuse?

14   A.  You have different things.  Demonstration of abuse -- Like

15   I say, the main ones are being -- with them being withdrawn and

16   not making eye contact, and just they don't -- they're not

17   outgoing.  It's like they're ashamed of things.

18   Q.  Based on your eight years experience, when you met Mr.

19   Smith were these factors as you stated withdrawn no, eye

20   contact, were these factors present in Mr. Smith?

21   A.  Yes, they were.

22              MS. McKEE:  No further questions, Your Honor.

23                        CROSS EXAMINATION

24              BY MS. HARDWICK OF SARAH ALLEN:

25   Q.  Ms. Allen, you have no evidence of abuse in this case, do

1    you?

2    A.   As to what are you talking about?

3    Q.   You have not witnessed any abuse in this case, have you?

4    A.   No.  I never seen any abuse.

5    Q.   In this case.  And we're being very specific about this

6    case, all the questions are in reference to Mr. Smith.

7              So you're not here to tell this jury that Mr. Smith

8    had been abused.

9    A.   I can't say he wasn't abused.  I didn't see anything.

10    Q.   Can you say that he was abused, Ms. Allen?

11    A.   No, I cannot say whether he was or was not.

12    Q.   So you could not say that he was.

13    A.   Or was not.

14    Q.   Okay.  My question was not was not.  You cannot say he was

15    abused.

16    A.   No, ma'am, I cannot.

17    Q.   And based on your experience, there are other things that

18    happen in the medical profession, including the fact that a

19    person is sedated that they might not even be able to keep

20    their eyes open when you're talking to them, isn't that

21    correct?

22    A.   Yes, ma'am.

23    Q.   And isn't it also correct that people who are experiencing

24    shock from an automobile accident or other trauma --

25              MS. McKEE:  Objection, relevance.

1      THE COURT:  Overruled.

2  Q.  They may not make eye contact with you?

3  A.  Yes, ma'am.

4  Q.  Isn't there a number of conditions in your profession that

5  you've seen other than abuse where a person does not make eye

6  contact?

7  A.  Yes, ma'am.

8  Q.  Even just a shy person.

9  A.  Yes, ma'am.

10  Q.  And you were not present here on June twenty-second, two

11  thousand seven in Montgomery, Alabama?

12  A.  No, ma'am.

13  Q.  So you have nothing that you could offer this jury that

14  would assist them in describing a bank robbery that happened on

15  June twenty-second, two thousand and seven?

16  A.  No, ma'am.

17  Q.  And you have no testimony that would assist this jury on

18  what happened in a shooting on July twenty-first, two thousand

19  and seven?

20  A.  No, ma'am.

21      MS. HARDWICK:  Thank you.

22              REDIRECT EXAMINATION

23          BY MS. McKEE OF SARAH ALLEN:

24  Q.  Miss Allen, were you aware at all of the circumstances of

25  how Mr. Smith was found or brought to the hospital?

1    A.   I knew that he had been found.

2              MS. HARDWICK:  Your Honor, unless she knows first

3    hand we would object.

4              THE COURT:  I think the question is are you aware.

5              THE WITNESS:  Yes, ma'am.

6    Q.  And based on your experience and in your treatment of Mr.

7    Smith and what you saw personally during the two days that you

8    cared for him, what is your professional opinion based on your

9    training and experience as an L. P. N. as to whether or not Mr.

10   Smith was abused?

11             MS. HARDWICK:  Your Honor, we object, unless she's

12   been trained as an expert in abuse.

13             THE COURT:  Are you saying he was abused, or that his

14   conditions are consistent with someone who has been abuse?

15             THE WITNESS:  They're consistent with someone who has

16   been abused.

17             THE COURT:  I'll allow that.

18             MS. McKEE:  No further questions.

19                       RECROSS EXAMINATION

20               BY MS. HARDWICK OF SARAH ALLEN:

21   Q.  Ms. Allen, if a person is out using marijuana, cocaine and

22   drinking, they could end up in your hospital in any condition,

23   couldn't they?

24   A.  Yes, ma'am.

25             MS. HARDWICK:  That's all.

```
 1                  (Whereupon the witness, Sarah Allen, stepped down
 2       from the stand.)
 3                  THE COURT:  Next witness.
 4                  MR. BUTLER:  Your Honor, I'm going to recall Mr.
 5       Glenn Teague.  This will be the last time.
 6                  THE COURT:  You're calling Mr. Teague again?
 7                  MS. HARDWICK:  Your Honor, we object.
 8                  THE COURT:  This is the third time, Mr. Butler.
 9                  MR. BUTLER:  The first and second time was regarding
10       an issue that arose --
11                  THE COURT:  I know, but why are we calling him a
12       third time?
13                  MR. BUTLER:  This is regarding incidents, one
14       question regarding what happened while Mr. Smith was in the
15       hospital.
16                  MS. HARDWICK:  Your Honor, we object.
17                  THE COURT:  This is not proper.  I'll take that up
18       later.  Three times you're calling Mr. Teague.
19                  MR. BUTLER:  Yes, Your Honor.
20                  THE COURT:  I can understand the second time, but
21       this third time?  We'll take that up outside the presence of
22       the jury.
23                  Who is your next witness?
24                  MR. BUTLER:  Your Honor, at this time we'd call
25       Deanne Peters.
```

```
 1              THE COURT:  Ms. Peters.
 2                    D E A N N E    P E T E R S,
 3          the witness herein, having first been duly sworn or
 4      affirmed to tell the truth, was examined and testified as
 5      follows.
 6                        DIRECT EXAMINATION
 7                 BY MS. McKEE OF DEANNE PETERS:
 8      Q.  Miss Peters, if you could state your name and spell your
 9      last name for the record, please.
10      A.  Deanne Peters.
11      Q.  Ms. Peters, can you scoot a little closer to the mic?
12      A.  Yes.
13      Q.  Thank you.
14              Ms. Peters, where do you live?
15      A.  Montgomery, Alabama.
16      Q.  And how old are you?
17      A.  Twenty-five.
18      Q.  Ms. Peters, do you know Andreas Smith?
19      A.  Yes.
20      Q.  And how do you know Andreas Smith?
21      A.  We dated, and he's the father of my two children.
22      Q.  Now you understand that Mr. Smith is obviously on trial
23      here today, correct?
24      A.  Yes.
25      Q.  And you understand that before this trial began, at some
```

```
 1   point Mr. Smith was arrested.
 2   A.  Yes.
 3   Q.  And before Mr. Smith was arrested, law enforcement officers
 4   had been in contact with you, correct?
 5   A.  Yes.
 6   Q.  They actually had been in contact with you more than once.
 7   A.  Yes.
 8   Q.  You cooperated with these law enforcement officers every
 9   time they contacted you, right?
10   A.  Yes, ma'am.
11   Q.  Let me ask you where, if any places, did you speak to any
12   of these officers?
13   A.  At my job, my home and over the telephone.
14   Q.  And in cooperating, you even told them where Andreas was
15   when they asked you, correct?
16   A.  Yes.
17   Q.  Now when did you first meet Mr. Smith?
18   A.  In nineteen ninety-eight.
19   Q.  And you said that the of two you have two kids?
20   A.  Yes, two sons.
21   Q.  And how old are the boys?
22   A.  Two and three.
23   Q.  What are their names?
24   A.  Mxxxxxx and Mxxxxxx.
25   Q.  Now you met Mr. Smith in nineteen ninety-eight.  Have you
```

1    all dated that entire period of time since ninety-eight?

2    A.  No, ma'am, not the entire time.

3    Q.  In June of two thousand seven were the two of you dating?

4    A.  No, ma'am.

5    Q.  In that year in July or August of that year, were the two

6    of you dating?

7    A.  No.

8    Q.  During any periods of time that the two since you've known

9    Mr. Smith and you all were not dating, did you all still get

10   along during those periods of time?

11   A.  Yes, ma'am, we got along great.

12   Q.  How is Mr. Smith -- or is he involved with his kids?

13   A.  Yes, ma'am.

14   Q.  And how is he involved?

15   A.  He always calls.  He asks about them.  He spends time.  We

16   spend times together.  He pretty much calls every day and talks

17   to them.

18   Q.  Now knowing Mr. Smith since nineteen ninety-eight, were you

19   ever aware of -- Well, let me ask you this:  When you first met

20   Mr. Smith in nineteen ninety-eight, did you meet his father?

21   A.  No.

22   Q.  At any point -- Do you have any firsthand knowledge of the

23   relationship that Mr. Smith had with his father?

24   A.  When me and Andre got together in oh three, he didn't have

25   no relationship with his father.

1    Q.  You met Andreas in ninety-eight.

2    A.  Yes.

3    Q.  You said when Andreas and you got together in two thousand

4    three --

5    A.  Start living together.

6    Q.  You can continue.  When the two of you started living

7    together in two thousand three --

8    A.  Right.  We called downtown and got his father's number and

9    found out where he was, and Andreas wrote him and they started

10   writing each other back and forth.

11   Q.  At some point during this, you've already testified that

12   you had spoken to law enforcement, correct?

13   A.  Yes.

14   Q.  At any point, did you know that Andreas around June two

15   thousand seven, did you happen to know specifically since the

16   two of you were not dating, that he was going to Florida?

17   A.  No.

18   Q.  At any point did you learn that Mr. Smith had been to

19   Florida?

20   A.  Yes.

21   Q.  And how do you know Mr. Smith was in Florida?

22   A.  The U. S. marshals told me.

23   Q.  And what was that -- Why did they tell you he was in

24   Florida?

25   A.  They was asking me had I talked to him, and they had told

```
 1    me that they think that he robbed a bank in --
 2                MS. ADAMS:  Objection, Your Honor.  Hearsay.
 3                THE COURT:  Why isn't this hearsay?
 4                MS. McKEE:  Your Honor, actually what I was asking
 5    Ms. Peters, I actually got a different answer so I'm not
 6    attempting to go into that particularly.
 7                THE COURT:  Sustained.  Go ahead.
 8    Q.  Miss Peters what, if anything, in regards to going to
 9    Florida, why was there any significance of Mr. Smith going to
10    Florida?
11    A.  I don't know.
12    Q.  You stated that you and Andreas, Mr. Smith, kept in contact
13    pretty often because of the kids even though the two of you
14    were not dating.
15    A.  Right.
16    Q.  When were you first made aware that a bank had been robbed
17    in Montgomery?
18    A.  At my job.
19    Q.  But that was not by Mr. Smith, correct?
20    A.  Correct.
21    Q.  Ma'am, at any point that -- You said the marshals told you
22    that Mr. Smith had gone to Florida.
23    A.  Yes.
24    Q.  Did you have any firsthand knowledge that Mr. Smith was in
25    Florida as well?
```

1    A.   Yes.

2    Q.   And how did you know at some point that Mr. Smith was

3    actually in Florida?

4    A.   He called me from the hospital.

5    Q.   And why did he call you?

6    A.   He called and asked me how I was doing and how the kids was

7    doing.   And that was pretty much it.

8    Q.   At any point since you have known and you first met Mr.

9    Smith in nineteen ninety-eight, have you ever seen Mr. Smith

10   with any type of firearm or gun?

11   A.   No, ma'am.

12   Q.   At some point after law enforcement contacted you, at any

13   point did you ever inform Mr. Smith that somebody was looking

14   for him?

15   A.   No.

16   Q.   Did anyone ever tell you that Andreas's father tried to

17   kill him?

18   A.   Yes.

19   Q.   And who was that?

20        MS. ADAMS:   Objection, Your Honor, hearsay.   I'm also

21   objecting as to how the questions have been posed.

22        THE COURT:   Sustained.

23        Why isn't that pure hearsay?

24        MS. McKEE:   Your Honor, I will withdraw the question.

25   Q.   Ms. Peters, you stated that you and Mr. Smith were not

1    dating in July of two thousand and seven.

2    A.   Correct.

3    Q.   But did you in fact see Mr. Smith specifically on July

4    twentieth, two thousand seven?

5    A.   I'm not sure.

6    Q.   Well, let me ask you this.  Was there ever a point where

7    you recall in July of two thousand seven where you took Mr.

8    Smith some food?

9    A.   Right.

10    Q.   Okay.  Would that have been, do you recall, at the

11    beginning or the end of July?  If you recall.

12    A.   I don't recall exactly when.

13    Q.   Okay.  If you could, what were the circumstances of you

14    bringing Mr. Smith some food that day in July of two thousand

15    seven?  Why did you?

16    A.   He had called me and told me that he was hungry and that he

17    didn't have any money.

18    Q.   And when he called and said he was hungry and he didn't

19    have any money, what did you do at that point?

20    A.   I had called the U. S. marshals and let them know that

21    Andreas had contacted me.  He wanted me to meet him to bring

22    him something to eat.

23    Q.   And why did you do that?

24    A.   Because what they were saying, I just didn't believe that

25    he did that, and that Andreas is not -- he's not a violent

```
 1   person.  And I trusted Hamilton because he led me to believe
 2   that all they wanted with Andreas was to question him.
 3   Q.  And, again, because law enforcement legally were asking
 4   you, you told them where he was, correct?
 5   A.  Correct.
 6              THE COURT:  Told who?
 7              THE WITNESS:  The U. S. marshal.
 8              THE COURT:  Go ahead.
 9   Q.  Now, did you in fact at some point take any food to Mr.
10   Smith in July of two thousand seven, the day that he called you
11   and said he didn't have any money and was hungry?
12   A.  I took a bag of chicken out of the freezer.
13   Q.  Did you see Mr. Smith after he called you and said I don't
14   have any money and I'm hungry?
15   A.  Yes.  Me and the kids went where he was, and he came out to
16   the car and I did what the detectives told me to do.  He told
17   me to cut on the lights in my truck.
18   Q.  Let me ask you this.  You said you went to where Mr. Smith
19   was.
20   A.  Yes.
21   Q.  Do you recall the name of the street or the neighborhood
22   where Mr. Smith was?
23   A.  It was Woodley Park.
24   Q.  Would it have been on Jan Drive?
25   A.  All I know is the Woodley Park area.
```

1    Q.  So you said you and your two children went over to where

2    Mr. Smith was?

3    A.  All four of my kids.

4    Q.  All four.  Okay.  And, again, did you actually see Mr.

5    Smith when you got to that area?

6    A.  Yes, he got in the car.

7    Q.  At the point when he got in the car with you, did you ever

8    see Mr. Smith with a gun?

9    A.  No.

10   Q.  What, if anything, did Mr. Smith do while he was in the car

11   with you and your four children?

12   A.  He talked to us and he played with his kids.  His kids was

13   in his lap, so we sat out there maybe like an hour, an hour

14   and-a-half.

15   Q.  Was Mr. Smith playing with the children during that entire

16   hour, hour and-a-half that he was sitting in the car with

17   you?

18   A.  Yes.

19   Q.  Your children today, right now, are two and three that you

20   have with Mr. Smith?

21   A.  Mm-hmm.

22   Q.  Around that age, are they pretty settled?  Are they really

23   still -- Were they sitting on his lap perfectly?

24   A.  You know, they're little boys, they were hopping around.

25   Q.  At any point during that entire hour and-a-half that Mr.

1  Smith was in the car with you, did you ever see a gun with him
2  while he was there?
3  A.  No.  Andreas would not put his kids in --
4          MS. ADAMS:  Objection, Your Honor, to testimony that
5  does not respond to the question.  It's non-responsive.
6          MS. McKEE:  She had answered my question.  I'll move
7  on to the next one.
8          THE COURT:  Move on.
9  Q.  At some point did Mr. Smith get out of your vehicle?
10  A.  Yes.
11  Q.  And he went back into the residence where he was in the
12  Woodley Park area, correct?
13  A.  Yes.
14  Q.  At that point when he got out of your vehicle, did you see
15  Mr. Smith with a gun?
16  A.  No.
17  Q.  Were you still present outside the home as Mr. Smith walked
18  up to the residence where he had come out of earlier?
19  A.  I didn't hear you.
20  Q.  Were you still parked outside the home when he got out as
21  he began to walk up to the residence?
22  A.  When he began to walk up I drove off.
23          MS. McKEE:  May I have a moment, Your Honor?
24          THE COURT:  Yes.
25          (Whereupon, Ms. McKee conferred with Mr. Butler off

```
 1   the record and out of the hearing of the other courtroom
 2   participants.)
 3   Q.  In July of two thousand seven, that would have been in the
 4   summertime, do you recall what Mr. Smith was wearing -- Well,
 5   let me ask you this:  Do you recall if Mr. Smith had a jacket
 6   on that day in July of two thousand seven?
 7   A.  I don't think he had a jacket on.
 8   Q.  Do you recall whether or not you saw Mr. Smith as he walked
 9   out of the home to your car, as he was walking from the
10   residence?
11   A.  No.  I didn't see him walking.
12   Q.  Based on what you recall and in being in close proximity to
13   Mr. Smith that day in July last year, did it appear to you that
14   Mr. Smith had any firearms on his body anywhere?
15   A.  No.
16              MS. McKEE:  Your Honor, we have no further questions.
17              THE COURT:  Cross.
18                       CROSS EXAMINATION
19              BY MS. ADAMS OF DEANNE PETERS:
20   Q.  I'm Jerusha Adams, and I'm an Assistant United States
21   Attorney assigned to the case and I'd like to ask you a few
22   questions.
23              You just stated to Ms. McKee that you provided some
24   chicken to the defendant in July?
25   A.  Yes.
```

1    Q.   But you couldn't recall the specific date?

2    A.   No, ma'am, not the specific date.

3    Q.   You also mentioned that you had been in contact with law

4    enforcement.

5    A.   Yes.

6    Q.   And you specifically had mentioned "Hamilton".

7    A.   Yes.

8    Q.   Are you referring to Deputy United States Marshal John C.

9    Hamilton?

10   A.   I just remember the "Hamilton".  I used to call him "Mr.

11   Hamilton".

12   Q.   So you were in contact with Mr. Hamilton on numerous

13   occasions?

14   A.   Well, they came to my job, they came to my home and they

15   also called my cell phone.

16   Q.   And you provided truthful information to Mr. Hamilton?

17   A.   Yes.

18   Q.   And you tried to assist Mr. Hamilton as much as possible?

19   A.   I did assist Mr. Hamilton as much as possible.

20   Q.   Isn't it true that the United States Marshals Service paid

21   you a thousand dollars for your cooperation?

22   A.   Yes.

23   Q.   And wasn't that money based upon you telling them where the

24   defendant was located that day in July of two thousand and

25   seven?

```
 1   A.  He told me that all this would actually be confidential,

 2   that I wouldn't even have to testify on -- no money even being

 3   mentioned.  The way he came at me was he was to help --

 4   Q.  Ma'am --

 5            THE COURT:  Just a minute.  Ask your question

 6   again.

 7   Q.  My question, ma'am, was wasn't this money provided to you

 8   for telling Deputy Hamilton where the defendant was located on

 9   July twentieth, two thousand and seven?  I'm sorry, not the

10   specific date, but the date you brought the defendant chicken.

11   A.  Yes.

12   Q.  Now the day that you brought the defendant chicken and you

13   said that he visited with your children, that's right?

14   A.  Yes.

15   Q.  Did you pat the defendant down before he got into your

16   vehicle?

17   A.  No, ma'am.

18   Q.  And you also didn't search the defendant as he got in your

19   vehicle, did you?

20   A.  Why would I?

21   Q.  So you did not?

22   A.  No, ma'am, I didn't.

23   Q.  Ma'am, didn't you talk to Deputy Hamilton after the

24   defendant was taken into custody?

25   A.  Yes.
```

```
 1    Q.  Isn't it true that you told Deputy Hamilton that the

 2    defendant had smoked a line of cocaine that night?

 3    A.  No.

 4              MS. ADAMS:  No further questions, Your Honor.

 5                      REDIRECT EXAMINATION

 6              BY MS. McKEE OF DEANNE PETERS:

 7    Q.  Ms. Peters, you had began to, or tried to finish your

 8    answer.  Given how things happened and occurred, do you feel

 9    betrayed by Officer Hamilton?

10    A.  Yes.

11    Q.  Why is that?

12    A.  He came to my job.  He came to my home, and he was

13    specifically saying that --

14              MS. ADAMS:  Objection.  Hearsay.

15              THE COURT:  It depends on what he said.  I don't know

16    whether it's hearsay or not.

17    A.  He was saying to me that the only thing that they wanted

18    with Andreas --

19              THE COURT:  I'll allow that.  That's not hearsay.

20    Q.  Ms. Peters you can continue.  Why did you feel based on how

21    things happened, why do you feel betrayed by Officer

22    Hamilton?

23    A.  Because he said the only reason he wanted Andreas was to

24    talk to Andreas.  They wasn't accusing him of nothing, and they

25    just wanted him for questioning.
```

1    Q.  The thousand dollars that you received, was that something

2    Hamilton told you that he was a reward for something that he

3    was only giving especially to you?

4            MS. ADAMS:  Objection, leading and it includes

5    hearsay.

6            MS. McKEE:  Your Honor, I'm attempting to ask this

7    witness who has been questioned and posed --

8            THE COURT:  I'll allow that question.  Go ahead.

9    Q.  Ms. Peters, did Officer Hamilton, the thousand dollars that

10    you received, was that stated as a reward simply for

11    cooperating with law enforcement, or did Officer Hamilton tell

12    you that was just especially for you if you told?

13    A.  He said it was to help me out for all the things that I

14    went through, and just talking to them and he knows how

15    frustrated I am.

16    Q.  Let me ask you.  You say you were frustrated around that

17    time?

18    A.  Yes.

19    Q.  Frustrated why?

20    A.  I just got tired of them talking to me because they kept

21    asking me where was Andreas and I just kept telling them I

22    didn't know.

23    Q.  That's important.  You had spoken to these officers a

24    couple of times, correct?

25    A.  Right.

1    Q.  And at one point when you talked to them you told them

2    where Mr. Andreas was.

3    A.  Right.

4    Q.  During the times that you spoke with them, before you told

5    them where Mr. Smith was -- These conversations were not all on

6    the same day, correct?

7    A.  Correct.

8    Q.  Did you know where Mr. Smith was during the previous times

9    that you had spoken with law enforcement officers?

10   A.  No, and I kept telling them that.  I didn't know.

11   Q.  So when you told the officers at any point when you told

12   them that you didn't know where Mr. Smith was, were you telling

13   the truth then?

14   A.  Yes.

15   Q.  And at the point obviously when you did know where Mr.

16   Smith was, what did you do then?

17   A.  I called Hamilton.

18   Q.  Ma'am, now the two of you dated at some point, correct?

19   A.  Yes.

20   Q.  And you have two children together.

21   A.  Yes.

22   Q.  You don't want to necessarily see Mr. Smith get in trouble,

23   correct?

24   A.  Correct.

25   Q.  But will you lie for him?

1    A.   No.

2    Q.   Will you lie to law enforcement for him?

3    A.   No.

4    Q.   Ma'am, at any point during this entire time when law

5    enforcement continued to contact you, was there ever any threat

6    to your job at all?

7    A.   I just felt uncomfortable when they came to my job.  People

8    just started looking at me different because they came twice.

9    And I just felt uncomfortable at work because management would

10    be looking, and -- I just didn't like it.

11             MS. McKEE:  One moment, Your Honor.

12             (Whereupon Ms. McKee conferred with Mr. Butler off

13    the record and out of the hearing of the other courtroom

14    participants.)

15             MS. McKEE:  No further questions.

16                        RECROSS EXAMINATION

17                  BY MS. ADAMS OF DEANNE PETERS:

18             MS. ADAMS:  One question Your Honor.

19    Q.   Ms. Peters, you're not testifying here today that Deputy

20    Marshal Hamilton forced you to take that thousand dollars, are

21    you?

22    A.   No, he didn't force me to take it.

23             MS. ADAMS:  No further questions, Your Honor.

24             THE COURT:  Thank you.  You may step down.

25             (Whereupon the witness, DeAnne Peters, stepped down

1    from the stand.)

2            THE COURT:  Next witness.

3            MR. BUTLER:  We'd call Hercules Walker.

4                    H E R C U L E S    W A L K E R,

5        the witness herein, having first been duly sworn or

6    affirmed to tell the truth, was examined and testified as

7    follows:

8                            DIRECT EXAMINATION

9                    BY MR. BUTLER OF HERCULES WALKER:

10   Q.  Mr. Walker, could you state your name and spell your last

11   name for the record?

12   A.  My name is Herculese Walker, W-a-l-k-e-r the Third.

13   Q.  Mr. Walker I'm going to ask you a series of questions, but

14   I have to get a few items first.  One moment.

15            Mr. Walker, could you tell the ladies and gentlemen

16   of the jury where you live.

17   A.  I stay on Montgomery, Alabama.

18   Q.  And that's here in Montgomery, Alabama?

19   A.  Yes, sir.

20   Q.  What do you presently do for a living?

21   A.  I lay tile.  Work on machinery.

22   Q.  Do you know Mr. Willie Jackson?

23   A.  Yes, sir.

24   Q.  How long have you known Mr. Willie Jackson?

25   A.  Since he's about fifteen or sixteen years, so he was about

```
 1    eleven.
 2    Q.   Okay.  Do you know a Mr. Jamaal Clark?
 3    A.   Yes, sir.
 4    Q.   How long have you known Mr. Jamaal Clark?
 5    A.   Ever since he's about eleven.  The same amount of time.
 6    Q.   Since he was about eleven, as well?
 7    A.   Yes, sir.
 8    Q.   Okay.  Do you know Mr. Andreas Smith?
 9    A.   Yes, sir.
10    Q.   And how long have you known him?
11    A.   Since he's about ten or eleven.
12    Q.   Do you see Mr. Andreas Smith here?
13    A.   Yes, sir.
14    Q.   Are you familiar at all with Twenty-eight sixty-one Jan
15    Drive?
16    A.   Yes, sir.
17    Q.   How do you know that residence?
18    A.   It was a place we used to gather sometimes on the weekend.
19    On weekends we'd go there.
20    Q.   How often do you -- Before you answer that, who lives
21    there?  Who is the owner, do you know?
22    A.   Willie Jackson.
23    Q.   How often do you go over to that residence?
24    A.   Sometimes every weekend we'd be over there.
25    Q.   Every weekend and sometimes during the week?
```

```
1    A.   Yes, sir.
2    Q.   And how long have you been going to that address?
3    A.   Since he's been living in that particular house.
4    Q.   When you go to that address, is -- who is usually
5    present?
6    A.   Me, Andreas, Willie, Jamaal.  And that's the main people
7    that's going to be there for sure.
8    Q.   Okay.  Are there other people that come and go?
9    A.   Yes, sir.  It's a multiple amount of people.  Sometimes ten
10   to fifteen to twenty people might be there on the weekend.
11   Q.   But the persons, again, that are usually there are you,
12   Jamaal, Willie and Andreas?
13   A.   Yes, sir.
14   Q.   Have you had an opportunity to see and observe the
15   individuals at that residence?  And when I say that, you know,
16   what they're wearing, what they have, what they possess?
17   A.   Yes, sir.
18   Q.   I'm showing you what's been marked as Government's exhibit
19   sixty A.  Do you recognize that?
20   A.   Yes, sir.
21   Q.   And how do you recognize it?
22   A.   It's identical to a weapon that I'd see inside the house.
23   Q.   Who -- Did you see anybody in possession of that weapon?
24   A.   Jamaal Clark.
25   Q.   Okay.  When you were present -- You are present at the
```

```
1    residence, you indicate, almost weekly on the weekends and

2    sometimes multiple times during the week.

3    A.   Mm-hmm.

4    Q.   Have you seen that firearm in Mr. Clark's possession?

5    A.   Once before many.

6    Q.   Okay.  Have you ever seen that firearm in Mr. Andreas

7    Smith's possession?

8    A.   No, sir.

9    Q.   I'm showing you what's -- I'm showing you a firearm.  Does

10   this firearm appear similar to the one in the photograph?

11   A.   Yes, sir.

12   Q.   And is this the firearm that you've seen in Mr. Clark's

13   possession?

14   A.   Yes, sir.

15          MS. ADAMS:  Objection, Your Honor.  There's been no

16   foundation indicating that that is the gun that he saw Mr.

17   Clark with.

18          THE COURT:  Can you tell whether that is the actual

19   gun?

20          THE WITNESS:  Like I said, it's identical to the one

21   to it.

22          THE COURT:  It's identical.

23          THE WITNESS:  I don't know if that's the same, but I

24   know it's identical.

25          THE COURT:  Very good.  Go ahead.
```

1    Q.   In the event that this firearm was found at Twenty-eight

2    sixty-one Jan Drive, this would conform with what you had seen

3    in the past during your visits.

4    A.   Yes, sir.

5    Q.   Could you inform the ladies and gentlemen of the jury

6    whether you had been at Twenty-eight sixty-one Jan Drive on or

7    about June twenty-second, two thousand and seven?

8    A.   Yes, sir.

9    Q.   What time did you go by Jan Drive?

10   A.   It was in the evening around four o'clock.  Somewhere

11   around there.

12   Q.   Okay.  In addition to this firearm, did you see any other

13   firearms in the residence?  Do you recall seeing any other

14   firearms?

15   A.   Yes, sir.

16   Q.   I'm showing you what's been marked as Government's exhibit

17   fifty-five.  Is that a firearm that you've seen in the

18   residence?

19          MS. ADAMS:  Objection, Your Honor.  He has not laid a

20   foundation to indicate that that is the firearm that he has

21   seen in the residence.

22   Q.   Is that a firearm that's similar to one that you have seen

23   in the residence?

24   A.   Yes, sir.

25   Q.   Okay.  The firearm that you saw in the residence, who owned

1  that?  Whose weapon was that, the one that was similar to this?

2  A.  To my knowledge it was the person that owned the house, I

3  guess.

4            THE COURT:  Do you know who owned the weapon?

5            THE WITNESS:  I don't know for a fact who owns that

6  weapon.

7  Q.  Have you ever seen this firearm in the house?

8            MS. ADAMS:  Again, objection regarding that specific

9  firearm.

10           MR. BUTLER:  I'll rephrase it.

11 Q.  Have you ever seen a weapon similar to this one in the

12 house?

13 A.  That's the first time I ever laid eyes on that particular

14 one.

15 Q.  While you were at the residence did you see or observe

16 what's marked as defendant's exhibit fifty-six?

17 A.  Yes, sir.

18 Q.  What did you believe that to be?

19 A.  Marijuana, smoking, scales, whatever.

20 Q.  Do you have any knowledge of -- Well let's put it this way:

21 Had you been in the residence the day prior or a time shortly

22 before June twenty-second?

23 A.  Yes, sir.

24 Q.  Was that marijuana present when you were there in the day

25 or days prior to June twenty-second, two thousand seven?

1    A.   Yes, sir.

2    Q.   Okay.  Did you see anyone within the residence handling

3    and/or manipulating that marijuana?

4    A.   Yes, sir.

5    Q.   Who did you see handling and/or manipulating that

6    marijuana?

7                 MS. ADAMS:  Objection, Your Honor.  Relevance?

8                 THE COURT:  Overruled.

9    A.   Jamaal Clark.

10   Q.   Jamaal Clark?

11   A.   Yes, sir.

12   Q.   Did you see or have any knowledge based on what you could

13   see and observe, what Mr. Jamaal Clark was doing with that

14   marijuana?

15   A.   Making money.

16   Q.   What do you mean by "making money"?

17   A.   Distribution, sales.

18   Q.   You saw him selling the marijuana?

19   A.   Yes, sir.

20   Q.   Okay.  The firearms that you did see in the house, the one

21   that was similar to this one that was lying in the house at

22   Twenty-eight sixty-one, and this one which is similar to the

23   one that you saw in the possession of Jamaal Clark and that was

24   found in the house at the time of Mr. Smith's arrest, what was

25   your understanding of why those weapons were in the house?

1        MS. ADAMS:  Objection, Your Honor.  It calls for

2  hearsay.

3        MR. BUTLER:  No it doesn't.

4        THE COURT:  How would he know it other than based on

5  hearsay?

6  Q.  Based on what you could see and observe, what was your

7  understanding of where the weapons were in the house?

8        THE COURT:  Just a minute.  Did someone tell you

9  this, or what?

10        THE WITNESS:  No, sir.  It's just something I know.

11  I stay in the neighborhood.  This is not hearsay.

12        THE COURT:  I think he can testify as to why people

13  may keep such weapons in the house, but he can't testify why

14  those weapons were kept in the house.

15        MR. BUTLER:  Understood, Your Honor.

16  Q.  Based on your life experience, having lived in the

17  neighborhood, what you saw in the house, i.e. this marijuana,

18  based on the fact that you saw Jamaal Clark selling the

19  marijuana, why do you believe that these weapons --

20        THE COURT:  That's sustained.  That's not what I

21  said.  What he believes is irrelevant.  It's what the jury

22  believes.  He may testify as to why people keep guns in houses,

23  but his personal beliefs are irrelevant.

24        MR. BUTLER:  Understood, Your Honor.

25  Q.  Why were the guns kept in the house?

```
 1      A.   Protection.

 2              THE COURT:  No, people keep guns in houses for

 3      protection.  Why those guns were kept in the house is

 4      irrelevant.  What his opinion is is irrelevant.  You asked him

 5      why were those guns in the house.  And the jury should ignore

 6      that response.  The question is, why do people in the community

 7      that you live typically keep guns in houses.

 8              THE WITNESS:  For protection.

 9              THE COURT:  That's all he can say.  He can't testify

10      as to why those guns were in that house.

11              MR. BUTLER:  I'll lay some more foundation.

12      Q.   Were you ever in the house and see or observe Mr. Clark

13      sell or distribute drugs?

14      A.   Sir?

15      Q.   During his sale or distribution of drugs, did you ever see

16      that firearm in his possession?

17              MS. ADAMS:  Objection, Your Honor.  He's referring to

18      that specific firearm again.

19              THE COURT:  Sustained.

20      Q.   A firearm similar to the one found in the house found on

21      the table next to Mr. Clark, did you ever see a gun similar to

22      that one in his hand?

23              THE COURT:  You mean a similar gun.

24      Q.   A similar gun.

25              MS. ADAMS:  Your Honor, I also object to that
```

1    question because Defense counsel is mischaracterizing evidence.

2    That gun was found on a table next to Mr. Clark, is what he

3    said.

4              THE COURT:  The question is, did you ever see a gun

5    like that in Mr. Clark's possession?

6              THE WITNESS:  Yes, sir.

7    Q.  While he was selling marijuana.

8              THE COURT:  I'll allow that.  Go ahead.

9    Q.  What did he do with the gun similar to that one while he

10   was selling marijuana?

11   A.  It was a knock, and he pulled it out and went to the door,

12   or to the front window.  I didn't see him when he left out of

13   my eyesight, but I know he went --

14   Q.  You're going to have to repeat that.

15   A.  I seen him pull it out from the waistline and went to see

16   who was at the door.

17   Q.  And he had the gun similar to this one in his possession at

18   the time he went to the door?

19   A.  One identical to that one.

20   Q.  After -- Are you aware that Mr. Smith was arrested at

21   Twenty-eight sixty-one Jan Drive?

22   A.  Yes, sir.

23   Q.  After Mr. Smith was arrested, did you have any conversation

24   with Mr. -- one moment.

25              (Whereupon, Mr. Butler examined various documents at

```
 1    the lectern.)
 2    Q.  Have you ever been to the residence when Jamaal Clark
 3    wasn't there?
 4    A.  No.
 5    Q.  Have you ever seen the weapon similar to the one in this
 6    photograph in anyone else's possession at Twenty-eight
 7    sixty-one Jan Drive?
 8    A.  No, sir.
 9    Q.  The only person you've ever seen in possession of the
10    weapon similar to this one was Jamaal Clark.
11    A.  Yes, sir.
12    Q.  After the incident in which Mr. Smith was arrested, did you
13    have occasion to talk to Mr. Willie Jackson at Twenty-eight
14    sixty-one Jan Drive?
15    A.  Yes, sir.
16    Q.  Did Mr. Jackson tell you that --
17            MS. ADAMS:  Objection, Your Honor.  Calls for
18    hearsay.
19            MR. BUTLER:  We laid the foundation for this.  If the
20    Court will remember, it's during Mr. jackson's testimony -- at
21    the very end of his testimony.
22            THE COURT:  What's your question?
23    Q.  Did Mr. Jackson tell you that Jamaal Clark fired the
24    firearm on January twenty-second?
25            THE COURT:  Now I'll hear your objection.
```

1          MS. ADAMS:  Your Honor, it calls for hearsay.

2          MR. BUTLER:  It's not being offered for the truth of

3   the matter asserted.  It's being offered to impeach Mr.

4   Jackson.  This specific question word for word was asked Mr.

5   Jackson while he was on the stand.

6          MS. ADAMS:  Your Honor, that specific question was

7   not -- To my recollection, I remember Mr. Butler asking Mr.

8   Jackson if he had told anyone.  He was not specific in saying

9   Mr. Walker.

10         THE COURT:  Did he say no, that he had not told

11  anyone?

12         MR. BUTLER:  That is correct.

13         MS. ADAMS:  I believe so, Your Honor.

14         THE COURT:  Okay.  I'll allow it in, but the jury is

15  under the instructions that it's admitted for the purposes of

16  impeachment, but not allowed in for its substance.

17  Q.  The question again was, did Mr. Willie Jackson informed you

18  that Mr. Jamaal Clark had discharged the firearm on July

19  twenty-second?

20  A.  Yes, sir.

21  Q.  I'm sorry, July twentieth.  I think I used the July

22  twenty-second.

23  A.  Yes, sir, the next day.

24  Q.  Thank you.

25         Did Willie Jackson tell you that Mr. Andreas Smith

```
 1    had discharged the firearm?

 2    A.  No, sir.

 3    Q.  During this conversation, what was Mr. Jackson's demeanor

 4    based on what you could see and observe, and based upon the

 5    fact that you've known him since he was ten or eleven years

 6    old?

 7    A.  Kind of nervous.  Kind of scared.

 8            MR. BUTLER:  One moment.

 9            (Whereupon, Mr. Butler conferred with the defendant

10    off the record and out of the hearing of the other courtroom

11    participants.)

12    Q.  Have you ever seen Mr. Andreas Smith possess in the

13    twenty-six years -- or sixteen years you've known him, possess

14    and/or discharge a firearm?

15    A.  No, sir.

16    Q.  The ladies and gentlemen of the jury are entitled to know.

17    Within the last ten years have you been convicted of a

18    felony?

19    A.  Yes, sir.

20    Q.  What was that for?

21    A.  That was for a possession charge.

22    Q.  Possession of?

23    A.  Of marijuana.

24    Q.  Marijuana?

25    A.  Yes, sir.
```

```
 1   Q.  Have you received any promises or inducements to come here
 2   and testify?
 3   A.  No, sir.
 4            MR. BUTLER:  Nothing further, Your Honor.
 5                         CROSS EXAMINATION
 6            BY MS. ADAMS OF HERCULES WALKER:
 7   Q.  Good morning, Mr. Walker.  I'm Jerusha Adams, and I'm an
 8   Assistant United States Attorney.  I'm just going to ask you a
 9   few questions.
10            Now you've just testified that you've known Willie
11   Jackson since he was eleven.
12   A.  Yeah, about ten, eleven.
13   Q.  And you've known Jamaal Clark the same amount of time?
14   A.  Yes, ma'am.
15   Q.  And you've also known the defendant for the same amount of
16   time.
17   A.  Yes, ma'am.
18   Q.  So who is more of a closer friend to you out of those
19   three, Jackson, Clark or Mr. Smith?
20   A.  Jackson then Mr. Smith.
21   Q.  Now you also testified that you have been to Mr. Jackson's
22   residence on Jan Drive, right?
23   A.  Yes, ma'am.
24   Q.  And you said that you've never gone there without Jamaal,
25   is that correct?
```

1    A.  No.  When I go there Jamaal is always present.

2    Q.  So you don't actually travel there with Jamaal.

3    A.  No, ma'am.

4    Q.  Okay.  So if Jamaal is always present at Jackson's

5    residence when you are there, where was Jamaal when Jackson

6    told you that Jamaal was a shooter?

7    A.  He wasn't there.

8    Q.  He wasn't at Jackson's house?

9    A.  Not the next day.

10   Q.  Didn't you just say that Jamaal was always there at

11   Jackson's house?

12   A.  He was probably home scared at the time.

13   Q.  Didn't you just say that Jamaal Clark is always at

14   Jackson's house when you are at Jackson's house?

15   A.  Yes, ma'am, but that's the shooting happened he was always

16   there.

17   Q.  Now you have admitted to Mr. Butler that you have been

18   convicted of possession of marijuana first, right?

19   A.  Yes, ma'am.

20   Q.  And you were placed on parole for that conviction, right?

21   A.  Probation.

22   Q.  Probation?

23   A.  Yes, ma'am.

24   Q.  And your probation did not end until December of two

25   thousand and seven, right?

1     A.   Yes, ma'am.

2     Q.   So you were actually on probation while you were at Mr.

3     Jackson's residence in July of two thousand and seven?

4     A.   Yes, ma'am.

5     Q.   Mr. Walker, isn't it a violation of your probation to be

6     around marijuana?

7     A.   Yes, ma'am.

8     Q.   And yet you clearly testified that you were present around

9     that marijuana in July two thousand seven, right?

10    A.   Yes, ma'am.

11    Q.   Mr. Walker, as a convicted felon isn't it unlawful for you

12    also to be around firearms?

13    A.   Yes, ma'am.

14    Q.   And you're aware of that prohibition?

15    A.   Yes, ma'am.

16    Q.   And yet you just testified that you were around Mr. Jamaal

17    Clark when he had a gun that was similar to Government's

18    exhibit sixty-eight, correct?

19    A.   Yes, ma'am.

20              MS. ADAMS:   No further questions, Your Honor.

21              MR. BUTLER:   Briefly.

22                        REDIRECT EXAMINATION

23                   BY MR. BUTLER OF HERCULESE WALKER:

24    Q.   The marijuana that was present, what individuals at that

25    residence did you see based on what you could see have

1   interaction with that, deal with it?

2   A.  Jamaal Clark.

3   Q.  That was the only one?

4   A.  No.

5   Q.  Who was the other one?

6   A.  Jackson.

7   Q.  The firearms, similar to the ones in the pictures that you

8   saw at the residence, we understand your testimony as to this

9   one, but the other firearms in the residence, who did you see

10  handle and/or manipulate that weapon?

11  A.  To be honest, there was multiple people that were handling

12  it.  It was just there on the couch, and whoever was close to

13  it would grab it if something would happen, or whatever, I

14  guess.

15  Q.  Did you ever see Mr. Andreas Smith grab it?

16  A.  No, sir.

17  Q.  The Government made a very interesting point.  Your

18  testimony here today is at risk to you.  By that I mean, you

19  are testifying even though you're testifying that you may have

20  violated your probation.

21  A.  Yes, sir.

22  Q.  If anything, you might be punished, not gain anything from

23  testifying today.

24  A.  Yes, sir.

25        MR. BUTLER:  Nothing further, Your Honor.

```
 1                    RECROSS EXAMINATION

 2              BY MS. ADAMS OF HERCULESE WALKER:

 3    Q.  Mr. Walker, I just want to clarify.  You would be punished

 4    for being around marijuana while on probation, right?

 5    A.  Yes, ma'am.

 6    Q.  Not necessarily for your testimony here today, right?

 7    A.  I hope not.

 8    Q.  Because you would be punished for your conduct, correct?

 9    A.  I guess you could say that.

10              MS. ADAMS:  No further questions, Your Honor.

11                    FURTHER REDIRECT EXAMINATION

12              BY MR. BUTLER OF HERCULESE WALKER:

13    Q.  And what you're testifying to today is your conduct back

14    around June twenty-second?

15    A.  Yes, sir.

16              MR. BUTLER:  Thank you.  Nothing further.

17              MS. ADAMS:  Nothing further.

18              THE COURT:  Thank you.  You may step down.

19              (Whereupon the witness, Herculese Walker, stepped

20    down from the stand.)

21              THE COURT:  How many more witnesses?

22              MR. BUTLER:  One or two depending on the Court's

23    ruling.

24              THE COURT:  Okay.  Let me hear the one that is not

25    subject to my consideration.
```

```
 1              MR. BUTLER:  The issue now is for purposes of
 2   continuity --
 3              THE COURT:  I'm not concerned about continuity.
 4   You're the one that wants to call the witness.  I'm not going
 5   to put the jury out again.
 6              MR. BUTLER:  Yes, Your Honor.
 7              A N D R E A S    S M I T H,  (RECALLED)
 8      the witness herein, having first been duly sworn or
 9   affirmed to tell the truth, was examined and testified as
10   follows:
11                      REDIRECT EXAMINATION
12              BY MR. BUTLER OF ANDREAS SMITH:
13   Q.  Mr. Smith, when we concluded your testimony yesterday, you
14   indicated that you wanted to leave the hospital.
15   A.  Yes, sir.
16   Q.  Based upon that desire, what did you do?  You're in Florida
17   now; based upon your desire to leave the hospital, what did you
18   do?
19   A.  When the nurse came around and the doctor came around I
20   told them I was ready to go.
21   Q.  Mr. Smith, again, you're going to need to scoot up to the
22   mic.  Thank you.
23              When the nurse and the doctor came around you, what?
24   A.  I asked them was I ready to go, and they said yeah, if
25   you're able enough to check out, and that's when I checked
```

1    myself out.

2    Q.   Once you checked yourself out where did you go?

3    A.   To a hotel room.

4    Q.   Did anyone else -- Was anyone else present with you when

5    you checked yourself out?

6    A.   My grandmother and Gene and Rodney.

7    Q.   Your grandmother and Gene --

8    A.   And Rodney.

9    Q.   Your grandmother on whose side of the family?

10   A.   On my Daddy's side.

11   Q.   Okay.  Gene and Rodney are -- Refresh the jury's memory.

12   A.   His brothers.

13   Q.   They're his brothers?

14   A.   Right.

15   Q.   Were any family members from Montgomery present when you

16   checked yourself out?

17   A.   No, sir.

18   Q.   We don't have to go through each and every detail, but

19   given what had happened to you over the last week, how did you

20   feel about upon being checked out being with your father's side

21   of the family?

22   A.   I was ready to get back to Montgomery.

23   Q.   After you left the hospital, you indicated you went to a

24   hotel, correct?

25   A.   Yes, sir.

1    Q.   Did they give you your own room?

2    A.   Well, they already had the hotel room.

3    Q.   So when you got checked out of the hospital they already

4    had a hotel room?

5    A.   They had two.

6    Q.   Do you remember what the hotel was?

7    A.   Just a regular hotel room.

8    Q.   Understood.

9         While you were around Gene, Rodney and the other

10   family members at the trailer, based on what you could see and

11   observe, not what they told you, just what you could see and

12   observe, did their financial situation strike you as such that

13   they could buy multiple hotel rooms?

14   A.   Yes, sir.

15   Q.   I'm sorry?

16   A.   Yes, sir.

17   Q.   Did you have a sense of where that money had come from?

18   A.   No, I didn't.

19        MS. HARDWICK:  We'll object, unless he knows

20   specifically.

21        THE COURT:  I didn't hear you.

22        MS. HARDWICK:  He answered it anyway.

23   Q.   While you were at that hotel room, did you see and observe

24   any of the other individuals doing anything that made you

25   uncomfortable?

```
 1    A.  Well, they were smoking crack.
 2    Q.  Do you have any personal knowledge as to where the funds
 3    for that crack came from?
 4    A.  No, sir.
 5    Q.  After you left the hospital, did you receive a phone call
 6    from your father?
 7    A.  He called Rodney and he passed me the phone.
 8    Q.  Okay.  So the father never called you directly.
 9    A.  No, sir.
10    Q.  While you were in the hospital during that stay, did your
11    father ever attempt to contact you at the hotel -- I mean at
12    the hospital?
13    A.  No, sir.
14    Q.  Based on your conversation with your father, did you have
15    any concerns regarding returning to Montgomery?
16    A.  I wanted to come home.
17    Q.  Okay.  And what date, again -- do you recall what date you
18    were released from the hospital?
19    A.  It was on a Friday.
20    Q.  All right.  While you're in this hotel room and during this
21    period of time, don't say who told you or what they told you,
22    did you come to any knowledge that law enforcement might be
23    looking for you in Montgomery?
24    A.  No, sir, not at the time.
25    Q.  Okay.  While you were in the hotel room as well?
```

1   A.   My father told me to stay down in Florida.

2          THE COURT:   Say that again now?

3          THE WITNESS:   He told me to stay in Florida.   He

4   called his brother and they passed me the phone.   He told me to

5   stay down in Florida.

6          THE COURT:   Who told you this?

7          THE WITNESS:   My Daddy.

8   Q.   Given that admonition, did you say well, maybe I should

9   just stay in Florida?

10  A.   No.

11  Q.   Where did you want to return to?

12  A.   Montgomery.

13  Q.   Did you have any reason to fear law enforcement in

14  Montgomery?

15  A.   No, sir.

16  Q.   Did any individuals from your family in Montgomery arrive

17  in Florida?

18  A.   Yeah, Saturday morning.

19  Q.   You were released from the hospital -- It was the following

20  day?

21  A.   Yes.

22  Q.   So you were released from the hospital on Friday?

23  A.   Yeah, Friday afternoon.

24  Q.   And that was a week after you had gone down to Florida with

25  your father?

1    A.  Yes, sir.

2    Q.  So it was Friday the twenty-ninth?

3    A.  Yeah, if that's the date.

4    Q.  Did you sleep at all while you were in the hotel room with

5    Gene, Rodney and the other --

6    A.  No, sir.

7    Q.  Was there any reason that you didn't sleep that night?

8    A.  I didn't want to be around them.

9    Q.  Well you were getting a ride the next day, so you weren't

10   going to be around them long; why didn't you just take a nap or

11   get some rest?

12   A.  I didn't feel comfortable around them, period.

13   Q.  The following day your family arrives in Florida that

14   morning.  What family members?

15   A.  My mother, Willie Jackson, and my brother Corey.

16   Q.  What did you do when they came up?

17   A.  Got in the truck and got on the Interstate.

18   Q.  Were there any long good-byes with Gene or Rodney?

19   A.  No. I was just going home.

20   Q.  Again, these were family members that you hadn't seen in

21   your twenty seven years -- excuse me -- Well, had you seen --

22   This was the first time you've seen them.

23   A.  I had seen Gene, but it was the first time in meeting the

24   other side of the family.

25   Q.  But you were in no hurry to stay down there with them,

1    correct?

2    A.  No, sir.

3    Q.  Okay.  When -- Describe your return trip.  Just describe it

4    briefly.

5    A.  I got in the truck and we came back to Montgomery.

6    Q.  When you got back to Montgomery, where did you go to live

7    and reside?

8    A.  I went to Forty Fairlane Drive.

9    Q.  And whose residence is that?

10   A.  My mother's.

11   Q.  Before you left for Florida with your father, where were

12   you living?

13   A.  Forty Fairlane Drive.

14   Q.  Did you make any attempts to get another apartment or

15   change your residence?

16   A.  No, sir.

17   Q.  Why did you go back to Forty Fairlane Drive?

18   A.  That's where I stay at.

19   Q.  Do other people know -- Are there other people aware that

20   that's where you stay?

21   A.  Everybody who know me know I stay there.

22   Q.  All right.  So you come back to Montgomery on or about June

23   thirtieth, two thousand seven.  You go back to your Mom's

24   house, and could you describe, does your life change at all?

25   A.  Yes.

```
 1    Q.   How?
 2    A.   Well I get a phone call from my father.
 3    Q.   You get a phone call from your father once you're back in
 4    town?
 5    A.   Yeah.
 6    Q.   Okay.  Based on that phone call, do you have any new
 7    concerns or problems?
 8    A.   Well he told me, he said, "They're looking for you."
 9    Q.   What do you do in response to this?
10    A.   I leave.
11    Q.   You leave where?
12    A.   I leave my mother's house.
13    Q.   And where did you go and live?
14    A.   I ain't leave like to go stay nowheres, I just left the
15    residence.
16    Q.   Okay.  For how long?
17    A.   I was riding around with my sister.
18    Q.   So based on that phone call, you were under the impression
19    that someone was looking for you that day?
20    A.   I really laughed at him.  My sister was there anyway.  My
21    older sister, she was over.  I just got in the car with her and
22    rode around.
23    Q.   After you rode around what did you do?
24    A.   I came back.
25    Q.   Back where?
```

```
1    A.   To Forty Fairlane.
2    Q.   It's not like you went anywhere, you just left the house
3    and came back?
4    A.   She was just going  to different stores shopping and I went
5    with her.
6    Q.   So did your lifestyle change at all based on this phone
7    call?
8    A.   Not this, but when I found out what he did.
9    Q.   Say that one more time?
10   A.   I found out he put a robbery case on me.  That's the only
11   thing that changed.  But at the moment I didn't know nothing
12   about that.
13   Q.   Okay.  So your life changed once you found out all this was
14   happening.
15   A.   Yeah.
16   Q.   But when you got back to -- When I say "all this was
17   happening," that you had been charged with a robbery and that's
18   why your life changed, correct?
19   A.   Yes, sir.
20   Q.   But when you first got back to Montgomery in June
21   thirtieth, of two thousand seven, other than that phone call
22   from your father and going for a drive with your sister, did
23   your life change?
24   A.   It was the same.
25   Q.   Okay.  Given that you are now aware that law enforcement is
```

1   looking for you, you got a head start on them.  Why didn't you

2   just leave?  Why didn't you just go back down to Florida?

3   A.  Because I didn't do nothing.

4           MS. HARDWICK:  I'll object to the statements by Mr.

5   Butler.

6           MR. BUTLER:  I'll rephrase it.

7           THE COURT:  Rephrase it now.

8   Q.  Given that law enforcement was looking for you, why did you

9   stay in Montgomery?

10  A.  I had nothing to run from.

11  Q.  To your knowledge did law enforcement ever come to

12  Forty-five Fairlane?

13  A.  Not to my knowledge.

14  Q.  Moving this along.  June thirtieth, we're on Saturday, June

15  thirtieth.  You get back here, you go for a drive after a phone

16  call from your father.

17          MS. HARDWICK:  Your Honor, we would object.  Mr.

18  Butler has his client on direct.  And before I've questioned --

19          THE COURT:  I'll sustain.  You're unnecessarily

20  leading him.  She's absolutely right.

21          MR. BUTLER:  Yes, Your Honor.

22  Q.  Did you do anything unusual or out of -- unusual, given the

23  dynamic between June thirtieth, two thousand seven and July

24  twentieth, two thousand and seven?

25  A.  What do you mean?

1    Q.  Did your life change?  Did you do anything different?

2    A.  No, I didn't do nothing different.

3    Q.  All right.  July twentieth, two thousand seven comes.

4    Could you tell the ladies and gentlemen of the jury when being

5    -- what you did that day?

6    A.  Well, that night, like she say, I visit my children.

7    Q.  Not just that night.  The day.

8    A.  The day?  I just hung around the house all day.

9    Q.  What house?

10   A.  I went to One eight-six Jan Drive.

11   Q.  While you were hanging out at the house, were you the only

12   person there?

13   A.  No, it was me and Jamaal Clark.

14   Q.  Who is the owner of that residence?

15   A.  Willie Jackson.

16   Q.  Where was he?

17   A.  At work.

18   Q.  All right.  What time did you get to the residence,

19   actually get there first on the twentieth?

20   A.  About eleven in the evening.

21   Q.  Eleven in the evening?

22   A.  Yeah, before twelve o'clock.

23   Q.  All right.  When you got there, did you have on your

24   possession any firearms?

25   A.  No, sir.

1    Q.  I'm showing you what's been photographed and once been

2    marked as Government's exhibit sixty A.  Does that look

3    familiar to you?

4    A.  Yes, sir.

5    Q.  What does that appear to you to be?

6    A.  Jamaal Clark's gun.

7    Q.  I'm showing you -- Do you recognize that?

8    A.  Yes, sir.

9    Q.  What is that?

10   A.  A gun that's on the screen.

11   Q.  Who have you -- who have you seen in possession of that

12   gun?

13   A.  Jamaal Clark.

14   Q.  While you were at the residence, did -- Let's put it this

15   way:  Did you stay at the residence at all times all day

16   long?

17   A.  Yes, sir, until I left for a minute to visit my children.

18   Q.  Could you describe that?  What happened?

19   A.  I just went and sat in the car and talked to my children

20   and played with them.  The both of them.

21   Q.  At that time did you have in your possession a firearm?

22   A.  No, sir.

23   Q.  When you -- I'm assuming you finished playing with your

24   children at some point.  Do you recall what time it was?

25   A.  No.  It was close to eleven o'clock, though.

```
1    Q.  What did you do after you were done playing with the
2    children?
3    A.  I went in the house, sat down.
4    Q.  I'm showing you a diagram of the inside of the house.  Just
5    pointing on the screen, where did you go and sit down?
6    A.  Right here.
7    Q.  When you went back into the residence and sat down there,
8    who was in the house?
9    A.  Jamaal Clark and Willie Jackson.
10   Q.  So Willie had come home at some point?
11   A.  Yeah.
12   Q.  Do you recall when he came home?
13   A.  He got off at about four-thirty.
14   Q.  So you had been at the house since at least four-thirty.
15   A.  I had been at the house since earlier that day.
16   Q.  Okay.  At some point was there a knock on the front door?
17   A.  Yes, sir.
18   Q.  All right.  Where were you at the time the knock on the
19   front door happened?
20   A.  In this chair right here.
21   Q.  So you were sitting there?
22   A.  Yes, sir.
23   Q.  Where was Jamaal Clark?
24   A.  In this chair right here.
25   Q.  Where was Mr. Willie Jackson?
```

1    A.  Right here.

2    Q.  On this table right here, were there any firearms that you

3    could see?

4    A.  No, sir.

5    Q.  From where you were sitting, could you see any firearms in

6    the residence?

7    A.  No, sir.

8    Q.  Could you see, given where you were sitting, a firearm in

9    Mr. Jackson -- Well, when the knock first happens, did you see

10   either Mr. Jackson or Mr. Clark's possession of a firearm?

11   A.  No.

12   Q.  All right.  So there's a knock at the door.  What happens

13   next?

14   A.  Well I get up, I go around this way.

15   Q.  Why did you get up?

16   A.  I thought she was coming back.

17   Q.  Say this one more time?

18   A.  I thought that Deanne was coming back because once she

19   leave my children they cry, and she'll bring them back to me to

20   calm them down.

21   Q.  So had it been long since Deanne had left?

22   A.  No, it wasn't forty-five seconds.

23   Q.  Okay.  So you got up and you followed that path that you

24   have outlined on the screen, correct?

25   A.  Yes, sir.

1    Q.  Could you hear or see at this time Mr. Jackson or Mr. Clark

2    doing anything?

3    A.  All those got up at the same time.

4    Q.  Was that normal when the door knocked?

5    A.  Yes, sir.

6    Q.  Okay.  How often had you been at Twenty-eight sixty-one Jan

7    Drive?

8    A.  I'd be there all the time.

9    Q.  Based on having been there regularly and routinely, had you

10   become familiar with how others respond when certain things

11   happen?

12   A.  Yes, sir.

13   Q.  Okay.  When there was a knock at the door at night, how did

14   people respond?

15   A.  Well, they assumed their position.  They covered the house.

16   They recorded it.

17   Q.  All right.  And, again -- You have seen, we're not talking

18   about this incident right now, but you had seen this in the

19   past?

20   A.  Yes.

21   Q.  Can you describe what you saw based on having been there in

22   the paths where Mr. Jackson goes?

23   A.  He always come and core this wall straight through the

24   wall.

25           MS. HARDWICK:  I'm sorry, Your Honor, I can't

1    understand what Mr. Smith is saying.

2    A.  Willie Jackson go off here.  They're watching the door and

3    Jamaal Clark went over here and watching the door from this

4    way.

5    Q.  All right.  Could you draw a W where Mr. Willie Jackson

6    went.

7    A.  In this right here.  When he got up he walked this way and

8    went right here.

9    Q.  All right.  Write a W.

10          Where did Mr. Clark go?  And put a J there.

11          (Whereupon, the witness complied).

12    Q.  Now you're walking to the front door?

13    A.  Yes, sir.

14    Q.  Know everybody has moved to these positions, you're

15    thinking that it might be your girlfriend coming back.

16    A.  Yeah.

17    Q.  All right.  When you get to the door what happens?

18    A.  Well, I opened the door a crack and the marshal tried to

19    bust in.  He tried to bust right into the house.

20    Q.  All right.  Could you stand up and walk right in front of

21    me?

22          (Whereupon, the witness complied.)

23    Q.  All right.  Facing the jury, there's a door in front of

24    you, what did the marshal try to do?

25    A.  Well I'd open it and stubbing my foot like this, and he

1   tried to pound it open and I came back.

2   Q.  Please go back up so the reporter can hear you.

3            Was there an announcement of his presence that he was

4   a United States marshal, please open the door?

5   A.  No, sir.

6   Q.  When you cracked open the door --

7   A.  He tried to come in.  He just tried to bust in the house.

8   Q.  All right.  Now, you were present in court when an Officer

9   J. C. Hamilton testified, correct?

10  A.  Yes, sir.

11  Q.  Was that the individual who was at the door?

12  A.  Yeah.  I didn't get a good look at him at the door, but

13  they said, "That's him," I guess.

14  Q.  So you're not certain if I tell you that that was the

15  person?

16  A.  I didn't know.  There was just somebody on the other side

17  of the door.

18  Q.  When he was at the door, could you tell that he was a

19  United States marshal?

20  A.  No, sir.

21  Q.  Given his conduct, the person's conduct, given the person's

22  conduct what did you think was happening?

23  A.  A robbery.

24  Q.  Now, let me get some photographs here.  This is important

25  for the jury.  We've got so many.  At this point, when the door

1    is being pushed open, can you see or do you hear anything from

2    Mr. Jamaal Clark?

3    A.  Well he shouted in the direction where me and the marshal

4    was at the front door.

5    Q.  I'm showing you what's been previously marked as

6    defendant's exhibit two.  Do you have any knowledge of why

7    those panes are not in the glass?

8    A.  No, sir.  I just hard gunshots.

9    Q.  Did you hear that glass break?

10   A.  No, sir.

11   Q.  All right.  When those gunshots took place, what happened

12   regarding the individual who was trying to get in through the

13   front door?

14   A.  He stepped back up out of the house and he said he ran to

15   the side.

16   Q.  I'm sorry?

17   A.  He jumped back up out of the house.  We were tussling when

18   the gunshots were fired.  That's what broke us apart.  And I

19   was able to close the door.  He was in the house, and then when

20   the shots was fired he ran out of the house and that's when I

21   closed the door.

22   Q.  And the person doing the firing was whom?

23   A.  Jamaal Clark.

24   Q.  I took it off but I have to put it back on.

25        Where is he at the time he's doing the firing.

1    A.  Right here.  Right on this corner right here.

2    Q.  Okay.  The door then -- And could you indicate where Willie

3    is.

4    A.  Right here.

5    Q.  Put a W, if you can.  Thanks.  And a J where Jamaal is.

6           Now the door the shuts and what happens next?

7    A.  I come here.  I come running right here and get behind this

8    wall right here.

9    Q.  Do you have -- Could you see or observe what Jamaal was

10   doing?

11   A.  He ran back this way.  He stopped right here, wiped the gun

12   down and put it on the table and then ran here.

13   Q.  You saw him wipe the gun down?

14   A.  Yes, sir.

15   Q.  Could you see what Mr. Jackson was doing?

16   A.  He was down on his knees holding an assault rifle.

17   Q.  At the location where you have the "W"?

18   A.  Yes, sir.

19   Q.  Did you hear any other shots in the residence?

20   A.  No, I just heard two.

21   Q.  You just heard the two?

22   A.  Yes.

23   Q.  Okay.  When you came around the corner, what happened

24   next?

25   A.  By that time, the marshals was coming in through the back.

```
1    I see the glass shattering and the way they were coming
2    through.
3    Q.  And what happened then?
4    A.  Well, he ran with Jackson first and pointing the gun at
5    him, and he was like, "Who shot --"
6    Q.  Let's slow down.  Could you just point on the screen, I
7    think we all know, but point on the screen where the marshals
8    came in through the residence.
9    A.  You came right in the door right here.
10   Q.  Where are you standing?
11   A.  Right here.
12   Q.  Who did the marshals go to first?
13   A.  There was two of them -- well the white person went to
14   Willie Jackson first, and the other one ran into Jamaal
15   Clark.
16   Q.  What was hang with you?
17   A.  I was on the floor.
18   Q.  What happened after they went to those people?
19   A.  All this happened in seconds.  It wasn't like I know the
20   date.
21   Q.  Okay.  All of this is happened very fast, in seconds.  Who
22   went up to who with a gun and said who shot them?
23   A.  I guess his name was Hamilton.
24   Q.  So the white officer went up to --
25   A.  Willie Jackson first.
```

```
 1   Q.  And you saw this?

 2   A.  Yes.

 3   Q.  Again, what did he say?

 4   A.  "Who shot the gun?"

 5   Q.  What happened next?

 6   A.  He said, "I don't know," and he came to me and asked me the

 7   same question.

 8   Q.  And what did you say?

 9   A.  "I don't know."

10   Q.  What happened then?

11   A.  He hit me on the side of the head, jumps on my back.

12   Q.  Do you recall or do you have any knowledge as to how long

13   you were on the ground?

14   A.  You mean until the paramedics came?

15           THE COURT:  How much longer are you going to be?

16           MR. BUTLER:  Five more minutes.

17           THE COURT:  If you can do it in five minutes, fine.

18   If it will take longer, I want to break for lunch.

19           MR. BUTLER:  Understood.

20   Q.  While you were on the ground did you have any injury?

21   A.  My head was busted.

22   Q.  Okay.  And was anything happening as a result of your head

23   being busted?

24   A.  I was bleeding.

25   Q.  Okay.  Could you see or hear anything while you were laying
```

1   on the ground?

2   A.  No, just the marshals going back and forth asking, "Who

3   shot the gun?"

4   Q.  Based on what you could see or hear, did anybody respond to

5   that inquiry?  Did anybody say anything?

6   A.  No, sir.

7   Q.  You indicated that you were treated?  Somebody came and

8   helped you?

9   A.  The paramedics came about thirty minutes later.

10  Q.  And during that thirty minute period of time where were you

11  while you were waiting for them?

12  A.  Laying on the floor.

13          MR. BUTLER:  One moment, Your Honor.

14          (Whereupon, Mr. Butler conferred with Ms. McKee and

15  Ms. Mason off the record and out of the hearing of the other

16  courtroom participants.)

17  Q.  When was the first time that you were aware that the

18  persons at that residence were not there to rob you but they

19  were law enforcement?

20  A.  When they came through the backdoor.

21  Q.  Okay.  What happened when they came through the backdoor?

22  What did you see or observe or hear that made you realize that

23  these were law enforcement officers?

24  A.  When I saw a black and white guy holding pistols out, I

25  knew they was police.  I saw a white guy and a black guy and

1    holding pistols.  I knew right then they were officers.

2    Q.  So it wasn't based on anything written anywhere or anything

3    that was said, it was based on the fact that there was a black

4    guy and a white guy?

5    A.  Yeah.  To my knowledge, yeah.

6    Q.  Why would a black guy and a white guy tell you that they're

7    police?

8    A.  They're polices (sic.).

9    Q.  Other than the fact that there was a black guy and a white

10   guy, did you see something else to confirm to your knowledge

11   that these individuals were law enforcement?

12   A.  You see somebody coming in and tell you to get down, that's

13   the police.

14   Q.  That was the next thing that you heard?

15   A.  If they come in, they come in with their gun waving.

16   Q.  Did you see any police vehicles?

17   A.  No, sir.

18   Q.  Did you ever see any shirts or things that said police or

19   marshals?

20   A.  I was on the ground.

21   Q.  Understood.

22         Final question:  Did you possess or discharge any of

23   the firearms that were found at that residence that day?

24   A.  No, sir.

25         MR. BUTLER:  Nothing further.  Your Honor, that

1    concludes my direct examination at this time.

2              THE COURT:  It's now almost ten after.  We'll come

3    back at one ten.  I'll excuse the jury until one ten.  We'll

4    take up that other matter now.

5              MR. BUTLER:  Actually, Your Honor, based on this

6    examination, that won't be necessary.

7              THE COURT:  Is this your last witness?

8              MR. BUTLER:  This is our last witness.

9              THE COURT:  Do you anticipate any rebuttal?

10             MS. HARDWICK:  Yes, Your Honor.

11             THE COURT:  We'll come back at one ten and you can

12   begin your cross examination at one ten.

13             (Whereupon the luncheon recess was taken.)

14             THE COURT:  Proceed.

15                          CROSS EXAMINATION

16             BY MS. HARDWICK OF ANDREAS SMITH RECALLED:

17   Q.  Mr. Smith, you testified on direct examination that while

18   in Florida your father called you, and if I have this

19   correctly, you said that your father told you to stay in

20   Florida because they're on you.

21   A.  On him.

22   Q.  On him?

23   A.  Yes.

24   Q.  Okay.  So -- And that you had no reason to fear law

25   enforcement.

1    A.   No, ma'am.

2    Q.   And you wanted to come back to Montgomery.

3    A.   Yes, ma'am.

4    Q.   Okay.  Now you heard the United States Marshal J. C.

5    Hamilton testify that when he knocked on the door on Jan Drive

6    that you answered the door and he recognized you.  You heard

7    that testimony?

8    A.   Yeah, I heard what he said.

9    Q.   And that he called you by name, told you who he was, United

10   States marshal, and they had a warrant for your arrest to come

11   on out.  Do you remember that testimony?

12   A.   Yeah, that's what he said.

13   Q.   But you dispute that, right?

14   A.   Yes, I dispute that.

15   Q.   That didn't happen?

16   A.   No, ma'am.

17   Q.   You also heard him testify that he had on him, he was

18   wearing a shirt that had the insignia on it for the United

19   States Marshals.  You heard that testimony as well, didn't

20   you?

21   A.   That's what he said.

22   Q.   And you also heard his testimony that he also had his badge

23   on his belt?

24   A.   That's what he said.

25   Q.   And that the United States Marshal Duane Richardson had on

1  his vest that says "United States Marshal".

2  A.  That's what they said.

3  Q.  But they are wrong?

4  A.  I ain't look at them like that.  The door, I didn't open

5  the door and look at them.  I didn't do that.

6  Q.  Okay.  You just shut the door on them?

7  A.  He tried to bust in the house.

8  Q.  Wearing a marshal's badge he tried to bust in the house?

9        Okay.  Now, do you recall on August the third when

10  Detective Hill and F. B. I. Agent Drew came to take a picture

11  of your neck, do you remember that?

12  A.  Yes, ma'am.

13  Q.  And when they got there, you wanted to know or you wanted

14  them to explain the charges.

15  A.  Mm-hmm.

16  Q.  Right?

17  A.  Yeah.

18  Q.  And you told them at that time that your mother had told

19  you that the police was looking for you.

20  A.  No.

21  Q.  You didn't tell them that?

22  A.  No.

23  Q.  You also told them at that time that you knew that it was

24  the marshals at the door and you slammed the door on them.

25  A.  No I didn't.

1    Q.  You didn't say that either?

2    A.  No.

3    Q.  Okay.  Now are you saying that you did not have a

4    conversation with your mother regarding this case?

5    A.  I had a conversation with my mother.

6    Q.  And what did you tell her regarding what happened to you on

7    the Jan Drive residence?

8    A.  That night I thought the police had shot me in my head.

9    Q.  And that's what you told your mother, didn't you?

10   A.  Yes.

11   Q.  That didn't happen, did it?

12   A.  I don't know.  I didn't know.  A bullet went past my

13   head.

14   Q.  You didn't tell her that the police were the one that shot

15   you in the head?

16   A.  Yeah, I believe the police had did it.

17   Q.  But you weren't shot in the head, were you, Mr. Smith?

18   A.  I don't know, I heard a bullet pass by my head.

19   Q.  But you know you weren't shot, and you were taken to the

20   hospital, weren't you?

21   A.  I didn't see no hospital records.

22   Q.  Do you recall going to the hospital?

23   A.  Yes.

24   Q.  Okay.  I didn't ask you if you saw any hospital records.

25   You did go to the hospital, didn't you?

```
 1    A.   Yes.
 2    Q.   And when the officers came in that day, they hit you on the
 3    head, didn't they?
 4    A.   Yeah, they hit me.
 5    Q.   Okay.  So you knew how your head got damaged, didn't you?
 6    You knew that you were hit on the head so when you told your
 7    mother that you had gotten shot in the head, you knew your
 8    injury was from having been hit on the head.
 9    A.   No.
10    Q.   And you told the marshals when they came to talk to you on
11    August the third that you didn't want to go to jail.
12    A.   Nobody want to go to jail.
13    Q.   I didn't ask you that, Mr. Smith.  You told them you did
14    not want to go to jail, is that correct?
15    A.   Yeah.
16    Q.   So when the officers came, it would have been very simple
17    for you to open the door.
18    A.   That ain't got nothing to do with that.
19    Q.   I didn't ask you that.
20    A.   I'm not answering, then.
21         THE COURT:  Just a minute.  Just a minute.  Now
22    you're both talking at the same time.
23         Listen to her question carefully, and then answer her
24    question.  And if you want to explain it I'll let you explain
25    your answer.
```

1              Ask the question again.

2    Q.  It would have been very simple for you, Mr. Smith -- It's

3    not your residence, right?

4    A.  Yeah.

5    Q.  You go and answer the door, correct?

6    A.  Yes.

7    Q.  To just open the door.

8    A.  I did that.

9    Q.  And then you tried to slam it back.  You did slam it back.

10   A.  I didn't slam it back.  The only reason I shut the door is

11   the marshal jumped the door, he was in the house.  He jumped

12   back out of the way and that's when I shut the door.

13   Q.  And the marshal, J. C. Hamilton, is also mistaken when he

14   says when he entered the residence from the rear you were the

15   only person in motion?

16   A.  No.

17   Q.  So you are to be believed, right?

18   A.  Yes, I am.

19   Q.  And he's mistaken about your identity?

20   A.  Yes.

21   Q.  And Ms. Gurley is mistaken about your identity?

22   A.  Yes.

23   Q.  And Mr. Robinson and everybody is lying but you?

24   A.  Yes.

25              MS. HARDWICK:  Those are all my questions.

1      THE COURT:  Any further direct?

2      MR. BUTLER:  Just based on cross.

3      THE COURT:  Go ahead.

4              FURTHER REDIRECT EXAMINATION

5          BY MR. BUTLER OF ANDREAS SMITH:

6  Q.  First off, when you went to the door, who did you think was

7  at the door?

8  A.  My mother.

9  Q.  Because of that you began to open the door, correct?

10  A.  Yes, sir.

11  Q.  How wide, just using your hands, was the door open before a

12  lot of force was applied and it started to open up?

13  A.  Probably like this.

14          (Whereupon, the witness indicated.)

15  Q.  What could you see as that force was being applied?

16  A.  I did see a white guy pushing the door like this trying to

17  bust in.

18  Q.  Could you see a United States marshal badge on the waist?

19  A.  I didn't got time to look.

20  Q.  Could you see any writing or any identification on the

21  vest?

22  A.  No, sir.

23  Q.  What caused the person being pushing on the door to stop

24  and allowed you to shut the door?

25  A.  The gunshots fired.

1   Q.  By who?

2   A.  Jamaal Clark.

3   Q.  Do you want to go to jail for something you did not do?

4   A.  No, sir.

5   Q.  Thank you.  Nothing further.

6                    FURTHER RECROSS EXAMINATION

7                BY MS. HARDWICK OF ANDREAS SMITH:

8   Q.  Mr. Smith, you testified also that Jamaal Clark and Mr.

9   Jackson, did you testify that they assumed a position?

10                MR. BUTLER:  Your Honor, this is beyond the scope of

11   redirect.

12                MS. HARDWICK:  Your Honor, I'm just clearing up a

13   matter that he's indicated.

14                THE COURT:  Overruled.

15   Q.  So when you realized it wasn't your children's mother as

16   Mr. Butler just asked you, you peeped out and you saw it wasn't

17   their mother, did you say anything to them to cause them to

18   take a position?

19   A.  No.  When they got up, automatically in the house they

20   chose to get up and go cover the door, watch the door.

21   Q.  And you assume under the charge history that they are, and

22   you telling this jury, that they're getting in a protective

23   position and you just go to the door and tussle with someone at

24   the door totally unarmed?

25   A.  Yeah.  I didn't have no gun.

1    MS. HARDWICK:  Your Honor, to avoid calling another

2  witness back to expedite time, we can play the tape through

3  this witness.  He's acknowledged that he made the phone call to

4  his mother.

5    THE COURT:  Very good.  Let's play the tape, then.

6    How are we going to play it?

7    MS. HARDWICK:  We have the speakers, Your Honor, that

8  are connected to the computer.

9    THE COURT:  Okay.  Do we have any earphones or things

10  like that?

11    MS. HARDWICK:  I think it will be loud enough.

12    (Whereupon, said audio recording was played before

13  the Court and jury.)

14    UNIDENTIFIED JUROR:  I can't understand anything.

15    THE COURT:  You can't understand anything?  I think

16  it's because it's so loud that it's garbled.

17    MS. HARDWICK:  I'll turn it down.

18    (Whereupon, said audio recording continued to be

19  played before the Court and jury.)

20    MR. BUTLER:  Your Honor, would you inquire of the

21  jury given the last playing, was it any better for them?

22    THE COURT:  Play it again.

23    (Whereupon, said audio recording was played before

24  the Court and jury.)

25  Q.  Mr. Smith, you just heard that entire conversation.  Did

1    you hear any reference in there to the bank robbery?

2    A.  Ma'am?

3    Q.  Did you hear any reference, or did you say anything, or did

4    you hear anything that you said in reference to the bank

5    robbery?

6    A.  No, ma'am.

7    Q.  And you heard your mother say that y'all keep her in the

8    dark about everything so she doesn't really ever know what's

9    going on, right?

10   A.  She said my Daddy called her.

11   Q.  She said, "Y'all keep me in the dark about everything."

12   A.  What's that supposed to mean?

13   Q.  That's what she said, didn't she?

14   A.  Yeah, that's what she said.

15   Q.  Now, throughout that conversation you talked about the

16   shooting and we've already heard the marshals testify and we

17   have their version, and now we have your version about the

18   shooting.  My question to you is, throughout this conversation

19   with your mother, the jury has heard the testimony regarding

20   the shooting; you never mentioned anything about the robbery,

21   did you?

22   A.  I said they had me charged with it.

23   Q.  Right.  But your whole complaint there was about the

24   shooting.

25   A.  Yeah, because I had been in the hospital with staples in my

1    head.

2    Q.   And you initially told her that the police shot you.

3    A.   Yeah.

4    Q.   And that wasn't true, was it?

5    A.   I can't say that.

6    Q.   And then at the --

7                THE COURT:  You say what, now?

8                THE WITNESS:  I said I can't say that.

9                THE COURT:  You can't say what?

10               THE WITNESS:  I can't say that.

11   Q.   Now at the end of the statement you changed and told her

12   they started whooping up on your head.

13   A.   That'd don't mean they whooped on my head, though.

14   Q.   But that's what you told her, right?

15   A.   Yeah.

16   Q.   So you gave her two different versions in that short

17   conversation, didn't you?

18   A.   Not no two different versions, I told her what happened.

19   Q.   And, Mr. Smith, you want this jury to believe every single

20   thing that you have said?

21   A.   Yes, I do.

22   Q.   And you want them to totally discredit everybody else

23   that's testified so they can believe you?

24   A.   I told you what happened on this tape.  You just heard what

25   they were doing, what the police be doing.

1   Q.  And you didn't mention anything on that tape about people

2   taking up positions to guard the house when you went down

3   there.

4   A.  I told the marshals.

5   Q.  And you didn't mention anything there about the door,

6   because you had just gone back to the door that you talked

7   about with Deanne?

8   A.  What would I say that for?  I told my mother what was

9   happening to me.  I didn't know I was being recorded.

10  Q.  But you were telling the truth weren't you, whether you

11  were being --

12  A.  The question you asked me I'm answering.  It's the whole

13  truth.

14  Q.  So today you're telling the whole truth?

15  A.  Yes.

16  Q.  And you haven't told anybody before about your Dad having

17  all of this money and confessing to the robbery?

18  A.  As you heard what she said, he told her, and they talked

19  about -- I don't know what they talked about.

20  Q.  Mr. Smith, my question was not to you regarding what your

21  father --

22          THE COURT:  Listen to her question.  And the question

23  is very simple.  Did you tell someone else, did your Dad,

24  having confessed to the robbery and having all the money, did

25  you tell your mother that?

```
 1              THE WITNESS:  Yeah, she knew.
 2              THE COURT:  Pardon me?
 3              THE WITNESS:  Yeah, she knew.
 4   Q.  She knew.  You told your mother that?
 5   A.  That my Daddy robbed the bank?
 6   Q.  Yes.
 7   A.  Yeah.
 8   Q.  When did you tell her?
 9   A.  You heard the tape.
10   Q.  There was nothing on there about your Daddy robbing a bank,
11   Mr. Smith.
12   A.  Who do you think she's talking about y'all?
13   Q.  Mr. Smith, there is nothing in this conversation about --
14              THE COURT:  You're arguing with him again.
15              Members of the jury, you'll be able to listen to this
16   tape.  You can take it back with you.  And you may want to play
17   it a little bit more slowly.  I know it's difficult to hear,
18   but you'll have an opportunity to play it.
19              Will you make arrangements so the jury can hear the
20   tape if they want to?
21              MS. HARDWICK:  Yes, sir.
22              THE COURT:  Go ahead.
23   Q.  Mr. Smith, anybody else you told that your Dad told you
24   that he robbed the bank?
25   A.  My whole family know that my Daddy did it.
```

```
1    Q.  Now your whole family knows?

2    A.  Yeah.

3    Q.  When did they learn?

4    A.  He came back to Florida when I was in the hospital.  When

5    he came back to Montgomery he went to my Mama's house.

6    Q.  How do you know that?

7    A.  Because my brothers done told me.

8    Q.  You were being interviewed when the officers came to arrest

9    you and told you they were arresting you for the robbery of the

10   Compass Bank, you've never mentioned that you were baby-sitting

11   for your sister, did you?

12           MR. BUTLER:  Objection, Your Honor.  This goes back

13   to --

14           THE COURT:  That's true, his silence cannot be used

15   against him.

16           MS. HARDWICK:  Your Honor, I'm intending to impeach

17   him on the fact that he's saying now all these people knew.

18           THE COURT:  I understand that, but he has the right

19   after his arrest to remain silent.

20   Q.  And when you came back from the robbery, if you had nothing

21   to hide from the police, why didn't you just go turn yourself

22   in?

23   A.  For what?  They had him.

24   Q.  They had him?

25   A.  Yeah.
```

1   Q.  He's walking around out here.

2   A.  After they got me.  He made a deal with them, I guess.

3   Q.  Do you know anything about a deal or are you speculating,

4   Mr. Smith?

5   A.  Well when they had him locked up, they let me go, or they

6   let him go and they got me.

7   Q.  So at least we know that there were two people involved in

8   that bank robbery, right, from the testimony you've heard here

9   this week?

10  A.  That's what they say.

11        MS. HARDWICK:  Those are all my questions Your Honor.

12                FURTHER REDIRECT EXAMINATION

13               BY MR. BUTLER OF ANDREAS SMITH:

14        MR. BUTLER:  Your Honor, this tape is a bit of new

15  evidence, so I have some examination regarding it.

16        THE COURT:  Go ahead.

17  Q.  First and foremost, what's critical on this tape, did you

18  confess to engaging in any criminal activity?

19  A.  No, sir.

20  Q.  When you called your mother, was I sitting by your side?

21  Was there a stenographer there and had you been sworn to tell

22  the truth and was it a court proceeding?

23  A.  No, sir.

24  Q.  You called your Mom because you thought you had just been

25  shot in the head and you wanted to talk to your mother?

1    A.  Yes, sir.

2    Q.  In your family, do you and your other family members

3    sometimes have short colloquialisms to reference things?  For

4    instance, "y'all".  When you heard the expression, I think you

5    used the word "y'all" in the tape; what did you take that to

6    mean?

7    A.  My Mama says we always be doing stuff.

8    Q.  So when she's referencing "y'all," she's saying she found

9    out stuff from y'all, correct?

10   A.  Yeah.

11   Q.  Now you had just been taken into custody as a result of

12   what had happened at Willie Jackson's house, correct?

13   A.  Yes, sir.

14   Q.  What, in not so graceful terms, and I can understand why

15   they were harsh a little bit, is the police were barking at you

16   that you tried to kill them.

17   A.  Yes.

18   Q.  That's what they were telling you they thought happened.

19   A.  Yes.

20   Q.  And that they were going to charge you with murder.

21   A.  Yes, sir.

22   Q.  And you're aware of what the penalties are for murder.

23   A.  Yes, sir.

24   Q.  So what's on your mind right now is the fact that you were

25   thinking --

1          MS. HARDWICK:  Your Honor, we object.

2          THE COURT:  Sustained.  You're not letting him

3    testify.  You just led him whop, whop, whop, whop, whop.  One

4    leading question after another.  He's your witness.

5          MR. BUTLER:  Your Honor, I object to that ruling.

6          THE COURT:  You don't say this was on your mind.  You

7    ask him what was on your mind, you don't say this was on your

8    mind.

9          MR. BUTLER:  But this is not my witness any more.

10          THE COURT:  This is your witness.  I've ruled, you

11    will follow my instructions.  You ask him what was on his mind.

12          MR. BUTLER:  I'm not being allowed to direct this

13    based on this new evidence that was put in?

14          THE COURT:  The rules say I decide a witness who can

15    be led and who can't.  Now I've ruled, and you will follow.

16          MR. BUTLER:  Yes, Your Honor.

17    Q.  Now when speaking to your mother you make reference to

18    someone named "Mall" having done something.  What are you

19    talking about?

20    A.  He tried to -- He shot at the U. S. Marshal.

21    Q.  And at the time you're making this statement, are you aware

22    -- when I say "statement," you're talking to your mother, are

23    you aware it could be used, for instance, I don't know, six

24    months down the line in a court proceeding?

25    A.  No, sir.

1    Q.  How are you talking to your mother?

2    A.  I'm just telling her what happened.

3    Q.  All right.  Do you, and this is me, I couldn't hear the

4    tape particularly well but I think I heard the expression M F

5    in there somewhere.  Did you hear that?

6    A.  Yeah.

7    Q.  And it appears that you're referencing your father.  Is

8    that who you're referencing?

9         MS. HARDWICK:  Your Honor, we would object to what it

10    appears.  He can simply ask him who was he referencing.  Again,

11    he's leading.

12         THE COURT:  Yes, just ask him who he's referencing.

13         MR. BUTLER:  I renew my objection --

14         THE COURT:  Your objection is noted, your objection

15    is wrong and I've ruled.

16    Q.  Who were you referencing?

17    A.  I don't remember the part saying it like that.

18    Q.  That's what I thought I heard, I guess there wasn't the

19    reference.

20         Towards the end of the conversation you expressed

21    concern regarding others and what was going to happen to you.

22    Do you recall, again we need to clarify, what you were saying

23    regarding -- what you were saying regarding blame and what

24    other people did?  Do you recall?

25    A.  About them 'fessing up to what they did?

1    Q.   No, whether you were being blamed for what someone else

2    did.

3    A.   That's what I was telling my daughter.

4    Q.   Can you tell the jury again what you were telling the jury

5    was happening to you because of others?

6    A.   They were putting me to attempted murder charges on me for

7    something that somebody else did.  I did -- I had nothing to do

8    with it.

9    Q.   When you were at the -- made that phone call, what facility

10   were you in?

11   A.   In the Montgomery County Jail.

12   Q.   And how long had you been there, do you recall?

13   A.   They processed me.  They booked me in, got all the

14   information, then they give you a phone call.

15   Q.   So you had been there a very brief period of time.

16   A.   A couple of hours.

17   Q.   Prior to that couple of hours, what had happened to your

18   head again?

19   A.   They had put staples in it.  I had four staples in my

20   head.

21   Q.   To your knowledge, what had caused those four staples to be

22   necessary?

23   A.   I thought it was a bullet.

24   Q.   Okay.  Do you recall, in addition to the possibility a

25   bullet, anything else happening to your head?

```
 1    A.  The marshals came.  They hit me in my head, too.

 2    Q.  Did they hit you hard?

 3    A.  Yes.

 4    Q.  Did it kind of daze you?

 5    A.  I just lay on the floor in a puddle of blood.

 6    Q.  This is the state of mind that you're -- and, again, you've

 7    just come back with four staples, this is your state of mind

 8    when you're making your phone call to your mother.

 9    A.  Yes, sir.

10    Q.  And even with four staples in your head, having been hit in

11    the head, possibly shot, that's what you thought, you clearly

12    told your Mama you had nothing to do with these murders, or

13    attempted murders.

14    A.  Yes, sir.

15              MR. BUTLER:  Nothing further.

16              MS. HARDWICK:  Nothing further from the Government,

17    Your Honor.

18              THE COURT:  You may step down.

19              (Whereupon the witness, Andreas Smith, stepped down

20    from the stand.)

21              THE COURT:  You rest?

22              MR. BUTLER:  Yes, Your Honor.

23              THE COURT:  Any rebuttal?

24              MS. ADAMS:  Yes, Your Honor.

25              THE COURT:  Call your first witness.
```

```
1              MS. ADAMS:  The United States calls Willie Jackson.

2                    W I L L I E      J A C K S O N,

3         the witness herein, having first been duly sworn or

4    affirmed to tell the truth, was examined and testified as

5    follows:

6                      REBUTTAL DIRECT EXAMINATION

7                    BY MS. ADAMS OF WILLIE JACKSON:

8              MS. ADAMS:  Your Honor, just for the record, and also

9    to give defense counsel notice, I'm calling Mr. Jackson for the

10   limited purpose of providing rebuttal testimony to Herculese

11   Walker.

12   Q.  Mr. Jackson, you are aware you are still under oath?

13   A.  Yes, ma'am.

14   Q.  Do you know Herculese Walker?

15   A.  Yes, ma'am.

16   Q.  How do you know Mr. Walker?

17   A.  Just by growing up in the same neighborhood.

18   Q.  I'm sorry, could you please speak into the mic.

19   A.  Just by growing up in the same neighborhood.

20   Q.  How long have you known Mr. Walker?

21   A.  Probably around fourteen years or so.

22   Q.  What type of relationship do you have with Mr. Walker?

23   A.  We're some sort of friends.

24   Q.  Does Mr. Walker associate with any of your other friends?

25   A.  Yeah, Andre.
```

1    Q.  You said who?

2    A.  Andre.

3    Q.  Are you referring to Andreas Smith when you say "Andre"?

4    A.  Yes, ma'am.

5    Q.  How do you know that Mr. Walker and Mr. Smith are

6    friends?

7    A.  Like I said, we all grew up in the same neighborhood.

8    Q.  Does Mr. Walker visit your home frequently?

9    A.  Yes, ma'am.

10   Q.  Does he visit your home when Mr. Smith has been present?

11   A.  Yes, ma'am.

12   Q.  Have you heard Mr. Smith describe his relationship with Mr.

13   Walker?

14   A.  Not actually describe it, but I know they're friends.

15   Q.  Have you heard Mr. Smith refer to Mr. Walker in a certain

16   way?

17   A.  I'm not understanding your question.

18   Q.  I don't want you to be confused so I'll try to rephrase.

19           Have you heard Mr. Smith say anything regarding how

20   he is close to Mr. Walker?

21   A.  I mean like I said, we all grew up in the same

22   neighborhood.  I mean they were in prison together.

23   Q.  I'm sorry?

24   A.  I said they were in prison together.

25   Q.  You heard Mr. Smith mention that?

```
 1    A.   Yes.
 2    Q.   So you're saying you heard Mr. Smith mention that he was in
 3    prison --
 4              MR. BUTLER:  I object.  It's hearsay, what Mr. Smith
 5    said.
 6              THE COURT:  Which Smith are we talking about?
 7              MS. ADAMS:  The defendant, Your Honor.
 8              THE COURT:  How is that hearsay?
 9              MR. BUTLER:  Your Honor, he is the defendant.
10              THE COURT:  So it's not hearsay.
11              MR. BUTLER:  No, sir.
12    Q.   And I'm sorry, but you keep saying "he" and "they".  Are
13    you saying when you said "he" and "they," are you referring to
14    Mr. Smith told you that he and Mr. Walker had been in prison
15    together?
16    A.   Yes, ma'am.
17    Q.   Have you talked to Mr. Smith since he's been in jail?
18    A.   Once.
19    Q.   When did you have that one conversation with Mr. Smith?
20    A.   It may have been in like August or somewhere around
21    there.
22    Q.   When you say "August," are you referring to -- What year
23    are you referring to when you say "August"?
24    A.   Oh seven.
25              MR. BUTLER:  Your Honor, before this witness answers
```

```
1   this question I may have a motion if this is a statement from
2   my client regarding the allegations in this case.
3               THE COURT:  Say this again, now.
4               MR. BUTLER:  I would -- Depending on what the answer
5   is, if what's about to be provided is a statement from my
6   client regarding the allegations in this case, I have not
7   received this information prior to trial.  And if he answers, I
8   will have a motion.  If that's the substance of his answer.
9               MS. ADAMS:  Your Honor, we do not have a copy of this
10  information.  And this is information that was revealed during
11  the --
12              THE COURT:  Why don't I excuse the jury for just a
13  moment.
14              (Whereupon, the jury was escorted out of the
15  courtroom and the following colloquy ensued):
16              THE COURT:  Now what's going on?
17              MR. BUTLER:  Your Honor, this individual --
18              THE COURT:  First of all, why don't you ask the
19  question.  Go ahead, while the jury is out.
20              MS. ADAMS:  Yes, Your Honor.
21  Q.  You were stating that you had one conversation with Mr.
22  Smith in August two thousand and seven.
23  A.  Yes, ma'am.
24  Q.  Did Mr. Smith talk with you about Jamaal Clark?
25  A.  Yes, ma'am.
```

```
1     Q.  And what did Mr. Smith tell you to do?

2     A.  He told me that we needed to go and tell the police that

3     Jamaal shot the gun and not him.

4               THE COURT:  Did he say anything else like why he

5     wanted you to do that?

6               THE WITNESS:  He said he didn't do it.

7               THE COURT:  He said he didn't do it?

8               THE WITNESS:  Yeah.

9               MR. BUTLER:  I withdraw my objection.

10              THE COURT:  So you withdraw your objection?

11              MR. BUTLER:  Yes, Your Honor.

12              THE COURT:  One other thing, Mr. Butler.  The

13    committee notes say if you're examining your own client on

14    cross examination, you still have him as direct and you cannot

15    lead him.

16              MR. BUTLER:  If I'm examining my client on cross

17    examination --

18              THE COURT:  Yes, you cannot lead him.  That's

19    committee notes to rule six eleven.

20              MR. BUTLER:  My apologies to the Court.

21              THE COURT:  Secondly, it's up to the discretion of

22    the Court anyway, but there is specific law to that effect.

23              MR. BUTLER:  Regardless of the ruling, you are

24    correct and I apologize for my tone.  It was inappropriate.

25              THE COURT:  Bring in the jury.  Let's proceed.
```

1           That's evidentiary rule six eleven.

2           MR. BUTLER:  Thank you, Your Honor.

3           (Whereupon, the jury was escorted into the

4    courtroom.)

5           THE COURT:  Proceed, Ms. Adams.

6           MS. ADAMS:  Thank you, Your Honor.

7    Q.  Mr. Jackson, you were talking about one telephone

8    conversation that you had with Mr. Smith in August of two

9    thousand and seven, weren't you?

10   A.  Yes, ma'am.

11   Q.  During that telephone conversation, did Mr. Smith talk to

12   you about Jamaal Clark?

13   A.  Yes, ma'am.

14   Q.  What did Mr. Smith tell you to do in reference to Jamaal

15   Clark?

16   A.  Said we needed to go and tell the police that he didn't

17   shoot the gun, that Jamaal did.

18   Q.  Why did -- Let me rephrase.

19          Did Mr. Smith tell you why he was asking you to do

20   that?

21   A.  He say he didn't do it.

22   Q.  Did Mr. Clark shoot at the marshals?

23   A.  No, ma'am.

24          MS. ADAMS:  No further questions, Your Honor.

25                      REBUTTAL CROSS EXAMINATION

1                        BY MR. BUTLER OF WILLIE JACKSON:

2    Q.  You know Herculese Walker, correct?

3    A.  Yes, sir.

4    Q.  And, again, you say you've known him for fourteen years?

5    A.  Yes, sir.

6    Q.  Do you consider him a friend?

7    A.  Yes, sir.

8    Q.  He's someone that you trust?

9    A.  I mean we're more associates than friends.

10   Q.  So you've known him for fourteen years but you only

11   consider him an associate?

12   A.  Mm-hmm.

13   Q.  He is at your residence weekly, or regularly?

14   A.  Yeah.

15   Q.  Has he, to your knowledge, ever done anything to compromise

16   your safety or your residence's safety?

17   A.  No, sir.

18   Q.  You have not been charged with the firearm that was found

19   in the residence, correct?

20            MS. ADAMS:  Objection, Your Honor.  That goes beyond

21   the scope of direct.

22            THE COURT:  Overruled.

23   Q.  Correct?  You have not been charged with any felony

24   offenses in this court regarding the firearms found in your

25   house, correct?

```
1    A.   No, sir.
2    Q.   You don't have any charges pending in this court?
3    A.   No, sir.
4              MR. BUTLER:  Nothing further.
5              THE COURT:  Anything else we haven't heard?
6              MS. ADAMS:  No, Your Honor.
7              THE COURT:  Thank you.  You may step down.
8              (Whereupon the witness, Willie Jackson, stepped down
9    from the stand.)
10             THE COURT:  Next witness?
11             MS. ADAMS:  The United States has no further
12   witnesses, Your Honor.
13             THE COURT:  Okay.  Any surrebuttal?
14             MR. BUTLER:  No surrebuttal.  Just a brief motion,
15   Your Honor.
16             THE COURT:  Members of the jury, we're going to
17   recess probably for about thirty minutes.  It's going to take
18   that long for us to get the case ready for you.
19             Counsel, how long do you think you'll need for your
20   closing arguments?
21             MS. ADAMS:  Forty minutes, Your Honor.
22             MR. BUTLER:  Forty minutes, Your Honor.
23             THE COURT:  Why forty minutes?
24             MR. BUTLER:  There are four charges --
25             THE COURT:  Okay, forty minutes it is to a side.
```

1    Let's try to start at three.  I'll give each side forty minutes

2    to do their closing arguments.  We'll try to get started back

3    around two-thirty.

4         Again, do not discuss the case among yourselves or

5    with anyone else.  Turn your pads over in your chairs.

6         (Whereupon, the jury was escorted out of the

7    courtroom.)

8                    MOTIONS IN OPEN COURT

9                 (THE JURY IS NOT PRESENT):

10         THE COURT:  Yes, I'll entertain motions.

11         MR. BUTLER:  Yes, Your Honor.  At the conclusion --

12         THE COURT:  Let's take each count separately.

13         MR. BUTLER:  As to the bank robbery only --

14         MS. ADAMS:  Your Honor, may I use the restroom,

15    please?

16         THE COURT:  We'll take five minutes.

17         MS. ADAMS:  Thank you.

18         THE COURT:  Counsel, we'll come back and take up your

19    motion.

20         In the meantime, I have the jury charge ready.  I'm

21    going to try to pass that out to you so you'll have that when

22    you get back to your chairs.  There are probably some

23    grammatical corrections if you need to make.  If you find any,

24    let my clerk know.  We're sort of proofing it right now.

25         Why don't we go ahead and take ten minutes so

1    everyone can do that.

2              (Whereupon, a recess was taken.)

3              THE COURT:  I'll hear your motions.  We'll take it

4    count by count, and I'll hear the Government's response.

5              MR. BUTLER:  Count one.  Count one is a violation of

6    Eighteen United States Code twenty-one thirteen A.  That is

7    bank robbery.  In addition to what I argued at the conclusion

8    of the Government's case, it is our position that further

9    evidence establishes that the Government has not proven its

10   case beyond a reasonable doubt.  Particularly Patricia Franco

11   testified that the individual who arrived at eight forty-five

12   who Ms. Gurley testified, then returned to the bank because she

13   saw him arrive at eight forty-five, was one and the same

14   person.  That person was a dark skinned African-American male.

15             Upon questioning of Ms. Franco, as well as Ms.

16   Gurley, it was made clear that Mr. Smith is not a dark skinned

17   African-American male.  So that further makes incredible my

18   next point as to count one; that being that the identification

19   by Ms. Gurley is incredible and unreliable.

20             Further substantiating that assertion is the fact

21   that Dr. Fulero testified that there are certain factors which

22   lead a witness's identification to become reliable.  Those

23   factors are -- This is a textbook example of that case.  By

24   that I mean, number one, Ms. Gurley was under stress.  Two, the

25   events that took place were very brief.  Her viewing of the

1    robber was extremely brief.  Three, as a result of her --

2         THE COURT:  Do I have the authority absent a motion

3    prior to trial to suppress the identification to now grant

4    judgment as a matter of law in your favor?

5         MR. BUTLER:  Yes, Your Honor.  I believe the Court --

6    The Court, at any time, if as a result of evidence it hears

7    here believes that a previous motion raised by the Defense

8    suggests identification -- I moved to suppress the

9    identification on the grounds it was suggestive.

10        THE COURT:  I don't remember that ever reaching me.

11   Wasn't that withdrawn?

12        MR. BUTLER:  No, Your Honor.

13        THE COURT:  Did I rule on the merits of that?

14        MR. BUTLER:  I believe you did make findings.

15        THE COURT:  Maybe I just don't remember.

16        MR. BUTLER:  I would reopen that motion and ask that

17   you rule in our favor.  It is our position that given the fact

18   that her identification was unreliable --

19        THE COURT:  I'm trying to find an order where I did

20   that.  What's the document number?

21        MS. ADAMS:  Document number thirty-eight, Your Honor.

22        THE COURT:  Okay.  Go ahead.

23        MR. BUTLER:  It is our position that the

24   identification was not reliable and should not be considered by

25   the jury.  Because the identification by Ms. Gurley was not

1   reliable and should not be considered by the jury, there is no

2   identification.  Mr. Robinson did indicate when shown the

3   lineup which included Mr. Smith, that the person identified as

4   Mr. Smith, number six, had characteristics of the person who

5   had committed the offense.  That he was sixty to seventy

6   percent sure that that person had characteristics.

7        Mr. Robinson never, never had testified in court,

8   identified number six as the person who committed the offense.

9   He never made an identification.  For that reason, Your Honor,

10  it's our position that there is no -- Well, one other thing,

11  Your Honor.

12       THE COURT:  Okay, I do remember now, looking at that

13  suppression matter.  And I do remember looking at the

14  transcript and so forth.  I would note, however, that you

15  didn't file any objections.

16       MR. BUTLER:  Your Honor, I did not contest the

17  Court's ruling based upon the law applied.  The Court -- Judge

18  Moorer saw the facts different than I.  I therefore did not

19  file objections.

20       THE COURT:  But you're still asking me now to

21  reconsider?

22       MR. BUTLER:  Yes, Your Honor.

23       THE COURT:  Go ahead.

24       Mr. BUTLER:  For those reasons, it is our position

25  that count one should be denied.  It is also our position that

1    though it was offered -- Withdraw that.  I'm not going to go

2    there.

3            For those reasons, Your Honor, it's our position that

4    count one should be dismissed.

5            As to count two, count two is a violation of eighteen

6    United States Code one eleven.  That is on July twentieth Mr.

7    Smith by means --

8            THE COURT:  Wait a minute, we're supposed to go count

9    by count.  What's the Government's response to count one?

10            MS. HARDWICK:  Your Honor, the Government's response

11    to Mr. Butler's first motion regarding the bank robbery and the

12    fact that there was no identification, the Court allowed the

13    testimony of Dr. Fulero in this case regarding cross-racial

14    identification and set out certain factors.  However, what Mr.

15    Butler is arguing today is that it was unduly suggestive in

16    that the Court should reconsider its prior finding.

17            What the Court found there was that the

18    identification was indeed reliable and that Ms. Nichols, now

19    Ms. Gurley, had sufficient opportunity to observe the criminal

20    activity at the time that the crime occurred.  And that she

21    focused another degree of attention to the person that was at

22    that moment robbing her.  And she identified him in a lineup.

23    She also identified him in the courtroom.

24            Mr. Butler today is saying that there was no

25    identification.  I think that is a jury question at this point.

1    They have heard the testimony from Ms. Gurley, from Mr.

2    Robinson and her testimony here.  Certainly they can take the

3    weight of the testimony from Dr. Fulero as this Court is going

4    to charge them regarding the expert witness testimony that is

5    presented in any case before a jury.  That jury has the

6    opportunity to consider that testimony and apply it to the

7    facts of this case.

8         The Government would submit that based on the

9    identification that Miss Gurley made prior to her testimony

10   during this trial and her identification of the defendant

11   during the trial, that there has been a positive

12   identification.  Mr. Butler has not challenged any other

13   elements of the robbery offense so the Government would assume

14   that he agrees that the Government presented sufficient

15   evidence to show that the bank was federally insured and that

16   he took money from Miss Gurley on that particular day by

17   intimidation or force.

18        That's all Your Honor.

19        MR. BUTLER:  The only thing in rebuttal is we do not

20   agree that the government has shown -- I think the Government

21   used the word "he".  It is our position they have not shown who

22   that "he" is.  They have not shown the identity.

23        But nothing further.

24        THE COURT:  Okay.  The Court has reconsidered your

25   motion, essentially to suppress the identification of the

1    defendant by Ms. Nichols or Mr. Johnson, assuming that he may

2    have made some identification, and I deny the request for two

3    reasons.  First of all, as I stated in my order of November

4    twenty-nine, two thousand and seven, document number

5    thirty-eight, while the Court disagreed with the magistrate

6    judge's conclusion that there was nothing in the photographic

7    lineup which in any manner suggested to Nichols to identify

8    Smith as the bank robber, the Court still agreed with the

9    magistrate judge's ultimate conclusion that the lineup was not

10   unduly suggestive.

11          The Court went on to conclude that even if it was

12   unduly suggestive, the identification was still sufficiently

13   reliable to go to the jury and the Court made a number of

14   findings including that Nichols had sufficient opportunity to

15   observe the criminal at the time of the crime, that she focused

16   a sufficient degree of attention on the criminal, that the

17   suspect she identified in the lineup accorded with her prior

18   description of the criminal after the robbery, that she

19   exhibited a great deal of certainty from identifying the

20   suspect in the photographic lineup, and that the length of time

21   between the crime and confrontation were not excessive and the

22   Court relied on these factors based on the United States

23   Supreme Court case *Neil versus Biggers* (ph.), four oh nine U.

24   S. one eighty-eight at page one nineteen nine, a nineteen

25   seventy-two Supreme Court case.  The Court readopts those

1  findings.

2       The second reason why I reject the suppression

3  request is because there is other circumstantial evidence that

4  implicates the defendant's involvement.  And I think that is an

5  independent grounds for count one to go to the jury.  That is

6  absent just the identification.

7       MR. BUTLER:  Yes, Your Honor.

8       THE COURT:  I'll hear you as to count two now.

9       MR. BUTLER:  Count two charges that on July

10  twentieth, my client knowingly and by means of use of a deadly

11  dangerous weapon is the source of assault, resist, oppose,

12  impede, intimidate and interfere with deputies of the United

13  States Marshals Service while they engaged in and on account of

14  the performance of their official duties in violation of

15  Eighteen United States Code one eleven.

16       Your Honor, it's our position that credible evidence

17  in this case was presented through Mr. Smith, as well as Mr.

18  Herculese Walker that Mr. Smith did not use any of the means

19  listed in the indictment to interfere with the deputy United

20  States marshals.  It was, in fact, Mr. Jamaal Clark, and for

21  that reason, Your Honor, it is our position that the Government

22  has not proven count two.

23       THE COURT:  Okay.  I'll hear from the Government.

24       MS. HARDWICK:  Yes, Your Honor.  It is true, Your

25  Honor, that the defendant in this case did testify.  The case

1    law is clear that when a defendant testifies the jury can

2    assume the opposite of his testimony.  He testified that he did

3    not shoot the firearm; however, there were two other people in

4    the residence who testified that they did see him with a

5    firearm.  They did not testify that he saw him fire, it but

6    they testified that they saw him with a firearm.

7            Deputy United States Marshal J. C. Hamilton indicated

8    that the defendant had a firearm and was the only person in

9    motion when the weights were thrown through the sliding glass

10   door at the rear of the residence on Jan Court -- or Jan Drive.

11   At that time the defendant had to be forcibly subdued.

12           In reference to count two, the forcible assault on a

13   federal officer, the United States Marshal J. C. Hamilton

14   testified that he is a United States marshal and that he was at

15   the Jan Drive location for the purpose and in his official

16   capacity to execute an arrest warrant for Andreas Jejuan Smith.

17   He indicated that he identified himself, called the defendant

18   by name, told him that he had an arrest warrant for him and

19   asked him to step outside of the residence.

20           At that time shots were fired through the door, and

21   when he saw him again he was running from around the side of

22   the kitchen of the residence with a firearm that he

23   subsequently threw to the floor.  The Government believes that

24   those elements are sufficient to establish the elements for

25   count two.

```
 1              THE COURT:  Anything else from the defendant?

 2              MR. BUTLER:  No, Your Honor.

 3              THE COURT:  To the extent that you're arguing that I

 4    can rely on the defendant's testimony to the extent that I

 5    don't believe him to support count two, I can't do that alone I

 6    don't think.

 7              MS. HARDWICK:  No, but the jury could consider the

 8    opposite.

 9              THE COURT:  The other evidence.

10              MS. HARDWICK:  Exactly.  They can also consider the

11    opposite of what the defendant says to be true.

12              THE COURT:  That's what's called a pregnant negative,

13    and I don't think I can do that.  But you're absolutely right,

14    I can consider that in conjunction with the other evidence and

15    the motion is denied.

16              What about count three?

17              MR. BUTLER:  Count three charges Mr. Smith with

18    knowingly using and carrying a firearm during and in relation

19    to and in furtherance of the crime of violence charged in count

20    two.

21              THE COURT:  Right.

22              MR. BUTLER:  That's in violation of nine twenty-four

23    C one A three.

24              THE COURT:  Really, count three hangs on count two.

25              Do you have anything to add?
```

```
 1              MR. BUTLER:  No, Your Honor.

 2              THE COURT:  The motion is denied as to count three.

 3              And count four is --

 4              MR. BUTLER:  That after having been convicted of a

 5     felony offense, my client subsequently and on July twentieth,

 6     two thousand seven, possessed a firearm.

 7              THE COURT:  That's count four?

 8              MR. BUTLER:  Yes, Your Honor.

 9              MS. HARDWICK:  That's correct, Your Honor.  Felon in

10     possession of a firearm.

11              THE COURT:  I thought count four was carrying a

12     firearm during the commission of a felony.  Oh, I have them

13     backwards.  I have count three, which should be count four.  I

14     have count four which should be count three.

15              Okay, then.  We'll definitely make that correction.

16              MR. BUTLER:  And as to count four as charged in the

17     indictment, Your Honor, again, our evidence is essentially the

18     same as to the counts two and three.  That being that the

19     evidence has shown that Mr. Smith did not possess a firearm

20     during this event; that it was, in fact, Jamaal Clark who

21     possessed that firearm and discharged it at the marshals and

22     therefore he's not guilty of that.

23              THE COURT:  I think it's up to the jury to decide who

24     possessed the firearm.  So all counts will go to the jury.  So

25     the motion is denied as to all counts.  All counts will go to
```

1    the jury.

2            Now let's talk about the Court's charge.  I will

3    reverse the charge as to counts three and four.  I think I have

4    them in the incorrect order.

5            I also note that the word in front of the word

6    "defendant" is sometimes improperly capitalized.

7            MS. ADAMS:  On page ten you have the middle name for

8    the defendant as DuJuan.

9            THE COURT:  Yes, okay.  Got it.

10           MS. ADAMS:  It should be Jejuan.

11           THE COURT:  You're absolutely right.  It's not

12   DuJuan.  Okay.

13           MS. ADAMS:  And the next subtitle, count one, is not

14   armed bank robbery, the defendant is charged with simply bank

15   robbery.

16           THE COURT:  Okay.  So we should take out the word

17   "armed".

18           MS. ADAMS:  Yes, Your Honor.

19           THE COURT:  Very good.

20           MS. ADAMS:  As we discussed on page fourteen, you

21   have count three, but that's actually count four.

22           THE COURT:  We'll reverse those.

23           Anything else?

24           MS. ADAMS:  On pages fifteen and sixteen, what you

25   have is count four; that should be count three.  Then when it

1  refers to the "crime of violence," it should be referring to

2  count two.

3          THE COURT:  Now let me see.  The defendant can be

4  found guilty of that offense as charged in -- of course we're

5  going to have to change all those words in count four.  Where

6  is the charge of violence?  Oh, I see.  That's the first

7  element?

8          MS. ADAMS:  Yes, Your Honor.

9          THE COURT:  That should be count two.

10          MS. ADAMS:  Yes, Your Honor.

11          THE COURT:  Anywhere else, Ms. Adams?

12          MS. ADAMS:  Yes.  On page seventeen, the last

13  paragraph of that count it refers to count four and it should

14  be count three.

15          THE COURT:  Let me see if I have this -- We're on

16  page seventeen?

17          MS. ADAMS:  Yes, Your Honor.

18          THE COURT:  Where?

19          MS. ADAMS:  The last paragraph, second sentence.

20          THE COURT:  Why don't you just read it to me.

21          MS. ADAMS:  "It is charged, in other words, that the

22  defendant violated the law as charged in count four."

23          THE COURT:  That should be count three.

24          MS. ADAMS:  Yes, Your Honor.

25          THE COURT:  Okay.  Thank you.

1          Anything else?

2          MS. ADAMS:  No, Your Honor.

3          THE COURT:  Those changes will all be made.

4          MS. MASON:  Your Honor, we have one more correction.

5          THE COURT:  Yes?

6          MS. MASON:  On page seven, the middle paragraph, the

7    last sentence just needs to be completed.  It says, reading

8    from the comma, "must never be considered evidence of guilty of

9    the crimes for which the trial period --"

10          THE COURT:  Just a minute.  You've lost me now.

11   Where are you reading from?

12          MS. MASON:  The last sentence of that middle

13   paragraph on page seven.

14          THE COURT:  Okay.  Now start again.

15          MS. MASON:  I'm reading from the comma on the second

16   line from the bottom.  "And must never be considered as

17   evidence of," that should be guilt, "of the crimes for which

18   the trial period".

19          THE COURT:  I agree with that.

20          Something else should be there.  You're absolutely

21   right.

22          Did you get those things, Fred?

23          THE COURT'S LAW CLERK:  Yes.

24          THE COURT:  Okay.  All of those changes will be made.

25          Ready for closing arguments?

1    MR. BUTLER:  Yes, Your Honor.

2    MS. ADAMS:  Your Honor, before the jury comes in, I

3  do have a request according to your rules attached to the

4  table.  I would like to have someone from our office here and

5  work the computer while I do my closing argument.

6    THE COURT:  Yes.

7    MR. BUTLER:  No objection.

8    THE COURT:  Have you told the clerk as to how you

9  would like to divide your time?

10    MS. ADAMS:  Yes, Your Honor.

11    THE COURT:  Obviously, we're going almost two hours

12  with closing arguments.  What we'll do is -- How much time are

13  you taking in your opening?

14    MS. ADAMS:  Twenty or twenty-five minutes.  But we

15  honestly do not expect to take the full forty minutes, Your

16  Honor.

17    THE COURT:  You can't raise something that wasn't in

18  your rebuttal, or by the defendant in his argument.

19    MS. ADAMS:  Yes, Your Honor.

20    MR. BUTLER:  Just so the Court is aware as well,

21  given what I perceive to be some reactions of the jurors when I

22  said "forty minutes," I'm going to try to expedite my closing

23  as well.

24    THE COURT:  Very good.

25    Bring in the jury.

1           (Whereupon, the jury was escorted into the

2     courtroom.)

3           THE COURT:  Members of the jury, we've reached the

4     point in the trial when the attorneys are ready to make their

5     closing arguments.

6           Ms. Adams, you may proceed.

7                       CLOSING ARGUMENTS:

8           MS. ADAMS:  Ladies and gentlemen of the jury, I'm

9     Jerusha Adams, and I talked to you close to three weeks ago at

10    the beginning of this case.  And I, and Ms. Hardwick, are

11    Assistant United States Attorneys who have been doing this

12    case.

13          First of all, I just want to say to all of you thank

14    you for taking the time to sit on this case and listen to all

15    the evidence.  I know we went through jury selection that we

16    told you this trial would last between two and four days, and

17    unfortunately this is now the third week, so I just want to

18    thank you for your time because it's lasted much longer than we

19    truly expected.  And I just thank you for your attentiveness.

20          Now as I told you in opening statement, this case is

21    about convicting a violent criminal of violence.  As you've

22    heard the evidence in this case, and all the evidence comes

23    from this witness stand here, Judge Thompson is going to

24    instruct you that all of the arguments that you heard from the

25    lawyers, me, Ms. Hardwick, Mr. Butler, Ms. McKee, none of that

1    is evidence.  Everything that you heard coming from this podium

2    is not evidence.

3         What's evidence is what comes from over here, and

4    that is what you should consider.  And we, the United States,

5    submits to you that we have provided all of the evidence which

6    establishes beyond a reasonable doubt that the defendant,

7    Andreas Jejuan Smith, is guilty of all four counts of the

8    indictment.

9         I know you haven't heard the Government's evidence in

10   over a week, but I don't have the time and I don't want to take

11   the time to go through everything with you because I'm trying

12   to be brief and hit the highlights for you.

13        Count one of the indictment charges the defendant

14   with bank robbery.  In order to prove a defendant is guilty of

15   bank robbery the United States has to establish beyond a

16   reasonable doubt that on June twenty-second, two thousand and

17   seven in Montgomery County, Alabama the bank, Compass Bank

18   located at Thirty-four eighty Eastern Boulevard, was robbed.

19        In order to prove the defendant robbed that bank we

20   have to present evidence to you, and the United States submits

21   that we have presented the evidence, indicating that the

22   defendant, Andreas Jejuan Smith, took from a person, in this

23   case Ms. Annette Nichols or Annette Gurley, I'll refer to her

24   as "Annette Gurley" because that's her present name, that the

25   defendant took from the presence of Ms. Gurley money in the

1    possession of a federally insured bank.  And that he did so

2    with means of force, violence or intimidation.  We submit to

3    you that we have satisfied those elements beyond a reasonable

4    doubt.

5            You heard the testimony of Ms. Gurley.  Now at

6    opening statements I just want to refresh your memory because

7    the judge is also going to tell you this.  There are two forms

8    of evidence.  As I told you in the opening there's direct and

9    there is circumstantial.  "Direct evidence" is when a witness

10   testifies that a specific fact is true, like an eyewitness.

11   "Circumstantial evidence" is when you have a chain of evidence

12   that tends to prove or disprove a fact.  On the bank robbery we

13   have presented both.

14           We presented the direct evidence, expert testimony --

15   I'm sorry -- eyewitness testimony from Ms. Gurley indicating

16   that on June twenty-second, two thousand and seven she was

17   working at Compass Bank located at Thirty-four eighty Eastern

18   Boulevard.  She testified to you that she was working out her

19   teller station.  She told you that the bank is insured by the

20   F. D. I. C., making it federally insured, and she told you

21   around ten o'clock a young black male came to her teller

22   station and demanded money.  He gave her a note that said,

23   "This is a robbery" and demanded money and also said that he

24   had a weapon.

25           She also told you that here she was sharing two to

1    three feet with this person because he laid on the counter to

2    get the money.  You saw the video.  You saw the photos.  She

3    told you that was the first time that she had been robbed.  It

4    was stressful for her, but she remembered the details.

5          She also told you that she had given a description of

6    the bank robber to the police and she noted that the bank

7    robber was a young black male, and that he had a bandage on the

8    left side of his neck.  She remembered that and she noted that.

9    And she made sure she told that to the police.

10         She also told you that that bank robber came in and

11   took five thousand nine hundred and twenty dollars from her

12   teller station.  He took that money and he left.  But very

13   significantly what she also told you is that as she was working

14   her teller station and he took the money out of the drawer, he

15   said, "Where's the rest of the money?"  So she squatted down to

16   go into the safe so he would have access to the money in the

17   safe, and that he reached down and took the money from the safe

18   while she was squatting down looking at him observing the bank

19   robber scared and threatened.

20         What else did she tell you?  She told you that when

21   she had a chance to look at a photo array and pick out the

22   robber that robbed her, she picked the defendant, Andreas

23   Jejuan Smith.  That's our eyewitness.  That's our direct

24   evidence.  We submit to you that if you solely believe the

25   testimony of Ms. Gurley, the United States has satisfied the

1    evidence that is required to prove for count one.  It has

2    satisfied that solely by the testimony of Ms. Gurley.

3         But fortunately we provided more evidence to you.  We

4    didn't give you just direct, we also gave you circumstantial

5    evidence.  Notably, the final thing Ms. Gurley said, which was

6    so important, is she came up in here, she sat in that witness

7    stand and she identified the defendant, Andreas Jejuan Smith,

8    as the person that robbed her.  And she told you that she

9    remembered his eyes.

10        Now the defendant raised an issue about the

11   sunglasses.  And they have tried to add a little smokescreen,

12   add a little confusion to this case.  The United States submits

13   to you there is no confusion.  As you can see in the exhibits,

14   there are patterns on the floor of that bank.  We submit to you

15   that was the alleged sunglasses that the defendant wants to

16   argue to you.

17        In addition, Daniel Robinson, the second bank

18   employee, got up on the stand and he testified.  He also said

19   he saw the bank robber.  He said he didn't remember any

20   sunglasses.  The two people that saw that bank robber said that

21   he was not wearing sunglasses.  So don't be fooled.  Don't be

22   confused, because what's important is what you get from here.

23        Now moving along.  Mr. Robinson, since I brought him

24   up, Mr. Robinson came in and he testified he likes cars, he's

25   familiar with cars, June twenty-second he made a payment and

1    Ms. Gurley's teller station standing there looking out the

2    window talking to her, and he realized that the black car,

3    specifically the nineteen ninety-nine Chrysler Sebring that

4    pulled up.  And Mr. Robinson said to you that he saw that black

5    vehicle pull through the circular drive of the bank.  He

6    recognized the type of vehicle it was, and he thought it was

7    odd that it pulled around the circular parking of the bank and

8    that it stopped facing Eastern Boulevard.  He saw the young

9    black male get out of that vehicle on the passenger side and

10   walk into the bank.

11            I just want to address one thing I just mentioned.

12   The fact that the bank robber got out of the passenger side of

13   the vehicle.  The judge is going to tell you to use your common

14   sense in this case.  And common sense dictates that nobody can

15   drive a car from the passenger side.  That means there was a

16   driver.  The United States concedes there's a driver.  Two

17   people robbed that bank.  But that is not what is before you in

18   this case.  We're not charging two people with bank robbery in

19   this case.  What we're charging is Andreas Jejuan Smith, the

20   person that went in the bank.

21            That's for you to decided today.  And you have given

22   an oath and said under oath that you would decide the facts of

23   this case before you, and the facts of this case before you are

24   the facts pertaining to the guilt of Andreas Jejuan Smith.

25            Now Mr. Robinson also saw the car, recognized the

1    car, told the police what the car looked like.  But in

2    addition, when he was approached with photos, what did he do?

3    He picked out Andreas Jejuan Smith.

4            Ladies and gentlemen of the jury, while she's working

5    on that picture, I would bring something else to your attention

6    because you heard a lot of evidence in this case.  You've heard

7    evidence of a Hooters incident.  An incident where Ms. Gurley

8    was at Hooters, and she said that someone looked like the bank

9    robber.  I want to remind you when we did opening statements

10   close to three weeks ago, Ms. McKee told you that you would

11   hear that Ms. Gurley saw Edward Oliver -- Edmond Oliver, the

12   Hooters cook, and Ms. Gurley said, "That is the robber."

13   That's what Ms. McKee told you.  But you didn't hear that.  You

14   did not hear that.  So you need to consider what promises have

15   been made to you and what you would hear from this case and

16   what you actually heard.

17           What you actually heard was Ms. Gurley say she saw

18   the Hooters cook, Mr. Oliver at that time, how he was acting,

19   his mannerisms, she thought he was part of the bank robbery.

20   They put Mr. Oliver in a photo array.  They showed that photo

21   array to Ms. Gurley.  She didn't identify him.  You see who she

22   identified in exhibit eighty-one of the Government's exhibits?

23   She circled the defendant and she put the name down as

24   identification.  She said she was ninety-nine to a hundred

25   percent sure.

1    Now Mr. Robinson saw this same photo array with

2    Hooters and Mr. Oliver.  Did he identify anyone?  Did he circle

3    a name?  A number and put down his name?  No, he did not.  But

4    when he saw the photo array of the defendant, he circled that

5    number of the defendant and he put down his name.  That's an

6    identification.

7    The other evidence that we have in this case that

8    corroborates Ms. Gurley's direct evidence, the other

9    circumstantial evidence that we have, is that the police did an

10   investigation.  The detective told you that they happened to

11   come along the suspect vehicle while he's working another

12   robbery and he sees the nineteen ninety-nine black Chrysler

13   Sebring and it has the yellow "Support Our Troops" on it.

14   The first time you heard about the yellow "Support

15   Our Troops" sticker was from Raymond McCoy, a witness who lived

16   in the neighborhood behind the bank, behind Blue Cross Blue

17   Shield, and he said he saw that vehicle parked in that

18   neighborhood.  That he saw a young black male get into the

19   passenger's side and the car pulled off.  That was another link

20   in the chain indicating that Andreas Jejuan Smith robbed the

21   bank.

22   So then Detective Hill, who incidentally happens to

23   be, looks up and he sees a nineteen ninety-nine black Chrysler

24   Sebring with a yellow "Support Our Troops" sticker.  Stops the

25   person, who that can be?  Glenn Teague, the defendant's father.

1    Mr. Teague said to Detective Hill that allows his son, Andreas

2    Smith, to drive his vehicle.

3        He also says that Andreas Smith gives him his age.

4    He's in his twenties.  That triggers Detective Hill, it is a

5    possible another link here.  So he engages in further

6    investigation and develops a suspect.  Develops these photo

7    arrays.  After he looks at the picture of the defendant and

8    after he looks at a still photo shot, photo of the bank

9    robbery, and he says hmm, I think that may be Mr. Andreas

10    Smith.  But I don't know because I wasn't there.  So he takes

11    it to Ms. Gurley, the eyewitness, and he takes it to Mr.

12    Robinson.  They say that's him.  That's Mr. Smith.

13        So Detective Hill goes and he gets an arrest warrant.

14    He gets an arrest warrant for Andreas Jejuan Smith.  Why is

15    that significant?  That's significant because it's consistent

16    with the evidence that you heard here.  You've heard evidence

17    of a young black male.  You've heard evidence of a young black

18    male.  That would be Mr. Smith.  Not Mr. Teague, who is

19    forty-nine, but Mr. Smith.  But, ladies and gentlemen, I submit

20    to you that you'll get the evidence, you'll get the pictures,

21    you've seen Mr. Smith get up on the stand numerous times and

22    testify, and you've seen Mr. Teague do the same.  You make the

23    determination.

24        Who looks more like exhibit fifteen?  The person in

25    exhibit number fifteen.  You decide, because you are the judges

1    of the facts in this case.

2         Ladies and gentlemen of the jury, I want to move

3    along to count number two now, because I submit to you that the

4    evidence you heard from the witness stand speaks for itself and

5    establishes that beyond a reasonable doubt, using your common

6    sense, Andreas Jejuan Smith robbed Compass Bank on June

7    twenty-second, two thousand and seven.

8         Now count number two charges forcible assault on a

9    federal officer with the use of a deadly or dangerous weapon.

10   In order to prove that case the United States has to establish

11   beyond a reasonable doubt that the defendant, Andreas Jejuan

12   Smith, forcibly assaulted a federal officer while that officer

13   was engaged in the performance of his official duties, and that

14   the defendant did so knowingly and willfully.  And that he also

15   did so with the use of dangerous or deadly weapon.

16        The United States submits to you that we have

17   presented the evidence which satisfies that case.  Satisfies

18   that charge.  Why?  Because the marshals had an arrest warrant

19   for Mr. Smith.

20        One more thing I want to bring out because I almost

21   forgot it, and this is something that Detective Hill considered

22   when he was getting that arrest warrant.  You've seen the

23   tattoo that Mr. Smith has on the left side of his neck.  In

24   fact, he's the only person that got up on that witness stand

25   and had a scar, a burn or anything to cover on the left side of

1    his neck.  That was another consideration when Detective Hill

2    went and got the arrest warrant for bank robbery.  The marshals

3    got a copy of that arrest warrant.

4            You heard Deputy United States Marshal John C.

5    Hamilton testify.  He testified to you that he developed,

6    through talking to people, that the defendant, Andreas Jejuan

7    Smith, was located at Twenty-eight sixty-one Jan Drive on July

8    twentieth, two thousand seven.  That residence is located in

9    Montgomery County.  And he told you he was working with the

10   Gulf Coast Regional Task Force.  Their job is to find and

11   arrest fugitives.  People who are deemed fugitives because they

12   have state or federal arrest warrants out for them.  He told

13   you that's what he and his team were doing that night.

14           He also told you some very, very important details.

15   He told you that he and Duane Richardson, another Deputy United

16   States Marshal, and those two individuals are the victims in

17   this case for count two, they were at the front door of

18   Twenty-eight sixty-one Jan Drive, and who opens the door when

19   they knocked?  The defendant, Andreas Jejuan Smith.

20           Deputy Hamilton told you he had on a polo wearing

21   "Deputy United States Marshal" insignia, he had his badge on,

22   and he told you that Deputy United States Marshal Richardson

23   had on a ballistic vest, a bulletproof vest, that said "U. S.

24   Marshals, Police".  Further, he told you that when he knocked

25   on the door at Twenty-eight sixty-one Jan Drive, Andreas Jejuan

1  Smith answered the door, and he said after immediately

2  identifying Mr. Smith, "Andreas Jejuan Smith, U. S. Marshals.

3  We've got an arrest warrant for you.  Come on outside."  He

4  identified himself.  He identified the defendant, and he

5  identified his purpose for being there.

6          He was engaging in the performance of his official

7  duties.  And what happened?  Mr. Smith slammed the door on

8  them.  They ultimately had to kick down the door and then shots

9  were fired.  The two shots.

10         Let's discuss another smokescreen at this time.  The

11  defendants want to say there is more than two shots.  The

12  Defense wants to argue and say there's the possibility that

13  someone else shot off one of those rifles form that house.  You

14  heard the testimony in this case.  You heard from Deputy United

15  States Marshal Jim Austin.  He discovered the weapon at the

16  time of the incident.  He recovered them and he cleared them.

17  There was a rifle by the sofa.  He cleared it.  It had not been

18  fired.

19         There was one rifle upstairs up under a mattress.  It

20  wasn't even loaded.  It had not been fired.  But what had been

21  fired was a handgun, forty caliber Smith & Wesson.  That's the

22  only gun that had been fired that night.  And there were two

23  shell casings indicating only two bullets that were found in

24  the kitchen.  And in fact, the defendant himself told you only

25  the two shots were fired that night.  Now the judge will also

1    tell you have the right to believe or disbelieve all or part of

2    a witness's testimony.  That's up to you.  If you want to

3    believe the defendant, you can.  You can believe everything he

4    says, you can believe nothing he says or you can believe a part

5    of it.  And the United States submits to you that he's told you

6    part truth, part lie.

7         He told you there were two shots, but he also told

8    you he wasn't the shooter.  He told you everyone else that was

9    there that night is lying.  Everyone included Deputy United

10   States Marshal Hamilton, Willie Jackson who was a homeowner and

11   said that Andreas Jejuan Smith went to the door with a forty

12   caliber Smith & Wesson in his hand.  Jamaal Clark who told you

13   Andreas Jejuan Smith went to the front door with the forty

14   caliber Smith & Wesson in his hand.

15        Finally, Deputy John C. Hamilton who told you that as

16   he entered the house, Mr. Smith was holding this gun running

17   from the kitchen, the same place where the shell casings were

18   found.  The kitchen.  Andreas Jejuan Smith was the only one in

19   motion when law enforcement came into that house.  He's the

20   only one holding a handgun.

21        Now, ladies and gentlemen of the jury, I have to be

22   honest, I'm kind of clumsy so I can't hold this gun a little

23   too long.  Deputy Hamilton told you Andreas Jejuan Smith had a

24   gun.  He threw the gun and then he resisted arrest.  Not only

25   did he slam the door on them, he ran straight towards Deputy

1    Hamilton to the point where Deputy Hamilton had to restrain

2    him.  Now the defendant told you he saw the police and laid on

3    the floor.  He laid on the floor.  We submit to you that the

4    witnesses that you heard from this witness stand, all of the

5    witnesses who were there that night who told you Smith was the

6    shooter, are not lying.

7            Now all of that shooting that occurred on July

8    twentieth, two thousand seven, all of that leads us to count

9    three and count four.  Count three is use and possession of a

10   firearm during and in relation to a crime of violence.  If you

11   find that Andreas Jejuan Smith is guilty of count two, which is

12   a crime of violence, and then you also find that he used or he

13   possessed this forty caliber Smith & Wesson and that he did so

14   knowingly, that's count three.  Which means if you believe the

15   rest of the testimony that you heard regarding that shooting,

16   everybody but the defendant, then you will find that beyond a

17   reasonable doubt count three is satisfied.

18           In addition, there's count four.  And count four is a

19   felon being convicted -- a convicted felon possessing a

20   firearm.  In order to establish that charge, the United States

21   has to prove beyond a reasonable doubt that on the same night,

22   July twentieth, two thousand seven, the defendant, after having

23   been convicted of a felony, possessed a gun.  Possessed a

24   firearm.  And that firearm had traveled in interstate commerce.

25   Now I must admit to you I'm paraphrasing.  I know you see words

1    in front of you.  Don't necessarily respond to what I'm saying

2    verbatim.  I'm paraphrasing to make it a little easier.

3            You heard testimony that the defendant is a convicted

4    felon.  In fact, he admitted it himself.  And you also heard

5    that the parties stipulated that this gun traveled in

6    interstate commerce.  So that's satisfied.

7            Now the last part of it, the actual possession, that,

8    again, comes from the witness stand.  That comes from Deputy

9    Hamilton, it comes from Willie Jackson, and it comes from

10   Jamaal Clark.  Actual possession, that is.  Because you'll hear

11   there's two kinds.  There's actual and there's constructive

12   possession.  Actual is when you have it on your person, holding

13   it like he was when he went to that front door, like he was

14   when he ran from the kitchen, or constructive when it is within

15   your ability to exercise dominion or control over it.  Just

16   like Jim Austin said.  When he came in, Smith was laying on the

17   floor and the gun was next to his hand.  That's constructive

18   possession.

19           Ladies and gentlemen of the jury, we submit to you

20   that the United States has proven the four charges of this

21   event.

22           Now I also want to say one more thing, because I know

23   I have been talking for a while.  The judge is going to

24   instruct you that you should not decide this case based upon

25   sympathy.  He's going to tell you to decide this case based

1    upon the evidence you hear from the witness stand, and I

2    specifically referred to sympathy because that's what

3    defendant's counsel tried to give you the whole time.

4           They started out saying that Andreas Jejuan Smith was

5    a victim just like Ms. Gurley, just like Deputy Hamilton, and

6    just like  Deputy Richardson, the people that he shot at and

7    robbed.  Any argument regarding abuse, regarding assault,

8    regarding whatever happened in Florida because of whatever

9    argument occurred over robbery, the money, pork off of a grill

10   or anything else, that's irrelevant.  It's irrelevant to the

11   bank robbery.  It's irrelevant to the shooting.  Don't use it

12   for sympathy.  Don't use it to decide this case.  Decide this

13   case based upon the evidence.  And based upon the evidence,

14   find the defendant guilty.

15           Thank you.

16                      CLOSING ARGUMENTS:

17           MR. BUTLER:  Ladies and gentlemen, we also want you

18   to decide this case based on the facts.  Some of the facts in

19   this case are very strong, very compelling and for some will

20   elicit sympathy.  Don't decide the case on sympathy, but

21   understand how those facts factor into this case and help

22   establish the fact that Mr. Smith is not guilty of this

23   offense.

24           Ladies and gentlemen, I'm going to take you to June

25   twenty-sixth, two thousand seven.  In front of me is a ditch

1    off of Highway Nineteen near a rest stop in Perry, Florida.

2    Down in this ditch there are weeds that are overgrown.  There

3    are bugs, rodents and other animals and insects that are common

4    to this ditch.  All in this ditch.  It's hot and it's muggy.

5    What else is also down in this ditch?  My client, Andreas

6    Smith.  He's lying in this ditch naked.  Barely conscious.

7    Barely alive.  Bugs are feeding on him.  They are eating him.

8    He is so weak, he can't even swat the bugs away.  He's

9    dehydrated.  He's suffering from renal failure.  His reasonable

10   system is not working.  You heard the nurse's testimony.  That

11   is where he is on June twenty-sixth, two thousand seven.

12          He's been left in this ditch by his father.  He's

13   been left to die in this ditch in Florida -- the first time

14   he's ever been there -- by his father.  But I'll talk about

15   that piece of work a little bit later.  But that's where his

16   father has left him.  Naked and being eaten alive, eaten by

17   bugs.  But he is slightly conscious.  He is aware of what's

18   going on.  He starts thinking to himself what has brought me to

19   this point?  I'm twenty-six years old, here I'm going to die,

20   I'm going to end up some story on the news in Florida about

21   naked man found decomposing in the ditch.

22          That is his fate.  He's resigned to that fate.

23   That's where he is going to die.  He starts to think back on

24   his life.  He starts to think back to the fact that over his

25   twenty-six years, it hasn't been that remarkable.  Let's just

1    be frank.  It hasn't been that remarkable.  He dropped out of

2    school in ninth grade.  He's convicted of a felony at age

3    nineteen.  He did two years in prison, felony for stealing

4    radios with another knucklehead.  He's convicted of a felony,

5    and -- oh, excuse me -- but one thing keeps him motivated.

6         One thing brings a slight smile to this man dying in

7    this ditch.  He thinks that he has done something remarkable in

8    his life.  In two thousand and four, two years later, he had

9    two children.  The best thing that he's ever done.  He did do

10   something remarkable, so if he's going to die here in this

11   ditch, at least he can look upon that with some pride.  And

12   there's a slight smile on his face.

13        But then thoughts start to come back over him.  It is

14   ironic to him.  He thinks in his head that the reason he's

15   dying in this ditch is he wanted to do something good for his

16   kids.  He didn't have a father around.  He was raised by his

17   mother.  He didn't want to make the same mistake with the two

18   children that he had that had befallen him.  Under normal

19   circumstances what Mr. Smith attempted to do might have been

20   the makings of a wonderful field good movie after school

21   special Hallmark Hall of Fame type of thing.

22        He thinks I'm going to let bygones be bygones.  I'm

23   going to reach out and I'll try to contact the Dad who doesn't

24   give a darn about me.  He hasn't called me once in my

25   twenty-four years, who hasn't sent me a birthday card, hasn't

1  so much as said hello to me.  I'm going to be a better man than

2  that, because I want to be a better man for my children, so I'm

3  going to reach out to this man.  Very noble sentiments.

4  Something that should be applauded.

5          What he didn't know is that by picking up -- excuse

6  me -- finding out where his father was, writing him and

7  reaching out to him, he was letting slither into his life an

8  evil, vile and disgusting man.  It's a terrible thing to say

9  your own father, Mr. Smith, but I think it's pretty clear from

10  the testimony what happened in this case that that is true.

11  Mr. Smith's attempt to reach out to his own father almost led

12  to his death in a ditch in Florida.  It has led to an arrest of

13  an innocent man here at Hooters.  It has led to all of us being

14  in this courtroom.

15          Mr. Teague, that is Mr. Glenn Teague, that's

16  Mr. Smith's father.  I've already talked about him a little

17  bit.  One of the most interesting things I found during this

18  entire trial, at least to me, was when he was on the stand and

19  I asked him what was important about nineteen eighty.  Oh, shit

20  -- excuse me -- that's the year that I went to jail.  And it

21  was bad.  But, you know, it happened and I went off to jail.  I

22  asked him again, anything else important happen?  No, that's

23  the year I went to jail.  I had to remind him that that was the

24  year that his son was born.

25          He doesn't give a darn about this person.  He doesn't

1    give a darn about his son.  He had to be reminded of his birth.

2    And he sure enough showed during the twenty-four years that he

3    was in prison that he never reached out for his son.  This is

4    the type of man that we're dealing with.  The type of man who

5    when he took the stand said well, you know, when things get

6    hot, you got to lie to get out of them.  He said that from the

7    stand.  That takes some something.  But that's what he said on

8    the stand directly to you.

9        What does this tell you?  He's willing to do anything

10   to get himself out of trouble and not have to go back to jail.

11   That anything includes attempting to kill his son if necessary,

12   lying on his son, doing whatever is necessary.  What happened

13   on June twenty-second, two thousand seven is that Mr. Teague,

14   someone else, robbed the Compass Bank.

15       I'm going to go through a time line, simply because I

16   don't want to do what the Government indicated it was going to

17   do during its case.  I'm not trying to sit here and draw this

18   thing out longer than it needs to, but my client is on trial

19   for his life.  I'm going to take the time to make sure you

20   understand everything that took place here.  I'm not going to

21   try to summarize things and just breeze through it; you need to

22   understand what's at issue in deciding my client's fate.

23       In two thousand four Mr. Smith reached out to talk to

24   his father.  May of two thousand four.  The reason?  He had

25   just had a child.  I'm not going to go through everything

again, but he wanted to give to his child that which he didn't

receive.  That even met reaching out to the person who had

abandoned him his entire life.  So in two thousand four he

reaches out for his Dad.

Understand at this time Mr. Teague is approximately

twenty-five years old.  It's been six years since he caught the

felony for stealing radios with a friend.  He's living an

unremarkable life, but he has done something remarkable, he's

having this child.  He's doing his best to support him, staying

out of trouble, and he wants to have the son's grandfather in

his life so he contacts him.

Unbeknownst to him, when he contacts him his Dad's

parole date is coming up.  He didn't know this when he reached

out to talk to him, it just was.  So literally, months after he

reaches out to his father for the first time by writing, his

father slithers even closer into his life, not just by mail but

in person.  He's released from jail and he comes to live in

Montgomery.  What I think is interesting and very telling is

that two thousand and four goes by, two thousand five goes by,

two thousand six goes by and almost all of two thousand seven

goes by.  Mr. Smith, he hasn't gotten into any trouble with the

law.  Mr. Smith is having to make every attempt once his father

is released, for his father to stay engaged with him and his

child.

There's been no testimony that once he was out Mr.

1    Teague was like oh, I'm out, I'll repair the damage I've done,

2    I'm going to try to get in touch with my family.  No, not Mr.

3    Teague.  Not the person who would lie or do whatever it takes

4    to get ahead.  Mr. Smith, he just basically hangs out as his

5    mother's home, my client's grandmother's home.  He does

6    maintain employment, but he makes no attempts to repair the

7    damage that he's caused to rebuild the family that his absence

8    has helped destroy.  He does nothing.

9         Something interesting happens, though, in June.  In

10   June, on or around June twenty-second, the father suddenly

11   decides to start coming around.  He's calling up his son.  Hey,

12   do you want to go on a trip to Florida?  It's been four years

13   and the father hasn't been around.  All attempts to stay in

14   contact have come from Andreas Smith, but all of a sudden on

15   June twenty-second the father comes around and he wants to set

16   up a trip to Florida.  He's rather demanding in his request;

17   i.e., I want you to be ready at twelve o'clock on the

18   twenty-second and we'll go do down to Florida.

19        For Andreas this is the first chance.  This is what

20   he's been waiting for.  Dad has basically done nothing for him

21   for his entire life.  The four years, three and-a-half, four

22   years he's been out of prison he's made no attempt to

23   reconnect, but now it's happening.  Andreas looks forward to

24   it.  One thing also at this point we need to understand and

25   underscore, the reason Glenn Teague was in prison was that he

1    got a forty year sentence for robbery.  The same thing that

2    we're here for today.  Mr. Teague had twenty-four years in

3    prison to perfect his skills and to learn how to survive.  Mr.

4    Teague is a robber for whom prison was the place to be where he

5    spent twenty-four years.

6            He stole some radios out of cars.  He never committed

7    a robbery.  He was convicted of receiving stolen property.

8            Now what happens on the morning of June

9    twenty-second?  The Compass Bank is robbed.  The Government,

10   essentially their argument is the bank was robbed.  When a good

11   lineup was put together, the victim teller identified my

12   client, he must therefore be guilty.  It's a lot more

13   complicated than that.

14           First, you have to recognize that the whomever

15   committed this robbery came to the bank at approximately eight

16   forty-five.  There was testimony from Patricia Franco that that

17   individual got out of the vehicle, went up to the doors,

18   because it was closed turned around, walked back to the car and

19   left.

20           The victim teller, Ms. Gurley, saw this person at

21   eight forty-five as well, and also testified that this is the

22   person who came back at ten o'clock and committed the robbery.

23   The thing that is very important here is that Patricia Franco

24   said that this individual was a dark skinned black male.  Very

25   dark skinned black male who would come up to the bank and

1    return to the car.  This is the same person that Ms. Gurley

2    saw.  So the person who is committing this offense is a very

3    dark skinned black male.

4            At approximately ten o'clock, ten eighteen, that

5    person comes back to the bank.  Mr. Daniel Robinson, you can

6    see him in the video, has his shoulder up on the counter,

7    conversing with Ms. Gurley, possibly doing a little minor

8    financial transaction, sees the person get out of his vehicle,

9    walk into the bank and towards Ms. Gurley's station.  What did

10   Mr. Robinson do?  You'll see in the video, it appears he turns,

11   finishes whatever he's doing and then goes off to his office.

12           I think Mr. Robinson's testimony in this case was

13   very compelling.  The reason being is, he was very

14   straightforward and honest.  The person had a hat down to here.

15   Mr. Robinson made it very clear that he could not identify the

16   person because of where the hat was.  When ultimately shown a

17   lineup, he does state that the person he identifies has

18   characteristics of the person who robbed the bank, but he does

19   not identify that person as the bank robber.  Pay very close

20   attention to that.  There is only one supposed identification

21   in this case, and that takes place by Ms. Annette Gurley.

22           Now let's talk about what happened there.  Before I

23   go into this I want to make clear that in no way, shape or form

24   does anyone at the Defense table is trying to say that whatever

25   happened to Ms. Gurley should ever happen to anyone.  She's a

1    teller who was doing her job and she was robbed.  That should

2    never happen to anyone.  But the fact is it is her testimony

3    upon which the people sitting at this table have built their

4    entire case.  And her testimony as to the identification of the

5    bank robber is simply incredible.  And this is why.

6         Ms. Gurley, Ms. Robinson has walked off.  An

7    individual approaches Ms. Gurley.  Ms. Gurley appears, I would

8    say to look at him.  What then happens -- And before I go any

9    further, all of this happens over forty-six seconds.  Consider

10   that.  Pay very close attention to your notes and what you

11   remember.  She said whoa, if he told me that I would never have

12   guessed that.  I thought it was so much longer.  This is

13   important because that fact comports with some of the things

14   that Dr. Fulero testified to, and we'll get into that in a

15   moment.

16         Anyway, she's at her desk, the person comes up.  The

17   first thing that happens?  The person slides the note.  Where

18   is her attention directed?  Down.  She sees the note, what

19   happens?  Fear.  Normal, understandable fear and stress.

20   There's a note that says that she's being robbed.  When that

21   happens, people's perceptions change.  She sees this note and

22   looks back up, I'm sure.  At that point the individual states I

23   want the money, and she then goes back down.  She's had two

24   viewings of this individual which appeared to be between two

25   and three seconds.  The first viewing of two seconds before she

1    sees the note, she may have been calm.  But everything after

2    she sees the note is all in an elevated sense of fear.

3         She sees the note, she takes out the money and hands

4    it to the person.  The person expresses displeasure and asks

5    her to go to the vault.  What does she do?  The vault is over

6    here.  She's got to take her focus away from the person and do

7    whatever it is to open up the vault.  My point is, we don't

8    have a situation where Ms. Gurley is simply sitting there

9    staring at the person in front of her.  She's looking up and

10   down, she's down here in the vault, she's not getting a good

11   glimpse of the person there.

12        Additionally, and I don't mean to be silly, but for

13   twenty seconds of this forty-six seconds the person is leaning

14   over and getting the money out from underneath the vault.  At

15   best, even assuming the Government's position, that being that

16   she was crouching down just looking at him as compared to maybe

17   what I would believe would be the normal reaction, and use your

18   common sense, standing back, at best she's seeing the side of

19   his face, possibly the side of his face but in all likelihood

20   what she's saying is the top of his hat.  She cannot identify

21   who that person is.  And how do we know this?  After the events

22   of that day, Ms. Gurley gives the most accurate description of

23   what took place.

24        She's interviewed by Detective Hill at the bank.  A

25   couple things about Detective Hill.  I got a little huffy with

1   him because it was during my examination and to the extent that

2   was inappropriate, I apologize.  But that examination

3   underscored something that's taking place in this case.  This

4   was Detective Hill's first case.  This is his first bank

5   robbery.  I'm not sure about your employ, but it has been my

6   experience that your first whatever is usually viewed pretty

7   carefully by your superiors to see how things -- how you do.

8   Whether or not you deserve to be here.

9           This is his first bank robbery.  He's got -- After

10  the bank robbery, he speaks to Ms. Gurley.  What does Ms.

11  Gurley tell him?  Well, the guy had no facial hair.  No facial

12  hair.  He was African-American, and I think he had a white hat

13  on.  She described some of his clothing.  At the conclusion of

14  that interview she's asked well, do you think you could

15  identify this person?  What does she say?  No.  Well, maybe.

16  She doesn't.  She can't I D the person.  This is what she tells

17  the detective right at the conclusion of these events.

18          What the Government wants you to imagine is that Ms.

19  Gurley is the reverse of most individuals.  That being, as time

20  went on, her confidence got better and better and better.  And

21  by July, she's able to accurately identify my client as the

22  robber.  That just makes no sense, given what took place and

23  given what she told the police officers right after the event.

24  So where does this leave Mr. Gurley -- I mean Mr. Hill.

25          This leaves Mr. Hill with the first case in which

1    there are no fingerprints, there's no physical evidence,

2    there's no D. N. A. evidence, the victim teller understandably

3    cannot identify the robber, but he does have a potential car

4    but nothing else.  Not the best case for a rookie detective.

5    Not your best first case.  It's dead in the water.

6         What happens two days later is Ms. Gurley is called

7    into the police station and she's asked to put together a

8    composite.  That composite is interesting.  Because two days

9    later all of a sudden the individual now has facial hair.  She

10   said the person didn't have facial hair the first time, but now

11   using Dr. Renfroe's analogy she's calling back up the image and

12   altering it.  She's putting facial hair on him.  After seeing

13   this image, she saves it in her head and it goes back into her

14   memory.  But what's happening is she's altering her actual

15   recollection from the date of the event as time is going by.

16        So when she puts together this composite now, all of

17   a sudden it has facial here.  You'll see the composite when you

18   get back there.

19        The ironic things don't stop there.  What then

20   happens is Ms. Gurley goes into Hooters on June twenty-sixth.

21   And while sitting at Hooters, she sees a cook, Mr. Edmond

22   Oliver, who she identifies as the person who robbed her.  I

23   loved the Government's little glossing over facts regarding

24   what happened at Hooters.  The Government made it sound like

25   she went in, saw somebody she thought was the robber, she then

1    was subjected to a photo spread.  She went in there and said I

2    was a hundred percent certain that this guy was the robber.

3    What happened?

4              MS. HARDWICK:  Your Honor, we would object to the

5    mischaracterization of Ms. Gurley's testimony.

6              THE COURT:  I'll leave it up to the jury to decide

7    what she actually said.

8              MR. BUTLER:  And how do we know that she was certain?

9    It's not like a police officer came in and said Mr. Oliver I

10   just want to talk to you for a second about your whereabouts

11   last Friday.  We got a report that you kind of match the

12   description of somebody.  No, that didn't happen.  More

13   officers than Mr. Oliver count with his eyes.  That was his

14   testimony.  They came swarming into Hooters.  I propose to you,

15   ladies and gentlemen, common sense says that doesn't happen

16   when somebody says well, he kind of matches.  No, she said that

17   that was the person who committed the offense.

18              So, again, she's altering her perception of who

19   committed this offense.  We all saw Mr. Oliver.  He's six foot

20   four.  He is darker skinned.  But the point here is Ms. Gurley

21   has no clue who did this.  She's not just picking out young,

22   black males who kind of match for her what she is now starting

23   to alter in her mind as the person who committed the offense.

24   What results?  Mr. Oliver is whisked out of there.  He's

25   paraded in front of the other stores by the officers.  He

1    testified that he's brought back in the front of Hooters for

2    example.  He's then put in the police car and taken off to the

3    station.  He's arrested.  An innocent man.

4         Ms. Gurley has a lot of power right now.  She's being

5    a hundred percent accurate with people, and they're just

6    sucking up and taken down to the police station.

7         What then happens is three days later, June

8    twenty-five.  Mr. Smith's father is stopped by Officer Hill a

9    hundred yards, I believe, when Glenn Teague testified to --

10   from the Compass Bank.  Kind of interesting that the place that

11   Officer Hill gets lucky and pulls over this car, the car is a

12   hundred yards from the bank that was robbed a week ago.

13   Officer Hill testifies that it was Luck.  Not police work.  He

14   was driving, saw a car, pulled it over and the person driving

15   that car was Mr. Glenn Teague, Mr. Smith's father.

16        We're going to talk about what series of events

17   happened after this in a moment.  But what's interesting in

18   this case is there are kind of two time lines that diverge

19   after the bank robbery.

20        What also happens after the bank robbery is that at

21   twelve o'clock Mr. Smith and his father go down to Florida.

22   Now I'm not going to go through everything all over, but this

23   was the first opportunity Mr. Smith had had to have a father.

24   He had been waiting twenty-seven years for this.  Twenty-six

25   and-a-half years and now it's happening.  His father has

1    invited him to go and meet the other side of the family; this

2    other side of the family that he's not seen in twenty-six

3    years.

4           You heard Mr. Smith testify that well, you know, I

5    wasn't sure it was going to happen so, you know, I was ready

6    but, you know, Dad was unpredictable.  But he was looking

7    forward to it.  And guess what?  Sure enough, twelve o'clock,

8    Dad pulls up.  Mr. Smith had gotten forty dollars from his

9    sister for baby-sitting.  Government counsel is right, it might

10   have been in bad taste to have taken that money given the fact

11   that he was going to ask his brother to look after his sister's

12   child for the rest of the day.  But he did, he took his forty

13   dollars, took his bag, and got in the car with dear old Dad.

14   And they went on to Florida.

15          THE COURT:  You have four minutes left.  You said

16   five.  I'll give you your five.

17          MR. BUTLER:  Anyway, so he goes down to Florida.  I'm

18   going to expedite this.  He goes down to Florida and while in

19   Florida he sees his father off the hook.  That's an expression

20   for just acting crazy.  He's never seen him this way.  All of a

21   sudden his father is behaving in a manner which he has never

22   seen before.

23          While on this trip he sees the father also with a lot

24   of money.  Tensions begin to rise between the two of them while

25   they're down there.  He finally confronts his father on Sunday

1    regarding what went on.  The father threatens him, explains to

2    him where he got the money and tells him he's not going back to

3    jail.  Mr. Smith, he also says you're not going anywhere to his

4    son.  Mr. Smith, the next thing he knows, he wakes up in that

5    ditch.  That ditch we first started talking about.  Naked with

6    the bugs eating at him.

7         What then happens is Mr. Smith returns to Montgomery.

8    A lot of things -- Excuse me.  He's found in the ditch, he's

9    taken to the hospital.  People can come and visit him at the

10    hospital from Florida.  The folks who he has suspicions may

11    have how he may have gotten into that ditch.  He wants to come

12    back home.  He gets back home.  What he finds out when he gets

13    back home is that his father has told authorities that he

14    committed this bank robbery.  He had nothing to do with it.

15         Mr. Smith is going to stay in Montgomery.  He's got

16    nothing to do with this offense, so he stays in Montgomery.

17         Two weeks go by.  He then goes over to his friend,

18    Willie Jackson's home.  Mr. Jackson, he is known for a long

19    period of time.  Make no mistake about what was going on at

20    Twenty-eight sixty-one Jan Street.  I think we all know what

21    was going on there.  It was a drug house.  They have what

22    appears to be a large quantity of marijuana and firearms.

23    There is testimony from two people that when that door knocks,

24    people get into position here, one person goes to the door and

25    that's how business is probably done at Jan Street.  That's how

1  you got to act when you're involved in that type of business.

2  The person that takes the assault rifle is Mr. Jackson.

3          THE COURT:  You've got two minutes left.

4          MR. BUTLER:  He's got the front door.  The person who

5  has the handgun is Mr. Jamaal Clark.  What happens on the date

6  of my client's arrest is everything works the way it's supposed

7  to.  My client, he's over there hanging out.  There's no

8  testimony or evidence that he's involved in this drug activity

9  at all.  He's known these people since childhood, he's there

10  hanging out.  The door knocks.  Mr. Jackson gets the gun, the

11  rifle, Jamaal Clark gets the firearm and they're ready in case

12  there's a problem.  And there is a problem.  As soon as that

13  problem, that is the person starts to rush in, Jamaal boom boom

14  fires the weapon.  The person goes back.  There is a slight bit

15  of calm, but people start scrambling within the residence.  At

16  least my client does.

17          What then happens is the marshals come crashing

18  through the back way.  Mr. Smith's account makes the most

19  sense.  It also comports perfectly with what Hercules Walker

20  testified.  A person who took the stand under the possibility

21  that he could be punished for telling the truth.  Talk about

22  unbiased testimony.  He testified knowing his probation could

23  be revoked.  And his testimony comports perfectly with what Mr.

24  Smith said.

25          The point here, the people who could be punished for

1    what happened there, Mr. Clark and Mr. Jackson, lied.  They

2    haven't been charged thanks to the people sitting at this table

3    as a result of what they did there.  The only person that's

4    been charged is Mr. Smith.  He's the most convenient and

5    easiest target.

6          Ladies and gentlemen the Government lass not proven

7    that my client committed offense.  What the Government has

8    shown is that someone robbed the bank, but Ms. Gurley doesn't

9    know who did it.  She couldn't identify the person at the

10   robbery.  She misidentified someone at Hooters, and then

11   suddenly and magically was able to pick my client out of a

12   lineup.

13         Pay close attention to Dr. Fulero's testimony.  The

14   stress she was the under, corroborating cross-racial

15   identification, as well as other factors led to the fact that

16   she was not able to identify the person.  The lineup that was

17   shown to Ms. Gurley or out of the four people, top row and the

18   middle person don't even match the description she was given.

19   She essentially has the choice between two people.  And the

20   person that she does choose is my client.  She doesn't have a

21   true lineup, she's basically given a fifty/fifty chance.  And

22   according to the Government, she does pick my client up.

23         But also pay attention to what Dr. Fulero said about

24   subjectivity.  It is our position that given the fact that this

25   is Mr. Hill's first case, due to the fact that he doesn't use

1    double blind or any of the other methods that required to

2    ensure an accurate lineup, of course Ms. Gurley was going to

3    pick our client.  The reason being is because of what we call

4    suggestive and improper.

5            As to the shooting, what is clear that my client was

6    with two individuals in that house who were running a drug

7    house.  They acted in conformity with their militaristic style

8    of dealing with customers.  One of them did the shooting.  The

9    person who confirms that is a person who has the most to lose

10   here, the person who told the truth here with the possibility

11   that he could go to jail.  Ladies and gentlemen, they also have

12   not proved counts two, three and four, all which revolve around

13   the same facts; that is, whether or not my client possessed a

14   gun.  He did not.  Mr. Jamaal Clark possessed the gun.

15           Thank you.

16           THE COURT:  Go ahead.

17                   REBUTTAL CLOSING ARGUMENTS:

18           MS. HARDWICK:  Ladies and gentlemen, what you've just

19   heard is a sympathy plea.  And the very first thing that this

20   judge is going to charge you is that you cannot consider

21   sympathy in making a decision in this case.  That is an

22   instruction that each of you have been sworn to follow because

23   you've stated that you will follow the instructions that the

24   judge gives you to decide this case.

25           The next thing that Mr. Butler said that I want to

1    address is, he said that Mr. Smith is on trial for his life.

2    That is so far from the truth.  The judge is going to tell you

3    in these words, and I do want to read this to you:  "The

4    question of punishment should never be considered by the jury

5    in any way in deciding the case."  Mr. Smith is not on trial

6    for his life.

7           So now what is Mr. Smith on trial for?  He's on trial

8    for robbing the Compass Bank.  But the first half of Mr.

9    Butler's closing argument was about a naked person in a ditch.

10   Now when you're back there deliberating, I want you to ask

11   yourself every time you consider that naked person in a ditch,

12   which element does it apply to?  Which element of any of the

13   charges that the Government has made does a naked person in a

14   ditch apply to?  And I'll tell you now, you won't be able to

15   apply it to any of the elements that the Government is required

16   to prove.

17          With that in mind, you can very comfortably dismiss

18   it.  It happened after the fact.  And I submit to you there

19   were two people who robbed the bank.  That's undisputed.  The

20   car that dropped Mr. Smith off moved.  And if you use your

21   common sense you know it did not move on its own.  So there was

22   another driver.

23          Now whether that was his father, we don't know.  He

24   does.  So now you've got the Dad put it on him, he's putting it

25   on the Dad, but what we do know is that Ms. Gurley, who has

1    been attacked in every way possible, I want to ask you a

2    question.  You go into a restaurant or a store or anyplace and

3    you are treated horribly by the clerk, the next time you go in

4    there you're going to remember that clerk, aren't you?  You

5    might not remember anyone else in there, but you're gonna

6    remember that clerk just because of the way you were served.

7         So why wouldn't Ms. Gurley remember the person who

8    says, "I have a gun.  I want your money."  And when she doesn't

9    give him enough, he leans over in her face, in her space,

10   because she has nothing else to do but confront him and say he

11   has a gun, I need to do what he says.  So she gave him all the

12   money.  She didn't give it to him, he took it.  He took it.

13        Then if you look at the photograph -- and this

14   overhead is not on -- but if you look at that photograph you'll

15   see that the person that's standing there before Ms. Gurley is

16   not a very dark skinned black male.  Now how many times have

17   you had a conversation with someone when you are having this

18   conversation you think you're talking about the same thing or

19   the same person, but you find out you're really not.  I think

20   that's probably happened to every person living.  That's

21   exactly what happened between Ms. Franco and Ms. Gurley.

22        Ms. Gurley saw someone.  Ms. Franco saw someone.  In

23   the conversation, "Well I saw a person come to the bank earlier

24   this morning, do you think that may have been he?"  "Yes."

25   They probably weren't even talking about the same person.  Then

all of this smokescreen about her misidentifying someone, be

fair to Ms. Gurley.  Ms. Gurley was as honest as she possibly

could be.  When she tried to give them a composite and they

showed her the composite, Detective Hill said she said that was

a poor or a low representation of the person that robbed her.

I think the woman was being honest.

Then when she thought she saw a person who resembled

the bank robber, what should she have done, just sat there?

She did what any victim would have done.  She contacted her

boss who contacted law enforcement.  Now let me just plug this

in.  If you don't like the way that law enforcement handled Mr.

Oliver, don't hold it against Ms. Gurley.  She's not

responsible for how they came in there or how they handled

their business.  That's not her fault.  But, again, give her

credit.  They placed Mr. Oliver in a lineup.  Again, they

showed that lineup to Mr. Robertson.  Mr. Robertson said no, I

can't pick out a person in here.  Ms. Gurley said no, can't

pick out a person in here.  Give them credit.  Give them credit

for their honesty.  Then you have the lineup that was placed --

THE COURT:  You have four minutes.

MS. HARDWICK:  All of the factors put together based

on the yellow sticker, "Support Our Troops", circumstantial

evidence, but the father drived and the defendant himself said

that the car did have a "Support Our Troops" on it.  He is

there robbing that bank.  We may not have his father, but we've

1    got him because Ms. Gurley said he did it.

2           Now let's go to the shooting and to the residence.

3    You have J. C. Hamilton.  He doesn't know Mr. Smith.  He

4    doesn't have anything against Mr. Smith.  All he's doing is

5    executing an arrest warrant, and he says to you Mr. Smith

6    answers the door, immediately he says "Mr. Smith, United States

7    Marshal, I have an arrest warrant for you for robbery."  All

8    this man had to do was open the door and step out.

9           Mr. Butler tells you he didn't have any reason not to

10   come back to Montgomery, why didn't he just step outside of

11   that door?  He didn't.  He slammed the door.  What reason does

12   J. C. Hamilton have to say when he busted in that door and

13   through the weights in there, who did he see moving?  The only

14   person moving was Mr. Smith.  Everybody else is trying to get

15   out of the place because there is gunfire coming out of the

16   house.  Why does he have to lie?  There's no reason.

17          This defendant would have you say believe me, tell

18   you that everybody else lied on him.  What sense does it make?

19   The judge is going to tell you that you've got your common

20   sense.  The other two charges are interrelated to the shooting

21   at the residence.

22          If you believe that J. C. Hamilton and the other

23   officers when they walked in there had to hit him in the head

24   and then subdue him because he's struggling, handcuff him, yes

25   he's bleeding, yes he has a gash in his head, all of that

because he's trying to get away.  Now what did his Daddy did to him?  That may not be nice, but you're not here, nor did you take an oath, to be a social worker.  This case is not about being a social worker, it's about punishing a violent criminal who shot at two United States marshals who told an older woman sitting in a bank I'm robbing you, I have a gun.  That's what this case is about.

The problems he had as a young person so many young people have in their life.  Do they go shooting at officers, go out and robbing banks?  That's no excuse.  And then he's already served time in jail and he told Detective Hill and the F. B. I. agent I'm not going to jail, I don't want to go back to jail.  He proved that he didn't want to go back.  He slammed that door.

This is not a complicated case, all you heard is smokescreen.  Eliminate the smokescreen.  Eliminate the garbage and when you eliminate the sympathy, you have nothing but factual evidence to apply to the law that this judge is going to give you.  And when you apply the facts and the law together in this case and eliminate the sympathetic trash that you've heard, you have more than enough evidence to find that he is guilty.  Not only of the bank robbery, but shooting at those officers and discharging that firearm during and in relationship to a crime of violence while he is a felon in possession of a firearm.  That's your case.  And the Government

1    believes we have proved each and every one of those elements

2    beyond a reasonable doubt.

3          Thank you.

4          THE COURT:  Members of the jury, we'll take five

5    minutes since we've been going an hour and-a-half.  When we

6    come back I'll charge you as to the law.  That's going to take

7    about twenty to twenty-five minutes, and then you can begin

8    your deliberations.  We'll take five minutes to stretch.  So

9    you may step out and stretch.  Five minutes.

10          (Whereupon, a recess was taken.)

11          THE COURT:  Will you hand out copies of the Court's

12    charge.

13          COURTROOM DEPUTY CLERK:  Yes, Your Honor.

14                    CHARGE TO THE JURY:

15          UNIDENTIFIED JUROR:  May we write on this?

16          THE COURT:  Yes.  Those are your copies.

17          Now, members of the jury, I'm going to ask that you

18    read these instructions along with me.

19          It is now my duty to instruct you on the rules of law

20    that you must follow and apply in deciding this case.  When I

21    have finished you will go to the jury room and begin your

22    discussions, what we call your deliberations.  It will be your

23    duty to decide whether the Government has proved beyond a

24    reasonable doubt the specific facts necessary to find the

25    defendant guilty of the crimes charged in the indictment.  You

1    must make your decision only on the basis of the testimony and

2    other evidence presented during the trial, and you must not be

3    influenced in any way by public opinion or by either sympathy

4    or prejudice for or against the defendant or the Government.

5         Both the defendant and the Government expect a fair

6    trial at your hands, and that you will carefully and

7    impartially consider this case without prejudice or sympathy.

8    You must make your decision only on the basis of the testimony

9    and other evidence presented here during the trial, and you

10   must not be influenced in any way by either sympathy or

11   prejudice for or against the defendant or the Government.

12        You must also follow the law as I explain it to you,

13   whether you agree with that law or not.  And you must follow

14   all of the my instructions as a whole.  You may not single out

15   or disregard any of the Court's instructions on the law.

16        Now the indictment or formal charge against any

17   defendant is not evidence of guilt.  Indeed, every defendant is

18   presumed by the law to be innocent.  The law does not require a

19   defendant to prove innocence or to produce any evidence at all.

20   The Government has the burden of proving a defendant guilty

21   beyond a reasonable doubt, and if it fails to do so you must

22   find that defendant not guilty.

23        Now while the Government's burden of proof is a

24   strict or heavy burden, it is not necessary that a defendant's

25   guilt be proved beyond all possible doubt.  It is only required

1    that the Government's proof exclude a reasonable doubt

2    concerning the defendant's guilt.  A "reasonable doubt" is a

3    real doubt based upon reason and common sense after careful and

4    impartial consideration of all the evidence in the case.

5    "Proof beyond a reasonable doubt," therefore, is proof of such

6    a convincing character that you would be willing to rely and

7    act upon it without hesitation in the most important of your

8    own affairs.

9         If you are convinced that the defendant has been

10    proved guilty beyond a reasonable doubt, say so.  If you are

11    not so convinced, say so.

12         As stated earlier you must consider only the evidence

13    that I have admitted in the case.  The term "evidence" includes

14    the testimony of the witnesses and the exhibits admitted in the

15    record.  Remember, that anything the lawyers say is not

16    evidence in the case.  It is your own recollection and

17    interpretation of the evidence that controls.  What the lawyers

18    say -- what the lawyers have said is not binding upon you.

19         Also, you should not assume from anything I may have

20    said that I have any opinion concerning any of the issues in

21    this case.  Except for my instructions to you on the law, you

22    should disregard anything I may have said during the trial in

23    arriving at your own decision concerning the facts.

24         In considering the evidence you may make deductions

25    and reach conclusions which reason and common sense lead you to

1    make.  And you should not necessarily be concerned about

2    whether the evidence is direct or circumstantial.  "Direct

3    evidence" is the testimony of one who asserts actual knowledge

4    of a fact, such as an eyewitness.  "Circumstantial evidence" is

5    proof of a chain of facts and circumstances tending to prove or

6    disprove any fact in dispute.  The law makes no distinction

7    between the weight you may give to either direct or

8    circumstantial evidence.

9         Now in saying you must consider all of the evidence

10   in the case, I do not mean that you must accept all of the

11   evidence as true or accurate.  You should decide whether you

12   believe what each witness had to say and how important that

13   testimony was.  In making that decision you may believe or

14   disbelieve any witness in whole or in part.  Also, the number

15   of witnesses testifying concerning any particular dispute is

16   not necessarily controlling.  You may decide the testimony of a

17   smaller number of witnesses concerning any fact in dispute is

18   more believable than the testimony of a larger number of

19   witnesses to the contrary.

20        Now in deciding whether you believe or do not believe

21   any witness, I suggest that you consider which side called the

22   witness as well as the demeanor and manner in which the witness

23   testified.  And that you should ask yourselves a few questions.

24        Did the witness impress you as one who was telling

25   the truth?

1    Did the witness have any particular reason not to

2    tell the truth?

3    Did the witness have a personal interest in the

4    outcome of the case?

5    Did the witness seem to have a good memory?

6    Did the witness have the opportunity and ability to

7    observe accurately the things he or she testified about.

8    Did the witness appear to understand the questions

9    clearly and answer them directly?

10    Did the witness's testimony differ from other

11    testimony or other evidence?

12    Now you should also ask yourself whether there was

13    evidence tending to prove that a witness testified falsely

14    concerning some important fact, or whether there was evidence

15    that at some other time the witness said or did something or

16    failed to say or do something which was different from the

17    testimony he or she gave before you during the trial.

18    Now you should keep in mind, of course, that a simple

19    mistake by a witness does not necessarily mean that the witness

20    was not telling the truth as he or she remembers it, because

21    people naturally tend to forget some things or remember other

22    things inaccurately.  So if a witness has made a misstatement,

23    you need to consider whether that misstatement was simply an

24    innocent lapse of memory or an intentional falsehood, and that

25    may depend upon whether it has to do with an important fact or

1    with only an unimportant detail.

2    Now a defendant has a right not to testify.  If a

3    defendant does testify, however, you should decide in the same

4    way as that of any other witness whether you believe the

5    defendant's testimony.  Evidence of a defendant's previous

6    conviction of a crime is to be considered by you only in

7    deciding whether you believe or do not believe the defendant as

8    a witness, and must not be considered as evidence of guilt of

9    the crime for which the defendant is on trial.

10    In any criminal case the Government must prove, of

11    course, the identity of the defendant as the person who

12    committed the alleged crime.  When a person -- Pardon me --

13    When a witness points out and identifies the defendant as the

14    person who committed a crime, you must first decide as with any

15    other witness whether that witness is telling the truth.  Then

16    if you believe the witness or believe the witness was truthful,

17    you must still decide how accurate the identification was.

18    Again, I suggest you ask yourself a number of

19    questions.

20    Did the witness have an adequate opportunity at the

21    time of the crime to observe the person in question?

22    What length of time did the witness have to observe

23    that person?

24    What were the prevailing conditions at that time in

25    terms of visibility or distance and the like?

1          Had the witness known or observed the person at

2     earlier times?

3          You may also consider the circumstances surrounding

4     the later identification itself including, for example, the

5     manner in which the defendant was presented to the witness for

6     identification, and the length of time that elapsed between the

7     incident in question and the witness's identification of the

8     defendant.  After examining all of the testimony and evidence

9     in the case, if you have a reasonable doubt as to the identity

10    of the defendant as the perpetrator of the offense charged, you

11    must find him not guilty.

12         You should not give extra credence to a person's

13    testimony just because of his or her status as a law

14    enforcement officer.  You must consider him or her as any other

15    witness.  Under the laws of the United States witnesses,

16    including law enforcement officers, are the same.  Feelings of

17    support for law enforcement officers, right or wrong, have no

18    place under our system of justice.

19         Likewise, when knowledge of a technical subject might

20    be helpful to the jury, a person having special training or

21    experience in that technical field is permitted to state an

22    opinion concerning those technical matters.  Merely because

23    such a witness has expressed an opinion, however, does not mean

24    that you must accept that opinion.  The same as with any other

25    witness, it is up to you to decide whether to rely upon it.

1    Now the defendant in this case is Andreas Jejuan

2    Smith.  He is charged in a multiple count indictment which you

3    will take to the jury room with you.  The indictment contains

4    four counts.  Count one, bank robbery.  Count one of the

5    indictment charges the defendant with violating Title Eighteen

6    United States Code, Section two one one three A.  This

7    provision makes it a federal crime or offense for anyone to

8    take from the person or presence of someone else by force or

9    violence, or by intimidation any property or money in the

10    possession of a federally insured bank.  The defendant can be

11    found guilty of that offense only if all of the following facts

12    are proved beyond a reasonable doubt.

13    First, that the defendant knowingly took from the

14    person or in the presence of the person described in the

15    indictment money or property then in the possession of a

16    federally insured bank as charged.  And second, that the

17    defendant did so by means of force and violence or by means of

18    intimidation.

19    A "federally insured bank" means any bank, the

20    deposits of which are insured by the Federal Deposit Insurance

21    Corporation.

22    To "take by means of intimidation" is to say or do

23    something in such a way that a person of ordinary sensibilities

24    would be fearful of bodily harm.  It is not necessary to prove

25    that the alleged victim was actually frightened, and neither is

1    it necessary to show that the behavior of the defendant was so

2    violent that it was likely to cause terror, panic or hysteria.

3    The essence of the offense is the taking of money or property

4    aided by intentionally intimidating behavior on the part of the

5    defendant.

6         Count two.  Forcible assault of a federal officer.

7    Count two charges the defendant with violating Title Eighteen

8    United States Code, Section one one one B.  This provision

9    makes it a federal crime or offense for anyone to forcibly

10   assault a federal officer using a deadly or dangerous weapon

11   while the officer is engaged in the performance of official

12   duties.  The defendant can be found guilty of the offense of

13   assaulting a federal officer with a deadly weapon only if all

14   of the following facts are proved beyond a reasonable doubt.

15        First, that he forcibly assaulted the person

16   described in the indictment as that term is hereafter defined.

17        Second, that the person assaulted was a federal

18   officer as described above, then engaged in the performance of

19   an official duty as charged.

20        Third, that the defendant acted knowingly and

21   willfully.

22        And, fourth, that in doing so -- or that in so acting

23   the defendant used a deadly or dangerous weapon.

24        The term "forcible assault" means any willful threat

25   or attempt to inflict serious bodily injury upon someone else

when coupled with an apparent present ability to do so and includes any intentional display of force that would give a reasonable person cause to expect immediate and serious bodily harm or death, even though the threat or attempt is not actually carried out and the defendant is not actually injured. It is not necessary to show that the defendant knew that the person being forcibly assaulted was at that time a federal officer carrying out an official duty so long as it is established beyond a reasonable doubt that the victim was in fact a federal officer acting in the course of performing an official duty, and that the defendant willfully committed a forcible assault upon the officer.

On the other hand, the defendant would not be guilty of a willful assault if the evidence leaves you with the reasonable doubt concerning whether the defendant knew the victim to be a federal officer, and that the defendant only acted because of a reasonable good faith belief that self-defense was needed to protect against an assault by a private citizen.

The term "deadly" or "dangerous weapon" includes any object capable of being readily used by one person to inflict severe bodily injury upon another person.  And for such a weapon to have been used, it must be proved that the defendant not only possessed the weapon, but that he intentionally displayed the weapon in some manner while carrying out the

1    forcible assault.

2         As stated before, a forcible assault requires a

3    willful threat or attempt to inflict serious bodily injury or

4    death upon someone, and such an assault may be committed even

5    though the threat or attempt to cause such a serious injury is

6    not carried out and the intended victim is not actually

7    injured.

8         Count three.  Carrying a firearm during a crime of

9    violence.  Count three charges the defendant with violating

10   Title Eighteen United States Code, Section nine two four C one.

11   This provision makes it a separate federal crime or offense for

12   anyone to carry a firearm during, and in relation to, or

13   possess a firearm in furtherance of a crime of violence.  The

14   defendant can be found guilty of that offense as charged in

15   count three of the indictment only if all of the following

16   facts are proved beyond a reasonable doubt.

17        First, that the defendant committed the crime of

18   violence charged in count two of the indictment.

19        Second, that during the commission of that offense

20   the defendant knowingly carried or possessed a firearm as

21   charged.

22        And, third, that the defendant carried the firearm in

23   relation to the crime of violence or possessed a firearm in

24   furtherance of the crime of violence.

25        The term "firearm" means any weapon which is designed

1  to, or may readily be converted to expel a projectile by the

2  action of an explosive, and the term includes the frame or

3  receiver of any such weapon or any firearm muffler or firearm

4  silencer.  To carry or possess a firearm means that the

5  defendant either had a firearm on or around his person, or

6  transported, conveyed or controlled a firearm in such a way

7  that it was available for immediate use if the defendant so

8  desired during the commission of the crime of violence.

9          "To carry a firearm in relation to an offense" means

10  that there must be a connection between the defendant, the

11  firearm and the crime of violence so that the presence of the

12  firearm was not accidental or coincidental, but facilitated the

13  crime by serving some important function or purpose of the

14  criminal activity.

15          To "possess a firearm in furtherance of an offense"

16  means something more than mere presence of a firearm.  It must

17  be shown that the firearm helped further, promoted or advanced

18  the offense in some way.  The indictment charges that the

19  defendant knowingly carried a firearm during and in relation to

20  a crime of violence and possessed a firearm in furtherance of a

21  crime of violence.  It is charged, in other words, that the

22  defendant violated the law as charged in count three in two

23  separate ways.

24          It is not necessary, however, for the Government to

25  prove that the defendant violated the law in both of these

1   ways.  It is sufficient if the Government proves beyond a

2   reasonable doubt that the defendant knowingly violated the law

3   in either way.  But in any event, or in that event you must

4   unanimously agree upon the way in which the defendant committed

5   the violation.

6          Count four.  Possession of firearm by a convicted

7   felon.  Count four charges the defendant with violating Title

8   Eighteen United States Code, Section nine two two G.  That

9   provision makes it a federal crime or offense for anyone who

10  has been convicted of a felony offense to possess any firearm

11  in or affecting interstate commerce.  The defendant can be

12  found guilty of that offense only if all of the following facts

13  are proved beyond a reasonable doubt.

14         First, that the defendant knowingly possessed a

15  firearm in or affecting interstate commerce as charged.  And

16  second, that before the defendant possessed the firearm he had

17  been convicted in a court of a crime punishable by imprisonment

18  for a term in excess of one year, that is a felony offense.

19         The term "firearm" means any weapon which is designed

20  to or may readily be converted to expel a projectile by the

21  action of an explosive.  And the term includes any frame or

22  receiver or any weapon or any firearm, muffler or firearm

23  silencer.

24         The term "interstate commerce" includes the movement

25  of a firearm between anyplace in one state and anyplace in

```
 1    another state.  It is not necessary for the Government to prove
 2    that the defendant knew that the firearm had moved in
 3    interstate commerce before he possessed it, only that it had
 4    made such movement.
 5          You will note that the indictment charges that the
 6    offense was committed on or about a certain date.  The
 7    Government does not have to prove with certainty the exact date
 8    of the alleged offense, it is sufficient if the Government
 9    proves beyond a reasonable doubt that the offense was committed
10    on a date reasonably near the date alleged.
11          The word "knowingly" as that term has been used in
12    this indictment or in these instructions means that the act was
13    done voluntarily and intentionally, and not because of mistake
14    or accident.
15          The word "willfully" as that term has been used in
16    the indictment or in these instructions means that the act was
17    committed voluntarily and purposely, with the specific intent
18    to do something the law forbids; that is, with either bad
19    purpose or to disobey or disregard the law.
20          Now a separate crime or offense is charged with each
21    count of the indictment.  Each charge and the evidence
22    pertaining to it should be considered separately.  The fact
23    that you may find the defendant guilty or not guilty as to one
24    of the offenses charged should not affect your verdict as to
25    any other offense charged.  I caution you, members of the jury,
```

1    that you are here to determine from the evidence in this case

2    whether the defendant is guilty or not guilty.  The defendant

3    is on trial only for those specific offenses alleged in the

4    indictment.

5         Also, the question of punishment should never be

6    considered by the jury in any way in deciding the case.  If the

7    defendant is convicted, the matter of punishment is for the

8    judge alone to determine later.

9         Any verdict you reach in the jury room, whether

10   guilty or not guilty, must be unanimous.  In other words, to

11   return a verdict you must all agree.  Your deliberations will

12   be secret.  You will never have to explain your verdict to

13   anyone.

14        Is it your duty as jurors to discuss the case with

15   one another in an effort to reach agreement if you can do so.

16   Each of you must decide the case for yourself, but only after

17   full consideration of the evidence with the other members of

18   the jury.  While you are discussing the case do not hesitate to

19   reexamine your own opinion and change your mind if you are

20   convinced, or if you become convinced, that you were wrong.

21   But do not give up your honest beliefs solely because the

22   others think differently or merely to get the case over with.

23   Remember, that in a very real way you are judges, judges of the

24   facts.  Your only interest is to seek the truth from the

25   evidence in the case.

         Now when you go to the jury room you should first
select one of your members to act as your foreperson.  The
foreperson will preside over your deliberations and will speak
for you here in court.

         Now verdict forms have been prepared for your
convenience.  You will take the verdict forms to the jury room,
and when you have reached unanimous agreement you'll have your
foreperson fill in the appropriate verdict forms, date and sign
them, and then you will return to the courtroom.

         Now if you should desire to communicate with me at
any time please write down your message or question and pass
the note to the marshal who will bring it to my attention.  I
will then respond as promptly as possible either in writing or
by having you return to the courtroom so that I can address you
orally.  I caution you, however, with regard to any message or
question that you might send, that you should not tell me your
numerical division at that time.

         Now, members of the jury, the verdict form you
received -- well actually it will be a cream color.  It has
essentially four questions on it, and each question corresponds
to each count of the indictment.  The verdict form says as to
the charge in count one of the indictment we the jury find the
defendant Andreas Jejuan Smith, and then it has a place to
either check guilty or not guilty, and that's the same for each
count of the indictment.  You will take this verdict form back

1  to the jury room with you, that is the cream colored copy.  You

2  will have your foreperson fill it in, date it and sign after

3  you've reached your unanimous verdict if you can do so, and

4  then you'll return to the courtroom.

5       I'm going to ask at this time that you step out.  Now

6  when you step out this time, you're to take all of your

7  personal belongings with you because when you come back in the

8  courtroom you will stand in front of the jury box.  So take

9  your sweaters, your jackets, purses, anything you have because

10 you're not going to go back into the jury box, you'll be in the

11 front of the jury box when you come out.

12      Now you'll be out only for about ten seconds.  You

13 won't even have time to go to the restroom.  So do not discuss

14 the case at this time yet.  Please step out for just a few

15 moments.  Take everything with you, including your notes and my

16 instructions on the law.

17      (Whereupon, the jury was escorted out of the

18 courtroom, and the following colloquy ensued):

19      THE COURT:  I'll hear from the Government first.

20      MS. ADAMS:  In relation to the jury instructions, no

21 objection.

22      THE COURT:  Defendant?

23      MR. BUTLER:  We're satisfied.

24      THE COURT:  Who is our alternate?

25      MS. ADAMS:  Mr. Parker.

1          THE COURT:  You can tell the security officer to

2    bring the jury back in.

3          (Whereupon, the jury was escorted into the

4    courtroom.)

5          THE COURT:  Will you face me, please.  Do we have all

6    thirteen?

7               Mr. Benjamin C. Parker.  Mr. Parker, you are our

8    thirteenth juror.  You are excused at this time.  I know it's

9    been an inconvenience to serve, but you would have served in

10   case one of the other twelve could not have served.  And I

11   thank you very much for your service.  You may give your notes

12   to the courtroom deputy.  You're free to go.

13         The remaining twelve jurors, you may now begin your

14   deliberations.  It's now twenty of five.  If you can reach a

15   verdict today that's fine.  If you can't, we can come back

16   tomorrow and you may continue then.  But you may now begin.

17         Let us know through your foreperson if you'd like to

18   recess at any time.  Okay?  Thank you very much.

19         Court will be in recess until we have a verdict from

20   the jury.

21         (Whereupon the jury was escorted out of the courtroom

22   to enter into its deliberations at four-forty p.m.)

23                    IN OPEN COURT

24              (THE JURY NOT PRESENT):

25              FIRST JURY INQUIRY AT FIVE-TWELVE P.M.

```
 1              THE COURT:  Counsel, I have received a statement from
 2     the jury.  It says, "The jury would like to see the defendant's
 3     hands."  The clerk will file the state, and I'll hear from the
 4     Government and then from the defendant.
 5              MS. ADAMS:  The United States thinks that actually
 6     allowing the jury to see the defendant's hands could be
 7     submitting supplemental evidence to the jury.
 8              MR. BUTLER:  Agreed.
 9              THE COURT:  Very good.  I'll tell the jury that.
10              Would you bring them out.
11              (Whereupon, the jury was escorted into the courtroom,
12     and the following colloquy ensued):
13              THE BAILIFF:  Jury is entering the courtroom.
14              THE COURT:  Who is Mr. Douglas Godwin?  Mr. Godwin, I
15     have received the following message from you.  "The jury would
16     like to see the defendant's hands."  The message is dated April
17     one, two thousand and eight and it is signed by Mr. Godwin.
18              Because that was not put in evidence as part of the
19     case, I may not allow that.  That would be additional evidence,
20     and you have all of the evidence that's been allowed in this
21     case, so you'll have to rely on the evidence that's been
22     presented.
23              Thank you very much, and you may now resume your
24     deliberations.
25              THE FOREPERSON:  Judge, I don't know if it's
```

1    appropriate, but we've decided to break for the evening.

2            THE COURT:  Yes, it is appropriate.

3            You may be seated for just a minute.

4            It's now five sixteen.  I'm going to let you recess

5    until tomorrow morning at nine o'clock.

6            Now you are under these instructions while you are at

7    home over the evening.  You are not to discuss the case among

8    yourselves or with anyone else, that includes family and

9    friends, or you should have no contact whatsoever with the

10   attorneys or parties.  You're to report back to the jury room

11   where you have been deliberating at eight forty-five so that

12   you may resume your deliberations at nine.

13           Now I will not bring you back in the courtroom to

14   resume your deliberations at nine.  Instead, you are to resume

15   your deliberations when all twelve of you are present.  If at

16   nine o'clock there are eleven of you in the jury room, you

17   can't talk about the case.  Only when that twelfth juror has

18   arrived, means you can't be late because you'd be holding up

19   the other jurors, only when that twelfth juror has arrived may

20   you resume your deliberations.  You're free to go until eight

21   forty-five tomorrow.

22           Thank you very much.

23           (Whereupon the jury was escorted out of the

24   courtroom.)

25           THE COURT:  Anything else, Counsel?

1          MR. BUTLER:  No.

2          MS. ADAMS:  No, Your Honor.

3          THE COURT:  You're free to go until nine tomorrow.

4    Thank you very much.

5          (Whereupon, the proceedings were concluded at five

6    nineteen p.m.)

7          (Whereupon, the proceedings were concluded.)

8                  * * * * * * * * * * *

9              COURT REPORTER'S CERTIFICATE

10       I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled

12   matter as prepared by me to the best of my ability.

13       I further certify that I am not related to any of

14   the parties hereto, nor their counsel, and I have no

15   interest in the outcome of said cause.

16       Dated this 18th day of May 2008.

17

                      \s\ Mitchell P. Reisner, CM, CRR
18                    **MITCHELL  P.  REISNER,  CM,  CRR**
                      Official US Dist. Court Reporter
19                    Registered Professional Reporter
                      Certified   Real-Time   Reporter
20

21                  * * * * * * * * *

22

23              **COURT REPORTER'S**

24              **REDACTION CERTIFICATE**

25       I certify that the foregoing is a true and correct copy of

1   the transcript originally filed with the clerk of court on June

2   2, 2008 and incorporating redactions of personal identifiers

3   requested by the following attorney(s) of record: Jerusha

4   Adams, Esq. in accordance with Judicial Conference policy.

5   Redacted characters appear as an "x" in the transcript.

6        Dated on this 15th of July, 2008.

7

8                              \S\ Mitchell P. Reisner, RMR, CRR
                               **MITCHELL P. REISNER, RMR, CRR**
                               Official Court Reporter
9                              U. S. D. C. Mid. Dist. of Alabama

10                  * * * * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25