**IN THE UNITED STATES DISTRICT COURT**
**FOR**
**THE MIDDLE DISTRICT OF ALABAMA**

THE UNITED STATES
  OF AMERICA
                                    CRIMINAL ACTION NO.
      vs.                           2:07-Cr-165-MHT

ANDREAS JEJUAN SMITH



                    REDACTED TRANSCRIPT




                    VOLUME VI OF VII
                     5TH DAY OF:
                  JURY TRIAL PROCEEDINGS



                    * * * * * * * * * *


HEARD BEFORE:       The Hon. Myron H. Thompson?

HEARD AT:           Montgomery, Alabama

HEARD ON:           March 31, 2008

APPEARANCES:        Tommie Brown-Hardwick, Esq.
                    Jerusha Adams, Esq.
                    Kevin Butler, Esq.
                    Aylia McKee, Esq.
                    Danielle Mason, Esq.

1              **T A B L E   O F   C O N T E N T S**

2

3    **ITEM DESCRIPTION**                                **PAGE NO.**

4

5    Table of Contents ...........................    1

6    Title Page ..................................    2

7    Voir Dire Examination Continuing
     by Ms. Adams of Solomon Fulero
8           (The jury is not present) ..............    5

9    Voir Dire Examination
            by Mr. Butler of Solomon Fulero
10          (The jury is not present) ..............   27

11   Patricia Franco - Direct Examination
            by Mr. Butler ..........................   62
12
     Patricia Franco - Cross Examination
13          by Ms. Adams ...........................   70

14   Patricia Franco - Redirect Examination
            by Mr. Butler ..........................   71
15
     Patricia Franco - Recross Examination
16          by Ms. Adams ...........................   72

17   Patricia Franco - Further Redirect Examination
            by Mr. Butler ..........................   73
18
     Patricia Franco - Further Recross Examination
19          by Ms. Adams ...........................   75

20   Patricia Franco - Further Redirect Examination
            by Mr. Butler ..........................   76
21
     Tawni Roberts - Direct Examination
22          by Ms. McKee ...........................   76

23   Tawni Roberts - Cross Examination
            by Ms. Hardwick ........................   87
24
     Tanisha Huddleston - Direct Examination
25          by Mr. Butler ..........................   91

1        **T A B L E   O F   C O N T E N T S**

2

3    <u>**ITEM DESCRIPTION**</u>                          <u>**PAGE NO.**</u>

4

5    Tanisha Huddleston - Cross Examination
         by Ms. Adams ..........................   99

6    Edmond Oliver - Direct Examination
         by Mr. Butler .........................  101

7

8    Edmond Oliver - Cross Examination
         by Ms. Adams ..........................  113

9    Britney Crosskey - Direct Examination
         by Ms. McKee ..........................  115

10

11   Britney Crosskey - Cross Examination
         by Ms. Adams ..........................  122

12   Argument and Ruling by the Court
         in re:  Motion in Liminey - Expert Testimony
13       (The jury is not present) ..............  126

14   Annette Gurley - Direct Examination
         by Mr. Butler .........................  128

15

16   Annette Gurley - Cross Examination
         by Ms. Hardwick .......................  136

17   Annette Gurley - Redirect Examination
         by Mr. Butler .........................  140

18

19   Annette Gurley - Recross Examination
         by Ms. Hardwick .......................  146

20   Solomon Fulero - Direct Examination
         by Mr. Butler .........................  147

21

22   Solomon Fulero - Cross Examination
         by Ms. Adams ..........................  177

23   Solomon Fulero - Redirect Examination
         by Mr. Butler .........................  185

24

25   Phillip Mitchell - Direct Examination
         by Ms. McKee ..........................  187

**T A B L E   O F   C O N T E N T S**

**ITEM DESCRIPTION**                                    **PAGE NO.**

Phillip Mitchell - Cross Examination
        by Ms. Hardwick ........................  199

Gene McAllister - Direct Examination
        by Mr. Butler .........................  199

Gene McAllister - Cross Examination
        by Ms. Hardwick ........................  206

Colby Keen - Direct Examination
        by Ms. McKee ..........................  208

Colby Keen - Cross Examination
        by Ms. Adams ..........................  214

Sarah Allen - Direct Examination
        by Ms. McKee ..........................  216

Colby Keen - Direct Examination (Recalled)
        by Ms. McKee ..........................  227

Glenn Teague - Direct Examination
        by Mr. Butler .........................  229

Glenn Teague - Cross Examination
        by Ms. Hardwick ........................  258

Glenn Teague - Redirect Examination
        by Mr. Butler .........................  264

Glenn Teague - Recross Examination
        by Ms. Hardwick ........................  265

Glenn Teague - Further Redirect Examination
        by Mr. Butler .........................  265

Andreas Smith - Direct Examination
        by Mr. Butler .........................  266

Andreas Smith - Cross Examination
        by Ms. Hardwick ........................  293

Andreas Smith - Redirect Examination
        by Mr. Butler .........................  315

1    WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE HON.
     MYRON H. THOMPSON ON MARCH 31, 2008 AT THE UNITED STATES
2    COURTHOUSE IN MONTGOMERY, ALABAMA:

3

4                    VOIR DIRE CROSS EXAMINATION CONTINUING

5                    BY MS. ADAMS OF SOLOMON FULERO

6                         (THE JURY IS NOT PRESENT):

7              THE COURT:  Proceed, Ms. Adams.

8              MS. ADAMS:  Thank you, Your Honor.

9    Q.  Good morning, Dr. Fulero.

10   A.  Good morning.

11   Q.  Are you being compensated for your testimony in this

12   case?

13   A.  No, ma'am, I'm being compensated for my time.

14   Q.  And what will is your compensation for your time?

15   A.  That's a good question.  I think I get two hundred and

16   fifty dollars an hour, but I think we talked about some kind of

17   maximum figures or something, so I'm not really sure.

18   Q.  And that would include the time that you discussed this

19   case with Mr. Butler back in two thousand and seven when you

20   couldn't remember the dates?

21   A.  Yeah, I don't think we had very many formal conversations

22   so it would include whatever conversations we had.  We

23   certainly never met.  We talked a little bit on the phone but I

24   think it's mostly about scheduling.

25   Q.  Does that also include your travel expenses?

1  A.  Well, I think the Government pays the travel expenses.  I

2  mean I got a seventy-five dollar a night room and whatever the

3  Government rate is on airplanes.

4  Q.  What percentage of your annual income is consulting and

5  testifying in eyewitness reliability cases?

6  A.  Oh, I would say that I probably make roughly the same doing

7  that as I do teaching.

8  Q.  So what percentage would that be?

9  A.  Percentage of my total income?  Probably like I said, it's

10  probably about half I would say.  Whatever my teaching is.  I

11  probably make roughly the same or a bit less.

12  Q.  You would disagree with the statement that no crime victim

13  could identify an assailant, right?

14  A.  I said before I think either on direct or cross that some

15  eyewitnesses are correct and some are incorrect.  And the

16  problem from the jury's perspective is telling the

17  difference.

18  Q.  It's your testimony here today and last Friday the last

19  time that we met, the Friday before last, your testimony is not

20  to say that no crime victim can actually identify an assailant,

21  right?

22  A.  That's right, absolutely.

23  Q.  And it's true that victims make correct identifications

24  every day.

25  A.  Well I don't know whether they make them every day or not,

1    but definitely they make correct ones.  And, again, in a given

2    case the problem is whether this one is correct or not.  So,

3    sure.

4    Q.   Now the last time we met you described the three stages of

5    the memory process as being acquisition, retention and

6    retrieval, right?

7    A.   Yes.

8    Q.   And the factors that affect the acquisition stage are

9    exposure, time, stress, weapons focus, cross-racial

10    identification, detailed salience and time overestimation, is

11    that right?

12    A.   Yeah.  I mean with explanation, yeah.  Yeah.

13    Q.   And it's also true 245 each factor plays a separate role in

14    affecting the reliability of a person's memory, correct?

15    A.   Yeah.  I think each factor is important to assess.  The

16    studies find what they find and it's my belief of course that

17    they, knowing those findings, can assist the jury in making a

18    determination in a better case better without the science.

19    Q.   And it's also your testimony that each factor since it

20    affects a person's memory, then would affect an identification

21    or reliability of eyewitness identification, correct?

22    A.   Yeah R. I think it affects their memory and more

23    specifically what the studies look at is how they affect the

24    accuracy much identification.

25    Q.   Now I don't think that you discussed weapons focus

1    specifically when Mr. Butler was asking you questions.  Isn't
2    it true that weapons focus means that when an eyewitness is
3    let's say a victim of a bank robbery, and a gun anterior a
4    knife is involved, that that eyewitness or victim would tend to
5    spend time concentrating on the weapon, and that would, thus,
6    affect the actual memory of the assailant?
7    A.   That's part of it.  I think as I explained if there is an
8    actual weapon present it takes their eyes away from the face.
9    It also increases stress and if I implied that I had a weapon
10   even without showing it your hand is -- I mean your eye is
11   going to go where my hand is because I've immaterial employed
12   there's a weapon by my hand.  So the effect is the same.
13          THE COURT:  Let me ask you this.  I found your
14   testimony regarding that curious.  Let's say a bank teller is
15   asked to identify a person who appeared before them on March
16   thirty-one of two thousand and seven.
17   A.   Okay.
18          THE COURT:  Saw them once.  Came in to cash a check
19   and a bank teller is asked to identify someone who pulled a gun
20   on them and so forth in two thousand and search.  Which are
21   they more likely to remember?
22          THE WITNESS:  Well the problem is --
23          THE COURT:  You say that the stress lowers the
24   identification, but to me it's the importance of the occasion
25   that would seemingly given emphasis to the identification.

1      THE WITNESS:  Right.  And thereby is why the science

2  is essential, because that's what people think.  But that's not

3  what --

4      THE COURT:  You're telling me that someone is better

5  able to tell you what someone looked like on March thirty-one,

6  two thousand and seven, a year ago, who appeared before them

7  once and which nothing happened other than to cash a check,

8  than someone who came and held them up, assuming they got to

9  look at both individuals?  I mean, I cannot tell you who came

10  -- I couldn't describe some of the lawyers who came to my

11  chambers a year ago, unless I held one in contempt.  I mean,

12  you know, something has to be dramatic to draw your attention.

13      THE WITNESS:  And I agree.  And I think what the

14  studies on weapons focus --

15      THE COURT:  I wasn't really focusing just on the

16  weapon, I'm talking about your comment about stress level.  I

17  can see that cutting both ways.  I mean, I can see how absence

18  of stress would mean indifference.

19      THE WITNESS:  Yes.

20      THE COURT:  And the presence of stress would be

21  emphasis.

22      THE WITNESS:  That's right.  And I think what I said

23  about stress was that what we find about stress is that the

24  higher levels of stress, fear and arousal, if I give you a

25  warning that you're going to need to remember me, so it's going

1    to increase accuracy but only to a point, and then it drops.

2    And that's absolutely correct.

3            Think of it as an inverted  of stress and

4    performance.  It's lower on both ends.  But it's a little

5    higher in the middle, if I give you a little advanced warning.

6    That's what the studies actually show.

7            THE COURT:  Go ahead.

8            MS. ADAMS:  Thank you.

9    Q.  Well that's what I wanted to discuss, is the specific

10   factors and how they interrelate.  And in regards to weapons

11   focus.  So your testimony, and correct me if I'm wrong, but

12   it's your testimony today that with weapons focus a part of

13   that factor is that if a weapon is involved, then the victim

14   would tend to spend time looking at the weapon rather than

15   looking at the assailant, correct?

16   A.  Correct.  There is actual studies with eye fixation

17   machines to show that their eyes go to the weapon, or where the

18   weapon is presumed to be located.  So that takes attention away

19   from the face and lowers accuracy.

20   Q.  So if you have a crime in which no weapon is involved, so a

21   weapon focus does not play a factor, wouldn't that indicate

22   that the eyewitness identification would be more reliable

23   because then you have the victim spending more time actually

24   looking at the assailant?

25   A.  Yes.  I think a lot of these factors cut in both

1   directions.  Now there are three things, though, that you've

2   put the dichotomy weapon present weapon not present, but I've

3   also mentioned weapon implied.  So the weapon doesn't have to

4   be present if the weapon is implied.  If in fact the assailant

5   comes in and there's no weapon present or implied, and it's a

6   garden variety robbery, then weapons focus does not come into

7   play.

8           THE COURT:  What if the victim has been informed or

9   says that he or she, when there is a weapon drawn, makes a

10  special effort to identify the assailant, or just to look at

11  the face?  In other words, suppose you are then saying I've got

12  to remember this face, I have to remember this face because I

13  may be called upon in the future to describe it.

14          THE WITNESS:  I think that would be for the jury to

15  consider, whether that mitigates the effect.  You know, we

16  don't have any evidence from scientists who say that and

17  actually do it, and we also have some evidence that people

18  retrospectively remember things in a way different from what

19  happens.  So, then, in other words, if I put a person through a

20  photo spread, I tell them I have a suspect --

21          THE COURT:  I guess what bothers me is you keep

22  generalizing.  I can't say I have a problem with these factors,

23  but then you want to generalize rather than focus on the

24  individuality of each person.  In other words, it may be true

25  that sixty percent of people make mistakes, but that doesn't

1    mean the person in this case made a mistake.  Or you want to

2    say that everyone focuses on a gun, but when I said what if

3    someone makes an effort not to focus on a gun, you just

4    generally dismiss that.

5         I remember at your last testimony you said something

6    like, "I deal in probability."  This jury is not supposed to

7    deal in probability.

8              THE WITNESS:  Judge, that's --

9              THE COURT:  Let me finish.

10         And it seems like you're saying that the jury, and I

11   can't remember, you used a metaphor of some type or simile, and

12   you seemed to think that the jury's role is to just make a

13   probability guess based on your science applying it to this

14   person.  I don't have a problem with your saying these are the

15   factors, but what I do have a problem with is you saying that

16   because of these factors there's a probability that you're

17   wrong or right.  To me the issue is did I focus on the face.

18         I agree that some things may happen that are wrong,

19   but I don't want the jury assuming that they have got to make a

20   ninety percent or an eighty percent or a seventy percent

21   probability just because your science says that.

22             THE WITNESS:  Right.  I agree completely, Your Honor.

23             THE COURT:  That's where I'm having a problem meshing

24   your science with its application.

25             THE WITNESS:  Let me see if I can do this.  You know,

1    I got asked questions --

2           THE COURT:  Because then you could say that if it's

3    purely a question of your science, then the jury would say

4    well, do I think that because seventy percent of the time

5    they're wrong, is seventy percent in this case enough to

6    convict beyond a reasonable doubt?  And that's not the way it's

7    supposed to apply.

8           THE WITNESS:  I agree, Your Honor.  And I don't think

9    from my testimony in the entire trial that I ever specified a

10   percentage.  Even though I was pressed to do so, I never did

11   that.

12          I was thinking a lot about it and, you know, I got

13   asked questions like how many seconds would you actually have

14   to have.  And I think that the best analogy I can give you is

15   it would be perfectly permissible, and it's generally accepted

16   scientifically, it would be permissible for an expert witness

17   to testify that the science finds that there's a correlation

18   between cigarette smoking and getting lung cancer.  That

19   cigarettes cause lung cancer.

20          THE COURT:  You're mixing apples and oranges there.

21          THE WITNESS:  But I would never have to specify how

22   many cigarettes --

23          THE COURT:  You're mixing apples and oranges.  I have

24   no problems with, in concrete science, applying a percentage

25   and so forth, like cigarette smoking.  What I do have a problem

1    with is doing it in the social sciences.  And when a jury is

2    making an application to things like eyewitness identification

3    in which there really is nothing like where you go out and do

4    the type of test you're talking about when you can with

5    concrete.  And I don't think the social sciences even support

6    that distinction that I'm drawing.  I don't think social

7    scientists would address a problem in the same way a chemist or

8    physicist would.

9         THE WITNESS:  I'm not sure that I agree that the

10   methods are different.

11        THE COURT:  The methods might be different, but they

12   would call for different analysis because in the social

13   sciences obviously you're talking about each person being

14   particularly different.  Especially when you're talking about

15   eyewitness testimony.  Otherwise, I could just tell the jury

16   seventy percent of all, and you can probably give me this

17   figure, seventy percent of all identifications are wrong, or

18   seventy percent are right.  You have to be convinced that it's

19   beyond a reasonable doubt.

20        I can do that in a case where it's chemistry or

21   physics, but I can't do that in a case involving social science

22   and identification.

23        THE WITNESS:  Well, Your Honor, I don't think any

24   expert, again, using the lung cancer analogy, no expert could

25   come up and say in this case or in general there's a seventy

1    percent chance that cigarettes cause cancer in this case.  But

2    they certainly could testify to the principle that cigarette

3    smoking --

4            THE COURT:  With cigarette smoking, they can do --

5    You can't do that here.  That's what I'm saying.  This jury

6    can't deal in probability, they have got to deal in what they

7    believe this witness is credibility to and what this witness

8    actually saw.

9            THE WITNESS:  Judge, I think the standard you are

10   setting would make any social science testimony per se

11   inadmissible.

12           THE COURT:  No, it does not make it per se

13   inadmissible.  But what you're saying would make it pro se

14   admissible and determinative.

15           THE WITNESS:  I don't think that the expert testimony

16   is determinative because the jury is free to reject it --

17           THE COURT:  I was just concerned when I said the

18   witness -- When I told you that if the witness said I

19   concentrated on the face, you just dismiss that.  You wrote it

20   off as -- I know you did it in a nice way, but you did it.

21           THE WITNESS:  I think what I was trying to say is if

22   the witness --

23           THE COURT:  In other words, anything that came up

24   that in any way flawed your analysis, you wrote it off.  And

25   that's what troubles me.

1          THE WITNESS:  Well I would agree with you.  If I did

2    that, I apologize.  I don't mean to do that.  What I mean is

3    that the jury would consider that.  It would be possible for

4    the jury to go back and say well, the witness says that --

5          THE COURT:  I'm also surprised you didn't say that.

6    That, to me, would be critical.  I mean what about individual

7    circumstances?  What if I am being held up by someone and I

8    have been trained to look at them because I know I may be

9    called upon?

10          THE WITNESS:  The answer is that --

11          THE COURT:  Why wouldn't you have included that in

12    your analysis?

13          THE WITNESS:  Well because unfortunately what studies

14    show is that people with special training don't do any better

15    or better worse.

16          THE COURT:  You told me a second ago that no one had

17    looked whether someone who was specifically told that --

18          THE WITNESS:  You asked me about attention.  It's the

19    case that there are studies to look at whether police or other

20    people who have gone through special training, or even people

21    like portrait artists in general, aren't better or worse --

22          THE COURT:  That's not my question.  My question was,

23    someone who was specifically told on the occasion to

24    concentrate on the individual.  I could see why a portrait

25    artist might not be any better because a portrait artist might

1   not be anybody they saw off the street.

2        Now that was not the question that I posed to you.

3   The question was, would a portrait artist who is being held up

4   who had been told to think about what the person looks like,

5   would that person be able to.

6        THE WITNESS:  It could be.  And I think that that

7   would be appropriate cross.  And I think that would go to what

8   I think we in the law would say goes to the weight of the

9   testimony and not its admissibility.  I think that's

10  appropriate case.  In fact, I think a lot of the questions I'm

11  being asked go to the weight of the testimony, not the

12  admissibility and are perfectly good cross examination.

13       THE COURT:  I'm just concerned about you sometimes

14  crossing the line and putting your testimony more on the

15  weight.

16       THE WITNESS:  I promise you, Judge, under no

17  circumstances will I ever in front of the jury say that there

18  is a percentage for being incorrect.

19       THE COURT:  Go ahead.

20  Q.  Speaking of individuals varying in stressful situations,

21  isn't it true that one person's stress level could be just

22  higher than others?

23  A.  Oh, I certainly think that's true.  I think the best way to

24  measure a person's stress level is ask them, and usually they

25  will tell you.  You know, I was scared to death, my heart was

1   pounding.

2   Q.  That poses a concern for me because there you say you would

3   rely on the victim's statement on stress, but then on the other

4   side of the studies you don't rely on the victim's

5   identification, or the victim's time, or the victim's exposure

6   to the actual assailant.  How do you determine at what point

7   you will rely on the victim's statement, and then at another

8   point you won't?

9   A.  Because we looked scientifically of people's ability to

10  judge their own stress level, and they're better at it than

11  remembering faces under stress, which has been tested.  People

12  under stress make estimates of exposure time that are longer

13  than the actual event.

14  Q.  So in some factors where you can actually address them

15  because there are other things, like you said a video before

16  when you testified about an earthquake --

17  A.  Right.

18  Q.  -- that you could go and actually look at the records and

19  see how long the earthquake occurred, they may say two minutes

20  when it was four or five seconds.  Then with other factors you

21  have to rely on the victim's actual statements.

22  A.  Yeah.  And you can test in advance, you know, how reliable

23  those statements are likely to be.  Just like you pointed out

24  with the length of time of an event.  If a witness says that

25  they're stressed, their heart was pounding, so on and so on,

1    and, you know, witnesses also sometimes will say well, you

2    know, no, I was really actually pretty calm.

3         You can take those estimates, the estimate of stress

4    as your example was is.  This is not as unreliable as some of

5    the other estimates that people give.

6    Q.  How many empirical studies on cross-racial identification

7    have you yourself performed?

8    A.  Well, I wasn't sure the standard for testimony was whether

9    I performed them or not.  But I have not performed any of them.

10   They are published in the generally accepted scientific

11   literature, M. E. T. A. and its generally accepting findings.

12   But I haven't personally performed any of them.

13   Q.  So why does cross-racial identification and the fact that

14   you said it's less accurate that same rates identification, why

15   does that occur?

16   A.  Well, there's at least two or three possibilities, but the

17   leading possibility now, it seems, and I think I talked about

18   this on direct, was less of an issue of prejudice or bias in

19   some way and much more kind of an ordinary cognitive

20   explanation; that the more experience that I have with members

21   of other races, the better I get at distinguishing facial

22   characteristics.

23        You just simply get better at it.  I think the

24   example I used was that my friends in Louisiana told me that

25   you get better over time in telling the difference between an

1    alligator and a crocodile.  You just get better at it because

2    you learn what characteristics are.

3    Q.  So there is really no specific reason, it's just a leading

4    possibility?

5    A.  Well, there's a finding and then there's an explanation for

6    the finding.  And whether or not the explanation is theory one

7    or theory two, the finding is still the same.  And the finding

8    is, you know, where the rubber hits the road.  It's the bottom

9    line.  I would say that what's most generally accepted now is

10   the theory I just mentioned.

11   Q.  So if there is a case with cross-racial identification, how

12   is the jury supposed to know whether or not that played a

13   factor with the eyewitness identification?

14   A.  I think they're supposed to know in all the ways that we

15   know about scientific findings; that something is a scientific

16   finding and generally accepted that cross-racial identification

17   makes a difference.  Differential experience clearly makes a

18   difference.

19          It would be perfectly appropriate cross examination

20   for you to bring up that the particular witness in the case had

21   more experience with members of other races than the norm, and

22   that would go to the weight of the finding and not its

23   admissibility.  I agree to that completely.  I think it's a

24   perfectly appropriate question.

25   Q.  So then you're saying that based on your generalization of

1    science, and then you would rely on the attorney's cross

2    examination, and that's how the jury is supposed to make that

3    determination for that particular case?

4    A.   Well the jury hears everything.  They hear the findings and

5    it's certainly appropriate for -- In fact, if I'm not mistaken

6    I think on direct exam I mentioned differential experience.  So

7    I think it's important to mention that, and I have before.  And

8    you've probably seen transcripts of what I've said before, and

9    I certainly bring it up.  I think it's appropriate.

10   Q.   Now you stated that you have been in Montgomery, Alabama

11   before, right?

12   A.   That's true.

13   Q.   And you have actually testified at the federal courthouse

14   here before, right?

15   A.   You know, I could swear that I have seen Mitch, the court

16   reporter, before and I remember that I testified in a

17   postconviction hearing.  I looked it up.  The guy's name was

18   Melvin Davis.  I don't know whatever happened in this case, but

19   I definitely testified.  I can't remember if it was in this

20   courthouse or not.  I think it might have been.  I'm not

21   positive.

22   Q.   Well you do recall working with Mr. Butler on a case,

23   right?

24   A.   Yeah.  I think I was propounded once before and not

25   allowed, if I'm not mistaken.

1   Q.   Do you remember when that occurred?

2   A.   No, I don't.  It's been probably a couple of years.  I'm

3   guessing, but I don't remember when it was.

4   Q.   It amazes me that you can't remember things and you're an

5   expert on memory.

6   A.   Well, you know, we're all subject to the same rules.

7                THE COURT:  Just ask a question now.

8   Q.   Does the case *United States vs. Jeremiah Colata* ring a

9   bell?

10  A.   No, but I would trust that that would be the case.

11  Q.   And I'll say that the case number for the record is oh two

12  C R one seventy-four N.  That doesn't sound familiar,

13  Dr. Fulero?

14  A.   Can you tell me who the judge was?

15  Q.   It's now Chief Judge Fuller, who is now Chief Judge Mark

16  Fuller.

17  A.   I don't remember it, but I do remember that there was a

18  case in which the judge did not allow the testimony.

19  Q.   So you do recall testifying or proposing your testimony to

20  a judge, and he making the determination that your testimony

21  would be excluded and not allowed before the jury?

22  A.   I remember being propounded.  I don't remember if there was

23  some kind of hearing or not.  That I don't remember.  But I do

24  remember my testimony not being allowed.  I don't remember the

25  facts and circumstances of it.

1          MS. ADAMS:  Your Honor, may I approach?

2          THE COURT:  Yes.

3          MR. BUTLER:  Your Honor, for the record, I do

4   remember the *Colata* case, to be honest with you, Dr. Fulero.  I

5   was second chair.  Joe Van Heest was the first chair.  Just for

6   the record.

7          THE COURT:  Okay.

8   Q.  Dr. Fulero, I'm handing you a transcript of that case.

9   Your testimony starts right here.

10  A.  Yeah, there we go.  Let me look.

11          Oh, I see.  I believe that the judge had already --

12  That's a really good question.  It says they're taking

13  Dr. Fulero out of order, for the purpose of the Defense

14  tendering him as an expert witness without objection.

15  Q.  Can you see in the transcript where it indicates that Mr.

16  Butler questioned you on direct for the *Daubert* hearing?

17  A.  Yes.  And it looks like the Court felt that under those --

18  It says in the Court's ruling that it didn't fall within the

19  acquisition or retention of things that I had described because

20  there had been a surveillance camera.

21  Q.  Isn't it true that on page one forty-two, line twenty-two,

22  you state that, "This is your shot at the Eleventh Circuit?"

23  A.  Right.  We had already -- the judge had already indicated

24  that the testimony was not going to be admissible.  Mr. Butler

25  was making a record for appeal, and so I did say I don't want

1    to upset the Court.  I know the Court is trying to move things

2    along and so we were doing a very quick summary of the

3    testimony to make a record because it was clear that this case,

4    if the defendant had been convicted, was going to go to the

5    Eleventh Circuit.

6    Q.  And isn't it true on page one sixty through one sixty-one

7    of that transcript --

8            MR. BUTLER:  Your Honor, by the way, I don't have a

9    copy of that.  Does the Government have a copy for us?

10           THE COURT:  Yes, you should have a copy for the

11   defendant.

12           MS. ADAMS:  Your Honor, I don't have an additional

13   copy with me.

14           THE COURT:  Do you want to stand up here?

15           MR. BUTLER:  Yes.  I'll just stand there by you.

16           THE COURT:  Go ahead.  You really need to supply the

17   defendant with a copy before trial.

18           MS. ADAMS:  I apologize, Your Honor.

19   Q.  My question was, on page one sixty through page one

20   sixty-one, isn't it true that Judge Fuller states that he was

21   not admitting your testimony to the jury because he thought

22   that it would be overly confusing to the jury?

23   A.  Yeah.  But earlier he said that he was simply following the

24   guidelines and mandates of the Eleventh Circuit under the

25   existing case law.

```
 1   Q.  But he did state that it would be overly confusing to the
 2   jury.  Do you agree?
 3   A.  In part.  He said lots more than that.  But you are correct
 4   that that in one part of the one sentence you're quoting,
 5   that's what he said.  But he said a lot more, though.
 6   Q.  As you are not familiar with that case, isn't it true that
 7   that case was appealed to the Eleventh Circuit?
 8   A.  I have no idea.
 9           MS. ADAMS:  Your Honor, I'm giving the witness a copy
10   of an unpublished Eleventh Circuit opinion.
11   Q.  So you've never seen that before, Dr. Fulero?
12           MR. BUTLER:  I'm going to object at this point to
13   this testimony.  As to I guess cross based on testimony he gave
14   before Judge Fuller, I can understand and I have no objection.
15   As to what the Eleventh Circuit ruled based on an appeal, it
16   speaks for itself.  This expert is not here to discuss whether
17   the Eleventh Circuit was right or wrong.
18           THE COURT:  Right.  It depends on what her question
19   is, though.  Let me see where Ms. Adams is going.
20   Q.  So, Dr. Fulero, you've never seen that opinion before?
21   A.  I've never seen it before.
22   Q.  And you were not aware of the Colata appeal, its status?
23   A.  Absolutely not.  It's unpublished, and I wouldn't have
24   found it.  I guess it's been a while, but it's unpublished.
25   But what they say is the established rule is that it is
```

1    impermissible per se.

2         MR. BUTLER:  I'm going to object.

3         THE COURT:  He can bring it out.  Overruled.

4    A.  I was not aware of it.  It's reviewed under the abuse of

5    discretion standard, it's not under an abuse of discretion to

6    exclude and it's not the same thing.

7    Q.  Dr. Fulero, once Mr. Butler stopped you and objected, you

8    stopped with your testimony.  But what were you stating at that

9    time?

10   A.  I was saying that they say that even in light of *Daubert* is

11   what it says, that it's not admissible.  And they say it's not

12   an abuse of discretion to exclude.  That was the actual

13   finding.  It says it's not an abuse of discretion to exclude.

14   The rest I would say is probably dicta, but you guys can argue

15   that.  It is not an abuse of discretion to exclude.  I think

16   that's the general standard everywhere.  And it has always

17   amused me that attorneys make the equation between not an abuse

18   of discretion to exclude and inadmissible when they're not the

19   same.

20   Q.  Thank you, Dr. Fulero.

21        MS. ADAMS:  No further questions, Your Honor.

22        MR. BUTLER:  Your Honor, can I have a moment to take

23   a look at the transcript?

24        THE COURT:  Yes.  Have you seen the opinion, too?

25        MR. BUTLER:  She gave me a copy.

```
1              THE COURT:  Very good.

2              Are you through now, Ms. Adams?

3              MS. ADAMS:  Yes, Your Honor.  And just for the

4     record, Dr. Fulero, that's your copy of that.

5              THE WITNESS:  Thanks.  I appreciate that.

6                   REDIRECT VOIR DIRE EXAMINATION

7                   BY MR. BUTLER OF SOLOMON FULERO

8                     (THE JURY IS NOT PRESENT):

9     Q.  I'm going to show you -- it has been entered, but this is

10    the transcript of the case of United States vs. Gerald Colata.

11    The Government just pointed this out to you?

12    A.  Mm-hmm.

13             THE COURT:  Could you read all of Judge Fuller's

14    ruling as to -- starting at page twenty-four as to the

15    admissibility of your testimony.

16    A.  Well --

17    Q.  Could you read it for the court reporter?

18    A.  From twenty four?

19             "I find at this particular time that his testimony

20    would be overly confusing to the jury and would lead to the

21    possibility of the jury being confused.  I am not going to make

22    any kind of finding as far as whether or not this testimony of

23    Dr. Fulero would constitute a matter which would give rise to

24    scientific knowledge within the context of the Daubert

25    decision, but I do find under the principles that have been
```

```
 1    laid out before me and based upon the testimony, I know we

 2    haven't heard all the testimony but I feel like the most or the

 3    closest that I heard that there has been eyewitness testimony

 4    does not fall within any of the acquisition or retention

 5    guidelines that Dr. Fulero has described."  .

 6            And then he goes on --

 7    Q.  That's fine.

 8            Judge Fuller did not exclude your testimony on the

 9    grounds that he found that it was not -- there was no

10    scientific basis for it, correct?

11    A.  No.  That's right.

12    Q.  As a matter of fact, Judge Fuller, he goes on to say that

13    it was his opinion, the Court's opinion at that time that the

14    eyewitness identification issues in that case would not lend

15    themselves to the -- that your analysis would provide no light

16    as to the eyewitness identification issues in that case.  Is

17    that correct?

18    A.  That seems to me to be what he found under the facts of

19    that case, that it would be more confusing than not,

20    presumably.

21    Q.  And then he went on to say that's why he thought it would

22    be more confusing.

23    A.  I think that's -- Well that's how I read what he said.

24    Q.  Is this case, *United States versus Jeremiah Colata*?

25    A.  I think the facts are different here.
```

1    Q.   You got ahead of me.   Are the facts in this case different

2    to your knowledge in the case of *United States vs. Jeremiah*

3    *Colata*?

4    A.   I believe they are, and I think that it's very possible to

5    find it in one case and not in another.

6    Q.   Thank you.

7            Are you going -- Is it your intent, have we ever

8    discussed you taking the stand and testifying whether a witness

9    -- whether a witness's identification was right or wrong?

10   A.   I think I may have said specifically that I would never say

11   that a particular witness is correct or incorrect or assign any

12   probability of that being the case.   And that the role of the

13   expert is just as the role of any social science expert -- a

14   social science expert that comes in to testify about something

15   like when the Government calls an expert on rape trauma

16   syndrome, to explain what rape trauma syndrome is.

17   Q.   That's interesting, I was going to use posttraumatic stress

18   disorder?

19   A.   Well it works the same way.   You know, it's certainly

20   possible to explain the phenomenon without assigning a

21   percentage to the particular person in the case, or even

22   diagnosing the particular person in the case as having or not

23   having it.   So in similar fashion mental health experts or

24   psychologists should be able, it seems to me, to explain the

25   workings of memory to be able to assist the jury.

1          It's hard to imagine how the jury could be confused

2     by science in this fashion.  If the alternative is not having

3     it, it seems to me from what we note about the myths and

4     misconceptions that people have about this sort of thing, that

5     they would be more confused without it than they would be with

6     it.

7     Q.   Okay.  I'm showing you what has been marked as defendant's

8     exhibit B.  Do you remember writing that out and we presented

9     that to the Court?

10    A.   Yes I do.

11    Q.   Based on be your experience, are these acquisition,

12    retention, retrieval, recall, as well as the sub factors, for

13    instance acquisition, I believe on cross-racial identification,

14    you listed a whole bunch, but my question is, though, are these

15    matters which are common knowledge to what I'll just say the

16    lay person from your typical juror?

17    A.   I don't believe they are.  And I further don't believe --

18    and I think this is really important, I tried to bring there

19    out the other day -- I think that it is not common knowledge

20    that there is a science about this that exists, and that

21    supports arguments that may be made by one side or the other.

22          And it's important to understand that the science can

23    be argued in both directions.  You just heard the Assistant U.

24    S. Attorney talk about the flip side of weapons focus.  That

25    is, in a case where a weapon isn't present or isn't implied, it

1   would be perfectly appropriate for that to be brought up, that

2   the science finds that those identification issues would be

3   more accurate.  But in order for her to ask that question she

4   has to assume validity of the science.

5   Q.  Understood.

6            A couple of -- Well, not couple.  You mentioned rape

7   trauma and I mentioned posttraumatic stress disorder.

8   A.  Correct.

9   Q.  You're not here to testify as an expert on either of those

10  topics?

11  A.  No.

12  Q.  But as a result of your work in the social sciences, you're

13  familiar with the area of study in those areas, correct?

14  A.  Oh, absolutely.  I've testified in a battered woman's case

15  at least once before.  Again, explaining the phenomenon without

16  rendering an opinion.  It was -- Neither side was particularly

17  happy with me because I wasn't able to say one way or the

18  other.  In order to say in the case that I testified in whether

19  the woman involved was a victim of battered woman syndrome or

20  not, involved my having to accept one side's set of facts

21  versus the other's, because there was substantial disagreement

22  about the facts.  And what I ended up being able to say was, if

23  you believe one set of facts that she is, if you believe

24  another set of facts she isn't.  But what I was able to do was

25  to explain the phenomenon as we know it in the science.

1    Q.  And I guess my follow-up question is, was rape trauma,

2    battered women, as well as posttraumatic stress disorder, have

3    those scientific bodies of work always existed?

4    A.  Well they haven't always existed.

5    Q.  My point is, studies were done, scientific analysis was

6    done over periods of time as to each of those, including

7    eyewitness identification, correct?

8    A.  Yes.  And I think the analogy is very appropriate.  There

9    were times when battered women syndrome testimony was clearly

10   ruled inadmissible.  Rape trauma syndrome the same.

11   Q.  And were there times when it wasn't even offered because no

12   one was aware exactly of its existence?

13   A.  Yes, that's true.

14   Q.  My point is science is an evolving process, especially the

15   social sciences.

16   A.  Yes.  And I think the *Daubert* standard was indeed an

17   attempt to set up some guidelines as to when it crosses over

18   into being a reliable enough means to present to the jury.

19   That was the whole point of the case.

20   Q.  And as a result of scientific research and development, and

21   post traumatic stress and battered woman syndrome are sciences

22   that to your knowledge are regularly scientific testimony, that

23   is regularly presented to jurors?

24   A.  Very much so.  And I go back to the fact that the

25   Government has relied on that scientific research in the

1    guidelines to make changes.  To how eyewitness evidence is

2    collected by photo spreads and lineups.

3        All of the same arguments that we've been having and

4    the judge has been commenting on would be true on the studies

5    having to do with simultaneous versus sequential presentation

6    or double blind presentation, and it's certainly the case that,

7    for example, you could ask the question now isn't it true that

8    if somebody presents a simultaneous lineup that they could

9    still, with a simultaneous lineup, that they could still make

10   an accurate identification?  And the answer would be yes.

11       But the fact is that sequential presentation leads to

12   greater accuracy, and that's a scientific finding that the

13   Government itself has relied on.  That's a social science

14   finding subject to all the things that we've been talking about

15   here.  But the Government understands that's something that is

16   appropriate to rely on.

17   Q.  Because of the way the hearing started the last time, I

18   don't know if I went into it in depth.  I think I did, but

19   we're going to go over it one more time.

20       THE COURT:  Let's not go ever it unless it's

21   something I haven't heard.

22       MR. BUTLER:  Well that's what I'm not clear about,

23   Your Honor.  When we began the hearing last time Your Honor

24   indicated that -- I submitted to the Court his vitae as basis

25   for his background and qualifications.  I never examined him on

1   this because it was presented to the Court.  Does the Court

2   have any further desire --

3           THE COURT:  No.

4           MR. BUTLER:  All right.

5   Q.  As to, and there may be too numerous to name, based on your

6   experience, based on your field of study, has eyewitness

7   identification been studied, tested and reviewed?

8   A.  Absolutely.  Under the same sorts of scientific methods and

9   principles that are used in other sciences, and these are

10  generally accepted scientific methods in our field to draw

11  conclusions.

12          The *Daubert* opinion emphasizes the methods and not

13  the particular conclusions, if I remember correctly.  I believe

14  it meets the standard.  I've written so in a peer reviewed

15  article.

16  Q.  Okay.  Is it possible to put a finger on how many studies

17  exist as to this area of science?

18  A.  There have been published estimates that range in the three

19  to four thousand published articles in scientific journals.

20  That doesn't count book chapters.

21          There's an upcoming two volume handbook of eyewitness

22  psychology.  There is a -- In the *Journal on Human Behavior*,

23  which is a publication of our major society, the American

24  Psychology Law Society, there was in nineteen ninety-eight a

25  published -- there was a panel -- a blue ribbon panel appointed

1    of experts.  I was on that panel.

2            We published what was at that time the first white

3    paper, it was called, in nineteen ninety-eight.  It's

4    referenced in the Department of Justice guide at the end.  I

5    think it's called good practice recommendations for photo

6    spreads and lineups, or something to that effect.  We'd have to

7    look.  But it was voted on and accepted by the society.  It's

8    the first one of its type.

9            And if there's anything that would be more generally

10   accepted in the field of psychology and law than the eyewitness

11   identification research, I can't imagine what it is.

12   Dr. Wells, who was one of the people on the panel, was last

13   year awarded a presidential citation for his work from the

14   president of the American Psychological Association.

15   Q.  I think you answered it in this answer, your last one.  I'm

16   assuming by publication and those type of articles, as well as

17   the other thousands of articles, that is what submitting

18   information for peer review is.  You put it out there, and

19   people comment.  And has this been reviewed by others in your

20   field?

21   A.  Right.  Peer review is when a scientist does a piece of

22   work and they want it published in one of the scientific

23   journals such as *Law and Human Behavior*, it will be submitted

24   to the editor.  The editor will send it out for review to other

25   scientists to make judgments or recommendations about the

1    scientific worth and merit of the article.

2        Those recommendations are transmitted back to the

3    editor who makes the final decision, and the rejection rate for

4    publications in a journal like *Law and Human Behavior* is around

5    eighty-five to ninety percent.  So that only about ten to

6    fifteen percent of the work that's submitted makes it to print.

7    So you could conceive peer review as essentially quality

8    control.

9    Q.  And is this an area of science that's generally accepted?

10   A.  By any measure that I could possibly put to it, I can't

11   think of any body of work -- you know, psychologists testify

12   routinely in cases like this, or I should say in criminal

13   cases.

14       Even in terms of probability, as you know in sexually

15   violent predator cases, and even in death penalty science,

16   probability estimates are given by psychologists based on

17   testing and all sorts of other things that if they were

18   subjected to the kind of standard that this work is subjected

19   to, it's been written by people that they may or may not meet

20   such a standard.

21       There is no body of work that I'm aware of in this

22   field that is more generally accepted than this.  You'll find

23   it in introductory psychology textbooks.  Every psychology one

24   student in the United States of America who reads a general

25   textbook will open their book to chapter six on memory, and

1    this work will be discussed in there.

2            There is nothing more generally accepted than what

3    makes it into an introductory psychology textbook because no

4    one wants to offend anyone.

5            The handbook is another measure.  The acceptance by

6    the federal government, the acceptance by law enforcement

7    agencies around the country, the acceptance by legislators who

8    have mandated legislative change in states like in North

9    Carolina based on the scientific findings seems to have general

10   acceptance.

11   Q.  Going back to something that we discussed earlier, and

12   touching upon what the Government spent I think the first

13   substantial portion of their testimony, I mean examination on,

14   in the study of battered women syndrome, is there -- which you

15   have testified as an expert on, correct?

16   A.  A couple of times, yeah.  Not many.

17   Q.  But based upon your experience, knowledge in that science,

18   is there a bright line test as to after what beating a woman

19   will react and kill or strike out?  Is there a bright line

20   test?

21   A.  That's an excellent analogy, and the answer is no, of

22   course not.

23   Q.  Is there an analogy after what bullet goes by a soldier's

24   head, like in Vietnam, that post traumatic stress disorder

25   would automatically kick in?

```
1    A.   No.

2    Q.   Rape trauma syndrome, is there unfortunately a study as to

3    exactly what act, at what point during that traumatic event,

4    the woman all of a sudden does or does not remember or

5    recognize or has issues related to the trauma?

6    A.   No.   And, again, the general scientific links between

7    factor A and factor B are still there, even without the ability

8    to specify in a particular case, you know, how many times it's

9    going to take for something to occur.

10            And, again, I believe further, actually, that that

11   scientific link between factor A and factor B could still be

12   helpful to the jury in making a decision in an individual case,

13   you will never find a science that tells you what's always true

14   with exactitude about as many times, you know, as how many

15   times it would take.   But the scientific findings are still

16   applicable, and I think that was the struggle that the Supreme

17   Court had in the *Daubert* trilogy, with getting the science in

18   without there having to be the kind of specificity, you know,

19   how many cigarettes it takes, for example, or how many seconds

20   it takes for a witness to be able to view.

21   Q.   And this is critical; it is not your intent to testify that

22   because witness X saw person Y for X seconds the identification

23   is wrong?   It is not your intent to testify that because

24   witness X is from a certain background, their identification is

25   wrong?
```

1    A.   No.  My intent would be to testify about the scientific

2    relationships between those factors.  It will be the jury's job

3    to apply it in an individual case subject to what I get asked

4    and what I talk about, and what they decide to talk about when

5    they go back in the jury room.

6    Q.   We've been here for approximately two and-a-half to three

7    hours discussing this.  I think that may speak to it itself.

8    But is everything that we've just discussed over these two

9    and-a-half to three hours able to be explored adequately

10   through a simple cross examination?

11   A.   Oh, if I understand your question, it is often the case

12   that people will argue that you don't need an expert to talk

13   about this stuff because it's all handleable on cross

14   examination.  And I think it's pretty clear that that is not

15   the case.

16         If cross examination is great to pick up liars, but

17   not to pick up people who genuinely believe in what they are

18   saying but who are mistaken.  And certainly not for some of the

19   more complex stuff like sequential presentation.  And if the

20   officer who puts together the lineup, is asked do you know what

21   a sequential presentation is and he says no, then that's the

22   end of the cross examination on sequential and the jury never

23   hears of the scientific finding that that would lead to greater

24   accuracy.

25   Q.   That, then, kind of begs my last question.  How long have

1    you been in this area of study?

2    A.  Well, if you count back into graduate school, thirty-three,

3    thirty-four years probably.

4    Q.  To your knowledge, do you know whether or not I have any

5    background in your area of study?

6    A.  Well, I don't know, but even if you did whatever you said

7    to the jury would be argument and not evidence.

8    Q.  And if I asked a witness regarding scientific information

9    that you have garnered from your thirty-three years and that

10   witness says I don't know what you're talking about, based on

11   your experience it dies there, doesn't it?

12   A.  That's right.  It has been always a mystery to me that the

13   courts would rely on cross examination in this sort of a case.

14   I do -- I am reminded of the men who wrote it's a great engine

15   for truth, cross examination, but I believe that that has to

16   end.  And also with a recent article in the Weidner Law Review

17   by Professor, I think his name is Dr. Gene Epstein, in which he

18   makes the argument that a cross examination is not adequate in

19   cases of eyewitness identification.

20           MR. BUTLER:  Nothing further, Your Honor.

21           THE COURT:  Any further recross?

22           MS. ADAMS:  No, Your Honor.

23           MR. BUTLER:  Your Honor, if the Court is -- Your

24   Honor?

25           THE COURT:  Yes?

```
1            MR. BUTLER:  I have no further redirect.

2            THE COURT:  You may step down.

3            (Whereupon the witness, Solomon Fulero, stepped down

4    from the stand.)

5            MR. BUTLER:  If the Court wants to hear the argument

6    as to the issue of law, Ms. Mason will, because the jury is not

7    here, she will argue the law in this.

8            THE COURT:  Okay, very good.

9            Why don't we take a ten minute recess and we'll come

10   back and hear the law.

11           MR. BUTLER:  Thank you, Your Honor.

12           (Whereupon, a recess was taken.)

13                        ORAL ARGUMENT IN OPEN COURT

14                          (THE JURY IS NOT PRESENT):

15           THE COURT:  Ms. Adams, I'll hear from you.

16           MS. ADAMS:  Thank you, Your Honor.

17           Your Honor, I will be brief.  I feel that the circuit

18   law that applies to this issue, as well as the brief that was

19   submitted by the United States, speaks for itself.  And in this

20   case the United States submits that Dr. Fulero's testimony does

21   not satisfy the second prong of *Daubert*.

22           Specifically, it does not the jury in this case in

23   determining this issue that's in dispute.  As the Eleventh

24   Circuit has ruled it has repeatedly had the per se

25   inadmissibility rule for eyewitness expert testimony.  However,
```

1    even considering *Daubert* and the factors that *Daubert* applies,

2    the Eleventh Circuit has stated that such testimony should be

3    excluded and it's not abuse of discretion for the District

4    Court to exclude such testimony.

5            Your Honor, specifically in regards to Dr. Fulero's

6    testimony, he testifies regarding generalizations.

7            THE COURT:  Before we do that, let's just discuss the

8    Eleventh Circuit law first.

9            MS. ADAMS:  Yes, Your Honor.

10            THE COURT:  Now you've given me this opinion in the

11    *U. S. A. vs. Colata*.  Obviously it's an unpublished opinion.

12    But it does say that eyewitness testimony is inadmissible per

13    se, even in light of *Daubert*.  And it cites *Smith* and *Holloway*.

14    Now are *Smith* and *Holloway* post or pre *Daubert*?

15            MS. ADAMS:  Your Honor, *Smith* is, and I want to make

16    sure I say this correctly, *Smith* is post *Daubert*, and I believe

17    *Holloway* is pre *Daubert*.

18            THE COURT:  Okay.  Does *Smith* say that eyewitness

19    testimony is inadmissible per se, even in light of *Daubert*?

20    Does *Smith* say that?

21            MS. ADAMS:  Your Honor, *Smith* acknowledges that rule

22    as established by *United States vs. Thevis*.

23            THE COURT:  Okay.  When you say "*Smith* acknowledges"

24    it, what do you mean?

25            MS. ADAMS:  I mean that *Smith* in the actual opinion

1    acknowledges that the Eleventh Circuit has the per se

2    inadmissibility rule for expert witness testimony.

3             THE COURT:  Does it say that rule is existing post

4    *Daubert*?

5             MS. ADAMS:  Yes, Your Honor.

6             THE COURT:  Where does it say that?  Read it to me,

7    where it says that in *Smith*.

8             MS. ADAMS:  It states, and I'm looking at page

9    thirteen fifty-nine, it refers to Thevis, T-h-e-v-i-s, and it

10   says "We have held that a District Court does not abuse this

11   discretion when after examining the proffered testimony the

12   Court excludes it.  And then it cites *Thevis*, six six five F

13   second at six forty-one.  It continues.

14            "Most recently we have held that expert testimony

15   regarding eyewitness reliability is inadmissible per se."  and

16   it cites *Holloway* and *Benitez*, B-e-n-i-t-e-z.

17            THE COURT:  Are those pre or post *Daubert* case?  And

18   what does it say?

19            MS. ADAMS:  Those cases are pre *Daubert.*

20            THE COURT:  Go ahead.

21            MS. ADAMS:  And then it says, "We need not decide

22   whether the post *Thevis* says inadmissibility rule decisions

23   conflict with *Daubert*.  Because we conclude that our holding in

24   *Thevis* is in accord with *Daubert*, and that is all that is

25   necessary to dispose of an appeal in which a District Court has

1    exclude the proffered testimony."

2              THE COURT:  So it really leaves the question open,

3    whether *Daubert* changes the rule, doesn't it?  Doesn't it say

4    we don't have to decide that issue?

5              MS. ADAMS:  Yes, Your Honor, it says that the circuit

6    decided it was not going to decide that issue in that

7    particular case.  But it acknowledged that that is a rule of

8    the circuit.

9              THE COURT:  Okay.  Go ahead, then.

10             MS. ADAMS:  Continue?

11             THE COURT:  Yes.

12             MS. ADAMS:  Well, in regard to Dr. Fulero's specific

13   testimony, as the Court stated he testifies regarding

14   generalizations.  And when Mr. Butler asked him questions, he

15   answers them, but yet on cross or when questions are posed to

16   him by the Court he tends to be more evasive and circular in

17   responding to the questions.

18             Also, as the Court noted, he's very dismissive in

19   addressing certain issues which tends to benefit the defendant

20   in this case in response to questions that raise issues that

21   the jury should receive information on.

22             THE COURT:  What if the Court were to restrict his

23   testimony to just his observations about eyewitness testimony,

24   and prohibit him from making comments about whether the

25   specific evidence in this case either raises a cause for

1    concern or comments about what weight to give to any particular

2    evidence in this case?  In other words, what if I were to just

3    say you can list the factors that should be considered in

4    determining eyewitness -- the reliability of eyewitness

5    testimony, but it will be up to the jury to apply those factors

6    in this particular case?  What would be wrong with that?

7            MS. ADAMS:  Your Honor, his testimony would still

8    lead to confusion by the jury because on cross examination in

9    asking Dr. Fulero specific questions regarding those issues,

10   assuming you would allow him to testify on the general theories

11   of memory, he is evasive and does not specifically address the

12   questions posed to him.

13           In addition, this science is based upon statistical

14   analysis.  Dr. Fulero does not provide a statistical analysis

15   answer in response to questions.  He provides generalizations.

16   For instance, if these meta-analysis papers and the actual

17   tests that are run in these cases, and the tests that are

18   performed, if it's analyzed statistically then I would think

19   that an expert would be able to say that in forty to fifty

20   cases we have found that at the time that an eyewitness has had

21   exposure to a criminal between forty-five to fifty seconds or

22   forty-five seconds to a minute, it tends to be more reliable.

23           The United States is not looking for a bright line.

24   We are just looking for the analysis that actually has been

25   performed, and what the science actually indicates.  And if it

1    is based upon statistics, then there are certain numbers.  And

2    I'm not saying that there are certain numbers that are right or

3    wrong, but there has got to be certain numbers.  And the United

4    States --

5         THE COURT:  What if there really is evidence that

6    people have difficulty, as a generalization, identifying across

7    races?  I mean I can remember a theme on Sesame Street about

8    children from different lands and how all Chinese look alike.

9    This was actually on Sesame Street.  And all Japanese look

10   alike and how you, after a period of time realize that they

11   really don't look alike, that it's just a matter of being

12   exposed to people of different races?  What would be wrong with

13   the jury just hearing that so as to make, then, an analysis as

14   to whether -- what was her name?  I can't remember her name

15   now.

16        MS. ADAMS:  Ms. Gurley?

17        THE COURT:  Ms. Gurley.  Nichols was her earlier

18   time.  Whether Ms. Gurley either does or does not -- well, I

19   guess it wouldn't be that she -- I guess one could apply that

20   observation to Ms. Gurley.  Obviously Ms. Gurley said I think

21   she went to an elementary school that had a few blacks in it,

22   but then she went to a high school at least for the last year

23   or two that was at least fifty percent black.

24        With those types of facts in the record, what would

25   be wrong with just at least putting it before the jury that

```
 1   while, you know, it's just human nature that some people may or
 2   may not have difficulty identifying people of another race
 3   merely because that's just the way are as people?
 4          Obviously, we'd be different individually.  Maybe the
 5   one person, you know, might, right off the bat, identify
 6   somebody else with another race with ease and other people
 7   might not, but at least sensitive to the proposition that the
 8   jury should be sensitive to.  What's wrong with bringing that
 9   up?
10          MS. ADAMS:  Your Honor, there's nothing wrong with
11   its before the jury, and a lot of courts have done so in jury
12   instructions.
13          THE COURT:  Do you have a jury instruction that does
14   that?
15          MS. ADAMS:  No, Your Honor, I have not.
16          THE COURT:  Does either side?
17          MR. BUTLER:  We don't have one, but we'll prepare one
18   by the end of today.
19          THE COURT:  Where -- What courts have given such jury
20   instructions?
21          MS. ADAMS:  One second, Your Honor.
22          (Whereupon, Ms. Adams consulted various documents at
23   counsel table.
24          MS. ADAMS:  In the *United States vs. Smith*, Eleventh
25   Circuit, nineteen ninety-seven, one twenty-two F third thirteen
```

1    fifty-five.

2            THE COURT:  Is what?  There's a jury instruction

3    there?

4            MS. ADAMS:  I'm sorry, I thought you asked what court

5    had given a jury instruction.

6            THE COURT:  Yes, that's what I said.

7            MS. ADAMS:  In this Court, the district court,

8    actually gave the jury instruction to the jury.  However, the

9    actual instruction is not listed in the opinion.

10           But just to clarify, the Court, as stated by the

11   Eleventh Circuit in its opinion, it says that "Smith did, in

12   the present case, and was successful in getting the district

13   court to instruct the jury about cross-racial identification,

14   potential bias and earlier identifications, delay between the

15   event and the time of identification and stress."

16           THE COURT:  Okay.  You don't know whether any of the

17   books that have these sort of pattern jury instructions also

18   has a particular instruction for cross-racial identification,

19   do you?

20           MS. ADAMS:  Your Honor, I know that the Eleventh

21   Circuit does not have one; however, I have not perused the

22   other circuits' pattern jury instructions.

23           THE COURT:  Go ahead.

24           MS. ADAMS:  Your Honor, in this case Dr. Fulero's

25   testimony provides tools to a jury, but it doesn't tell the

1    jury how to use those tools.  Honestly, I don't know anything

2    about building a house, but it's like handing me a circular saw

3    and telling me to build a house.  I wouldn't know how to do

4    that.  If I already have a hammer and nails, like the jury

5    already has general knowledge on these issues, then I'm just

6    going to resort to what I know.

7            It's going to confuse me to try to use a tool that I

8    have no foundation of, and haven't learned anything which would

9    assist me in using that tool.

10           THE COURT:  Ms. Mason, I'll hear from you.

11           Would you mind standing at the lectern.

12           MS. MASON:  That's fine.

13           Your Honor, on Friday the Defense filed a motion, and

14   I'll be arguing from that motion today.

15           The first thing we want to address is the timeliness

16   of the Government's filing of its motion to exclude.  We just

17   renew that.  We won't go into that any more because --

18           THE COURT:  Isn't that rather moot now, since we've

19   all been through it and to hold the Government to that now,

20   wouldn't that just be a technicality?

21           MS. MASON:  Well it is, Your Honor, but it was still

22   a basis for our exclusion.  So for the record I'm just

23   mentioning it.  But I'm not going to dwell on it.

24           The first argument that we have is that the

25   admissibility of expert testimony is within the trial court's

1    discretion.  And even though the Government has cited the

2    Eleventh Circuit, it has held that this type of testimony is

3    per se inadmissible.  I would like to direct the court to the

4    many cases where the Eleventh Circuit has consistently held

5    that the admissibility of such testimony is within the broad

6    discretion of the trial judge.  That is cited in *United States*

7    *vs. Bender*.  That's two thousand two.  *United States vs.*

8    *Chastain*, two thousand -- I'm sorry, nineteen ninety-nine.

9    *United States vs. Smith*, which is also the case that the

10    Government relies on --

11              THE COURT:  How do you reconcile the evidence being

12    within the discretion of the Court and the evidence also being

13    per se inadmissible?

14              MS. MASON:  Well because the Eleventh Circuit has

15    drawn out a narrow niche for expert testimony on eyewitness

16    identification.

17              THE COURT:  What's that niche?

18              MS. MASON:  That it's the per se inadmissible rule.

19    They are saying in that instance experts on eyewitness

20    identification, not necessarily experts on other topics, but

21    just on eyewitness identification they're saying that that

22    particular type of testimony is per se inadmissible.

23              THE COURT:  You're saying here it's not eyewitness

24    identification?

25              MS. MASON:  We are offering eyewitness

1    identification.  I'm agreeing with the Government yes, they are

2    correct in their citation of the law the that the Eleventh

3    Circuit has held it is per se inadmissible for expert testimony

4    on eyewitness identification.

5              THE COURT:  And that's what you're seeking to offer

6    here?

7              MS. MASON:  Yes, that's what we're seeking to offer.

8    But again --

9              THE COURT:  Why isn't it per se inadmissible, then?

10             MS. MASON:  It's not -- We're arguing that it's not

11   per se inadmissible because other circuits -- the Eleventh

12   Circuit is the only circuit left that is holding to that rule.

13             THE COURT:  And I am in the Eleventh Circuit.  I have

14   to follow what the Eleventh Circuit says, don't I?

15             MS. MASON:  Well, there is --

16             THE COURT:  I think it's just up and down.  Don't I

17   have to follow what the Eleventh Circuit says, being in the

18   Eleventh Circuit?

19             MS. MASON:  Well the Eleventh Circuit does cite to

20   the prior panel precedent rule.  But, Your Honor, there have

21   been many circumstances.  And I don't have case law to back me

22   up on this, but sometimes precedent is in need of change.  I

23   mean eventually --

24             THE COURT:  Do I change precedent or does the

25   Eleventh Circuit change precedent?

1          MS. MASON:  Well, Your Honor, the Eleventh Circuit

2    has not explicitly ruled in this.  They are following the pre

3    *Daubert* standards.

4          THE COURT:  So explain that to me.  What are you

5    saying there?  You've switched gears on me now, I think.  What

6    are you telling me?

7          MS. MASON:  What I'm saying is the Eleventh Circuit

8    to this point has argued that it is not an abuse of discretion

9    to exclude such testimony.  But they have not gone as far to

10   say that it is abuse of discretion to include it.

11         THE COURT:  What do I do with the cases that, say,

12   it's per se inadmissible?  Do I just ignore them?

13         MS. MASON:  Well we're not asking you to ignore that,

14   Your Honor, but we're also asking you to take a look at the

15   other ten circuits.

16         THE COURT:  I think when the Eleventh Circuit speaks

17   I don't look to the other circuits.  I only look to the

18   Eleventh Circuit and the Supreme Court.  When the Eleventh

19   Circuit speaks, the other circuits are irrelevant to this

20   Court.

21         MS. MASON:  I understand, Your Honor.  And, again,

22   Your Honor, we would just state that the Eleventh Circuit has

23   only gone so far as to say it is not an abuse of discretion to

24   exclude the testimony --

25         THE COURT:  Let's talk about your expert's testimony

1    here now.

2         MS. MASON:  Okay.  Our expert testimony goes to the

3    fit requirement of *Daubert*, and that is the prong that Ms.

4    Adams has just identified.  It is not Dr. Fulero's job to take

5    the facts of our case and apply it to his science.  That is our

6    job as the attorneys.  What we do offer is the fit of the facts

7    and his testimony.  The fit being Miss Gurley's testimony when

8    this trial began discussed that it was established on cross

9    examination, I believe, that the whole incident of the robbery

10   took less than a minute.

11        She testified on the stand, and these are from my

12   notes during trial, that she felt like it took longer.  This

13   goes to Dr. Fulero's incident of the effects of time of the

14   event and the ability to recall it.  The robber alerted her

15   that he had a gun;  this goes to the weapons focus that Dr.

16   Fulero will testify to.  Also, it goes to the heightened stress

17   level, as well as the violence of the situation.  All of those

18   things he talked about on the stand.  The victim teller was

19   white and the robber was black.  This goes to the cross-racial

20   identification --

21        THE COURT:  What about Mr. Robinson?  He also said

22   that the robber fit, or at least was close to the description

23   of the defendant.

24        MS. MASON:  Your Honor, based on my --

25        THE COURT:  Mr. Robinson is black and the defendant

*x*    **MITCHELL P. REISNER, CM, CRR**
Official U. S. Court Reporter
Middle District of Alabama
(334) 265-2500

1    here is black.

2              MS. MASON:  He is, Your Honor.  And in the motion we

3    state that we are not so much focused on Mr. Robinson's

4    testimony because he did not give a confidence statement, and

5    that's another statement I'll get to in the a moment.  What he

6    said was that he was about seventy percent sure that the person

7    in the photograph had characteristics of the robber.  He never

8    stated that the defendant in this case, Mr. Smith, was in fact

9    the robber.  Miss Gurley did, and that is the testimony we wish

10   to offer or rebut the testimony of using Dr. Fulero.

11             Going on with the prongs or the fit in this case, Ms.

12   Gurley, we established that she identified another person as

13   someone who could have been a robber, could have been the

14   robber two days after, but then identified the defendant in a

15   photographic lineup some weeks later.  That goes to the effects

16   of time passing from the event and the ability to recall it as

17   well as the effects of post identification events on memory.

18             Miss Gurley also stated in her direct examination

19   that she was nervous during the encounter, which rightfully so

20   she should have been, but that goes to the stress and the

21   violence of the situation.  During redirect of the witness, the

22   Government elicited a confidence statement when asked when you

23   picked out the photograph in the lineup did you pick it out

24   without hesitation?  I don't have that verbatim, but I do

25   recall the question being posed, did you have any hesitation

1    when you picked out that photograph?  In our view that is the

2    same thing as saying I'm confident that number six was the

3    robber.  And that goes to the confidence versus the accuracy of

4    the identification still.

5         Also, it was also established through one of the

6    officers that the Government put on the stand that he was the

7    one to prepare the lineup, as well as the one to administer it

8    to Ms. Gurley at her home.  That goes to the prong of

9    Dr. Fulero's testimony.  When one person both prepares and

10   administers a photo spread, the likelihood of misidentification

11   increases.

12        And these -- I have some other factors too that were

13   just brought to my attention this morning.  The witness in this

14   case, Miss Gurley, was told by the police that they had a

15   suspect in advance of showing her the photographic lineup.  In

16   those instances it does relate to the accuracy of the

17   identification, as well as when a composite sketch is done by

18   the witness.  That composite sketches are done first leads to

19   inaccuracy later on.

20        So, Your Honor, based on the facts of Ms. Gurley's

21   testimony that was elicited during trial, Dr. Fulero's points

22   go directly, they're highly relevant, to all of those prongs.

23   And the jury should be entitled to hear those to weigh the

24   credibility of Ms. Gurley.

25        We also feel that this is highly important in light

```
 1    of the fact that Ms. Gurley is the strongest witness in the
 2    Government's case.  And fit has been found in other cases where
 3    the eyewitness testimony represents the chief, if not the sole
 4    evidence against the defendant.
 5              THE COURT:  That's not true here, is it?
 6              MS. MASON:  I'm sorry?
 7              THE COURT:  That's not true here, is it?
 8              MS. MASON:  You mean in the Eleventh Circuit?
 9              THE COURT:  No, not true in this case.
10              MS. MASON:  In this case?  We would argue that it is,
11    Your Honor, because --
12              THE COURT:  We have Mr. Robinson, we have the other
13    people that said the person running away was a youthful person,
14    and I suppose the most compelling evidence we have is how the
15    defendant reacted when he was being arrested.  If he had
16    nothing to be afraid of, why would he allegedly shoot at
17    somebody?
18              MS. MASON:  Well that's a fact to be determined, Your
19    Honor.
20              THE COURT:  You said that was the only evidence.  I'm
21    saying the identification is not the only evidence we have
22    here, is it?
23              MS. MASON:  But it is the strongest link, Your Honor,
24    and based on the scientific studies, jurors are unduly
25    receptive to witnesses that get on the stand and say to the
```

```
 1    effect I am confident that this is the person who did it, as
 2    opposed to just a youthful person could be anyone.  As opposed
 3    to a witness who might say I'm seventy percent sure that a
 4    different individual, not that it was Mr. Smith.
 5              Also, I'm trying to think back of what other examples
 6    you just gave.  Those were the only -- that was the only thing
 7    that actually tied Mr. Smith to the robbery.  The Government
 8    offered no prints, no fingerprints at the scene, offered no --
 9              THE COURT:  What about the car?
10              MS. MASON:  The car didn't belong to the defendant,
11    Your Honor.
12              THE COURT:  Belonged to his Dad, didn't it?
13              MS. MASON:  Absolutely.
14              THE COURT:  That's circumstantial evidence, too.  I
15    think his Dad said he had access to the car, didn't he?
16              MS. MASON:  There is no indication, Your Honor, that
17    Mr. Smith had access to that car on that day.  There's been no
18    testimony from the Government that he was in that car that day.
19    All we have is there were two African-Americans males who got
20    in the car.  And that could mean anyone.  But Ms. Gurley's
21    testimony, in effect, said it was Mr. Smith.
22              THE COURT:  Thank you very much.
23              MR. BUTLER:  Your Honor, I do need to add one thing
24    as lead counsel in the case.  It is not our position that the
25    Eleventh Circuit per se excludes this type of testimony.  It's
```

```
 1    our position that the Eleventh Circuit relied on pre *Daubert*
 2    logic.
 3            THE COURT:  What about the *Colata* case?
 4            MR. BUTLER:  Your Honor, it's our position that that
 5    case is, again, looking back to the Smith case which was relied
 6    on pre *Daubert* logic.  It is our position that the Eleventh
 7    Circuit has never been presented with a *Daubert* analysis, or
 8    has never specifically said that under the *Daubert* analysis
 9    this form of testimony is to be excluded.  That has never been
10    done.  I just wanted it clear that it is not inadmissible in
11    this circuit per se.
12            THE COURT:  Well isn't your strongest argument about
13    *Colata* that the *Colata* case is an unpublished opinion and,
14    therefore, has no weight?
15            Well I'll let you know something shortly.  Let's get
16    started with your witnesses.
17            MR. BUTLER:  Before we proceed, there are two issues
18    outstanding.  One, there is a six oh nine motion.  Depending on
19    what the Court's position is as to Dr. Fulero, the Government
20    wanted --
21            THE COURT:  Oh, that's right.  You wanted to show he
22    had this drug conviction?
23            MS. ADAMS:  Yes, Your Honor.
24            THE COURT:  Back when, now?
25            MS. ADAMS:  I believe it's from nineteen
```

```
 1    seventy-four.
 2              THE COURT:  And what do the rules say?
 3              MS. ADAMS:  Under six oh nine, the rule says that
 4    evidence of a conviction which is more than ten years old --
 5              THE COURT:  What rule are we looking at?
 6              MS. ADAMS:  Six oh nine.
 7              THE COURT:  Let me turn to it.
 8              Yes, what does it say now?
 9              MS. ADAMS:  Six oh nine B.
10              THE COURT:  Okay.
11              MS. ADAMS:  Evidence of a conviction is not
12    admissible if a period of more than ten years since the date of
13    the conviction.  And then it goes on to say that unless the
14    Court determines in the interest of justice that the probative
15    value of the conviction supported by specific facts and
16    circumstances substantially outweighs the prejudicial effect.
17              THE COURT:  That's in B?  Right.  Yes, I see it here.
18    So how does the probative value here of a drug conviction --
19    How old is the expert here?  Fifty-seven.
20              THE COURT:  So how old was the witness?
21              THE WITNESS:  I was actually convicted in nineteen
22    seventy-two when I was twenty-one.
23              THE COURT:  So twenty-one years old, he's now
24    fifty-seven and I'm supposed to hold this against him?
25              MS. ADAMS:  Yes, Your Honor, because his testimony is
```

```
 1    regarding the credibility of other witnesses.  Eyewitness
 2    identifications of the defendant.
 3            THE COURT:  Okay.  That objection is sustained.  I'm
 4    not going to saddle this man with an age twenty-one conviction
 5    for drugs.  I find based on rule six oh nine that the prejudice
 6    extraordinarily outweighs any probative value.
 7            MR. BUTLER:  Your Honor, two things.
 8            THE COURT:  That doesn't mean his testimony is
 9    admissible.  I haven't decided that yet.
10            MR. BUTLER:  We'd ask to admit defendant's exhibit A
11    and B that was presented to Dr. Fulero during his testimony.
12    That's his time line and his vita.
13            THE COURT:  Very good.  Call your first witness.
14            MR. BUTLER:  That's the issue.
15            THE COURT:  How many witnesses do you have in the --
16    I understand your list has grown.
17            MR. BUTLER:  Your Honor, we have sixteen witnesses.
18            THE COURT:  Okay, let's get started, then.
19            MR. BUTLER:  Your Honor, the question I have for the
20    Court, though, is for purposes of defense continuity, our first
21    witness was going to be Ms. Gurley.
22            THE COURT:  You can't call her yet.
23            MR. BUTLER:  Yes, Your Honor.
24            THE COURT:  Unless you want to call her, but I
25    haven't decided about --
```

1          MR. BUTLER:  I don't want to call her without the

2    ruling.  May I ask for purposes of scheduling our witnesses,

3    does Your Honor think the Court may be deciding before noon?

4          THE COURT:  I hope so.

5          MR. BUTLER:  Thank you, Your Honor.

6          THE COURT:  A and B are admitted for purposes of the

7    examination outside the presence of the jury.  They do not go

8    to the jury.

9          MR. BUTLER:  Yes, Your Honor.

10         Your Honor, a final matter, and again we will make

11   adjustments as the Court deems appropriate, but so the Court is

12   aware, Dr. Fulero has an appointment, a plane flight at four

13   o'clock today.

14         THE COURT:  Okay.  I'll keep that in mind.

15         MR. BUTLER:  Thank you, Your Honor.

16         THE COURT:  First witness.

17         MR. BUTLER:  Patricia Franco.

18         THE COURT:  Bring in the jury.

19         (Whereupon, the jury was escorted into the

20   courtroom.)

21         THE COURT:  Bring in all witnesses and we'll swear

22   them all in if they're here.  It will save time.

23         Welcome back, members of the jury.  Just to let you

24   know, we've been here since seven getting ready for you all.  I

25   didn't want you to think we were slackers.

```
 1              (Whereupon all prospective witnesses currently
 2      present were duly sworn by the courtroom deputy clerk.)
 3              MR. BUTLER:  Your Honor, some of our witnesses aren't
 4      yet present, and I'll notify the Court which ones aren't.
 5              THE COURT:  Very good.
 6                      P A T R I C I A    F R A N C O,
 7          the witness herein, having first been duly sworn or
 8      affirmed to tell the truth, was examined and testified as
 9      follows:
10                          DIRECT EXAMINATION
11              BY MR. BUTLER OF PATRICIA FRANCO:
12      Q.  Could you state your full name and spell your last name for
13      the record.
14      A.  Patricia Franco.  F-r-a-n-c-o.
15      Q.  Miss Franco, could you bend the microphone towards you a
16      little bit or scoot up?  There you go.  Great.
17              Miss Franco, where are you currently employed.
18      A.  Compass Bank.
19      Q.  And how long have you worked at Compass Bank?
20      A.  A year this past November.
21      Q.  So approximately a year and-a-half?
22      A.  Yes.
23      Q.  Okay.  I'm going to direct your attention back to June
24      twenty-second, two thousand seven.  Do you recall coming to the
25      bank that day?
```

```
1    A.   Yes, I was working that day.
2    Q.   And I don't think I asked.  What do you do at the bank?
3    A.   I'm a commercial banker, a commercial lender.  I make
4    commercial loans.
5    Q.   The Compass Bank that you were going to on that date, where
6    was it located?
7    A.   On the Eastern Boulevard, the main office there at
8    Executive Park.
9    Q.   Now you indicated that you're a commercial banker?
10   A.   Yes.
11   Q.   And you make commercial loans?
12   A.   Yes.
13   Q.   Does the bank -- I'm assuming it's a full service bank,
14   that Compass Bank?
15   A.   Yes.
16   Q.   Are there's a commercial lending arm there as well,
17   though?
18   A.   Yes.
19   Q.   Okay.  So that Compass Bank focuses on things that maybe a
20   branch might not, a typical branch?
21   A.   Yes.
22   Q.   For instance, commerce lending.
23   A.   Right.
24   Q.   Okay.  Now, do you recall what time you went to the bank?
25   A.   I believe it was a little before nine, maybe about eight
```

```
 1   forty-five.  Don't know exactly, but it was before nine
 2   o'clock.
 3   Q.  Could you describe for the jury what your routine is when
 4   you arrive there?  Where do you park?
 5   A.  There's a parking area pretty much all over, but I park on
 6   the parking side that's along the Eastern Boulevard, on that
 7   side of the bank.
 8   Q.  Did you notice anything -- I'm assuming you went to work as
 9   normal that morning?
10   A.  Yes.
11   Q.  Eight forty-five you say you got there?
12   A.  Yes.
13   Q.  Did you notice anything or unusual as you were getting out
14   of your vehicle?
15   A.  Not as much as when I was getting out of my car, but when I
16   was walking in I happened to notice --
17   Q.  When you were walking in where?
18   A.  Going to the front door.  I got out of my car and was
19   walking toward the front door.
20   Q.  Now are you inside or outside of the bank when you noticed
21   this --
22   A.  Outside.  All the parking is outside.
23   Q.  But you were coming toward the front door.  How far away
24   were you from the front door?
25   A.  I'm not good at distances.  It was probably past the doors
```

```
 1   to come in here.
 2   Q.  Okay.  And what did you notice?
 3   A.  I noticed somebody, a guy walking in toward the front doors
 4   of the bank.  And I'm still walking to get, you know, to get to
 5   the same doors to come in the front doors, and he didn't stay
 6   but a few seconds.
 7   Q.  Let me stop you right there.  Is the gentleman -- At the
 8   point that you noticed the gentleman, you indicated that he
 9   made it farther than me, possibly to these doors behind us?
10   A.  Right.
11   Q.  He's at the doors, you're away and that's where you notice
12   him?
13   A.  Right.
14   Q.  Okay.  And you say he was there for a few seconds?
15   A.  He walked inside and just stayed very briefly and then he
16   came back out of the doors, the same doors that I'm headed to.
17   But I'm still a good ways away from him.
18   Q.  When he exited the bank, I'm assuming you're walking
19   towards the doors?
20   A.  Mm-hmm.
21   Q.  At the point that he exited the bank, approximately what's
22   your distance from him at that point?
23   A.  It's still a good way.  I mean, it's still probably at
24   least to where the doors are.  Or maybe a little bit less.  But
25   I'm still a good ways away from him.
```

1    Q.   Now you were able to -- Well, you were spoken to after that
2    event, correct --
3    A.   Right.
4    Q.   -- by law enforcement?
5    A.   Right.
6    Q.   And you provided law enforcement with the details to the
7    best of your ability of what you could see and observe,
8    correct?
9    A.   Yes.
10   Q.   And could you describe for the ladies and gentlemen what
11   you -- what clothing the person was wearing.
12   A.   I think the thing that I noticed most is that it was like
13   an odd type of hat.  It wasn't really a baseball cap.  Wasn't
14   really close enough to tell what kind of fabric it was or
15   anything, but it was just a really odd looking hat thing on.
16   Q.   Do you recall what color it was?
17   A.   Kind of like a beige, I guess.  Kind of beige, kind of
18   taupie kind of color, I guess.
19   Q.   Do you recall the clothing the person was wearing?
20   A.   Couldn't really describe it a whole lot other than it was
21   like a lot of clothing, I guess.  It was a hot summer day and
22   he seemed to have a lot of clothing on to me.  I believe the
23   bottom was some kind of blue jean type fabric and everything.
24   Q.   Okay.  My -- We've spoken before, correct?
25   A.   Right.

```
1    Q.  You can see me?

2    A.  Mm-hmm.

3    Q.  You can see my skin tone.  I'm an African-American and you

4    can see my skin tone.

5    A.  Mm-hmm.

6    Q.  Was the individual who walked into the bank, what was his

7    skin tone?

8    A.  It was darker skin tone to me.  The most that I could see,

9    though, was his legs.  I really didn't see his face that much,

10   but from what I can recall it was darker.

11   Q.  Was his skin tone darker than mine?

12   A.  No.

13   Q.  So he was approximately my skin tone?

14   A.  I couldn't really say for sure.  I couldn't see his face

15   that much but yes, I would say it was probably darker.  But the

16   hat was -- you know, I didn't really get a look at his face but

17   yes, it was darker from what I can recall.

18   Q.  Now you would agree that Mr. Smith's skin tone is lighter

19   than mine.  He's an African-American but his skin tone is

20   lighter than mine?

21   A.  Yes.

22   Q.  Thank you.

23        And the person that entered the bank had

24   approximately my skin tone or slightly darker, to the best of

25   your recollection.
```

1    A.   I wouldn't say that he was slightly darker, no.

2            THE COURT:  You said you would or would not?

3            THE WITNESS:  Would not.

4            THE COURT:  Okay.

5    Q.   But it was your testimony -- When we spoke you indicated

6    that the person's skin tone was darker.

7    A.   Yes, that he was darker as opposed to real light.

8    Q.   Okay.

9            THE COURT:  I don't quite understand when you say

10   "darker" as opposed to "real light".

11           THE WITNESS:  He was asking me if he was darker than

12   him, and I don't really know that I would say that he was

13   darker than him.  I thought he was a darker skinned person.

14           THE COURT:  Would you say he's darker than Mr. Butler

15   is, the same as Mr. Butler or lighter than Mr. Butler?

16           MR. BUTLER:  Your Honor, I might be able to assist

17   the Court here.

18           THE COURT:  No, let's see what she says.

19           THE WITNESS:  The legs are what I remember the most.

20           THE COURT:  If you don't know, you can also say I

21   don't know.

22           THE WITNESS:  I don't know.  I don't know.  Thank

23   you.

24   Q.   I'm going to show you what's been marked as defendant's

25   exhibit C.  Could you take a look at that.  Do you recognize

1    that document?

2    A.   Yes.

3    Q.   Okay.  Could you flip to the second page.

4    A.   Mm-hmm.

5    Q.   Now, I'm pointing you to -- well, here.

6         And you recall making this statement to the police?

7    A.   Yes.

8    Q.   And, again, at that time you were conveying to the police

9    things to the best of your knowledge and ability.

10   A.   Yes.

11   Q.   I mean you didn't see him perfectly clear.

12   A.   No.

13   Q.   And, again, that statement was given on the twenty-second,

14   the day of the event?

15   A.   Yes.

16   Q.   Having looked at your statement, can you now recall what

17   you told the police the person's skin complexion was?

18   A.   I said he had very dark skin.

19   Q.   Thank you.

20        Let me grab that back from you.

21        Do you recall describing the vehicle that he had

22   gotten into?

23   A.   Yes.

24   Q.   What's that?

25   A.   Yes.

1    Q.  And could you let the ladies and gentlemen know what

2    vehicle you described as the vehicle involved?  At least at

3    eight forty-five.

4    A.  I can't remember so much, but the description of like the

5    manufacturer or the model or any of that.

6    Q.  Just to the best of your ability.

7    A.  It was some kind of like blue car.  And I noticed it

8    because it was parked where customers don't usually park.  It

9    was kind of where you usually see where employees park.  And

10   that's really about it.

11   Q.  Okay.  I want to show you this one more time.  And take a

12   look at the third page.

13          UNIDENTIFIED JUROR:  We're having some problems

14   hearing the witness.

15          THE COURT:  Okay.  Why don't you stand over there so

16   you speak across the jury and then they can hear the witness.

17   She said she was having problems hearing the witness.

18   Q.  Do you recall being asked -- First -- Well let me ask you

19   this.  Do you recall being asked whether or not the individual

20   had facial hair?

21   A.  Do I recall?  No, I don't remember.

22   Q.  Could you look at that statement.

23          (Whereupon, the witness complied and examined said

24   document.)

25   A.  Yes, I see that.

1    Q.   Okay.  Now having seen the statement, is that able to

2    refresh your recollection as to what you told law

3    enforcement?

4    A.   It's what I told them.  But, I mean --

5    Q.   What did you tell law enforcement on the twenty-second when

6    you were interviewed?

7    A.   That he was clean-shaven.

8    Q.   Thank you.

9             THE COURT:  He was what?

10            THE WITNESS:  Clean-shaven.

11            THE COURT:  When you say "clean-shaven," do you mean?

12   The total absence of hair on the face?

13            THE WITNESS:  He had this kind of funny looking hat

14   on and from what I could tell, right around here, like on the

15   chin there was no facial hair.

16            THE COURT:  I'm having trouble hearing you.

17            THE WITNESS:  The hat covered up a lot.  Lighter

18   around here, but I don't recall any facial hair.

19   Q.   You indicated that -- Well on the part of the face that you

20   could see he didn't have any facial hair.  And you were doing

21   something with the side.  Did it look like, I think he had

22   something weird, or coming out of --

23   A.   It was some kind of hat or knit.  It's almost like it kind

24   of flowed, but it was a head covering hat.

25   Q.   You don't know exactly what it was?

 1    A.   I was not close enough, no.

 2    Q.   Okay.  But it appeared to be protruding from under his hat

 3    area or the crown of his headish area?

 4    A.   It was like it was the hat part, that kind of hat he had

 5    on.

 6    Q.   It was flowing down in some weird way?

 7    A.   Yes.

 8    Q.   Are you familiar with the expression due rag?

 9    A.   Yes.

10    Q.   Did it look like it could have been something like that?

11    A.   No, that's what was odd about it.  No.

12    Q.   Just was not quite sure what it was, but it was flowing

13    down?

14    A.   No.

15                MR. BUTLER:  Nothing further.

16                          RECROSS EXAMINATION

17                BY MS. ADAMS OF PATRICIA FRANCO:

18    Q.   Good morning, Ms. Franco.

19    A.   Good morning.

20    Q.   I'm Jerusha Adams, and I'm an assistant United States

21    attorney prosecuting this case and I have a few brief questions

22    for you.

23           You told defense counsel, Mr. Butler, that you

24    remember speaking to the police on June twenty-second, two

25    thousand and seven?

```
1    A.  Yes.

2    Q.  And you were honest to the police, weren't you?

3    A.  Oh, yes.

4    Q.  And you told them everything you knew?

5    A.  Absolutely.

6    Q.  Now you told the police that you saw someone at the bank

7    around eight forty-five, right?

8    A.  Yes.

9    Q.  But you didn't actually see the bank robbery occur at ten

10   or ten-fifteen, did you?

11   A.  No.

12   Q.  And so you're not here to testify today as to the person

13   that you saw was the bank robber, right?

14   A.  No.

15          MS. ADAMS:  No further questions, Your Honor.

16          MR. BUTLER:  Redirect?

17          THE COURT:  Yes.

18                      REDIRECT EXAMINATION

19              BY MR. BUTLER OF PATRICIA FRANCO:

20   Q.  Are you aware of the fact that the victim teller, Ms.

21   Gurley, also indicated she saw somebody come to the bank prior

22   to nine o'clock?

23          MS. ADAMS:  Objection, Your Honor.

24          MR. BUTLER:  I'll rephrase that.

25          THE COURT:  She can't comment on someone else's
```

1    testimony.

2    Q.  Did you speak with Ms. Gurley after the event, Ms. Nichols

3    now, but Annette Nichols after the bank robbery?

4    A.  Yes.

5    Q.  Did you inform Ms. Nichols that you had seen somebody come

6    to the bank prior to nine o'clock, prior to it opening?

7    A.  I didn't have to inform her.  She knew -- We commented on

8    it when I walked in that morning.

9    Q.  You commented on the fact that you had seen someone come to

10   the bank at approximately eight forty-five?

11   A.  Yes.

12   Q.  And did she acknowledge that in the -- Well, let me

13   rephrase that.

14        Did she seem surprised, or did she understand what

15   you were saying?

16   A.  Yes.

17        MS. ADAMS:  Objection.  Speculation.

18        THE COURT:  You can ask how she appeared.

19   Q.  How did she appear when you told her?

20   A.  I'm not sure I understand the question.

21   Q.  When you told her what you had seen, could you -- how did

22   Ms. Nichols appear?

23        THE COURT:  Did she show any expression one way or

24   the other, something that you could observe.

25        THE WITNESS:  I'm not sure I understand.  I mean

```
 1    before the robbery or after?
 2              THE COURT:  After.
 3              THE WITNESS:  I mean, I can tell you what we said.
 4    Q.  What did you say?  Do you recall?
 5    A.  Yes.  After the robbery I said, "Was that the guy?"  And
 6    she said, "Yes."
 7    Q.  Okay.  Did you -- Before the robbery, did you guys speak
 8    regarding what you had seen at the front door?
 9    A.  Yes.
10              MR. BUTLER:  Nothing further.
11              THE COURT:  Any further recross?
12                        FURTHER RECROSS EXAMINATION
13                        BY MS. ADAMS OF PATRICIA FRANCO:
14    Q.  Ms. Franco, you said that Ms. Gurley said to you, you asked
15    her, "Was that the guy?"  And she said, "Yes."  Is that what
16    she said?
17    A.  Yes.
18    Q.  Did you know what she meant by that the when she responded
19    to your question?
20    A.  Yes.
21    Q.  Miss Franco, it's your testimony today that you didn't see
22    the bank robbery though, right?
23    A.  No, I did not.
24    Q.  So you can't say whether the guy you saw that morning was a
25    bank robber or not.
```

1    A.   No.

2              MS. ADAMS:   Thank you.

3                    FURTHER REDIRECT EXAMINATION

4                  BY MR. BUTLER OF PATRICIA FRANCO:

5    Q.   The Government didn't ask you a follow-up question, I'm

6    going to.  When Ms. Nichols acknowledged that that was the guy,

7    did you take that to mean the person who had robbed the bank

8    was the person that you had seen that morning?

9    A.   Yes.

10             MR. BUTLER:   Thank you.  Nothing further.

11             MS. ADAMS:   No further questions, Your Honor.

12             THE COURT:   Thank you.  You may step down.

13             (Whereupon the witness Patricia Franco, stepped down

14   from the stand.)

15             THE COURT:   I'm going to take a five minute recess.

16             (Whereupon a recess was taken.)

17             THE COURT:   Go ahead.  Bring in the jury.

18             (Whereupon, the jury was escorted into the

19   courtroom.)

20                  T A W N I    R O B E R T S,

21       the witness herein, having first been duly sworn or

22   affirmed to tell the truth, was examined and testified as

23   follows:

24             Direct examinationBY MS. McKEE OF TAWNI ROBERTS:

25             MS. McKEE:   Your Honor, the Defense calls Tawni

1    Roberts to the stand.

2              THE COURT:   Okay.

3    Q.   Ms. Roberts, if you would please state your name for the

4    record.

5    A.   Tawni Roberts.   And, Ms. Roberts, where do you work?

6    A.   I work at Hooters.

7    Q.   And which Hooters do you work at, what location?

8    A.   The one here in Montgomery on Eastern Boulevard.

9    Q.   And how long have you worked at the Hooters here in

10   Montgomery?

11   A.   For a year.

12   Q.   What is your position at Hooters?

13   A.   I'm the assistant manager.

14   Q.   Ma'am, as the assistant manager of Hooters, were you aware

15   if an Edmond Oliver was ever employed with Hooters in June of

16   two thousand seven?

17   A.   Yes, ma'am, he was.

18   Q.   Now we're pretty familiar with what some of the uniforms

19   are at Hooters, but what would someone -- Edmond Oliver is a

20   male, correct?

21   A.   Yes.

22   Q.   What would an individual like Edmond Oliver wear at

23   Hooters?

24   A.   They are required to wear a black Hooters T-shirt, a hat

25   and some form of either denim jeans or khaki jeans.

1   Q.  Now is this the uniform that every male working at Hooters

2   would be wearing?

3   A.  It's actually the kitchen employees' uniforms, yes.

4   Whether they're male or female.

5   Q.  And what was Edmond Oliver's position at Hooters back in

6   June of two thousand seven?

7   A.  He was a kitchen staff employee.

8   Q.  So the uniform that you just described with the apron, the

9   black shirt and the hat, would that be the uniform that Mr.

10   Oliver would have worn?

11   A.  Yes, ma'am.

12         MS. McKEE:  Your Honor, may I approach the witness?

13         THE COURT:  Yes.

14   Q.  Ma'am, I'm showing you for identification purposes what's

15   been marked as defendant's exhibit fifty-eight.  Can you tell

16   me -- Well, first, tell me if you could identify what's being

17   displayed in the picture.

18   A.  It is one of my kitchen employees in his uniform.

19   Q.  Does it accurately reflect the uniform that a kitchen

20   employee would wear at Hooters?

21   A.  Yes.

22         MS. McKEE:  Your Honor, the defendant moves to admit

23   fifty-eight.

24         THE COURT:  I'll admit it for the limited purpose of

25   showing the uniform, not the person in it.

```
 1            MS. McKEE:  Yes, correct.
 2    Q.  Miss Roberts, I'm showing you defendant's exhibit
 3    fifty-eight here.  The clothing that we see this individual
 4    wearing on the picture, is this the uniform that a kitchen
 5    worker at Hooters would wear?
 6    A.  Yes, ma'am.
 7    Q.  Ma'am, is it a requirement that while they're actually in
 8    the kitchen, that they have to keep their apron and hat on at
 9    all times?
10    A.  Yes, ma'am.
11    Q.  Ma'am, could you describe the kitchen area of Hooters?  Can
12    a customer in Hooters that is eating, can they actually see
13    inside the kitchen area at all?
14    A.  Yes, ma'am.
15    Q.  How would a customer be able to see inside the kitchen?
16    A.  Every Hooters is designed to have an open kitchen to where
17    you can see from the dining area.  We have a low wall and you
18    can see clear into the kitchen from just about anywhere you sit
19    in Hooters.
20    Q.  And, ma'am, is the kitchen located -- or where is the
21    kitchen located specifically inside Hooters?  Behind any
22    particular area in Hooters?
23    A.  It generally is located in the center of the restaurant.
24    You have the kitchen area, and right in front of the kitchen
25    area is generally the bar area.  And there's like four
```

1   and-a-half foot, five foot wall that separates the two.

2          MS. McKEE:  Your Honor, may I approach the witness?

3          THE COURT:  Yes.

4   Q.  Miss Roberts, I'm showing you what's been marked for

5   identification purposes as defendant's exhibit fifty-nine.  Can

6   you tell me if you recognize what's displayed in the picture?

7   A.  Yes.  This is the --

8          MS. HARDWICK:  We object to any further testimony or

9   any references to the exhibit that's just been posed to the

10  witness.  Defense counsel has shown it to the Government.

11  Defense counsel provided the Government with a disk containing

12  pictures that they would use.  That picture was not among those

13  pictures.

14         THE COURT:  Why not?

15         MS. McKEE:  Your Honor, these are pictures that were

16  taken of the Hooters here in Montgomery simply to assist the

17  jury in --

18         THE COURT:  Yes, but you're supposed to also let

19  opposing counsel have exhibits.

20         MS. McKEE:  Yes, Your Honor, and we have displayed --

21         THE COURT:  No, before trial.  Aren't you all

22  supposed to exchange exhibits before trial?

23         MS. McKEE:  Yes, Your Honor.

24         THE COURT:  Why wasn't this not among the exhibits

25  that were exchanged?

```
1              MS. McKEE:  Your Honor, if it was not -- Excuse me.
2    May I have a moment?
3              THE COURT:  Yes.
4              (Whereupon, Ms. McKee conferred with Mr. Butler off
5    the record and out of the hearing of the other courtroom
6    participants.)
7              MS. McKEE:  Your Honor, as a result of -- as a result
8    of testimony given in the Government's case, these pictures
9    were then gone out and taken on Friday based on the testimony
10   in the Government's case, and they were shown to the Government
11   this morning.
12             THE COURT:  Okay.  What testimony in the Government's
13   case justified your not taking these pictures until last Friday
14   rather than taking them earlier?
15             MS. McKEE:  Your Honor, specifically with regard to
16   testimony involving Ms. Nichols, who is now known as Ms. Gurley
17   and --
18             THE COURT:  What did she say that warranted you
19   suddenly having to go out and get these pictures in the middle
20   of the trial?
21             MS. McKEE:  Your Honor, her testimony of stating that
22   she saw this individual at Hooters, and he was an individual
23   working in the kitchen area.  And that's simply what is
24   displayed in this picture, is the kitchen area as it was
25   described by Ms. Nichols in two thousand seven, now known as
```

1    Ms. Gurley.

2            MS. HARDWICK:  Your Honor, the Government's response

3    is that was also provided in Miss Nichols' statement after she

4    was interviewed by law enforcement.  They also had a copy of

5    the photo array that was shown to her.  They knew that she

6    thought that a person at Hooters was staring at her that made

7    her uncomfortable.

8            All of the information was in her statement that was

9    provided in discovery.  So if there is a reference to anything

10   regarding Hooters, it could have been done to substantiate or

11   clarify her statement that was provided earlier on in this

12   case.

13           We would object to the photographs that were not

14   previously provided.

15           MS. McKEE:  And, Your Honor, I do believe, based on

16   my recollection of Ms. Gurley's testimony, that as a part of

17   her statement that this individual at Hooters, one of the

18   things that this individual was kind of going behind certain

19   items at Hooters.  It is displayed in this picture for that

20   purpose, to show that there is nothing that would have blocked

21   this particular individual.  Nothing that would have created in

22   the establishment the way that Hooters is set up that would

23   have created any screen or mask of this individual at Hooters

24   to actually go back and forth behind.

25           THE COURT:  Anything else, Counsel?

```
1          MS. HARDWICK:  Your Honor, again, all of the
2     information was previously provided from her statement.
3          THE COURT:  I'll allow the exhibit.  Overruled.  Go
4     ahead.
5     Q.  Ma'am, do you recognize this picture?
6     A.  Yes, ma'am.
7     Q.  And does it accurately reflect -- well, let me ask you --
8          THE COURT:  Let me say this.  In the future, don't do
9     this again.  You have your exhibits ready beforehand.
10         MS. McKEE:  Yes, Your Honor.
11    A.  It's a picture of our bar area as well as the kitchen
12    area.
13    Q.  Does this picture accurately reflect the bar area and the
14    kitchen areas as it was in June two thousand seven?
15    A.  Yes, ma'am.
16         MS. McKEE:  Your Honor, the Defense moves to admit
17    defendant's exhibit fifty-nine.
18         MS. HARDWICK:  Same objection, Your Honor.
19         THE COURT:  The objection is overruled.
20    Q.  Ma'am, I'm showing you defendant's exhibit fifty-nine.
21    This is the Hooters -- the kitchen area of Hooters, correct?
22    A.  Yes, ma'am.
23    Q.  If you could, I believe you can touch your screen.  Can you
24    identify for us where the bar area in this picture is
25    located?
```

1    A.    This is the bar area right here.

2    Q.    And, Miss Roberts, can you identify in the picture for us

3    where the actual kitchen area is located in this picture?

4    A.    The kitchen area begins here.  I'll put an X there.  That's

5    the makeup station, and it goes all the way right here behind

6    this white wall.  And it stops right there where that X is.

7    Q.    Now I'm going to clear this screen so we can see the white

8    wall.

9    A.    Okay.

10    Q.    Now if you can, for us, can you identify or just place a

11    finger on the actual white wall you described in this

12    picture?

13    A.    Okay.

14    Q.    And how high up -- Well, let me ask you, how tall are

15    you?

16    A.    I'm five two.

17    Q.    And how high up would this white wall come to you?

18    A.    It's approximately a five foot wall.

19    Q.    So if you were looking, the only thing, probably about the

20    two inches, is what someone would see of you?

21    A.    Yes, ma'am.

22    Q.    Do you have any idea how tall Edmond Oliver is?

23    A.    He is approximately six foot, six one.

24    Q.    Have you ever seen Mr. Oliver behind this white wall that's

25    been identified in the picture?

1   A.  Yes, ma'am.

2   Q.  Can you see Mr. Oliver over this white wall?

3   A.  Yes, ma'am.

4   Q.  What portion of his body, if any, can you see over this

5   white wall?

6   A.  Probably from his shoulders or his chest up.

7   Q.  Looking at this picture, it appears that there are items

8   hanging from, I guess the top of the ceiling area.  Is that

9   hanging over the bar portion or the kitchen area?

10  A.  It only hangs over the bar.

11  Q.  Other than the white wall separating the bar and the

12  kitchen area, is there anything else, any type of divider or

13  anything set up that would block someone's view of the kitchen

14  staff behind that behind that white wall?

15  A.  No, ma'am.

16  Q.  So a customer sitting at the bar area would have a clear

17  view of anyone working in the kitchen staff standing behind the

18  white wall.

19  A.  Definitely.  Yes, ma'am.

20  Q.  Obviously if they were taller than five feet.

21  A.  Right.

22  Q.  Ma'am, do you know if specifically Edmond Oliver was

23  working on June twenty-sixth, two thousand seven at Hooters?

24  A.  Yes, ma'am, he was.

25  Q.  Were you in fact working on June twenty-sixth, two thousand

1    seven?

2    A.  Yes, ma'am, I worked the day shift.  I opened and was there

3    from like eight a.m. until six p.m.

4    Q.  While you were at work that day, did anything unusual

5    happen while you were at work?

6    A.  No, ma'am.

7    Q.  Ma'am, I want to show you defendant's exhibit fifty-eight.

8    What color is the apron that is displayed in defendant's

9    exhibit fifty-eight?

10   A.  Black.

11   Q.  And is the apron specifically a part of this uniform, or is

12   this just something this individual is wearing?

13   A.  No, they are all required to wear an apron as long as

14   they're in the kitchen.  When they step out of the kitchen they

15   have to take the aprons off.

16   Q.  Ma'am, I want to show you what's already been admitted as

17   defendant's exhibit fifty-two.  Let me ask you, do you

18   recognize the individual in number three?

19   A.  Yes, that's Edmond Oliver.

20   Q.  And looking at me here now, and looking at this picture of

21   Edmond Oliver or even as you know him, would you say that

22   Edmond Oliver is lighter or darker than I am?

23   A.  Darker.

24   Q.  Again, looking at the picture, number three of Edmond

25   Oliver in defendant's exhibit fifty-two, this is my co-counsel,

1    Kevin Butler.  Would you say that Edmond Oliver is lighter or

2    darker than Mr. Butler?

3    A.  Lighter.

4    Q.  Ma'am, I'm now going to show you Government's exhibit

5    thirty-two.  Again, Ms. Roberts, looking at number three in

6    defendant's exhibit fifty-two, Edmond Oliver, and looking at

7    this individual in Government's exhibit thirty-two, number six,

8    looking at these two pictures would you say that Edmond Oliver

9    is lighter or darker than the individual in number six?

10   A.  Darker.

11   Q.  Ms. Roberts, to your knowledge do you know if Andreas Smith

12   worked at Hooters in June of two thousand seven or at any

13   point?

14   A.  No, ma'am.  I do not know of him being an employee, no.

15            MS. McKEE:  May I have a moment, Your Honor?

16            THE COURT:  Yes.

17            (Whereupon, Ms. McKee conferred with Mr. Butler off

18   the record and out of the hearing of the other courtroom

19   participants.)

20            MS. McKEE:  No further questions at this time.

21                        CROSS EXAMINATION

22            BY MS. HARDWICK OF TAWNI ROBERTS:

23   Q.  Ms. Roberts, my name is Tommie Brown-Hardwick and I'm an

24   Assistant United States Attorney, and I'm going to ask you a

25   few questions.

1    A.   Okay.

2    Q.   On the evening you testified on June twenty-six, nothing

3    happened in your presence that was unusual, is that correct?

4    A.   Yes, ma'am.

5    Q.   So you have no information to provide to this jury as to

6    what went on at Hooters on June twenty-six, two thousand and

7    seven?

8    A.   Not while I was there, no, ma'am.

9    Q.   And on June twenty-second, two thousand seven if I was to

10   tell you that Compass Bank on the Eastern Boulevard was robbed

11   you would have no information to provide this jury regarding

12   that robbery, would you?

13   A.   No, ma'am.

14   Q.   Now you're familiar with Mr. Oliver.  Would you say he's a

15   very thin fellow?

16   A.   Yes.

17   Q.   Mr. Oliver is very thin?

18   A.   Yes.

19   Q.   And would you say that he's rather tall?

20   A.   Yes, ma'am.

21   Q.   You indicated in the photograph that the employees at

22   Hooters are required to wear a cap at all times.

23   A.   Yes, ma'am.

24   Q.   Such as the individual depicted in defendant's exhibit

25   fifty-eight?

1  A.  Yes, ma'am.

2  Q.  And in that cap that they're required to wear the cap all

3  the time, that their face shows?

4  A.  Yes, ma'am.

5  Q.  And the wall that's behind there, it's depicted in the

6  photograph defendant's exhibit fifty-nine.  It appears, and

7  correct me if I'm wrong, that the lighting in Hooters is sort

8  of conducive to young people.  Would that be a fair

9  statement?

10  A.  I'm not sure exactly what you mean.

11  Q.  It's not really bright like this courtroom.

12  A.  It depends on what time of the day this picture was taken.

13  During the daytime all the lights are up really bright.  At a

14  certain time at night we do dim the lights a little bit.

15          THE COURT:  What are the times?

16          THE WITNESS:  Generally around sixish, sevenish when

17  it starts getting dark outside.  We dim the lights a little

18  bit.

19  Q.  And as you can see in this photograph, can you just tell

20  whether this photograph was taken day or night?

21  A.  No, ma'am.  But the kitchen lights are never dimmed.  Only

22  the restaurant lights.

23  Q.  So a person sitting in the restaurant in various positions,

24  have you ever been in a restaurant and thought you saw someone

25  that really wasn't that person?

```
 1   A.   That could happen anywhere.
 2   Q.   My question to you, Ms. Roberts, is have you ever been in a
 3   restaurant or any other location and thought you saw someone
 4   but once you were closer you recognized that it wasn't that
 5   person?
 6   A.   Yes.
 7   Q.   Okay.  And other people have done that too, is that
 8   correct?
 9   A.   I guess.  I mean, I can't answer for other people.
10   Q.   I'm sure you've heard your friends or someone say I thought
11   I saw you or I thought I saw someone else in another location
12   that --
13            MS. McKEE:  I'll object.  It's speculation.
14            THE COURT:  I'll sustain that.
15   Q.   So, Ms. Roberts, basically it's your testimony here that
16   you can't provide any information regarding what happened on
17   June twenty-second, two thousand and seven at Compass Bank?
18   A.   No.
19   Q.   Thank you.
20            MS. McKEE:  No further questions, Your Honor.
21            THE COURT:  Thank you.  You may step down.
22            (Whereupon the witness, Tawni Roberts, stepped down
23   from the stand.)
24            MR. BUTLER:  Your Honor, our next witness is
25   Miss Tanisha Huddleston.
```

1          MS. ADAMS:  We object to the this witness as the jury

2     has not been voir dired on her.

3          THE COURT:  We can do it right now.

4          MS. ADAMS:  I wanted it stated on the record.

5          THE COURT:  I'll ask them now.

6          THE COURT:  Why didn't you provide this witness

7     earlier anyway?

8          MR. BUTLER:  Your Honor, this is follow-up

9     investigation post swearing of the jury that was done this

10    Thursday and Friday.

11         THE COURT:  We'll talk about this later.

12         What is your name, ma'am?

13         THE WITNESS:  Tanisha Huddleston.

14         THE COURT:  Does any member of the jury know Ms.

15    Huddleston?

16              (Whereupon, there was no response.)

17         THE COURT:  Okay.

18              T A N I S H A    H U D D L E S T O N,

19        the witness herein, having first been duly sworn or

20    affirmed to tell the truth, was examined and testified as

21    follows:

22              Direct examinationBY MR. BUTLER OF TANISHA

23                    HUDDLESTON:

24    Q.  Would you state your name, please.

25    A.  Tanisha Huddleston.

```
 1    Q.   Where are you employed?

 2    A.   Hooters of Montgomery.

 3    Q.   Were you employed at Hooters of Montgomery in June of two

 4    thousand and seven?

 5    A.   Yes, sir.

 6    Q.   Specifically, on or about June twenty-six, two thousand and

 7    seven.

 8    A.   Yes, sir.

 9    Q.   Could you give the location of the Hooters, I think there

10    is only one, but could you give the location of the Hooters

11    Restaurant you're employed at?

12    A.   I can't remember the exact address.  I know it is on the

13    corners of Vaughn Road and Eastern Boulevard.

14    Q.   Okay.  On June twenty-six -- Well, do you know a gentleman

15    by the name of Edmond Oliver?

16    A.   Yes, sir.

17    Q.   What is his relation to you?

18    A.   He was a personal friend and an employee.

19    Q.   Of?

20    A.   Hooters.

21    Q.   Was he an employee of Hooters to your knowledge on June

22    twenty-six, two thousand seven?

23    A.   Yes, sir.

24    Q.   On June twenty-six, two thousand seven did you observe

25    anything unusual happen in regards to Mr. Oliver?
```

1    A.   Yes, sir.

2    Q.   Okay.  Before we get into that, what shift were you working

3    on June twenty-six, to thousand seven?

4    A.   My shift started at four o'clock, and I normally close, so

5    we didn't close until twelve.  We didn't get out of there until

6    one-thirty or two o'clock in the morning.

7    Q.   Do you know what shift Mr. Oliver was working?

8    A.   He was on the same shift.

9    Q.   Did anything unusual happen during your shift, and

10   approximately what time?

11   A.   It was approximately I'd say about five, five-thirty.

12   Q.   Okay.  And when was this?

13   A.   Excuse me?

14   Q.   Five or five-thirty?

15   A.   In the evening, yes, sir.

16   Q.   And this happened again on June twenty-six?

17   A.   Yes, sir.

18   Q.   So at five or five-thirty in the summertime the sun is

19   still out.

20   A.   Mm-hmm.

21   Q.   Okay.  Your establishment -- Well, let me rephrase that.

22        At five or five-thirty, what did you observe happen?

23   A.   I observed three to four officers walking in the front

24   door.

25   Q.   Could you stop right there?  Did the -- Were the officers

1    dressed in any type of -- First, what type of officers were
2    they?
3    A.  I'm not from here so I just figured they were regular
4    police officers because they had the vests with the suit and
5    badges.
6    Q.  Okay.  So three to four officers came in --
7    A.  In the front door.  And then three more came in off the
8    side patio door.
9    Q.  Okay.  Before we go any further, did you observe anyone
10   during the course of your employ -- I mean during the course of
11   your job within the restaurant at the bar area?
12   A.  Yes, sir.  Where I was standing, it is over like right
13   under the Budweiser sign over on the far --
14   Q.  Would you touch the screen?
15   A.  The far wall, right over here is where I am normally
16   stationed.
17   Q.  Okay.
18   A.  So that lets me see just about everything that's going to
19   go on in the store.  I can see the bar, most of the floor, some
20   of the patio, upstairs and the loft.
21   Q.  Okay.  Did you see anyone sitting in that area?
22   A.  Yes.  It was a female sitting right there.
23   Q.  Let me clear this.
24          Where was the female sitting?
25   A.  In this area right along there.

1  Q.  Did you observe the female doing anything unusual?

2  A.  No.  I just took her as a regular customer.

3  Q.  At five or five-thirty you say you saw four officers come

4  in the front.  They were dressed like normal police officers?

5  A.  Mm-hmm.

6  Q.  And you said you observed officers coming in in another

7  direction?

8  A.  Yes, from a side patio door which is off on this side.  The

9  front doors would be back this way.

10  Q.  Okay.  So you saw a total of seven officers?

11  A.  Yes, sir.

12  Q.  Did you see any other officers?

13  A.  Not to my recollection.

14  Q.  What did they do?

15  A.  They walked right in and went to the middle of the floor.

16  Q.  Where's the middle of the floor?

17  A.  Right in this area.

18  Q.  Okay.  So all seven --

19  A.  No, sir.  The first three or four walked in the front door.

20  They stood there for like ten, twenty seconds.  And then

21  everybody made a beeline around the side of this bar to the

22  kitchen entry which is right there.

23  Q.  Okay.  Now, when you say "a beeline," what did you observe?

24  A.  Straight forward.  We're not paying attention to what's

25  going on, we're going directly to the kitchen, you come here.

1  Q.  They seemed rather focused?

2       Based on what you could observe, it wasn't a casual

3  we might want to speak to this --

4  A.  No.  It was, "You, sir, red head, come here."

5  Q.  And, again, all seven of them followed this line that you

6  have here?

7  A.  Yes, sir.

8  Q.  When they got to that person what did the they do?

9  A.  They removed a metal ball.

10  Q.  Who is this person?

11  A.  Edmond Oliver.

12  Q.  Okay.  So they remove the metal ball.

13  A.  They set it at another station and they told him, "You're

14  under arrest."

15  Q.  Did you see and observe this?

16  A.  Yes, sir.

17  Q.  Did Mr. Oliver put up any resistance?

18  A.  No, sir.

19  Q.  Did they -- Did you see them handcuff him?

20  A.  Yes, sir, they did handcuff him.

21  Q.  And what did they do after that?

22  A.  They proceeded to take him out through the side on the

23  patio --

24  Q.  Point to it on the screen.

25  A.  They came back out that door over there, and they proceeded

1    to take him out.  But then they stopped and they took him back

2    in through the kitchen all the way in the back to that back

3    door right there.

4    Q.  Based on what you could see and observe, did this incident

5    unsettle the restaurant?

6    A.  Yes, sir.

7    Q.  Could you describe what you could see and observed the

8    restaurant patrons?

9    A.  I would say probably thirty percent of the store left.

10   Q.  Did the officers seem concerned about that?

11   A.  No.

12   Q.  Were the officers cordial?

13   A.  No.

14   Q.  Could you describe how they were?

15   A.  I wouldn't say hostile, but I would say militant.  It was a

16   no questions asked.  This doesn't concern you, go back to doing

17   what you're supposed to be doing.

18   Q.  Did you see the officers speak to the person who was seated

19   here?

20   A.  No, sir.

21   Q.  Could you describe -- I think you may have said so, but

22   describe the person who was sitting there.  It was female, but

23   maybe you could give us a more detailed description.

24   A.  Female.  Middle aged.  I want to say medium colored hair.

25   Other than that I really couldn't tell you too much more.

1    Q.   Did you, from what you could observe, did anyone else speak

2    to the person to the person who was sitting there?

3    A.   Besides the bartender, no.

4    Q.   Based on what you could see and observed, was Mr. Oliver

5    allowed to simply go down to the police station and speak to

6    officers?

7    A.   From the way they took him out, Mr. Oliver really wasn't

8    saying anything.

9    Q.   Okay.  I guess my point is, do you have any knowledge of

10   whether or not Mr. Oliver was simply allowed to go down to the

11   police station and talk to officers or was he taken?

12   A.   Oh no, sir, he was taken to the police station.

13   Q.   And, again, you heard them say he was under arrest?

14   A.   Yes, sir.

15   Q.   I'm showing you what's been marked as defendant's exhibit

16   thirty-two.  Do you recognize who is located here?

17   A.   Yes, sir.

18   Q.   And who is that?

19   A.   That's Edmond Oliver.

20   Q.   You're aware of the fact that African-Americans have

21   varying skin tone?

22   A.   Yes, sir.

23   Q.   Is Mr. Oliver my skin tone?

24   A.   No, sir.

25   Q.   Is he lighter or darker?

1  A.  He's lighter than you.

2  Q.  Is he approximately your skin tone?

3  A.  He's like my skin complexion, maybe a half a shade

4  darker.

5  Q.  But lighter than me?

6  A.  But lighter than you.

7  Q.  Would you agree that Mr. Andreas Smith, the person standing

8  here, is lighter than me?

9  A.  Yes, sir.

10  Q.  He also appears at least to be lighter than you, is that

11  accurate?

12  A.  Yes, sir.

13  Q.  Mr. Oliver is a half shade darker than you but lighter than

14  me?

15  A.  Yes, sir.

16          MR. BUTLER:  Nothing further.

17          THE COURT:  Cross.

18                    CROSS EXAMINATION

19          BY MS. ADAMS OF TANISHA HUDDLESTON:

20  Q.  Ms. Huddleston, good morning.  I'm Jerusha Adams, and I'm

21  an Assistant United States' Attorney prosecuting this case.

22  And I just have a few questions for you.

23          What is your position with Hooters?

24  A.  I'm a cook.

25  Q.  And so you're saying as a cook that night on June

1  twenty-six, two thousand and seven that you were stationed

2  right here?

3  A.  Yes, in this area.  This -- That little wall back there is

4  the makeup station.  That's where the plates get made in order

5  for the food to get put on.

6  Q.  So you're actually saying you're by the plates, that's

7  where you were working?

8  A.  Yes.

9  Q.  I see.  And you don't know who was the female who was

10  sitting in that chair there, do you?

11  A.  No, ma'am.

12  Q.  And you don't know anything about the June twenty-second,

13  two thousand seven bank robbery at Compass Bank, do you?

14  A.  No.

15  Q.  And you don't know anything about shooting at the U. S.

16  marshals, do you?

17  A.  No.

18          MS. ADAMS:  No further questions, Your Honor.

19          MR. BUTLER:  Nothing further, Your Honor.

20          THE COURT:  Thank you.  You may step down.

21          (Whereupon the witness, Tanisha Huddleston, stepped

22  down from the stand.)

23          MR. BUTLER:  At this time I would call Mr. Edmond

24  Oliver.

25                    E D M O N D    O L I V E R,

```
 1        the witness herein, having first been duly sworn or
 2   affirmed to tell the truth, was examined and testified as
 3   follows:
 4              Direct examinationBY MR. BUTLER OF EDMOND OLIVER:
 5   Q.  Mr. Oliver, my name is Kevin Butler.
 6              Could you state your name and spell your last name
 7   for the record.
 8   A.  Edmond Terrel Oliver.  O-l-i-v-e-r.
 9   Q.  Mr. Oliver, what's your date of birth?
10   A.  Mxxxxx.
11   Q.  That makes you what?
12   A.  Twenty-seven.
13   Q.  So you're in your mid twenties?
14   A.  Yes, sir.
15   Q.  Okay.  Mr. Oliver -- Late twenties.  How tall are you?
16   A.  About six three or six four.
17   Q.  Mr. Oliver, I'm going to ask you to stand up and walk right
18   in front of the podium here.
19              Mr. Smith, could you stand up.
20              (Whereupon, both individuals complied.)
21   Q.  Thank you.
22              In June of two thousand and seven, where were you
23   working?  On or about June twenty-six, two thousand seven.
24   A.  In our Hooters in Montgomery.
25   Q.  And what was your position there?
```

1    A.   I was a line cook.

2    Q.   And how long had you been employed there?

3    A.   Since they opened up in May of that year.

4    Q.   So in about June you had been working there about a

5    month?

6    A.   Yes, sir.

7    Q.   I'm showing you what's been marked as defendant's exhibit

8    fifty-eight.  You don't worry about who the person is in there,

9    but do you recognize what that person is wearing?

10   A.   Yes, sir.

11   Q.   And what is that?

12   A.   The Hooters uniform.

13   Q.   And that uniform includes a shirt and an apron and what

14   appears to be jeans or dark pants of some sort?

15   A.   Mm-hmm.

16   Q.   Is that what you wore on or about June twenty-six, two

17   thousand seven when you were working there?  Is that your

18   uniform?

19   A.   Pretty much so.  Probably not the same shirt, but --

20   Q.   Yeah, I understand.  But you had a black apron on at that

21   time?

22   A.   Yes, sir.

23   Q.   All right.  What time did you come to work on June

24   twenty-six, two thousand seven?

25   A.   I would usually come in early to work, so I would come in

```
1    around four or five.

2    Q.  So you came in around four or five?

3    A.  Yes, sir.

4    Q.  What did you do?  You got there at four or five.  Just tell

5    the ladies and gentlemen of the jury what your job entailed.

6    A.  Well, I would come in.  I would usually be the first one on

7    line  What my job was, I would serve the appetizers, the cheese

8    sticks, chicken wings.  Or when the girls would throw their

9    tickets on, they would throw them on little sliders and I would

10   take the tickets off the sliders, call them out to everyone and

11   I would slide them back to the kitchen so we could prepare the

12   meal.

13   Q.  Okay.  That's one of the jobs that a cook at Hooters does,

14   correct?

15   A.  Mm-hmm.

16   Q.  And had you had any disciplinaries or any type of action

17   taken against you at the time between when you started in

18   June?

19   A.  I had one incident with a manager.

20   Q.  And what was that.  This was before June twenty-six?

21   A.  It was before.

22   Q.  What was that?

23   A.  We were working, and we were real busy that night.  And we

24   were asking one of the managers for help, but he would never

25   come up front to help us.  We got backed up.  And once we got
```

1    backed up, that's when he came out and got kind of mad because

2    we were backed up.  And he basically -- well, me and him

3    basically got into it verbally.

4    Q.  Because he wasn't helping out enough?

5    A.  That, too.  And we were packed in the kitchen and stuff,

6    and he, instead of him talking to me, he came over and he

7    grabbed me.  And so not in nice words, but I told him to get

8    his hands off me.  He left and he got the security guard for me

9    to escort me out of the building.  That was the incident that

10   happened with me and the manager.

11   Q.  Okay.  I'm going to move on to June twenty-six, two

12   thousand seven.  You say you got there four-thirty.  You were

13   doing your job.  You were describing how you were working

14   orders and doing your job.  Did anything unusual happen to you

15   that day at Hooters?

16   A.  Yes.

17   Q.  Okay.  About what time did it happen?

18   A.  Well, a Hooters girl came up to me and said -- I'm not sure

19   what this time was, but she told me that the --

20         MS. ADAMS:  Objection.  Hearsay.

21   Q.  Okay.  Don't say what someone else told you.  Just describe

22   what happened.

23   A.  All right.  Well, I had a Hooters female come up to me

24   later on that evening and tell me that a --

25   Q.  Don't say what someone told you.  Just describe -- Let me

1    help you through this.  A Hooters girl came up to you,

2    correct?

3    A.  Right.

4    Q.  Shortly after that Hooters girl came up to you, did anyone

5    else approach you?

6    A.  Numerous people.

7    Q.  Okay.  How many, to the best of your recollection, and who

8    were they?

9    A.  The Hooters girl, Maggie I was talking about, and about two

10   other girls.

11   Q.  Okay.  They came up to you?

12   A.  Yes, sir.

13   Q.  All right.  Based on what you learned during that

14   conversation, did you do anything?

15   A.  You said what now?

16   Q.  Based on what you learned -- I'm assuming they spoke to

17   you?

18   A.  Yeah, they told me something, mm-hmm.

19   Q.  Based on what you learned as a result of those

20   conversations, did you do anything?

21   A.  You mean what did I do?

22   Q.  Yeah, what did you do?

23   A.  I remember after they told me what they did, I walked out

24   of the kitchen because they basically made it known that

25   someone was looking for me.  Usually I have guests that come

1    there, either my family members or just everyday Hooters people

2    that come in and know me or know other kitchen workers.  They

3    would call us to the table, and so that's what I thought was

4    going on.

5    Q.  Okay.  When you walked out of the kitchen and into -- I'm

6    showing you what's been marked as defendant's exhibit

7    fifty-nine.  What side of the kitchen did you walk out on?

8    Looking at this photograph, just press on the screen where what

9    side you were on.

10   A.  Right over here, there's a chair.

11   Q.  All right.  As you walked out of the kitchen, did you see

12   anything unusual inside the restaurant area here?

13   A.  Not at that time, no.

14   Q.  Okay.  What did you do after you walked out of the

15   kitchen?

16   A.  I took a left right out here where the door is.

17   Q.  Go ahead and touch the screen.

18   A.  Where the door comes out here, I went to the left.  I

19   walked to the patio.  When I came back, I didn't see anybody

20   looking for me and I had work to do, so I turned around and I

21   came back into the kitchen and I entered back through this

22   door.  I walked back to the kitchen right here.

23   Q.  You went back about your business?

24   A.  Yes, sir.

25   Q.  Did anything else unusual happen as you were going about

1    your business inside the kitchen?

2    A.   Probably about thirty minutes or forty-five minutes after

3    that I noticed at this door from the patio there were, I want

4    to say officers but -- Like I said, they were police officers,

5    but there were two standing by the door here, there was two

6    going back this away to the front door where you enter it, and

7    there was -- I think it was either one or two by the bathroom

8    stall right here.  There's a little wall right here.

9    Q.   Did that strike you as unusual?

10   A.   Yes.  By that time it was about -- probably about five to

11   six officers that came on the line right where I went so I was

12   working at.

13   Q.   Point on the screen.

14   A.   They were standing right here on the corner, on the side,

15   and I was right here in the middle.

16   Q.   So if you had to estimate, how many police officers arrived

17   at Hooters based on what you could see and observe?

18   A.   You mean total inside and out?

19   Q.   Inside and out.

20   A.   After I was handcuffed and took outside, there were at

21   least six, seven, eight, nine, ten -- there were at least ten,

22   two undercovers or police officers inside the store.  When I

23   walked to the back of the store, which is right here where the

24   exit is, the back exit, they said they wanted to walk me out

25   the backdoor so no one would see --

1    Q.  Wait just a second.  This is getting a little confusing.

2    Let me help here.

3         Now you said you were located about here when you

4    noticed two officers here, two officers here, then you said

5    maybe there were five or six coming from another area.

6    A.  No.  They all came from the front, but just before -- once

7    they were all coming into the building in the front, the rest

8    of the officers went immediately to the back in this area back

9    here.

10   Q.  And that's where you were.  Where that arrow is, that's

11   approximately where your location is?

12   A.  No, sir.  The arrow is pointing to the backdoor where the

13   back dock is.  Where I'm standing at is where this right behind

14   this white shelf right here.

15   Q.  And you estimated that there were approximately ten

16   officers inside the restaurant altogether?

17   A.  That I counted for myself, ten, yeah.

18   Q.  Okay.  Did those officers approach you?

19   A.  When I was standing on the line right here, they -- some of

20   the officers had tasers out.  And I don't want to lie and said

21   they did, but I want to say they had guns out but they told me

22   -- they asked me what my name was.  They said is my name

23   Edmond, Edmond Oliver, and I said, "Yeah."  I said, "What's

24   wrong?"  And by the time I said, "What's wrong," that's when

25   they came around and pulled me.  They called me over as much as

1   they could.

2   Q.  Let's walk the jury through this again.  So what's happened

3   so far is you're behind this wall.  You say six officers come

4   behind the wall towards where you are?

5   A.  Right.  Their starting point was from right here.  From

6   where I am, they called me over to them.  By the time I got to

7   about right here, that's when they grabbed me and put me in

8   handcuffs.

9   Q.  All right.  Based on what you could see and observe, you

10  saw tasers.  You couldn't say whether for sure there were guns

11  drawn, too?

12  A.  Yes, sir.

13  Q.  And they put you in handcuffs?

14  A.  Yes, sir.

15  Q.  Did they say at -- Well, let me rephrase that.

16          Were you simply spoken to at the restaurant and

17  allowed to go about your workday.

18  A.  Repeat that one more time for me.

19  Q.  Did they simply talk to you at the restaurant and the let

20  you go about your workday?

21  A.  No, sir.

22  Q.  What did they do?

23  A.  They walked me back to the backdoor entrance.  We have some

24  chairs here and they sat me down.  And they were talking to a

25  manager then.  And I was talking to one of the officers.  I

1    asked him what was I being arrested for, and he said he would

2    tell me once they got me outside.

3         So once I came outside, at that time I seen more

4    officers pull up in cars, and all I remember seeing is just

5    everybody from the A. B. C. store to T. J. Max was looking at

6    me.  They walked me from the back entrance of Hooters --

7    Q.  How did that make you feel?

8    A.  Humiliated.

9    Q.  You said more officers than your eyes could count,

10   everybody at T. J. Max and everyone else was looking at you

11   being arrested.  How did that make you feel?

12   A.  Made me feel real low.  I've never been a troublemaker.

13   Previously before that, I had got arrested my very first time

14   just for a citations.  I didn't do anything.  But this is my

15   second time getting arrested.  It just really bothered me.  It

16   still bothers me to this day.

17   Q.  Understood.

18        Were the officers forceful in what they were doing

19   with you?  Well just describe what the officers did.

20   A.  They walked me on the side of the building, and that's

21   where I seen about five more police cars pull up.  And they

22   looked at me for a second and the officers that had me, they

23   walked me up to the front, the very front of Hooters where

24   everybody could see me.

25   Q.  So -- Wait a second.  So after you had been escorted -- Six

```
1    officers approach you at least.  They handcuff you, they have

2    got tasers and guns, possibly guns out, they escort you out the

3    back, everybody in T. J. Max seeing you and then they what,

4    walked you to the front?

5              MS. ADAMS:  Your Honor, we object as to the relevance

6    of this line of questioning.

7              THE COURT:  How is this relevant?

8              MR. BUTLER:  Your Honor, Ms. Gurley testified that

9    she did not make an identification of this individual.  That

10   she basically just told police that I saw somebody that looks

11   like the bank robber.  This line of questioning is to show that

12   Ms. Gurley did make an identification.  Ten officers showed up

13   with tasers out, possibly a gun, they're radioing around, we're

14   attempting to show what that identification led to.  I think

15   that's very relevant to the jury as to whether or not she

16   really did identify someone.

17             MS. ADAMS:  Your Honor, Ms. Gurley's testimony

18   regarding the cook, or Mr. Oliver in this case, resembling the

19   bank robber by no means controlled the police officers' actions

20   and is not relevant to the facts before the jury.

21             THE COURT:  I think we've gone into this enough.  I'm

22   going to overrule the objection.  I think it is relevant, but I

23   think we've gone into it enough, though.

24             MR. BUTLER:  I'll move on.

25   Q.  Did they simply let you go at that point?
```

```
1   A.  No, sir.  After they finally left from Hooters, they took
2   me downtown.  I stayed downtown.  I think they came and got me
3   around eight o'clock, or somewhere around that time.  I stayed
4   down there until like three or four o'clock in the morning.
5   Q.  In the morning?
6   A.  Yes, sir, in the morning.
7   Q.  And at three or four o'clock in the morning, what
8   happened?
9   A.  Nothing.
10  Q.  They just let you go?
11  A.  Yeah.  They told me they saw somebody was downstairs and
12  they walked me out front.
13  Q.  Did you get an apology from anybody?
14  A.  Nobody said anything to me.
15          THE COURT:  How is this relevant?
16          MR. BUTLER:  Withdrawn.
17  Q.  Were you ever told what you were arrested for?
18  A.  Probably not until about the two or three hours after I had
19  been downtown and talked at the police station.  They told me
20  that someone had identified me a hundred percent at Hooters and
21  I fit the description of an individual.  And I asked them,
22  "What did I do?"  And they said they had me on camera.  So I
23  kind of chuckled at the police officer and the other one, he
24  asked me why I was chuckling, and I said, "You got the wrong
25  person."
```

```
1    Q.   And you were told they identified you a hundred percent?

2    A.   Yes, sir.  That's what the two officers told me.

3               MR. BUTLER:  Nothing further.

4               THE COURT:  Cross?

5                         CROSS EXAMINATION

6               BY MS. ADAMS OF EDMOND OLIVER:

7    Q.   Good morning, Mr. Oliver.  I'm Jerusha Adams, and I'm an

8    Assistant United States Attorney prosecuting this case.  I just

9    have a few questions for you this morning.

10              Earlier you stated that you arrived at Hooters on

11   June twenty-six at four or five.  Are you referring to p.m.?

12   A.   Yes, ma'am.

13   Q.   Also, Mr. Oliver, I know that you were compared with the

14   defendant in relation to height.  But you don't have any

15   tattoos on your neck, do you?

16   A.   Not on my neck, no.

17   Q.   Would you please show to the members of the jury that you

18   don't have any tattoos on your neck.

19              (Whereupon, the witness complied.

20   Q.   And the other side, please.

21              (Whereupon, the witness complied.)

22   Q.   Thank you.

23              Sir, you were not charged with anything that night,

24   were you.

25   A.   From what I was told, after I was arrested, but when we
```

1    called back to get a statement or police report, they said they

2    didn't have one on me.

3         THE COURT:  I didn't hear what you said.  They didn't

4    have what?

5         THE WITNESS: They didn't have a police report on me

6    for what had happened that night or the night before.

7    Q.  So are you saying that you later learned you weren't

8    charged?

9    A.  No, I still haven't learned -- I have been trying to -- the

10   reason after that I tried to get jobs and I couldn't get jobs

11   for some reason so I thought it was on my record or whatever.

12   Q.  But you haven't been charged with anything for that

13   incident?

14   A.  Not that I know of.

15   Q.  And, sir, you're not testifying today regarding a robbery

16   of Compass Bank on June twenty-second, two thousand seven, are

17   you?

18   A.  Yes, ma'am.

19   Q.  You're testifying regarding the bank robbery?

20   A.  I think so, yes, ma'am.

21   Q.  Were you present when the bank was robbed on June

22   twenty-second, two thousand seven?

23   A.  No, ma'am.

24   Q.  So you're testifying today as to what happened to you while

25   you were working on June twenty-six, two thousand seven, right?

```
1    A.   That's right.  Not to the bank robbery, I guess.
2    Q.   And you're not testifying today regarding any shooting at
3    the U. S. marshals, are you?
4    A.   No, ma'am.
5    Q.   Thank you, sir.  That's all I have.
6           THE COURT:  I think the jury knows what he's
7    testifying about.  Let's move on.
8           MR. BUTLER:  Yes, Your Honor.
9           THE COURT:  We don't have to state the obvious.
10          (Whereupon the witness, Edmond Oliver, stepped down
11    from the stand.)
12          THE COURT:  Next witness.
13          MS. McKEE:  Britney Crossky.
14               B R I T N E Y   C R O S S K E Y,
15      the witness herein, having first been duly sworn or
16    affirmed to tell the truth, was examined and testified as
17    follows:
18                    DIRECT EXAMINATION
19            BY MS. McKEE OF BRITNEY CROSSKEY:
20    Q.   Ms. Crossky, would you state your name and spell your last
21    name for the record.
22    A.   Britney Crosskey, C-r-o-s-s-k-e-y.
23    Q.   Miss Crosskey, where do you live?
24    A.   McGhee Place.
25    Q.   McGhee Place?
```

```
 1   A.  It's called the Belmont, now.
 2   Q.  I can't see you, but are you sitting as close to the
 3   microphone as can you?
 4   A.  Yeah.
 5   Q.  Okay.  And who do you live with in McGhee Place?
 6   A.  It's me and my baby.
 7   Q.  Where were you living back in June of two thousand seven?
 8   A.  Forty Fairlane Drive.
 9   Q.  Forty --
10   A.  Fairlane Drive.
11   Q.  And who was living at the residence with you on forty
12   Fairlane drive back in June of two thousand seven?
13   A.  My Mom, my brothers, my baby.
14   Q.  You said your brothers?
15   A.  Mm-hmm.
16   Q.  Who are your brothers?
17   A.  Andre, Corey, Kevin and J. C.
18   Q.  You said Andre --
19   A.  Corey, Kevin, J. C.
20   Q.  What's Andre's last name?
21   A.  Smith.
22   Q.  And is this your brother here, Andreas Smith?
23   A.  Yes.
24   Q.  So back in June of two thousand seven it's your mother,
25   Andreas Smith your brother, as well as three other brothers?
```

1    A.   Yes.

2    Q.   Now you said that you have a child that you live with a

3    child now on McGhee Place?

4    A.   Ma'am?

5    Q.   You said that you live with your child now on McGhee

6    Place?

7    A.   Mm-hmm.

8    Q.   Was your child living with you on Forty Fairlane Drive back

9    in June?

10   A.   Yes.

11   Q.   And do you have a little boy or a little girl?

12   A.   A boy.

13   Q.   What's his name?

14   A.   Mxxxxxx.

15   Q.   How old is Mxxxxxx?

16   A.   He'll be five this week.

17   Q.   So back in June of two thousand four he was about four

18   years old?

19   A.   Yes.

20   Q.   And where did you work back in June of two thousand

21   seven?

22   A.   Jack Ingram Motors.

23   Q.   Do you currently work at Jack Ingram now?

24   A.   Yes, ma'am.

25   Q.   How long have you been at Jack Ingram Motors?

```
1    A.   Two years.
2    Q.   Do you recall the shift that you worked back in June, two
3    thousand seven at Jack Ingram Motors?
4    A.   Seven to five-thirty.
5    Q.   Is that seven in the morning or in the evening?
6    A.   In the morning.
7    Q.   So seven a.m. to five-thirty p.m.
8    A.   Yes, ma'am.
9    Q.   With your son being four years old at the time back in
10   June, two thousand seven, did you have any day-care or anyone
11   that would watch your child while you went to work from seven
12   a.m. to five-thirty p.m.?
13   A.   He was in day-care.  I withdrawed (sic.) him out until the
14   end, I had Andreas watching him.
15   Q.   So you said once you withdrew your son, Mxxxxxx from
16   day-care, Andreas Smith, your brother, watched him?
17   A.   Yes, ma'am.
18   Q.   Was that a typical arrangement that yourself and your
19   brother, Mr. Smith, had set up back in June of --
20   A.   There was a problem at day-care.  So as far as I had him
21   watching him, he wasn't played with -- The arrangement was that
22   he was going to watch him because I was wondering like how I
23   was going to go without me working and him not being at
24   day-care.  So there was an arrangement that he was going to
25   watch him.
```

1   Q.  Let me ask you.  At the time, how old was your brother
2   Corey that was living with you in the house?
3   A.  He should have been like twenty-five or something like
4   that.
5   Q.  And how old was Kevin?
6   A.  Twenty -- No no, I'm sorry, because I'm twenty-one.
7   Twenty-two.
8   Q.  And how old is J. C.?
9   A.  He's actually -- He's twenty.
10  Q.  Okay.  And at any point how dependable was Mr. Smith as far
11  as watching your baby when you had him?
12  A.  He was very dependable.
13  Q.  Typically, who was the individual when you went to work
14  after your child was not in day-care?  Was there one particular
15  individual that typically watched your child?
16  A.  Say that again?  I'm sorry.
17  Q.  Once your child was out of day-care, was there one
18  individual in the household, you had named several people that
19  lived there, was there one individual in particular that would
20  actually baby-sit your child for you when you were at work?
21  A.  As far as --
22  Q.  Back in June two thousand seven.
23  A.  Oh.  Well, I mean Andreas was watching him so if he
24  wouldn't watch him or whatever, which he will watch him, and
25  that way J. C., which he didn't watch him very often but

1    Andreas was the one who was watching him at the time.

2    Q.  I want to take you back to the date of June twenty-second,

3    two thousand seven.  Let me ask you, around that period of time

4    before then, were you ever familiar -- Let me ask you this way.

5    You and Andreas, Mr. Smith, are brothers and sisters.

6    A.  Yes, ma'am.

7    Q.  Do you all have the same father?

8    A.  No, we don't.

9    Q.  Do you know Mr. Smith's father?

10   A.  I mean --

11   Q.  As far as whether or not he ever had a relationship with

12   Mr. Smith that you are aware of.

13   A.  I don't know him like that.  He's just talking to you like

14   that, it's that kind of relationship, but I don't have no close

15   bond with him.

16   Q.  When you were younger, do you know where Mr. Smith's, your

17   brother's father was?

18   A.  No, ma'am.

19   Q.  Specifically, on June twenty-second, two thousand seven,

20   that was a Friday, who was at home when you left for work on

21   June twenty-second, two thousand seven?

22   A.  I can't really think back on a certain day, but normally it

23   would be my Mom and brothers that's actually were there when we

24   wake up in the morning and he had to work.

25   Q.  Do you recall if you went to work at Jack Ingram Motors

1    that day?

2    A.  I should have, yes, ma'am.  It's not very often that I miss

3    days at work.

4    Q.  And around that day, June two thousand seven, would your

5    son have been out of day-care at that point?

6    A.  Yes.

7    Q.  So when you went to work on that day, who watched your

8    child for you when you went to work?

9    A.  Thinking back on this day?

10    Q.  Yes.

11    A.  I mean, I don't recall Andreas watching him because I can't

12    be specific on days, but he was known to be watching Mxxxxxx.

13    Q.  At any point in your life have you ever seen your brother,

14    Mr. Smith, with a gun at all?

15    A.  No, ma'am.

16    Q.  At any point when you all were growing up or even after you

17    two became adults, at any point have you ever seen Mr. Smith

18    possess any kind of narcotic or drug?

19    A.  No, ma'am.

20           MS. McKEE:  May I have a moment, Your Honor?

21           THE COURT:  Yes.

22           (Whereupon, Ms. McKee conferred with Mr. Butler off

23    the record and out of the hearing of the other courtroom

24    participants.)

25    Q.  Ms. Crossky, do you have any knowledge of Mr. Smith's

```
 1    relationship with his father as to whether or not he had a
 2    relationship with him?
 3    A.  I don't think he really had a relationship with him.
 4              MS. McKEE:  No further questions, Your Honor.
 5              MS. ADAMS:  May I proceed, Your Honor?
 6              THE COURT:  Yes.
 7                          CROSS EXAMINATION
 8                   BY MS. ADAMS OF BRITNEY CROSSKY:
 9    Q.  Good morning, Ms. Crossky.
10    A.  Good morning.
11    Q.  My name is Jerusha Adams, and I'm an Assistant United
12    States Attorney that's prosecuting this case.
13              Now you said the defendant, Mr. Smith, is your
14    brother, right?
15    A.  Yes, it is.
16    Q.  In fact, he's one of your older brothers?
17    A.  Yes.
18    Q.  You also stated that you don't specifically recall what
19    happened on June twenty-second, two thousand seven, right?
20    A.  No, ma'am.  I can't be specific as far as days and dates
21    because I can't remember when I pulled him out, but I know
22    y'all can check back.
23    Q.  Because if you could specifically remember, then you would
24    have told the police about it earlier, right?
25    A.  Yes.
```

1  Q.  Because you would have done everything you could to clear

2  your older brother, right?

3  A.  Meaning clear him as far as what?

4  Q.  Meaning if he was in trouble and you knew that he was at

5  your house or your mother's house watching the baby while it's

6  alleged that he was in trouble, you would have came forward and

7  said I know for a fact that he was not doing whatever you guys

8  think he was doing, right?

9  A.  I wouldn't take nobody's sides.  I would just tell you

10  honestly what actually happened.

11  Q.  Right.  Now do you remember in December of two thousand

12  seven speaking to an A. T. F. agent?

13  A.  A. T. F. is a detective?

14  Q.  I'm sorry.  I'll clarify it.  A. T. F. is Bureau of

15  Alcohol, Tobacco and Firearms and Explosives.  Do you remember

16  speaking to a federal agent in December of two thousand

17  seven?

18  A.  No, ma'am.

19  Q.  Mr. Fitzpatrick, would you please stand.

20  A.  Oh, yeah.

21  Q.  Were you speaking to him?

22  A.  I'm sorry.  That didn't make sense to me.  I'm new to all

23  this.  But yeah, I do remember seeing his face.

24  Q.  I know you interact with a lot of people.  But you remember

25  Mr. Fitzpatrick?

```
1    A.   Yes.

2    Q.   And you remember him asking you about your brother watching

3    your son?

4    A.   Mm-hmm.

5    Q.   And you were honest with Mr. Fitzpatrick, weren't you?

6    A.   Yes, ma'am.

7    Q.   And you told him everything you could remember at that

8    time?

9    A.   That's correct.

10   Q.   And you told him just like you said today --

11        MR. BUTLER:   Your Honor, I'm going to ask at this

12   time to speak with Government counsel.

13        THE COURT:   Yes.

14        (Whereupon, Mr. Butler conferred with Ms. Adams off

15   the record and out of the hearing of the other courtroom

16   participants.)

17   Q.   Miss Crossky, I was asking you, you said that you

18   remembered speaking with Agent Fitzpatrick, right?

19   A.   Yes.

20   Q.   And you said that you told him the truth?

21   A.   Yes, ma'am.

22   Q.   And I'm just asking you, you remember telling him that you

23   could not recall specifically what happened on June

24   twenty-second, two thousand seven?

25   A.   Yes.
```

```
 1    Q.  Just like you said today.

 2              MS. ADAMS:  One moment.

 3              (Whereupon, Ms. Adams conferred with Ms. Hardwick off

 4    the record and out of the hearing of the other courtroom

 5    participants.)

 6              MS. ADAMS:  No further questions, Your Honor.

 7              MR. BUTLER:  Your Honor --

 8              MS. McKEE:  Your Honor, may I have just a brief

 9    moment?

10              THE COURT:  Yes.

11              (Whereupon, Ms. McKee conferred with Mr. Butler off

12    the record and out of the hearing of the other courtroom

13    participants.)

14              MS. McKEE:  No further questions, Your Honor.

15              THE COURT:  Thank you.  You may step down.

16              (Whereupon the witness, Britney Crossky, stepped down

17    from the stand.)

18              It's now a little after eleven o'clock.  I'm going to

19    excuse the jury for ten minutes.

20              (Whereupon, the jury was escorted out of the

21    courtroom, and the following colloquy ensued):

22              THE COURT:  Counsel, we'll take a ten minute recess.

23    When we come back I'll let you know my ruling on the expert

24    witness.

25              (Whereupon, a recess was taken.)
```

```
1                      MOTIONS IN OPEN COURT

2                   (THE JURY IS NOT PRESENT):

3           THE COURT:  Counsel, I have considered the motion in

4    limine regarding the testimony of Dr. Fulero, and the Court has

5    first been guided by the Eleventh Circuit law which prior to

6    Daubert had a per se rule.  But as the Eleventh Circuit said in

7    a later case, I believe it was United States vs. Smith, that it

8    is open to question as to whether that per se rule exists in

9    light of Daubert.

10          I do, however, have the unpublished opinion that Ms.

11   Adams gave me.  However, unpublished opinions cannot be cited

12   for precedence.

13          I've considered the law from other circuits, as well

14   as the Smith case, and I've in particular considered the

15   evidence that's been presented in this case.  And I have been

16   very much enlightened by the evidence in this case, and I think

17   that the question of cross-racial identification is very

18   critical to the disposition of this case in particular.

19   Therefore, the motion in limine is denied.

20          However, I will allow the expert to only give limited

21   testimony.  He's not to comment on the evidence in this case.

22   He's only to outline the factors.

23          He's also not to take any position on how the jury

24   should ultimately consider those factors.

25          So the motion in limine is sort of granted in part
```

1    and denied in part.

2           By the way, I'm going to issue a longer opinion that

3    sets forth my reasons.

4           Bring in the jury.

5           Could you hold the jury for just a minute?

6           I would just caution one thing, Ms. Adams.  I know

7    this puts you in a slightly difficult position, but to the

8    extent that you cross, you have to be careful that you don't

9    open up certain avenues that I have said the expert cannot go

10   into.  But we'll just have to cross that path when we get to

11   it.

12          MS. ADAMS:  Yes, Your Honor.  I would just request

13   that you give the jury an instruction regarding the limited

14   admissibility of Dr. Fulero's testimony.

15          THE COURT:  If you'll draft it, I will give it after

16   he testifies, providing I agree with it.  In fact, let Mr.

17   Butler see it and see if you all can agree on a charge.

18          Very good.  Bring in the jury.

19          (Whereupon, the jury was escorted into the

20   courtroom.)

21          THE COURT:  Mr. Butler, you may call your next

22   witness.

23          MR. BUTLER:  Yes, Your Honor.  At this time the

24   Defense recalls Annette Gurley.

25                    A N N E T T E    G U R L E Y,

```
 1        the witness herein, having first been duly sworn or
 2    affirmed to tell the truth, was examined and testified as
 3    follows:
 4              Direct examinationBY MR. BUTLER OF ANNETTE GURLEY:
 5    Q.  I'm just going to ask you a few follow-up questions.  It
 6    should be brief.
 7              Ms. Gurley, where were you born?
 8    A.  In Lexington, South Carolina.
 9    Q.  And, I'm not trying to be offensive or inappropriate, but
10    this has relevance.  What year were you born?
11    A.  Nineteen fifty-three.
12    Q.  How long did you live in Lexington, South Carolina?
13    A.  Until I was about five or six.
14    Q.  And where did you move after Lexington, South Carolina?
15    A.  Pike Road, Alabama.
16    Q.  And where do you presently live?
17    A.  Montgomery.
18    Q.  Okay.  At between the ages, I guess, from birth to five or
19    six, did you attend nursery school, preschool, anything like
20    that?
21    A.  No.
22    Q.  Did you attend elementary school?
23    A.  Yes.
24    Q.  And where did you attend elementary school?
25    A.  Pike Road Junior High.
```

```
 1   Q.  And you went to Pike Road Junior High between what ages or
 2   grades?
 3   A.  From the first to the ninth.
 4   Q.  Were there any African-American students at Pike Road
 5   Junior High?
 6   A.  No.
 7   Q.  Where did you attend high school?
 8   A.  Lanier and J. D.
 9   Q.  Lanier first, then J. D.?
10   A.  Yes.
11   Q.  So Lanier for what grades?
12   A.  The tenth through the eleventh.
13   Q.  And J. D. for the --
14   A.  The eleventh and twelfth.
15   Q.  All right.  Were there any African-Americans at Lanier?
16   A.  Definitely.
17   Q.  Okay.  And at J. D.?
18   A.  Yes.
19   Q.  Do you recall, and if you don't know the exact -- I'm
20   asking for an estimation here, do you know what percentage of
21   the high school at Lanier was African-American?
22   A.  I have no idea.
23   Q.  But you do recall African-American students?
24   A.  Oh, yes.
25            THE COURT:  Can you say whether it was approximately
```

```
 1    fifty percent?  Forty percent?  Ninety percent?  Do you have
 2    any idea?
 3            THE WITNESS:  I'm not really positive.
 4            THE COURT:  If you really can't say, I'm not forcing
 5    you to say something.
 6            THE WITNESS:  Yeah.  If I had to guess I would say at
 7    Lanier probably and J. D. at least fifty/fifty.  But I had
 8    several African-Americans in my classroom, so now -- but I
 9    couldn't --
10    Q.  What -- Do you recall what years you attended Lanier?
11    A.  Sixty-nine and seventy.
12    Q.  And J. D. seventy, seventy-one?
13            Are you aware, yes or no, that the Montgomery school
14    district was segregated up until nineteen sixty-nine.
15    A.  Yes.
16    Q.  Did you attend college?
17    A.  At Massey (ph.) Drawns Business College.
18    Q.  And what years was that?
19    A.  Oh, I'm not sure.  In the eighties, but I'm not sure.
20    Q.  After graduating high school between seventy-one and when
21    you attended Massey Drawns, did you hold various jobs?  Or what
22    were your --
23    A.  I had a few jobs, yes.
24    Q.  What was your source of employment during that period, or
25    were you --
```

```
1    A.   I was a housewife first, and then in about seventy-six I
2    worked at Farmburgs (ph.) in the Montgomery Mall.  I worked at
3    the State of Alabama for just a little while.  I worked at
4    Mutual Savings Credit Union.  I worked at Ralston Purina.  I
5    worked at G. M. A. C. for over fourteen years.
6    Q.   Does that bring us to approximately when you attended the
7    business school?
8    A.   I attended the business school just a little bit before I
9    went to, let's see -- I attended the business school before I
10   went to the state and before I went to Ralston Purina.
11   Q.   Again, these questions are not intended to be offensive,
12   but there is a relevance.  Have you ever had a personal
13   relationship other than friendship with an African-American
14   male?
15   A.   No.  If you're talking about dating, or --
16   Q.   Dating.  Yeah.
17   A.   No.
18   Q.   What church do you attend, or do you attend church?
19   A.   Yes I do.  Frasier.
20   Q.   Here in Montgomery?
21   A.   Yes.
22   Q.   Do you have any knowledge of what the percentage of
23   African-Americans are parishioners there or attend that
24   church?
25   A.   I have no idea.
```

1  Q.  Approximately ten percent, would that be accurate?

2  A.  They have so many people there and so many services I have

3  no idea.

4  Q.  The services that you attend, do you have a sense of what

5  the usual percentage of African-Americans in that service

6  are?

7  A.  Actually, no.  I don't pay attention to how many people or

8  stuff like that.

9  Q.  I understand.

10        You worked for a Compass Bank.  How long have you

11  worked for Compass Bank?

12  A.  Three years.

13  Q.  On June twenty-second, two thousand and eight you were at

14  the location on Eastern Boulevard.  How long had you been

15  employed at that location?

16  A.  Two years -- Well, yeah, but --

17  Q.  A little longer than two years?

18  A.  A little longer, but not in that same position the whole

19  time.

20  Q.  I understand.  But you had been at that location for that

21  two and-a-half year period, correct?

22  A.  Except for an opportunity like a month or two.

23  Q.  Okay.  That location handles more than just what I'll call

24  teller transactions.  Well probably all locations do, but that

25  location has a, and correct me if I'm wrong, a commercial loan

1   unit, correct?

2   A.   Commercial lending, yes.

3   Q.   Commercial lending.  It's one of the main offices for

4   Compass Bank as far as its businesses?

5   A.   Yes, it is.

6   Q.   Can you kind of tell from the photographs, it does have a

7   teller station, that's why we're here, because of what happened

8   at yours, but you don't have the teller traffic that other

9   location have, the high volumes, correct?

10  A.   Right.

11  Q.   You have developed personal relationships with some of your

12  customers because the customers that do use that bank tend to

13  be, not all of them but some of them, maybe a good chunk tend

14  to be routine regular customers, is that correct?

15  A.   That's correct.

16  Q.   As compared to some other banks where you might have a

17  hundred or two hundred people come in one day that might be

18  completely different than the next day?  You tend to have, I'll

19  use the word cyclical, a cyclical clientele going to and from

20  that the branch?

21  A.   That's correct.

22  Q.   Okay.  Don't give the address, but what area of the major

23  cross streets of the area where you live in Montgomery,

24  Alabama?  Don't give me your street address, that's not our

25  business.  But what are the major cross streets of the

1    neighborhood where you live?

2    A.   Off Atlanta Highway.

3    Q.   Is it near, in using Montgomery, is it near the Eastern

4    Bypass, or towards what I'll call the Wal-Mart, down that

5    area?

6    A.   The Eastern Bypass or what?

7    Q.   Towards the Wal-Mart as you go down the Atlanta Highway.

8    Atlanta Highway is very long.  I need a cross street.

9            THE COURT:  What, are you just getting the racial

10   makeup of her neighborhood?

11           MR. BUTLER:  Yes.

12           THE COURT:  Just ask her that.  You might just want

13   to ask her that directly.

14   Q.   Do you know the racial makeup of your neighborhood?

15   A.   They're integrated.

16   Q.   Okay.  So it's Atlanta and what cross section?  What's the

17   nearest cross section?

18           MS. HARDWICK:  Your Honor, we would object to any

19   further details.  This witness was a victim in an armed

20   robbery, and I'd ask we limit those questions.

21           MR. BUTLER:  And I do not want her address.  I'm just

22   asking for the make cross section.

23           THE COURT:  I'll allow that.  The major cross

24   section.

25   A.   I'm not sure exactly where you're talking about, but I do

```
1    not want to get specific.
2              THE COURT:  No, you do not need to give your address.
3              THE WITNESS:  I know, but I don't want to give right
4    in my area either, really.  It's closer to Madison Avenue.
5    Q.  Thank you.
6              After the events on June twenty-second --
7              MR. BUTLER:  One moment, Your Honor.
8    Q.  I believe during your direct examination when you testified
9    previously you indicated that after the events -- after the
10   robbery, you spoke to law enforcement officers, correct?
11   A.  Yes.
12   Q.  I believe your testimony also was that you spoke to some of
13   the other bank employees regarding what had just taken place.
14   A.  Not until after the investigation was over.
15   Q.  Yeah, after the law enforcement had done their
16   investigation you spoke to some of the other bank employees
17   regarding what had taken place.
18   A.  Yes.
19   Q.  Okay.  Daniel Robinson?
20   A.  I'm sure we did.
21   Q.  Patricia Franco?
22   A.  Yes, I'm sure we spoke.
23   Q.  Okay.  And during your earlier examination you were asked
24   regarding the individual who came to the door prior to the bank
25   opening.  That is an individual had come at some point to the
```

```
1    door prior to the bank opening, correct?
2    A.  That's correct.
3    Q.  All right.  To the best of your knowledge, your testimony
4    was that that was the individual that had returned to the bank,
5    correct?
6    A.  That's correct.
7            MS. HARDWICK:  Your Honor, we object to the
8    mischaracterization.  I don't think that was her testimony.
9            THE COURT:  Well she can say what she said.
10           Was that the person you said had returned?
11   Q.  To the best of your knowledge.  And your answer was
12   correct?
13   A.  I'm not exactly sure what I said earlier.
14           THE COURT:  Well why don't you tell us is it the same
15   person that returned later?
16           THE WITNESS:  It looked like the same person.
17           THE COURT:  Okay.
18           MR. BUTLER:  Nothing further, Your Honor.
19                         CROSS EXAMINATION
20                   BY MS. HARDWICK OF ANNETTE GURLEY:
21   Q.  But you never identified who the person was that came early
22   in the morning, is that correct?
23   A.  Not to my knowledge.
24   Q.  Were you there at the bank when the person came earlier
25   before the bank opened?
```

```
1    A.  Yes, ma'am.

2    Q.  You never identified that person as being the bank robber,

3    you simply said it "looked like him"?

4    A.  That's correct.

5    Q.  You also said that the person at Hooters looked or

6    resembled him.

7    A.  That's correct.

8    Q.  When you were shown a photo lineup of the person at Hooters

9    you didn't identify that person, did you?

10   A.  No, ma'am.

11   Q.  Now in reference to your locations, Mr. Butler asked you a

12   series of questions about your background, and I want to ask

13   you a few questions about that.  When you were brought up, Ms.

14   Gurley, were you around African-Americans?

15   A.  Quite a bit.

16   Q.  And when you went to school, you said that one through nine

17   there were no African-Americans in your class?

18   A.  That's correct.

19   Q.  And you were aware of the fact of the date that the schools

20   were integrated?

21   A.  Yes, ma'am.

22   Q.  And at the time the schools were integrated, you had

23   African-Americans in your school?

24   A.  Yes.

25   Q.  And in fact you had African-Americans in your classroom.
```

```
1    A.   Yes, ma'am.

2    Q.   Were these people that you learned to know by name?

3    A.   Yes, ma'am.

4    Q.   You were able to distinguish your classmates one from

5    another?

6    A.   Yes, ma'am.

7    Q.   Did you later have any socializations with any

8    African-American people at your workplace or church?

9    A.   Yes, ma'am.

10   Q.   Do you have social functions at your church?

11   A.   Yes, ma'am, but I don't attend them.

12   Q.   Okay.  But when you say that you've had interactions with

13   African-Americans at your school during your class periods, you

14   had interactions when there were African-Americans in your

15   class?

16   A.   Yes, ma'am.

17   Q.   People who have come to your bank at your location at

18   Compass, are African-Americans customers at Compass?

19   A.   Yes, ma'am.  Do you know them apart by name?

20   A.   Yes, ma'am.

21   Q.   Have you -- are there -- Let me rephrase that.

22          Have you ever confused or saw a Caucasian person that

23   resembled somebody else that you thought you knew.

24   A.   Yes.

25   Q.   Have you ever seen an African-American that you saw that
```

1  you thought you knew?

2  A.  Yes.

3  Q.  And would it be a fair statement that you believe that that

4  may have happened to a lot of people?

5  A.  Yes, ma'am.

6  Q.  But on June twenty-second, two thousand and seven when you

7  were confronted with the person robbing you, was your focus on

8  that individual?

9  A.  Yes, ma'am.

10  Q.  And when you were given two opportunities to identify him

11  with a composite that was drawn, do you recall that?

12  A.  Yes, ma'am.

13  Q.  And you told them that was a poor copy of the composite

14  looking like the person that you remembered that robbed you, is

15  that correct?

16  A.  Yes, ma'am.

17  Q.  And you couldn't identify the composite of that individual

18  who they drew as being the person who robbed you, is that

19  correct?

20  A.  That's correct.

21  Q.  And you were also shown another group of six people, and in

22  that six group you could not say that that was the person who

23  robbed you, could you?  The first group of pictures that you

24  were shown?

25  A.  No, ma'am, I could not.

```
 1   Q.  When they showed you the picture that had the person in it
 2   who asked you for your money and told you he had a gun, you
 3   identified him, didn't you?
 4   A.  Yes, ma'am.
 5          MS. HARDWICK:  Those are all my questions.
 6          MR. BUTLER:  Briefly.
 7                    REDIRECT EXAMINATION
 8                BY MR. BUTLER OF ANNETTE GURLEY:
 9   Q.  Between -- While a teenager, up until about the age of
10   eighteen, what church did you attend?
11   A.  Pike Road Baptist Church.
12   Q.  Were there any African-Americans in that church?
13   A.  No.
14   Q.  The first time that you regularly interacted and socialized
15   with other African-Americans was when you attended high
16   school?
17   A.  No.
18   Q.  Let's put it this way --
19   A.  I interacted with them from the time I was in the first
20   grade on.
21   Q.  Okay.  They just didn't go to school with you?
22   A.  That's correct.
23   Q.  The first time you were in a school setting with
24   African-Americans was when you were in high school?
25   A.  That's correct.
```

```
1    Q.   And, again, your church through high school was all
2    white?
3    A.   That is correct.
4    Q.   Were there any African-Americans who visited your home or
5    worked with your family at all while you were growing up?
6    A.   Yes.
7    Q.   And in what capacity?
8    A.   My father supervised a ranch out at Pike Road.  He had
9    several farmhands that were black and some that were white.
10   And I did Four-H, so I worked with steers and so I worked with
11   a lot of the black and the white farmhands.  I knew them very
12   personally.
13   Q.   And the individuals -- Again, this was between while you
14   lived in Montgomery up until high schoolish that you were
15   working with the farmhands and socializing with them?
16   A.   That was at Pike Road, yes.
17   Q.   But you were a younger person -- well, a younger person at
18   that time?
19   A.   Yes.
20   Q.   And the farmhands tended to be older African-Americans,
21   older men?
22   A.   Yes.
23   Q.   The identification that you made of Mr. Smith, again, that
24   occurred at your home, correct?  The photo was brought to your
25   home?
```

1    A.   That's correct.

2    Q.   Okay.  Was -- Did the officer who presented the photo,

3    Officer Hill, did he inform you that it was a double blind

4    identification?

5    A.   That it was what?

6    Q.   A double blind identification?

7         MS. HARDWICK:   Your Honor, we would object.  He could

8    ask the officer what he informed her of.

9    Q.   Do you know --

10        MR. BUTLER:   Let me rephrase it.

11   Q.   Do you know whether or not it was what is called a double

12   blind identification?

13   A.   I do not know.

14   Q.   Okay.  The reason the officer was there was to your

15   knowledge was that they had developed a suspect in the bank

16   robbery.

17   A.   That's correct.

18   Q.   You made -- You're aware of that portion of your

19   identification at your residence was tape-recorded, are you

20   aware of that?

21   A.   I'm sure it was.  I don't exactly recall, but --

22   Q.   You haven't been shown a copy of the tape-recorded

23   statement you made?

24   A.   No.

25   Q.   How long was the officer at your residence for that

1    identification procedure?

2    A.  I have no idea how long he was there.

3    Q.  Was it fifteen minutes?  Twenty minutes?

4    A.  I'm sure he was there for around fifteen or twenty minutes.

5    I cannot say for sure.

6    Q.  And I'm not asking you to say exactly how long, that you

7    have a stopwatch on, but based on your recollection it was

8    there for approximately fifteen to twenty minutes?

9    A.  I'm not positive.  That's been eight, nine months ago.

10   Q.  Okay.  Well let me put it this way.  He didn't just knock

11   on the door and come in, you did it and he'd leave.  He was

12   there for a period of time.

13   A.  We sat down at the table and he showed me some pictures.

14   Q.  Okay.  I'm showing you what's marked as defendant's exhibit

15   sixty.  Do you recognize that?

16   A.  I don't recognize the first part.  I do recognize the

17   pictures and my signature.

18   Q.  Okay.  You can read it.  You can take your time and read it

19   to yourself.

20            (Witness complied.)

21   Q.  Having read it, does that refresh your recollection of what

22   that statement is?

23   A.  Yes.

24   Q.  Okay.

25            MS. HARDWICK:  Your Honor, we would object to that

```
 1   being referenced to her statement.  It's not a statement that
 2   she adopted, it's something that was done by someone else.
 3              THE COURT:  Yes.  Why is this relevant?
 4   Q.  Is this a statement that you made to law enforcement?
 5              THE COURT:  Did you read it and sign it?
 6              THE WITNESS:  No, I did not sign it or read it or
 7   anything.  I mean I did sign the picture.
 8              MS. HARDWICK:  Your Honor, she's testified that's the
 9   first time she's seen what Mr. Butler has presented to her, but
10   she's seen the pictures which contains her signature.
11              MR. BUTLER:  Can I lay some foundation for this?
12   Q.  A law enforcement came to your house, correct?
13   A.  That's correct.
14   Q.  He talked and spoke to you and showed you a photo lineup,
15   correct?
16   A.  That's correct.
17   Q.  It appears that that conversation was tape-recorded by law
18   enforcement.  Having looked at that statement, does that appear
19   to be what you told law enforcement?
20              MS. HARDWICK:  Your Honor, again, we would object
21   because if there is a transcription --
22              THE COURT:  Well, she did read it and see if it's
23   accurate.  There's nothing wrong with that.
24              (Whereupon, the witness examined said document.)
25   A.  From my recollection, I would guess this is correct.
```

```
1    Q.  Okay.  Based on your recollection, this correctly reflects
2    what you told law enforcement on seven two oh seven, correct?
3              MS. HARDWICK:  Your Honor, again, her answer to Mr.
4    Butler's question was "I guess".
5              THE COURT:  Well based on your memory, is that
6    accurate?  Is the statement accurate?
7              THE WITNESS:  I think so.
8              THE COURT:  What's your question, though?  What are
9    you getting at?
10   Q.  My point is, this is approximately eight questions and
11   answers lines, correct?  Is that correct, it's one page?
12   A.  That's correct.
13   Q.  What's on here is one page, is that correct?
14   A.  That's correct.
15             MR. BUTLER:  That's all I was trying to get at.
16   Q.  On this page, is there any reference to law enforcement
17   being at your home?
18   A.  Let me see it again.
19             THE COURT:  You can't impeach her with this
20   statement.  If that's what you're seeking to do, no.  The
21   statement is hearsay.  You have to call the person who made the
22   statement.
23             MR. BUTLER:  Understood.
24             Nothing further.
25             MS. HARDWICK:  Just one question, Your Honor.
```

```
 1              THE COURT:  Yes.

 2                     RECROSS EXAMINATION

 3              BY MS. HARDWICK OF ANNETTE GURLEY:

 4   Q.  Ms. Gurley, Mr. Butler said when they showed you the lineup

 5   they said they had developed a suspect in the bank robbery, is

 6   that correct?

 7   A.  That's correct.

 8   Q.  When they showed you the first lineup where you made no

 9   identification, they told you then they had a list of suspects

10   and you made no identification.

11   A.  That's correct.

12              MS. HARDWICK:  Nothing further.

13              THE COURT:  Anything else we haven't heard?

14              MR. BUTLER:  No, Your Honor.

15              THE COURT:  Thank you.  You may step down.

16              (Whereupon the witness, Annette Gurley, stepped down

17   from the stand.)

18              THE COURT:  Who is your next witness?

19              MR. BUTLER:  Dr. Fulero.

20              THE COURT:  We'll go thirty minutes and then we'll go

21   to lunch.

22              How many more witnesses do you have, other than Dr.

23   Fulero?

24              MR. BUTLER:  Eleven.

25                     S O L O M O N    F U L E R O,
```

```
1        the witness herein, having first been duly sworn or
2    affirmed to tell the truth, was examined and testified as
3    follows:
4             Direct examinationBY MR. BUTLER OF SOLOMON FULERO:
5    Q.  Dr. Fulero, could you state your name and spell your last
6    name for the record.
7    A.  Yes.  It's Dr. Solomon M. Fulero.  That's spelled
8    F-u-l-e-r-o.
9    Q.  Dr. Fulero, where are you currently employed?
10   A.  Well, I'm a professor of psychology at Sinclair College in
11   the Dayton, Ohio. I have a second academic appointment in the
12   School of Medicine at Wright State University, which is in
13   Dayton, Ohio.
14   Q.  Do you hold any other professional degrees?
15   A.  Well, as far as professional positions go I'm licensed to
16   practice psychology in the state of Ohio, and also licensed as
17   an attorney and practice law in the state of Ohio, and been
18   there since an attorney in good standing since May of nineteen
19   eighty.
20   Q.  Do you have any areas of specialties?  Do you specialize as
21   far as psychology?
22   A.  Well, yeah.  My area of interest and work is in what's
23   generally called forensic psychology, which you could say is
24   the application of psychological research and theory and
25   practice to the answering of various legal questions.  And most
```

```
1   all of my professional, work one way or the other, has been in
2   that area.
3   Q.  Do you hold, in addition to being a member of the Bar, are
4   you a member of any type of professional organizations?  Can
5   you outline some of those organizations?
6   A.  Well, the typical organizations for my field with the
7   degrees that I have like on the law side, I'm a member of the
8   Ohio State Bar Association.
9          On the psychology side the major organization for us
10  is the American Psychological Association, and I'm now a
11  fellow, they call it now, of the American Psychological
12  Association.  And then within that group there are -- it's
13  organized into divisions of interest.  So there is a division
14  for child psychology and a division for educational psychology.
15         One of the divisions is the division for psychology
16  and law, or forensic psychology.  And I'm actually a past
17  nationally elected president of that particular division.
18  Q.  Could you describe for the jury your clinical experience in
19  the area of forensic psychology.
20  A.  Well, as far as clinical experience, I've worked as a
21  clinical director of what's called a forensic center,
22  evaluations of defendants by court order, that sort of thing.
23  Q.  And have you published any articles, periodicals or other
24  writings in the area of psychology?
25  A.  Well, yeah.  I think over the years I've published in,
```

1    like, peer reviewed scientific journals and law reviews and all

2    of that kind of stuff probably somewhere around seventy or so,

3    give or take, articles.

4            Then there's book chapters, and I'm the coauthor of a

5    forensic psychology textbook that the publishers like to say is

6    the leading textbook in the college market.  I don't know much

7    about how they decide that, but --

8    Q.   Okay.  Have you done any work -- have you done any work or

9    do you have any training and experience in the areas of

10   eyewitness identification?

11   A.   Yes.  One of my major areas of work that is a sub area of

12   forensic psychology is the study of eyewitness identification,

13   eyewitness reliability, the factors that can affect eyewitness

14   reliability and also the collection of eyewitness evidence by

15   means of things like composite sketches or lineups or photo

16   spreads.  You know, the sorts of ways that police collect

17   eyewitness evidence.

18   Q.   And how long have you been knowledgeable, studied, learned

19   in this area?

20   A.   Well, I guess I have been interested in this field which

21   has been around quite a long time.  Most of my --

22   Q.   Strictly witness identification.

23   A.   Yeah.  Most of my academic career.  But I guess I have been

24   working in this area since about nineteen eighty or eighty-one,

25   for sure.

1    Q.   Okay.   Eyewitness identifications.   I'm being simple about

2    this, but I see something, I'm later asked about it and I say I

3    just saw something.   I guess that's a rudimentary way of

4    looking at it.   Is there a way of breaking down how things are

5    acquired and recalled by individuals on a more scientific

6    level?   And could you describe that for the jury.

7    A.   Sure.   You know, we've been interested in this area as to

8    eyewitness reliability dating back quite a long time now.

9    Psychologists study memory.   That's certainly true.   And what

10   better place to see it but in eyewitness identification

11   situations.

12          There's a science to this that the dates back to the

13   eighteen nineties or so.   We've looked at a lot of things.   Not

14   only the kinds of factors that can make eyewitnesses more or

15   less likely to be accurate, but ways of collecting eyewitness

16   evidence that can make it -- I mean I think everyone's goal is

17   to get the right person more often and the wrong person less

18   often, and we certainly tried to do that by looking at ways

19   that eyewitness identification can be improved.

20          What we know is that the memory doesn't work like a

21   video tape recorder.   The theory that drives our work is

22   something called the reconstructive theory of memory.   Memory

23   doesn't work like a video tape recorder.   When you see

24   something, especially something complicated, it's not like you

25   turn on some kind of a mental record button and watch it and,

1    you know, then when it's done you hit the mental stop button

2    and then everything stays the same forever and all you have to

3    do to remember something is press the mental rewind button.

4    That's not the way it works at all.

5           When we see something, what we do is is we abstract

6    pieces of information about it.  Bits and pieces.  That's what

7    goes into your memory.  And later to reconstruct the memory

8    from the information.  You fill in the gaps sometimes the way

9    you know it's supposed to be logically, and then the most

10   important thing of all is that we narrow down information that

11   people something after it actually happens can alter their

12   memory of the initial event, and then be experienced later as

13   though it had happened at this earlier time.

14           It works much the way that a computer works.  If I

15   silt down at a computer, I can write a letter.  I can create a

16   letter and type it on the screen, and I can say to the computer

17   save that letter into the memory, which it will do just fine.

18   But if the next day I call up the memory, the letter on to the

19   screen and I make changes to it, I add a couple of words, I

20   take away a sentence, I do some editing, if I save it again

21   what comes up the following day is the changed version, right?

22   With not way to tell what you did originally from what you did

23   to it later.  And memory works that way too.

24           People have heard, I'm sure, about cases where people

25   say they remember something that happened to them in their

1    early childhood that may or may not have happened, but they
2    suddenly remember it.  These are the kinds of things that we
3    study.  And we do break memory down into stages to explain
4    this.
5    Q.  Can -- Let's say that a person witnesses an event.  Okay?
6    Are there factors -- And let's call that event a criminal act.
7    A.  Sure.
8    Q.  Are there factors that can affect how that person acquires
9    that information?
10   A.  Well, yes.  What we do is to break memory down into three
11   stages.  And you're talking about the first of those stages.
12   In order for anyone to remember anything there are three things
13   logically that have to happen.  The first is that at the time
14   of the event, you have to put something into your memory.  Then
15   you have the to keep it for a period of time afterwards.  And
16   then the third thing is you have to get it back out.
17          So memory involves logically putting it in, keeping
18   it and getting it back out.  If you can visualize a time line
19   with an arrow going in one direction with two points on it,
20   point A and point B, and pint A is the crime and point B is
21   remembering it later, then at the time of point A, the event,
22   you'd have to put something in, then you have to keep it and
23   then you have to get it back out.  And what we call those three
24   stages of memory is acquisition, retention and retrieval.
25   Putting it in, keeping it, getting it back out.

1    All three have to work.  A problem in any one of the

2    three stages of memory leads to a memory problem, which is

3    perhaps why perhaps our memories fail us more likely than we

4    would like.  Two out of three is not good enough.  So we look

5    at the factors at each one of these stages.

6    Q.  At the phase of acquisition, that is getting the

7    information, do things such as stress, time, race, could those

8    things be factors in how a person acquires information and can

9    you describe those?

10   A.  Yeah.  There are five or six acquisition factors.  The

11   first one is the length of time that -- it's what we call

12   exposure time.  The longer that a witness has to look at

13   somebody's face, the more likely they are to be accurate.  That

14   much we know from our work.  However, you have to consider a

15   witness's estimate of how long they had in light of a couple of

16   things.

17        First is that when we talk about exposure time

18   leading to greater accuracy, it's not the length of time of the

19   whole event from start to finish.  It's not how long it takes

20   from the moment it starts to the moment it ends.  What matters

21   is how long the witness is doing the task that's necessary for

22   them to pick a face out later, and that's looking at the face.

23   And that's a smaller amount of time than the length of time

24   total, because during an event people are doing other things.

25   They're looking someplace else, they're trying to get away,

1    whatever they might be doing.  And so that's the first thing.

2    Exposure time leads to greater accuracy, but it's the

3    length of time looking at the face, not the length of time

4    looking at the total event.

5    The other thing is that in most cases where witnesses

6    estimate the lengths of time, that's what it is, it's an

7    estimate.  There's usually not a stopwatch running to actually

8    clock what they say.  There's a second factor that's called

9    time overestimation that you have to consider.  People are not

10   very good judges of lengths of time, and it's particularly true

11   when an event is powerful or exciting.  Everything seems

12   subjectively to slow down, and it also seems to take a lot

13   longer than it actually takes.  And we know that from studies

14   in which we compare what a witness says about how long an event

15   takes to the how long the stopwatch says it takes.

16   Or, for example, you can ask people who have been in

17   an earthquake how long did the Earth shake.  If we compare

18   their estimate to the government data from the seismograph and

19   see how long it actually shook, and what we find is that people

20   overestimate lengths of time when they're scared.

21   Q.  You used the word "scared".  Does that fear, stress, does

22   that also affect acquisition?

23   A.  Stress or fear or arousal is another factor.  You know, you

24   hear people say sometimes it's burned into my memory, I'll

25   never forget it, so on and so on, the implication being that

1    the stress makes people's memory better or more accurate.

2            In fact, what we find is at very high levels of fear,

3    stress and arousal, you know the kind that the victims and

4    witnesses typically report, you know, the heart pounding kind

5    of stress that people get when they're scared, facial

6    identification accuracy goes down.  People are less accurate in

7    the identification under stress.  They're not more accurate.

8            Now they may remember the event the rest of their

9    life, but of what you're interested in is whether or not

10   they're going to be more accurate in a photo spread or lineup,

11   stress makes people worse and not better.

12   Q.  Again, we're speaking about an event, the event being a

13   crime.  If the criminal act is being conducted by, and the

14   victim of that criminal act are of different races, does that

15   have any impact on acquisition?

16   A.  Yes.  Put simply, cross-racial identifications are less

17   accurate than same-race identifications.  That is found not

18   only with whites and African-Americans, but it's found around

19   the world.  Hispanics, Asians.  You know, we're not the only

20   country with crime problems and this factor has been studied by

21   scientists in other countries too and you find the same

22   cross-racial is less accurate than same-race.

23           Within the white and African-American version of

24   this, the combination with the lowest accuracy rates is white

25   witness, African-American target.  We've looked a lot at this,

1    and when I talk to people about it, you know, it's difficult

2    when you're talking about this to talk about the white and the

3    African-American version of this because it's so racially

4    loaded everywhere you go, it's hard to talk about it.  But for

5    some reason you can still get white people today to say I have

6    trouble telling the difference between someone who is Japanese

7    and someone who is Chinese.  That apparently is okay to say.

8             But people ought to know that within the Asian

9    community nobody has any trouble.  Japanese, Chinese, Thai,

10   Vietnamese, they all know each other and they're much better,

11   the accuracy rates are higher than the cross rate.  And what we

12   think is that this is a product of differential experience.  It

13   doesn't appear to be a prejudice thing, it's just that the more

14   experience you have with members of other races, the better you

15   get at figuring out what the deal is with the different kinds

16   of faces that there are.

17            As my friends in Louisiana like to tell me, this is

18   how get to know the difference between an alligator and a

19   crocodile.  The more times you see them, the more you figure

20   out, it's something about the eyes or where they're placed or

21   whatever, you just get better at it.  So it doesn't appear to

22   be a prejudiced thing per se.

23   Q.  If, for instance, an individual grew up in an environment

24   where there were very few African-Americans and more or less

25   maintains that environment as an adult, would that be something

1    that might factor into that person's ability to -- would it

2    lead to the potential of cross-racial misidentification?

3    A.   Well, sure.   The potential is still there, and I think that

4    it's fair to say that differential experience mitigates the

5    effect.   But there is still an overall cross-racial effect.

6    Q.   I understand.   I guess what you're saying is as a rule --

7    Well, strike that.

8         Retention.   Keeping the information.   Could you

9    describe that and what could affect it.

10   A.   Sure.   The stuff that I've just --

11   Q.   Hold on.   Before you go there, I meant to ask you this.   Is

12   it your position that all cross-racial identifications are

13   wrong?

14   A.   No, that's definitely not the case.   They're less accurate,

15   they're not totally inaccurate.   I don't think there is

16   anything that would tell you to a certainty something like

17   that.   It's not that all same-race identifications are accurate

18   and all cross-race identifications are inaccurate.   It's that

19   there's a higher likelihood of a correct identification in a

20   same-race and a lower likelihood of correct in a cross-race.

21   Q.   As to retention, that is keeping -- storing the information

22   accurately, can things affect that ability?   I think you used a

23   hypothetical earlier that was helpful, calling up a document

24   and putting something else in.   Could something such as a

25   request to do a composite affect a person's ability to remember

1  something?

2  A.  Yeah.  You mentioned composites.  The factors that I have

3  talked about were all acquisition factors.  Stress was present

4  at the time, cross-racial I D is present at the time, exposure

5  time, all of those things are at point A.  But once the event

6  is over, that doesn't end it, because memory is reconstructive

7  and things that happen afterwards in that interval between A

8  and B can cause the memory to change.  And, you know, one of

9  the things ironically enough about it and I talked about, this

10  is called post event information.  Maybe I didn't say that

11  before.

12       Information that people get about something after it

13  happened.  And ironically enough, of course, one of the ways in

14  which we -- one of the types of post event information that

15  witnesses get is the very ways we collect eyewitness evidence.

16  Witnesses are questioned, they undergo procedures for evidence

17  collection.  They can look at composites.  They look at photo

18  spreads.  All of those require the witness to call it up from

19  the hard drive, if you will, where it's safe and put it on the

20  screen where it's vulnerable.  And we've learned that the

21  manner in which eyewitness evidence is collected can have an

22  impact on eyewitness accuracy.  And composites is one of them.

23  And people know what a composite is.

24  Q.  I think we all do, but just describe it briefly and how

25  that can affects --

1    A.   Right.  Well, use of composites is a pretty generally

2    accepted sort of police procedure.  Where if you have nothing

3    else, you go to a witness and you say -- they sit down with a

4    sketch artist or whatever and draw -- the police artist will

5    typically draw some kind of a sketch.  You've probably seen it

6    in T V from time to time.

7              There are several problems with composites.  One of

8    them is that we know that people who do composites are less

9    accurate later in a lineup or a photo spread.  The reason is

10   that when you call it up on the screen, it muddies your memory

11   of the person you saw originally.  So they actually turn out to

12   be less accurate later.

13   Q.   For example, let's say that a person witnesses an event and

14   says the person had a rather large nose.  They do the

15   composite.  For whatever reason, the person doing it, that is

16   manipulating the machine or whatever that does it, or drawing

17   it, doesn't draw the nose large, they draw it smaller.  Would

18   that have an impact on how that person might store that

19   information?

20   A.   Yes, that's very consistent with what we know about

21   reconstructive memory.

22             The other thing about the composites is that they

23   have problems in and of themselves.  If a composite was really

24   good, there actually have been studies with composites where if

25   you can imagine this, you go to somebody and you say to them I

1    want you to describe to the sketch artist President Bush.  Now

2    the sketch artist doesn't know this, but you have been told to

3    give a description of President Bush to the sketch artist so he

4    can draw the president.  But you can't say to him it's

5    President Bush, you just have to describe what his face looks

6    like.

7             Then the artist draws the picture from what you've

8    given him, and if the sketch is that good, you ought to be able

9    to turn around and take the sketch and give it to another

10   person and say who is this, and they should say President Bush.

11   But that's not the way it works.  They're imprecise to begin

12   with.

13            They're also necessary tools sometimes.  I mean, if a

14   police officer has nothing else, what are you going to do,

15   right?  And so it has to be done.  But it's not a reliable

16   technique and it also leads later to inaccuracy.  There's a

17   price to pay.

18   Q.  As to a misidentification, like a composite, could a

19   subsequent misidentification start to alter retention as

20   well?

21   A.  Yes.  If the person then goes through the photo spread

22   procedure, and of course we know stuff, there's five or six

23   things about the photo spread that are important too, but if

24   they then -- what happens is you're overwriting your initial

25   memory with these sequential memories now, so that now the face

1    that is being identified from the spread is now the face of the

2    perpetrator.  This is how misidentifications can occur.

3    Q.  Can the identification procedure itself lead to alterations

4    and retention and errors in retrieval?

5    A.  Yeah.  The most typical procedure that is used in cases is

6    a photo spread.  The presentation to witnesses out of a group

7    of photos, one of which may or may not contain a suspect.  And,

8    again, we know some things about how that photo spread can be

9    constructed to minimize bias.

10         We know something about what instructions should be

11   given and what the witness should be told or not told, and we

12   know about whether or not it should be done double blind or

13   sequential.  I think all of those things are important.

14   Q.  Without going into each and every detail about what should

15   happen, what happens if certain procedures aren't followed?

16   Obviously there are things that should happen, but what happens

17   if they aren't followed?

18   A.  Quite simply it would increase the risk of

19   misidentification.  And of course you know we know these things

20   occur.  The Government tells us these things occur from their

21   own publications.

22   Q.  In the event an individual is shown a lineup with the

23   instruction that there's a suspect in there, it's just normal

24   instructions, but does that alone start to create problems?

25   A.  The instruction that a witness is given before they look at

1    a photo spread turns out to be really, really important.  You

2    know, if the you think about what a photo spread is, you're

3    actually testing a witness's memory with what amounts to many

4    times a multiple choice question, right?

5            You're giving them six pictures and you ask is the

6    person you remember, you have choices A, B, C, D, E and F.  And

7    you remember when you had multiple choice questions in school.

8    Everybody knew what you're supposed to do.  Well, no, everybody

9    remembers a multiple choice question if it was what you're

10   supposed to do is like I guess you'd call it a process of

11   elimination.  I don't remember A, I don't remember B but that's

12   the closest one to the one I remember.  In other words, you do

13   a process of elimination.

14           You get down to the one that's closest to the one you

15   remember.  But you will also remember that if you had a

16   question that had the choice at the end, none of the above, you

17   remember you were like -- because that meant that the choice

18   might not be contained.  The answer might not be contained in

19   the choice because there was always the option that it might

20   not be there.  And in a photo spread it's very important that

21   the witness not understand their task to be we have a suspect,

22   here are a group of photos.  Because what you've done is you've

23   taken away of none of the above.

24           You have told the witness that the answer, the

25   suspect, is contained in the choices.  So the instruction that

1    works, and that is recommended, is an instruction that goes

2    remember that the person that you saw may or may not be in the

3    group of photos that you were about to look at.  And that

4    instruction when it is given and when it is not countermanded

5    by anything else that anyone says, actually reduces the number

6    of incorrect picks significantly.  That instruction is the one

7    that is recommended in the guide.

8    Q.  Do people, based on your study of psychology, have a desire

9    to want to please the examiner; i.e., I have been given a list

10   of suspects, I want to do the right thing, I want to please

11   this person.  Does that have an impact?

12   A.  Well, sure.  We all want -- and people have an

13   understandable desire to get the bad guy, and if I'm told, if I

14   out independently that the police have already affixed on a

15   suspect and that suspect is contained in the group of pictures,

16   then my task is not to pick out the one that -- it's now to

17   pick out the person who is the suspect.  That's why it's very

18   important that witnesses not be told anything about --

19   witnesses who are about to see a photo spread not be told

20   anything about what the procedure is about other than we have a

21   group of photos.  We would like you to look at them.  Remember

22   that the person you saw may or may not be in this because

23   partly because it reduces the number of false picks, partly

24   because it does reduce the pressure of the pick.

25   Q.  I guess this would be a form of identification.  If a

1    witness, without being shown a formal police lineup,

2    misidentifies somebody, let's just say off the street, as a

3    person who committed the offense against him and then is

4    subsequently shown another actual lineup, that's essentially

5    two forms of identifications that are taking place.  Do

6    multiple identifications create problems?

7    A.  Multiple identification procedures do create problems and,

8    you know, when you have composite plus something else plus

9    something else.  The more times people undergo procedures, the

10   more problematic it is.  Multiple procedures are dangerous.

11        They don't in and of themselves mean that the person

12   is incorrect, but certainly when you have a situation where

13   someone, you know, is shown to misidentify somebody in a

14   voluntary sort of way, it does, you know, create an issue about

15   the person's ability to do something accurate in a subsequent

16   procedure.

17   Q.  Retrieval.  The last stage.  Could you talk a little bit

18   about that?

19   A.  Well, there were a couple of more double blind and

20   sequential.  If you want me to --

21   Q.  Please.

22   A.  There's two things about the presentation of photos that we

23   found to be particularly important.  One is in almost every

24   procedure that we see in places that have not changed this as

25   some places have, the person who puts together the spread is

1   also the person who gives it.  And thereby the person who is

2   giving the spread knows the identity of the suspect in the

3   spread.

4         Now the reason this is a problem is not what you

5   might think.  It's not that the we think that police officers

6   are out-and-out cheating.  You know, like take a closer look at

7   number four.  It's nothing like that.  The problem is that when

8   people know the identity of the suspect, it is possible for

9   them in the procedure to unconsciously communicate the answer

10  to the witness outside of their awareness.  Body language.

11  Tone of voice.  It's the reason why poker players wear

12  sunglasses.  Because these things are outside of your

13  awareness, the things that you send off.

14         So the solution to this is to make sure that one

15  person puts together the spread, but somebody else gives it who

16  doesn't know which one the suspect is.  That's called double

17  blind presentation.  It's done in science all the time when

18  they run studies to see if a drug is effective.  Nobody knows

19  who is getting what.  It's a very simple solution.  The person

20  the that gives the spread should not know which one the suspect

21  is.

22         And you couple that with the fact that the procedures

23  are not actually recorded.  They're not taped.  You have no

24  idea what happens during these procedures except witness

25  identified number six, or something to that effect.  But the

1    procedure itself is not available for independent use to see

2    what was done or what wasn't done.

3         The other thing is the sequential presentation.

4    Again, in all the places where they haven't changed this which

5    we have in some places, the photos are presented to the witness

6    all at once.  All six.  Typically, it's what's called in law

7    enforcement parlance it's a six-pack.  Three on the top and

8    three on the bottom.  But all of the pictures are presented all

9    at once.  This is called simultaneous presentation.

10        The problem with simultaneous presentation is that if

11   I have all six pictures in front of me I can do the good

12   old-fashioned process of elimination.  He's too old, his hair

13   is wrong, I don't remember that nose.  You narrow it down to

14   the one that's closest to the one that you remember.  Right?

15   Now the alternative --

16   Q.  Dr. Fulero, one thing I want to add.  For instance, let's

17   say as a result of what I'll call computer recall, calling up

18   on screen, you now remember the nose not being so big, it's

19   smaller, but when you're shown the photo identifications you

20   have three very large noses and -- I mean five very large ones

21   and one small one.  Your memory has already been corrupted

22   because the composite when you see the noses in the sixth one

23   you have a small nose in your mind, you have to focus the one

24   that matches your recall.  And assuming one of the matches

25   that's one you're going to zero in on, is that an accurate way

1    of describing it?

2    A.    Yes.   I think that would be accurate.   And of course you're

3    always wanting to look at initial descriptions because the

4    earlier descriptions are less likely to be corrupted over time.

5    That's why in the guide we emphasize a lot of this early and

6    complete and accurate recording of eyewitness evidence because

7    it's like any other kind of evidence, it's best when it's fresh

8    and so on.

9         Now as to the alternative form of presentation,

10    again, if the photos are presented all at once, you have this

11    tendency to do a process of allegation.   The alternative

12    procedure is what's called a sequential presentation in which

13    what you do is you present the photos one at a time and the

14    person has to say yes or no to the first one before they see

15    the next one.   And no going back either.   They can't say can I

16    see number three again.   Because that allows them to do what

17    you're trying not to do.   So number one, yes or no.   Number

18    two, yes or no, and so on down the line.

19         That sequential presentation substantially reduces

20    the number of incorrect picks without really affecting in too

21    much detail.   I mean if you know, you know.   But it does get

22    rid of these false alarms, what we call false alarms by which

23    we mean picking the wrong person.   So double blind, sequential,

24    with proper instructions putting them together so there is no

25    bias or suggestivity in the photos, all of those are

1    particularly important.

2            MR. BUTLER:  Your Honor, I have about fifteen more

3    minutes.

4            THE COURT:  We'll take a recess until one-thirty,

5    then.

6            Members of the jury, turn over your notes in your

7    chairs and you're under the same instructions, cautionary

8    instructions about the case.

9            Court's in recess until one-thirty.

10           (Whereupon the luncheon recess was taken.)

11           (Whereupon the jury was escorted into the

12    courtroom.)

13           THE COURT:  Proceed, Mr. Butler.

14           MR. BUTLER:  Thank you, Your Honor.

15   Q.  Dr. Fulero, when we adjourned you had, I believe, just

16   discussed the double blind technique.

17   A.  Yes, double blind and sequential, yeah.

18   Q.  That technique involves the presentation of what I'll call

19   a lineup, the photographs to a potential witness.  Is that

20   lineup itself, should that be structured a certain way?

21   A.  Yeah.  The manner in which photos are selected is also

22   pretty important.  I mean, I think we all sort of know

23   intuitively that if you have a group of pictures, you want --

24   you don't want the suspect to stand out from the others in any

25   way, because if one photo stands out from the others it's going

1    to be more likely to be selected, even if it's wrong, as it

2    turns out.  But it's also the case, and what we train law

3    enforcement officers to do is do a strategy that's called match

4    to description, we call it.  In other words, if you look at the

5    description that a witness gives right at the beginning, the

6    idea is to the match the photos to the description, because if

7    you do that then the photo -- no one photo is going to stand

8    out to the witness in any particular way.

9            The reason that's really important is that you will

10   often find that if to the witness one or two of the photos and

11   one particular photo stands out, the witness will say things

12   like that looks most like the person I saw, or something to

13   that effect.  It's not the person, but it looks most like the

14   person.  And ironically enough it is possible, if you really

15   wanted to do it the same way that police officers can calibrate

16   a D. U. I. machine before they use it to collect evidence, it's

17   possible to calibrate the spread before you use it.

18           You can actually test in advance whether the spread

19   has a problem.  And the way you do that is to take the spread

20   that's put together, and let's say there are six pictures in it

21   and you show it to sixty people who know nothing about the case

22   and you say to them here's the description of somebody who is

23   accused of a crime.  And you read them the description and then

24   you say now knowing no more than what I just read to you, which

25   one of these people do you think is the suspect.

1          Now if the spread is really fair, those of you who

2    know gambling, what you're going to end up with is that ten

3    people are going to pick each picture.  Because it should be

4    random, they should all look or sound like the original

5    description.  But if you've got twenty or thirty of them going

6    to one photo based on what was read to you, you've got a

7    problem, because one photo is closer to the description than

8    the others and it needs to be calibrated.

9          So if somebody wanted to, you could actually test

10   these in advance.

11   Q.  I guess in a nutshell, if the lineup is not calibrated

12   correctly, there is a possibility, maybe even a likelihood that

13   a certain person might be identified out of that lineup,

14   whether it's accurate or not.

15   A.  Yes, because one of the photos will then be closest to the

16   description, closest to the one the person remembers, and

17   that's particularly true also if the witness also understands

18   that the police have a suspect and that one of the photos is a

19   suspect.

20   Q.  Gotcha.

21          Simultaneous and sequential presentations.  Could you

22   explain to the jury what that is and how it's used.

23   A.  Well, yeah.  Again, as I said before the simultaneous is

24   with all of the six at once.  The sequential is one at a time

25   with the person saying yes or no before they get to see the

1    next one.  That one reduces the number of incorrect picks.

2    Q.  So in addition to being a double blind, coupled with a

3    sequential presentation, is another way of basically reducing

4    error in this process.

5    A.  Absolutely.

6    Q.  And for lack of a better sequential is like flipping over

7    cards, here's one, here's the next, as opposed to having them

8    all out at the same time.

9    A.  Right.  If a person sees all of them at one time, then they

10   will do the process of elimination that we inevitably all do.

11   Q.  Scientific research in this field, has it shown anything in

12   regards to -- we kind of touched on this before, but feedback

13   from the examiner to the witness, how that may interplay in

14   identifications?

15   A.  Yeah.  I said before that it's really important that the

16   person giving the spread not give them any information in

17   advance.  But it turns out that it's also important if not to,

18   after an identification is made, give them any kind of

19   reinforcement for it.  Yes, that's the one or you've picked the

20   suspect.  It's what's called postidentification feedback.

21         And, of course, if the person who gave the spread

22   didn't know which one the suspect was, then they wouldn't be

23   able to do that anyway.  But it turns out that when you tell

24   people -- And, you know, witnesses are people like anybody

25   else.  They ask the officers oftentimes, you know, did I get

1  him?  Is this the one that you had in mind?  And if that's

2  confirmed, it turns out that what that does is to cause the

3  witnesses to distort their memory of their viewing.  They will

4  change what they said about how good their viewing time was but

5  it also increases the confidence that they express on the

6  witness stand and it turns out that confidence is a pretty

7  important factor.

8  Q.  And we're going to touch on that next, but kind of just to

9  underscore what you just said, let's say that feedback is

10  provided prior to, for instance, a witness taking the stand.

11  You may have just said this.  Does that feedback have the

12  effect -- potential effect of bolstering that witness's

13  confidence at subsequent proceedings whether or not that person

14  is accurate or not?

15  A.  Yes.  That's correct.  And that's why not only should the

16  witness not be told yes you got him or yes that's the suspect

17  or anything of that sort, or yes that's the person we thought

18  it was, but also not to give them other evidence.  Yes that's

19  the person we thought because, and then they're told a bunch of

20  stuff that they wouldn't have known otherwise.

21          Again, since we all look at the witness on the

22  witness stand, it's been shown to affect the confidence with

23  which they make the identification and do their testimony.

24  Q.  Finally, confidence and accuracy.  You've touched on it.

25  Could you describe -- They seem like pretty straightforward

1    terms, but they have very different meanings to the jury and

2    how those things play into this.

3    A.   Right.   The confidence that a witness expresses, we all

4    look to it.   You know, the reason that the Government asks the

5    question how sure are you, is because everybody knows, at least

6    they think they know, that there's an assumption that we all

7    have that the more confident we are about something the more

8    likely we should be to be right.   If I'm a hundred percent

9    sure, I should be more likely to be accurate.   I mean, that's

10   why the question gets asked.   And it's very easy in the

11   research that we do to test that, because in the work that we

12   do, we know when witnesses are correct or incorrect.

13          When we run a study, a witness makes an

14   identification, we know if they're right because we've set it

15   up in advance.   All we have to do is ask the next question

16   which goes something like on a scale of zero to one or one to

17   ten or any scale you want, the question is how sure are you

18   that the identification that you have just made is correct.

19   And we can look to see if that's true.   He's a hundred percent

20   sure, you know, a hundred percent accurate and does it go up

21   and down together.   You know, it would be a wonderful world,

22   I'd like to say if everything that we were sure about we were

23   right about, everybody would be rich and no one would be

24   divorced.

25          As it turns out, in our work there is virtually no

1    relation between confidence and accuracy.  A witness who is a

2    hundred percent sure is just as likely to be wrong as one who

3    the hems and haws.  You can't use the confidence expressed as

4    an indicator of accuracy, and it actually works the other way.

5    We tell law enforcement officers, you know, just because

6    somebody is not sure, that doesn't mean they're wrong either.

7    It just doesn't help you either way one way or the other to

8    make a determination.  Even though it's seen as a big deal, in

9    our work there is virtually no relation between confidence and

10   witnesses' accuracy.

11   Q.  Additionally, in your experience and in your work is it

12   possible for a witness to be, not just wrong because time has

13   passed, but to be completely confident in an inaccurate I D

14   that has been skewed or altered as a result of things that

15   happened during the retention phase?

16   A.  Oh, absolutely.  Unquestionably.  As you know, there are a

17   number of documented cases of mistaken identification that have

18   been conclusively shown.  The Government has done work on what

19   are called postconviction D. N. A. exoneration cases where

20   later people who have been convicted are found to be innocent

21   through the use of D. N. A.  The witnesses in those cases, even

22   though they were shown to be mistaken, were equally

23   confident.

24   Q.  I'm showing you what's been previously marked as

25   defendant's exhibit B.  Do you recognize that?

1  A.  Yeah, that's -- I apologize for my handwriting, but it's a

2  pretty crude drawing of that time line that I mentioned

3  earlier.

4        MR. BUTLER:  Your Honor, for purposes of these

5  proceedings I'm moving to enter defendant's exhibit B.

6        THE COURT:  Admitted.

7  Q.  And we're not going to dwell on it because you've talked

8  about all of these factors.  This is, like you indicated, are

9  somewhat rudimentary drawing of what your testimony has been;

10  i.e., an event, acquisition, retention, retrieval with the time

11  line represented by the arrow.

12  A.  Yeah.  This is the time line of human memory.  I've put

13  point A as the event.  In this case of course it's a crime,

14  although it could be anything.  If I were interested in whether

15  at point B you could remember what you had for lunch yesterday,

16  then A would be lunch.  I mean conceptually it doesn't matter

17  what it is.  And then B is eventual recall, which is the

18  witness sitting in the court for the final time telling their

19  story on the time line here.  Then the three stages of memory,

20  putting it at the time, keeping it and getting it back out.

21  The factors that we look at in all of this research on

22  eyewitness accuracy and collection of eyewitness evidence

23  focuses on the factors as you see them there.

24  Q.  The information that's on this sheet, what we've testified

25  to, have you been asked and/or provided this information to

1    assist the Government, the Justice Department in any fashion?

2    A.   Well, yeah.   Somewhere around nineteen ninety-eight and

3    early nineteen ninety-nine the Department of Justice put

4    together a working group called the Technical Working Group on

5    Eyewitness Evidence.   The Government has all these acronyms so

6    we became known as the Twigee (ph.).

7              This group was thirty-four people from around the

8    country.   About half of them law enforcement officers,

9    prosecutors, defense attorneys and then a group of six

10   scientists.   And we were the scientists as it were, who work in

11   the area of eyewitness reliability.   We met a number of times.

12   We wrote a document that was submitted to the Department of

13   Justice and published by them in October of nineteen

14   ninety-nine called *Eyewitness Evidence, A Guide for Law*

15   *Enforcement,* which talks about these things like double blind

16   presentation and sequential and the collection of eyewitness

17   evidence in varying ways.

18             And, again, the goal is that I think it's obviously

19   in everybody's interest to get the right person more often.

20   And given that we know there are these techniques that can

21   increase accuracy, it made pretty good sense to the Justice

22   Department and to the rest of us to put this together.   There

23   has been since this time in two thousand and three a training

24   manual put together for the Department of Justice, also for law

25   enforcement officers to learn the techniques and then teach

1    other law enforcement officers on the theory that law

2    enforcement officers aren't necessarily going to want to hear

3    from pointy headed academics like me, but that we can train

4    them to train themselves in these techniques.  And they spread

5    around the country.

6              MR. BUTLER:  Your Honor, I'm not certain that this

7    would be appropriate to enter as an exhibit for purposes of

8    these proceedings, but I am offering Dr. Fulero's vitae, it

9    outlines his qualifications.

10             THE COURT:  He's already given his background.

11             MR. BUTLER:  Understood.  Then it won't be entered.

12             Nothing further, Your Honor.

13             THE COURT:  Cross?

14             MS. ADAMS:  Thank you, Your Honor.

15                       CROSS EXAMINATION

16                  BY MS. ADAMS OF SOLOMON FULERO:

17   Q.  Dr. Fulero, you just mentioned the D. O. J. guidelines.

18   A.  Yes.

19   Q.  Did you have the little booklet in front of you?

20   A.  Mm-hmm.

21   Q.  Isn't it true that in that guideline it states that

22   "Opinions are points of view expressed in that document

23   represent a consensus of the authors and do not necessarily

24   reflect the official position of the U. S. Department of

25   Justice"?

1    A.   It does in the second printing.  It didn't in the first

2    printing.  This was added without the knowledge of the group.

3    Q.   And the second printing occurred when?

4    A.   I'm not sure.  A couple of years later.

5    Q.   Okay.  You also testified that you have been working on

6    eyewitness identification and the science of it for thirty

7    years, am I correct?

8    A.   I'm not sure how I phrased it, but I've certainly been

9    studying the area that long.  I haven't been publishing in the

10   area that long, but I have been testifying in the area that

11   long.

12   Q.   So you have been testifying for around thirty years on

13   eyewitness identification?

14   A.   Yeah.  Nineteen eighty-one was the first time, I think, and

15   I have been in state and federal courts in probably

16   twenty-seven or twenty-eight states.

17   Q.   Isn't it true that during the close to thirty years that

18   you have been testifying on eyewitness identification, that you

19   have not testified for the Government on eyewitness

20   identifications?

21   A.   I have not testified for them and they have not asked me.

22   Q.   So you've only testified for defense, correct?

23   A.   I have only been called or asked by the defense.

24   Q.   Dr. Fulero, you are being compensated for your time on this

25   case by defense counsel, aren't you?

```
 1    A.   I hope I'm being compensated.  I don't know if it's by
 2    defense counsel.  I suspect it's a little more complicated than
 3    that, but I hope to get compensated for my time.  I haven't
 4    yet, but I hope to.
 5    Q.   But that's part of the agreement to receive compensation,
 6    correct?
 7    A.   Well, yeah.  I get paid for my time the way most people
 8    do.
 9    Q.   You're certainly not being compensated from the United
10    States, correct?  Meaning the U. S. Attorney's Office.
11    A.   Oh, no no.  You didn't ask me to testify.  If you had,
12    though, I would have said the same thing I said, though.
13    Q.   Now you stated when Mr. Butler was asking you questions
14    that there are factors that affect the acquisition stage.
15    A.   Yes, definitely.
16    Q.   And you testified that they're -- the factors you mentioned
17    are exposure time, stress, cross-racial identification and time
18    overestimation.  Correct?
19    A.   Yeah.  I'm trying to think if there were any others that I
20    mentioned, but I certainly mentioned those.
21    Q.   Isn't it true that those vary over circumstances?
22    A.   How do you mean?
23    Q.   Meaning I'm not talking about the phrase, but how those
24    factors actually affect an identification varies in case by
25    case circumstances.
```

1    A.  Well, I'll cautiously agree with you.  I mean obviously

2    with something like stress, you know, let's say, or

3    cross-racial identification better yet, some cross-race I Ds

4    are still going to be accurate, as you and I have talked about.

5    Science doesn't tell us what's always true, it tells you what's

6    most likely to be true.

7    Q.  And you said some cross-race I Ds are accurate and you also

8    mentioned stress.  So stress varies from person to person,

9    right?

10   A.  Well, sure.  Stress in a given situation varies.  Again, I

11   think the easiest thing to do to measure stress in a given

12   situation is just to ask a witness and they will tell you, I

13   was excited, I was scared to death and they will tell you.

14   Q.  Isn't it true, Dr. Fulero, that those factors interrelate,

15   and the science as to how reliable an eyewitness identification

16   can be?

17   A.  I'm not sure what you mean by "interrelate".  I think

18   they're all important and they're all factors that ought to be

19   considered in the determination of any eyewitness -- Any claim

20   of eyewitness identification needs to be evaluated with what

21   the science shows.  I'm not sure I know what you mean.

22   Q.  Well, Doctor, that's what I mean.  When you said that

23   they're all factors and they should be considered.  So if

24   stress varies from person to person, wouldn't that factor play

25   a different role based on each circumstance?

1  A.  Well, no.  I'm not sure, again, that I know exactly what

2  you mean.  I think what you're trying to say is there are some

3  people who are in a very stressful situation who may be

4  accurate despite the fact that they're under high stress.

5  However, if you bet your money, you know, if I find that stress

6  -- high levels of stress cause people to be less accurate,

7  that's what happens most of the time.  Are there exceptions to

8  a rule?  Of course.

9         THE COURT:  Now wait a minute now.  I don't know if

10  anyone wants to say that's a rule.  I think they can say those

11  are observations.  But it's not a rule.

12         THE WITNESS:  No, I was using sort of the analogy.

13  Any time somebody comes up with a finding or anything of that

14  sort, it's never a hundred percent one way or zero the other.

15  So it is quite possible, and in fact quite likely, that there

16  are going to be people who --

17         THE COURT:  I think the question comes down more to

18  people react differently to stress.  So person A may be very

19  cool and may not register on a stress scale very high, and

20  person B may lose it all.  And your observations don't take

21  that into consideration.  And I think that's what she's getting

22  at.

23         THE WITNESS:  Well, no, I think they take them into

24  consideration, but I think that you're absolutely right.  Some

25  people will say well, in this situation I was okay and others

```
1    who are not.  And that certainly is true.
2    Q.  So speaking of, since we just discussed stress,
3    cross-racial identification, it's your testimony today that
4    same-race identifications for example, black person identifying
5    a black person, they're highly reliable, correct?
6    A.  Well I didn't say that.  What I said was they're more
7    accurate than cross-race.
8    Q.  Cross-race.  Okay.  So in the instance where --
9            THE COURT:  Again, that's not correct.  They're not
10   more accurate.  They may be likely to be more accurate, but
11   they're not necessarily more accurate.  That's for the jury to
12   decide, whether it was more accurate or not.
13           THE WITNESS:  Yes.  Given one, I agree.  But the
14   finding, it's certainly in general with cross-racial I Ds --
15           THE COURT:  You can generalize in the sense of your
16   observations, but you can't just say because it was cross-race
17   or within race one was more accurate than the other one.
18           THE WITNESS:  Any given one, that's absolutely
19   correct.
20   Q.  And you're testifying based upon the studies that you have
21   had with the science of eyewitness identification --
22   A.  Right.  These are the generally accepted findings that
23   scientists accept to be what the studies show.
24   Q.  So my question is this.  In a case where you have a
25   same-race identification, what you just said, tends to likely
```

1    be more accurate than cross-race.  In the instance where you

2    have both, wouldn't that support a notion of eyewitness

3    identification accuracy?

4    A.  Well, it would be almost impossible to say that without

5    knowing what the circumstances are and I appreciate your point.

6    But if you have a cross-race and a same-race I D in the same

7    case, assuming you do, the mere fact that two people identify

8    the same person out of, you know, if it's out of a photo

9    spread, doesn't necessarily mean that the two people are right,

10   cross-race or same-race.

11         The problem is that if I put together a spread that

12   has an inherent problem in it that leads people to a particular

13   photo, it may well be that two people pick the same picture but

14   not because it's the actual perpetrator but for another

15   reason.

16   Q.  If I'm understanding what you're saying then is that there

17   are other factors that come into play as well there, such as

18   the blind -- let me make sure I get this correctly -- the

19   double blind procedure and simultaneous and sequential.  You're

20   saying that also plays a role in the eyewitness

21   identification?

22   A.  I think they all have to be considered.  I do think that

23   each one has to be considered in a given case.  I've got no

24   problem with that notion.

25   Q.  Now didn't you just testify that there's no relation

1    between confidence and accuracy in an eyewitness

2    identification?

3    A.   I don't think I said no relation, I said virtually no

4    relation, and I think maybe I would say just a very weak

5    relation, if any at all, might be another way to put it.

6    Q.   Okay.

7    A.   I think that the generally accepted conclusion in the field

8    is, that you cannot use a witness's expression of confidence as

9    an indicator of their potential accuracy.

10   Q.   But that's just, and I know you said "virtually," but

11   that's a generalization because it is true that a person could

12   be accurate and could have a hundred percent confidence,

13   right?

14   A.   That's certainly possible, but you're leaving out, again,

15   the notion that if there is a relation between the two -- if

16   there is no relation between the two, you can't use one to

17   predict the other.  Is it possible that in some cases a witness

18   who is confident is also correct?  The answer is yes.  But

19   that's not what the most likely outcome is from what we know.

20   And that's just simply a function of the way math works.

21   Q.   Dr. Fulero, you're not here today to testify that no crime

22   victim could ever accurately identify an assailant, are you?

23   A.   Absolutely, and I agree with you a hundred percent.  I've

24   said before that some witnesses are correct and some are

25   incorrect, and the problem is telling the difference.

```
1    Q.  And so then you would agree that in a lot of circumstances
2    victims accurately identify the assailant all the time?
3    A.  Oh, I agree that both accurate and inaccurate
4    identifications happen and happen all the time.
5              MS. ADAMS:  One moment, Your Honor.
6              (Whereupon, Ms. Adams conferred with Ms. Hardwick off
7    the record and out of the hearing of the other courtroom
8    participants.)
9              MS. ADAMS:  No further questions, Your Honor.
10             THE COURT:  Anything else?
11             MR. BUTLER:  Yes, briefly.
12                      REDIRECT EXAMINATION
13                 BY MR. BUTLER OF SOLOMON FULERO:
14   Q.  Based on your professional experience, training and
15   knowledge in this field, in the event that there was an
16   identification which a witness puts a high degree of confidence
17   in, but there's clear evidence that there were problems in the
18   acquisition phase, i.e. high level of stress, cross-racial
19   identification issues, problems regarding time, too, there were
20   issues regarding retention, i.e. the person was asked to recall
21   certain information and do a composite, the person did a
22   misidentification, given your training would that give rise to
23   questions as to whether or not that confident identification
24   was accurate?
25   A.  I appreciate and understand where you're going, but I
```

1   really don't know if I can say -- I certainly believe that in

2   the hypothetical that you asked me, the kinds of findings from

3   our research about those factors would be really important to

4   consider in making a determination about the accuracy.  The

5   more of these factors that are present, the more it would leave

6   rise to concern.

7   Q.  But the fact remains, and I believe the Government is

8   right, the person could be right, though.

9   A.  Well, you know, the lawyer answer is anything is possible,

10  but when you have these findings, this science never tells you

11  what's always true, it tells you what's most likely to be true

12  and that's the best we can hope for in any field of endeavor.

13            MR. BUTLER:  Nothing further.

14            MS. ADAMS:  No further questions, Your Honor.

15            THE COURT:  Thank you.  You may step down.

16            (Whereupon the witness, Solomon Fulero, stepped down

17  from the stand.)

18            THE COURT:  Next witness.

19            MS. McKEE:  The defendant calls Phillip Mitchell,

20  Your Honor.

21            P H I L L I P    M I T C H E L L,

22       the witness herein, having first been duly sworn or

23  affirmed to tell the truth, was examined and testified as

24  follows:

25            Direct examinationBY MS. McKEE OF PHILLIP MITCHELL:

```
 1   Q.  Sir, if you will please state your name and spell your last
 2   name for the record.
 3   A.  Phillip Mitchell.  M-i-t-c-h-e-l-l.
 4   Q.  Thank you.
 5           And, Mr. Mitchell, where do you work?
 6   A.  No Mess Commercial Cleaning Service.
 7   Q.  And, sir, what is your title at the No Mess --
 8   A.  I'm the fifty percent owner.
 9   Q.  Do you actually participate in the management of the
10   business itself on a day-to-day basis?
11   A.  Yes, ma'am.
12   Q.  As a part of that management, would that include hiring
13   certain employees to work for No Mess Commercial Cleaning?
14   A.  Yes, ma'am.
15   Q.  Would that involve scheduling as far as when these
16   employees were coming to work?
17   A.  Yes, ma'am.
18   Q.  Are you familiar with Glenn Teague?
19   A.  Yes, ma'am.
20   Q.  And how are you familiar with Mr. Teague?
21   A.  He's an employee of No Mess --
22           MS. HARDWICK:  At this time, Your Honor, we'd object
23   to any further questions of this witness of Glenn Teague.
24           THE COURT:  I have no idea what your objection is
25   based on.  Do you want to take this outside the presence of the
```

1    jury?

2            MS. HARDWICK:  Yes, Your Honor.

3            THE COURT:  Okay.  Why don't we step back here

4    instead.  Well, I'll have to excuse the jury for just a minute.

5            (Whereupon, the jury was escorted out of the

6    courtroom, and the following colloquy ensued):

7            THE COURT:  I'll hear from the Government.

8            MS. HARDWICK:  Your Honor, the Government expects the

9    testimony from this witness to be that Glenn Teague was not at

10    work on June twenty-second, two thousand and seven, which is

11    the date of the bank robbery.  Glenn Teague is not on trial

12    here.

13            THE COURT:  What is your purpose here?  What are

14    trying to show?

15            MS. McKEE:  Your Honor, it is correct that this

16    individual, this witness is only going to testify as to whether

17    or not Mr. Teague was present at work on a particular Friday.

18    However, it is very relevant in this case.  This is a Defense

19    theory.  It's already been testified that Mr. Teague is the

20    individual that was identified by the case agent in this case

21    as the individual matching the description of the bank robber.

22            He was stopped in a car, again, testified to the by

23    the case agent, that matched the description of the get-away

24    vehicle.  And it is the Defense theory of the case that this

25    particular individual, Mr. Glenn Teague, is a very likely

1    suspect in this particular bank robbery involved.

2            THE COURT:  This is the defendant's father we're

3    talking about?

4            MS. McKEE:  It is.  Yes.

5            THE COURT:  And you want to show that he was not at

6    work?

7            MS. McKEE:  Yes, that is the only purpose for this

8    witness.

9            MS. HARDWICK:  Your Honor, before the Court makes a

10   ruling on that, that's not the accuracy of the investigation.

11   The detective testified that he stopped the car.  He was headed

12   to another robbery, I believe, or some investigation.  A car

13   meeting the description of the one that had been given to him

14   by several witnesses was behind him.  He pulled over and made a

15   traffic stop.

16           The description of the bank robber having been a

17   young black male, Mr. Teague is approximately forty-nine years

18   old.

19           THE COURT:  Is Mr. Teague in the courtroom?

20           MS. HARDWICK:  No he's not, he's outside.

21           THE COURT:  Could I see him?

22           MR. BUTLER:  Yes, Your Honor.

23           THE COURT:  If I understand the Defense's argument

24   here, and I may have it wrong, they just want to show that

25   there's a likelihood that -- Maybe I should excuse the witness.

1    I don't know.

2              MS. HARDWICK:  Yes, sir.

3              THE COURT:  Would you mind stepping out for just a

4    minute.

5              (Whereupon, the witness was escorted out of the

6    courtroom.)

7              THE COURT:  If I understand it correctly, that the

8    defendant is contending that Mr. Teague may have done it, is

9    that right?

10             MR. BUTLER:  That's correct, Your Honor.

11             THE COURT:  So I guess they want to build a case

12   showing that circumstantially.

13             Would you bring Mr. Teague forward.

14             Have you been sworn, Mr. Teague?

15             MR. TEAGUE:  Yes, sir.

16             THE COURT:  And how old are you?

17             MR. TEAGUE:  Forty-nine.

18             THE COURT:  Now you may step out of the courtroom

19   again.

20             (Whereupon, Mr. Teague was escorted out of the

21   courtroom, and the following colloquy ensued):

22             THE COURT:  I'm not sure that the issue is the

23   adequacy of your investigation, but rather that Mr. Teague may

24   just have been the one who committed the crime.

25             MS. HARDWICK:  Your Honor, I didn't hear your last --

1    THE COURT:  I'm not sure the issue is the adequacy of

2    your investigation, but rather that Mr. Teague was driving the

3    car that he arguably may fit the description of the person who

4    was at the bank and, therefore, he may be the one.  And, third,

5    he was not at work on that day so, therefore, he may in fact

6    have been the one who robbed the bank.

7    MS. HARDWICK:  Your Honor, the question is the

8    witnesses, I think there is constantly a mischaracterization of

9    the actual evidence that's been placed before this Court.  All

10    witnesses have testified that it was a young black male, which

11    is consistent --

12    THE COURT:  Well, that's why he came in here, which

13    is one of the issues I wanted -- I wanted to see what he looked

14    like.

15    Go ahead.

16    MS. HARDWICK:  Your Honor, and the additional

17    testimony was that it was a young black male in his twenties.

18    That's from both of the employees at the bank, Ms. Kilcrease

19    that testified from Blue Cross/Blue Shield from Mr. Raymond

20    McCoy, one of the young men that saw him get into the car in

21    the neighborhood.  Everyone has testified that he was a young

22    black male.

23    It follows that when the officer testified and he

24    stopped Mr. Teague and saw visibly that Mr. Teague was not a

25    young black male in his twenties.  He asked him whether or not

```
 1    anyone else had access to his car, and he indicated his son.

 2    And that's how they got to his son.

 3              THE COURT:  Let me ask you this.  Should I make the

 4    determination as to whether Mr. Teague could be mistaken for a

 5    young black male, or should that be a jury issue?

 6              MS. HARDWICK:  No, Your Honor, you should not.

 7              THE COURT:  Can I make that decision as a matter of

 8    law?

 9              MS. HARDWICK:  No.  I'm not asking the Court to make

10    that decision as a matter of law.  I'm just saying the

11    testimony of this employee in reference to Mr. Teague at this

12    point is irrelevant.  Maybe at a later time it may become

13    relevant, but at this point his testimony just to say that Mr.

14    Teague was not at work on a given day is irrelevant at this

15    point in this trial.

16              THE COURT:  Actually, I thought your argument was

17    going to be different, which I'll go ahead and raise.  Is it a

18    proper defense to claim that somebody else did the crime?

19              MS. McKEE:  Your Honor, as the Defense, we are able

20    to put forth our own theory of the case.  And if that entails

21    that there is another person who is more likely even than our

22    client that the sits here before the jury today, that is a more

23    likely suspect than the person who actually did this, then yes,

24    I would say that it is the Defense's right to put forward their

25    own theory about the case.
```

1    THE COURT:  Okay.  One of the reasons I wanted to

2    look at Mr. Teague was to see whether he could be mistaken for

3    someone younger.  And I have to be candid and say yes.  I don't

4    know whether he dyes his hair or not, but he clearly does not

5    look like a middle aged forty-nine year old man.  Surprisingly

6    so, I have to admit, too.

7    I think he could at best be mistaken for someone in

8    his thirties, that is looking at him fully, is a full view.

9    Obviously, the person who did the robbery, I think they got a

10   view after the bottom part and his body features and so forth,

11   but he does have an athletic build, he is a slender man, and I

12   think he could be mistaken for a person who is much, much

13   younger than a forty-nine year old.

14   That was my real point earlier when I was saying that

15   you may be right that Mr. Teague is too old, but my question

16   is, can I make that determination as a matter of law or is that

17   just a jury issue?

18   MS. HARDWICK:  I'm not asking the Court to make that

19   decision.  My objection simply is at this point in the trial,

20   after some additional evidence that's placed before this jury,

21   maybe his testimony would become relevant, but at this point I

22   don't see that his testimony is relevant.

23   THE COURT:  Well you have to build your defense

24   somewhere.  I'll let it in.  Overruled.

25   Bring in the jury.

1    MS. McKEE:  Your Honor may we also bring in Mr.

2    Mitchell?

3    (Whereupon, the jury was escorted into the

4    courtroom.)

5    THE COURT OFFICER:  The jury is entering the court.

6    THE COURT:  Proceed.

7    MS. McKEE:  Thank you, Your Honor.

8    Q.  Mr. Mitchell, I was asking about some of your duties, and

9    one of the things you said part of your duties is that you

10   actually manage, as well as involve yourself in, setting the

11   schedules for your employees.

12   A.  Yes, ma'am.

13   Q.  And what I asked you was are you familiar with Glenn

14   Teague.

15   A.  Yes, ma'am.

16   Q.  And how are you familiar with Glenn Teague?

17   A.  He is an employee of mine.

18   Q.  And was Mr. Teague employed with No Mess Commercial

19   Cleaning Service back in June of two thousand seven?

20   A.  Yes, ma'am.

21   Q.  Do you recall specifically in that month if there was a day

22   when Mr. Teague did not come to work?

23   A.  Yes, ma'am.

24   Q.  What, if anything, happened the following week when Mr.

25   Teague did return to work the week after he did not come?

1    A.   The time when we were working he showed up late?

2    Q.   Yes.

3    A.   There's a period -- We do a lot of floor work, and he

4    showed up unusually late, maybe thirty or forty-five minutes

5    late.  I asked him what happened, and he said he had been

6    pulled over --

7                   MS. HARDWICK:  We object to the hearsay.

8                   THE COURT:  Sustained.

9    Q.   So, Mr. Mitchell, do you recall when this was, the day --

10   Well let me ask you first, do you recall the day Mr. Teague did

11   not show up for work?

12   A.   His Friday night work at the Y. M. C. A. in Wetumpka.  I

13   don't remember the exact date, but I do know that he was going

14   out of town to Florida.

15   Q.   And is there anything that allows you to be sure that the

16   particular month that Mr. Teague did not show up for work

17   because he was going to Florida, is there any reference point

18   or anything that makes you sure that it was actually June two

19   thousand seven?

20   A.   Yes.  I was out of town over July fourth, and during that

21   time my partner had told me that Glenn was --

22                   MS. HARDWICK:  We object again, Your Honor, to the

23   hearsay.

24   Q.   You said "July fourth"?

25   A.   That is correct.

1    Q.   So where were you on July fourth?

2    A.   Las Vegas.

3    Q.   And had you gone out of town at all the two weeks prior to

4    going to Las Vegas?

5    A.   No.

6                MS. McKEE:   May I have a moment, Your Honor?

7                THE COURT:   Yes.

8                (Whereupon, Ms. McKee conferred with Mr. Butler off

9    the record and out of the hearing of the other courtroom

10   participants.)

11   Q.   Sir, referencing back to a June two thousand seven

12   calendar, do you recall what day July fourth was on in two

13   thousand seven?

14   A.   No, ma'am, I do not.

15   Q.   Would seeing a calendar of two thousand seven refresh your

16   memory of when that date -- what day July fourth fell on in the

17   year two thousand seven?

18   A.   Yes.

19                MS. McKEE:   May I approach the witness, Your Honor?

20                THE COURT:   Yes.

21   Q.   This is the two thousand calendar here.   If you can refresh

22   your memory.

23   A.   Okay.

24   Q.   And, sir, again, do you recall what day July fourth, two

25   thousand seven fell on?

1    A.   Yes, ma'am.

2    Q.   And what day is that?

3    A.   Wednesday.

4    Q.   Now that Friday before July fourth you were present in

5    Montgomery, correct?

6    A.   That is correct.

7    Q.   And that would have been the day you've already testified

8    Mr. Teague showed up late for work, correct?

9    A.   Yes.

10   Q.   Would you like to see the calendar to refresh your memory

11   as to whether or not that previous Friday was the day that

12   Mr. Teague showed up for work?

13   A.   Yeah.  I'm positive it was June twenty-second when he

14   showed up for work because we had another schedule at

15   Caterpillar the next week and that's when he was late.

16   Q.   So referencing that July fourth date when you were in Las

17   Vegas, referring back to the testimony where you've already

18   testified, the day Mr. Teague did not show up for work was June

19   twenty-second, two thousand seven, correct?

20   A.   That is correct.

21   Q.   Which was a Friday?

22   A.   That's correct.

23   Q.   And the following Friday, a week later would have been July

24   twenty-ninth, correct?

25   A.   That is correct.

1    Q.  And that is the date you stated that Mr. Teague showed up

2    late for work?

3    A.  I can't guarantee it was that Friday.  It could have been

4    Thursday or Friday, but it was the latter part of the week when

5    we do our floor work and that's when he showed up late.

6    Q.  And let me just ask you so we're clear, which time was the

7    time that Mr. Teague said that he was going to Florida?

8           MS. HARDWICK:  Objection, Your Honor, to hearsay

9    again.

10          MS. McKEE:  This has already been testified to by the

11   witness.

12          MS. HARDWICK:  We objected to the hearsay.

13          THE COURT:  He did say that.  I'll allow him to

14   clarify.

15   Q.  What date was that, again, that Mr. Teague said he was

16   going to Florida?

17   A.  June twenty-second.

18          MS. McKEE:  Your Honor, We have no further questions.

19          THE COURT:  Cross.

20                        CROSS EXAMINATION

21            BY MS. HARDWICK OF PHILLIP MITCHELL:

22   Q.  Mr. Mitchell, my name is Tommie Hardwick and I'm an

23   Assistant U. S. Attorney.  I just have a few questions for you.

24          How old is Mr. Teague, approximately?

25   A.  Late forties.

```
 1    Q.   In his forties?

 2    A.   Yes, ma'am, late forties.

 3    Q.   Late forties.

 4    A.   Yes, ma'am.

 5              MS. HARDWICK:  Those are all my questions.

 6              THE COURT:  Anything else?

 7              (Whereupon, there was no response.)

 8              THE COURT:  Thank you, you may step down.

 9              (Whereupon the witness, Phillip Mitchell, stepped

10    down from the stand.)

11              THE COURT:  Next witness.

12              MR. BUTLER:  Your Honor, the Defense calls Gene

13    McAllister.

14                     G E N E    M c A L L I S T E R,

15        the witness herein, having first been duly sworn or

16    affirmed to tell the truth, was examined and testified as

17    follows:

18               Direct examinationBY MR. BUTLER OF GENE McALLISTER:

19              MS. HARDWICK:  Your Honor, again, we would object to

20    this witness being called.  This witness was not qualified

21    before this jury.

22              THE COURT:  Was he qualified before the jury?

23              MR. BUTLER:  He was.

24              Your Honor, it's our position he was.

25              THE COURT:  Well, I'll just ask the jury now.  Does
```

```
1    any member of the jury recognize this witness?
2              (Whereupon, there was no response.)
3              THE COURT:  Proceed.  Go ahead.
4    Q.  Could you state your name and spell your last name for the
5    record.
6    A.  My last name?
7    Q.  Could you state your full name and spell your last name for
8    the record.
9    A.  My name is Gene Raymond McAllister.  My last name is
10   spelled M-c-A-l-l-i-s-t-e-r.
11   Q.  Where do you live?
12   A.  I live in Perry, Florida.
13   Q.  I'm going to ask you to repeat some of that because I
14   couldn't even hear you.  Could you state your name again and
15   spell it for the record.
16   A.  My name is Gene Raymond McAllister.  And it's G-e-n-e
17   Raymond, M-c-A-l-l-i-s-t-e-r.
18   Q.  Mr. McAllister, where do you live?
19   A.  I live at Perry Florida.
20   Q.  And, Mr. McAllister, are you presently employed?
21   A.  No, I'm not.
22   Q.  Okay.  I'm just going to -- Well, do you have any brothers
23   or sisters?
24   A.  Yes, I do.
25   Q.  Could you state their names.
```

1   A.   I have a brother Donald Robertson.  Glenn Teague.  Barry

2   McAllister.  Glenn Teague.  Larry Teague.  George Teague.  And

3   sisters I have Charlotte Washington, Junior McAllister.  I also

4   have some half brothers which is --

5   Q.   You don't have to go any further.  You do have a brother by

6   the name of Glenn Teague?

7   A.   Yes.

8   Q.   On June twenty-second, two thousand and seven your brother

9   visited you in Florida.

10  A.   Yes, he visited me in Perry, Florida.

11  Q.   I'm sorry, sir?

12  A.   He visited me in Perry, Florida.

13  Q.   He came down to Florida with his son --

14        MS. HARDWICK:  Your Honor, we'll object to the

15  leading.

16  Q.   Was anybody else with him when he came down to Florida?

17  A.   Yes.

18  Q.   And who else was with him?

19  A.   Andreas.

20  Q.   And do you see Andreas in court right now?

21  A.   Yes, I do.

22  Q.   And where is he seated?

23  A.   He's seated on the right-hand side by his attorney, I

24  guess.

25  Q.   Do you know what he's wearing?

1    A.   Do I know what he's wearing?

2    Q.   Can you describe what he's wearing?

3    A.   Look like a black jacket with a white shirt.

4    Q.   Okay, thank you.

5              What was the purpose of -- What did you and your

6    brother Glenn Teague do while he was in Florida on Friday.

7    A.   When they got there Friday, we just basically barbecued,

8    you know, and ate and sat around and talked.  That was that

9    Friday.

10   Q.   How often did Mr. Teague get down to see you?

11   A.   That was his first visit.

12   Q.   In how long?

13   A.   Well, I just had recently moved there in May.  I moved from

14   Montgomery to Perry.

15   Q.   And that was the first time that he had gone down since you

16   had moved to Perry?

17   A.   Yes.

18   Q.   Okay.  I'm going to show what's been marked as defendant's

19   exhibit one.  Do you recognize that photograph?

20   A.   Yes, I do.

21   Q.   Do you recognize the individuals in that photograph?

22   A.   Yes.

23   Q.   Were you -- Are you one of the individuals in that

24   photograph?

25   A.   I am.

1    Q.  And if you look down at the bottom right corner of that

2    photograph, don't say what it says, but is there a date

3    there?

4    A.  Yes, there is.

5    Q.  Is that the date that that photograph was taken?

6    A.  I can't be sure because it may have been when she had it

7    developed.  I'm not sure.

8    Q.  Okay.  While your brother Glenn was in Florida, were

9    photographs taken?

10   A.  These photographs were taken.  I think -- I don't know if

11   it was a Saturday or Sunday when we took those pictures.

12           MR. BUTLER:  Your Honor, at this time I move to enter

13   -- Oh, one second.

14   Q.  There are three individuals in the photograph.  Whore those

15   three individuals?

16   A.  To the left is myself, in the middle is my brother Raymond

17   and to the right is my brother Glenn Teague.

18           MR. BUTLER:  Your Honor, at this time I move to enter

19   defendant's exhibit one.

20           THE COURT:  Admitted.

21   Q.  Where I'm pointing right now, that's you?

22   A.  Yes, it is.

23   Q.  In the middle it's your --

24   A.  Brother Raymond McAllister.

25   Q.  And on the right side is who?

1    A.   Glenn Teague.

2    Q.   Mr. Teague is wearing something.   What's he wearing?

3    A.   He's wearing a hat with some glasses on it.

4    Q.   Can you tell what color that is?   Or to the best of your

5    recollection what color is that hat?

6    A.   It looks like it's white, to me, with some blue and gray

7    glasses or something like that.

8    Q.   And there are some glasses draped across the top?

9    A.   Yes.

10   Q.   The shirt that he's wearing, could you describe it?

11   A.   It looks like a blue and white to me.

12   Q.   Dark blue?

13   A.   Yes, sir.

14   Q.   And white.

15            And Andreas was with Mr. Teague when he came down to

16   Florida.

17   A.   Yes.

18            MR. BUTLER:   One moment, Your Honor.

19   Q.   I'm going to show you what's been marked as defendant's

20   exhibit one B.   Do you recognize what that is?

21   A.   Yes.

22   Q.   And what is that?

23   A.   That's a picture of me and my brothers.

24   Q.   Is it the same picture that's defendant's exhibit one but

25   the actual one?

1   A.  Yes.

2          MR. BUTLER:  Your Honor, at this time I would move to

3   enter exhibit one.

4          MS. HARDWICK:  Your Honor, that photograph contains

5   right on the back that has not been authenticated.  We don't

6   know who wrote it there, and for that reason we'd object to it.

7          MR. BUTLER:  One moment, Your Honor.

8   Q.  There is writing on the back of this photograph.  Don't

9   read it, but do you recognize the handwriting?

10  A.  Yes, I do.

11  Q.  Whose handwriting is that?

12  A.  It's mine.

13  Q.  So did you write "plus" written on the back of this?

14  A.  Yes, I did.

15         MR. BUTLER:  Your Honor, now I'll move to enter it.

16         MS. HARDWICK:  With that clarification, no objection,

17  Your Honor.

18         THE COURT:  It's admitted.

19  Q.  This is the same thing.  It's just the actual photograph,

20  potentially a little -- Well, I don't want to lead you there,

21  but it's the same photograph, right?

22  A.  Yes, it is.

23         MR. BUTLER:  Your Honor, no further questions at this

24  time.

25         THE COURT:  Cross?

```
 1                      CROSS EXAMINATION
 2              BY MS. HARDWICK OF GENE McALLISTER
 3    Q.  Mr. McAllister, I'm Tommie Hardwick and I'm an Assistant
 4    United States Attorney.  I just have a few questions.
 5    A.  Yes, ma'am.
 6    Q.  You state that Mr. Teague came down to visit you in June,
 7    is that correct?
 8    A.  Yes, ma'am.
 9    Q.  And you state that that photograph which reflects June
10    twenty-third was taken either on Saturday or Sunday.
11    A.  Yes, ma'am.
12    Q.  Okay.  And did they spend the night when they first got
13    there?
14    A.  Yes.
15    Q.  Do you recall approximately what time of day or night that
16    they got there?
17    A.  No, ma'am, I don't.  I know it was like in the evening
18    time.
19    Q.  Was it after six p.m.?
20    A.  No, it was before six.
21    Q.  Before six?
22    A.  Yes, ma'am.
23    Q.  Do you recall whether it was after two or three?
24    A.  Yes, it was probably somewhere around about two, I'll
25    say.
```

```
 1   Q.  Now you have mentioned your city in Florida several times.

 2   A.  Yes.

 3   Q.  And I've had difficulty understanding it.  Could you spell

 4   the name of your city, please, in Florida?

 5   A.  P-e-r-r-y.

 6   Q.  Perry?

 7   A.  Perry.

 8   Q.  How far is Perry from Montgomery?

 9   A.  Two hundred and seventy miles, ma'am.

10   Q.  Excuse me?

11   A.  Two hundred and seventy miles.

12   Q.  And at approximately ten o'clock in the morning you have no

13   idea what your nephew or your brother may have been doing.

14   A.  No, ma'am.

15            MS. HARDWICK:  No more questions.

16            MR. BUTLER:  No more questions of this witness at

17   this time, but I'm not excusing this witness.

18            THE COURT:  You have to remain.  You may step down.

19            (Whereupon the witness, Gene McAllister, stepped down

20   from the stand.)

21            THE COURT:  Next witness.

22            MS. McKEE:  Your Honor, the Defense calls Colby Keen.

23                      C O L B Y     K E E N,

24            the witness herein, having first been duly sworn

25   or affirmed to tell the truth, was examined and testified as
```

1    follows:

2             Direct examinationBY MS. McKEE OF COLBY KEEN:

3    Q.  If you would, please state your name and spell your last

4    name for the record.

5    A.  James Colby Keen.  K-e-e-n.

6    Q.  And, Mr. Keen, where do you live?

7    A.  Mayo, Florida.

8             THE COURT:  I can barely hear you and I'm right next

9    to you.  I know the jury can't hear you.  You have to speak

10   loud enough so the gentleman over there can hear you.

11   Q.  If your chair can scoot up, you can sit a little closer to

12   the mic.

13            Where is that that you live.

14   A.  Mayo, Florida.

15            THE COURT:  Would you spell that.

16   A.  M-a-y-o.

17   Q.  And how old are you, Mr. Keen?

18   A.  Nineteen.

19   Q.  What do you do for a living?

20   A.  I work for my father.  He has a contract with the Florida

21   D. O. T.

22   Q.  You say with "Florida D. O. T."?

23   A.  Department of Transportation.

24   Q.  And I'm assuming you work with your father?

25   A.  Yes, ma'am.  Picking up trash on the side of the road.

1    Q.  Is that primarily what your duties are in working with your

2    father, is picking up litter?

3    A.  Yes, ma'am.

4    Q.  Where would you typically pick up litter?

5    A.  In the surrounding counties.  LaFayette County.  Taylor

6    County.  Madison County.

7    Q.  Is this a job that would have continued even through the

8    summer months, like in June?

9    A.  Yes, ma'am.  It lasts all year.

10   Q.  And specifically on June twenty-sixth, two thousand seven

11   do you recall if you were working on that date?

12   A.  Yes, ma'am.

13   Q.  Do you recall where you were picking up litter on June

14   twenty-sixth, two thousand seven?

15   A.  Yes, ma'am.

16   Q.  Where was that?

17   A.  Outside of Perry on U. S. Nineteen.

18   Q.  When did you actually get to Perry County and begin to pick

19   up litter?

20   A.  Early that morning.

21   Q.  Around what time?

22   A.  Around eight-thirty.

23   Q.  And how do you -- Explain to the jury, how do you generally

24   go about picking up litter?  Are you walking or are you riding

25   in a truck?

1    A.  We ride on a four wheeler with a long stick with a metal

2    rod on the end of it and we pick up trash.

3    Q.  And how many people generally are out there working with

4    you?

5    A.  There was four that day.

6    Q.  Did anything unusual happen in the morning hours of June

7    twenty-six, two thousand seven?

8    A.  No, ma'am, not in the morning.

9    Q.  So when lunchtime came what, if anything, did you do at

10   your job?

11   A.  Normally you carry your lunch with you and we ate.

12   Q.  You said you ate, and you carry your lunch with you?

13   A.  Yes, ma'am.

14   Q.  On June twenty-six, two thousand seven would you have

15   stayed in that same area where you began picking up trash, and

16   is that where you would have eaten lunch?

17   A.  Yes, ma'am.

18   Q.  What did you do -- Around that time what was the

19   temperature that day, do you recall?

20   A.  I don't remember the exact temperature, but it was hot.

21   Q.  Did you all carry any water bottles or anything like that

22   with you?

23   A.  Yes, ma'am.

24   Q.  What area did you go to immediately after you ate your

25   lunch?

```
 1    A.   About eight miles outside of Perry.

 2    Q.   Did anything unusual happen once you got to the area about

 3    eight miles outside of Perry?

 4    A.   Yes, ma'am.

 5    Q.   What unusual happened?

 6    A.   I found a man lying in the ditch naked.

 7    Q.   You had you found a man naked lying in a ditch?

 8    A.   Yes, ma'am.

 9    Q.   Were you picking up trash in this ditch?

10    A.   Yes, ma'am.  It was fifteen foot off the road, and the

11    ditch was further.

12    Q.   You said the ditch was fifteen feet away from the road?

13    A.   About that.

14    Q.   And what was on the other side of the ditch?

15    A.   Brush.  Bushes.  Trees.  Small trees.

16    Q.   What, if anything, is the first thing that alerted you to

17    the man that was laying in the ditch naked?

18    A.   He was yelling.  He wasn't yelling very loudly.

19              MS. ADAMS:  Objection.  Calls for hearsay, Your

20    Honor.

21              THE COURT:  Actually that's not hearsay.  That's what

22    he was doing.  He can describe what he was doing.

23              Go ahead.

24    Q.   And, Mr. Keen, after you heard this man yelling, how far

25    away from you when you first heard the yelling?
```

1    A.  Probably about fifteen, twenty feet away.

2    Q.  Could you see this man yelling from where you were standing

3    when you first heard the yells?

4    A.  No, ma'am.

5    Q.  What, if anything, did you do once you heard this

6    individual yelling?

7    A.  I drove past him a little bit and I backed up and went to

8    the edge of the bushes and saw him laying in the ditch.

9         THE COURT:  You saw him what?

10        THE WITNESS:  I saw him laying in the ditch.

11   Q.  You said you drove by him.  Did you see him when you

12   actually drove by?

13   A.  No, ma'am.

14   Q.  Could you tell at all if this individual that was yelling

15   in the ditch was able to move on his own?

16   A.  Whenever I got to him he didn't move.

17   Q.  Could you describe -- At a certain point did you ever get

18   close to this man that you heard yelling?

19   A.  Yes, ma'am.

20   Q.  Would you describe for the jury, please, what you saw when

21   you first came upon this individual.

22   A.  Well, he didn't have no clothes on and he had scratches on

23   him.  And he was laying -- He had bugs around him.

24   Q.  From the way it looked to you, did it appear like that

25   individual had been there for a while?

```
1    A.  Yes, ma'am.

2    Q.  Mr. Keen, you said that during this time of year it was hot

3    and you carried water bottles around, correct?

4    A.  Yes, ma'am.

5    Q.  Did you have your water bottle with you when you came into

6    contact with this individual laying in the ditch?

7    A.  Yes, ma'am.

8    Q.  Did you do anything with the water bottle once you saw this

9    individual?

10   A.  Yes, ma'am.  He asked for some water and I carried the

11   water bottle down to him.

12   Q.  What, if anything, did you do after finding this

13   individual?  You said there were four other people there with

14   you?

15   A.  They weren't with me, but they -- they were not on that

16   side of the road where he was in.

17   Q.  Did you happen to have a cell phone with you at the time?

18   A.  Yes, ma'am.

19   Q.  What, if anything, did you do after finding this

20   individual?

21   A.  I called nine one one, and afterwards the ambulance came

22   out there.

23   Q.  Were you present at the scene once the ambulance arrived?

24   A.  Yes, ma'am.

25   Q.  Did you stay at the scene once the ambulance was there?
```

```
 1   A.  Yes, ma'am.
 2   Q.  Were you still present -- Well let me ask you this:  Did
 3   you see the medical team providing any assistance to this
 4   individual that was in the ditch?
 5   A.  Yes, ma'am.
 6            MS. McKEE:  Your Honor, may I have a moment?
 7            THE COURT:  Yes.
 8            (Whereupon, Ms. McKee conferred with Mr. Butler off
 9   the record and out of the hearing of the other courtroom
10   participants.)
11   Q.  Mr. Keen, did you ever come to learn who that person was
12   that you found laying in the ditch naked yelling?
13   A.  No, ma'am.
14            MS. McKEE:  No further questions.
15            THE COURT:  Cross?
16                      CROSS EXAMINATION
17                 BY MS. ADAMS OF COLBY KEEN
18   Q.  Good afternoon, Mr. Keen.  I'm Jerusha Adams, and I'm an
19   Assistant United States Attorney and I just have a few
20   questions for you this afternoon.
21            You said that you were picking up litter outside of
22   Perry on U. S. Nineteen?
23   A.  Yes, ma'am.
24   Q.  Is that Perry the city or Perry County?
25   A.  That's Perry the city.  That's Taylor County.
```

1    Q.  And you just testified that you found a man in the ditch

2    after lunch?

3    A.  Yes, ma'am.

4    Q.  Do you know around what time that was?

5    A.  No, ma'am.  I had ate lunch and it was shortly after.

6    Q.  And so you don't know how that person got to be in the that

7    ditch, do you?

8    A.  No, ma'am.

9    Q.  And you don't know how long he was there, do you?

10   A.  Well he said three or four days.

11            MS. ADAMS:  No further questions, Your Honor.

12            THE COURT:  Thank you.

13            Any further examination?

14            MS. McKEE:  Nothing further, Your Honor.

15            THE COURT:  Thank you.  You may step down.

16            (Whereupon the witness, Colby Keen, stepped down from

17   the stand.)

18            THE COURT:  Next witness.

19            MS. McKEE:  The Defense calls Sarah Allen.

20            THE COURT:  Sarah Allen.

21                    S A R A H    A L L E N,

22       the witness herein, having first been duly sworn or

23   affirmed to tell the truth, was examined and testified as

24   follows:

25            Direct examinationBY MS. McKEE OF SARAH ALLEN:

1   Q.  If you would, please state your name and spell your last

2   name for the record.

3   A.  Sarah Allen.  A-l-l-e-n.

4   Q.  Ms. Allen, where do you live?

5   A.  I live in Greenville, Florida.

6   Q.  Where is that in Florida?

7   A.  Greenville.

8   Q.  And where do you work, Ms. Allen?

9   A.  Doctors Memorial Hospital in Perry, Florida.

10  Q.  What position do you hold?

11  A.  L. P. N., a licensed practical nurse on the Med./Surg.

12  floor.

13  Q.  And what type of educational background do you need to be

14  an L. P. N. at the hospital?

15  A.  I have eleven months of clinicals and book work.  You go

16  through an eleven month course.

17  Q.  Okay.  And what are some of your general duties as an L. P.

18  N. nurse?

19  A.  We do assessments.  We do IV therapy.  We do physical

20  therapy.  Maintain medications.

21  Q.  And this would be kind of obvious for any of us that had

22  been to a hospital, but the nurse would probably be the one who

23  has more interaction with a patient.

24  A.  Yes, ma'am.  The doctor is around one time a day and the

25  nurses are there all day.

1    Q.   And how long have you actually been an L. P. N. nurse?

2    A.   Eight years.

3    Q.   And have those eight years been at Doctors Memorial

4    Hospital?

5    A.   No, ma'am, five of them have.

6    Q.   Were you working at Doctors Memorial Hospital back in June

7    of two thousand seven?

8    A.   Yes, ma'am.

9    Q.   Specifically, were you working on June twenty-six, two

10   thousand seven at Doctors Memorial Hospital?

11   A.   Yes, ma'am.

12   Q.   In what area or section of the hospital were you working in

13   on that day?

14   A.   I work Medical/Surgical.  We have three different hallways.

15   I can't recall exactly the hallway I was on.

16   Q.   Well, ma'am, let me ask you, do you recall on June

17   twenty-six, two thousand seven an individual by the name of

18   Andreas Smith being brought into the hospital?

19   A.   I remember getting a report on an Andreas Smith.

20   Q.   And did you in fact see Mr. Smith when he came to Doctors

21   Memorial Hospital?  Were you one of the nurses that treated

22   him?

23   A.   I was one of the nurses that treated him on the floor, not

24   when he came not E. R.  But I got him when he came to the

25   floor.

```
1   Q.  At what point do you know did Mr. Smith come to the
2   floor?
3   A.  He was admitted on Med./Surg. the night before I came in
4   the next morning.
5   Q.  So the day that you would have met Mr. Smith would have
6   been June twenty-seventh?
7   A.  Yes, ma'am.
8   Q.  The very next morning?
9   A.  Yes, ma'am.
10  Q.  Could you describe to the jury what Mr. Smith looked like
11  when you met him on June twenty-seventh?
12  A.  The only thing I can really recall is he did have the some
13  scratches.  He would not look at you eye to eye.  He never made
14  eye contact, but he did have what we call papulas, pustules on
15  his neck.  Appeared to be ant bites on his neck.  That's about
16  all I can recall.
17  Q.  Even though you were not the individual present when Mr.
18  Smith was brought into the hospital, as his nurse would you
19  have had access to his records while he was there?
20  A.  Yes, ma'am.
21  Q.  Would you have actually accessed these records in order to
22  treat Mr. Smith?
23  A.  Yes, ma'am.  For the most part I would look at the doctors'
24  orders and the nursing procedures.
25  Q.  Are you aware of any preliminary diagnosis that was made on
```

1    Mr. Smith when he came to the hospital?

2         MS. HARDWICK:  Your Honor, we would object.  It calls

3    for hearsay.

4         THE COURT:  What was your objection now?

5         MS. McKEE:  Is she aware of any preliminary diagnosis

6    that was made of Mr. Smith when he first came to the hospital.

7         THE COURT:  And your objection is hearsay?

8         MS. HARDWICK:  Yes, sir.

9         THE COURT:  Why isn't it hearsay?

10        MS. McKEE:  Your Honor, may I have a moment?

11        (Whereupon Ms. McKee conferred with Mr. Butler off

12   the record and out of the hearing of the other courtroom

13   participants.)

14        MS. McKEE:  Your Honor, I'll rephrase the question.

15   Q.  Ma'am, what, if anything, did you do to treat Mr. Smith?

16   A.  Pardon?

17   Q.  What, if anything, did you do to treat Mr. Smith while he

18   was at Doctors Memorial Hospital?

19   A.  IV medications.  P. O. medications.  And on the tracking

20   map that we have, we go by what IV he has, if he was on any

21   type of precautions or anything like that.

22   Q.  As the nurse, when you treated Mr. Smith, were these things

23   you were doing following someone's orders or based on your own

24   training and experience as well in the treatment of patients?

25   A.  Combination of both.  We have physician orders, and we look

1    at those physician orders and they have the diagnoses on the

2    physician's orders.  So we treat them according to their

3    diagnoses.

4    Q.  Ma'am, do you recall what you were treating Mr. Smith

5    for?

6    A.  To the best of my knowledge, dehydration and renal

7    insufficiency.

8    Q.  And could you explain just briefly what that is.

9    A.  Dehydration is you can go two to four day without eating or

10   drinking, and your body does not make -- I mean it holds all

11   the fluids and you have no intake and you have nothing to put

12   out.  So therefore when you're dehydrated, when body doesn't

13   have sufficient fluids, you don't have fluids to put out so

14   there's your renal failure.

15   Q.  At any point during the treatment of Mr. Smith, were you

16   able to get much information from Mr. Smith while you were

17   attempting to treat him?

18        MS. HARDWICK:  Your Honor, we would ask the Court to

19   caution her.  It calls for a hearsay response of what Mr. Smith

20   may have told her or someone else.

21        THE COURT:  I'm not sure what you're getting at here.

22   You can lead her, but it depends on where you're going with

23   this.

24   Q.  Miss Allen, what were your observations of Mr. Smith during

25   the period of time that you treated him?

```
1    A.  My observation?  He was withdrawn.  Like I say, he would

2    not make eye contact with you.  And if you did ask him

3    anything, you would have to ask him twice because he would

4    speak so low that you really had to ask him twice.

5    Q.  Based on your training and experience, was this -- What,

6    typically, would cause such behavior as being withdrawn, no eye

7    contact and you said that he spoke very low?

8    A.  You have two to three choices with that.  Usually you

9    suspect abuse.

10              MS. HARDWICK:  Your Honor, we would object to the

11   relevancy of any further testimony from this nurse regarding

12   that area.

13              THE COURT:  How is it relevant?

14              MS. McKEE:  I'm sorry?

15              THE COURT:  How is it relevant?

16              MS. McKEE:  Your Honor, it's relevant because this

17   individual is the nurse that actually treated Mr. Smith.

18              THE COURT:  No, how is it relevant?

19              MS. McKEE:  Your Honor, the individual that we

20   believe that caused Mr. Smith to be in the hospital is that

21   individual attempted to kill him.

22              MS. HARDWICK:  Your Honor, we object.  We object to

23   this narrative.

24              THE COURT:  Just a minute.  Just a minute.  I'll have

25   to excuse the jury again.  I apologize, but it's a serious
```

```
1    matter for both sides.

2              (Whereupon, the jury was escorted out of the

3    courtroom, and the following colloquy ensued):

4              THE COURT:  Now it's my understanding that Mr. Smith

5    is going to testify?

6              MR. BUTLER:  Yes, Your Honor.

7              THE COURT:  Is he going to testify that he was

8    abused?

9              MR. BUTLER:  Yes, Your Honor.

10             THE COURT:  He is?

11             MS. McKEE:  Yes.

12             THE COURT:  I'm going to sustain the objection until

13   I hear what Mr. Smith has to say so that I'll know where you're

14   going with this.  So if the witness, I'll allow them to call

15   you back, unless you want to take her on cross right now.

16             MS. HARDWICK:  Your Honor we just --

17             THE COURT:  I need to understand where you're going,

18   because until you really put this in perspective, I think Ms.

19   Hardwick is entitled to know this, too, where you are going

20   with this.

21             Yes?

22             MS. HARDWICK:  Your Honor, the Government's position

23   is that at any point in time the defendant can decide not to

24   take the stand.

25             THE COURT:  That's why I'm saying I'm not going to
```

1    allow it until he decides to testify, because I don't want to

2    put it in and then he elects not to testify and then it becomes

3    irrelevant.  Of course he has a right not to testify, that's

4    true.

5             Anything else?

6             (Whereupon, there was no response.)

7             THE COURT:  Who is your next witness?

8             We'll reserve her until further cross, until you let

9    us know.

10             MR. BUTLER:  Glenn Teague, and then Andreas Smith.

11             THE COURT:  Now Mr. Teague is not going to have the

12    same problem where I have to determine relevancy?

13             MR. BUTLER:  No, Your Honor.

14             MS. HARDWICK:  Your Honor, we do expect that some of

15    the things we solicit from Mr. Teague could be directly

16    relevant to the whether or not the defendant testifies.

17             THE COURT:  We'll have to see.

18             Bring in the jury.

19        (Whereupon the witness, Sarah Allen, stepped down from the

20    stand.)

21                         IN OPEN COURT

22                    (THE JURY IS NOT PRESENT):

23             MS. HARDWICK:  Your Honor, in reference to Mr. Teague

24    testifying, Glenn Teague, who is the father of the defendant,

25    if Mr. Teague is called the Government believes that there were

```
 1    two people involved in the robbery.

 2              Obviously there's been prior testimony that the car

 3    moved by Mr. Robinson, Mr. Daniel Robinson, and that the

 4    individual from Mr. Raymond McCord testified that the

 5    individual got in the car on Lisa Lane, streets over.  Another

 6    individual testified that a person ran through the field.

 7              With all of that testimony that's already before the

 8    jury, and if Mr. Teague is to testify, we'd be asked that he be

 9    advised of his rights and there's a possibility that he would

10    invoke the Fifth based on some of the questions --

11              THE COURT:  Do you know whether he's going to be

12    invoking the Fifth?

13              MR. BUTLER:  I do not.

14              THE COURT:  Are you going to ask him whether he

15    participated in the robbery?

16              MR. BUTLER:  No, Your Honor.

17              MS. HARDWICK:  The Government will.  And for that

18    reason he would need to be advised of his rights.

19              THE COURT:  Well maybe we need to do it now.  Is Mr.

20    Teague your next witness?

21              MR. BUTLER:  We're going to recall Colby Keen for

22    like fifteen seconds and then Mr. Teague.

23              THE COURT:  While the jury is out, why don't we call

24    Mr. Teague right now.

25              MS. HARDWICK:  And there was also a reference I think
```

1    by Ms. McKee, then the Government objected and she was

2    beginning to proffer to the Court testimony involving a

3    possible attempted murder.

4              THE COURT:  I have no idea where that was going.

5              MS. HARDWICK:  And, Your Honor, that's why we're

6    discussing it now, because if that's also where they're going

7    and Mr. Teague is alleged to be the person who possibly tried

8    to kill Mr. Smith, that too becomes an issue.

9              THE COURT:  Are you going to be asking Mr. Teague if

10   he tried to kill his son?

11             MR. BUTLER:  Nope.

12             THE COURT:  Why don't we bring in Mr. Teague and I

13   can advise him on what he says.  Or you can advise him,

14   actually.  You probably know the *Miranda* rights better than I

15   do.

16             MR. BUTLER:  Your Honor, does the Court want me to go

17   through my entire examination of Mr. Teague?

18             THE COURT:  No.  I just think Ms. Hardwick wants to

19   ask him and advise him of his rights.

20             MS. HARDWICK:  No, Your Honor.  I think the procedure

21   -- They're calling him as a witness.  Once they present their

22   testimony, the Government thinks it's important that they do go

23   through their testimony.

24             THE COURT:  He's not going to ask him that question,

25   he said.

1    MS. HARDWICK:  Your Honor, it's based on what he may

2    ask him that would facilitate the Government asking him.

3    THE COURT:  Let's bring him in and I'll advise him.

4    Mr. Teague, you may take a seat up here.

5    VOIR DIRE EXAMINATION OF GLENN TEAGUE

6    (THE JURY IS NOT PRESENT):

7    THE COURT:  Now, Mr. Teague, you understand that

8    certain questions will be asked of you, and you understand that

9    you have a right not to incriminate yourself?  You understand

10    that?

11    MR. TEAGUE:  Yes, sir.

12    THE COURT:  You also have a right to a lawyer before

13    you say anything that might be incriminating.  You understand

14    that?

15    MR. TEAGUE:  Mm-hmm.

16    THE COURT:  And do you understand that things that

17    are said here could be used against you?  Do you understand

18    that?

19    MR. TEAGUE:  Yes, sir.

20    THE COURT:  Do you have anything else?

21    MS. HARDWICK:  No, Your Honor.

22    THE COURT:  This is your next witness?

23    MR. BUTLER:  No, Your Honor, Colby Keen.

24    THE COURT:  If you'll step down for a second.

25    (Whereupon the witness, Glenn Teague, stepped down

1    from the stand.)

2         THE COURT:  Bring in the jury.

3         (Whereupon, the jury was escorted into the

4    courtroom.)

5         THE COURT:  Proceed.

6                     C O L B Y    K E E N,

7       the witness herein, having already been duly sworn or

8    affirmed to tell the truth, was reexamined and testified

9    further as follows:

10                    DIRECT EXAMINATION

11         BY MS. McKEE OF COLBY KEEN (RECALLED):

12   Q.  Mr. Keen, the last time we were talking you testified that

13   you had found an individual on June twenty-sixth, two thousand

14   and seven naked in a ditch, correct?

15   A.  Yes, ma'am.

16   Q.  Let me ask you a question about that particular area.  The

17   area where you found this individual in the ditch, is this near

18   a rest area?

19   A.  Yes, ma'am, it's about a mile and-a-half.

20   Q.  And what is the nearest hospital from that rest area?  Or

21   let me ask you, is there a hospital near the rest area?

22   A.  Yes, ma'am.

23   Q.  Do you know how close it is?

24   A.  It's about five to six miles.

25   Q.  Do you happen to know the name of the hospital?

1    A.   Yes, ma'am, Doctors Memorial Hospital.

2    Q.   Sir, how in fact was the individual that you found?  At a

3    certain point was the individual removed from the scene, the

4    ditch where you found him?

5    A.   Yes, ma'am.

6    Q.   How was he removed from that ditch?

7    A.   He was put on a flat board by the E. M. S. people, and then

8    put on to a cart, a roller cart.  And then they put him into

9    the back of the ambulance.

10   Q.   So the ambulance took this individual away?

11   A.   Yes, ma'am.

12   Q.   You said that when you found this individual that he was

13   naked?

14   A.   Yes, ma'am.

15   Q.   Can you describe for us whether or not this person was

16   either clean or dirty, what they looked like?

17   A.   He was dirty.

18   Q.   What, if anything, did you notice on his skin at all?

19   A.   Just scratches and bug bites.

20   Q.   Were the scratches and bug bites in a particular area on

21   his body, or were they all over his body?

22   A.   As far as I could tell, all over his body.

23            MS. McKEE:  No further questions.

24            MR. BUTLER:  No questions, Your Honor.

25            THE COURT:  Thank you.  You may step down.

```
 1                    (Whereupon the witness, Colby Keen, stepped down from
 2       the stand.)
 3                    THE COURT:  Now Mr. Teague?
 4                    MR. BUTLER:  Yes, Mr. Teague is our next witness.
 5                         G L E N N     T E A G U E,
 6            the witness herein, having first been duly sworn or
 7       affirmed to tell the truth, was examined and testified as
 8       follows:
 9                         DIRECT EXAMINATION
10                    BY MR. BUTLER OF GLENN TEAGUE:
11       Q.  Mr. Teague, could you state your name and spell your last
12       name for the record.
13       A.  Glenn Teague.  T-e-a-g-u-e.
14       Q.  Because of the acoustics in the courtroom, sir, you're
15       going to have to stay close to the microphone so that everybody
16       can hear you.
17       A.  All right.
18       Q.  Mr. Teague, when were you born?
19       A.  July nineteen fifty-eight.
20       Q.  Nineteen fifty-eight?
21       A.  Yes.
22       Q.  And where were you born?
23       A.  Crestview, Florida.
24       Q.  So your birth place is Florida?
25       A.  Yes.
```

```
1    Q.  Do you have a lot of family and friends in Florida?

2    A.  Yes.

3    Q.  Where are you currently employed?

4    A.  No Mess.

5    Q.  And how long have you been working there?

6    A.  I'd say about three years.

7    Q.  About three years?

8    A.  Yes.

9    Q.  Okay.  Prior to your employ at No Mess, where were you

10   employed?

11   A.  Let's see -- Fox and the Hound.  The restaurant.

12   Q.  And prior to that?

13   A.  Sinclair's.

14   Q.  So what did you do at Fox and the Hound?

15   A.  I was a cook.

16   Q.  A cook?

17   A.  Yes.

18   Q.  And at Sinclair's?

19   A.  A cook.  The same.

20   Q.  And in your employ at Fox and the Hound and at Sinclair's,

21   is it normal procedures to wear aprons when dealing with

22   food?

23   A.  Yes, got to have one.

24   Q.  Okay.  Have you been convicted of -- Let me be more

25   specific.  On or about June two thousand and seven you were on
```

```
 1   parole, correct?
 2   A.  Right.
 3   Q.  You were on parole from what?
 4   A.  Robbery.
 5   Q.  When did that robbery take place?
 6   A.  Nineteen eighty.
 7   Q.  Was there an allegation in that robbery --
 8            MS. HARDWICK:  Your Honor, we would object to any
 9   further detail.  He's acknowledged the fact that he has a prior
10   conviction of robbery.  We'd object to any further details
11   surrounding the conviction.  He's acknowledged that he does
12   have a robbery conviction and I think that is sufficient.
13            THE COURT:  Yes.
14            MR. BUTLER:  The detail is not necessary for purposes
15   of the conviction, but necessary for our theory of defense and
16   it's relevant to some of the allegations contained within this
17   charge.
18            THE COURT:  Overruled.  Go ahead.
19   Q.  The conviction for which you received in nineteen eighty,
20   was there allegations of a firearm being possessed?
21   A.  No.
22   Q.  Did -- Was the robbery of -- What was it a robbery of, do
23   you recall?
24   A.  A filling station.
25   Q.  Filling station.
```

1          What was the sentence that you received?

2     A.   Forty years.

3     Q.   And how much time did you actually serve in prison?

4          MS. HARDWICK:  Your Honor, again, we would object to

5     the relevancy.

6          THE COURT:  How is it relevant how much time he

7     served?

8          MR. BUTLER:  Your Honor, it will be tied up with the

9     defense.  With further witnesses.  It has to do with times of

10    events, sequence of events leading to this case, leading to the

11    robbery in this case.  It will be tied up with our next

12    witness.

13         MS. HARDWICK:  Your Honor, if it's not tied up and

14    it's no longer, and if it's not relevant with the next witness,

15    it's too late.

16         THE COURT:  I'll allow this.  Go ahead.

17    Q.   How much time did you serve?

18    A.   Repeat the question now.

19    Q.   How much time did you serve?

20    A.   I served eighteen years.

21    Q.   And when were you released?

22    A.   Nineteen ninety-eight.

23    Q.   Were you returned to prison after nineteen ninety-eight?

24    A.   Yes, I did.  I was violated.

25    Q.   When did that violation take place?

```
1     A.   Two thousand and one.

2     Q.   And how much longer did you serve in prison?

3     A.   About another thirty-six months.

4     Q.   About another three years?

5     A.   Yes, sir.

6     Q.   When were you released the second time?

7     A.   It would have to be two thousand and five.

8     Q.   So you've spent approximately for that offense, you spent

9     approximately twenty-four years in prison?

10    A.   Yes.

11    Q.   Is prison a violent place?  Can it be a violent place?

12    A.   Very violent.

13    Q.   Is prison, for lack of a better word, an unpleasant place

14    to be?

15    A.   Very.

16         MS. HARDWICK:  Your Honor, we would object to this

17    line of questioning.

18         THE COURT:  What does this have to do with this case,

19    whether it's an unpleasant place to be?

20         MR. BUTLER:  Your Honor, it has everything to do with

21    hit.  Our following witnesses will make it clear why, given the

22    nature of prison, the events in this case have transpired the

23    way they did.

24         THE COURT:  Go ahead.  Overruled for right now.  Go

25    ahead.
```

```
1    Q.  Do you have a desire to go back to prison?

2    A.  Hmm?

3    Q.  Do you have a desire to go back to prison?

4    A.  No, I don't have no desire to go back to prison.

5    Q.  In nineteen eighty you went to prison.  Do you recall any

6    other substantial event that year?

7    A.  Nineteen eighty?

8    Q.  Yes.

9    A.  Not really.

10   Q.  Okay.  So for you, the most substantial thing for you is

11   that you went to prison.

12   A.  Right.

13   Q.  Would it surprise you that your son was born in nineteen

14   eighty?

15   A.  Oh, yeah.  He was.

16   Q.  So you kind of remember that now, hmm?

17   A.  Right.

18   Q.  Was that important at all for you?

19   A.  Very important.

20   Q.  You just forgot to mention that one.

21           While you were in prison, how many birthday cards did

22   you send Mr. Smith?

23   A.  Now?  Not one.

24   Q.  How many letters did you write to your son?

25           MS. HARDWICK:  Your Honor, we're going to object to
```

1    the relevancy.

2          THE COURT:  I'll allow this.  Overruled.

3    Q.  How many letters did you write to your son?

4    A.  Not one.

5    Q.  You indicated that you were released from prison in

6    nineteen ninety-eight?

7    A.  Yes, sir.

8    Q.  And you were placed on parole?

9    A.  Yes, sir.

10   Q.  When you're released on parole you're advised that there

11   are certain rules that you have to follow.

12   A.  Yes, sir.

13   Q.  Whether you agree with it or don't agree with it, a

14   parolee's liberty is restricted.

15   A.  Yes, sir.

16   Q.  And you have to sign and attest to your understanding what

17   those rules --

18         MS. HARDWICK:  Your Honor, this is the Direct

19   examination.  Mr. Butler has called this witness, and he's

20   truly leading him down a path.

21         THE COURT:  I'll allow him to lead him on this issue.

22   These concern standard parole restrictions.  I'll allow him to

23   go into this issue.

24         But once you set forth what the parole requirements

25   are, don't lead him after that.

```
 1              MR. BUTLER:  Yes, Your Honor.
 2    Q.  So you have to comply with rules.
 3    A.  Yes.
 4    Q.  You went back to prison, though, I think you said in two
 5    thousand one?
 6    A.  Yes, I did.
 7    Q.  What rule did you not follow?
 8    A.  Being in possession of narcotics.
 9    Q.  So you chose to ignore the rules after your release and you
10    went back to prison.
11    A.  That's right.
12    Q.  And this was in two thousand and one?
13    A.  Yes.
14    Q.  Between nineteen ninety-nine and two thousand and one while
15    you were out, how many birthday cards did you send your son?
16    A.  Hmm?
17    Q.  When you were out the first time --
18    A.  I didn't met my son.
19    Q.  I don't think I've been clear.  Do you happen to know what
20    your son's name is?
21    A.  Yeah, I know what his name is. I'm trying to tell you that
22    I haven't met him.
23    Q.  You have never met your son?
24    A.  Right.  I didn't meet my son until I got out in two
25    thousand five.
```

1    Q.   Okay.  So the point is, you did not send him any birthday

2    cards nor letters, nothing, until two thousand five, correct?

3    A.   Right.

4    Q.   You were released in nineteen ninety-nine.  But while you

5    were released what efforts did make to see your son and/or

6    visit your son?

7    A.   Well, I tried to find him, but I couldn't find his Mom.

8    Q.   What's your son's date of birth?

9    A.   It's Xx/xx/1980.

10    Q.   Okay.  Now, in two thousand five you were released from

11    prison.  What was the first job that you took?

12    A.   When?

13    Q.   You mentioned Sinclair's, Fox and Hound and No Mess.  Was

14    Sinclair's the first job you got?

15    A.   No.

16    Q.   What was the first job you got?

17    A.   I was working at the Long Horn's.

18    Q.   Cook?

19    A.   Yes.

20    Q.   Do you wear aprons in that employ during that job?  Do you

21    have to wear an apron?

22    A.   In all cook jobs.

23    Q.   Okay.  And after Long Horns, is that when you started

24    working at Sinclair's?

25    A.   No.  I didn't start working at Sinclair's until two

1   thousand and six, I believe.

2   Q.  Okay.  Backing up a smidge, in two thousand five when you

3   were released the second time after your parole had been

4   revoked, did you have to sign for release conditions upon your

5   release then?

6   A.  Yes.

7   Q.  Okay.  And when you signed those conditions, again, you're

8   promising your parole officer and the State of Alabama that

9   you're going to abide by their rules.

10  A.  That's right.

11  Q.  All right.  You would agree that there are multiple ways of

12  lying.

13  A.  Multiple ways of lying?

14  Q.  By that I mean if you ask me how tall I am and I say I'm

15  five one, I'm telling you a lie.

16  A.  Right.

17  Q.  Additionally, if you say Kevin, did you go to school

18  yesterday but I played hooky, I'm lying in two ways.  One, I'm

19  telling you; two, I'm not doing what I'm supposed to.  You

20  would agree?

21  A.  No.

22  Q.  So not doing what you're supposed to is a way of lying, of

23  not doing right.

24  A.  I don't know about all of that now, but --

25  Q.  Well you would say that doing drugs while you're on

```
1    probation --
2              THE COURT:  What's the question?  Where are you going
3    with this?  You're just having an exchange with him.
4              MR. BUTLER:  Yes, Your Honor, I'll move on.
5    Q.  In two thousand five you were released and you signed
6    conditions, you indicated you signed parole conditions.
7    A.  That's right.
8    Q.  Conditions that you promised you'd abide by.
9    A.  Right.
10   Q.  I'm going to move ahead to two thousand and seven;
11   specifically, June twenty-second, two thousand and seven.  On
12   June twenty-second, two thousand and seven you went to Florida.
13   A.  I can't say it was June twenty-second or June twenty-third
14   because I was keeping up with no dates.
15   Q.  Let's put it this way.  On or about June twenty-second or
16   twenty-third, a weekend there, you went to Florida.
17   A.  Yes.
18   Q.  One of your conditions of parole was that you could not
19   travel out of either Montgomery County or the state without the
20   permission of your parole officer.
21   A.  That's right.
22   Q.  But you lied and you went out of state without their
23   permission.
24   A.  Yes, I did.
25   Q.  Now as a result of that lie, your parole was revoked again.
```

1    A.  No, it wasn't.

2    Q.  It wasn't?

3    A.  No.  I was --

4    Q.  You didn't go into custody?

5    A.  Yes, I went into custody but I wasn't revoked, though.  For

6    the conditions going down to Florida, the Board, they were

7    lenient and I understood the reason why.

8    Q.  Backing up, you didn't tell your parole officer you were

9    going to Florida, correct?

10   A.  Right, he didn't know.

11   Q.  You had to wait to be arrested and detained and then

12   explain yourself before they decided to take no action,

13   correct?

14   A.  Yes, sir.

15   Q.  The fact of the matter is you lied to your parole officer

16   because you went to Florida without their permission?

17   A.  I never did talk to them.

18   Q.  You never told him?

19   A.  Right.

20   Q.  Do you know what a lie by omission is?

21   A.  It's called a breach of trust.

22   Q.  You breached their trust?

23   A.  Yeah.

24   Q.  All right.  You went to Florida with your son Andreas.

25   A.  Hmm?

1  Q.  You went to Florida with your son Andreas?

2  A.  No.

3        MS. HARDWICK:  Your Honor, we still object to the

4  continuous leading.  This is a direct examination.

5        THE COURT:  I will sustain that.

6        MR. BUTLER:  I'll rephrase it.

7  Q.  Did you go to Florida with anyone?

8  A.  No, I didn't.

9  Q.  Okay.  Do you recognize the individuals in this

10  photograph?

11  A.  Yes, I do.

12  Q.  That's you?

13  A.  Yes, sir.

14  Q.  And who are these two individuals?

15  A.  Them are two brothers, Raymond and Gene.

16  Q.  And you are saying that when this photograph was taken,

17  your son was not in Florida with you?

18  A.  That's right.

19  Q.  If your brother said he was in Florida with you, he would

20  be lying?

21  A.  No.  That was another time.

22  Q.  Do you see the date in the bottom corner of this?

23  A.  Okay, the twenty-third.

24  Q.  Of two thousand seven.  That's June twenty-third, two

25  thousand seven.  That weekend you're talking about.

```
1    A.   Okay.
2    Q.   If your brother says that your son was with you in Florida
3    at that time, he's lying?
4    A.   Like I say, it all depends on when.
5    Q.   Can you explain to me what you mean by that.
6    A.   What I'm saying, my son didn't come back with me, but he
7    came down later that weekend.
8    Q.   All right.  So you did go to Florida with your son.
9    A.   No.
10   Q.   You went by yourself and your son met you?
11   A.   Right.
12   Q.   All right.  You recall meeting with your parole officer?
13   A.   Yes.
14   Q.   Additionally, you met with an officer who was investigating
15   this offense.  Are you aware that your son is charged with
16   robbing a bank?
17   A.   Yes, I am.
18   Q.   Do you recall telling him that you went to Florida by
19   yourself?
20   A.   Yeah, I sure do.
21   Q.   And you recall telling your parole officer that you went to
22   Florida by yourself?
23   A.   Yes.
24   Q.   You never mentioned to either of them that your son was
25   down there with you?
```

```
 1    A.   No.

 2    Q.   This is the first time you're bringing that up, right?

 3    A.   Well, no.

 4    Q.   Did you tell the parole commission this?

 5    A.   No, they weren't asking about that.  All they wanted to

 6    know is -- all they wanted to know was did I leave the state of

 7    Alabama.

 8    Q.   We'll move back to that.  About a week -- Oh.  How long did

 9    you stay in Florida when you went down?

10    A.   About three days.  I'd say three days.

11    Q.   And you returned when?

12    A.   Sunday.

13    Q.   And when you returned on Sunday, did you come back with

14    your son?

15    A.   No.

16              THE COURT:  Yes or no?

17              THE WITNESS:  No.

18              THE COURT:  No?

19              THE WITNESS:  No.

20    Q.   How many times had your son gone to Florida and visited

21    these relatives?

22    A.   As far as my knowledge, that was the first time.

23    Q.   How did your son know how to get there?

24    A.   You'd have to ask him that.

25    Q.   So it's your position that he just figured out how to get
```

1   to where you were and got there?

2          MS. HARDWICK:  We object.  That's not what the

3   witness testified to.

4          MR. BUTLER:  Withdrawn.

5   Q.  Let's talk about this.  How did he show up?  Well let's put

6   it this way:  First, when did you get there?

7   A.  I got my check that Wednesday.  I probably left that

8   Thursday.  Thursday afternoon.

9   Q.  And when you got down to Florida, where did you go?

10  A.  I went to my -- Well, I called my brother Raymond.  Tried

11  to find out where we'd stay at.

12  Q.  Which brother is this?

13  A.  That's the one in the middle.

14  Q.  That's where -- You went to stay with Raymond?

15  A.  Right.

16  Q.  Did you stay there during your entire trip?

17  A.  No, sir.

18  Q.  Where else did you stay?

19  A.  At this motel.  I don't know the name, but we stayed at a

20  motel.

21  Q.  What day did your son arrive?

22  A.  I would say Saturday.

23  Q.  Where were you when he arrived?

24  A.  We were at one of my brother's friend's house.  We were

25  just barbecuing and chilling.

1    Q.   What did he arrive -- Did you see what vehicle he was
2    driving, what he arrived in?
3    A.   No, I didn't.
4    Q.   Do you recall who -- Did he have any luggage or suitcase,
5    do you recall that?
6    A.   He had an overnight bag.
7    Q.   He had an overnight bag?
8    A.   Yeah.
9    Q.   Who dropped him off, do you know?
10   A.   No.  I just got a call from him.
11   Q.   I'm sorry, sir?
12   A.   I said I just got a call.
13   Q.   From who?
14   A.   From my son.
15   Q.   Okay.  So you are where when you get this phone call on
16   Saturday, the twenty-third?
17   A.   I was with my brother now.  We were eating out, kind of
18   like a family gathering.
19   Q.   And you got a call from your son?
20   A.   Right.
21   Q.   And after that phone call from your son, when was the next
22   time you saw him?
23   A.   I went and picked him up.
24   Q.   Where did you pick him up?
25   A.   At Wal-Mart.

```
1    Q.   Who was with you?

2    A.   Oh, shoot, my brother Raymond.

3    Q.   Okay.  Do you know how he got to that Wal-Mart?  If you do

4    you do, if you don't you don't.

5    A.   No.

6    Q.   Where did he stay while he was in Florida?

7    A.   At a motel room.

8    Q.   I'm sorry, sir?

9    A.   I said at a motel.

10   Q.   He stayed at a motel?

11   A.   Yes.

12   Q.   Was it the same motel that you were staying at?

13   A.   Yes.

14   Q.   Did you guys share a room?

15   A.   Yes.

16   Q.   Okay.  How did he get to that motel?

17   A.   I carried him there.  He didn't have a car or a ride.

18   Q.   And this is Saturday?

19   A.   Mm-hmm.

20   Q.   Did you two do anything together while you were down

21   there?

22   A.   We hung out.  We went to see my brother in the hospital.

23   Stuff like that.

24   Q.   Okay.  What day was that, do you recall?

25   A.   It could have been either Saturday or Sunday.  One of
```

```
 1   them.
 2   Q.  Did you drive a car that your son had rented, or how did
 3   you get to the hospital?
 4   A.  We went with my stepmom.  She drove down there to
 5   Tallahassee.
 6   Q.  So she had driven down there?
 7   A.  Right.  All of us went with her.
 8   Q.  Okay.  After that visit to the hospital, you guys did
 9   what?
10   A.  We left.  We dropped my son off at the motel and we went
11   on, went back to my mother-in-law's house.
12   Q.  Okay.  At any point, did you return to the hotel?
13   A.  Yes.
14   Q.  With your stuff?
15   A.  Yes, later on at night.
16   Q.  What night?
17   A.  I said "later on".  Well probably the next morning.
18   Q.  Saturday night, Sunday morning, or --
19   A.  No.  It had to be Sunday morning.
20   Q.  You went back to the hotel and got your stuff?
21   A.  Right.  Well, I went back to go to sleep.
22   Q.  Okay.  Was your son there?
23   A.  Yes.
24   Q.  Okay.  What happened after you got up and gathered up your
25   stuff?
```

1    A.   Basically, me and him got into a little conversation.

2    Q.   You and your son got into a conversation at the hotel

3    room?

4    A.   Right.

5    Q.   Okay.  And what happened?

6    A.   He left.

7    Q.   And he left.  Okay.

8         What did you do after he left?

9    A.   I waited and waited hoping that he'd come back.  I waited

10   on him.

11   Q.   For how long?

12   A.   I'd say about five hours.

13   Q.   Did you call anyone?

14   A.   No.

15   Q.   Now it's your testimony this was your son's first time in

16   Florida, first time meeting this side of the family.

17   A.   Right.

18   Q.   You didn't think it might be of benefit to contact some

19   family members to help locate him?

20   A.   Well, during that time, that period in the morning everyone

21   was sleeping, so really, you know --

22   Q.   Well this is your son.

23   A.   I understand that.

24   Q.   This is your son, and his first time in Florida.

25   A.   Okay.

1    Q.  You don't think it's important to track him down by waking
2    somebody up?
3    A.  It wasn't that.  I knew my son could take care of
4    himself.
5    Q.  In a place he's never been before?
6    A.  Yeah.
7    Q.  So what did you do then?
8    A.  I left.
9    Q.  I'm sorry, sir?
10   A.  I left.  I came back to Alabama.
11   Q.  Without your son?
12   A.  Right.
13   Q.  He didn't have a car that you ever saw him driving,
14   correct?
15   A.  Right.
16   Q.  You didn't know where he was?
17   A.  Right.
18   Q.  You just decided to drive back?
19          MS. HARDWICK:  We object to the leading, and we also
20   object to the relevancy of this blow-by-blow of what happened
21   in Florida.  This date is about what happened in Montgomery,
22   Alabama.
23          THE COURT:  Overruled.  Go ahead.
24   Q.  You then made it back to Alabama?
25   A.  Yes.

1    Q.   What type of car do you have?

2    A.   When, now?

3    Q.   On or about June twenty-second, two thousand seven, about

4    five or six months ago.  What type of car did you have?

5    A.   A black Sebring.

6    Q.   Is that the car that you went to Florida in?

7    A.   Yes, sir.

8    Q.   And, again, it's your position that you drove down to

9    Florida on Thursday.

10    A.   Right.

11    Q.   Thursday afternoon.

12    A.   Yes, sir.

13    Q.   So that black Sebring was down in Florida on Thursday.

14    A.   Yes, sir.

15    Q.   If somebody said that they saw it driving around a bank on

16    Friday, they're wrong?

17    A.   They're wrong.  Definitely.

18    Q.   Did that Sebring have any stickers on it, do you

19    remember?

20    A.   Not that I remember.

21    Q.   Did it have a ""Support Our Troops" sticker on it or

22    something?

23    A.   Not that I know of.

24    Q.   You don't recall?

25    A.   No, sir.

1    Q.  What was the license plate on that Sebring, do you

2    remember?

3    A.  No, sir.

4    Q.  About a week after you got back, I'll call it about the

5    twenty-sixth or twenty-seventh, do you recall being stopped by

6    law enforcement?

7    A.  Yes, I do.

8    Q.  Where were you driving?

9    A.  A black Sebring, my car.

10   Q.  Do you recall approximately where you were stopped?

11   A.  Yes.  On the Eastern Boulevard right in front of Igor's.  I

12   don't know if y'all know where Igor's at.

13   Q.  Have you come to know that this case is your son is accused

14   of robbing a bank?

15   A.  Yes.

16   Q.  Okay.  Are you aware that -- Well, let's put it this way:

17   Law enforcement informed you of where that bank was located.

18   A.  Yes.

19   Q.  And that bank is a Compass Bank located off of Eastern

20   Boulevard?

21   A.  Yes.

22   Q.  Do you know how far it is from that Compass Bank to

23   Igor's?

24   A.  I would say about a hundred yards.  Maybe more.  Something

25   like that.  Just across the street.

```
1    Q.  So you were stopped in the car at or near Igor's, which is
2    a hundred yards from the bank that had been robbed the week
3    before?
4    A.  Right.
5    Q.  Had you ever been inside that bank?
6    A.  Yes.
7    Q.  Cash checks there?
8    A.  Yes, sir.
9    Q.  How often?
10   A.  Every two weeks.
11   Q.  So you're familiar with how that bank was set up and
12   essentially who the folks who worked there are.  You don't know
13   them necessarily.
14   A.  I know the teller there.  I don't know her, but she'd be
15   the same lady there.
16   Q.  Okay.  Do you know whether or not your son, Andreas, has a
17   bank account at that Compass bank?  Either has a bank account
18   or cashes his checks there?  Do you know?  If you do you do.
19   If you don't, you don't.
20   A.  Not.
21   Q.  So you're stopped a hundred yards from the Compass Bank
22   from a car that matches the description of the car used in the
23   bank robbery.  Are you arrested?
24   A.  No.
25   Q.  Were you asked by law enforcement to submit to any type of
```

1    lineup or identification?

2    A.  No.

3    Q.  Are you shown at that time anything by law enforcement?

4    Shown any photographs, documents or anything?

5    A.  No, sir.

6    Q.  Okay.  How long did the car stop take?

7    A.  Probably about forty-five minutes.

8    Q.  Okay.  Did more than one officer arrive?

9    A.  No, just two detectives.

10   Q.  Two detectives had you there for forty-five minutes.

11           Did they take your photograph, do you recall?

12   A.  No, sir.

13   Q.  Did they attempt to fingerprint you or anything?

14   A.  No, sir.

15   Q.  Now you went to Florida in this car on Thursday, right?

16   A.  Yes, sir.

17   Q.  You drove it back without your son on Sunday.

18   A.  Right.

19   Q.  You're driving around on Friday, correct?

20   A.  Friday?

21   Q.  I mean the day you're stopped, you're driving around

22   driving to work?

23   A.  No, that following Monday.

24   Q.  Excuse me, that following Monday.  This is the car that you

25   use to come and go from work, correct?

1    A.  Yes, sir.

2    Q.  You had purchased this car.  You had bought this car, it

3    was your car?

4    A.  Yes, sir.

5    Q.  When you went down to Florida on Thursday, do you know

6    whether or not your son was down there, down in Florida?

7    A.  I don't know for a fact, because I haven't been talking to

8    him that week, but --

9    Q.  When you were down there on Thursday, did you use your

10   vehicle to use it to go to your hotel room on Thursday?

11   A.  Mm-hmm.

12   Q.  You used it to get around and see your family members,

13   correct?

14   A.  Yes, sir.

15   Q.  To your knowledge, did your son drive the car back to

16   Montgomery on Friday and then drive it back down unbeknownst to

17   you maybe Friday afternoon?

18   A.  No, sir.

19   Q.  All right.  Now, do you recall informing law enforcement

20   when -- Let me back up.

21          After the stop where you were stopped for forty-five

22   minutes, do you have any other conversations with the police?

23   A.  After that?

24   Q.  Yeah.

25   A.  Yes.

1    Q.   Either the police or your parole officer?

2    A.   After I left, the police followed me to my apartment and

3    asked me, you know, how many places I do stay at, because I had

4    given my address at Mellow Lark Drive in which I went to my

5    partner's apartment.  When I come out, I seen him out there

6    waiting on me, that's when they asked me.

7    Q.   So after you're stopped by law enforcement near Igor's they

8    let you go, but they follow you back to your place?

9    A.   Right.

10   Q.   Are you going -- Did they ask you about your place, or was

11   that just where you were headed?

12   A.   I was going to tell my partner that what just happened.

13   Q.   You were going to tell your partner?

14   A.   Yeah.

15   Q.   Who is your partner?

16   A.   Tony Blackman.

17   Q.   Who is that?

18   A.   That's my friend.

19   Q.   And when you get over to Blackman's, place you see the

20   police following you?

21   A.   Yeah.  As I come back, they was in the parking lot.

22   Q.   Did they arrest you at that time?

23   A.   No.

24   Q.   Did they detain you at that time?

25   A.   No.

1   Q.   Okay.  Let me just move this along.  On or about July

2   third, did your parole officer ask you down to her -- his or

3   her officer?  Officer Shifman, that was your parole officer?

4   A.   Still is.

5   Q.   And when you were at that office, was there anyone else

6   with her?

7   A.   Not with him.  What happened, I went down to report, and

8   while I was reporting he say, "Some detectives want to talk to

9   you, and they're fixing to come over and talk to you."

10  Q.   Okay.  You have to speak up.  I'm just not hearing you

11  well.

12          You said you went to your parole office to report on

13  the third.  And when you were there what happened?

14  A.   My parole officer said that, "The detectives are -- they're

15  coming down and they want to talk to you."  Like that.  And I

16  said, "Okay."

17  Q.   Now before the detectives got there, did your parole

18  officer ask you -- speak with you?

19  A.   Yes, he did.

20  Q.   Okay.  Do you recall telling your parole officer that you

21  hadn't seen your son since May?

22  A.   Yeah.  Something about that.  About May.

23  Q.   Do you recall also telling law enforcement who came later

24  that you had not seen your son since May?

25  A.   I don't know about all that.  Something like that.  About

1    Father's Day or something.

2    Q.   But you did not tell them that he had gone with you to

3    Florida.

4    A.   No.

5    Q.   So you were lying about that too.

6    A.   About what?

7    Q.   Your son being down in Florida with you.

8    A.   Being down there with me?

9    Q.   Being in Florida with you.  You lied to your parole officer

10   and you lied to the officers --

11   A.   No.  My parole officer never asked me about my son.

12   Q.   Let me just clear it up.  You told either your parole

13   officer or law enforcement that you hadn't seen your son since

14   May.  Or about Father's Day.

15   A.   Something like that, yeah.

16   Q.   So lied to one of them.  Either the parole officer or the

17   police.  Correct?

18   A.   Somewhere, yeah.

19   Q.   Well you had seen him because according to you he had been

20   in Florida.

21   A.   Right.

22   Q.   You decided to leave him down there.

23   A.   Mm-hmm.

24   Q.   You didn't tell them that, did you?

25   A.   That wasn't any of their business.

```
1   Q.  Let's put it this way.  You're allowed to lie to your
2   parole officer whenever you want to if you think it's not their
3   business, correct?  Is that the your position?
4   A.  When you violate your contract, you know -- see, I had
5   violated my contract.
6   Q.  So it's free rein to lie?
7   A.  Well, you know, you try to make things as easy as you
8   can.
9   Q.  So it's your position that when things get a little hot,
10  you have to lie to get out of them if you can.
11          MR. BUTLER:  Andreas, stand up.
12  Q.  I know it wasn't important to you, but do you recognize who
13  is standing here?
14  A.  Yes, that's my son.
15          MR. BUTLER:  Nothing further.
16          THE COURT:  Cross?
17                       CROSS EXAMINATION
18          BY MS. HARDWICK OF GLENN TEAGUE:
19  Q.  Mr. Teague, I'm Tommie Hardwick.  I am an Assistant United
20  States Attorney, and I just have a few questions for you.
21          You indicated that you were stopped on the Eastern
22  Boulevard by law enforcement sometime around June twenty-ninth,
23  is that correct?
24  A.  Yes, ma'am.
25  Q.  And at the time that you were stopped, you were driving
```

1    your black Sebring?

2    A.   Yes, ma'am.

3    Q.   And the officers asked you about whether or not a younger

4    person ever drove your car, whether or not you ever had a

5    younger person in your family, is that correct?  A son?

6    A.   They asked me who all drove my car, and I gave them my

7    sister, you know, all the people that drove my car.

8    Q.   And did they ask you whether someone younger in their

9    twenties possibly drove your car?

10   A.   Yes.

11   Q.   You gave them the name of your son, is that correct?

12   A.   I gave my son, yes.

13   Q.   You gave them his date of birth as xx/xx/1980?

14   A.   Okay.  I don't know if I gave them his date of birth, but I

15   told them that my son drove my car.

16   Q.   And at that time you had the ""Support Our Troops" sticker

17   on your car, didn't you?

18   A.   I can't recall that.  I don't remember having no trooper

19   sticker on my car.

20   Q.   I'm not asking you about a trooper sticker.  Specifically,

21   I'm asking you about a yellow ""Support Our Troops" sticker.

22   Didn't you have that sticker on your car that ultimately ended

23   up on your Mom's car?

24   A.   Now my Mom had one.  I ain't never had no sticker on

25   mine.

1    Q.   So you say your Mom has one?

2    A.   She don't have them now.

3    Q.   At one time you say your Mom had one?

4    A.   Yeah.  I don't know she had support your state troopers.

5    Q.   I'm not asking you anything about support state troopers.

6    I'm asking you specifically about ""Support Our Troops" as in

7    military people.  The yellow ribbons that a lot of people have

8    on their cars.

9    A.   Okay.

10   Q.   Not state troopers, ""Support Our Troops"."  You don't

11   recall having that sticker on your car when the detectives

12   stopped you?

13   A.   I can't remember having that sticker on my car.

14   Q.   You're saying you don't remember.  Specifically, is it that

15   you don't remember, or are you saying to the jury that you

16   never had one?

17   A.   I can't remember them now.

18   Q.   So you're not saying you didn't have one, you're saying you

19   didn't remember?

20   A.   I never put one on there.

21   Q.   That's not my question, who put it on there, Mr. Teague.

22   Do you remember having a ""Support Our Troops" yellow ribbon

23   sticker on your black Sebring?

24   A.   No, ma'am.

25   Q.   You don't remember?

```
1    A.   No, ma'am.

2    Q.   Could you say without a doubt that you've never had one?

3    A.   Yes, I can.

4    Q.   Okay.  Now you indicated that you went to Florida on

5    Thursday.

6    A.   Okay.

7    Q.   And you drove your car?

8    A.   Ma'am?

9    Q.   You said you went to Florida on Thursday, which would have

10   been June twenty-first.

11   A.   All right.

12   Q.   You're saying "all right."  I'd ask you to answer my

13   questions, not just agree with me.  Did you drive to Florida on

14   June twenty-first?

15   A.   Yes.

16   Q.   Did you Drive to Florida alone?

17   A.   Yes.

18   Q.   Did you drive your car to Florida?

19   A.   Yes.

20   Q.   So are you telling this jury that it's not possible that

21   your car could have been here in Montgomery?

22   A.   It's impossible.  I was down in Florida.

23   Q.   And if someone described your car -- Let me just show you.

24           MS. HARDWICK:  May I approach, Your Honor?

25           THE COURT:  Yes.
```

1    Q.   I want to show you what's already been admitted into
2    evidence as Government's exhibit number forty-four.  Do you
3    recognize that?
4    A.   Yes.  It look like the back of my car.
5            THE COURT:  You said what, now?
6            THE WITNESS:  It looks like the back of my car.
7            THE COURT:  All right.  Go ahead.
8    Q.   I want to show you Government's exhibit number twenty-nine.
9    Do you recognize Government's exhibit number twenty-nine?
10   A.   Yes.
11   Q.   I'm going to show you Government's exhibit number
12   twenty-eight.  Do you recognize Government's exhibit number
13   twenty-eight?
14   A.   Yes, ma'am.
15   Q.   What is it?
16   A.   It's a black Sebring.
17   Q.   Is that your car?
18   A.   Yes.
19   Q.   So if someone said they saw your car in the area of the
20   bank robbery on June twenty-second, they would be lying?
21   A.   Yes.
22   Q.   If more than one person saw your car in that area they
23   would all be lying?
24   A.   Yes.  They didn't see my car, that car right there.
25   Q.   And, Mr. Teague, if there's been testimony that that car

1    was involved in a bank robbery, everybody would be lying,

2    wouldn't they?

3    A.    Yes.

4    Q.    Were you the driver of that car on June twenty-second when

5    that bank was robbed?

6            THE COURT:    Ask your question again.

7    Q.    Were you the driver of the car on June twenty-second when

8    the bank was being robbed?

9    A.    That would be impossible.    I was in Florida.

10   Q.    Mr. Teague, just as it is impossible that that car was

11   identified when you say you drove it to Florida on Thursday

12   prior to that robbery?

13   A.    It couldn't have been that car.    I got a sister-in-law who

14   has a black Sebring that looks just like mine.

15   Q.    Does she have the same tag number you have?

16   A.    No, ma'am.

17   Q.    Does she have a son whose date of birth is xx/xx/1980?

18   A.    No, she don't.

19   Q.    Now you also said that you have been in that bank before.

20   A.    Yes, ma'am.

21   Q.    And you know the teller.

22   A.    Well, you know, I know her but just coming in.    We talk and

23   stuff like that.

24   Q.    So the teller would have recognized you had gone in,

25   wouldn't she?

1    A.   I would think so.  Like I say, she know me.

2              MS. HARDWICK:  Those are all my questions, Your

3    Honor.

4              MR. BUTLER:  Briefly.

5                        REDIRECT EXAMINATION

6                   BY MR. BUTLER OF GLENN TEAGUE:

7    Q.   Could you stand up and just step down for a brief moment.

8              (Whereupon, the witness complied.)

9    Q.   How tall are you?

10   A.   Six one.

11   Q.   You look like you're in either good shape.  You're pretty

12   slim.

13   A.   Mm-hmm.

14   Q.   Okay, thank you.

15              You go into that bank every two weeks, correct?

16   A.   Yes.

17   Q.   It's not like you're in the bank every day.

18   A.   No.

19   Q.   And the conversation that you might have with that teller

20   was hello, how are you type thing?

21   A.   Yeah.

22   Q.   You're not good friends with the teller, you don't

23   socialize with the teller?

24   A.   No.

25              MR. BUTLER:  Nothing further.

```
1                      RECROSS EXAMINATION

2               BY MS. HARDWICK OF GLENN TEAGUE:

3   Q.  Do you have any marks on your left or right side of your

4   neck, Mr. Teague?

5   A.  No, ma'am.

6          MS. HARDWICK:  That's all.

7                   FURTHER REDIRECT EXAMINATION

8               BY MR. BUTLER OF GLENN TEAGUE:

9   Q.  Mr. Teague, this is you in this photograph, right?

10  A.  Yes, sir.

11  Q.  You're on the right side.  This is you?

12  A.  Yes, sir.

13  Q.  You're wearing a white hat?

14  A.  Yes, sir.

15  Q.  Sunglasses?

16  A.  Yes, sir.

17  Q.  Got a dark either blue or black shirt on with white?

18  A.  Yes, sir.

19  Q.  You had an apron on up to here.  All you would see up to

20  here is the dark part, correct?  Would that be accurate?

21  A.  Yeah.

22  Q.  It would cover up the white part?

23  A.  Right.

24  Q.  Thanks.

25          MR. BUTLER:  Nothing further.
```

1              THE COURT:  Thank you.  You may step down.

2              (Whereupon the witness, Glenn Teague, stepped down

3      from the stand.)

4              THE COURT:  Next witness.

5              MR. BUTLER:  At this time I'd call Mr. Andreas Smith.

6              THE COURT:  Okay.  Mr. Smith.

7                        A N D R E A S     S M I T H,

8         the witness herein, having first been duly sworn or

9      affirmed to tell the truth, was examined and testified as

10     follows:

11                          DIRECT EXAMINATION

12              BY MR. BUTLER OF ANDREAS SMITH:

13     Q.  Mr. Smith, you have been present during all of these

14     proceedings.

15     A.  Yes, sir.

16     Q.  All right.  I'm going to ask you a series of questions

17     related to the first charge against you, which is bank robbery.

18     Okay?  I'm going to ask you a series of questions about that.

19              Let's start here.  What year were you born?

20     A.  Nineteen eighty.

21     Q.  Your date of birth?

22     A.  Xx/xx/1980.

23     Q.  Was your father a part of your life after birth?

24     A.  No, sir.

25     Q.  At some point did you come to understand where your father

1    was?

2    A.  Yes, sir.

3    Q.  When?

4    A.  When I was like fourteen years old.

5    Q.  Okay.  Up until that point, had you received a postcard

6    from your Dad?

7    A.  No, sir.

8    Q.  Phone call from your Dad?

9    A.  No, sir.

10   Q.  Birthday card from your Dad?

11   A.  No, sir.

12   Q.  Any acknowledgement of your existence from your father?

13   A.  No, sir.

14   Q.  Who raised you?

15   A.  My mother.

16   Q.  When you were nineteen years old, did you get into some

17   trouble?

18   A.  Yes, sir.

19   Q.  Would you tell the ladies and gentlemen of the jury what

20   happened.

21   A.  Well, I stole.

22           THE COURT:  Can you all understand him?  Please,

23   raise your hand and say I can't understand.  I can't hear him

24   and I'm sitting right next to him.

25           It's really critical, members of the jury, that you

```
 1    say you can't understand.  Don't be bashful.  We've been here
 2    how many days now?  We're family now.  Speak up.
 3    A.  It was receiving stolen property.  Me and a couple of guys
 4    with my friends, we stole some radios out of a car.
 5    Q.  Okay.  Were you convicted of that offense?
 6    A.  Yes, sir.
 7    Q.  And, again, how old were you?
 8    A.  Nineteen.
 9    Q.  Had you been convicted of any other felony offenses since
10    that age?
11    A.  No, sir.
12    Q.  Okay.  Were you punished for stealing those radios?
13    A.  Yes, sir.
14    Q.  Did you go to jail?
15    A.  I went to prison for two years.
16    Q.  All right.  When you got out, you were twenty-one?
17    Twenty-two?
18    A.  Yes, sir.
19    Q.  What did you do?
20    A.  I started working.
21    Q.  Okay.  At some point did you become interested in
22    contacting your father?
23    A.  Yeah.  When I was twenty-four I had my first time.
24    Q.  When you were -- Try to speak really clear.
25    A.  When I was twenty-four I had my first son.  I looked on the
```

1  birth certificate and found out what his name was.  And I

2  contacted central records because I know they could find him.

3  So I called them and they told me --

4  Q.  Don't say what they told you, but based on the information

5  that you gathered, what were you able to do?

6  A.  Get an address and what prison he was at and the A. I. S.

7  number.  And I can wrote him and asked him, "Do you know my

8  mother?"

9  Q.  So you made the first contact to try to find -- to interact

10  with your father.

11  A.  Yes, sir.

12  Q.  That twenty-four years prior to that, had your father ever

13  tried to contact you?

14  A.  No, sir.

15  Q.  Okay.  What was your motivation again for all of a sudden

16  reaching out after twenty-four years?

17  A.  I always wanted to know who my Dad was, but I wanted some

18  fatherly advice.  Raising a family, I was trying to do that

19  thing there.  I was lost from that.  I was looking for some

20  advice from at least my father, somebody I feel who could give

21  me an opinion.

22  Q.  So you had a newborn son, I believe you just said?

23  A.  Yes, sir.

24  Q.  You're reaching out to your Dad to maybe give you some

25  advice?

1   A.   How to raise a family.

2   Q.   You are aware of the fact that he wasn't there for you for

3   twenty-four years.

4   A.   Still, I wanted to see my Dad.  I wanted to know what kind

5   of information he could give me anyway.

6   Q.   What happened after you wrote him?

7   A.   Well, he wrote back and said he told me what him and my Mom

8   had going on.  He was talking about that.  And they was in

9   love, and all that story.  Gave me that story and that's about

10  it.  He told me he was doing time.  He might come up for parole

11  soon, and that's all there was.

12  Q.   How many letters did you write to him in prison?  Or do you

13  remember how many letters there were?

14  A.   Well, it wasn't many because he got right out and my son

15  was born in May.  He probably got out like in July.

16  Q.   When you decided for whatever reason to reach out -- Well,

17  you know what reason, to get your advice from your Dad.  Did

18  you have any idea in your head that he was going to be getting

19  out that soon?

20  A.   No, I didn't.

21  Q.   It was just pure happenstance that you start writing and

22  then he gets out?

23  A.   Yes, sir.

24  Q.   When he got out of prison, did you maintain contact with

25  him?

1   A.   Yes, sir.

2   Q.   Could you describe for the ladies and gentlemen of the jury

3   what you did to maintain contact?

4   A.   I always went over, tried to sit down and talk with him.

5   He was staying with my grandmother.  I would go over there and

6   sit down and talk to him.  Take my son over there.  Let him

7   visit him.  And we would talk, and that was it.

8   Q.   Okay.  How many times after your father was released from

9   prison -- Again, you made the first attempt to contact him and

10  he knows you're alive.  How many times after he was released

11  from prison did he come by and say hey, son, do you want to go

12  to a ball game?

13  A.   He never did nothing like that.  I guess he was

14  institutionalized.

15  Q.   And because of that what?

16  A.   He wouldn't just want to sit around and talk right in the

17  garage.  Just sit down and talk.

18  Q.   So did he come over to your house to sit in the garage?

19  A.   I always went over to where he was.

20  Q.   How many birthday cards did he send you after that?

21  A.   None.

22  Q.   Did he send your son any birthday cards?

23  A.   No.

24  Q.   How many birthday presents did he buy for your son?

25  A.   None.

```
1    Q.  Other than you having to go and try to engage him, did he

2    ever seek you out to try to engage you in conversations?

3    A.  No, sir.

4    Q.  All right.  He's released in about July of two thousand

5    four.  You're trying to keep him part of your life, he's not

6    doing anything --

7              MS. HARDWICK:  Your Honor, we object to the

8    characterizations and the narrative leading from Mr. Butler.

9              THE COURT:  I'll sustain the narrative leading.

10             MR. BUTLER:  I'll rephrase that.

11   Q.  Two thousand five comes and goes, two thousand six comes

12   and goes.  Is your father improving at all during any of these

13   times as far as trying to stay in touch with you?

14   A.  It always be the same.  I go over.  He'd take me to work

15   some days if I called him.

16   Q.  But, again, you'd have to call?

17   A.  Yeah, I'd have to call him.

18   Q.  Okay.  Two thousand seven begins.  The relationship stays

19   the same?

20   A.  It's the same.

21   Q.  Does anything unusual happen in June of two thousand seven

22   regarding your Dad?

23   A.  No.  He just told me to get ready, we were going to take a

24   trip to Florida.  Did I want to meet the other side of the

25   family, and I told him yeah, I'd go.
```

1    Q.  This trip to Florida, who's contacting you regarding it?

2    A.  My father.

3    Q.  Is this unusual in the sense that how many times -- Let me

4    rephrase it.

5         How many times up until June of two thousand and

6    seven had he contacted you to go do anything?

7    A.  Never.

8    Q.  All right.  So in June of two thousand seven all of a

9    sudden he's saying -- he's contacting you?

10   A.  Yes, sir.

11   Q.  All right.  About a week prior to June twenty-second, two

12   thousand seven do you recall any conversations with your Dad?

13   A.  Yeah.  He told me to get ready, we're going to go visit his

14   brother, that he was fixing to get out of the hospital.  He

15   hadn't seen him for a couple of years.  He was in prison and he

16   wanted to and he said did I want to go and I said, like,

17   "Yeah."

18   Q.  Later -- Let me put it this way.  That's the Friday before

19   the twenty-second, so that would be what -- Well, the week

20   prior.  The Wednesday going -- to you going down, so that would

21   be the twenty-first, around the nineteenth or twentieth, did

22   your father contact you again?

23   A.  I don't understand what you're saying.

24   Q.  Did your father call back with any more details about the

25   trip?

```
1    A.   No.   That was it.
2    Q.   Okay.   When your father told you about the trip to Florida,
3    did you notice anything, or did you observe anything different
4    in his tone regarding the trip?
5    A.   No.   He just said he'd be ready.   "I'm going to pick you up
6    around noon and we'll head out then, so to be ready."
7    Q.   Why did that the strike you to be odd regarding the be
8    ready part?
9    A.   Because if he come get me like I tell him come take me to
10   work, I wouldn't be ready.   I.
11   Q.   Again, repeat, I think you said if he said he was going to
12   come and get you --
13   A.   He said, "Be ready," because sometimes I wouldn't be ready
14   when he pulled up in the yard.   And he said, "Be ready.   I'm
15   going to be pulling out at noon, twelve o'clock.   Whatever,
16   We'll be heading out to Florida, so be ready."
17   Q.   Did that seem unusual?
18   A.   No, not usual.
19   Q.   I'm sorry.   Okay.   Was your father, was he punctual and
20   routine in his visits with you?   Did he show up on time when he
21   said he was going to show up?
22   A.   No.
23   Q.   So when he said, "Be ready," what did you take it to
24   mean?
25   A.   I didn't think nothing of it.
```

1    Q.   Now let's move ahead.  June twenty-second, two thousand

2    seven.  Describe that morning.

3    A.   Well my sister, she came and gave me forty dollars.  She

4    said, "I'm going to work."  I was laying down.  She said, "I'm

5    going to work," and she gave me forty dollars.  And I said,

6    "All right."  And she left.

7    Q.   What was that four hundred dollars for?

8    A.   Forty.

9    Q.   I'm sorry, forty dollars?

10   A.   Forty dollars.

11   Q.   What was that forty dollars for?

12   A.   For keeping my nephew, her son, Mxxxxxx.

13   Q.   And was anyone else at the home at that time?

14   A.   My mother and brother.

15   Q.   Okay.  Who was the person who primarily took care of the

16   nephew?

17   A.   I was baby-sitting.

18   Q.   Okay.  Now did twelve o'clock come?

19   A.   Yes, sir.

20   Q.   And what did you do with the nephew as twelve o'clock was

21   approaching?

22   A.   Well I told my brother, he was in the room, I told him,

23   "I'm fixing to ride out to watch Mxxxxxx until Britney gets out

24   of work."

25   Q.   Did he agree to do so?

1  A.  Yes, sir.

2  Q.  When twelve o'clock rolled around what happened?

3  A.  My father pulled up and I went and got in the car.

4  Q.  Did he get out of the car, come up to the doorbell and --

5  A.  No.

6        MS. HARDWICK:  I'm going to object to the leading.

7        MR. BUTLER:  Withdrawn.

8  Q.  Did your father come up to the home?

9  A.  He pulled up to the driveway.

10  Q.  Did he get out of the car?

11  A.  No, he blew the horn.

12  Q.  What did you do?

13  A.  I came out and got in the passenger's side.

14  Q.  All right.  What happened next?

15  A.  We went down to our highway and we started to going toward

16  Dothan and going to Florida.

17  Q.  Did you see or observe anything during the trip that struck

18  you as odd regarding your father's financial status?

19  A.  Yes.  When we got to Dothan, we stopped and pulled over for

20  a gas station.  He went in and he bought beer and stuff.

21  Q.  Okay.

22  A.  And he came back in the car.  He put the beer by me, so he

23  started checking the console and the visor pulling it down.  I

24  he noticed the money in the there and the money was over the

25  visor.  And he was like, "What you doing that for?"  I'd never

1   take anything like that.

2        MS. HARDWICK:  Your Honor, I'm not understanding what

3   he's saying.

4   Q.  You have to repeat that.

5   A.  There was money in the console where you put your hand out,

6   and in the sun visor he had money stuffed there.  He had money

7   in his left pocket, and money in his pockets.  And I was joking

8   him about it.

9   Q.  And what did you say, joking to him about what?

10  A.  I was like, "I ain't going to take none" from him because

11  he was searching like I went and took his stuff.

12  Q.  Oh.  Okay.  You said to him, "I'm not going to take

13  anything from you."  And how did he respond when you said

14  that?

15  A.  He just looked at me and cracked a smile.

16  Q.  Okay.  Had you ever seen your father with this type of cash

17  his person?

18  A.  No, sir.

19  Q.  When you saw this type of cash on his person, it struck you

20  as odd, but did you think anything of it?

21  A.  I asked him where he got it.

22  Q.  All right.

23  A.  He told me, "Mind your own business."

24  Q.  All right.  You then left the gas station in Dothan and

25  what happened?

1    A.   Went on to Florida.

2    Q.   Okay.  And, again, what day is this?

3    A.   This is Friday.

4    Q.   You didn't drive, or walk, or take a bus or fly by plane or

5    with your arms down to Florida by yourself, did you?

6    A.   No, sir.

7    Q.   Okay.  When you got to Florida on Friday, what did you

8    do?

9    A.   We first went to Wal-Mart and he called his brother, the

10   one that came.  Gene.  And he came and met us at Wal-Mart.

11   Q.   You have been present during the trial correct?

12   A.   Yes, sir.

13   Q.   The gentleman, Gene, who is in defendant's exhibit one B on

14   where I'm pointing, is that Gene?

15   A.   Yes, sir.

16   Q.   And what happened?

17   A.   Well he called, he came up to Wal-Mart and led us to the

18   trailer where they were staying at.

19   Q.   They led them to the trailer.  Who is the "they"?

20   A.   The other brother.

21   Q.   The other brother that was in the photograph?

22   A.   Yes, sir.

23   Q.   Okay.  And what happened there?

24   A.   Well, they -- They were waiting on Rodney to get off

25   work.

```
 1   Q.   In this photograph, there is your father, Gene and who is
 2   in the middle?
 3   A.   That's Rodney.
 4   Q.   Okay.  And what happened?
 5   A.   They were waiting for him to get off work.  So when he got
 6   off work they went to Wal-Mart and bought meat to barbecue, and
 7   bought beer.  Meat for a little barbecue.
 8   Q.   Okay.  Let's back up a little bit here.  Are you familiar
 9   with what your father's faith is?  What his religion is?
10   A.   He practices Islam.
11   Q.   And yourself?
12   A.   I practice Islam.
13           MS. HARDWICK:  I object to the relevancy of his
14   religious faith.
15           MR. BUTLER:  I'll tie it up.
16           THE COURT:  Go ahead.
17   Q.   When you're at the trailer, they went and got barbecue,
18   correct?
19   A.   Yes, sir.
20   Q.   Did Rodney ever show up?
21   A.   Yes, sir.
22   Q.   Okay.  When Rodney showed up and you all are down there,
23   what did you guys do with the barbecue and beer?
24   A.   We sat around and we were drinking and they were
25   barbecuing.
```

1   Q.   Okay.  Do you recall what type of barbecue this was?

2   A.   Well they had some swine, pork.  They had some hamburger

3   and they had some chicken.  That's all I know was right

4   there.

5   Q.   Did you observe what your father was doing in regards to

6   some of this barbecue?

7   A.   Yes.  He was snatching -- there was some swine, or pork.

8   He was grabbing them off the grill eating them.

9   Q.   Some people might not understand how -- the import of this,

10   but given your faith and what his purported faith was, how did

11   this make you feel?

12   A.   Really, it was -- He was going against all the laws that he

13   was teaching me.  That's forbidden, to eat that.

14   Q.   Okay.  Did you approach him about that?

15   A.   Yes, sir.

16   Q.   How did he respond?

17   A.   "I'm your Daddy, don't be questioning me."

18   Q.   You just used the tone "I'm your Daddy don't be questioning

19   me."  Was that his tone?  Was it that civil?  Was it that

20   calm?

21   A.   No, it was more like straight out point-blank, "Don't be

22   questioning me," with the attitude because he had been

23   drinking.  He was more blunt with it.  "Don't be questioning

24   me, I'm your Daddy."

25   Q.   All right.  You have been around your father now for about

1    three years.

2    A.   Yes, sir.

3    Q.   Had you seen this side of your father before?

4    A.   No, sir.

5    Q.   And how did his behavior at this time make you feel?

6    A.   How did it make me feel?  Well basically I was looking up

7    to him, he was teaching me Islam, and I was teaching him

8    because he never had acted like that down in Montgomery.  He

9    played the role well.  He just would sit around and talk.

10        When I go to him and he would be sitting down and

11   just talk all the time.  But when he got to Florida, I got to

12   see a whole other side of him.  He was acting like a little

13   kid.  All this stuff he was teaching me was just something to

14   talk about just to entertain me.  He wasn't living under the

15   principles that he was trying to teach me.

16   Q.   Did you see him and/or others using drugs while they were

17   down there?

18   A.   Yes, sir.

19   Q.   Tell the ladies and gentlemen of the jury what you saw him

20   doing.

21   A.   He was drinking beer, smoking marijuana and smoking crack

22   cocaine.

23   Q.   And had you ever seen your father use drugs like this

24   before?

25   A.   Not no crack cocaine.

1  Q.  Now let's lay it out there for the ladies and gentlemen of
2  the jury.  Did you use any drugs while you were down there?
3  A.  Yeah, I did some cocaine and smoked some weed and drunk
4  some beer.
5  Q.  Was your father sitting there going, you know, chill out on
6  that?
7  A.  No, sir.
8          MS. HARDWICK:  Your Honor, we object to that.
9  Q.  Did your father attempt to stop you from using any of those
10 controlled substances?
11 A.  No, sir.
12 Q.  All right.  Did you ever -- Well, let's put it this way,
13 did you have any further conversations with your father
14 regarding the money that he now had in his possession and his
15 behavior?
16 A.  When we got back to the room.
17 Q.  Okay.  Now you got down there on Friday night.  You go over
18 to your Uncle Gene's and you guys have this party.  You leave
19 at some point and you go back to your room.  Do you recall what
20 time it was that you left?
21 A.  It was, like, Saturday morning, about three, three-thirty
22 in the morning.
23 Q.  When you got back to your hotel room?
24 A.  Yes, sir.
25 Q.  All right.  When you got back to the hotel room, what did

1    you and your father discuss?

2    A.   I really asked him -- He didn't tell me, but he didn't come

3    out right then and tell me that he had robbed the bank.

4            MS. HARDWICK:  We object, Your Honor, to any hearsay

5    testimony.

6            MR. BUTLER:  Okay.

7    Q.   Did you ask your father anything further regarding his

8    behavior -- I mean, did you tell him how you felt regarding his

9    behavior?

10   A.   I didn't ask him about that right there.  I left that

11   alone.  I asked him where he got the money from.

12   Q.   Okay.  Did you come to know where he got the money from?

13           MS. HARDWICK:  We would object.  Calls for hearsay.

14           THE COURT:  How would he know?  Do you have a way of

15   getting this in so that it's not hearsay?

16           MR. BUTLER:  Not at this time.  There is a method,

17   and Mr. Teague is still present.

18   Q.   Did you at some point leave the hotel room to visit any

19   other family member?

20   A.   Yes, sir.

21   Q.   What happened then?

22   A.   We went to Florida.  Well, not Florida, but Tallahassee up

23   the highway from where we was at.

24   Q.   And this was Saturday?

25   A.   Yeah, this is Saturday.  We went up there, stayed up there

1    probably five or six hours.

2    Q.   Where did you go?

3    A.   To some little hospital where the guy was at.  He was in a

4    little hospital.

5    Q.   And this person that you saw was whom and why was he in the

6    hospital?

7    A.   He's the one got A. I. D. S.  I don't know his name.

8    Q.   After you visited this person, what happened?

9    A.   We came back to Perry, Florida and we got in his car and

10    went back to the trailer.  And they did this barbecue thing

11    over again, the same process went over.

12    Q.   Did you see or observe your father engaging in behavior

13    that you didn't like?  Did your father act like he did the

14    night before?

15    A.   Yes, sir.

16    Q.   Okay.  How did this make you feel?

17    A.   He just, for my father, I didn't know he would act like

18    that, like a little child.  I was more mature than he was.

19    Q.   And did you confront him about there at the party?

20    A.   No, sir.

21    Q.   So you let it go this time?  I mean, you didn't --

22    A.   When we got back to the room, that's when we got into it.

23    Q.   All right.  We'll get there.

24           So, again, it's Saturday night now and you guys go

25    back to the room.  At this time, did you use any drugs or

1    alcohol or anything?

2    A.  Yes, sir.

3    Q.  All right.  And what did you use this Saturday night?

4    A.  I was drinking beer and smoking weed.

5    Q.  All right.  Were you using any other controlled

6    substances?

7    A.  No, sir.  I did that Friday night.

8    Q.  So you just smoked some weed, and -- I don't want to say

9    "just".  But you smoked some weed and you drank beer Saturday

10   night?

11   A.  And cocaine on Friday.

12   Q.  What time about did you leave your uncle's on Saturday

13   night?

14   A.  Probably the same time, two-thirty, three o'clock in the

15   morning.

16   Q.  So you get back to the hotel.  What do you -- Do you

17   confront your father?

18   A.  Yes, sir.

19   Q.  And at this point is your father -- how would you describe

20   your father's attitude towards you in the sense that I think

21   it's pretty clear he's never been particularly close, but at

22   this stage how would you describe his attitude towards you?

23   A.  It was like he was trying to dodge me.  Didn't want to be

24   around me.  He more like wanted to be around with his brothers

25   and wanted to leave me at the room.  So he came and dropped me

1    off.  He was going to just bring me back and leave me and he

2    was heading out.  And I said, "Why you treat me like that down

3    here?"

4          So, he was like, "Look, man, I'm grown, let me have

5    my business" and did like that.

6          So I'm like, "Look, I come down here.  I took my

7    Koran down with me."  I said, "Why does he never read it?"

8    Because I was going to get to him on what he was eating.  I was

9    going to bring this after to his attention.  So he got pissed

10   off then.  And he was like --

11   Q.  We're all grownups here and it's important that everyone

12   understands the tone of what your father was saying to you and

13   the manner in which he was acting.  So what happens?

14   A.  I left that alone, but he got real pissed off like he was

15   saying, "I'm your Dad, don't be questioning me.  I brought you

16   into this," and stuff like that.  So I asked him like, "Where

17   did you get the money from?  Why don't you tell me that?"

18          MS. HARDWICK:  We'll object to the responses that

19   he's about to go into.

20          MR. BUTLER:  The Government has a point, and the

21   there's a way getting around it.  Maybe the Government is being

22   lenient, but specifically their objection --

23          THE COURT:  I'm not following you at all.

24          MR. BUTLER:  The Government is objecting to specific

25   types of hearsay.  They're letting hearsay in from the father

```
1    in regard to other issues.  I think given that lapse, this is

2    just completing the story.  There is no way we can get around

3    doing this.  I'm just stating that I believe given --

4              THE COURT:  What is your other way?

5              MR. BUTLER:  We're going to recall Mr. Teague.

6              THE COURT:  I thought you weren't going to be asking

7    Mr. Teague any questions of that nature.

8              MR. BUTLER:  Unfortunately, Your Honor, we may have

9    to revisit that issue given this limitation.

10   Q.  What -- Don't say what your father told you.  After he said

11   whatever he said, what did you do?

12   A.  Tell him to take me home.

13   Q.  And what did he say?  I mean, did he take you home?

14   A.  No, sir.

15   Q.  And what did you do?

16   A.  I didn't do nothing.  He left out the room.

17   Q.  Were you there with anyone else?

18   A.  No, sir.

19   Q.  Do you recall -- or did you have any information as to

20   where your father was going?

21   A.  No, sir.

22   Q.  What's the next thing you recall happening while you were

23   in the room?

24   A.  Me flipping the remote, laying on the bed.

25   Q.  Okay.  After flipping the remote and laying on the bed,
```

1    what's the next thing you recall?

2    A.  Well, waking up on the side of the road two days later.

3    Q.  Now do you have any idea where you were found?

4    A.  I found out since I was in the hospital.

5    Q.  At that time -- At the time that you came to, do you recall

6    where you were?

7    A.  No, sir.

8    Q.  Did you have any idea how you had gotten there?

9    A.  No, sir.

10   Q.  What was your condition?

11   A.  What do you mean my "condition"?

12   Q.  How did you feel?  What was your body like?

13   A.  Well my ribs were bruised.  Head was hurting.  They said my

14   lung collapsed, and I had scratches all over me.  Dirt over me

15   and I had no clothes on.

16   Q.  Were you taken from that location to someplace else?

17   A.  To the hospital.

18   Q.  How long were you at the hospital?

19   A.  I got out Friday.

20   Q.  Who was the first person to come visit you at the hospital,

21   do you recall?

22   A.  My mother.

23   Q.  Your mother?

24   A.  My mother, my brother Corey and my sister Casha (ph.)

25   Q.  They came and visited you at this hospital?

1    A.   Yes, sir.

2    Q.   What day was that?

3    A.   I don't remember the day.

4    Q.   Okay.  But it was while you were at the hospital?

5    A.   Yes, sir.

6    Q.   How many times did your father visit you while you were at

7    the hospital?

8    A.   Not one.

9    Q.   How many times did your father call to check on your

10   welfare while you were in the hospital?

11   A.   He didn't.

12   Q.   Do you have any idea where your father was during the time

13   that you were out and in the hospital?

14   A.   No, sir.

15   Q.   How did you -- Did you have any concerns or fears while --

16   after you had been placed in the hospital?

17   A.   No, not really.

18   Q.   Okay.  Did you have any concerns regarding your safety

19   while you were in the hospital?

20           MS. HARDWICK:  Your Honor, I object.  He just

21   answered he didn't have any concerns or fears.  That was the

22   first question.

23           THE COURT:  Say that again, now?

24           MS. HARDWICK:  Mr. Butler asked whether or not he had

25   any concerns or fears, his answer was no.

1          MR. BUTLER:  And then my next question was did he

2     have any concerns for his safety.

3          MS. HARDWICK:  Asked and answered.  It's the same

4     thing.

5          THE COURT:  I'll allow it.  Go ahead.

6     Q.  Did you have any concerns for your safety while you were in

7     the hospital?

8     A.  Yes, sir.

9     Q.  What were those?

10    A.  When I got found on the side of the room and my Dad was in

11    the room --

12         MS. HARDWICK:  Your Honor, I couldn't understand him.

13         MR. BUTLER:  That's all right.  We'll do it again.

14    Q.  You had been found on the side of the road?

15    A.  Yeah, I was found on the side of the road and I didn't know

16    how I got there.  And my Daddy was the last person I seen, and

17    when he walked out he was on bad terms.  He was mad.  And I

18    feel that he did it.

19    Q.  Okay.  Again, your father didn't visit you at all as well

20    while you were there.

21    A.  No, sir.

22    Q.  Did any other family members -- You indicated your mother,

23    your sister -- Well your mother came and who else came with

24    you?

25    A.  That was the first.  That was like the next day, I believe,

1    probably Wednesday I guess where the hospital contacted them.

2    Q.  The hospital contacted them?

3    A.  Yeah.  And then Gene, and I don't know the lady's name,

4    it's supposed to be my grandmother, she came.

5    Q.  When was that?

6    A.  It was one of the days.  Between them days that I was in

7    the hospital.

8    Q.  All right.  Did you have any concerns regarding Gene while

9    you were in the hospital?

10   A.  No.

11   Q.  Okay.  You said you left the hospital on Friday.

12   A.  Yes, sir.

13   Q.  We've talked about your mother coming down with some family

14   member.  We talked about Gene and your grandmother, I believe,

15   coming to the hospital.  Did any other family members come to

16   the hospital?

17   A.  Rodney was with them.

18   Q.  Rodney, that's the gentleman in the middle here in the

19   photo?

20   A.  Yes, sir.

21   Q.  Again, Dad's here with these two there.  Did your Dad come

22   with those two?

23   A.  No, sir.

24   Q.  All right.  Friday came.  Were you checked out of the

25   hospital?  Let me rephrase that.

```
1            Did the doctor release you from the hospital?
2    A.  No, I was ready to go.
3    Q.  Okay.  Why were you ready to go already without the
4    doctor's release?
5    A.  Because I really didn't know what was going on, and I
6    wanted to get home to Montgomery.
7    Q.  It hadn't been a good trip for you.
8    A.  Yes, sir.
9    Q.  Okay.  Did your father ever contact you -- I know he didn't
10   come by.  Did he ever contact you by phone or anything while
11   you were at the hospital?
12   A.  Yeah.
13   A.  My grandmother came and got me from the hospital.  They
14   took me to --
15   Q.  This is Friday?
16   A.  Friday, yeah.  They took me to a room, a hotel room.  So
17   that night my Daddy called --
18           MS. HARDWICK:  Your Honor, I would object.
19   Q.  You don't have to say what your Dad said, but you say your
20   father called?
21   A.  He called right on the cell phone.
22   Q.  Okay.  Based on that phone call, did you have any cause for
23   concern coming back to Montgomery?
24   A.  I was trying to get back and he was trying to get me to
25   stay down here.  He was trying to get me to stay in Florida.
```

```
1   Q.  Okay.  Did you notice anything about Gene or Rodney's

2   financial condition during these days?

3   A.  Yes, sir.

4   Q.  Tell the ladies and gentlemen.

5   A.  Well, they had money.  They had more money than they had

6   the day when I first got here.  They didn't have the money when

7   I first got down there.  So when I got to the hospital they had

8   money, they had plenty of it.

9   Q.  Did you feel -- Not what he said, but did you feel

10  threatened by your father?

11  A.  Did I feel threatened by him?  Yes, I did.

12  Q.  Okay.

13          MR. BUTLER:  One moment, Your Honor.

14          (Whereupon, Mr. Butler conferred with Ms. Mason off

15  the record and out of the hearing of the other courtroom the

16  participants.)

17          MR. BUTLER:  Your Honor, no further questions.

18          THE COURT:  Okay.  Cross.  Proceed.

19                      CROSS EXAMINATION

20              BY MS. HARDWICK OF ANDREAS SMITH:

21          THE COURT:  Before we begin, how many more witnesses

22  do you have?  I want to see where we are in the trial.

23          MR. BUTLER:  Your Honor, we may have to recall Mr.

24  Teague, so six.

25          THE COURT:  Six more?
```

```
 1                    How long do you think your cross is going to take?
 2                    MS. HARDWICK:  It will be a while, Your Honor.
 3                    THE COURT:  Well, let's get started.
 4      Q.  Mr. Smith, you indicated that you had been smoking or using
 5      weed, marijuana?
 6      A.  Yes, ma'am.
 7      Q.  Combining that with beer?
 8      A.  Yes, ma'am.
 9      Q.  And combining that with crack cocaine?
10      A.  No, just powder cocaine.
11      Q.  Powder cocaine?
12      A.  Yes.
13      Q.  So you're snorting it?
14      A.  Yes, ma'am.
15      Q.  And you were studying the Muslim faith?
16      A.  Yes, ma'am.
17      Q.  To the point that you brought your Koran with you?
18      A.  Yes, ma'am.
19      Q.  But it bothered you that your Daddy was doing the same
20      thing.
21      A.  It bothered me?  I understand what you're saying, but he
22      was supposed to be a role model.  In other words, he was
23      teaching me the road to Islam.  I was practicing.  I didn't
24      know the fundamentals of Islam.  You understand what I'm
25      saying?
```

1              He was supposed to be teaching me.  I didn't know all

2    the rules and principles to the road of Islam.  I was doing my

3    everyday thing.  I didn't take it seriously.  It was like just

4    something to read.

5    Q.  You didn't take it seriously but it bothered you that your

6    Daddy was eating pork?

7    A.  Yeah.

8    Q.  Isn't that a little bit inconsistent, Mr. Smith?

9    A.  No, it's not.  Because he made me stop eating it.  I'd be

10   eating ribs, and he might say, "You might as well kill a cat."

11   Stuff like that.  That's what made me mad when I saw him

12   picking it up off the grill and eating it with no shame.

13   Q.  Did it bother you when you saw him using powder cocaine?

14   A.  Yes, because he never did it.

15   Q.  Did it bother you when he smoked marijuana?

16   A.  No, he always did that, crack or powder.

17   Q.  You said he always did that?

18   A.  He always smoked weed and drink beer.

19   Q.  Did you smoke weed and drink beer with him?

20   A.  Yeah.

21   Q.  And that violation of putting unclean things in your body

22   didn't bother you?

23   A.  I can't judge him.

24              THE COURT:  A clarification on your question.  You

25   asked did he smoke marijuana and drink beer with his father,

1    and you said yes, right?

2              THE WITNESS:  Yes.

3              THE COURT:  Were you talking about around June

4    twenty-second or before June twenty-second?

5              MS. HARDWICK:  During the whole period of time of

6    this relationship.  I'll be more specific.

7    Q.  When you were with your father, you said that he used weed

8    and he had drank beer before.

9    A.  Yes, ma'am.

10   Q.  Before June twenty-second, two thousand and seven.

11   A.  Yes, ma'am.

12   Q.  And you had done that with him on occasions?

13   A.  Yes, ma'am.

14   Q.  And he was teaching you because he was your role model

15   about the Muslim faith.

16   A.  Yes, ma'am.

17   Q.  And part of the Muslim faith is keeping a clean system.

18   A.  To the best of your ability.  You try to be a Muslim.  It's

19   not something you just up and quit, it's something that you

20   try.

21   Q.  So you were learning not to do those things, is that fair

22   to say?

23   A.  Yes, ma'am.  I had about a year.

24   Q.  So you were learning it from your father?

25   A.  I talked to him about it.  I learned it myself.  I would

```
 1    read it myself.
 2    Q.  Who provided you with it?
 3    A.  He gave me the Koran to read.
 4    Q.  So this was something that he started with you in
 5    developing your relationship?
 6    A.  Yes, ma'am.
 7    Q.  So in spite of developing this relationship and him
 8    starting you to study the Muslim faith, you did not abstain
 9    from using marijuana.
10    A.  No, I didn't.
11    Q.  And he did not abstain from using marijuana.
12    A.  No, ma'am.
13    Q.  And he did not abstain from drinking?
14    A.  No.
15    Q.  And neither did you.
16    A.  No.
17    Q.  And this was the role model that you had sought out to get
18    advice on raising your son.
19    A.  Yeah, I did.
20    Q.  So wouldn't it be a fair statement, Mr. Smith, that you
21    were a little bit selective in the things that you chose to do
22    that were right and those things not to do that were wrong?
23    A.  I wouldn't say that.  I wouldn't say that.
24    Q.  Well, do you think doing marijuana is wrong?
25    A.  No, not really.
```

1    Q.  You don't know that it's illegal?

2    A.  I don't think it's wrong.

3    Q.  Do you know that it's illegal?

4    A.  It's an herb.

5    Q.  Do you know that it's illegal?

6    A.  Yeah, by the Government's law it is.

7    Q.  Okay.  So knowing that the it's illegal, knowing that you

8    already have prior convictions, you still chose to do --

9             MR. BUTLER:  A conviction.  I think there was a

10   plural there.  There was one conviction.

11   Q.  Knowing that you have this on your record, you know that

12   marijuana is illegal, but you and your role model are sitting

13   around smoking weed?

14   A.  Yeah, I smoked weed.

15   Q.  Now you go to Florida.  And according to your testimony you

16   didn't leave Montgomery until noon because your Dad told you to

17   be ready at noon.

18   A.  Yes, ma'am.

19   Q.  And he pulled up at noon.

20   A.  Yes, ma'am.

21   Q.  Do you think you look like your Dad?

22   A.  That's what they say.

23   Q.  That's what they say?

24   A.  Yeah.

25   Q.  Do you think you look like your Dad?

1    A.  I don't know.  I can't say that.

2    Q.  Now Mr. Butler has asked you a lot of questions about

3    whether or not while you were down there you had any fear.  Did

4    you call anyone to come get you from Florida on Friday night?

5    A.  No, ma'am.

6    Q.  Your Daddy was eating pork on Friday night in the first

7    barbecue, wasn't he?

8    A.  Yes, ma'am.

9    Q.  Okay.  Now did you call anybody to come get you Saturday

10   when you were flipping the remote?

11          THE COURT:  Say that again, now?

12          MS. HARDWICK:  Flipping the remote.

13          THE COURT:  Go ahead.

14   A.  No, ma'am.

15   Q.  And you're not here to tell this jury that your Dad

16   physically did anything to you, are you?

17   A.  He was the last person I was with in the room.  When he

18   left the room, he was the only person with a key to the room.

19   Q.  You saw him leave the room?

20   A.  Yes, ma'am.

21   Q.  And you don't know who did anything to you?

22   A.  No, ma'am.

23   Q.  All you know is that you ended up in a certain area and you

24   had certain injuries.

25   A.  Yes, ma'am.

```
 1    Q.   Okay.   Now you've attempted to testify regarding when your
 2    Daddy went down -- when you were driving down to Dothan.   It
 3    was just you and your Dad?
 4    A.   Yes, ma'am.
 5    Q.   What time did you get down to Florida?
 6    A.   It had to be like six-thirty, seven o'clock.
 7    Q.   Six-thirty or seven?
 8    A.   Yes, ma'am.
 9    Q.   So where did you go when you first got there?
10    A.   To Wal-Mart.
11    Q.   And is that where your Uncle Gene came and met you?
12    A.   Yes, ma'am.
13    Q.   So you had not been to visit anyone else prior to your
14    Uncle Gene coming to get you?
15    A.   No, ma'am.
16    Q.   So while you're down in Florida at the Wal-Mart, did you go
17    shopping?
18    A.   Yes, ma'am.
19    Q.   What did you buy?
20    A.   He bought me some shoes and clothes.
21    Q.   During that time did you have any money?
22    A.   No, ma'am.
23    Q.   So when your Dad told you that he was coming to get you and
24    you were keeping your sister's little boy, your nephew?
25    A.   For forty dollars.
```

1    Q.   Excuse me?

2    A.   Forty dollars.

3    Q.   Did you pack a bag?

4    A.   Yes, ma'am.

5    Q.   Did you tell your sister that morning that your Dad was

6    coming to get you to take you to Florida?

7    A.   No, ma'am.

8    Q.   So you led her to believe that you were going to be keeping

9    her child?

10   A.   She paid me on Friday.  I was to keep him all week.  She

11   paid me on Fridays anyway.

12   Q.   That was not my question.

13   A.   It was payday anyway.  She paid me before she left to go to

14   work anyway.

15   Q.   My question is not whether the she paid you or not.  She

16   left you, according to your testimony -- Mr. Smith, when she

17   left that morning, according to your testimony if we're to

18   believe that, she left you keeping her son?

19   A.   Yes, ma'am.

20   Q.   So my question is, you led her to believe that you would be

21   keeping her son.

22   A.   I didn't keep him up until twelve o'clock.

23   Q.   So she expected you to keep him all day though, right?

24   Because that's what you usually did.

25   A.   Yeah.

```
 1    Q.  But you had plans to go to Florida?
 2    A.  Yes, ma'am.
 3    Q.  Did you pack a bag?
 4    A.  Yes.
 5    Q.  When did you pack a bag?
 6    A.  The night before.
 7    Q.  So the night before you packed your bag to go to Florida.
 8    And when your sister left that morning, you took her money and
 9    she left the child with you.
10    A.  Yes, ma'am.
11    Q.  And you didn't tell her you were going to be leaving.
12    A.  No.
13    Q.  Don't you think that was a little bit dishonest, Mr.
14    Smith?
15    A.  No.
16    Q.  Because she left her child with you.
17    A.  I had brothers in the house, and my mother in the house,
18    too.
19    Q.  So part of your story here is that you were keeping the
20    baby during the morning hours so you weren't at the bank
21    robbing it, right?
22    A.  Right.
23    Q.  So that's convenient.  But at noon when your Dad is coming
24    to get you, you've already packed a bag the night before
25    because you already knew you're going to Florida?
```

1    A.   Yeah.

2    Q.   So all of this planning was already in the works.

3    A.   I been over that.  My brother stated that.

4    Q.   So how long did you know you were going --

5    A.   A week before that.

6    Q.   So a week before June twenty-second, two thousand and

7    seven, you knew you were going to Florida with your Dad?

8    A.   Yes, ma'am.

9    Q.   Did your Dad's car have the "Support Our Troops" yellow

10   sticker on it?

11   A.   Yes, ma'am.

12   Q.   So your Dad lied about that, hmm?

13   A.   Y'all be the judge of that.

14   Q.   Excuse me?

15   A.   The jury be the judge of that.

16   Q.   Well you say that he had it and he said that he didn't.

17   A.   I told you he did.

18   Q.   So he did have the "Support Our Troops" sticker?

19   A.   Yes, ma'am.

20   Q.   So all those witnesses that you've sat here in the trial

21   and heard identify the car as being a black Sebring with a

22   "Support Our Troops," that's believable because your Dad's car

23   did have that car sticker on it, didn't it?

24   A.   Yes, ma'am.

25   Q.   And you've also heard them testify regarding the fact that

1  when that car pulled up at the bank, the person who robbed the

2  bank got out of the passenger side of the car.

3  A.  Yes, ma'am.

4  Q.  And that the car did not stay in that area, it moved from

5  the front of the bank?

6  A.  Yes, ma'am.

7  Q.  You heard all the testimony.

8  A.  Yeah.

9  Q.  And then that the person that robbed the bank ran across

10  the left side of the bank, got into the car that had "Support

11  Our Troops" sticker on it, the black Sebring, on Lisa Court.

12  You heard all that testimony, didn't you?

13  A.  Yes, ma'am.

14  Q.  Now so it sounds more like those people are pretty

15  consistent in their testimony, wouldn't you say, Mr. Smith?

16  A.  They identified the car.

17  Q.  And that's the car that meets the description of your Dad's

18  car?

19  A.  Yes, ma'am.

20  Q.  But they also identified you.

21  A.  They didn't identify me.

22  Q.  Miss Gurley didn't identify you as being the person who

23  robbed her?

24  A.  No.

25  Q.  She did not do that?

```
1    A.   No.

2    Q.   Mr. Smith --

3    A.   I don't think she identified me.

4    Q.   Okay.  Could you have been napping during that process when

5    she pointed and described what you had on?

6    A.   I'm the one charged with the crime.  I'm sitting over

7    there.

8    Q.   You just said she didn't identify you.

9    A.   She didn't identify me from no pictures.

10   Q.   She identified you in this courtroom, Mr. Smith.

11   A.   They already told her they've got a suspect.  Of course she

12   going to go with that.

13   Q.   We're not talking about the photo.  We're talking --

14   A.   She didn't identify me off no bank picture, or the same day

15   of the bank robbery.  She didn't identify me.

16   Q.   Okay.  I'm kind of confused, Mr. Smith.  Are you saying

17   that you disagree that she identified you in this courtroom, or

18   are you questioning her identification of you in the

19   photographs from the bank?

20   A.   I'm questioning it all.

21   Q.   Okay.  You just disagree with her?

22   A.   Yes, I do.

23   Q.   So she's mistaken?

24   A.   Very much, she is.

25   Q.   Mr. Robinson is mistaken?
```

1    A.   Mr. Robinson didn't identify me.

2    Q.   He didn't?

3    A.   No.  He said body language, hat down here.

4    Q.   I'll show you what's been marked as Government's exhibit

5    number thirty-two.  Is that your picture, number six?

6    A.   Yes, ma'am.

7    Q.   Do you see Daniel Robinson's signature on there?

8              MR. BUTLER:  I'll object.

9              THE COURT:  Sustained.  You're just going over other

10   evidence with him.

11             MS. HARDWICK:  Your Honor, this is cross examination.

12             THE COURT:  It has to be relevant.  The jury has

13   heard the evidence themselves.

14             MS. HARDWICK:  Government's exhibit thirty-two is an

15   exhibit --

16             THE COURT:  The jury heard the evidence.  It's up to

17   the jury to make that assessment of what Mr. Daniels or

18   Robinson, whomever, did.

19             MR. BUTLER:  Your Honor, I'd just like to add that he

20   did not identify my client.

21             THE COURT:  I'll leave that up to the jury as to what

22   the witnesses did.  What the attorneys say is not evidence.

23   Only what comes from the witness stand is evidence.

24   Q.   Now, Mr. Smith, you said that you sought your Dad out

25   because you wanted someone to teach you how to raise your son.

1   A.   Gave me some advice about how to do it.

2   Q.   Your mother raised you, is that correct?

3   A.   Yes, ma'am.

4   Q.   Does your mother have a father?

5   A.   I never met him.

6   Q.   Does your mother have sisters and brothers?

7   A.   No, ma'am.

8   Q.   Do you have any uncles on either side?

9   A.   No.  My mother is an only child.

10  Q.   Now -- So you've never had any contact with any other male,

11  adult male?

12  A.   Not beside my stepdad when I was little.

13  Q.   Excuse me?

14  A.   Not beside my stepdaddy when I was little.  When my sister

15  Britney came up here, her father.

16  Q.   What does your stepfather do?

17  A.   He's a mechanic.

18  Q.   Does he work every day?

19  A.   I didn't see him every day.  I was little then.

20  Q.   Does he have a job?

21  A.   Yes.

22  Q.   Does he earn an income?  Does he earn money?

23  A.   Yes.

24  Q.   You know where he lives?

25  A.   No, I do not.

```
1    Q.  Does your mother know where he lives?
2    A.  They have been divorced since ninety-three.
3    Q.  But you're telling this jury that the only male that
4    existed for twenty years that you've never had contact with any
5    other male in your life so you had to seek out your Daddy to
6    teach you how to raise your son?
7    A.  Yes.
8    Q.  Did you go to school?
9    A.  Yeah, I went to school.
10   Q.  How far did you go in school?
11   A.  To the ninth grade.
12   Q.  Did you play sports?
13   A.  Yes, ma'am.
14   Q.  What kind of sports did you play?
15   A.  Basketball.
16   Q.  Did you have a coach?
17   A.  Yes, ma'am.
18   Q.  Who coached you?
19   A.  His name was Coach Baker.
20   Q.  Excuse me?
21   A.  His name was Coach Baker.
22   Q.  How long did you play basketball?
23   A.  One year.
24   Q.  Now, Mr. Smith, when you sought out this relationship with
25   your Dad, but all you were doing was smoking marijuana and
```

1    drinking, was that the kind of role model you wanted to have to

2    teach your son?

3    A.  No, ma'am.

4    Q.  Then why did you continue to seek him out?

5    A.  It's a process.  You strive, first.  Ain't nobody going to

6    quit or nothing like that.

7    Q.  That's a crime, so nobody is just going to quit committing

8    a crime like that, is that what you're saying?

9    A.  No, it ain't got nothing do with a crime, me smoking no

10   weed.

11   Q.  You said you knew it was illegal.

12   A.  By the Government law.

13   Q.  The charge that you are charged with --

14   A.  Can I ask you something?

15   Q.  No, I'll ask the questions, Mr. Smith.

16         You know that there are other laws that are created

17   by the Government and by the State, is that correct.

18   A.  Yes, ma'am.

19   Q.  And you know that you're not the person to decide whether

20   it's illegal or not, you know that?  Isn't that correct?

21   You're not that person who decides.

22   A.  Yes, ma'am.

23   Q.  So when you say that you know that marijuana is illegal,

24   but you continue to do it, you're making a conscious decision

25   to continuously break the law every time you do it.  Isn't that

1    true, Mr. Smith?

2    A.  I see that as irrelevant.

3    Q.  Excuse me?

4    A.  I don't want to answer that question.

5        THE COURT:  I think we've gone over this enough.

6    Let's move on.  You all are just now getting to a point where

7    you're just arguing with each other.  So ask him another

8    question.

9    Q.  Now when you were at the hospital, who came to pick you up

10   from Florida?

11   A.  My mother, Willie Jackson and my brother Corey.

12   Q.  How long were you in the hospital before they picked you

13   up?

14   A.  I went in, I guess, Tuesday, and I got out Friday.  And

15   they went Saturday morning to get me.

16       MS. HARDWICK:  One moment please, Your Honor.  I may

17   be done.  Just a second.

18       THE COURT:  Mm-hmm.

19   Q.  Mr. Smith, you indicated that Miss Gurley was wrong, that

20   you're not the person who robbed the bank.

21   A.  Yes, ma'am.

22   Q.  Do you remember -- Well, what is that that you have on your

23   neck?

24   A.  A R. I. P. tattoo.

25       THE COURT:  Can you show me where it is?

```
 1              (Whereupon, the Witness complied.)
 2    A.  R. I. P. tattoo.
 3    Q.  R. I. P.?
 4    A.  Yes, ma'am.
 5    Q.  And what does that mean?
 6    A.  To rest in peace.
 7    Q.  R. I. P. means rest in peace.  But little cat, who is
 8    little cat?
 9    A.  One of my friends.
10    Q.  What's his name?
11    A.  Jamaal Mack.
12    Q.  Mr. Mack.  And where is Mr. Mack now?
13    A.  He deceased.
14    Q.  Was Mr. Mack affiliated with the gang?
15              MR. BUTLER:  Objection, relevance.
16              THE COURT:  I'll sustain that.
17    Q.  And how long have you had the R. I. P. Little Cat on your
18    neck?
19    A.  Since two thousand two.
20    Q.  So it was on there on June twenty-second, two thousand and
21    seven?
22    A.  Yes, ma'am.
23    Q.  And it is on your left side, is that correct?
24    A.  Yes, ma'am.
25    Q.  Now you heard Mr. Butler ask your Dad a lot of questions
```

1    about him not wanting to go back to jail.

2    A.   Yes, ma'am.

3    Q.   Didn't you make a similar statement to the officers when

4    they came to take a picture of the Rest in Peace Little Cat on

5    your neck?

6    A.   They made the same statement, yeah.

7    Q.   But you didn't want to go to jail, right?

8    A.   Yes, ma'am.

9    Q.   You told them, then, you didn't want to go to jail?

10   A.   I was already in jail, though.

11   Q.   You asked them what you had been charged with, right?

12   A.   I didn't know what I was charged with.  I already been

13   arrested, and I was in jail already.

14   Q.   And you didn't ask them what you were being charged with?

15   A.   No.

16   Q.   You didn't?

17   A.   No.

18   Q.   So Detective Hill didn't tell the truth about that?

19   A.   That was really argument.  That was no smooth conversation.

20   That was an argument we had.

21   Q.   Okay.  So you already knew what you had been charged with,

22   and you told them you didn't want to go to jail?

23   A.   I don't know what you're saying.  The conversation didn't

24   go like that.  I asked, "What y'all want me for?"

25   Q.   And they told you, didn't they?

1  A.  I didn't know why I was here.  I didn't want to talk to

2  them.  That's what I'm getting you to see, I'm already being

3  charged with something I didn't do.  I told them, "Who did it?"

4  But they didn't want to listen.

5  Q.  You told them during that conversation, "Who did it?"

6  A.  Yeah, I told them.

7  Q.  Who did you tell?

8  A.  There you go, he know what I say.

9        THE COURT:  No, you have to answer her question now.

10  A.  I told them, "Who did it?"  I told them, "What you

11  referring to the bank robbery or the shooting?"

12  Q.  The bank robbery?

13  A.  I didn't tell them nothing.  I didn't want to talk about

14  that.

15  Q.  So you never told them about anybody having any money?

16  A.  No.

17  Q.  You didn't tell them that you were in Florida?

18  A.  No.

19  Q.  You didn't tell them that you were baby-sitting for your

20  sister on June twenty-second?

21        MR. BUTLER:  Objection, Your Honor.  My client has a

22  constitutional right not to tell the officers.  I don't know

23  what this line of questioning is designed to illicit.  My

24  client has an absolute right not to speak to the officers.

25        THE COURT:  Just a minute.  Are you saying that he

1    made some statements but not other statements, or did he say

2    anything at all?

3        MS. HARDWICK:  Your Honor, he's saying today -- he's

4    putting forth an alibi, one, that he was baby-sitting, which he

5    already --

6        THE COURT:  Just a minute now.  He does have a right

7    not to say anything to the police.  That is true.

8        MS. HARDWICK:  I understand that.

9        THE COURT:  Okay.  Well, you can't infringe on that

10   right.

11       Now it's one thing if he started making a statement

12   and he left out things.  Now if you have something to that

13   effect, that's a different story.  He has a right to remain

14   silent.

15       MR. BUTLER:  Thank you.

16   Q.  So during your conversation with the officer, all you

17   wanted to know is what you were charged with?

18   A.  Why?  Why I was being charged with it.

19   Q.  And you were told why you were being charged with it,

20   weren't you?

21   A.  I was told.  I told them what happened in that shooting.  I

22   told them I didn't know nothing about the bank robbery.

23       "Can I ask you your name?"  A "Special Agent Drew."

24   He said, "Your Daddy says you did the bank robbery.  We know

25   your Daddy did it, why you didn't go tell them on him?"  I told

1    them, "I ain't got nothing to do with no bank robbery."  I

2    didn't believe them.

3        He said, "Your Daddy identified you as being the

4    robber.  We showed him the tape and he said that's you."  And I

5    didn't believe them, so I said I didn't want to talk about

6    that.  "You do something about the murder charges on me."

7    Q.  What did you tell them --

8    A.  "Jamaal shot the gun."

9    Q.  And you're saying, "Jamaal shot the gun."  Did you ever

10   have a conversation with someone else asking them to agree with

11   you on that subject matter, that Jamaal shot the gun?

12   A.  No.  If I talked to somebody, I told them, "Somebody told

13   me that."

14   Q.  And you didn't have the conversation with anybody else?

15   A.  I didn't tell nobody on nothing.

16        MS. HARDWICK:  Thank you, Mr. Smith.

17        MR. BUTLER:  Just a couple or three questions.

18                    REDIRECT EXAMINATION

19           BY MR. BUTLER OF ANDREAS SMITH:

20   Q.  He might not have been much, but Glenn Teague was your

21   father.

22   A.  Yes, sir.

23   Q.  He's not your football coach?

24   A.  No, sir.

25   Q.  He's not an uncle.

1    A.   No, sir.

2    Q.   He's not one of the kids you went to high school with.

3    He's your biological father.

4    A.   Yes, sir.

5    Q.   And you had had a son.

6    A.   Yes, sir.

7    Q.   Whether wise or not, you wanted to reach out to your

8    biological Dad for some advice, correct?

9    A.   Yes, sir.

10   Q.   All right.  Didn't want to reach out to your ninth grade

11   basketball coach?

12   A.   No, sir.

13   Q.   Did you hem and haw when I asked you whether or not you

14   smoked weed, pot, while you were in Florida?

15   A.   I did do what?

16   Q.   Did you make excuses?

17   A.   Yeah, I agree I did it.

18   Q.   You agreed you did it?

19   A.   Yeah.

20   Q.   You didn't come in here and try to lie?

21   A.   No, sir.

22   Q.   The Government is right, it's against the law.  But did you

23   lie to these jurors about your use of marijuana?

24   A.   No.

25   Q.   Because you did it.

1    A.  Yes, sir.

2    Q.  Did you rob a bank?

3    A.  No, sir.

4    Q.  Big difference between -- Well, let's put it this way.

5    They're both illegal.  You understand that?

6    A.  Yes, sir.

7    Q.  But are you aware -- Let me rephrase that.  They're very

8    different offenses, correct?

9    A.  Yes, sir.

10   Q.  Did you have anything to do with the robbery of Compass

11   Bank?

12   A.  No, sir.

13   Q.  Do you want to go to -- Let's put it this way.  The

14   Government made a big fact about the fact that you told law

15   enforcement you didn't want to go to jail.  You told them that,

16   didn't you?

17   A.  Yes, sir.

18   Q.  Do you want to go to jail for something you didn't do?

19   A.  No, sir.

20          MR. BUTLER:  Nothing further.

21                     RECROSS EXAMINATION

22               BY MS. HARDWICK OF ANDREAS SMITH:

23   Q.  Mr. Smith, you haven't been caught smoking marijuana, have

24   you?

25   A.  What you mean "caught"?

```
1    Q.  During the time you were smoking marijuana with your

2    father, you weren't caught doing that, were you?

3    A.  What you mean "caught"?  Like by who?  By police or what

4    you mean?

5    Q.  Any law enforcement person.  No law enforcement person has

6    ever charged you or caught you smoking marijuana.

7    A.  No, they didn't caught me smoking it.

8    Q.  And IF they caught you smoking marijuana, you would agree

9    that that would be a criminal charge.

10   A.  Yeah.

11   Q.  And you would not want to go to jail for that.  Wouldn't it

12   be a fair statement to say that don't want to go to jail

13   period?  And no one wants to go to jail.

14   A.  If you want to say that.

15   Q.  That's all.

16            THE COURT:  Anything else of this witness?

17            MR. BUTLER:  No, Your Honor.

18            THE COURT:  Thank you.  You may step down.

19            (Whereupon the witness, Andreas Smith, stepped down

20   from the stand.)

21            THE COURT:  Now you said you have approximately six

22   more witnesses?

23            MR. BUTLER:  Yes, Your Honor.  We're now changing our

24   focus to the events at Jan Street.

25            THE COURT:  Okay.  How long do you think your case is
```

1    going to take with the remaining witnesses?

2              MR. BUTLER:  Four hours.  Four to five hours.

3              THE COURT:  Most of tomorrow morning, then, if not

4    the morning.

5              MR. BUTLER:  Yes, sir.

6              THE COURT:  Do you anticipate any rebuttal at this

7    time?  I'm not holding you to that, but I'm just trying to make

8    plans for tomorrow.

9              MS. ADAMS:  Yes, Your Honor.  Possibly one or two

10   brief witnesses.

11             THE COURT:  We'll start promptly at nine o'clock with

12   your next witness.

13             Members of the jury, you are under the same

14   instructions about not talking about the case and so forth.

15   Don't forget to turn your notes over in your chairs.

16             We're going to see if we can get this case to you

17   sometime in the middle of the afternoon if possible.  I'm going

18   to try hard.

19             Thank you.

20             Counsel, please remain.  There are a couple of things

21   I'd like to take up with you.

22             (Whereupon, the jury was escorted out of the

23   courtroom and the following colloquy ensued):

24             THE COURT:  Just so that I can be prepared, how do

25   you expect to get this testimony in that you say you can get in

1    by calling Mr. Teague?

2              MR. BUTLER:  Your Honor, I anticipate recalling Mr.

3    Teague regarding statements he made.

4              THE COURT:  To whom?

5              MR. BUTLER:  To his son, my client.

6              THE COURT:  I believe he's already said he had

7    nothing to do with the robbery.

8              MR. BUTLER:  Your Honor, if he has said that, then I

9    don't recall that testimony.

10             THE COURT:  I thought the Government asked him, and

11   he said he was in Florida, according to him.

12             MS. HARDWICK:  Your Honor, he testified that he left,

13   driving his Sebring for Florida on the Thursday the bank

14   robbery happened at approximately ten, ten-thirty on Friday.

15             THE COURT:  I think he said I couldn't have because I

16   was out of town.

17             MS. HARDWICK:  "Impossible," I think was the word.

18             THE COURT:  You can ask him that again, but that's my

19   memory.

20             MR. BUTLER:  We do intend to ask him that question

21   again in a different fashion, specifically regarding comments

22   he made to his son.

23             THE COURT:  You can ask him whether he said to his

24   son that he committed the bank robbery?

25             MR. BUTLER:  Yes, Your Honor.

1          THE COURT:  Then what do you propose to do, is that
2     it?  Is that all you want to ask him?
3          MR. BUTLER:  Then at that time I intend to recall Mr.
4     Smith.
5          THE COURT:  And how do you propose to get it in at
6     that point?  That's what I'm getting at.  I just looked at the
7     rules, and I'm not sure that the gets it in.
8          MR. BUTLER:  I think it does, Your Honor.
9          THE COURT:  Which rule are we looking at?  That's
10     what I wanted to know.  I thought that's where you were going.
11          MR. BUTLER:  Your Honor, I don't have any --
12          THE COURT:  You need to show me what rule allows you
13     to get it in under those circumstances.
14          MR. BUTLER:  One moment, Your Honor.
15          THE COURT:  I thought you were going to ask him --
16     he's was going to deny it, but --
17          MR. BUTLER:  We would direct the Court to *Williams*
18     *versus the United States*, three ten F.2d one ninety-two.
19          THE COURT:  What rule are you looking at, first?  And
20     then I'll look at your case law.
21          MR. BUTLER:  Your Honor, it appears from our analysis
22     of the case that the Court is not specifically looking to a
23     rule.  It is stating that if a witness has denied making a
24     statement, I believe it's allowed to impeach that witness
25     through the use of another statement.  That statement is not

```
 1    being offered for the truth of the matter asserted.

 2              THE COURT:  Is that an Eleventh Circuit case?

 3              MR. BUTLER:  It's a Ninth Circuit case, Your Honor.

 4              THE COURT:  What's that cite again, now?

 5              MR. BUTLER:  The case in the Eleventh Circuit that

 6    cites to that is United States versus Billue, nine ninety-four

 7    F.2d fifteen sixty-two.

 8              THE COURT:  Now look at your cases.  Can you cite any

 9    rule that allows this evidence to come in?

10              MR. BUTLER:  The information I have before me right

11    now does not have the rule.  I will review that case.  I don't

12    believe --

13              THE COURT:  I looked at eight oh three, and I don't

14    see any exception under eight oh three.  I looked at eight oh

15    four and eight oh four allows a statement against interest, but

16    the witness has to be unavailable.

17              Anyway, I thought we'd get ready for tomorrow.  The

18    Government can look at it, too.  But as of now, I don't see how

19    it comes in.  But I'll look at your case law.

20              Ms. Adams, if you want us to look at any case law, or

21    Ms. Hardwick, you'll have to get it to me by eight o'clock in

22    the morning so my law clerks and I can look at it.

23              MS. HARDWICK:  Yes, sir.

24              THE COURT:  But you'll have to show me my preliminary

25    assessment is wrong.
```

1          MR. BUTLER:  Your Honor, again, I've got the *Billue*

2    case in front of me.  They do not cite to a Federal Rule of

3    Evidence.

4          THE COURT:  I'll read it tonight.

5          MR. BUTLER:  Specifically, page -- Well, head note

6    four and five.

7          THE COURT:  I don't read head notes, I read cases.

8          MR. BUTLER:  I understand, Your Honor.

9          THE COURT:  Okay.  I'll see you here at eight-thirty

10   so we can discuss this evidence you want to get in.

11         MR. BUTLER:  Thank you.

12         THE COURT:  Thank you.

13         (Whereupon the proceedings were concluded.)

14                   * * * * * * * * * * *

15              COURT REPORTER'S CERTIFICATE

16

17      I certify that the foregoing is a correct transcript

18   from the record of proceedings in the above-entitled

19   matter as prepared by me to the best of my ability.

20

21      I further certify that I am not related to any of

22   the parties hereto, nor their counsel, and I have no

23   interest in the outcome of said cause.

24

25      Dated this 11th day of May 2008.

_x_          **MITCHELL P. REISNER, CM, CRR**
**Official U. S. Court Reporter**
**Middle District of Alabama**
**(334) 265-2500**

```
 1

 2
                          \s\ Mitchell P. Reisner, CM, CRR
 3                        MITCHELL  P.  REISNER,  CM,  CRR
                          Official US Dist. Court Reporter
 4                        Registered Professional Reporter
                          Certified    Real-Time    Reporter
 5

 6                 *  *  *  *  *  *  *  *  *  *  *

 7                      COURT REPORTER'S

 8                    REDACTION CERTIFICATE

 9       I certify that the foregoing is a true and correct copy of

10   the transcript originally filed with the clerk of court on June

11   2, 2008 and incorporating redactions of personal identifiers

12   requested by the following attorney(s) of record: Jerusha

13   Adams, Esq. in accordance with Judicial Conference policy.

14   Redacted characters appear as an "x" in the transcript.

15       Dated on this 15th of July, 2008.

16                          \S\ Mitchell P. Reisner, RMR, CRR
                            MITCHELL P. REISNER, RMR, CRR
17                          Official Court Reporter
                            U. S. D. C. Mid. Dist. of Alabama
18

19

20

21

22

23

24

25
```