IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
UNITED STATES OF AMERICA    )
        v.                  )    CRIMINAL ACTION NO.
                            )         07cr165
ANDREAS JEJUAN SMITH        )          (WO)
```

OPINION

At trial, the United States moved to exclude the testimony of Dr. Sol Fulero, whom defendant Andreas JeJuan Smith offered as an expert on eyewitness identifications generally and cross-racial identifications in particular.  The government relied on two evidentiary rules to exclude this testimony.  First, it asserted that the testimony violated Fed. R. Evid. 702.  Second, it argued that this testimony violated Fed. R. Evid. 403 because its prejudicial value substantially outweighed its probative value.  The government's motion was granted in part (allowing Fulero to give his opinion about the science of eyewitness-identifications)  and denied in part (not permitting Fulero to testify about specific witnesses in this case).  The court promised

that a written opinion setting forth its reasoning in more detail would follow, and this is that opinion.

## I. BACKGROUND

On June 22, 2007, Montgomery Police responded to a report of a bank robbery at Compass Bank. After several weeks, police identified the robber as Smith and a warrant was issued for his arrest. When a United States Marshal Service task force went to arrest Smith at a friend's home, two shots were fired at arresting officers from inside. Fortunately, neither officer at the door was harmed.

Based on the above events, Smith was charged with armed robbery; assault of a federal officer; carrying a firearm during a crime of violence (the assault of a federal officer); and being a felon in possession of a firearm. A jury found Smith guilty of bank robbery and illegally possessing a firearm, but acquitted him of

assaulting a federal officer and carrying a firearm
during a crime of violence.

Dr. Fulero's expert testimony went principally to the
reliability of witness identifications of Smith as the
bank robber.    While Smith was found guilty of the
robbery after the court allowed Fulero's expert
testimony, the court believes that an opinion setting
forth its reasoning for allowing the testimony is still
warranted.


## II. DISCUSSION

The issue before the court is a pressing one.
Eyewitness testimony has long been recognized as one of
the most persuasive forms of evidence in criminal cases.
"[T]here is almost nothing more convincing than a live
human being who takes the stand, points a finger at the
defendant, and says 'That's the one!'" Watkins v.
Sowders, 449 U.S. 341, 352 (1981) (Brennan, J.,
dissenting) (internal citation and emphasis omitted);

3

Henry F. Fradella, <u>Why Judges Should Admit Expert Testimony on the Unreliability of Eyewitness Testimony</u>, 2 Fed. Cts. L. Rev. 2 (2007) ("'[S]eeing is believing' is not only ubiquitous common parlance but also appears to be gospel to jurors."); <u>see also</u> <u>Manson v. Brathwaite</u>, 432 U.S. 98, 120 (1977) (Marshall, J., dissenting) (stating that "juries unfortunately are often unduly receptive to [identification] evidence").

Despite eyewitness testimony's persuasive nature, mounting evidence has suggested that it is not as reliable as has often been assumed. <u>See</u> Hon. D. Duff McKee, <u>Challenge to Eyewitness Identification Through Expert Testimony</u>, 35 Am. Jur. Proof of Facts 3d 1, § 1 (1996) ("Eyewitness testimony may be the least reliable, and yet the most compelling.") By some estimates, roughly 84% of convicts who have been exonerated by DNA testing were convicted on the basis of mistaken eyewitness testimony. Barry Scheck, et al., <u>Actual Innocence Five Days To Execution, and Other Dispatches</u>

From the Wrongly Convicted (2000) (finding mistaken eyewitnesses as a factor in 84% of 67 wrongful convictions), as cited in Fradella, 2 Fed. Cts. L. Rev. at 2 n.2 ; see also Edward Connors, et al., Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence after Trial (Dept. of Justice 1996) (examining 28 cases in which DNA evidence exonerated a defendant and stating that, "In all 28 cases, without the benefit of DNA evidence, the triers of fact had to rely on eyewitness testimony, which turned out to be inaccurate"), available at http://www.ncjrs.gov/txtfiles/dnaevid.txt (last visited May 21, 2009). There is, then, a vast lacuna between jurors' perceptions of the power of eyewitness testimony and this testimony's accuracy.

Still, despite this gap, courts have sometimes looked askance at expert testimony on the factors that can influence eyewitnesses' perceptions. In United States v. Amaral, 488 F.2d 1148, 1152-54 (9th Cir. 1973), the Ninth

Circuit Court of Appeals upheld a district court's decision to exclude eyewitness-identification expert testimony, reasoning that cross-examination would unveil any weaknesses in identifications. A number of other older cases, including from Eleventh Circuit Court of Appeals, also have upheld rejections of similar evidence. See, e.g., United States v. Holloway, 971 F.2d 675, 679 (11th Cir. 1992) (relying on Thevis, infra); United States v. Purham, 725 F.2d 450, 454 (8th Cir. 1984) (concluding that the issue was within the province of the jury); United States v. Thevis, 665 F.2d 616, 641-42 (5th Cir. 1982) (reasoning that problems with this testimony could be revealed through cross-examination and citing a then-"uniform disapproval" of similar testimony in other circuits); United States v. Fosher, 590 F.2d 381, 382-84 (1st Cir. 1979) (ruling that the testimony would be prejudicial).

Yet, as the body of evidence has grown showing the unreliability of some eyewitness testimony, courts have

6

gradually recognized the potential value of expert testimony on this subject. United States v. Mathis, 264 F.3d 321, 339-40 (3rd Cir. 2001) (examining an eyewitness expert's methods and "welcom[ing]" such testimony); United States v. Smithers, 212 F.3d 306, 311-18 (6th Cir. 2000) (finding that a district court erred in not admitting eyewitness-identification expert testimony from Dr. Sol Fulero); United States v. Moore, 786 F.2d 1308, 1313 (5th Cir. 1986) (finding that, under some circumstances, eyewitness-identification expert testimony "properly may be encouraged"); United States v. Downing, 753 F.2d 1224, 1232 (3d Cir. 1985) (reasoning that "expert testimony on eyewitness perception and memory [should] be admitted at least in some circumstances"); United States v. Smith, 736 F.2d 1103, 1107 (6th Cir. 1984) ("The day may have arrived, therefore, when Dr. Fulero's testimony can be said to conform to a generally accepted explanatory theory.").

It has been over a decade since the Eleventh Circuit last addressed the admissibility of eyewitness-identification expert testimony in a published opinion. In <u>United States v. Smith</u>, 122 F.3d 1355, 1358 (11th Cir. 1997), the Eleventh Circuit held that "a district court does not abuse its discretion when it excludes expert testimony on eyewitness identification." Before that decision, the "established rule" of the Eleventh Circuit was apparently that such testimony was not admissible. <u>Holloway</u>, 971 F.2d at 679; <u>see also</u> <u>United States v. Benitez</u>, 741 F.2d 1312, 1315 (11th Cir. 1984) ("[Defendant's] contention that the district court incorrectly excluded expert testimony concerning identification also lacks merit because such testimony is not admissible in this circuit.").

While <u>Smith</u> acknowledged that eyewitness-identification expert testimony has been looked upon "unfavorably" in the Eleventh Circuit, 122 F.3d at 1357, the court explicitly declined to decide at that time

8

whether the "per se inadmissibility rule" remained in effect. <u>Id</u>. at 1358. The court also emphasized that the decision whether to admit expert testimony rests within the discretion of the trial court. <u>Id</u>. at 1359.

A per se proscription against all eyewitness-identification expert testimony is irreconcilable with the United States Supreme Court's decision in <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993). There, the Court eschewed such categorical prohibitions of entire classes of expert <u>conclusions</u>; in determining whether to admit testimony, the Court stated, the focus "must be solely on principles and methodology, not on the conclusions that they generate." <u>Daubert</u>, 509 U.S. at 595. The Court emphasized that this inquiry is "a flexible one," <u>id</u>. at 594, and provided a non-exhaustive list of factors for lower courts to consider when determining whether to admit proposed expert testimony as reliable and helpful under Fed. R. Evid. 702. <u>Id</u>. at 593-94.

9

Heeding the Supreme Court's command, this court at trial examined whether the proposed expert testimony complied with the strictures outlined in Daubert. See United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) ("[T]he Supreme Court made abundantly clear in Daubert [that] Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific evidence.") (citing Daubert, 509 U.S. at 589 n.7).

## A. Rule 702

Fed. R. Evid. 702 provides:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

10

In <u>Daubert</u>, the Supreme Court urged lower courts, first, to examine whether reliable methodology undergirds proposed expert testimony. That is, courts are to consider: whether the theory or technique "can be (and has been tested)," "whether the theory or technique has been subjected to peer review and publication," whether there is a known or potential error rate in the scientific technique, and whether the theory or technique has achieved general acceptance in the particular scientific community. 509 U.S. at 593-94. Second, if the opinion testimony is reliable, the court must determine whether the testimony would aid the trier of fact. <u>Id</u>. at 589. This, essentially, is nothing more than a restatement of the general rule that the trial judge ensure the evidence is "relevant to the task at hand." <u>Id</u>. at 597. To answer this second question, courts should look to whether the reliable scientific methods "fit" the case before a court, <u>id</u>. at 591, an inquiry that typically involves scrutinizing the particular

testimony offered and matching that testimony to the
specific factual context of a case.  The government
challenges the admission of Fulero's testimony at each of
these stages.[1]


## 1. Reliability

The government argues that Dr. Fulero's opinion does
not constitute reliable scientific or technical
knowledge. In support of this position, the government
cites a host of cases from other circuits in which
eyewitness-identification expert testimony has been
rejected as unscientific. However, the purported experts
in those cases failed to provide sufficient articles or

---

1. In Smith, 122 F.3d 1355 (11th Cir. 1997), because
the parties did not dispute the issue, the court did not
address the district court's ruling, based on the first
prong of Daubert's analysis, that the eyewitness-
identification expert testimony was valid scientific
knowledge.  122 F.3d at 1358.  The court addressed only
whether the prior holding in Thevis bound it to conclude,
under the second prong of the Daubert test, that the
district court did not abuse its discretion by denying
admission of the evidence on the ground that the expert
testimony would not assist the jury.

data demonstrating the reliability of the methods employed by those experts. E.g., United States v. Kime, 99 F.3d 870, 883 (8th Cir. 1996) (finding that two articles on the topic of eyewitness identification in lineups were "utterly deficient in regard to determining whether [the expert's] views constitute 'scientific knowledge' within the meaning of Daubert"); United States v. Rincon, 28 F.3d 921, 923-25 (9th Cir. 1994) (affirming the district court's exclusion of proffered eyewitness-identification expert testimony under Daubert and noting that, "while the article identified the research on some of the topics, it did not discuss the research in sufficient detail that the district court could determine if the research was scientifically valid"); United States v. Brien, 59 F.3d 274, 277 (1st Cir. 1995) (affirming the inadmissibility of expert testimony on the reliability of eyewitness identification, noting that the defendant failed to provide "data or literature underlying" the expert's opinion).

13

On the other hand, other courts have specifically reviewed Dr. Fulero's methods and found that they "easily" satisfy the first <u>Daubert</u> inquiry.  <u>United States v. Moonda</u>, No. 1:06CR0395, 2007 WL 1875861 (N.D. Ohio June 28, 2007) (Dowd, J.).  Indeed, in <u>United States v. Langan</u>, 263 F.3d 623 (6th Cir. 2001), the Sixth Circuit Court of Appeals refers to Fulero as the expert "whose 'qualifications and scientific methods' [have] already been 'praised' by the Sixth Circuit." <u>Id</u>. at 623 (citing <u>Smithers</u>, 212 F.3d at 315).

This court concurred at trial with the cases and thus concluded that Fulero's methods satisfied the reliability prong of <u>Daubert</u>.  In compliance with <u>Daubert</u>, the theories underlying Fulero's testimony have been well-tested in peer-reviewed publications, including in articles authored by Fulero.  <u>See, e.g.</u>, Nancy Stebay, Jennifer Dysart, Sol Fulero, & R.C.L. Lindsay, <u>A Meta-Analytic Comparison of Showup and Lineup Identification Accuracy</u>, 27 Law & Hum. Behav. 523 (2003); Nancy Steblay,

R.C.L. Lindsay, Sol Fulero, & Jennifer Dysart, <u>Eyewitness</u> <u>Accuracy Rates in Sequential and Simultaneous Lineup</u> <u>Presentations: A Meta-analytic Review</u>, 25 Law & Hum. Behav. 459-474 (2001); <u>see also</u> R.C.L. Lindsay & Gary L. Wells, <u>Improving Eyewitness Identification from Lineups:</u> <u>Simultaneous Versus Sequential Lineup Presentations</u>, 70 J. Applied Psychol. 556 (1985).

Furthermore, Fulero testified that the methods he relies upon are generally accepted, and this representation accords with this court's own findings. <u>See</u> <u>Frazier</u>, 387 F.3d at 1261 ("[T]he trial court's gatekeeping function requires more than simply taking the expert's word for it.") (internal quotations omitted). Numerous studies have been done under controlled conditions assessing the factors that influence eyewitnesses "in accordance with generally accepted practice in the behavioral science community" done independent of any litigation. Hon. Robert P. Murrian, <u>The Admissibility of Expert Eyewitness Testimony Under</u>

the Federal Rules, 29 Cumb. L. Rev. 379, 384-85 (1999)
(collecting studies).   As the Department of Justice
recognized in a 1999 guide, "research psychologists have
produced a substantial body of findings regarding
eyewitness evidence.   These findings offer the legal
system a valuable body of empirical knowledge in the area
of eyewitness evidence."   U.S. Dept. of Justice,
Eyewitness Evidence: A Guide for Law Enforcement 1
(1999), available at http://www.ncjrs.gov/pdffiles1/
nij/178240.pdf (last visited Mar. 28, 2008); cf. Illinois
v. Lidster, 540 U.S. 419, 425 (2004) (citing the
Department of Justice guide).   The Department of Justice
guide relied in part on an article co-authored by the
proffered expert in this case. U.S. Dept. of Justice, 42
(citing Gary L. Wells, Mark Small, Steven D. Penrod, Roy
S. Malpass, Sol M. Fulero, & Elizabeth Brimacombe,
Eyewitness Identification Procedures: Recommendations for
Lineups and Photospreads, 22 Law and Human Behavior 603
(1998)).

Also of note is that Fulero holds a Ph.D. in psychology and now teaches the subject at the university-level.   He has additionally demonstrated extensive knowledge of the ongoing, most recent developments in the field of eyewitness identification.   Indeed, Fulero has authored or co-authored roughly 60 publications, primarily addressing how psychological factors affect the administration of criminal justice.   Further, he is a reviewer for several major journals, including, among others, Law & Hum. Behav., J. of Forensic Psychol. & Prac., and Psychol. Pub. Pol'y & Law.   <u>See generally</u> <u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998) (requiring that experts be "qualified to testify competently" on a given subject matter); <u>see also</u> Michael R. Leippe, <u>The Case for Expert Testimony about Eyewitness Memory</u>, 1 Psychol. Pub. Pol'y & L. 909, 951 (1995) (encouraging courts to consider, prior to admitting an eyewitness-identification expert, whether he or she has: "(a) a PhD degree in psychology; (b)

17

documentable extensive graduate-level training in cognitive, social, and other areas of experimental psychology; and (c) evidence of recent and ongoing comprehensive, cutting-edge contact with the eyewitness literature (e.g., research and publication, university-level teaching, reviewing for major journals).") These facts satisfied the court that Fulero is qualified in the field and equipped to provide the jury with reliable expert testimony on eyewitness identifications.

## 2. Assistance to the Jury

The United States contended that Fulero's proposed testimony would not aid the jury because Fulero's proffered testimony presented no analysis from Fulero tailored to this case. <u>See</u> <u>Daubert</u>, 509 U.S. at 591 (stating that testimony must "fit" the facts of a case to satisfy Fed. R. Evid. 702). Instead, Fulero's testimony would discuss only general problems associated with

eyewitness identifications. Such testimony, the
government argued, would not aid the jury because
problems with eyewitness identification are within the
"ordinary knowledge of most lay jurors." See Langan, 263
F.3d at 624. In addition to the lack of support for the
proposition that juries commonly understand the unnamed
(but likely myriad) problems with eyewitness testimony or
the ways in which those problems interact with each other
and in different factual settings, a further problem with
the government's argument was that Fulero's expert
testimony actually fitted quite well to Smith's case.

The government's more categorical position, though,
finds some support in Eleventh Circuit precedent. In
United States v. Thevis, 665 F.2d 616, 641 (5th Cir.
1982) (Unit B),[2] the appellate court held that a district
court did not abuse its discretion in refusing to admit
expert testimony regarding eyewitness reliability. The

_____

2. In Stein v. Reynolds Securities, Inc., 667 F.2d
33 (11th Cir. 1982), the Eleventh Circuit adopted as
binding precedent all decisions of Unit B of the former
Fifth Circuit handed down after September 30, 1981.

court in Thevis expressed concern about opening the
floodgates of psychological evidence and concluded that
"the problems of perception and memory can be adequately
addressed in cross-examination and that the jury can
adequately weigh these problems through common-sense
evaluation." Id.; see also United States v. Smith, 122
F.3d 1355, 1357 (11th Cir. 1997) (explaining Thevis). As
noted earlier, the per se rule apparently adopted after
Thevis that such testimony is categorically inadmissible
cannot survive (at the very least) the first prong of
analysis mandated by the Supreme Court's decision in
Daubert. Smith, however, while declining to address
whether the first prong of Daubert's analysis invalidated
the per se rule, held that Thevis controlled its decision
because the decision to exclude the expert testimony was
consistent with Daubert's second prong; that is, Daubert
did not make it an abuse of discretion to find that
eyewitness-identification expert testimony would not have
assisted the juries in Thevis or Smith. Thus, Smith held

that circuit precedent mandated the conclusion "that a
district court does not abuse its discretion in excluding
such testimony."  Id. at 1359.

This result was confirmed by the recent unpublished
opinion in United States v. Smith, 148 Fed. Appx. 867
(11th Cir. 2005).  In that case, the panel indicated that
the defendant had produced evidence that undermined the
rationale of Thevis, but wrote that the court felt
limited by the prior panel precedent rule to uphold the
rule that a district judge did not abuse her discretion
by admitting such evidence.

Neither Smith nor Thevis addressed, however, whether
a district court abuses its discretion by admitting this
evidence pursuant to the analysis required by Rule 702
and Daubert.[3]  This court concludes, after significant

_____

3.  The holding in Thevis, which bound the court in
Smith, is not similarly binding here.  See  Anders v.
Hometown Mortg. Servs., 346 F.3d 1024, 1031 (11th Cir.
2003) (citing Watts v. BellSouth Telcomms., Inc., 316
F.3d 1203, 1207 (11th Cir. 2003) ("Judicial decisions
cannot make law beyond the facts of the cases in which
those decisions are announced."), and explaining that,
(continued...)

deliberation, that it does not.  A contrary conclusion
would be nothing short of untenable in light of the
discretion of courts to admit expert testimony that would
help factfinders reach more accurate results, recent
developments in our understanding of the human mind in
the 23 years since <u>Thevis</u>, and the unlikely salience of
that new but robust scientific knowledge among
factfinders.  As a result, the court will explain in
detail why, in the context of this case, it admitted the
reliable and relevant expert testimony.

　　　This is precisely the type of case in which
eyewitness-identification expert testimony would be of
particular use.  The strongest evidence that Smith
committed the armed bank robbery was two eyewitness

_____

　　　3(...continued)
while <u>Smith</u> confirmed that the prior panel precedent rule
obligates the court to follow the holdings of an earlier
decision, 122 F.3d at 1359, "the holdings of a prior
decision can reach only as far as the facts and
circumstances presented to the court in the case which
produced that decision," <u>United States v. Aguillard</u>, 217
F.3d 1319, 1321 (11th Cir. 2000) (citation and internal
quotation marks omitted)).

identifications by individuals who had had little contact with him.  The videotape evidence in this case was, at best, inconclusive.  See United States v. Smithers, 212 F.3d 306, 317 (6th Cir. 2000)("[E]xpert testimony should be admitted ... when there is no other inculpatory evidence presented against the Defendant with the exception of a small number of eyewitness identifications."); United States v. Moore, 786 F.2d 1308, 1313 (5th Cir. 1986) ("[I]n a case in which the sole testimony is casual eyewitness identification, expert testimony regarding the accuracy of that identification is admissible and properly may be encouraged ... ").

Importantly, Fulero was not permitted to testify about what weight the jury should give the testimony in this case.  Rather, he was allowed to supply jurors with information about some specific factors that, according to well-established social science-research, impact witness accuracy and, as a result, might  assist them in

23

their own determination of the facts.  Chief among these factors is the information concerning cross-racial eyewitness identifications; the evidence concerning the reliability of such identification is stunning and robust and, of crucial importance here, not likely well understood by juries.  In addition, the expert evidence also indicates that the accuracy of identifications, including cross-racial identifications, is impacted by whether the witness perceived the event in a high-stress environment and whether the witness has subsequently been exposed to facts that potentially altered his or her memory of an event.

The jury's decision-making process can be enhanced by learning how these factors combine to impact perception and memory.  For example, here, one of the government's eyewitnesses is white, and the defendant is black.  Research shows that cross-racial identifications are less accurate than same-race identifications.[4]   Brandon L.

---

4.   Indeed, "48% of exonerees convicted based on (continued...)

Garrett, <u>Judging Innocence</u>, 108 Colum. L. Rev. 55, 79 (2008) ("Social science studies have long shown that cross-racial identifications are particularly error prone."); Gary L. Wells & Elizabeth A. Olson, <u>The Other-Race Effect in Eyewitness Identification: What Do We Do About It?</u>, 7 Psychol. Pub. Pol'y & L. 230, 231 (2001) ("[A] Black innocent suspect has a 56% greater chance of being misidentified by a White eyewitness than by a Black eyewitness."); Christian A. Meissner & John C. Brigham, <u>Thirty Years of Investigating the Own-Race Bias in Memory for Faces: A Meta-Analytic Review</u>, 7 Psychol. Pub. Pol'y & L. 3, 5-13 (2001) (reviewing literature showing that the chances of a mistaken identification is 1.56 times greater in the cross-race context than the same-race context);   Heather M. Kleider & Stephen D.

---

     4(...continued)
eyewitness testimony [are] identified cross-racially."
Garrett, 108 Colum. L. Rev. at 79 (citing Innocence
Project, 200 Exonerated: Too Many Wrongfully Convicted
2 0 - 2 1 ,     <u>a  v  a  i  l  a  b  l  e      a  t</u>
http://www.innocenceproject.org/200/ip_200.pdf    (last
visited May. 21, 2009)).

Goldinger, Stereotyping Ricochet: Complex Effects of Racial Distinctiveness on Identification Accuracy, 25 Law & Hum. Behav. 605 (2001) (finding that cross-racial identifications are generally less accurate than same-race identifications); Frederic Woocher, Note, Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification, 29 Stan. L. Rev. 969, 982 (1977) ("considerable evidence indicates that people are poorer at identifying members of another race than of their own").  Recent evidence also shows that cross-racial identifications are even more error-prone when, as was true here, one of the eyewitnesses is white and the suspect is black.  Fradella, 2 Fed. Cts. at 14 ("The result of cross-racial bias is a higher rate of false positive identifications, especially when a Caucasian eyewitness identifies an African-American suspect."); see also Sheri Lynn Johnson, Cross-Racial Identification Errors in Criminal Cases, 69 Cornell L. Rev. 934, 938-40 (1984) (noting that research has

repeatedly found that whites are more accurate in identifying white faces than black faces).

The potential inaccuracies of cross-racial identifications are not necessarily within the common knowledge of the average juror or, for that matter, the average judge. See Commonwealth v. Zimmerman, 804 N.E.2d 336, 344 (Mass. 2004) (Cordy, J., concurring) (the unreliability of cross-racial identification is a subject "beyond the ordinary experience and knowledge of the average juror") (internal quotations omitted). The Supreme Court of New Jersey, in fact, requires jury instructions on the potential unreliability of cross-racial identifications for that reason. State v. Cromedy, 158 N.J. 112, 128 (1999).

Fulero also testified about how stress can impair a witness's perceptions and memories. One of the government's eyewitnesses testified that the bank robbery was the most traumatic experience of her life. Particularly in combination with the evidence about cross-racial identification, the jurors' judgment could

27

be enhanced by learning that trauma and fear can cause a sincere person to wrongly recall an event.   C. Neil Macrae et al., Creating Memory Illusions: Expectancy-Based Processing and the Generation of False Memories, 10 Memory 63, 72, 76-77 (2002) (finding that stress impairs an individuals perception and ability to accurately recall an event), as cited in Justin D. Levinson, Forgotten Racial Equality: Implicit Bias, Decisionmaking, and Misremembering, 57 Duke L.J. 345, 379 n. 178 (2007); Elizabeth Loftus & James M. Doyle, Eyewitness Testimony: Civil and Criminal 11 (2d ed. 1992) (explaining that fear and stress impair perceptions) as cited in Peter J. Cohen, How Shall They Be Known? Daubert v. Merrell Dow Pharmaceuticals and Eyewitness Identification, 16 Pace L. Rev. 237, 242 n. 45 (1996). This court will not assume that this psychological phenomenon is within the common knowledge of jurors. See generally D.S Greer, Anything But the Truth? The Reliability of Testimony in Criminal Trials, 11 Brit. J. Criminology 131, 133-35 (1971) (observing the high faith

28

jurors place in eye witness testimony, including when such testimony is unreliable), <u>as cited in</u> Steven I. Friedland, <u>On Common Sense and the Evaluation of Witness Credibility</u>, 40 Case W. Res. L. Rev. 165, 166 n. 14 (1990).

Also of assistance to the jury was Fulero's expert testimony regarding how "post-event information" can influence an eyewitness. Research regarding post-event information shows that access to facts after an occurrence can, under some circumstances, "change a witness's memory and even cause nonexistent details to become incorporated into a previously acquired memory." Cohen, 16 Pace L. Rev. at 246. <u>See</u> <u>Ferensic v. Birkett</u>, 501 F.3d 469, 472-83 (6th Cir. 2007) (finding that defendant should have been permitted to provide testimony on post-event information and that, under the narrow circumstances of that case, the error was <u>not</u> harmless); <u>People v. LeGrand</u>, 8 N.Y.3d 449, 458 (2007) (permitting testimony regarding post-event information); <u>but see</u> <u>United States v. Rodriguez-Berrios</u>, 445 F.

Supp.2d 190, 194 (D.P.R. 2006) (Perez-Gimenez, J.) (finding that understanding post-event information "is not the kind of issue that the jurors would be unqualified or unable to determine 'without enlightenment from those having specialized understanding of the subject involved in the dispute') (quoting Fed. R. Evid. 702 (Advisory Committee Notes)).

In this case, the two eyewitnesses to the bank robbery conversed with each other prior to providing testimony, and they acknowledged that they may have discussed what the robber looked like. Under such circumstances, testimony about post-event information could be of use to the jury. See Fiona Gabbert, et. al, Memory Conformity: Can Eyewitnesses Influence Each Other's Memories For An Event?, 17 Applied Cogn. Psychol. 533 (2003) (finding that when witnesses discuss events with one another, shared false recollections sometimes result); see also Gary L. Wells & Amy L. Bradfield, "Good, You Identified the Suspect": Feedback to Eyewitnesses Distorts Their Reports of the Witnessing

30

Experience, 83 J. Applied Psychol. 360, 361 (1998)
("Eyewitness testimony about an event reflects not only
what they actually saw but information they obtained
later on."), as quoted in Richard A. Wise, et. al, A
Triparite Solution to Eyewitness Error, 97 J. Crim. L. &
Criminology 807, 871 (2007); cf. Ralph Norman Haber & Lyn
Haber, Experiencing, Remembering and Reporting Events, 6
Psychol. Pub. Pol'y & L. 1057, 1091-92 (2000)
(recommending that eyewitness testimony be excluded if:
(1) there is no corroborating testimony, unless the
circumstances suggest a greater likelihood of
reliability; (2) the witness's account was possibly
tainted by suggestive procedures; (3) the witness was
exposed to post-event information; or (4) the testimony
is the product of a "fleeting glance"). And because
"jurors tend to be unduly receptive to, rather than
skeptical of, eyewitness testimony," Smithers, 212 F.3d
at 315, the jury's factfinding ability's will be enhanced
by learning about the effects of post-event information.

Another useful aspect of Fulero's testimony was his discussion of the factors that impact the reliability of a photograph identifications.  For example, research shows that a photo identification works best when neither the person conducting the photo array, nor the eyewitness, knows who the targeted suspect is.  <u>See</u> Fradella, 2 Fed. Cts. L. Rev. at 17.  Further, eyewitnesses exhibit greater accuracy when they are explicitly informed that "a suspect may or may not be" in a photo array.  <u>Id</u>.  Yet another factor that affects accuracy is whether an eyewitness is shown photographs one after another, rather than being shown multiple photographs at the same time; eyewitnesses who are shown photographs sequentially show greater reliability than those who view photographs simultaneously.  <u>Id</u>.

The evidence was that, in this case, the eyewitnesses were shown photographs simultaneously; and there was no evidence that these witnesses were told that the suspect "may or may not be" present in the photo array.  The research revealing the potential consequences of these

32

facts is likely not within the ken of the average juror. Indeed, exposure to this research proved of great assistance to this court during an earlier phase of this case, as it considered a motion to exclude the photo identifications as unduly suggestive under <u>Neil v. Biggers</u>, 409 U.S. 188 (1972); this court ultimately concluded that the photo identifications should not be excluded..   If social-science research regarding eyewitness identifications aided this court's ability to understand the evidence as it considered this motion, it would be curious to assume that this same research would be of no aid to the jury.

Finally, Fulero testified to the highly counter-intuitive, but well-founded, theory that the amount of confidence a person has in a recollection does not correlate well with the accuracy of that recollection. In other words, just because a witness says she is 100% sure of an identification does not mean that the witness's identification is correct.   As the Seventh Circuit Court of Appeals has observed, "Sometimes the

33

witness zeroes in on the correct person, sometimes not; there is an element of chance and an opportunity for manipulation. Once the witness decides that 'X is it' the view may be unshakable." Newsome v. McCabe, 319 F.3d 301, 305 (7th Cir. 2003). Social-science research "has established that the witness's faith is equally strong whether or not the identification is correct." Id. The appellate court in Newsome collected an array of publications documenting this phenomenon, id.: Daniel L. Schacter, The Seven Sins of Memory: How the Mind Forgets and Remembers 112-37 (2001); Elizabeth F. Loftus & James M. Doyle, Eyewitness Testimony: Civil and Criminal (3d ed. 1997); Elizabeth F. Loftus, Eyewitness Testimony (1979; rev. ed. 1996).

In the present case, one witness testified that he was 70% to 80% sure of his identification of the defendant. Another testified on the stand without equivocation that the defendant committed the bank robbery. Jurors often believe that a witness who testifies with such confidence should be accorded

stronger weight than a witness who does not.  See Watkins
v. Sowders, 449 U.S. 341, 352 (1981) (Brennan, J.,
dissenting) ("Eyewitness testimony is likely to be
believed by jurors, especially when it is offered with a
high level of confidence, even though the accuracy of an
eyewitness and the confidence of that witness may not be
related to one another at all.") (internal citation
omitted).  In an instance such as this, where intuition
is belied by scientific research, testimony from an
expert may be of great assistance to a jury.
Particularly in light of the implications of cross-racial
identification, all of this information, particularly to
the extent it is not common knowledge or intuition, could
assist the jury in reaching a fair and accurate
determination of the factual issues before it.

It bears reiterating that the expert was not
permitted to testify about the credibility and
believability of the witnesses in this case.  Fulero was
not permitted to discuss witnesses in this case at all;
nor was Smith allowed to ask Fulero about the credibility

35

or believability of witnesses in this case.  Fulero was instead allowed to educate the jury about the psychological literature regarding: cross-racial identifications; how stress impacts identifications; post-event information; and the weak correlation between a witness's confidence and his or her accuracy because these issues are specifically implicated by the factual context of this case.  The advisory committee notes to Fed. R. Evid. 702 expressly contemplate that sometimes experts will have this limited role.  The notes explain that it is wrong to conclude "that experts testify only in the form of opinions."  Id.  Rather, "an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts."  Id.

The court was convinced at trial that the psychological research supporting the above four subjects is both reliable and helpful and that the constantly increasing knowledge social scientists are obtaining about the inner workings of the human animal are likely

36

not commonly understood or obviously apparent to jurors
(or, for that matter, judges).  Therefore, educating the
jury about this research does not (and, in this case, did
not) run afoul of Rule 702, and, indeed, it is an
important step along the road to using improved
scientific knowledge to create more accurate and fair
legal proceedings.  It would be anachronistic to
categorically bar courts from employing the latest
reliable scientific evidence in their effort to make sure
that the trials that they administer resemble as closely
as possible a search for truth; such a search requires
diligently pursuing better understandings of human
decisionmaking, including the flaws, weaknesses, and
biases that characterize human life.  Particularly for
cases like this one, in which the reliability of
eyewitness testimony is so important and so linked to
well-established flaws in human perception and memory,
such testimony may be crucial to fair, thorough,
informed, and rigorous decisionmaking.  It can only help
to make factfinders more informed.  Applying this

37

research to the facts of this case, however, is within the sole province of the jury.

### B. Rule 403

The United States argued that Dr. Fulero's testimony transgressed Fed. R. Evid. 403, which provides that:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

According the government, admitting Fulero's testimony would incite unfair prejudice because his assertions would confuse and mislead jurors about their role as the ultimate arbiters of eyewitnesses' credibility.

The Eleventh Circuit has not had occasion to address whether eyewitness-identification expert testimony would violate Rule 403, and other circuits have split on this question.  The Second, Seventh, and Eighth Circuits have reasoned that eyewitness-identification expert testimony

38

might usurp the jury's role of determining witness
credibility, thus causing jurors to be confused and
misled regarding their role as the trier of fact. United
States v. Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999)
(holding a district court was within its discretion to
exclude an expert who "would effectively have inserted
his own view of the officers' credibility for that of the
jurors, thereby usurping their role"); United States v.
Kime, 99 F.3d 870, 884 (8th Cir. 1996) (applying a
deferential standard to conclude that "the district court
properly recognized the very real danger that the
proffered expert testimony could either confuse the jury
or cause it to substitute the expert's credibility
assessment for its own" ); United States v. Curry, 977
F.2d 1042, 1052 (7th Cir. 1992) ("the district court's
decision to exclude Dr. Loftus' testimony was a proper
exercise of its discretion, whether under Rule 702 or
Rule 403."); but cf. United States v. Gallardo, 497 F.3d
727, 733 (7th Cir. 2007) (holding that expert testimony
on effect of drug abuse on witness memory would "intrude

upon the jury's role in assessing witness credibility"
only because the defendant had not put forth any evidence
to show that the witnesses actually used drugs and that,
thus, there was no "factual link" between the expert's
testimony and the specific witnesses).

Similarly, in United States v. Rincon, 28 F.3d 921,
923-26 (9th Cir. 1994), appellate court affirmed a
district court's decision to exclude an eyewitness-
identification expert under Rules 403 and 702.  The court
cautioned, though, that the opinion represents an
"individualized inquiry" that "does not preclude the
admission of such testimony when the proffering party
satisfies the standard established in Daubert by showing
that the expert opinion is based upon 'scientific
knowledge' which is both reliable and helpful to the jury
in any given case."  Id. at 926.

In contrast, the Third and Sixth Circuits have ruled
that eyewitness-identification expert testimony comports
with Rule 403.  In United States v. Mathis, 264 F.3d 321,
339-40 (3rd Cir. 2001), the court reversed a district

court's decision to exclude eyewitness testimony based on Rules 403 and 702. Judge Pollack explained that eyewitness-identification experts who employ "reliable scientific expertise to juridically pertinent aspects of the human mind and body should generally, absent explicable reasons to the contrary, be welcomed by federal courts, not turned away." Id. at 340. The Sixth Circuit has likewise concluded that a trial court erred in excluding an eyewitness-identification expert under Rule 403, but held that the error was harmless. United States v. Smith, 736 F.2d 1103, 1107 (6th Cir. 1984); see also Smithers, 212 F.3d at 316 (finding that eyewitness-identification expert testimony did not violate Rule 403's prohibition against evidence that invites unjustified "delay").

This court appreciates the especial risk that accompanies expert testimony; despite jury instructions advising jurors not to embrace expert testimony uncritically, Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Basic Instruction 7,  courts have long

expressed concern that jurors may still do exactly that. United States v. Purham, 725 F.2d 450, 459 (8th Cir. 1984) (observing "the aura of reliability and trustworthiness that surrounds scientific evidence"); United States v. Addison, 498 F.2d 741, 744 (D.C. Cir. 1974) ("scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen"); Huntingdon v. Crowley, 64 Cal.2d 647, 656 (1966) (noting the need to protect "both litigants and jurors against the misleading aura of certainty which often envelops a new scientific process"). "Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." Daubert, 509 U.S. at 595 (citing Hon. Jack Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991)).

This risk was present in Smith's case because unfettered expert testimony could have been construed as

direct commentary on other witnesses' credibility.  It is axiomatic that "[a]ssessing the credibility of one witness is within the jury's exclusive province." United States v. Wright, 392 F.3d 1269, 1274 (11th Cir. 2004), cert. denied, 544 U.S. 968 (2005); see also Allison v. United States, 160 U.S. 203, 207 (1895) ("[I]t was for the jury to test the credibility of the defendant as a witness, giving his testimony such weight, under all the circumstances, as they thought it entitled to, as in the instance of other witnesses...") But see Fed. R. Evid. 704 (b) (Advisory Committee Notes) (rejecting as "empty rhetoric" the notion that some expert testimony is inadmissible because it usurps the "province of the jury.") (citing 7 J. Wigmore, Treatise on the Anglo-American System of Evidence in Trials at Common Law § 1920, at 17 (3d ed. 1940)).[5]

---

5. Fed. R. Evid. 704 (a) reads that, generally, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

(continued...)

43

But the critical point here is, instead, that this kind of expert testimony can, in some specific circumstances, be helpful, and even essential, to assisting the jury in its exercise of the exclusive power to determine witness credibility.  With respect to many other factual determinations which are also within the sole province of the jury, expert testimony can help the jury find the relevant facts in a more informed way. Eyewitness-identification expert testimony, as a category, is no different.

The parameters this court placed on Fulero's testimony, moreover, significantly allayed the concern that he would improperly invade the jury's role.  Because he was <u>not</u> permitted to testify about specific witnesses in this case and instead was allowed only to educate the jury about empirical evidence regarding the previously specified areas of eyewitness-identification research, his testimony did not mislead the jury about its role as

5(...continued)

**44**

the sole factfinder in a criminal jury trial. Accordingly, he was not allowed to "effectively [] insert[] his own view of the [witnesses'] credibility for that of the jurors, thereby usurping their role." Lumpkin, 192 F.3d at 289.

Indeed, it is difficult to see how it could possibly be prejudicial to provide scientifically robust evidence that seeks to correct misguided intuitions and thereby prevent jurors from making common errors in judgment simply by giving them more accurate information about issues directly relevant to the case. The court's restricted approach, which presented little risk of unfair, targeted, and prejudicial attacks on specific witnesses, maximizes the important values that underlie our legal system's reliance on criminal trials, including the role the jury plays as a factfinder to be trusted and a defendant's right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. Amend VI.

45

### III. TIMELINESS

Smith contended that the court should not reach the merits of the government's motion to exclude Dr. Fulero's testimony, because that motion was untimely under this court's order on December 7, 2007.  The order addressed the government's earlier motion to exclude expert testimony and its alternative motion for a _Daubert_ hearing.  The motion to exclude expert testimony was temporarily denied.  The court "further ORDERED that the alternative motion for _Daubert_ hearing is denied with leave to either party to renew the request by no later than February 1, 2008."  _Id_.

Failure to comply with a court's deadlines is a serious matter, and when it happens a court has a wide range of sanctions it may issue, including refusing to consider a belated motion. _See_ _Macsenti v. Becker_, 237 F.3d 1223, 1234 (10th Cir. 2001) ("we find no plain error in the rejection by the trial judge of the belated _Daubert_ objection."); _see generally_ Fed. R. Crim. P. 26(f) ("If a party or party's attorney fails to obey a

46

scheduling or pretrial order...the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B),(C),(D)."

The government countered that it is immaterial that there is the clause in this court's order stating that the alternative motion for a <u>Daubert</u> hearing was due on February 1 because the government did not request a <u>Daubert</u> hearing.  It was instead seeking to exclude the expert testimony without such a hearing.

It was unnecessary to resolve whether the court should have precluded Fulero's testimony because even if the government's motion was tardy, refusing to address the motion would not have been he proper remedy in this instance.  The Eleventh Circuit has articulated three factors to consider when determining whether to strike a document: the importance of the document or testimony; the reasons the deadline was traversed; and the prejudice faced by opposing party.  <u>Bearint ex. Rel. Bearint v. Dorrell Juvenile Group, Inc.</u>, 389 F.3d 1339, 1353 (11th

Cir. 2004) (applying these factors to determine whether to exclude a witness not listed in a pretrial order). The important nature of the issue presented in the government's motion has been already been acknowledged. More importantly, Smith was not prejudiced by this court's decision to consider the government's motion because the court denied the motion.

Another reason Smith was not prejudiced is because, even if the government had not filed a motion to preclude Fulero's testimony, this court would have undertaken a Daubert inquiry sua sponte. In City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 563 (11th Cir. 1998), the Eleventh Circuit affirmed, in part, a district court's sua sponte exclusion of expert testimony.[6] Here,

_____

6. Other courts addressing the issue have also determined that district courts may undertake a Daubert hearing on their own motion. Miller v. Baker Implement Co., 439 F.3d 407, 413 (8th Cir. 2006) ("we conclude that it did not abuse its discretion by undertaking a sua sponte Daubert analysis in dealing."); Kirstein v. Parks Corp., 159 F.3d 1065, 1067 (7th Cir. 1998) ("We have not required that the Daubert inquiry take any specific form and have, in fact, upheld a judge's sua sponte (continued...)

considering the importance of the eyewitness testimony in this case and the potential danger of unrestricted or unreliable expert testimony about these witnesses, this issue called out for a <u>Daubert</u> inquiry.

***

In conclusion, it should not be overlooked that, in issuing this opinion today, the court has the benefit of hindsight.  The court has now been able to see just how the admission of the eyewitness-identification expert testimony actually played out at Smith's trial.

First, the admission of the testimony did not pose any unusual or especially difficult problems for the parties or the court.  Each side was able to examine the expert adequately and, using the expert's testimony, present to the jury in an orderly way a picture of the

---

6(...continued)
consideration of the admissibility of expert testimony.").

•evidence that was more fully developed and reliable than it would otherwise have been.   Second, the jury, in assessing the evidence and reaching its verdict, had important and practical information that it would otherwise not have been to use in the assessing the evidence and engaging in fair, thorough, informed, and rigorous decisionmaking.  Finally, as a result, not only did Smith receive a fairer trial, but the jury, the court, and the entire judicial system can rest much more comfortably that Smith's robbery conviction is a reliable outcome because the conviction is much less likely to have been infected by the flaws uncovered by recent empirical studies on eyewitness-identifications.  While the court cannot, and does not, say that the admission of eyewitness-identification expert testimony is essential to a fair trial, its admission can, most certainly, be quite helpful in some cases.

DONE, this the 26th day of May, 2009.

___/s/ Myron H. Thompson___
UNITED STATES DISTRICT JUDGE